UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| ROY MESTAS, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | |
| v. | ) | Case No. 17-8092 |
| | ) | |
| TOWN OF EVANSVILLE, | ) | |
| WYOMING, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

On Appeal from the United States District Court
for the District of Wyoming

The Honorable Nancy D. Freudenthal
District Court Judge

D.C. No. 17-CV-00017-NDF

**APPELLANT ROY MESTAS'S OPENING BRIEF**

Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Tel: (307) 760-6258
E-mail: mlhayes@wyoming.com
Attorney for Roy Mestas

ORAL ARGUMENT IS REQUESTED
A NATIVE PDF DOCUMENT IS ATTACHED

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES    …………………………………… iv

TABLE OF AUTHORITIES ……………………………………………….. v

JURISDICTIONAL STATEMENT ………………………………………….1

STATEMENT OF THE ISSUES ……………………………………........ 1

STATEMENT OF THE CASE AND FACTS ………………….………………1

SUMMARY OF THE ARGUMENT………………………………………… 20

ARGUMENT    ………………………………………………………..21

    I. The undisputed facts and all reasonable inferences that may be drawn therefrom demonstrate that the Town of Evansville retaliated against Mr. Mestas for engaging in activities protected by the Americans with Disabilities Act. ……………………………………………………21

        A.    The Town moved for a summary judgment and the district court granted the motion and dismissed the ADA retaliation claim. ……………………………………………… 21

        B.    This Court reviews *de novo* a district court's grant of summary judgment, viewing all evidence and reasonable inferences therefrom in the light most favorable to Mr. Mestas ……….. 21

        C.    Mr. Mestas has produced sufficient evidence of retaliation by his supervisor to withstand a summary judgment on his ADA retaliation claim. ……………………………………. 22

            1. Mr. Mestas engaged in conduct protected by the ADA when he provided the Town with medical documentation that he was unable to work, when the Town granted him medical leave as a reasonable accommodation for his injury, when he complained to his supervisor about harassment, and when he requested reasonable accommodations for his medical condition including time off for a medical procedure, to use

his snow blower, and to be excused from shoveling
snow……………………………………………………    23

2.  After Mr. Mestas engaged in protected activity, he suffered a
tangible employment action when Brown terminated his
employment. He was subjected to additional adverse
employment actions when Supervisor Brown extended his
probation, threatened his continued employment, harassed
him, and selectively enforced workplace rules against
him………………………………………………………...29

3.  Supervisor Brown fired and harassed Mr. Mestas, adverse
employment actions that were so proximate to Mr. Mestas
participating in protected activities that retaliatory motive
can be inferred. ………………………………………….. 33

II.   Mr. Mestas has produced sufficient evidence of a tangible
employment action and a pervasively hostile work environment to
withstand a summary judgment on his Title VII claim…………….. 38

A.  The Town moved for a summary judgment on the Title VII claim
and the district court granted the motion……………………….. 38

B.  This Court reviews *de novo* a district court's grant of summary
judgment, viewing all evidence and reasonable inferences
therefrom in the light most favorable to Mr. Mestas…………… 38

C.  Supervisor Brown fired Mr. Mestas and subjected him to a
pervasively hostile environment with both race-based and race-
neutral harassment in violation of Title VII…………………….. 39

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ……………    46

CONCLUSION   …………………………………………………………    46

CERTIFICATE OF SERVICE……………………………………………47

CERTIFICATE OF COMPLIANCE......………………………………...  47

CERTIFICATE OF DIGITAL SUBMISSION……………………….......47

**APPENDIX**

     A.  Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment, November 21, 2017, attached hereto.

     B.  Volumes I-IV, including sealed Volume IV, filed herewith.

**STATEMENT OF RELATED CASES**

There are no related appeals.

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171 (10th Cir. 1999) . 22, 23, 30, 31, 36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………………………….. 39

*Barnett v. U.S. Air, Inc.,* 228 F.3d 1105 (9th Cir. 2000) …………………………26

*Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261 (10th Cir. 2015) ………. 22

*Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264 (4th Cir. 2015) ………….. 27

*Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998) ………………30, 32, 39, 43

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) …... 31

*Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6 (1st Cir. 2004) …………….. 24

*Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005) …………………….. 39, 42

*Cisneros v. Wilson*, 226 F.3d 1113 (10th Cir. 2000) ……………………………. 27

*Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544 (10th Cir. 1988) …………. 40

*Davis v. U.S. Postal Serv.*, 142 F.3d 1334 (10th Cir. 1998) ……………………. 41

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ……………………………… 40

*Doebele v. Sprint/United Management Co.*, 342 F.3d 1117 (10th Cir. 2003) …… 36

*EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028 (10th Cir. 2011) …………………...24, 26

*EEOC v. Chrysler Grp., LLC*, WL 693642 (E.D. Wis. 2011) …………………... 32

*Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) ……………………..40

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)………………. 30, 32, 39, 41

*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016) ............... 21

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ...................................41

*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255 (10th Cir. 2009) .................21

*Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675 (10th Cir. 2007)....... 38-39, 41-42

*Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167 (10th Cir. 1996) ........27

*James v. Sears, Roebuck & Co.*, 21 F.3d 989 (10th Cir. 1994) ..................... 40

*Jeffries v. Kansas*, 147 F.3d 1220 (10th Cir. 1998) ......................................31

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494 (3d Cir.1997) ...........................22

*Kwan v. Andalex Grp.*, 737 F.3d 834 (2d Cir. 2013) ................................ 34

*Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226 (3d Cir. 2008) ............. 32

*McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917 (10th Cir. 2001) ....... 40, 41

*Mobley v. Miami Valley Hosp.*, 215 U.S. Aplt. App. LEXIS 3105 (6th Cir. 2015) 26

*O'Shea v. Yellow Tech. Services, Inc.*, 185 F.3d 1093 (10th Cir. 1999) ........ 40, 42

*Pac. Power & Light v. Parsons,* 692 P.2d 226 (Wyo.1984)........................... 4

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
     212 F.3d 493 (9th Cir. 2000) ...................................................................27

*Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257 (10th Cir. 1998) ....... 41

*Phillips v. TIC-The Indus. Co. of Wyo., Inc.,* 109 P.3d 520 (Wyo.2005) .......... 4

*Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1205 (10th Cir. 2007).... 21, 22, 30

*Rascon v. U.S. West Commc'ns, Inc.*, 143 F.3d 1324 (10th Cir. 1998) ............. 27

*Sandoval v. City of Boulder*, 388 F.3d 1312 (10th Cir. 2004) ....................... 38

*Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249 (10th Cir. 2001) ………...  22, 23

*Smith v. Difee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955 (10th Cir. 2002) …….. 27

*Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014) …………………………..23-24

*Spengler v. Worthington Cylinders*, 615 F.3d 481 (6th Cir. 2010)………………34

*Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106 (10th Cir. 1999) ………………………27

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) …………………26

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)………………33-34

*Vance v. Ball State University,* 133 S. Ct. 2434 (2013)…………………………. 32

*Watkins v. State ex Rel Wyo. Med. Comm'n*, 250 P.3d 1082 (Wyo. 2011) ………. 4

*Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ………………24, 26

**Statutes**

18 U.S.C. § 3231……………………………………………….................... 1

28 U.S.C. § 1291……………………………………………….................... 1

42 U.S.C. § 2000e-2 …………………………………………………............2

42 U.S.C. § 2000-2(a)(1) …………………………………………….. 39

42 U.S.C. § 12112(a) and (b)(5) ……………………………………….2, 23

42 U.S.C. § 12203(a) …………………………………………………… 22

42 U.S.C. § 12203(b) …………………………………………………… 22

**Other**

29 C.F.R. 1630.2(o)(3) …………………………………………………………25

9 LEX K. LARSON, EMPLOYMENT DISCRIMINATION (2d ed. 2014)….. 24

EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship
Under the Americans with Disabilities Act, 1999 WL 33305876 (Mar. 1,1999). 26

EEOC Enforcement Guidance on Retaliation and Related Issues,
     August 25, 2016 ……………………………………………………….. 31

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231.  This Court has jurisdiction over the appeal of this case pursuant to 28 U.S.C. § 1291.  This is an appeal of the district court's final order granting summary judgment on November 21, 2017, and dismissing Mr. Mestas's claims of discrimination under both Title VII and the Americans with Disabilities Act.  Mr. Mestas filed a timely Notice of Appeal on December 6, 2017.  The district court clerk certified that for purposes of this appeal, the record was complete on February 20, 2018.

## STATEMENT OF THE ISSUES

ISSUE ONE:      Did the undisputed facts and all reasonable inferences that may be drawn therefrom demonstrate that the Town of Evansville retaliated against Mr. Mestas for engaging in protected activities under the Americans with Disabilities Act?

ISSUE TWO:      Did the undisputed facts and all reasonable inferences that may be drawn therefrom demonstrate that Supervisor Brown's discriminatory discharge and pervasive use of racial epithets and derogatory comments violated Title VII?

## STATEMENT OF THE CASE AND FACTS

Mr. Mestas filed an Amended Complaint in which he alleged that his supervisor, Dale Brown, had discriminated against him during his employment

with the Town of Evansville (the Town). He asserted three claims for relief: national origin discrimination for a discriminatory discharge and creating a hostile work environment, in violation of Title VII, 42 U.S.C. § 2000e-2; hostile work environment discrimination based on his record of a disability, in violation of the Americans with Disabilities Act and amendments thereto (the ADA), 42 U.S.C. § 12112(a) and (b)(5); and retaliation for engaging in protected activity, in violation of the ADA, 42 U.S.C. § 12203(b). (Aplt. App. at 46-60). At the conclusion of discovery, Mr. Mestas moved for entry of a partial summary judgment finding that he had a record of a disability for purposes of his ADA hostile work environment claim and that his medical leave to recover from a workplace injury was protected activity under the ADA for purposes of his retaliation claim. (Aplt. App. at 79-80). The Town moved for a summary judgment on all three of Mr. Mestas's claims. (Aplt. App. at 103-04). After a hearing, the district court granted the Town's summary judgment motion and denied Mr. Mestas's motion for partial summary judgment. (Aplt. App. at 704-720).

The following evidence was presented at summary judgment: Mr. Mestas began working as a sanitation truck driver for the Town of Evansville on September 12, 2012. According to the Town of Evansville's Employee Handbook, Mr. Mestas was required to serve a six-month probationary period as an at-will employee. (Aplt. App. at 157 and 182). His job location was the Public Works

2

maintenance garage, which is in a physically separate location from the Evansville Town Hall that houses the municipal offices. (Aplt. App. at 157).

On November 26, 2012, Mr. Mestas slipped on the ice at work. Co-employee Dan Adcock found him lying on the ground. Mr. Adcock informed their supervisor, Dale Brown, that Mr. Mestas had fallen on the ice. (Aplt. App. at 432). That same day, Mr. Mestas reported to Supervisor Brown, that 'I fell on the ice and hurt my back,' (Aplt. App. at 524:2-3) and he submitted a report of injury to the Wyoming Division of Workers' Compensation. (Aplt. App. at 96 and 98-99). In that report, Mr. Mestas described his accident and explained that he had injured his wrist and lower back. The Town Clerk, Janelle Underwood, signed the injury report.

Several days later, Mr. Mestas provided the Town with documentation from his physician that he was unable to work "until further notice." (Aplt. App. at 48 ¶13 and 67 ¶13). Supervisor Brown was aware that Mr. Mestas had provided the Town with medical documentation of his inability to work. (Aplt. App. at 525-26). Mr. Mestas's back injury was so painful that he could not work or perform many other activities without significant pain. (Aplt. App. at 95). After Mr. Mestas injured his back on November 26, 2012, he was placed on medical leave until January 14, 2013. (Aplt. App. at 48 ¶14, 67 ¶14, 78 ¶¶7 and 9, and 96 ¶5). While

on medical leave, Mr. Mestas received medical treatment for his back injury from Dr. Demian Yakel, including physical therapy. (Aplt. App. at 96 ¶6 and 778-866).

Wyoming's Workers' Compensation Division determined that Mr. Mestas's back injury was compensable and paid all medical bills associated with his back injury from November 28, 2012 to January 14, 2013.  (Aplt. App. at 96 ¶8). In addition, the Division awarded him Temporary Total Disability (TTD) benefits to offset his loss of income while he was on unpaid medical leave from November 26, 2012 to January 14, 2013.[1]  (Aplt. App. at 96 ¶9 and 100). On his TTD application, when asked "Have you asked your employer for suitable duties that accommodate your physical condition?" Mr. Mestas checked the box for "Yes," indicating that he had some discussion with the Town regarding an accommodation of his medical condition after providing documentation from his physician.  Also, on the TTD application, Dr. Yakel indicated that the expected duration of the temporary total disability would be from November 26, 2012 to January 15, 2013. (Aplt. App. at 100).

---

[1]The "'"purpose of temporary total disability benefits is 'to provide income for an employee during the time of healing from his injury and until his condition has stabilized.'"" *Watkins v. State ex Rel Wyo. Med. Comm'n*, 250 P.3d 1082, 1092 (Wyo. 2011) (quoting *Phillips v. TIC-The Indus. Co. of Wyo., Inc.,* 109 P.3d 520, 532 (Wyo.2005) and *Pac. Power & Light v. Parsons,* 692 P.2d 226, 228 (Wyo.1984)).

Mr. Mestas also completed an Initial Accident and Health Claim form for the Town in which he stated that he was unable to work after his November 26, 2012 injury.  That form required information about and verification of his injury by his physician, who indicated that Mr. Mestas would be "totally disabled" for a period of approximately 12 weeks. (Aplt. App. at 96 ¶10 and 101). The Town Clerk signed that claim form on behalf of the Town. (Aplt. App. at 101).

The Town held Mr. Mestas's job open for him, which allowed him to receive treatment, recover and return to work on January 14, 2013.  He resumed his position as a sanitation truck driver at the same pay, benefits and job duties. (Aplt. App. at 107-08).  Mr. Mestas did not qualify for unpaid leave under the Family and Medical Leave Act because according to the Town's Employee Handbook, only those who had been employed for more than one full year or had worked at least 1,250 hours were eligible for FMLA unpaid leave.  (Aplt. App. at 239).  Thus, his only option for unpaid leave from work for his injury was under the ADA.

When Mr. Mestas returned to work, his supervisor, Dale Brown, informed him that he was extending Mr. Mestas's six-month probationary period through May 24, 2013, "because of the extended lost work time due to your injury on November 26, 2012." (Aplt. App. at 6, 172-73 ¶¶ 3, and 286).  When Supervisor Brown presented Mr. Mestas with the memo extending his probationary period,

Brown told Mr. Mestas that he would 'have to let him go' if he did not sign the

document. Given the obvious threat, Mr. Mestas signed the document. (Aplt. App.

at 173).

From that day until Supervisor Brown fired him three months later, Brown

subjected Mr. Mestas to harsh and condescending treatment more frequently and

more severely than other employees. Three of Mr. Mestas's co-employees

witnessed Brown's retaliatory conduct. Eric Reyna, Ron Emond, and Dan Adcock

all testified that after Mr. Mestas returned from medical leave, Supervisor Brown

treated him much more harshly than before his leave, including that Brown "was

odious toward him." (Aplt. App. at 344-45 and 349) (Reyna testifying that after Mr.

Mestas got injured, Brown "targeted" Mr. Mestas, "singled him out" and was

"odious towards him"). Ron Emond testified that Brown 'beat up on [Mestas]

pretty good' and that Brown had told Emond that he would make Mestas's "life so

miserable that he would quit." (Aplt. App. at 385 and 388). Emond testified that

Brown "was always on [Mestas's] case with whatever he did after he came back

from the injury. Dale was pissed because he got hurt, plain and simple and that's it

in a nutshell." (Aplt. App. at 415:19-22. Dan Adcock testified that Supervisor

Brown treated Mr. Mestas differently after Mestas returned from injury leave,

specifically that Brown's treatment "progressively became worse. I'm not positive

the injury was the cause of it, but it certainly helped verify Dale's feelings that Roy

wasn't going to work there anymore.  So he just kept pushing even harder, as we talked about, with [sic] put him in positions to – very difficult to be successful, that sort of thing."  (Aplt. App. at 439:8-13 and 426-29) (Adcock providing multiple examples of Brown giving Mestas extra work after his injury so that he could not be successful in his job). Mr. Emond also testified that Supervisor Brown had yelled at him and Mr. Adcock when they completed one of Mr. Mestas's work orders.  Mr. Emond testified that he and Mr. Adcock weren't that busy so they delivered a trash bin as requested in a work order.  When they returned, Brown "stopped and yelled at us for doing his [Mestas's] job," which Mr. Emond found unusual and was something for which he had never before or since been reprimanded.  (Aplt. App. at 390).  Mr. Adcock testified that Supervisor Brown told Mr. Mestas to complete a certain task by noon.  Adcock knew that would be difficult to accomplish, so he did it himself and later was reprimanded for it by Brown, yet another example of how Brown made it impossible for Mr. Mestas to be successful in his job. (Aplt. App. at 439-440).

Supervisor Brown's retaliation took many forms, including expecting Mr. Mestas complete tasks without the assistance of co-workers, which was highly unusual in the small Public Works department. (Aplt. App. at 173 ¶¶ 8-9); (Aplt. App. at 344-45) (Reyna describing multiple situations when Public Works Department employees would help each other with job-related tasks).  Supervisor

Brown never issued a Town radio to Mr. Mestas so when he needed assistance, he used his personal cell phone to call Brown's Town-issued cell phone to request help.  Mr. Mestas's calls and phone messages to Brown requesting help always went unanswered.  (Aplt. App. at 173 ¶10).  *See also* (Aplt. App. at 349, Reyna testifying that Brown did not let Mr. Mestas have a radio and when Mestas called for help, Brown got upset and told Reyna "Don't help him.  He don't need help."). Supervisor Brown instructed co-workers not to assist Mr. Mestas and reprimanded them when they did. On one occasion, a large three-yard capacity trash bin fell into the back of Mr. Mestas's sanitation truck, which happens periodically and takes two or three employees to remove a trash bin of that size. Supervisor Brown told Emond, Adcock and Reyna not to help him and to let Mr. Mestas do it himself. (Aplt. App. at 173). *See also* (Aplt. App. at 350) (Reyna describing incident and Brown's instructions to let Mr. Mestas do it himself); (Aplt. App. at 385-86) (Emond describing incident and Brown's instructions to "Let him do it himself"); (Aplt. App. at 472-74) (Adcock describing incident and Brown's instructions to Mr. Mestas to get up on the truck and hook up the bin by himself, even though it was evident to everyone that Mestas was afraid of heights). Supervisor Brown was also hostile and condescending to Mr. Mestas during weekly staff meetings.  (Aplt. App. at 174 ¶15).

Because of Supervisor Brown's retaliatory behavior, Mr. Mestas began to write down and record some of his conversations with Brown, to document the harassment and Mr. Mestas's efforts to stop it. (Aplt. App. at 174 ¶16).  Mr. Mestas documented one such effort in an audio recording on February 21, 2013. Mr. Mestas broached the subject of Brown's hostility, as reflected in his opening comments:

> Well, I – I don't know if I've done something to piss you off or something. And I – I – man, I enjoy my job.  I love it here.  I – *I seem to upset you quite a bit, and I don't mean to*.

(Emphasis added). (Aplt. App. at 174 ¶17 and 271). Rather than acknowledge the, Supervisor Brown went on the offensive, telling Mr. Mestas that he doesn't "appreciate people arguing with me."  Brown told Mr. Mestas that he was 'still frustrated with your back,' and that although he knew Mr. Mestas had not injured his back intentionally, Mr. Mestas was not "bedridden" when he was out on "disability" and that he should have come to work anyway to perform administrative light-duty work.  (Aplt. App. at 272-73). Mr. Mestas reminded Mr. Brown that following his injury, Brown had gotten mad when Mestas did suggest some alternate duties he might be able to perform, such as light duty work at the Town Hall; Brown had responded 'no you're not.  You don't work for the Town Hall.' (Aplt. App. at 274:4-11).  Brown accused Mr. Mestas of using his injury to call in sick after returning from medical leave and told him, "I have people outside

of our department asking me, 'Is this a pattern?,'" insinuating that Mr. Mestas was lazy and trying to avoid work.  (Aplt. App. at 274-75). Supervisor Brown said someone outside of the department had told him that he should terminate Mr. Mestas's employment if Mr. Mestas was unable to perform his job. (Aplt. App. at 275).

These comments were threatening to Mr. Mestas, an at-will employee who was engaging in protected activity by complaining to his supervisor about retaliation and harassment.  (Aplt. App. at 175 ¶ 21). Supervisor Brown continued to accuse Mr. Mestas of being argumentative, (Aplt. App. at 271, 281-82), for which Mr. Mestas apologized profusely, multiple times, and explained that he never intended to be argumentative. (Aplt. App. at 282).

During this conversation, Supervisor Brown never suggested that Mr. Mestas could or should file a grievance, contact the mayor or any other Town official, or contact anyone at the Town Hall with his concerns.  Mr. Mestas believed, based on that conversation, that if he got injured or sick one more time, Brown would fire him.  (Aplt. App. at 175 ¶21). And although Mr. Mestas had tried to address the retaliation directly with the Town through his supervisor, the discrimination never abated. The following day, Brown called Mr. Mestas a "stupid beaner."  (Aplt. App. at 328). Mr. Mestas would frequently come home upset and complain to his wife that Brown called him stupid beaner, was

condescending, would not get Mr. Mestas any help when he requested it, instructed

co-workers not to help him and yelled at those who did.  (Aplt. App. at 175 ¶25

and 667:12-17).

Throughout his employment and particularly after returning from medical

leave, Mr. Mestas heard Supervisor Brown use the words "stupid beaner," "dumb

Mexican," "beaner," and make other derogatory comments about "Mexicans" and

other minority groups on multiple occasions, usually in the Public Works

maintenance garage office and often in the presence of co-employees.  These were

general derogatory comments, references and jokes about Hispanics.  (Aplt. App.

at 176-62 ¶26).  In addition, before and sometimes during weekly morning safety

meetings and in the presence of other Public Works employees, Brown and other

employees would joke about Hispanics or other ethnic and racial minority groups.

(Aplt. App. at 393-94).  Mr. Mestas personally heard Brown make derogatory

comments about Hispanics on at least six occasions, if not more.  (Aplt. App. at

176 ¶¶27-28).

Mr. Mestas kept a memo pad in his shirt pocket in which he documented

job-related information, such as addresses where trash bins needed to be repaired.

On February 22, 2013, and March 27, 2013, Mr. Mestas documented in his memo

pad that Supervisor Brown had made "stupid beaner" remarks. (Aplt. App. at 176

¶¶29-30, and 328). On at least two separate occasions, Mr. Mestas complained

directly to Supervisor Brown that his derogatory comments about Hispanics were offensive.  (Aplt. App. at 176 ¶31). Mr. Mestas documented one of those occasions in his memo pad as follows: "Asked Dale to stop using Beaner remarks!!! 4-1-13." (Aplt. App. at 176 ¶32 and 329). Supervisor Brown responded by stating that his (Brown's) wife is a "Mexican" and he says stuff like that to her all the time.  (Aplt. App. at 177 ¶33).

After Mr. Mestas complained about the derogatory comments, Supervisor Brown never suggested that he could or should file a grievance, contact the mayor or any other Town official with his concerns.  (Aplt. App. at 177 ¶34).  In fact, the Town had no procedure for employees to make complaints of harassment, other than for sexual harassment.  (Aplt. App. at 218-220). The Town only had a general grievance procedure that did not mention workplace harassment or discrimination. The grievance procedure was expressly limited to use only by permanent employees, not probationary employees like Mr. Mestas, whose probationary status had just been extended by Brown. (Aplt. App. at 177 ¶¶35-37 and 244-47). The Town's grievance procedure expressly provided that "[i]f a **permanent employee** has a grievance or wishes to complain, every effort should be made to resolve the problem by informal means at the lowest possible level, i.e., discussing the problem with the department head." (Aplt. App. at 244) (emphasis added).  Mr. Mestas had tried to resolve the problem informally with his department head, Dale

12

Brown, even though Mestas was not eligible to use the grievance procedure.

Mr. Mestas's three co-workers corroborated the hostile work environment.

Eric Reyna, the only other Hispanic employee in the Public Works department,

testified that Supervisor Brown would make comments to him such as "not bad for

a Mexican," comments that Reyna would relay to Mr. Mestas. (Aplt. App. at 351).

Mr. Reyna also described another incident when Brown had made a derogatory

comment to Reyna and Mestas about Mexicans, for which Brown later apologized

privately to Mr. Reyna. Mr. Reyna recalled the incident as "pretty upsetting."

(Aplt. App. at 351). Mr. Reyna explained that he told Mr. Mestas that Supervisor

Brown had called him (Reyna) to apologize for the derogatory comment:

> . . . the reason why I mentioned it to Roy was because it was said in the
> presence of both of us. And I remember looking at Roy, and he was upset
> about it, through his facial expressions. And I wasn't too happy about it
> either. First thing in the morning, something you don't want to hear. And
> so I did let him know that, yeah, Dale had apologized to me to see if maybe
> he received an apology as well.

(Aplt. App. at 351). *See also* (Aplt. App. at 694) (Mestas describing when he and

Reyna were going out on a job together, Brown told them, "I don't need you

beaners going together"). Reyna also testified that both he and Mr. Mestas were in

Brown's presence when Brown used terms like "beaner" and "Mexican," recalling

two specific times when Mr. Mestas was not happy about it. (Aplt. App. at 351-

52). Finally, Mr. Reyna recalled Supervisor Brown using the term "beaner" one

morning in the crew room in the presence of Mr. Mestas and other employees.  Mr.

Reyna never complained directly to Dale Brown or the Town's mayor about

Brown because he was afraid of losing his job and the likelihood that "there would

be repercussions in some way." (Aplt. App. at 348 and 353).  Mr. Reyna even

participated in some of the jokes (Aplt. App. at 363), perhaps in a dehumanizing

and sycophantic attempt to fit in with Brown. Mr. Reyna knew that the Town's

mayor and Supervisor Brown were close friends and Brown led his subordinates to

believe that the mayor would always defend him, so complaining would be futile

and would likely provoke retaliation from Brown.  (Aplt. App. at 348 and 353).

Mr. Emond testified that he heard Supervisor Brown refer to Mr. Mestas as a

"stupid beaner" sometime after Mr. Mestas returned from medical leave.  He also

testified that he heard Brown refer to someone as a "beaner" in a joking manner

and that he heard jokes at work that weren't only about "beaners." (Aplt. App. at

393-94).  Mr. Adcock testified that had heard Brown use the term "beaner" "many

times" outside of the workplace. He also heard Brown refer to his wife that way

and that Brown had once referred to an electrician as "Beaner Electric."  (Aplt.

App. at 442-43).

In early April of 2013, Mr. Mestas reinjured his back at work.  (Aplt. App. at

177-78 ¶¶38-39).  He never complained to Brown and never filed an injury report

because he was worried Brown would fire him.  (Aplt. App. at 178 ¶40).  Instead, he contacted his physician and scheduled a steroid injection for his back pain.  He was concerned he would be fired if he could not perform his job duties so he continued working.  (Aplt. App. at 178 ¶41).

In another recorded conversation on April 11, 2013, Mr. Mestas again engaged in protected ADA activity when he informed Supervisor Brown that he would need a day off on April 18, 2013, because "they're going to do an injection in my back where that – that – remember I was talking to you about it a while back?  They wanted to do one today, but I told them I couldn't because I need a driver and stuff because of medicine they give you, I can't drive. . . . " Mr. Mestas explained: "I won't miss any work, only than the – the day for the – the injection. You want me to write it on the calendar?"  (Aplt. App. at 178 ¶42 and 338). Supervisor Brown granted his request for time off of work for the injection and had Mr. Mestas put it on the Public Works department calendar. (Aplt. App. at 178 ¶43 and 338).

On snowy days, most Public Works department employees were supposed to report to work by 7 a.m., to shovel snow at Town facilities. On Monday, April 15, 2013, Mr. Mestas reported early to work to assist with snow removal.  On that day, the Casper area was experiencing a late spring storm with heavy, wet snow. While

15

shoveling snow, Mr. Mestas asked Supervisor Brown if he could use his own snow

blower because of his back pain, another request for an ADA accommodation for a

medical condition. Mr. Mestas's house is only a few short blocks from the location

where he was shoveling snow. Supervisor Brown denied Mr. Mestas's request for

a snow blower and said, 'that's what I have Mexicans for, to do this work,' or

words to that effect.  (Aplt. App. at 178-79 ¶¶44-47).  Mr. Mestas completed his

snow shoveling duties that day, which contributed significantly to his back pain.

(Aplt. App. at 179 ¶48). *See also* (Aplt. App. at 392) (Mr. Emond recalling that

Mr. Mestas asked to use his snow blower to shovel snow because his back was

sore and Dale Brown refused and required Mr. Mestas to complete the shoveling

with the rest of the crew). On April 16, 2013, the Casper area continued to get wet,

heavy snowfall.  Mr. Mestas called into work that morning to ask Brown if he

could be excused from shoveling snow because he had reinjured his back, another

request for an accommodation.  Supervisor Brown hung up on him.  When he

called back, Supervisor Brown told him he did not 'want to hear my shit.'  (Aplt.

App. at 179 ¶49). On April 17, 2013, when Mr. Mestas reported to work,

Supervisor Brown terminated his employment because things 'were not working

out.'  He told Mr. Mestas to 'go take care of your back and whatever . . . .'  (Aplt.

App. at 179 ¶50).

Mr. Mestas may have been able to continue working beyond April 17, 2013, if Supervisor Brown had accommodated his requests to use his snow blower, be excused from shoveling snow or get assistance from co-workers when needed. However, after reinjuring his back and being required to shovel snow on April 15, 2013, his pain worsened significantly. (Aplt. App. at 180 ¶53). After his termination, Mr. Mestas applied for Social Security Disability Insurance (SSDI) benefits and underwent two surgeries. (Aplt. App. at 179 ¶51). He remained out of the workforce until December of 2014. (Aplt. App. at 179-180 ¶¶51 and 54).

Dale Brown denied Mr. Mestas's allegations of harassment and retaliation. He testified that he only used the term "beaner" once in the workplace and that was in Eric Reyna's presence. (Aplt. App. at 605-07 and 650). He testified that he never used the term "beaner" or "stupid beaner" in Mr. Mestas's presence or at work and that Mr. Mestas had never asked him to stop using beaner remarks. (Aplt. App. at 611-12). He denied ever referring to his wife as a beaner. (Aplt. App. at 608). He denied telling co-workers not to assist Mr. Mestas and had no recollection of the incident when he required Mr. Mestas get the large bin out of his sanitation truck without assistance. (Aplt. App. at 616-17). He denied telling Mr. Emond that he would make Mr. Mestas's life so miserable that he would quit. (Aplt. App. at 545). He testified that he was not always "politically correct" and that employees would tell ethnic jokes and he didn't stop them, which is not "PC."

17

(Aplt. App. at 609-10). He denied ever treating Mr. Mestas in an odious manner.

(Aplt. App. at 615-16).

Supervisor Brown testified that an older employee, Wilbur Yankey, did only

"limited" shoveling on snow days, even though he did not have a note from his

doctor that excused him from shoveling snow. (Aplt. App. at 598). Brown

described the department's snow shoveling policy as follows:

> There's a multitude of different tasks that we do from shoveling to
> sometimes we could use a snowblower – or, not a snowblower – a leaf
> blower if it's fine and powdery. Sometimes we used the John Deere tractor
> with the snow blade on it. Not everything is just dyed in the wool.
> Circumstance dictates what procedures we would use on a given time, heavy
> wet snow, light powdery snow, snowblower, shovels, brooms.

(Aplt. App. at 596-97). Despite having a flexible policy, Brown never engaged in

any interactive process with Mr. Mestas after Mr. Mestas asked to use a snow

blower or be excused from shoveling snow because of back pain. Supervisor

Brown testified that he would only have excused Mr. Mestas from shoveling snow

if Mestas had a medical excuse. (Aplt. App. at 598).

Brown also denied treating Mr. Mestas harshly at all. Instead, he claimed

that after returning from medical leave, Mr. Mestas lacked initiative, was

argumentative, was slow in his job duties and full of excuses, never had time to

assist co-workers, and had problems "interfacing" with co-employees because of

"antisocial" tendencies.  (Aplt. App. at 545 and 614-15).  Supervisor Brown also claimed that Mr. Mestas would disappear from the job site and when asked by Brown, no other employee knew his whereabouts. (Aplt. App. at 550-53). Supervisor Brown could not recall which employees had issues with Mr. Mestas, could not recall which employees he asked about Mestas's whereabouts, and generally could not fathom Mr. Mestas's discrimination claims. He testified that he did not even know that Mestas was Hispanic, despite his complexion and surname. (Aplt. App. at 651:6-7).

Mr. Mestas's co-employees, Mssrs. Reyna, Edmond and Adcock, all testified that they got along fine with Mr. Mestas, believed he was a hard worker who kept his sanitation truck clean and well maintained, had no complaints and heard no complaints from other employees about his job performance, never noticed him disappearing from the job site, were never asked by Brown where Mestas was, and felt Mr. Mestas was a "team player" who assisted them with job-related tasks when needed, as was the custom and practice in their department. (Aplt. App. at 348, 380-81, 388, and 428-31).

On the basis of this evidence, the district court granted the Town's motion for a summary judgment and dismissed the case with prejudice.  (Aplt. App. at 719-35).  This appeal followed.

## SUMMARY OF THE ARGUMENT

This case concerns a Hispanic employee who was injured at work and, after taking medical leave under the ADA, was subjected to retaliation and discrimination by his supervisor.  The district court dismissed his ADA retaliation and Title VII claims despite the existence of disputed facts regarding the pervasiveness of the hostile work environment and the fact that he had engaged in conduct protected by the ADA on multiple occasions.  His supervisor fired and harassed him shortly after he engaged in ADA protected activities, from which a retaliatory motive can be inferred.

This case is not appropriate for summary judgment on either Mr. Mestas's ADA retaliation claim or his Title VII claim.  The pervasiveness inquiry under Title VII is quintessentially a question of fact.  Here, there are significant issues of disputed fact regarding Supervisor Brown's creation of a hostile work environment through both race-based and race-neutral harassment that should be resolved by a jury.  A jury should also decide whether Mr. Mestas can prove that his national origin was a motivating factor in Supervisor Brown's decision to fire him.  As argued below, Mr. Mestas has produced sufficient evidence to support his ADA retaliation and Title VII claims to survive a summary judgment and allow his case to proceed to trial.

# ARGUMENT

**I.    The undisputed facts and all reasonable inferences that may be drawn therefrom demonstrate that the Town of Evansville retaliated against Mr. Mestas for engaging in protected activities under the Americans with Disabilities Act.**

**A.    The Town moved for a summary judgment and the district court granted the motion and dismissed the ADA retaliation claim.**

The Town moved for a summary judgment on Mr. Mestas's retaliation claim under the ADA.  (Aplt. App. at 103-104).  The district court granted the Town's motion and dismissed Mr. Mestas's ADA retaliation claim, with prejudice. (Aplt. App. at 732-34).

**B.    This Court reviews *de novo* a district court's grant of summary judgment, viewing all evidence and reasonable inferences therefrom in the light most favorable to Mr. Mestas.**

The Tenth Circuit reviews *de novo* a district court's grant of summary judgment.  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016) (citing *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1205 (10th Cir. 2007)).

"In reviewing the record, we view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* "Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 (10th Cir. 2009). "A fact is material only if it might affect the outcome of the suit under the

governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1265-66 (10th Cir. 2015) (citations and quotation marks omitted).

*Id.*

### C.    Mr. Mestas has produced sufficient evidence of retaliation by his supervisor to withstand a summary judgment on his ADA retaliation claim.

The ADA's retaliation statute provides in pertinent part that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with *any individual* in the exercise or enjoyment of, *or on account of his or her having exercised or enjoyed*, . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b) (emphasis added).  To prosecute an ADA retaliation claim, "'a plaintiff need not show that []he suffers from an actual disability.'"  *Foster*, 830 F.3d 1178, 1186 (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).  "Rather, on this point, the plaintiff need only show that he had a reasonable, goodfaith belief that he was disabled" and needed an accommodation at work.  *Id.* (citing *Selenke*, 248 F.3d at 1264 and *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir.1997) ("By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA . . . ." (quoting 42 U.S.C. § 12203(a)).[2]

---

[2] The district court dismissed Mr. Mestas's retaliation claim, in part because on the

To establish retaliation under the ADA, a plaintiff must prove that:

1. he engaged in conduct protected under the ADA;
2. he was subjected to an adverse employment action after the protected conduct occurred;
3. the defendant retaliated against him because of his conduct protected by the ADA.

*Foster*, 830 F.3d 1178, 1187 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).  As demonstrated below, Mr. Mestas has produced sufficient evidence to support each of these elements of his ADA retaliation claim.

**1. Mr. Mestas engaged in conduct protected by the ADA when he provided the Town with medical documentation that he was unable to work, when the Town granted him medical leave as a reasonable accommodation for his injury, when he complained to his supervisor about harassment, and when he requested reasonable accommodations for his medical condition including time off for a medical procedure, to use his snow blower, and to be excused from shoveling snow.**

The first element of Mr. Mestas's *prima facie* case requires him to show that he engaged in conduct protected by the ADA.  Individuals who engage in protected activity include those whose protected activity relates to any provision of the ADA. 42 U.S.C. § 12203(a).  The act of making a good faith request for a reasonable accommodation is protected activity under the ADA. *Selenke v. Medical Imaging of Colorado,* 248 F.3d 1249, 1265 (10th Cir. 2001); *Solomon v. Vilsack*, 763 F.3d 1,

---

date he was terminated, he was not a qualified individual with a disability under the ADA. (Aplt. App. at 254).  That conclusion was legally erroneous.

15 n.6 (D.C. Cir. 2014) (citing authority for this majority rule in the circuit courts);

9 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 154.10, at p. 154-

105 & n.25 (2d ed. 2014) ("In addition to the activities specifically protected by

the statute, courts have found that requesting reasonable accommodation is a

protected activity.").  Even a simple request for an accommodation of a medical

condition, without using any specific words or ever referring to the ADA,

constitutes protected activity:

> For an ADA retaliation claim, a request for accommodation is adequate if it is 'sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004) (quotation marks omitted); *see EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (relying on *Calero-Cerezo* ). "Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or her disability." *C.R. Eng.*, 644 F.3d at 1049 (quotation marks and emphasis omitted) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)); *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) ("An employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment **due to a medical condition**." (quotation marks omitted)).

*Foster*, 830 F.3d 1178, 1188 (emphasis added).

In *Foster*, this Court reversed entry of a summary judgment on the plaintiff's

ADA retaliation claims.  There, the employee injured his neck at work when he

turned his head and heard a "pop."  When his pain continued, Mr. Foster saw a

doctor and submitted a return to work form to his employer, indicating he would

need two days off from work.  He received additional medical attention because of persistent pain and even believed that he might need surgery, although his physician's notes indicated otherwise and a medical appointment was scheduled for April 4 to discuss his "treatment options."  *Foster*, 830 F.2d at 1182. On April 3, Mr. Foster told his employer that he 'needed to meet with his doctor to schedule surgery.' This Court determined that "viewing the evidence in the light most favorable to Foster, a reasonable jury could interpret Foster's comments at the April 3 meeting as an adequate request for accommodation--one direct and specific enough to put Mountain Coal on notice that he was requesting an accommodation for his neck injury. Therefore, summary judgment on this issue is inappropriate." *Id*. at 1188.  Mr. Foster's request for time off to see his physician triggered the "employer's duty to provide a reasonable accommodation or participate in the interactive process of finding a reasonable accommodation." *Foster*, 830 F.3d 1178, 1188. *See* 29 C.F.R. 1630.2(o)(3) (describing the "interactive process" for employers to engage in with an employee who requests an accommodation for a medical condition). This Court held that Mr. Foster's request was conduct protected by the ADA because it gave his employer notice that he needed an accommodation for his medical condition.  *Foster*, 830 F.3d at 1190.

This Court has previously held that an employee need only inform his employer of the need for an adjustment or change at work because of a medical

condition to constitute a request for a reasonable accommodation. In *EEOC v. C.R. Engl., Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011), this Court reasoned that

> Although the notice or request "does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'" it "nonetheless must make clear that the employee wants assistance *for his or her disability.*" *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 313 (3d Cir.1999) (emphasis added). That is, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id.; see Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1089 (9th Cir.2002) ("An employee is not required to use any particular language when requesting an accommodation but need only 'inform the employer of the need for an adjustment due to a medical condition.'" (quoting *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1114 n. 5 (9th Cir.2000) (en banc), *vacated on other grounds by* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002))); *see also* Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 1999 WL 33305876, at *4 Mar. 1,1999) ("When an individual decides to request accommodation, **the individual ... must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition.** To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'").

(Emphasis added). *See also Mobley v. Miami Valley Hosp.*, 215 U.S. Aplt. App. LEXIS 3105 (6th Cir. 2015) (unpublished) (where the employee provided a doctor's note with medical restrictions requiring a job change, that was enough to put the employer on notice of a need for accommodation). Thus, requesting an accommodation at work because of a known medical condition constitutes protected activity under the ADA.

This Court has also repeatedly held that taking medical leave to receive treatment for or to recover from an injury is conduct protected by the ADA. *Foster*,

830 F.3d 1178, 1187; *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000);

*Smith v. Difee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002);

*Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1333-34 (10th Cir.

1998); *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir.

1996); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999).  Thus,

once an employee informs his employer of the need for a reasonable

accommodation for a medical condition, medical leave to receive treatment is

protected activity.

Other examples of protected activity include complaining about unlawful

discrimination to a supervisor.  *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d

264, 282 (4th Cir. 2015) (en banc) (holding that "an employee is protected from

retaliation when she opposes a hostile work environment that, although not fully

formed, is in progress.").  Informal as well as formal complaints or demands are

protected activities.  *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212

F.3d 493, 506 (9th Cir. 2000) (Title VII retaliation case).

Mr. Mestas informed his supervisor that he had injured his back. He

completed an injury report and received workers' compensation benefits, including

medical and TTD wage loss benefits, from November 26, 2012 to January 14,

2013.  He provided the Town with medical documentation that he was 'unable to

work until further notice.'  That note was sufficient to trigger the Town's duty to

participate in the interactive process of finding a reasonable accommodation for him. After some discussion with his supervisor about possible light duty work at the Town Hall and as evidenced in his TTD application, the Town accommodated Mr. Mestas by placing him on unpaid medical leave and holding his job open until he returned to work on January 14, 2013, to the same pay, benefits and job duties. Because Mr. Mestas was ineligible for FMLA leave under the terms of the Town's Employee Handbook, the only other option for unpaid medical leave was a reasonable accommodation under the ADA.

Mr. Mestas did not just "take" ADA leave as a reasonable accommodation without any notice or discussion with his employer, as the district court concluded. Viewing the facts in a light most favorable to Mr. Mestas, the Town granted him unpaid leave as a reasonable ADA accommodation after receiving medical documentation of his inability to work and after discussion with his supervisor about alternate light duty work.

After returning from medical leave, Mr. Mestas engaged in protected activity on several other occasions. In February of 2013, he attempted to resolve Brown's hostile treatment informally when he asked Brown if he had done something to upset him and attempted to work things out with Brown. That constituted protected activity -- complaining about harassment to a supervisor, in an attempt to end it. Mr. Mestas also engaged in protected activity on April 11,

2013, when he requested time off from work for a steroid injection for his back, an accommodation for a medical condition that Brown granted. On April 15, 2013, he asked to use a snow blower to shovel heavy, wet snow because he was experiencing back pain. That was another request for an accommodation that Supervisor Brown refused. Finally, on April 16, 2013, Mr. Mestas asked to be excused from shoveling snow, another request for an accommodation that Supervisor Brown refused to grant.

Mr. Mestas engaged in ADA protected conduct when he provided medical documentation to the Town of his back injury, when the Town granted him medical leave, when he complained to Brown about the harassment, and when he requested time off from work for a steroid injection, to use his snow blower and to be excused from shoveling snow. He has therefore produced sufficient evidence when, viewed in the light most favorable to him, satisfies the first element of his *prima facie* case for ADA retaliation.

**2. After Mr. Mestas engaged in protected activity, he suffered a tangible employment action when Brown terminated his employment. He was subjected to additional adverse employment actions when Supervisor Brown extended his probation, threatened his continued employment, harassed him, and selectively enforced workplace rules against him.**

The second element of Mr. Mestas's *prima facie* case requires him to show that he was subject to an adverse employment action after he engaged in protected conduct. A tangible employment action is a "significant change in employment

29

status," such as firing an employee. *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998). When an employee suffers a tangible employment action resulting from a direct supervisor's retaliation, the employer is strictly liable. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807-08. No affirmative defense is available to the employer in those cases. *Id.* Direct evidence that retaliation played a part in an employment decision is satisfied when the employee is terminated shortly after engaging in protected activity. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (the closer an adverse employment action is to the protected activity, the more likely it will support a showing of causation). *See also Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (retaliatory motive can be inferred from short time period between protected activity and adverse employment action).

Supervisor Brown fired Mr. Mestas on April 17, 2013, three short months after he returned from medical leave. During those three months, Mr. Mestas complained directly to Brown about his harassment and requested accommodations for his medical condition on April 11, 15 and 16, 2013. Brown's retaliatory motive can be inferred from the short time period between Mr. Mestas engaging in protected activity and his discharge, a tangible employment action for which the Town is strictly liable.

The ADA's anti-retaliation provision also makes it unlawful to take a an adverse employment action against an individual because of protected activity. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 69 (2006) (a "materially adverse action" is broadly construed and includes any employer action that "might well deter a reasonable employee from complaining about discrimination" or participating in protected activity).  This Court "liberally defines the phrase 'adverse employment action,'" and takes a "case-by-case approach in determining whether a given employment action is 'adverse.'" *Anderson*, 181 F.3d 1171, 1178 (quoting *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998). Examples of materially adverse actions include transferring an employee to a harder job within the same pay grade and suspending her without pay for 37 days even though the lost pay was later reimbursed, refusing to investigate "death threats" against an FBI agent, filing false criminal charges against a former employee, changing a working-parent's schedule, and excluding an employee from a weekly training lunch. *Burlington Northern*, 548 U.S. 53, 63, 69, and 71-73.  *See also* EEOC Enforcement Guidance on Retaliation and Related Issues, August 25, 2016, p. 36 (materially adverse employment action includes scrutinizing work more closely than that of other employees, without justification, and abusive verbal behavior that is reasonably likely to deter protected activity). Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard as a materially

adverse employment action even if it is not severe or pervasive. EEOC

Enforcement Guidance at 41 (citing *Martinelli v. Penn Millers Ins. Co.*, 269 F.

App'x 226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*, an employee

claiming "retaliation by workplace harassment" is "no longer required to show that

the harassment was severe or pervasive"); *EEOC v. Chrysler Grp., LLC*, WL

693642 at *8-11 (E.D. Wis. 2011) (holding that reasonable jury could conclude

employees were subjected to unlawful retaliation under *Burlington Northern*

standard when human resources supervisor verbally harassed them by screaming

and pounding his fists on the table while threatening termination if they filed

grievances)).

    In the absence of a tangible employment action and when there has instead

been only a materially adverse employment action, the employer may interpose an

affirmative defense to defeat liability by proving (a) that the employer exercised

reasonable care to prevent and correct promptly any discriminatory conduct, and

(b) the plaintiff unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to otherwise avoid harm.

*Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 764-65; *Vance v. Ball State

University,* 133 S. Ct. 2434 (2013).

    Here, the Town never attempted to prevent or promptly correct any

discriminatory harassment, even after Mr. Mestas reported it directly to Supervisor

Brown in February.  Therefore, the Town cannot meet the first prong of the

*Ellerth-Faragher* defense.  In addition, the Town had no corrective opportunities,

such as a harassment complaint process, for Mr. Mestas to use to report Brown's

retaliation.  Finally, even though the Town provided no opportunities for Mr.

Mestas to take advantage of any preventive or corrective opportunities, he did so

anyway by complaining directly to Brown, in an effort to avoid harm and to no

avail.

Viewing the evidence in the light most favorable to Mr. Mestas, Supervisor

Brown extended his probation, threatened his continued employment, harassed him

and fired him immediately after Mr. Mestas had engaged in protected activity.  Ms.

Mestas therefore has produced sufficient evidence to satisfy the second element of

his ADA retaliation claim.

### 3. Supervisor Brown fired and harassed Mr. Mestas, adverse employment actions that were so proximate to Mr. Mestas participating in protected activities that retaliatory motive can be inferred.

The third element of Mr. Mestas's ADA retaliation *prima facie* case requires

evidence that the Town retaliated against him because he engaged in protected

activity.  In ADA retaliation cases, the evidence supporting this element must show

that "but for" a retaliatory motive, the employer would not have taken the tangible

or adverse employment action. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct.

2517, 2534 (2013). The "but-for" causation standard does not require that

retaliation be the "sole cause" of the action; retaliation need only be "*a* but-for" cause of the materially adverse action for a plaintiff to prevail. *Nassar*, 133 S. Ct. at 2534*; see also Kwan v. Andalex Grp.*, 737 F.3d 834, 846 (2d Cir. 2013) ("'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of a retaliatory motive."). Evidence of selective enforcement of workplace rules or treating similarly situated employees who had not engaged in protected activity more favorably can support an inference that an employer's adverse action was motivated by retaliation. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 494–95 (6th Cir. 2010) (evidence showed that plaintiff, who was discharged after engaging in protected activity, was a valuable employee and that the rule pursuant to which he had been terminated was selectively enforced against him).

Supervisor Brown fired Mr. Mestas after he engaged protected activities, including providing medical documentation that he couldn't work, taking unpaid medical leave, complaining to Brown about his harassment, requesting time off on April 11, 2013 for a medical procedure, asking to use a snow blower on April 15, 2013, and asking to be excused from shoveling snow on April 16, 2013. Supervisor Brown fired him on April 17, 2013, and told him to 'go and take care of your back and whatever.' Firing Mr. Mestas was a tangible employment action for

which the Town is strictly liable.  It is undisputed that his discharge was so
proximate to multiple instances of protected activity that retaliatory motive can be
inferred.  Therefore, the Town is not entitled to a summary judgment as a matter of
law.

Viewing the facts in the light most favorable to Mr. Mestas, he also suffered
several materially adverse employment actions in the three months following his
return from protected medical leave.  Immediately on his return in mid-January,
Supervisor Brown informed him that he would be fired unless he agreed to extend
his probationary status. When Mr. Mestas complained to Brown in late February,
Brown threatened him by stating that he would be fired if he couldn't perform his
job duties and that taking any more sick leave would be another justification to
terminate his employment.  Brown harassed and retaliated against Mr. Mestas
when he 'beat up on Mr. Mestas pretty good,' was 'always on his case,' closely
scrutinized Mr. Mestas's work, isolated him from co-employees, put him in
situations where he could not succeed, deterred him from reporting his recurring
back pain for fear of being discharged, made his life miserable and selectively
enforced snow shoveling rules against him. Those actions affected the terms,
conditions and privileges of his employment, in violation of the ADA.

Brown's conduct was retaliatory because it would not have occurred but for
Mr. Mestas's participation in protected activity.  Reyna, Adcock and Emond all

testified that Brown's hostile treatment intensified significantly after Mr. Mestas

returned from medical leave. Moreover, Supervisor Brown's stated reasons for his

dissatisfaction with Mr. Mestas's job performance warranting his termination and

harassment are pretextual and support an inference of retaliation.  Brown

contended that Mr. Mestas was lazy, unmotivated, slow, argumentative, would

disappear from the job site and procure expensive items at the Town's expense

without authorization,[3] had "issues" with co-employees and "antisocial" tendencies.

These proffered reasons are unworthy of belief.  *Anderson v. Coors Brewing Co.*,

181 F.3d 1171, 1178; *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117

(10th Cir. 2003) (a plaintiff's prima facie case, plus evidence that the defendant's

reasons for the adverse action were pretextual, may be adequate to defeat a

summary judgment motion and the fact of pretext alone may support the inference

of discrimination). As of late February, Brown acknowledged that Mr. Mestas 'had

no rift' with any of his co-employees.  (Aplt. App. at 277:1-3).  Also, Brown's

complaints about Mr. Mestas's alleged poor job performance are disputed by Mr.

Mestas and his co-workers, all of whom testified that Mr. Mestas was a team-

player, worked hard, kept his truck clean and well-maintained, and that they got

---

[3]Supervisor Brown testified that after he returned to work following his medical
leave, Mr. Mestas made several expensive, unauthorized purchases that Mr. Brown
would later have to "sign off on."  (Aplt. App. at 556-57).  Despite reviewing all
receipts for items procured by Mr. Mestas during that time period, Brown was
unable to identify any that represented expensive, unauthorized or unapproved
purchases.  (Aplt. App. at Brown Depo., pp. 553-85).

along well with him and heard no complaints about him from other co-workers.  It was objectively obvious to those employees that Supervisor Brown was trying to drive him out of his job with hostile, retaliatory conduct.  Therefore, the facts and all reasonable inferences that may be drawn therefrom demonstrate that the Town is not entitled to a summary judgment as a matter of law on the ADA retaliation claim.

Mr. Mestas's receipt of SSDI benefits as of April 16, 2013, does not conflict with his ADA retaliation claim, which does not require a showing that Mr. Mestas was disabled or could perform the essential functions of his job. Furthermore, Mr. Mestas was subjected to harassment, retaliation and adverse employment actions that pre-dated his award of SSDI benefits as of April 16, 2013. Finally, Brown discharged him on April 17, 2013, one day after Mr. Mestas requested an accommodation for his medical condition, from which retaliation can be inferred. Mr. Mestas may have been able to continue working beyond April 16, 2013, if he had been accommodated by not having to shovel snow or being able to use a snow blower, rather than being driven to the point of a disabling back injury by his supervisor.

For these reasons, the Town is not entitled to a summary judgment on Mr. Mestas's ADA retaliation claim.  Viewing the evidence and all reasonable

inferences therefrom in the light most favorable to him, he has produced sufficient

evidence to support all three elements of his claim that should be resolved by a jury.

**II.    Mr. Mestas has produced sufficient evidence of a tangible employment action and a pervasively hostile work environment to withstand a summary judgment on his Title VII claim.**

**A. The Town moved for a summary judgment on the Title VII claim and the district court granted the motion.**

The Town moved for a summary judgment on Mr. Mestas's Title VII claim.

(Aplt. App. at 103-104). The district court granted the Town's motion and

dismissed Mr. Mestas's Title VII with prejudice. (Aplt. App. at 724-25).

**B. This Court reviews *de novo* a district court's grant of summary judgment, viewing all evidence and reasonable inferences therefrom in the light most favorable to Mr. Mestas.**

The Tenth Circuit reviews *de novo* a district court's grant of summary

judgment. *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).

To survive summary judgment on a claim alleging a racially hostile work

environment, the plaintiff "must show that a rational jury could find that the

workplace is permeated with discriminatory intimidation, ridicule, and insult, that

is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment," and that the victim "was

targeted for harassment because of [his] ... race[ ] or national origin." *Id.* (quoting

*Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (quotation

omitted); *see also Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). The

task of a court at the summary judgment stage is not to "weigh the evidence and

determine the truth of the matter," but to "decide only whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### C. Supervisor Brown fired Mr. Mestas and subjected him to a pervasively hostile environment with race-based and race-neutral harassment in violation of Title VII.

Title VII forbids employment discrimination on the basis of national origin,

making it unlawful for an employer to discriminate against any individual in a

protected class with respect to hiring and firing or the terms, conditions, or

privileges of employment. *Herrera*, 474 F.3d 675, 680; *Chavez*, 397 F.3d 826, 831;

42 U.S.C. § 2000-2(a)(1)).  Mr. Mestas alleged that Supervisor Brown

discriminated against him in violation of Title VII when Supervisor Brown

discharged him from his employment and subjected him to a pervasively hostile

work environment that affected the terms and conditions of his employment.

When a supervisor discharges an individual because of his national origin,

that is a tangible employment action for which the employer is strictly liable.

*Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (a tangible employment

action is a "significant change in employment status"); *Faragher*, *v. City of Boca

Raton*, 524 U.S. 775, 807-08 (1998).  No affirmative defense is available to the

employer in such cases. *Id.*  And when a plaintiff is discharged, he is not required

to prove that his national origin was the sole or exclusive motivating factor for the employer's decision to fire him. Instead, the plaintiff must prove only that his national origin was a motivating factor in that decision, meaning that it was a factor that made a difference in the employer's decision to discharge him. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (recognizing a plaintiff may prevail on a discrimination case even when more than one factor motivated the employer's employment decision); *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995); *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994); *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir. 1988).

An employer also can violate Title VII by affecting the terms and conditions of employment when a supervisor creates a severe or pervasively hostile work environment. *Herrera*, 474 F.3d 675, 680. The "'severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact.'" *Id*. (quoting *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 923 (10th Cir. 2001) (footnote omitted) and *O'Shea v. Yellow Tech. Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

Whether the working environment was hostile is determined by analyzing the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

40

work performance.'" *Faragher*, 524 U.S. 775, 787-88 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). A plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (discussing elements of a Title VII sexual harassment claim based on a hostile work environment theory) (citing *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)).

Mr. Mestas's allegations of racial insults, jokes and slurs are significantly more pervasive than those set forth in *Herrera*, wherein this Court reversed entry of a summary judgment for the employer. In *Herrera*, the plaintiff had a four-year employment history in Wyoming and enumerated five specific, discreet discriminatory comments made by his supervisor who was located in Texas. 474 F.3d 675, 691.  The court also found that other racially-neutral harassment, such as condescending and harsh treatment and comments made to other employees that were **occasionally** shared with the plaintiff, such as referring to him as "the Mexican" and "the fucking Mexican," presented a "close call" as to the pervasiveness of the harassment. 474 F.3d at 678-79 and 691-92, Judge Cassell dissenting.  But viewing the evidence in the light most favorable to Mr. Herrera, this Court concluded that he had "asserted sufficient evidence from which a jury

could find that his work environment was racially hostile. In particular, he has submitted sufficient evidence indicating that his workplace was pervasively discriminatory." *Herrera*, 474 F.3d at 680.

This Court reasoned that "'[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'" *Herrera*, 474 F.3d at 682, n.7 (quoting *Chavez*, 397 F.3d at 833) (addressing sexual harassment claim):[4]

> This is because what is important in a hostile environment claim is the *environment*, and [racially]-neutral harassment makes up an important part of the relevant work environment. Conduct that appears [racially]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior. Thus, when a plaintiff introduces evidence of both [race]-based and [race]-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct ... as the product of [racial] hostility, then it is for the fact finder to decide whether such an inference should be drawn. *Id.* (quotations, citation omitted); *see also McCowan,* 273 F.3d at 925–26; *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097, 1102 (10th Cir.1999). Further, the totality of the circumstances analysis in cases like the one before us obviates what would otherwise be the court's call in deciding how many racist comments constitute harassment or whether general profanity and vulgarity mixed with specific racial, ethnic, or sexual epithets equate to the sum of pervasiveness required .... Rather, by framing the evidence on *summary judgment* within the context of this particular workplace, we eliminate the suggestion that a certain number of comments is or is not actionable ... and leave the resolution to the trier of fact. *McCowan,* 273 F.3d at 926.

---

[4]In *Chavez*, the court determined that two comments made by a supervisor, in which he said the plaintiff was a member of a "clica," were not sufficiently pervasive to withstand entry of a summary judgment.  397 F.3d 826, 832.

*Id.* (quoting *Chavez*, 397 F.3d at 833). Thus, whether evidence of both neutral and race-based harassment establishes a pervasively hostile work environment, given the totality of the circumstances, is an issue that should be resolved by the jury, not by the court at summary judgment.

An employer is liable when a supervisor's conduct creates a hostile work environment for a plaintiff unless the employer can demonstrate that it is entitled to the *Faragher-Ellerth* defense.   That defense comprises two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. Based on the undisputed facts, the Town has no grounds on which to assert this affirmative defense.

Viewing the facts in the light most favorable to Mr. Mestas, there is sufficient evidence that his national origin was a motivating factor in his supervisor's decision to fire and harass him.  Mr. Mestas was employed for less than six months.  On at least six occasions during that time, Supervisor Brown called him a "beaner," a "stupid beaner," and a "dumb Mexican," vulgar terms whose only purpose is to humiliate and demean and hardly qualify as "offhand comments," according to the district court.  (Aplt. App. at 725). Also, contrary to

the district court's finding, Mr. Mestas did speak to a Town official about the racist comments: he complained twice, directly to Supervisor Brown, the Director of the Department of Public Works, whose knowledge is imputed to the Town. When he complained to his supervisor about his abusive conduct in February of 2013 and specifically about his use of racial epithets on April 1, 2013, Brown never attempted to correct, promptly or otherwise, the discrimination. These complaints only engendered more hostility, particularly when Brown claimed he would fire Mr. Mestas if he could not perform his job duties and insinuated that taking two days of sick leave equated to a "pattern" of avoiding work, implying that Mr. Mestas was a lazy Mexican. Finally, the Town had no grievance or complaint procedure for making a harassment or retaliation complaint that would allow the Town to assert the *Ellerth-Faragher* defense. Tellingly, Supervisor Brown never offered any preventive or corrective measures or told Mr. Mestas to speak with any Town official.[5]

Supervisor Brown subjected Mr. Mestas to both race-based and race-neutral harassment, including addressing him with racial epithets, making his life miserable, treating him in a condescending manner, isolating him, requiring him to complete tasks alone, scrutinizing his work more closely than his co-employees, and firing him. Co-workers testified that Brown's harassment intensified after Mr.

---

[5] Had Brown not extended Mr. Mestas's probation, he could have been eligible to use the general grievance procedure by April 1, 2013.

Mestas returned from injury leave and gave specific examples of Brown's hostile treatment and use of racial epithets. Mr. Mestas remembered vividly and wrote down specific dates when Supervisor Brown had called him a stupid beaner and when he told Brown to "stop with the Beaner remarks!" That was on April 1, 2013, just 16 days prior to his discharge.  Two days before he was fired and shortly after telling Brown he would need an injection for back pain, Supervisor Brown refused his request for an accommodation for his medical condition, specifically to use a snow blower.  Brown told him 'that's why I have Mexicans, to do this work."

It is for a jury to resolve, given the totality of the circumstances, whether firing Mr. Mestas and subjecting him to a hostile work environment was motivated by Mr. Mestas's national origin and actionable under Title VII. General profanity and vulgarity, mixed with racial epithets and retaliatory conduct obviates this Court's role to decide, at summary judgment, whether Mr. Mestas's working environment was pervasively hostile and whether his discharge was motivated, even in part, by his national origin.  There are genuine issues of material fact that require the jury's consideration and therefore, the Town is not entitled to judgment as a matter of law on Mr. Mestas's Title VII claim.

**STATEMENT OF COUNSEL AS TO ORAL ARGUMENT**

Because of the unique factual and legal issues presented in this appeal,
counsel believes oral argument will be helpful to this Court.

**CONCLUSION**

For the foregoing reasons, the district court's order dismissing Mr. Mestas's
ADA retaliation and Title VII hostile work environment claims at summary
judgment with prejudice should be reversed.  The case should be remanded to the
district court with directions to deny the Town's Motion for Summary Judgment
on the ADA retaliation claim and the Title VII hostile work environment claim and
to reinstate the case for trial on those two claims.

Respectfully submitted this 8th day of March, 2018.

s/ Megan L. Hayes

_____
Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY  82070
(307) 760-6258
E-mail: mlhayes@wyoming.com

Attorney for Roy Mestas

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of March, 2018, I deposited a true and correct copy of the foregoing **ROY MESTAS'S OPENING BRIEF,** by this Court's CM/ECF system and by United States mail, postage prepaid, addressed to:

Thomas Thompson
tthompson@wyomingattorneys.net


/s  Megan L. Hayes


## CERTIFICATE OF COMPLIANCE


As required by Fed. R. Aplt. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 11,343 words.  I relied upon Microsoft® Office Word 2017 SP2 to calculate the word count.  I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.


## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that pursuant to this Court's General Order dated March 18, 2009 that there are no required privacy redactions to be made to this document or its attachments, and that this document and its attachments have been scanned for viruses with Norton AntiVirus (Symantec Corporation) version 14.2.0.29 (updated on January 1, 2018) and are free of viruses.

s/   Megan L. Hayes