UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| ROY MESTAS, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | |
| v. | ) | Case Nos. 17-8092 |
| | ) | |
| TOWN OF EVANSVILLE, | ) | |
| WYOMING, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

_____

On Appeal from the United States District Court
for the District of Wyoming

The Honorable Nancy D. Freudenthal
District Court Judge

D.C. No. 17-CV-00017-NDF

_____

**APPELLANT'S APPENDIX VOLUME II**

_____

Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Tel: (307) 760-6258
E-mail: mlhayes@wyoming.com
Attorney for Roy Mestas

Mestas Declaration                                                                    Exhibit 4



1 ⌀. ~~⊠~~ 16X16X1
2 - 16X20X1
~~2~~ - ~~25X25X2~~
3  24X24X2

P/O #
42402
$441. 72

Mestas Employment 000003

000294

Mestas Declaration                                                          Exhibit 4





Mestas Declaration                                                    Exhibit 4









Mestas Declaration                                                    Exhibit 4

ASPENS  10-12-12

117 extra trash on ground
118 not out
106 not out
104 not out
101 extra trash left ~~~~~~~~~
149 not out
130 not out
139 not out
126 2 trash Bins
179 not out
181 not Out
180 Not out

Mestas Employment 000010

000301

Mestas Declaration                                                                    Exhibit 4



10-12-12

165 not out
167 not out
174 not out
176 not out
120 not out
196 not out
197 extra trash left
187 2 Bins?
190 Blocked By Car
89 Extra trash on ground
72 not out
58 not out

Mestas Employment 000011

000302



Mestas Declaration                                                          Exhibit 4

OVERFloW is not
Deing used
71 not out
78 not
139 not out
148 not out / No Bin ?
144 not out / No Bin?
145 extra trash on ground
80 not out
25 extra trash on groud too?
Colemen extra trash.
J.W. Blocked MME

Mestas Declaration                                                          Exhibit 4





N RAWHide RD
730/DALE's Yard/

Broomtail 917/1065/
1407/1442

362-1130

Mestas Employment 000016

Mestas Declaration                                        Exhibit 4









Mestas Declaration                                                                    Exhibit 4



Mestas Declaration                                                     Exhibit 4





Mestas Declaration                                                                    Exhibit 4













Mestas Declaration                                                Exhibit 4



Mestas Employment 000030

000321



683   6th      Lg.
869   C7th   Replace *
837   6th      LID
647   P. Park   LID*
614   Wagon T. LID
607   Wagon T. LID
621   Wagon   Replace *
655   Arow   Replace *
622   Bozeman Lid.
647   Bozeman   Lid.
617   Pony      Lid.

Mestas v. Town of Evansville                    Mestas Employment 000032
17-CV-00017-NDF

000323





Mestas Declaration                                                                 Exhibit 4



Mestas Declaration                                                        Exhibit 4



Mestas v. Town of Evansville
17-CV-00017-NDF

Mestas Employment 000036



Mestas Declaration                                                    Exhibit 4





Mestas Declaration                                                    Exhibit 4



Mestas Declaration                                                      Exhibit 4



Mestas Declaration                                                Exhibit 4



Mestas v. Town of Evansville
17-CV-00017-NDF

Mestas Employment 000042

Appellate Case: 17-8092    Document: 01019955823    Date Filed: 03/08/2018    Page: 42
Case 1:17-cv-00017-NDF   Document 59-6   Filed 11/03/17   Page 1 of 7

1

IN RE:  MESTAS V. TOWN OF EVANSVILLE


TRANSCRIPT OF AUDIO RECORDING LABELED

"A_A0000058"

2

```
 1              MR. MESTAS:  Thursday, April 11th.
 2   See what Dale has to say about my doctor's
 3   appointment.
 4                   (Pause in voices.)
 5              MR. MESTAS:  Morning.
 6              MALE SPEAKER:  Good morning.
 7              MR. MESTAS:  How's everything going
 8   this morning?
 9              MALE SPEAKER:  (Inaudible.)
10              MR. MESTAS:  (Inaudible) while I was
11   gone?
12                   (Inaudible voices.)
13              MR. MESTAS:  Huh?
14              MALE SPEAKER:  Oh, you were gone?
15              MR. MESTAS:  Oh.  Thanks.
16              MALE SPEAKER:  Welcome.
17                   (Inaudible voices.)
18              MR. MESTAS:  Geez.
19                   (Inaudible voices.)
20              MR. MESTAS:  Thanks, guys.  I love
21   you, too.
22              MALE SPEAKER:  You're really welcome.
23              MR. MESTAS:  Oh, good news, bad news.
24   I'm still alive, good news.
25              MALE SPEAKER:  Yeah?
```

3

```
 1              MR. MESTAS:  Yeah.  Tell you the bad
 2   news later.  There was something -- do you want me
 3   to start on with that -- want me to just get some
 4   prices?
 5              MR. BROWN:  What I'd like you to start
 6   on is (inaudible) in your truck.
 7              MR. MESTAS:  I don't know if it's
 8   going to be warm enough.  I'm going to have to warm
 9   that thing up to --
10              MR. BROWN:  No.  I don't want reasons
11   why not.
12              MR. MESTAS:  Okay.
13              MR. BROWN:  All I want is reason how
14   I'm going to get her done.
15              MR. MESTAS:  Okay.
16              MR. BROWN:  You got to warm it up, put
17   it in that room, that wash bay.  It's got a heater
18   in there.  When you get your door open, make sure
19   it's properly braced so it can't shut inadvertently.
20   Make sure the keys are in your pocket.
21              MR. MESTAS:  As always.
22              MR. BROWN:  As always.  And let's see
23   if we can't get started on that.
24              MR. MESTAS:  I can do that.
25              MR. BROWN:  Okey-dokey, smokey.
```

```
 1                    MR. MESTAS:  There's no problem there.
 2                    MR. BROWN:  Awesome.  You're the man
 3   for this job, man.
 4                    MR. MESTAS:  Huh?
 5                    MR. BROWN:  You're the man for that
 6   job.
 7                    MR. MESTAS:  Am I?
 8                    MR. BROWN:  That's what I was told.
 9   (Inaudible.)
10                    MR. MESTAS:  Well, they didn't lie to
11   you, then.
12                    MR. BROWN:  Okay.
13                    MR. MESTAS:  What are you raising your
14   eyebrows for?
15                    MALE SPEAKER:  (Inaudible.)
16                    MR. MESTAS:  You smile.  You just
17   smile way too much.
18                    MR. BROWN:  Some days.  Some days I
19   don't smile at all.
20                         (Pause in voices.)
21                    MR. MESTAS:  You want some more
22   (inaudible)?
23                    MALE SPEAKER:  (Inaudible.)
24                         (Pause in voices.)
25                    MR. MESTAS:  Well, since you're in a
```

5

```
 1  smiling mood, next --
 2              MR. BROWN:  No.
 3              MR. MESTAS:  What?
 4              MR. BROWN:  (Inaudible.)
 5              MR. MESTAS:  Already?  What the hell?
 6  No.  The -- they're going to do an injection in my
 7  back where that -- that -- remember I was talking to
 8  you about it a while back?  They wanted to do one
 9  today, but I told them I couldn't because I need a
10  driver and stuff because of medicine they give you,
11  I can't drive.  So I told them next Thursday would
12  be the day that I could do it.  So I'll be out of
13  commission on Thursday.  I'll be back Friday.
14              MR. BROWN:  Okay.
15              MR. MESTAS:  I won't miss any work,
16  only than the -- the day for the -- the injection.
17  You want me to write it on the calendar?
18              MR. BROWN:  Absolutely.  Absolutely.
19              MR. MESTAS:  Okay.  You know where
20  I'll be.
21              MR. BROWN:  I know.
22              MR. MESTAS:  Have fun.
23                  (Pause in voices.)
24              MR. MESTAS:  Morning (inaudible).
25                  (Inaudible background voices.)
```

6

```
 1                      (Pause in voices.)

 2                MR. MESTAS:  I'm going to steal that

 3  bay.  I got to bring the sanitation truck in and try

 4  and fix that (inaudible) on the back.  So I'll be in

 5  here.

 6           That's a bitch, huh?

 7                MALE SPEAKER:  (Inaudible.)

 8                MR. MESTAS:  Is it?  Well, you

 9  probably know more what you're doing now than last

10  time.

11                MALE SPEAKER:  (Inaudible.)

12                MR. MESTAS:  Rusted?

13                MALE SPEAKER:  (Inaudible.)

14                   (Inaudible voices.)

15                MR. MESTAS:  Okay.  I probably will,

16  because these guys are busy out here.  I don't want

17  to bother them.

18                     (Pause in voices.)

19                     (End of audio recording.)

20

21

22

23

24

25
```

7

1          C E R T I F I C A T E

2          I, SABRINA TREVATHAN, a Registered

3  Diplomate Reporter, do hereby certify that I

4  transcribed the audio-recorded proceedings contained

5  herein and that the foregoing 6 pages constitutes a

6  full, true, and correct transcript, to the best of

7  my ability.

8          I further certify that I am not related in

9  any manner to any party, witness, or counsel, and

10  have no financial or other interest in the outcome

11  of the above-entitled cause.

12          Dated this 18th day of June, 2017.

13

14  _____

15                    SABRINA TREVATHAN
                 Registered Diplomate Reporter
16

17

18

19

20

21

22

23

24

25

Mestas v. Town of Evansville                                    17-CV-00017-NDF

                                                                          1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3     ----------------------------------------------------------
      ROY MESTAS,
4
                   Plaintiff,
5
           vs.                      Case No. 17-CV-00017-NDF
6

7     TOWN OF EVANSVILLE, a duly
      incorporated municipal corporation
8     under the laws of the State of
      Wyoming, and DALE BROWN, in
9     his official capacity as public
      works supervisor for the
10    Town of Evansville,

11                 Defendants.
      ----------------------------------------------------------
12

13                 DEPOSITION OF ERIC REYNA
                  Taken in behalf of Plaintiff
14
                   12:55 p.m., Tuesday
15                 September 19, 2017

16

17         PURSUANT TO NOTICE, the deposition of ERIC REYNA

18    was taken in accordance with the applicable Wyoming Rules

19    of Civil Procedure at the offices of Schwartz, Bon,

20    Walker & Studer, 141 South Center, Suite 500, Casper,

21    Wyoming, before Randy A. Hatlestad, a Registered Merit

22    Reporter and a Notary Public in and for the State of

23    Wyoming.

24

25

                      Wyoming Reporting Service, Inc.
                             1.800.444.2826
         Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit B
                                                                                       000341

Mestas v. Town of Evansville                                  17-CV-00017-NDF

2

```
 1                    A P P E A R A N C E S
 2     For the Plaintiff:        MS. MEGAN L. HAYES
                                 Attorney at Law
 3                               910 Kearney Street
                                 Laramie, Wyoming 82070
 4
 5     For the Defendants:       MR. THOMAS A. THOMPSON
                                 Attorney at Law
 6                               MacPHERSON, KELLY & THOMPSON
                                 616 West Buffalo Street
 7                               P.O. Box 999
                                 Rawlins, Wyoming 82301-0999
 8
 9     Also Present:             Mr. Roy Mestas
10
11                        I N D E X

       DEPOSITION OF ERIC REYNA:
12                                                    PAGE
13     Examination by Ms. Hayes                         3
       Examination by Mr. Thompson                     47
14     Examination by Ms. Hayes                        87
       Examination by Mr. Thompson                     96
15
16
                        E X H I B I T S
17
       No.            Description              Identified
18
19     1     Transcript of Audio Recording          6

20     2     Purchase Order                         14
21
22
23
24
25
```

Mestas v. Town of Evansville                                    17-CV-00017-NDF

3

```
 1              P R O C E E D I N G S
 2         (Deposition proceedings commenced
 3    12:55 p.m., September 19, 2017.)
 4              ERIC REYNA,
 5    called for examination by the Plaintiff, being first duly
 6    sworn, on his oath testified as follows:
 7              EXAMINATION
 8    BY MS. HAYES:
 9         Q.   Mr. Reyna, my name is Megan Hayes, and I
10    represent Roy Mestas, who's filed a discrimination
11    lawsuit in federal court against the Town of Evansville.
12    Could you please state your name for the record and spell
13    it?
14         A.   Eric Reyna, E-R-I-C R-E-Y-N-A.
15         Q.   Have you ever had your deposition taken before?
16         A.   No, I don't believe so.
17         Q.   So, just to give you some guidance, we're on
18    the record with a court reporter, who is taking down your
19    every word.  And we are trying to get a clean transcript.
20    So, if you would just let me finish asking my questions
21    before you start answering, then the court reporter won't
22    have us talking over one another.  If I ask you a
23    question, instead of nodding or shaking your head, if you
24    could just say yes or no audibly.
25         A.   Okay.
```

4

```
 1         Q.   And if you need to take a break for any reason,
 2    if you could just tell me, and we can stop, if you need
 3    to use the rest room or stretch.  I'm going to assume
 4    that if I ask you a question, you've understood the
 5    question that I've asked.  Is that -- I'm sorry.  Let me
 6    start over.  I'll assume that if you answer a question,
 7    you will have understood the question that I asked.  Is
 8    that a fair assumption?
 9         A.   Yeah.  If I -- yes.
10         Q.   And if you don't understand --
11         A.   I'll ask you to elaborate on that.
12         Q.   Do you understand that you're under oath today?
13         A.   I do.
14         Q.   What does that mean to you?
15         A.   That, legally, there could be charges possibly
16    brought against me if I misspeak or don't tell the truth.
17         Q.   So that you're subject to penalty of perjury if
18    you don't answer the questions honestly.
19         A.   Okay.
20         Q.   Do you have any short-term or other memory
21    problems?
22         A.   No, not that I'm aware of.
23         Q.   Are you on any drugs or medication that might
24    affect your memory?
25         A.   No.
```

5

```
 1         Q.   Did you bring the documents listed in your
 2    subpoena?
 3         A.   I did not.
 4              MR. THOMPSON:  I've got those documents.
 5    Let's go off the record for a second.
 6              (Discussion off the record.)
 7              MR. THOMPSON:  I'm providing to you,
 8    Counsel, Evansville 0475 through Evansville 0484, which
 9    are responsive to the subpoena.  Again, my objection is
10    that the federal court has ordered that personnel files
11    should not be disclosed in this matter, and this is part
12    of the personnel file.  So, without waiving my objection
13    to production of other matters in the personnel file, I'm
14    providing these to you pursuant to the subpoena.  And I
15    believe the subpoena was also late, too, because it
16    requires 30 days before production.
17              MS. HAYES:  Thank you for these documents.
18         Q.   (BY MS. HAYES)  Mr. Reyna, what have you done
19    to prepare for your deposition today?
20         A.   Not a whole lot.  Reviewed some of the --
21    reviewed a couple of things but nothing major.  I have
22    other things that are more priority in my life at this
23    time.  So, as far as it goes, not much preparation.
24         Q.   Did you speak with me on the phone?
25         A.   I did.
```

6

```
 1         Q.   Did I suggest to you any ways that you should
 2    be answering questions --
 3         A.   No.
 4         Q.   -- that I'm going to ask?  Make sure you let me
 5    finish my question.
 6         A.   I'm sorry.
 7         Q.   Who else have you spoken to about your
 8    deposition?
 9         A.   Tom.
10         Q.   Anyone other than Mr. Thompson?
11         A.   No.  I mean, if you want to get technical, my
12    wife and my mother-in-law and stuff like that, but on a
13    very superficial level that I have a deposition.  As far
14    as that goes, no.
15         Q.   I'm going to hand you a transcript of an audio
16    recording dated April 1st, 2014, to be marked as
17    Deposition Exhibit 1.
18              (Exhibit No. 1 marked for
19    identification.)
20         Q.   (BY MS. HAYES)  Is this the document that you
21    reviewed, Mr. Reyna, in advance of your deposition?
22         A.   Yes, it is.
23         Q.   Did you tell the truth during that interview?
24         A.   Yes, I did.
25         Q.   Do you know Roy Mestas?
```

3  (Pages 3 to 6)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit B

000343

Mestas v. Town of Evansville                                    17-CV-00017-NDF

---

**7**

1    A.   I do.
2    Q.   How do you know Mr. Mestas?
3    A.   Through employment when he was working with the
4  Town of Evansville.
5    Q.   And when was that?
6    A.   Four or five years ago.  So that would be like
7  2012, 2013.
8    Q.   Do you know Dale Brown?
9    A.   I do.
10   Q.   How do you know Mr. Brown?
11   A.   Through employment.  He was the director of
12  public works.
13   Q.   And was he your supervisor --
14   A.   He was.
15   Q.   -- in 2012 and 2013?
16   A.   That's correct.  Yes.
17   Q.   Did you previously work for the Town of
18  Evansville?
19   A.   No.
20   Q.   Where did you work in 2012 and 2013?
21   A.   I did work for the Town of Evansville.  I must
22  have misunderstood the question.
23   Q.   Tell me about your employment history with the
24  Town, when you started, what your starting pay was, what
25  you were hired to do.

---

**8**

1    A.   When I started, I started in 2011, October.  I
2  started as kind of just float around, assist in areas
3  that needed assistance, smaller departments.  So I was
4  doing a lot of different tasks.  Through then, I moved
5  into sanitation driver.
6    Q.   When was that?
7    A.   Probably six months after my employment.  So
8  that would probably put it in 2012.  And did that for a
9  few months and then progressed into getting licensed
10  through the State of Wyoming, which opened up the door to
11  more responsibility.  And I left the Town of Evansville.
12  I was the chief distribution operator.  And that was this
13  year, 2017.
14   Q.   And what was your starting pay in 2011?
15   A.   $15 an hour.
16   Q.   Did you have a --
17   A.   I had a --
18   Q.   -- commercial driver's license at the time?
19   A.   I did.
20   Q.   What was your pay when you separated your
21  employment?
22   A.   24.25.
23   Q.   And why did you leave your employment with the
24  Town?
25   A.   Change of career.  Just wanted something -- a

---

**9**

1  new endeavor.
2    Q.   Were you asked to leave?
3    A.   No.
4    Q.   And where do you work now?
5    A.   I work for SUEZ Water Company.  It was General
6  Electric, but they sold to SUEZ Water Company.  And we
7  contract for Aethon Oil & Gas.
8    Q.   I'm sorry.  You left your employment with the
9  Town of Evansville when?
10   A.   This year, 2017, probably about a month ago,
11  two months ago.
12   Q.   What were your job duties in 2012 and 2013 for
13  the Town of Evansville?
14   A.   Well, there's a little bit of everything from
15  snow removal to collection system maintenance,
16  distribution system maintenance and operation,
17  sanitation, streets and alleys, parks.
18   Q.   And you mentioned that part of your job duties
19  was shoveling snow?
20   A.   That is correct.  Snow removal.
21   Q.   Can you describe when you would have to do
22  that?
23   A.   Usually during the snow season.  And that
24  entailed cleaning up the town hall, community center and
25  plowing the major -- plowing the streets of Evansville

---

**10**

1  and the highway.
2    Q.   And do you know if all public works employees
3  are required to shovel snow?
4    A.   Yeah, we're all required to shovel snow.
5    Q.   Did Dale Brown hire you to work for the Town in
6  2011?
7    A.   Yeah, him and Brian Boettcher.  I think it was
8  an agreement they made.  And, yes, they hired me.
9    Q.   And Dale was your immediate supervisor in 2012
10  and 2013.  Is that correct?
11   A.   That is correct.
12   Q.   How long have you known Dale Brown?
13   A.   Since my inception date, really, which was
14  since October of 2011, is when I met him.
15   Q.   And you didn't know him before you were hired?
16   A.   No.
17   Q.   When you were hired in 2011, were you issued a
18  Town phone or radio to use for your employment?
19   A.   I was issued a phone.
20   Q.   What did you use that for?
21   A.   To make calls to other personnel, coworkers,
22  anything business-oriented.
23   Q.   Like what?
24   A.   If I needed to call NAPA ordering -- ordering
25  parts or anything that we needed for the Town, we would

4  (Pages 7 to 10)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B

000344

Mestas v. Town of Evansville                                      17-CV-00017-NDF

11

1  use it for that.
2      Q.  And if you called other coworkers, what would
3  you be calling them about?
4      A.  If we needed assistance and something come up.
5  Maybe there's a -- need them to bring a tool or something
6  to a location that we're working at.
7      Q.  Did you ever call anyone to help you with any
8  of your job duties?
9      A.  All the time, yeah.  That's how we did -- and
10  I'm not sure when they instituted the radios.  I'd really
11  have to think about that one.  But we also had radios.
12  We'd radio back and forth and use those to communicate as
13  well.
14      Q.  And what were some of the things that you might
15  call other public works employees for assistance for on
16  your radio?
17      A.  Well, I know in the case during my first
18  initial time, we would call for -- if we dumped a trash
19  bin in the back of the sanitation truck or knocked over a
20  bin or anything like that, a possible oil leak, a number
21  of things.
22      Q.  If a bin got dumped into a truck, why would you
23  need assistance for that?
24      A.  Because they were big.  They were heavy bins.
25  They were difficult to move by yourself.

12

1      Q.  And how would you get them out?
2      A.  Well, a couple of ways.  One, come back to the
3  shop and pull it out using a backhoe and a chain.
4  Depending on the size of the bin and if it was empty, in
5  my case, I'd crawl back there and manually get it out.
6  If the back of the trash truck was empty, you'd open up
7  the back gate, and then you can drag it out that way.
8  With two people, sometimes you can wrestle it out and get
9  it out of the back too.  So a couple different ways
10  depending on the size of the bin and the material of the
11  bin.
12      Q.  So, if it was a larger trash bin --
13      A.  Yeah.  We would call and say, "Hey, can you
14  come and give me a hand getting this out of the truck?"
15  Or if there was material in the trash bins that are not
16  supposed to be in there, you would call and say, "Hey,
17  can you come help me move out a toilet from the bin," or
18  anything like that.
19      Q.  Because you would need help lifting it?
20      A.  Yeah.  You need assistance.
21      Q.  Just, physically, it wasn't something you could
22  do alone?
23      A.  No.  You shouldn't.
24      Q.  And was that a common --
25      A.  It is a common -- it can be common, yeah.

13

1      Q.  Frequently, you might?
2      A.  Yeah.  It happens on average.  I mean,
3  inevitably, you're going to run into situations where
4  there's things in the bins that you're going to need some
5  assistance with.  And that's a lot of things in the Town.
6  It takes two people to get some of the stuff done around
7  there.  To answer your question a little more clear, we
8  would use the radios to communicate to coworkers to help
9  out in situations that's going to require two people or
10  three.
11      Q.  Did you ever contact Mr. Mestas to help you
12  with anything?
13      A.  I'm sure I did for anything, even if it was a
14  spill or something.  I can't think off the top of my
15  head, but I'm sure I have, because I've contacted plenty
16  of the guys there to help out.
17      Q.  Did he ever tell you he wouldn't come and help
18  you?
19      A.  No.  He was always more than happy to help me,
20  and if he could show me anything, show me something.
21      Q.  Was there a procedure for employees, public
22  works employees, to use to procure supplies or equipment
23  for the Town in 2012 and 2013?
24      A.  I would have to say no.  As far as a process
25  being written down and guidelines, no.  May be spoken,

14

1  but not to my knowledge.
2      Q.  So, if you needed something, some supply or
3  something that was work-related, how would -- just
4  describe to me what you'd do to get that.
5      A.  Run it by the directors, make sure it met their
6  approval and then go ahead and call the distributor or
7  even go there and pick it up.  And usually you'd want to
8  run it by the director, make sure you got the okay.
9      Q.  Who do you mean by "the director"?
10      A.  Dale and Brian.  Dale or Brian.
11      Q.  And would you typically do that first before --
12      A.  Yeah.
13          MS. HAYES:  So I am handing you -- Randy,
14  this is Evans 0325, 0326 and 0327.  Would you please mark
15  that as Exhibit 2?
16          (Exhibit No. 2 marked for
17          identification.)
18      Q.  (BY MS. HAYES)  Mr. Reyna, do you recognize any
19  of those documents?
20      A.  Yeah.  I recognize as far as Lariat
21  International Trucking and stuff, yeah.
22      Q.  What was this for?
23      A.  It looks like it was for brake repair on the
24  sanitation truck.
25      Q.  What's the date of that?

                                          5  (Pages 11 to 14)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B
                                                                    000345

Mestas v. Town of Evansville                                    17-CV-00017-NDF

15

1    A.   It is 12/06 of 2012.
2    Q.   Would this have been a repair that you would
3  have first asked for the supervisor's approval?
4    A.   Oh, yeah.  They would definitely -- they were
5  well aware of situations like this that were going to
6  cost more and that we're going to -- yeah, they were
7  aware of this.  And you would need approval.
8    Q.   And the total amount of this repair is what?
9  I'm looking at the bottom on page 3.
10   A.   211.32.
11   Q.   And then toward the top left-hand side, it
12 looks like there's maybe a customer PO.
13   A.   Yeah.  A PO number.
14   Q.   How did you get that?
15   A.   We would call town hall.  That was part of the
16 process, too, depending on -- there's some -- each
17 purchase is a little bit different, what you're buying it
18 for, the cost of it, where you're going.  So the
19 requirements vary depending on the price, depending on
20 where you're going.  But usually, too, we get PO numbers,
21 and we would call town hall to obtain those.
22   Q.   So, just so I'm clear, you would first ask Dale
23 or Brian?
24   A.   Generally.
25   Q.   Generally?

16

1    A.   Yeah.
2    Q.   And then you would call the town hall?
3    A.   That's correct.
4    Q.   And say, "I need a PO number"?
5    A.   In this amount, exactly.  If you knew how much
6  it was -- you usually want to call, find out how much
7  it's going to cost, and then you would call town hall so
8  you can give them an accurate number.
9    Q.   Do you recognize the first two pages of this
10 exhibit?
11   A.   It looks familiar, yeah.  I don't remember this
12 specific incident, but I do know we do a lot with Lariat.
13   Q.   So page 2 of this exhibit, for example, it
14 looks like a purchase authorization.  And, again, the
15 Number 42675 is under "Office Use Only PO Number."  Do
16 you see that?
17   A.   In the --
18   Q.   Top right-hand corner.
19   A.   Oh, yeah.  PO for amount -- "Office Use Only,"
20 yeah.
21   Q.   So this was an authorization that Dale Brown or
22 Brian Boettcher had approved?
23   A.   Yeah.  And this one -- they were probably
24 completely aware of this one.
25   Q.   Did you say you would ever procure items for

17

1  the Town before getting a purchase order number?
2    A.   Depends on where we shopped, yes, and the value
3  and the amount.  Like Menards, that's a little bit
4  different situation.  We have an open account.  And if we
5  were going to be buying gloves, hardware, such as nuts
6  and bolts, those you can go in, and you don't need a
7  purchase order number for those.
8    Q.   Drill bits?
9    A.   Drill bits, stuff like that, you can go there
10 and get them.  Now, if they were going to cost quite a
11 bit, then you would want to get approval for that.
12   Q.   What would you consider "quite a bit"?
13   A.   I would say probably over 50 to 100 bucks.
14   Q.   For drill bits?
15   A.   Yeah, depending -- for drill bits?  I don't
16 know.  I don't think I've ever purchased them.  I know
17 you can get some good ones.
18   Q.   Were you ever reprimanded or disciplined for
19 procuring something for the Town before getting Dale
20 Brown or Brian Boettcher's approval?
21   A.   No, not to my knowledge.
22   Q.   Do you know if any public works employee was
23 ever reprimanded or disciplined in any manner for
24 procuring items before getting Mr. Brown or
25 Mr. Boettcher's approval?

18

1         MR. THOMPSON:  Objection as to form.  Go
2  ahead.
3    Q.   (BY MS. HAYES)  Do you know?
4    A.   No, not to my knowledge.  There was talk.  If
5  there was ever an incident, it was discussed on where we
6  could get a little better price, more economical.  But,
7  as far as any disciplinary action or anything of that
8  nature, I would, to my knowledge, say no.
9    Q.   Can you give me a list of stores in the area
10 that you would typically go to for supplies?
11   A.   Yeah.  To kind of answer your question a little
12 more -- to answer your question, it depends on what we
13 were getting, where we would have to acquire it from,
14 what side of town.  But most of our shopping was done on
15 the east side of town, Menards, Home Depot, Murdoch's,
16 Lariat.  We would even run to NAPA when we had to.  We
17 were going to -- into Mills to -- I think it was Airgas.
18 There's a distributor over there that I'm not thinking of
19 the accurate -- but we would go to Mills until we found
20 one closer by, and we'd start using that one.
21   Q.   Casper Tire?
22   A.   Casper Tire, yeah.  And there's another place
23 over here on 2nd -- or, I think it's Poplar -- Poplar
24 Street for wear parts.  So it just depended on what we
25 needed and who sold it at an economical or at a

6  (Pages 15 to 18)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000346

Mestas v. Town of Evansville                                17-CV-00017-NDF

19

1   competitive price.
2       Q.   Grainger?
3       A.   Yes, Grainger.
4       Q.   Grainger was something you'd go to for what
5   type of things?
6       A.   Let's see.  Grainger, we went there for -- I
7   know I went there specifically at one time for
8   connectors, wire connectors.  They were always a resource
9   to look into to see what kind of prices they offered.
10      Q.   And did some of these stores have accounts with
11  the Town?  Do you know?
12      A.   Yeah.  I believe so, yes.
13      Q.   So you could go to one of the stores that had
14  an account with the Town before getting a purchase order
15  number?
16      A.   Well, you could.  But you would want to -- it's
17  best business practices to get a purchase order number.
18  Say, for instance, Menards.  You can go to Menards and
19  ask for a purchase order.  But, in that situation, you
20  can put down the date, and that would be sufficient, and
21  then turn that in.
22      Q.   Because Menards had an account?
23      A.   Yeah.  And they still wanted a purchase order
24  number.  But that was one of those ones that is a little
25  bit different procedure.

20

1       Q.   I'd like to just ask you some questions about
2   your time working at the public works department with
3   Mr. Mestas.  How frequently would you see Mr. Mestas
4   during a typical workday?
5       A.   Well, that depends on what day it was.  Because
6   of the sanitation route, each day varies on when he's
7   going to be returning back from the shop.  Monday's a
8   longer route.  So, on Monday, I would probably see him
9   maybe an hour.  Tuesday's a little bit lighter, not as
10  many pickups, so I'd see him five hours.  So it varied
11  on -- it varied on which route he was running for the
12  day.
13      Q.   How about during a typical workweek?  How much
14  would you see Mr. Mestas?
15      A.   Probably 20 hours, I would have to say.  That's
16  just off the top of my head.  Because Thursdays there is
17  no route, so I'd typically see him for the whole eight
18  hours.
19      Q.   And what sorts of job duties would you be doing
20  on Thursday?
21      A.   Just depends on the time of the year, what was
22  going on, priorities.  But just to kind of generalize it,
23  just basic maintenance in the town where it needed.
24      Q.   And on those Thursdays when you would observe
25  Mr. Mestas at work, what sorts of things would he be

21

1   doing?
2       A.   I want to say he was doing vehicle repair on
3   the sanitation truck and fixing and repairing bins and
4   leveling bins and moving obstructions that were in the
5   alley out of his way.  And he would also assist in areas
6   that we needed if he was available.
7       Q.   Like what?
8       A.   I can't think specifically of one because we do
9   quite a bit.
10      Q.   Give me one example.
11      A.   I think we did water turn-ons or blue cards or
12  something.  I think we might have did something like
13  that.  And he would help out with that.
14      Q.   Did he ever tell you he wasn't willing to help
15  you?
16      A.   No.  He was always ready to help.
17      Q.   Did you ever have any arguments with Mr. Mestas
18  at work?
19      A.   No.  Not to my knowledge, no.
20      Q.   Any conflicts with Mr. Mestas?
21      A.   No, no conflicts at all.
22      Q.   Any issues with Mr. Mestas at work?
23      A.   No.
24      Q.   Did you ever complain to Dale Brown about
25  Mr. Mestas about anything?

22

1       A.   No, not to my knowledge.
2       Q.   Were you able to observe Mr. Mestas interacting
3   with other public works employees?
4       A.   Yeah.
5       Q.   Did you witness any conflicts between
6   Mr. Mestas and other public works employees?
7       A.   Yeah, I did.
8       Q.   Which employees was that?
9       A.   I witnessed some conflict between him and Dale
10  Brown.
11      Q.   Just others at this point, if you don't mind.
12      A.   Ron Emond.
13      Q.   What were the conflicts with Ron?
14      A.   Ron I think possibly overstepping his
15  boundaries and trying to dictate what should be done and
16  what shouldn't and what's wasting time and what's not,
17  which is not his position to do so.  Ron has a different
18  personality, a very challenging one, to be honest.  Can
19  be very challenging.
20      Q.   How is it challenging?
21      A.   He's very outspoken, likes to voice his opinion
22  as if they're truth, holds grudges, not a team player.
23      Q.   Did you witness Ron Emond and Dale Brown
24  interacting?
25      A.   Of course I did, yes.

7  (Pages 19 to 22)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B

000347

Mestas v. Town of Evansville                                                 17-CV-00017-NDF

23

1      Q.   And what was your perception of their
2   relationship?
3      A.   Depended.  Some days it was good.  Some days it
4   was not good.  They had their conflicts, and they had
5   their moments of working together.
6      Q.   Were you able to observe Mr. Mestas interacting
7   with Mr. Brown?
8      A.   Yes.
9      Q.   And did you ever observe Mr. Mestas being
10  disrespectful to Mr. Brown?
11     A.   No.
12     Q.   What is your perception of how Mr. Mestas got
13  along with his coworkers?
14     A.   Well, my perception is that he did everything
15  he could to get along with them and to be a team player.
16  Depending on how the day went, Dale -- what I perceived
17  is Roy doing his best to get along and be part of the
18  team.
19     Q.   Were you able to observe if Mr. Mestas kept his
20  sanitation truck cleaned and maintained?
21     A.   Yeah.  I witnessed him taking care of it and
22  cleaning it, maintenancing it.
23     Q.   And that would have been on Thursdays?
24     A.   Thursdays and possibly Tuesdays, depending on
25  what time he got done and if he had any other tasks that

24

1   took priority.  But, other than that, generally Tuesdays
2   and Thursdays.
3      Q.   And what was your opinion of how -- was he
4   keeping it --
5      A.   Yeah.  He was doing a good job.
6      Q.   Were you aware that Mr. Mestas was injured at
7   work?
8      A.   Yes.
9      Q.   Do you know how he got injured?
10     A.   Yeah.  He slipped on some ice showing up to
11  work early, and he hurt his back.
12     Q.   Prior to -- do you remember when he was
13  injured?
14     A.   No.  Sometime in December, maybe.  I don't
15  know.  I don't know.  It was in the winter.
16     Q.   It was late November of 2012.
17     A.   Okay.
18     Q.   And prior to the day he was injured, did you
19  notice any problems with his job performance?
20          MR. THOMPSON:  Objection as to form and
21  foundation.  Go ahead and answer if you can.
22     A.   No, not to my knowledge, nor did I ever hear
23  anything from supervisors on his performance.
24     Q.   (BY MS. HAYES)  Prior to his injury?
25     A.   Correct.

25

1      Q.   And you're aware that he took time off from
2   work, too, for that injury?
3      A.   Yes.
4      Q.   Do you recall when he returned to work?
5      A.   No, I don't.
6      Q.   I'll just represent it was mid January of 2013.
7   So, after he returned from his injury, would you say, in
8   a typical workweek, your went -- you saw him the same as
9   you did before his injury?  You testified that you would
10  see him on Thursdays for 8 hours, approximately perhaps
11  20 hours a week.
12     A.   Yeah.
13     Q.   Was that the same or different?
14     A.   You could tell he was recovering still.
15     Q.   But your interacting with Roy, your ability --
16  or, how much you saw him during a typical workweek, did
17  that change after his injury?
18     A.   No.
19     Q.   Same?
20     A.   Same.
21     Q.   And after he returned to work, did you notice
22  any problems with him performing his job duties?
23          MR. THOMPSON:  Objection as to form.
24  Foundation.
25     A.   I could tell that he was still recovering

26

1   from -- I know he had some surgeries and went through
2   rehabilitation.  And I could tell that he was still
3   recovering.
4      Q.   (BY MS. HAYES)  To your knowledge, after he
5   returned to work following his injury, would Mr. Mestas
6   just ever disappear during the workday?
7      A.   Just disappear?  He'd be on his route.  No.  I
8   mean, just disappear?  No.  I mean, he'd get in his truck
9   and go do his route, and I wouldn't see him.  But, as far
10  as that goes, no.
11     Q.   Did Dale Brown ever ask you where Mr. Mestas
12  had gone during the workday?
13     A.   Not to my knowledge.  I don't think so.
14     Q.   So, on Thursdays, for example, when it would be
15  a maintenance day, on any Thursday, do you remember
16  Mr. Mestas ever disappearing from the workplace?
17          MR. THOMPSON:  Objection as to form and
18  foundation.
19     A.   No.  I mean, not just -- no.  I mean,
20  disappearing.  I think that's kind of a general question,
21  disappearing.  I mean --
22     Q.   (BY MS. HAYES)  Without telling you where he
23  was going, for example.
24          MR. THOMPSON:  Objection as to form.
25     A.   Sometimes he would hop in his truck and go work

8  (Pages 23 to 26)

Wyoming Reporting Service, Inc.
1.800.444.2826

27

1   on bins and not say nothing. And sometimes he would say,
2   "I'm going to go work over here," and that's where he
3   would be. So, as far as just up and disappearing all of
4   a sudden, I would -- I don't know. No. It's kind of a
5   strange question, to be honest.
6       Q.   (BY MS. HAYES) But Dale Brown, did he ever ask
7   you where Mr. Mestas was during a workday?
8       A.   I don't know. I don't recall.
9       Q.   So does that mean it may have happened and you
10  don't remember or you don't recall it ever happening?
11           MR. THOMPSON: Objection as to form.
12      A.   I'm saying I don't remember. I don't remember.
13  I can't say.
14      Q.   (BY MS. HAYES) I think I asked you. You were
15  able to observe at times Mr. Brown interacting with
16  Mr. Mestas at work. Is that correct?
17      A.   Yeah.
18      Q.   And how often would you see them interacting?
19      A.   A little bit in the morning, a little bit in
20  the afternoon and a couple times throughout the day.
21      Q.   And did you notice any difference in the way
22  Mr. Brown treated Mr. Mestas after his injury?
23      A.   Yeah. I think, yes, there was a difference.
24      Q.   I'm going to ask you, please, to look at
25  page 12 of your -- and this would be line 5 to 7. Would

28

1   you just read that out loud, please, Mr. Reyna?
2       A.   "MR. REYNA: -- the most part. And then when
3   he injured himself, he really was a target --"
4       Q.   Is that an accurate portrayal of what you told
5   the interviewer?
6       A.   Yeah. I would probably maybe change it a
7   little bit. But Dale's attitude towards Roy did change.
8   Dale's attitude intensified towards Roy.
9       Q.   And what do you mean by that?
10      A.   That Dale always had some type of attitude, but
11  I think it even intensified even after Roy returned back
12  to work.
13      Q.   In what way?
14      A.   Just more -- he was odious towards him and,
15  yeah, kind of singled him out.
16      Q.   And how did he do that?
17      A.   By not letting us try to assist him when he
18  needed assistance.
19      Q.   Can you give some examples of that?
20      A.   Yeah. Roy called on the radio or on -- I think
21  he didn't even let him have a radio. He called Dale or
22  something and wanted assistance, or called me. I
23  remember we were in the shop. And then Dale got upset
24  when we went to try to help him. He said, "Don't help
25  him. He don't need help."

29

1       Q.   And help him doing what?
2       A.   It had to do with the sanitation route. I'm
3   not sure if he needed a bin removed or something moved
4   out of the container. It pertained to the sanitation
5   route, though. And he needed assistance moving something
6   or getting something out.
7       Q.   What do you mean by he became a target?
8       A.   Well, I guess I think better would be he
9   singled him out more or singled him out. I would -- I
10  don't know if I would -- he singled him out. By "a
11  target," I meant he would -- I guess to clarify it a
12  little bit, he would single him out or ostracized him by
13  not letting us help him, things of that nature.
14      Q.   And in 2012 and 2013, did you have regular
15  staff meetings with public works employees?
16      A.   Yes.
17      Q.   How did Dale Brown treat Mr. Mestas during
18  those meetings after his injury?
19      A.   He was very condescending to him. That's what
20  I can say. And that's all I can really remember, is that
21  I know that he was -- didn't treat him very kind.
22      Q.   Did you ever observe Mr. Mestas being
23  disrespectful to Mr. Brown?
24      A.   No.
25      Q.   Condescending to Mr. Brown?

30

1       A.   No.
2       Q.   Did Mr. Brown treat Mr. Mestas more harshly
3   than other public works employees after Mr. Mestas'
4   injury?
5       A.   After his injury, yeah.
6       Q.   And how so?
7       A.   By not letting us help him. And not letting us
8   help him made his job harder. So it was kind of a --
9   also, by not letting us help him, it kind of isolated
10  him. But, also, in doing so, it made his job harder.
11      Q.   Did Mr. Brown ever tell you not to help other
12  employees besides Mr. Mestas?
13      A.   I can't recall. I can't recall that. I don't
14  know.
15      Q.   Was it unusual to be told by Mr. Brown not to
16  help another employee, in your opinion?
17           MR. THOMPSON: Objection as to form.
18      A.   Yeah.
19      Q.   (BY MS. HAYES) Why? Why was it unusual?
20      A.   Because that's totally contrary to what -- to
21  the overall goals as a Town that we're trying to
22  accomplish. It's going to take a team of men, a group of
23  men or women, men and women, to accomplish some of the
24  goals. So, by not letting us assist each other, that's
25  kind of contrary to what we're trying to accomplish, how

9  (Pages 27 to 30)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000349

Mestas v. Town of Evansville                                    17-CV-00017-NDF

31

1    we're trying to accomplish tasks.
2        Q.   You mentioned that Dale Brown didn't let
3    Mr. Mestas have a radio.
4        A.   Yeah.
5        Q.   Did most -- do you know?  Did most public works
6    employees have a radio to use for work?
7        A.   Yes.
8        Q.   And how do you know he didn't let him have a
9    radio?
10       A.   Because I remember Roy being pretty upset that
11   he didn't have a radio and he had to use his own phone.
12   That sticks in my mind.  Because I didn't understand the
13   reasoning behind that.
14       Q.   So, when Mr. Mestas might call you for help,
15   say, to pull something out of a trash bin, do you
16   remember him -- would he call you on his own phone?
17       A.   He'd call me on his own cell phone.
18       Q.   And would he call you?
19       A.   I want to say there was times he did.  I can't
20   remember specific times, but I know there's times he did
21   call.
22       Q.   On pages 35 and 36 of your interview, you're
23   describing what you've already mentioned, which is this
24   trash bin that fell into Mr. Mestas' sanitation truck.
25   How did Mr. Brown respond when you were offering to help

32

1    Roy?  Mr. Mestas.  Excuse me.
2        A.   Which line is that in?  Do I reference that in
3    this?
4        Q.   Well, I was just going to have you read it if
5    you couldn't remember.  Let's see.  Yes, you do.
6        A.   Oh, "Dale said don't go up there; let Roy go up
7    there."
8        Q.   You want to keep reading just to the end of
9    line 24, please?
10       A.   Yeah.
11            "Dale said, Don't go up there; let Roy go up
12   there.  And that, to me, was like -- later on, he asked
13   me about that.  He said, Was I wrong or -- what did he
14   say?  Was that wrong of me, or, was that not right of me?
15   I don't remember his exact words.  But he asked me about
16   it.  And I told him, Dale, if that would have been you
17   who had a bin stuck in the back of the truck, I would
18   have helped you, because that's what we do as a team.
19   That's what we do.  And he just left it at that.
20       Q.   Is that an accurate portrayal of what you told
21   the interviewer?
22       A.   Yeah, that is.
23       Q.   Where were you when Mr. Brown approached you
24   and asked you about that incident?
25       A.   I think we were at the shop.

33

1        Q.   Were you alone?  Were there any witnesses?
2        A.   Yeah, we were alone.  I want to say it was just
3    us.  I can't remember for certain.  But I want to say it
4    was a one-on-one dialogue that we were having.
5        Q.   Was that unusual for Mr. Brown to ask you if he
6    made a mistake and --
7        A.   In that incident, yeah.  In regards to dealing
8    with personnel, yeah, that's unusual.  It doesn't happen
9    often.
10       Q.   Did he ever apologize to you about anything
11   else in the workplace that you recall?
12       A.   Like --
13       Q.   Anything that he'd done that he was asking you
14   was that appropriate or inappropriate?
15       A.   I don't remember.
16       Q.   You mentioned earlier in your testimony that
17   your job duties included shoveling snow on snow days.
18   Did Dale Brown shovel snow?
19       A.   Not to my knowledge, no.
20       Q.   Who's Brian Boettcher?
21       A.   Brian Boettcher?  He'd participate.  He'd help
22   out.
23       Q.   In your interview, on page 27, you told the
24   interviewer, when she was asking about were all public
25   works employees required to shovel snow, and you

34

1    responded that Brian and Dale, no, they don't shovel
2    snow, but that's another story.
3        A.   Yeah.
4        Q.   What did you mean by that?
5        A.   I don't remember.  I don't remember.  I said no
6    in that one, but I do recall Brian assisting me now and
7    then.  I'm trying to remember what -- I'd have to --
8            " -- the crew required to shovel --
9            "Yes."
10           -- snow?"
11           "Even Brian and Dale."
12           "Did Brian and Dale also shovel?"
13           Not sure.  That's strange.
14       Q.   Who is Wilbur Yankey?
15       A.   He was an older gentleman that worked with the
16   Town of Evansville.  Most of his responsibility was water
17   distribution.
18       Q.   And did he work at the same time as Mr. Mestas?
19   Do you recall?
20       A.   Yes.
21       Q.   Did Mr. Yankey shovel snow?
22       A.   No, he didn't shovel snow, now that I -- I
23   would have to say no, I don't think he did.
24       Q.   Do you know why he didn't shovel snow?
25       A.   I don't know why he didn't.  I don't know why

10  (Pages 31 to 34)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000350

Mestas v. Town of Evansville                                    17-CV-00017-NDF

35

1   they didn't have him shovel snow. But me personally, I
2   probably would have -- I don't know why they didn't have
3   him shovel snow.
4        Q.   Was any public works employee, to your
5   knowledge, ever disciplined for not shoveling snow?
6        A.   To my knowledge, no. But, if we showed up
7   late, then we did -- that was -- either late -- yeah. If
8   we showed up late to not shovel snow, we were called in
9   the office and talked to about it.
10       Q.   How about any public works employee being fired
11  for not shoveling snow?
12            MR. THOMPSON: Objection as to form.
13       Q.   (BY MS. HAYES) Do you know of any public works
14  employee?
15       A.   To my knowledge, no, I don't.
16       Q.   You also mentioned in your interview that you
17  recall -- this is on page 28. There was an incident
18  where Mr. Mestas asked Dale Brown if he could use his
19  snowblower. Do you recall that incident?
20       A.   Yeah.
21       Q.   Tell me what happened and how you know about
22  it.
23       A.   Well, I remember Roy wanting to use a
24  snowblower, and then Dale told him no. That's pretty
25  much what I remember. Remember Roy being really upset.

36

1   Yeah, I do remember something like that.
2        Q.   But you weren't there?
3        A.   No.
4        Q.   So you heard it after the fact?
5        A.   Yeah.
6        Q.   Did you hear anything about it from Mr. Brown?
7        A.   I don't remember.
8        Q.   You mentioned you would have -- I'll start
9   over. When you worked for the Town during 2012 and 2013,
10  did Mr. Brown make any comments to you about Mexicans?
11       A.   Yes.
12       Q.   What sorts of comments?
13       A.   To me specifically, just, "Not bad for a
14  Mexican" when I would do something that -- yeah, just
15  comments like that.
16       Q.   How often would you hear comments like that
17  from Mr. Brown?
18       A.   That comment I probably only heard maybe two or
19  three times that I can recall.
20       Q.   And this is during 2012 and 2013?
21       A.   I don't remember what time frame that was in.
22  I don't know exactly.
23       Q.   Do you remember mentioning to Mr. Mestas that
24  Mr. Brown had made comments to you about being a Mexican?
25       A.   I'm sure I told him.

37

1        Q.   Do you know how he responded?
2        A.   Wasn't very happy about it.
3        Q.   Did Mr. Brown ever apologize to you for making
4   a comment about Mexicans?
5        A.   Yes, he did.
6        Q.   When was that?
7        A.   I don't know the exact date or exact words he
8   used. But I remember it was pretty upsetting. Yeah, he
9   apologized for a comment he made. I don't remember the
10  time or day. But I do remember that he called me on the
11  radio, picked me up from where I was working and
12  apologized to me.
13       Q.   And what did he say? Just what do you remember
14  him telling you?
15       A.   That he was sorry, that he just didn't think
16  about what he was saying, or something along that nature.
17       Q.   And did you mention that conversation to
18  Mr. Mestas?
19       A.   I did. The comment that was mentioned and the
20  reason why I mentioned it to Roy was because it was said
21  in the presence of both of us. And I remember looking at
22  Roy, and he was upset about it, through his facial
23  expressions. And I wasn't too happy about it either.
24  First thing in the morning, something you don't want to
25  hear. And so I did let him know that, yeah, Dale had

38

1   apologized to me to see if maybe he received an apology
2   as well.
3        Q.   And did he receive an apology?
4        A.   No. I don't think so, no.
5        Q.   Do you remember what the comment was?
6        A.   I don't. I don't remember the specific
7   comment. But I remember it was not -- not a good one.
8        Q.   So, if you would look at page 23 of your
9   interview, does that refresh your memory about comments
10  made to you related to Hispanics? Or, I'm sorry.
11  Directed to Roy that he made about Hispanics.
12       A.   Which number?
13       Q.   I'm sorry. If you start reading line 14 on
14  page 23.
15       A.   Yeah. I know it was one of those.
16       Q.   If you wouldn't mind, just read aloud lines 14
17  to 20.
18       A.   Okay.
19            "But I know that Roy was in the presence of him
20  when he did use terms like "beaner" and "Mexican."
21            "Okay."
22            "MR. REYNA: And I can recall vividly two times
23  and -- because I remember Roy was not happy about that."
24       Q.   So do you remember? Did you learn about this
25  through Roy, or were you present when Dale Brown used the

11  (Pages 35 to 38)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit B

000351

Mestas v. Town of Evansville                                    17-CV-00017-NDF

39

```
1   term "beaner" or "Mexican"?
2       A.  I was present.
3       Q.  And it was one of these words, "beaner" or
4   "Mexican"?
5       A.  Yes.  That is correct.
6       Q.  Have you ever heard, outside of these two
7   times, Mr. Brown use the term "beaner"?
8       A.  Out of these two times?
9       Q.  If you want to look at page 18 to refresh your
10  recollection.
11          MR. THOMPSON:  Counsel, I'm going to
12  object to the form of the question.  You're asking him a
13  question, and he doesn't have an opportunity to answer,
14  and then you're directing him to the transcript.  If you
15  want to introduce the transcript, introduce the
16  transcript.  But I think asking him a question and then
17  not giving him an opportunity to answer and referring to
18  a statement that was never given under oath is
19  inappropriate.
20      Q.  (BY MS. HAYES)  Mr. Reyna, can you please read
21  out loud on page 18 from lines 9 to 13?
22      A.  "-- remember him using the term "beaners" on
23  more than one occasion --"
24          "FEMALE SPEAKER:  Okay."
25          "MR. REYNA:  -- in the presence of Roy and in
```

40

```
1   the presence of other coworkers."
2           "Okay."
3       Q.  Is this an accurate portrayal of what you told
4   the interviewer?
5       A.  I believe so.  I remember that one morning he
6   did say a statement like that in the presence of
7   everybody, which was kind of even more upsetting.
8       Q.  And "everybody."  Who were the other coworkers
9   who were there?
10      A.  The people in the crew room at the time, the
11  people who were working there.
12      Q.  And who would that have been?  Do you recall
13  who was present?
14      A.  I know Ron, I think, was present and possibly
15  Dan Adcock.  And I don't remember who else was there.
16      Q.  In 2012 and 2013, did you ever hear jokes being
17  told in the workplace about blacks or Hispanics or Asians
18  or any other minority groups?
19      A.  From which date?  2012, 2013?
20      Q.  Yes.
21      A.  I don't recall.  I don't.
22      Q.  If you want to look at page 20.  So lines 17 to
23  22, do you want to read those out loud?
24      A.  Sure.
25          "MR. REYNA:  I want to say -- and I -- depends
```

41

```
1   on -- I have heard him be involved in jokes --"
2           "Okay."
3           "-- that were Spanish or Mexican or something."
4           "FEMALE SPEAKER:  Okay."
5       24, "MR. REYNA:  But -- yeah.  I can't -- to be
6   honest with you, I would have to think about that."
7       Q.  Was he involved in jokes about Spanish or
8   Mexican or something?
9           MR. THOMPSON:  Objection as to form.
10      A.  I can't remember specifics.
11      Q.  (BY MS. HAYES)  Do you remember hearing jokes
12  about Mexicans in the workplace?
13          MR. THOMPSON:  Objection as to form.
14  Asked and answered.
15      A.  Yeah.  I made some myself.
16      Q.  (BY MS. HAYES)  Would Mr. Brown have been
17  present?
18      A.  Yeah.
19      Q.  Did you ever hear him telling --
20      A.  From him?  I would -- go ahead if you want to
21  finish your question.
22      Q.  Did you ever hear him tell anybody that jokes
23  about Hispanics or other minority groups were
24  inappropriate?
25          MR. THOMPSON:  Hold on for a second.
```

42

```
1   Objection as to form.  Assumes facts not in evidence.  Go
2   ahead.
3       A.  From him?  I would have to say I don't
4   remember.  I don't.
5       Q.  (BY MS. HAYES)  You don't remember it ever
6   happening?
7       A.  From him?  I don't remember.  I don't want to
8   misspeak.
9       Q.  Did you ever hear Mr. Brown make negative
10  comments about Wilbur Yankey's age, anything age-related?
11      A.  Yeah, jokingly.  Jokes, comments, yeah.  I
12  think they had a relationship where he felt comfortable
13  to do that with him.
14      Q.  Like what sorts of comments would he make?
15      A.  Just age-related comments in regards to how old
16  he was.  Then again, I don't know.  They must have had a
17  well-enough relationship where he felt comfortable to do
18  that.
19      Q.  Does Dale Brown still work for the Town of
20  Evansville?
21      A.  No.
22      Q.  Do you know why he left his employment?
23          MR. THOMPSON:  Objection as to form.
24  Relevance.
25      A.  I don't know why the -- I don't know why --
```

12  (Pages 39 to 42)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                 Exhibit B

000352

Mestas v. Town of Evansville                                    17-CV-00017-NDF

43

1  what the mayor, or whoever had any partake in that, let
2  him go for.  But, to my knowledge and understanding, he
3  was let go for unethical behavior in regards to the
4  Town's finances, yeah.
5      Q.  (BY MS. HAYES)  And what about the Town's
6  finances did you hear was a problem?
7      A.  Selling some -- giving away or selling Town
8  property, things of that nature.
9      Q.  Do you know what kind of property he was
10  selling?
11     A.  One that comes to mind is an old welder, an old
12  welding machine.
13     Q.  Do you know if Mr. Brown kept any personal
14  equipment on Town of Evansville property?
15     A.  I don't know.
16     Q.  An ATV?
17     A.  I think at one point, he did have some ATVs
18  down in the lagoon area.  Yeah, I think he did.
19     Q.  Do you know if the ATV had a snowplow on it?
20     A.  I don't remember that.  But now that you
21  brought that up, I do remember an ATV being -- two of
22  them, I think, parked down at the lagoon.
23     Q.  Did you keep any personal property at the Town
24  of Evansville facility?
25     A.  Not -- no.  I mean, no.

44

1      Q.  And who's Phil Hinds?
2      A.  That's the mayor.
3      Q.  And how long have you known him?
4      A.  Since two thousand -- since my inception date,
5  2011.
6      Q.  And was Mayor Hinds Mr. Brown's supervisor?
7      A.  Yes.
8      Q.  Did you ever complain to Mayor Hinds about
9  Mr. Brown?
10     A.  No.
11     Q.  Why not?
12     A.  Because I don't think it would do any good.
13     Q.  Why wouldn't it do any good?
14     A.  Based off the relationship Dale portrayed that
15  they had, that it was one of friendship outside of work
16  and that it carried into work and that what Dale led me
17  to believe is that the mayor would side with him in how
18  he dealt with certain situations.
19     Q.  Were you concerned that you might lose your job
20  if you complained about Dale Brown to Mr. Hinds?
21     A.  Yes.
22     Q.  Do you know Dan Adcock?
23     A.  I do.
24     Q.  How do you know Dan Adcock?
25     A.  Through work.

45

1      Q.  And how long did you work with Mr. Adcock?
2      A.  From 2011 to 2017.
3      Q.  Did you and Mr. Adcock hang Christmas lights on
4  Town property in 2016?
5      A.  Yes.  Yes.  I had to think about that.
6      Q.  Do you remember when it was or where you were
7  hanging lights?
8      A.  Yeah.  I believe we hung lights for 2016.
9      Q.  And did you encounter Mayor Hinds while you
10  were hanging those Christmas lights?
11     A.  Yes, I did.
12     Q.  Did the mayor make any comment to you about
13  your Hispanic heritage at that time?
14         MR. THOMPSON:  Objection as to form.
15  Relevance.
16     A.  Yes, he did.
17     Q.  (BY MS. HAYES)  What did he say?
18     A.  I was hammering in a T-post for Christmas
19  lights, and he said -- and I stopped.  And he said,
20  "Don't stop on my account."  And he said, "I like seeing
21  Mexicans work."  And I said, "Well, that's not hard to
22  find."
23     Q.  Did Mr. Adcock hear this comment?
24     A.  I'm not sure.  I think he did, yes.  And I
25  brought it up to him.

46

1      Q.  You brought it up to him?
2      A.  I brought it up to him to see if maybe I was
3  missing something.  You got to have the whole picture.
4      Q.  And what did you think you were missing?
5      A.  That type of -- those type of words and the way
6  it's said like that, if that should be tolerated or not.
7  I wasn't sure how to really receive that when somebody
8  says something like that.
9      Q.  Do you know if Dale Brown purchased a diesel
10  fuel tank with Town funds?
11         MR. THOMPSON:  Objection as to form.
12  Relevance.
13     A.  Yeah, I think he did.  I don't know where the
14  funds came from, but I'm pretty sure it was the Town's.
15     Q.  (BY MS. HAYES)  And do you know where that fuel
16  tank -- where Mr. Brown put the fuel tank?
17     A.  It was sitting down in our lagoon.  After he
18  was let go, he put it back on Town's property.
19     Q.  So just describe to me the fuel tank, like
20  where you came to see it and how it came to be where it
21  was.  Do you know the history of the fuel tank?
22     A.  I did.
23         MR. THOMPSON:  Same objection.  Relevance
24  to this whole line of questioning.  Go ahead.
25     A.  I did.  At the time I did.  But it's been some

13  (Pages 43 to 46)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit B

000353

Mestas v. Town of Evansville                                                17-CV-00017-NDF

47

1    time that has passed that I don't.  I don't recall.
2    Because I want to say that -- I don't know for sure.
3        Q.   (BY MS. HAYES)  But, for a time, did you
4    observe the fuel tank in Mr. Brown's personal vehicle?
5        A.   I did, in his white -- in his white Dodge.
6        Q.   And then when he left his employment --
7        A.   He returned it.
8        Q.   Do you know if Mr. Brown used Town funds to
9    procure items for himself personally?
10            MR. THOMPSON:  Objection as to form.
11   Relevance.
12       A.   I don't know.
13            MS. HAYES:  I don't have any further
14   questions at this time.
15                 EXAMINATION
16   BY MR. THOMPSON:
17       Q.   Eric, I've got a series of questions.  And
18   first of all, I want to start off by making sure that you
19   understand that your testimony today, as Ms. Hayes
20   indicated, is subject to the penalty of perjury.
21   Correct?
22       A.   Correct.
23       Q.   And still in regards to the questions that I'm
24   going to ask.  You understand that?
25       A.   Yes.

48

1        Q.   And that there's a jury trial that has been
2    scheduled in this matter in federal court in February,
3    and you likely will be asked to attend that jury trial
4    and to testify at that jury trial.  You understand that?
5        A.   Yes.
6        Q.   And you've given two statements in this -- or,
7    one statement in this matter, and you understood that
8    prior statement was not under oath.  Correct?
9        A.   Yes.
10       Q.   And you've reviewed that in preparation for
11   your deposition today?
12       A.   I reviewed some of it, not the whole thing.
13       Q.   Are there portions of that that are inaccurate
14   as you look at that and recall the events that occurred
15   back in 2012 and 2013?
16            MS. HAYES:  Objection to form.
17       A.   I would like to have reviewed it, and I should
18   have to have maybe chose my words better.
19       Q.   (BY MR. THOMPSON)  But you understand today
20   you're answering similar questions under oath.  Correct?
21       A.   Yes.
22       Q.   And it's important for the purposes of this
23   trial because there's serious allegations of unlawful
24   discrimination.  You understand that?
25       A.   Yes.

49

1        Q.   And there is unlawful -- allegations of
2    unlawful discrimination both based upon the Americans
3    with Disabilities Act as well as Title VII, which is a
4    federal law which prohibits these types of actions that
5    are being alleged?
6        A.   Yes.
7        Q.   So, when you testify, I'd ask you to testify
8    based upon your personal knowledge, not upon speculation
9    or hearsay, things that you heard, but what you
10   personally observed.  Okay?
11       A.   Okay.
12       Q.   Because there's some references in your
13   statement where you indicate, for example, that something
14   occurred on multiple occasions, but then you testified
15   today that it might have occurred on two occasions or
16   three occasions.  So those are the sorts of things that I
17   want to focus on.  And, if you can't recall, it's
18   perfectly fine to say, "I can't recall."
19       A.   Okay.
20       Q.   Now, in regards to conversations with
21   Mrs. Hayes, how many conversations have you had with her
22   prior to your deposition today?
23       A.   Just one.
24       Q.   And did that occur when you were an employee of
25   the Town of Evansville?

50

1        A.   No.
2        Q.   When did it occur?
3        A.   November the 15th of this year, 2017.  I think
4    it was Friday.
5        Q.   Well, we're in September.
6        A.   September.  I'm sorry.  September 15th, 2017.
7        Q.   And you were contacted by her directly?
8        A.   She contacted me, and then I gave -- responded
9    back with a phone call.
10       Q.   And how long did you spend talking to
11   Ms. Hayes?
12       A.   I don't know the exact time.
13       Q.   Can we find that?  It was a call made on your
14   cell phone?
15       A.   Yeah.  There should be a record of it.
16       Q.   That's something you can do on a break?  You
17   can look at your cell phone and see how long that call
18   was?
19       A.   Yeah.
20       Q.   Was it more than a half hour?
21       A.   Yeah, I would say it's more than a half hour.
22       Q.   Was it more than an hour?
23       A.   I don't think it was more than an hour.
24       Q.   Did she talk to you specifically about
25   questions that she's asked you today?

14  (Pages 47 to 50)

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                                    17-CV-00017-NDF

51

1      A.   I think there was some reference to some of the
2  questions.
3      Q.   For example, the Christmas lights, did she ask
4  you about that?
5      A.   Yes, she did.
6      Q.   And the dumpster being in the back of the
7  truck, did she ask you about that?
8      A.   I don't know.  I don't recall.
9      Q.   And do you understand what I'm talking about
10  when I'm talking about the dumpster in the back of the
11  truck?
12     A.   The one that's in this paperwork?
13     Q.   The reference to a dumpster being in the back
14  of the sanitation truck and --
15     A.   Yeah.  I remember now after I reviewed it.
16     Q.   Did she talk to you about that?
17     A.   I don't remember.  I really don't.
18     Q.   Did she talk to you generally about the
19  deposition testimony that you've given this afternoon?
20     A.   We talked about a little bit of it, yes.
21     Q.   You talked for at least a half hour.  Right?
22     A.   Yeah.  I would probably say at least a half
23  hour.
24     Q.   And maybe under an hour?
25     A.   Yeah.  Yes.

52

1      Q.   Now, Roy Mestas is a friend of yours?
2      A.   Yeah, I consider him a friend.
3      Q.   You've had contact with Roy since his
4  termination from the Town of Evansville?
5      A.   Yeah, off and on.
6      Q.   He's got your cell phone number.  Correct?
7      A.   That is correct.
8      Q.   And you have his?
9      A.   That is true.
10     Q.   And you talked about the charge of
11  discrimination that's been filed in this case?
12     A.   Yeah.
13     Q.   Do you socialize with each other?
14     A.   No.
15     Q.   You've never gone out and had a beer together?
16     A.   No.  No.
17     Q.   Why is that so funny?
18     A.   Because it's not that type of relationship.  Do
19  I have his phone number in my pocket?  Of course I do.  I
20  have the mayor's.  I had Dale's.  I had all the coworkers
21  in there.  And some of them are still in there.
22     Q.   I understand that.  But they haven't sued the
23  Town of Evansville.
24     A.   Yeah.
25     Q.   Roy Mestas has.

53

1      A.   Yeah.
2      Q.   So how many times have you talked to Roy Mestas
3  since he was terminated from the Town of Evansville?
4      A.   I don't know.  I can't give an accurate exact
5  number on that one.
6      Q.   More than ten?
7      A.   Maybe.
8      Q.   Did Roy talk to you about your testimony today?
9      A.   No.  We haven't talked about any of this
10  besides -- no.
11     Q.   During those ten conversations that you've had
12  with him, what have you talked about?
13     A.   We talked about life, and we talked a little
14  bit about the Town situation.  Just really unfortunate,
15  to be honest with you.  Completely unfortunate.
16     Q.   And so I'm clear in my question, have you
17  talked to him about his employment with the Town of
18  Evansville?
19     A.   I'm sure that was brought up.
20     Q.   And that would include the subject areas that
21  you've talked about today?
22     A.   Some of it, I'm sure.
23     Q.   Including the supervisor that he had, Dale
24  Brown?
25     A.   Yeah.

54

1      Q.   Now, you were a probationary employee when you
2  were first hired by the Town of Evansville?
3      A.   That is correct.
4      Q.   How long were you a probationary employee for?
5      A.   I think it's six months.
6      Q.   And what did that mean to you that you were a
7  probationary employee?
8      A.   It was kind of a trial -- like a -- what it
9  meant to me is that you were going to be observed just to
10  make sure you're able to perform your duties and you're
11  on time.
12     Q.   Did you have the same authority as a permanent
13  employee?
14     A.   I would say no.
15     Q.   And why is that?
16     A.   Because you're new.  You're still going to be
17  observed closely.  What do you mean by --
18     Q.   Well, for example, as a probationary employee,
19  did you have the ability to go get a purchase order and
20  purchase tools from one of the local vendors?
21     A.   I don't know.  I don't know that answer.
22     Q.   As a probationary employee, were you given a
23  phone immediately?
24     A.   I don't know that answer either.  I don't know.
25  I want to say I received my phone fairly quickly.

15  (Pages 51 to 54)

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                                17-CV-00017-NDF

---

55

1      Q.   But you don't know when it was?
2      A.   I don't know exactly, no.  I don't know
3    exactly.
4      Q.   Could have been before or after?  You're not
5    sure?
6      A.   Correct.
7      Q.   And you don't know whether, as a probationary
8    employee, that you were given the same authority, for
9    example, that you had when you left the Town of
10   Evansville to go purchase different items?
11     A.   Can you restate that?
12          MR. THOMPSON:  Would you read that back,
13   Randy?
14          (Previous question read by the
15          reporter.)
16     A.   Well, I think that comes with longevity of the
17   job, when the supervisors observe that you can make
18   purchases that don't need to be scrutinized so closely,
19   as opposed to somebody who just went in there.  So I
20   think over time, it gives the directors or supervisor
21   good judgment on whether you have enough reason to make
22   appropriate purchases.
23     Q.   (BY MR. THOMPSON)  It wasn't typical for
24   somebody that was working there for six weeks, to send
25   them out to go make purchases, was it?

---

56

1          MS. HAYES:  Objection.  Form of the
2    question.
3      A.   It could be if they were accompanied by
4    somebody else.  Because there was a process that they
5    would have to go through.  And so there would probably be
6    a guy there -- a senior guy there who would show them the
7    process and how it worked out.
8      Q.   (BY MR. THOMPSON)  The longer somebody was
9    there, the more they were trusted to make the right
10   purchases?
11     A.   I would say yes.
12     Q.   And you understood that when you made
13   purchases, that you were spending public monies?
14     A.   Yeah.  That's correct.
15     Q.   And was it true that when you made purchases,
16   you were expected to get the best deal that you could,
17   the best bang for your buck?
18     A.   You would want to.  If you had all the
19   information, you would want to plan to that and try to
20   make the best decision, yes.
21     Q.   You stated that you drove the sanitation truck
22   as you progressed through the jobs at Evansville.
23   Correct?
24     A.   That is correct.
25     Q.   Is that a one-man job?

---

57

1      A.   Yes.  The operation of the sanitation truck is
2    a one-man job.
3      Q.   Were you trained on the sanitation truck?
4      A.   I was trained on the sanitation truck.
5      Q.   And how long did your training take?
6      A.   I don't know specifically.  Over a week.
7      Q.   Did you ever have problems picking up bins
8    where you were bending the hooks on the bins?
9      A.   Yeah.  That's common -- can be a common
10   problem.
11     Q.   And what is the cause of that?
12     A.   Twisted hooks.  And that could be caused by
13   either a vehicle damaging them, old bins, just old and
14   wore out, rust, a number of things.
15     Q.   If you pick up the bin in an incorrect manner,
16   can it damage the hook?
17     A.   That can definitely tweak the hooks.
18     Q.   And is that time-intensive to go ahead and
19   replace the hooks?
20     A.   No, not -- no.
21     Q.   You have to bring the bin back to the shop?
22     A.   No, not always.
23     Q.   If you're going to take the old hook off and
24   put on the new hook, do you have to bring the bin back to
25   the shop?

---

58

1      A.   No.  You could take a set of tools and some
2    extra hooks and take off the hook and put a new hook on.
3      Q.   How long would that take?
4      A.   Depends on the bin.  Depends on how bad they're
5    damaged.  But, if you were pulled up to a bin that was
6    newer bolts and stuff, probably 15, 20 minutes.
7      Q.   How many times did you have to get help with
8    getting bins out of the sanitation truck?
9      A.   I don't remember exact number, but I had my
10   fair share of bins dumped.
11     Q.   Over what period of time?
12     A.   I don't know the exact dates or year.  But when
13   I was operating the sanitation truck at the beginning, I
14   dumped a couple bins in the back of the truck.  And some
15   of them I just got up myself.  Just didn't want to bother
16   anybody.
17     Q.   And this is one of those areas that I talked
18   about earlier when we started, is if it happened a couple
19   times and that is what you recall, that's fine.  That's
20   your testimony.  If you can't recall how many times it
21   happened, let me know that.
22     A.   Okay.  I can't recall the exact amount, no.
23     Q.   But there were times where the bin ended up in
24   the back of your truck and you got it out on your own.
25   Correct?

---

16  (Pages 55 to 58)

**Wyoming Reporting Service, Inc.**
1.800.444.2826

Mestas v. Town of Evansville                                                17-CV-00017-NDF

59

1     A.   Yeah, there was times I got it out.
2     Q.   This Exhibit 2, which is the purchase order,
3  during your conversation with Ms. Hayes, did she review
4  this with you?
5     A.   No.
6     Q.   Did she review the issue of purchase orders
7  with you?
8     A.   No.
9     Q.   She didn't talk to you at all about the system
10 for procuring parts at the Town of Evansville?
11    A.   I don't think so, no.
12    Q.   You don't think so or you don't specifically
13 recall?
14    A.   I don't specifically recall.  I don't think so.
15    Q.   Could have, but you can't recall?
16    A.   Yeah.  I don't think we talked about PO
17 numbers.
18    Q.   Did she talk to you about Mr. Mestas purchasing
19 drill bits or gloves?
20    A.   Huh-uh.
21    Q.   Is that a no?
22    A.   No.  That's a no.
23    Q.   Were you aware that Roy Mestas was secretly
24 tape-recording Dale Brown and Brian Boettcher?
25         MS. HAYES:  Objection.  Form of the

60

1  question.
2          MR. THOMPSON:  Hold on for a second.
3  What's the problem with the form, Counsel?
4          MS. HAYES:  Secretly recording.
5     Q.   (BY MR. THOMPSON)  Okay.  Without their
6  knowledge?
7     A.   Yeah.  Later on, I was aware of that.
8     Q.   Were you aware of it while it was going on?
9     A.   I don't think so.  While it was going on?  No,
10 I don't recall.  I really don't.
11    Q.   How did you become aware of it after the fact?
12    A.   Everything that was going on.  When he filed
13 charges and stuff, he said he had some evidence.  And
14 that's when I really can remember that.
15    Q.   There's an incident that is on a recording
16 where he's leaving -- it sounds like he's leaving a
17 pickup truck.  And the individual with him says, "Don't
18 go in there and start a fight," or something to that
19 effect.  Do you recall an incident where he went in and
20 recorded Dale Brown or Brian Boettcher and you were in
21 the vehicle prior to that?
22    A.   I do remember a specific -- it wasn't -- I
23 might have worded it, "Don't start a fight."  But there
24 was times where I just -- the way I would have approached
25 the situation is a different way.

61

1     Q.   And what way was Roy Mestas approaching the
2  situation?
3     A.   I think the way I would see it is not
4  tolerating his treatment, is how I would --
5     Q.   Confrontational?
6          MS. HAYES:  Objection.
7     A.   I don't know if I would say "confrontational."
8  I would say that he -- I don't know.  I would just say
9  not wanting to tolerate what was being said or done.
10    Q.   (BY MR. THOMPSON)  While he was employed with
11 the Town, did he tell you that he was going to sue the
12 Town?
13    A.   I don't think so, no.
14    Q.   He didn't say he was going to bring a lawsuit
15 against Dale Brown or the Town of Evansville?
16    A.   He might have.  I don't recall.  He might have
17 said something about that.
18    Q.   Did he tell you that that's why he was
19 recording those conversation?
20         MS. HAYES:  Objection.  Form of the
21 question.  Misstates the testimony.
22    A.   I don't recall.
23    Q.   (BY MR. THOMPSON)  Could have happened?
24    A.   Could have possibly happened.
25    Q.   Did you agree with him recording those

62

1  individuals without their knowledge?
2     A.   You assume that I knew, number one.  Number two
3  is I don't -- personally -- personally, me, I don't agree
4  with recording conversations.
5     Q.   Did you know?
6     A.   I don't recall.  I really don't.  Probably not
7  until later.  I don't recall.
8     Q.   Whether you knew at the time or after, did
9  you ever go and tell Dale Brown, "You're being recorded
10 without your knowledge"?
11         MS. HAYES:  Objection.
12    A.   No.  No.  But that assumes, again, that I knew
13 something.
14    Q.   (BY MR. THOMPSON)  The question was whether you
15 knew at the time or you knew afterwards.  You knew at
16 least at the time the charge of discrimination was filed
17 because you've testified under oath that Roy Mestas told
18 you.
19    A.   Told me what?
20    Q.   That he had evidence.  He had recordings.
21    A.   Yeah.  Later on, after -- but I don't think
22 I've ever said anything to Dale.
23    Q.   Why not?
24    A.   I think that was after Roy was already gone.
25 If you want me to be honest, I'll be honest.  I don't

17  (Pages 59 to 62)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B

000357

Mestas v. Town of Evansville                                        17-CV-00017-NDF

---

63

1    really recall.  And the other thing is, you know, that
2    was Dale and Roy's situation that they needed to resolve
3    and address.  And the way Roy approached it that he did,
4    that's what he chose to do.  As far as me being in the
5    middle of it, I don't want no part of it.  And I still
6    don't.
7          So, to answer your question honestly, I don't
8    know.  I probably never told anything to Dale.  I don't
9    know when I knew Roy was recording.  And even if I did, I
10   don't want no part of it.  I said that from the
11   beginning, and I'm saying it now.  I don't want no part
12   of this situation.  It's an unfortunate situation that
13   happened.
14         Q.   You talked about your observations of Roy
15   Mestas.  But my understanding from the testimony that was
16   given this morning is that the public works crew met in
17   the morning for a morning meeting, which was how long?
18   15 minutes?
19         A.   Well, usually depends on what -- there's a
20   lot -- there's factors that go into there.  To make a
21   general statement, we met in the morning for 15 minutes,
22   and it was a meeting -- I don't know if having coffee and
23   talking about the day is a meeting.  So these are real
24   general questions.  But I'm trying to give you -- trying
25   to be exact.

---

64

1          Thursdays was our typical Thursday meeting,
2    which was an hour.  Morning meetings, I don't know if you
3    would want to call them that.  Sometimes they were for
4    Roy's case.  He knew what he was doing.  And there was
5    not really much of a meeting.  I mean, sitting around --
6    a couple guys sitting around waiting until -- if you want
7    to say at 8:00 we had a meeting, then I don't know if I
8    could say to you we had a meeting every morning.  Because
9    most of the time we would sit and have coffee.  8:00 came
10   around.  You know what you're doing, and you go to work.
11         And if there was something different depending
12   on the weather, depending on if we had a project going
13   on, depending on if somebody was gone, depending on if
14   one of the supervisors was gone, there's a lot of factors
15   that play into that question.
16         Q.   So here's what I'm trying to figure out.
17   You've talked about your interaction with Roy Mestas.
18   But my understanding of the way that the public works
19   department was structured was exactly what you just said.
20   You came in, BS'd.  You had a cup of coffee.  You were
21   off doing your job.
22         A.   Yeah.
23         Q.   He was a sanitation truck driver, and you were
24   working not as a sanitation truck driver, so you didn't
25   see each other every day.

---

65

1          A.   Well, that's a question --
2          Q.   With the exception of morning and evening.
3          A.   Did we see each other every day?  You know what
4    I mean?  Sometimes I would out on the route.  You know
5    what I mean?  Those are very broad questions.  If you can
6    give me specifically what you're trying to ask, I can do
7    a better job of being honest with you.
8          Q.   Ms. Hayes asked you a question about was it
9    approximately 20 hours a week --
10         A.   Oh.
11         Q.   -- that you interacted with each other?  I
12   think that was the question.  Do you recall that?
13         A.   I do.
14         Q.   And it wasn't 20 hours a week?
15         A.   Well, her question was a very general question
16   too.  I'll wave, and that's an interaction.  "Can you
17   stop and do this?"  That's an interaction.  And when I
18   told her 20 hours, I made it clear that I'm just saying
19   20 hours.  And that's another question that varies.
20   Monday's route's longer.  Tuesday's route's usually
21   generally over by 10:30, 11:00, leaving the rest of the
22   day.  Wednesday's over about 3:00, 2:00.  So it just
23   depends.
24         Q.   And I'm not trying to trick you.  I'm just
25   trying to figure out what you're going to testify to when

---

66

1    you're put in the chair at trial.  And so let me ask this
2    question.  Were there weeks that you maybe interacted
3    with Roy less than a couple hours?
4          A.   I would probably say I think that would be --
5    over the course of a day or a week?
6          Q.   Yes.
7          A.   Over the course of a day?
8          Q.   Over the course of a week if you saw him at
9    morning meeting, had coffee, saw him at lunchtime and
10   then saw him at the end of the day.
11         A.   Well, I'd see him quite a bit on Thursdays.
12   Five hours, maybe.  I'm trying to be -- I want to be
13   honest with you.  If I sit down and really try to think
14   about how often, I could probably be more accurate.
15         Q.   And that's my next question.  Thursdays.  My
16   understanding of your testimony was it was a shop day for
17   Roy, but you were off doing other responsibilities?
18         A.   At times.  And that, again, depends on the time
19   of the season, the projects that are going on, who's
20   doing what.  Is there a guy there?  There's some other
21   things that play into that.
22         Q.   So there were times on Thursdays where you
23   weren't interacting with him throughout the day?
24         A.   Yeah.  I would say that's accurate.  Only a
25   couple of times.

---

18  (Pages 63 to 66)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit B

000358

Mestas v. Town of Evansville                                          17-CV-00017-NDF

67

1    Q.   Because you were off doing other things?
2    A.   Yeah.
3    Q.   And you were not his supervisor.  Correct?
4    A.   No.  That is correct.
5    Q.   And you were not rating his job performance.
6  Correct?
7    A.   No.
8    Q.   That was whose responsibility?
9    A.   That's the supervisor's job.
10   Q.   Which was Dale Brown?
11   A.   That is correct.
12   Q.   And he worked for a very short period of time
13 before his work injury, didn't he?
14   A.   Yeah.
15   Q.   He was injured on November 26th.
16   A.   Okay.
17   Q.   Right before Thanksgiving.  Do you recall that
18 now?
19   A.   I do remember that it was around Thanksgiving.
20   Q.   Do you recall Roy Mestas talking about wanting
21 to go on a trip over the Thanksgiving holiday?
22   A.   I don't remember that.
23   Q.   You don't recall that?
24   A.   No, I don't recall that.
25   Q.   He returned on January 14th.  Do you recall

68

1  that?
2    A.   I don't recall the exact dates, but I know it
3  was an extended time.
4    Q.   Do you have a specific recollection of the
5  interaction between Dale Brown and Roy Mestas prior to
6  November 26th; in other words, the first six weeks of his
7  employment?
8    A.   Do I remember any --
9    Q.   Specifically how they interacted.
10   A.   No.
11   Q.   So is it fair to say that you don't, then,
12 recall if he was treated differently after he returned
13 from the work injury?
14       MS. HAYES:  Objection.  Misstates the
15 testimony.
16   A.   Well, I guess where there's some -- where it's
17 a little bit nebulous is I don't know when he was hired,
18 when he was -- the specific dates and certain incidents
19 that happened.  When it comes to a time frame, I can't
20 give you accurate time.
21   Q.   (BY MR. THOMPSON)  What I'm trying to figure
22 out is you testified that he was treated differently when
23 he came back.
24   A.   Yes.
25   Q.   But you can't tell me how he was treated before

69

1  the injury?
2    A.   I don't know which incidents -- I'm trying to
3  remember which incidents occurred where at in that time
4  frame.
5    Q.   So is that fair that you can't recall how he
6  was treated before the injury and which incidents
7  occurred when?
8        MS. HAYES:  Objection.  Misstates his
9  testimony.
10   Q.   (BY MR. THOMPSON)  Am I misstating your
11 testimony?
12   A.   I'd have to -- I'd have to think about that.
13   Q.   Because I want to know specifically how he was
14 treated differently.
15   A.   I'm trying to give you specifics.  I think Dale
16 was a little bit more kind to him, treated him with a
17 little more dignity.  I think that would be -- I think
18 that would be -- the truth is that after -- before this
19 incident happened, Dale, I would say, was treating him
20 with a little bit more dignity, as opposed to the
21 incident that occurred, and then after that, then, yeah,
22 then that's where there's some -- he treated him
23 different, as opposed to treating him with some level of
24 respect.
25   Q.   But you can't give me any specifics other than

70

1  just generalizations that he treated him with more
2  respect prior to?
3    A.   I can't.  Yeah.  I'd have to think about that.
4    Q.   Did you ever observe Mr. Mestas arguing with
5  Dale Brown?
6    A.   I think I have.
7    Q.   Did you ever see Mr. Mestas raise his voice
8  when he was arguing with Dale Brown?
9    A.   Yeah, but not -- yeah.
10   Q.   Did you consider it appropriate for an employee
11 to be arguing with a supervisor?
12   A.   I don't know about arguing.  Disagreement,
13 having a disagreement.  But as far as arguing, it depends
14 on how you view it, you know.
15   Q.   Did you find it appropriate for Dale -- for Roy
16 Mestas to be raising his voice when he was having a
17 disagreement, as you put it, with Dale Brown?
18       MS. HAYES:  Objection.  Misstates the
19 testimony.
20   A.   They were valid.  In my opinion, they were
21 valid things to discuss.
22   Q.   (BY MR. THOMPSON)  I understand your opinion.
23 But did you consider that appropriate?
24   A.   Yes, I do.  I do consider the way that Roy
25 responded to Dale was completely appropriate.

19  (Pages 67 to 70)

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                                    17-CV-00017-NDF

---

71

1    Q.   Which was, it was okay for him as an employee
2    to raise his voice to his supervisor?
3          MS. HAYES:  Objection.  Misstates.
4    A.   No.  It's okay for him to -- I can't remember
5    him raising his voice.  But they had some disagreements.
6    And I think it's appropriate for anybody, if they feel --
7    depending on the disagreement that they're having, to go
8    ahead and have a vocal conversation about it.  I don't
9    feel like it was anything that was a threat to Dale's
10   position.
11   Q.   (BY MR. THOMPSON)  You testified that when Roy
12   Mestas returned from his work injury, that, quote, you
13   could tell he was recovering still.
14   A.   Yeah.
15   Q.   Was he returned -- or, released to return to
16   work without any restrictions?
17   A.   I don't know that.
18   Q.   Did you know anything about his medical
19   history?
20   A.   Just that he had had an operation.
21   Q.   How did you know that?
22   A.   It was shared with me through Mr. Mestas and
23   Dale.
24   Q.   And what did Mr. Mestas tell you about his
25   operation?

---

72

1    A.   That he had to have surgery.
2    Q.   Did he tell you where he had to have that
3    surgery?
4    A.   In his back.  Both Dale and him.
5    Q.   When Mr. Mestas returned to work, he didn't
6    tell you anything about whether he was under restrictions
7    or not?
8    A.   Not that I recall.
9    Q.   What was your belief?
10   A.   On what?
11   Q.   Whether he was still on restrictions.
12   A.   What my belief was is that -- I don't know.  I
13   don't remember at the time.
14   Q.   You testified that he was still recovering.
15   What did you mean by that?
16   A.   That you could tell he still must have been
17   sore, you know, a little bit more cautious in the way he
18   walked.
19   Q.   Were there things he wasn't able to do?
20         MS. HAYES:  Objection.  Foundation.
21   A.   I don't know.
22   Q.   (BY MR. THOMPSON)  You didn't observe anything?
23   A.   I know he had a difficult time shoveling snow.
24   Q.   That was in April?
25   A.   I don't know the time frame.

---

73

1    Q.   Was he given any demotion in his job when he
2    returned to work?
3          MS. HAYES:  Objection.  Foundation.
4    A.   I don't think so.
5    Q.   (BY MR. THOMPSON)  He was a sanitation truck
6    operator when he was hurt, and he returned as a
7    sanitation truck operator.  Correct?
8    A.   Yeah.
9    Q.   Do you know whether or not he was reduced in
10   pay?
11   A.   I don't know that.
12   Q.   Do you know whether or not he had any less
13   responsibilities than at the time that he was injured?
14   A.   I don't think he did.
15   Q.   He had all the same responsibilities?
16   A.   Yeah.  Oh, yeah.
17   Q.   Was required to do everything that he was
18   required to do at the time that he was injured?
19   A.   I believe so.
20   Q.   Did you know an employee by the name of
21   Waddell?
22   A.   Yeah.
23   Q.   How do you know him?
24   A.   Paul?
25   Q.   Yeah.

---

74

1    A.   Yeah.  He worked for the Town.
2    Q.   Did he get terminated by Dale Brown?
3    A.   Yeah.
4    Q.   Was he treated poorly by Dale Brown?
5    A.   I'm not sure.  I think he was.  I think he was.
6    I'm not sure what happened there.  He wasn't there very
7    long.
8    Q.   What do you recall about his interaction with
9    Dale Brown?
10         MS. HAYES:  Objection.  Foundation.
11   A.   Not much.  I know that they let him go.
12   Q.   (BY MR. THOMPSON)  Do you know why they let him
13   go?
14   A.   I don't know why, actually.
15   Q.   Do you know what his ethnicity was?
16   A.   I think they just didn't really care for him,
17   to be honest with you.
18         Yeah.  He was Caucasian.
19   Q.   Male?
20   A.   Yes.
21   Q.   Age?
22   A.   Probably 50, 40.  40, 50.
23   Q.   Based upon your employment with the Town of
24   Evansville and your interaction with Dale Brown, is it
25   fair to say that if he didn't like you, he didn't treat

---

20   (Pages 71 to 74)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B

000360

Mestas v. Town of Evansville                                    17-CV-00017-NDF

75

1  you very fair?
2      A.  That's fair.
3      Q.  And did you see this happen to both Roy Mestas
4  as well as other individuals?
5      A.  Yes.
6      Q.  And were the other individuals that he didn't
7  treat fairly or treated poorly, were they Caucasian?
8      A.  Yeah.
9      Q.  Did you believe that the way he treated Roy
10 Mestas at all was based upon Roy's ethnicity?
11     A.  No, I don't.
12     Q.  You don't think he had any motivation because
13 Roy was Hispanic?
14     A.  I can't say that he did.  I would hope not.
15     Q.  In your opinion?
16     A.  In my opinion?  In my opinion, no.  I would
17 hope not.
18     Q.  He gave that same sort of treatment to Waddell?
19     A.  Yeah, and some other people too.
20         MS. HAYES:  Objection.  Form of the
21 question.
22     Q.  (BY MR. THOMPSON)  And some other people too?
23     A.  Yeah.
24     Q.  What other people did he treat like that that
25 you can recall by name?

76

1      A.  This kid named Robert.  Robert -- I can't
2  recall his name right now, but I'm sure it will come to
3  me.
4      Q.  How did he treat him?
5      A.  Didn't treat him very nice.  Pushed him to the
6  point where he lost control, and then he let him go the
7  next week.
8      Q.  Was Robert employed prior to Roy or after Roy?
9      A.  Prior.
10     Q.  Was Robert Caucasian?
11     A.  Yes.
12     Q.  What was his age?
13     A.  He was probably around -- at the time he was
14 probably around 26.  25, 26, I would say.  Young.  Under
15 30.
16     Q.  Do you know why, as you've testified, that Roy
17 treated -- or, excuse me -- Dale treated Roy the way he
18 did?
19     A.  Do I know why?
20     Q.  Yeah.
21         MS. HAYES:  Objection.  Speculation.
22     Q.  (BY MR. THOMPSON)  And, again, personal
23 knowledge.
24     A.  Personally, I don't think he really cared for
25 Roy.  And then after he hurt his back, I think he didn't

77

1  really care for that.
2      Q.  The record will reflect in this matter, it's
3  undisputed that Roy was returned to work without any
4  restrictions on January 14, 2013.  So, when you say that
5  it was because he was injured, he's back, and he's
6  working.
7      A.  Yeah.  Because he was previously injured.  And
8  I think that Dale -- yeah.
9      Q.  Is this anything that you know personally, or
10 is this speculation?
11     A.  I just think Dale's attitude, what I picked up
12 from him, in my opinion, is because of the injury to
13 Roy's back, he viewed that as a liability.  And I think
14 before he knew of Roy's surgery, he even questioned
15 whether or not he was truly injured.
16     Q.  That's your assumption, or is that something
17 that Dale actually told you?
18     A.  We talked about it.  And that's something that
19 was mentioned.  But I don't -- Dale's, in my opinion, a
20 decent guy who made some bad decisions and said some
21 things that probably shouldn't have been said.
22     Q.  Were you aware that Roy had been injured on
23 other jobs?
24     A.  Huh-uh.
25     Q.  That he had filed other work comp claims?

78

1      A.  No.
2      Q.  Did he ever discuss that with you?
3      A.  Not to my knowledge, no.
4      Q.  And you didn't have that discussion with Dale
5  Brown at all?
6      A.  Which one?
7      Q.  That Roy had been injured on other jobs.
8         MS. HAYES:  Objection.  Foundation.
9      A.  I don't think so.  No, not to my knowledge.
10     Q.  (BY MR. THOMPSON)  You talked about radios and
11 Roy not being issued a radio?
12     A.  Yeah.
13     Q.  But I think you also testified that some public
14 works employees had radios.  Did every single public
15 works employee have a radio?
16     A.  I can't recall that.  You were supposed to all
17 have radios, is what I understood.
18     Q.  But you can't recall specifically as to whether
19 everyone had a radio?
20     A.  Yeah, there might have been somebody else.  I
21 think who else didn't have one is Wilbur, and that's
22 because they didn't think that he was going to be able to
23 hear it because he had some hearing impairment.  So, if I
24 sat here and thought about it, I might be able to narrow
25 it down.  So, to my knowledge, I guess there was other

21  (Pages 75 to 78)

Wyoming Reporting Service, Inc.
1.800.444.2826
Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000361

79

```
1    people that didn't have a radio too.  So that would be --
2       Q.   Was Roy the only probationary employee from
3    2012 to the date of his termination in April of 2013?
4       A.   I can't recall.  To be specific, I can't recall
5    who was hired with him in that time frame.  The time is
6    where I can't be accurate, 100 percent accurate.
7       Q.   When I talked to you about the differences in
8    what was given in the statement that you provided to the
9    hearing officer and what you're testifying to under oath,
10   for example, you've testified today that Boettcher would
11   shovel snow.  And I assume that when you testified to
12   that, you had a clear recollection of Boettcher shoveling
13   snow?
14      A.   I did.  I know I said no in there, but there
15   was times he did.  And I specifically remember because
16   he's a winter guy, and he liked the winter.  But I
17   think he -- yeah, he did.  He helped out at times when it
18   was needed.
19      Q.   And the statement that you gave to the hearing
20   officer, that was not given under oath, was it?
21      A.   No, it wasn't.  And I misspoke.  I do remember
22   Brian assisting.
23      Q.   And were you given the opportunity to have
24   counsel present when you were giving that statement, have
25   an attorney present?
```

80

```
1       A.   I don't recall.  I don't remember that.  I
2    don't think so, no.
3       Q.   Other employees that have testified today
4    testified that Wilbur had shoveled snow before.  Could
5    there be instances where he shoveled snows?
6       A.   There's possibilities where he could have, or
7    salted, did something to assist.  Wilbur was always
8    wanting to help and find a way to help.  So that could be
9    accurate.
10      Q.   Ms. Hayes asked you if you were ever
11   disciplined or if you were aware of any employees that
12   were ever disciplined for not shoveling snow.  That
13   assumes that there were employees that didn't shovel
14   snow.  Can you recall any employees that refused to
15   shovel snow?
16      A.   Refused?  No.  They may have been late or
17   something.  But refused?  No.
18      Q.   And what happened if an employee showed up late
19   on a day when you were supposed to shovel snow?
20      A.   We'd get called into the office, and he
21   would -- "Don't show up late."  We'd be talked to about
22   it.
23      Q.   Verbally reprimanded?
24      A.   Yes.
25      Q.   The incident with the snowblower, where Roy
```

81

```
1    requested to go home and get his snowblower --
2       A.   Uh-huh.
3       Q.   -- did you believe that the response from Dale
4    Brown that he wasn't going to let him do that was
5    reasonable?
6       A.   I do.  With the information I have now and
7    knowing a little bit more, it is -- it could be possible
8    liability.  So I understand Dale's position on that.
9    Could have been discussed at a later time.  But I think
10   Dale was reasonable about that.
11      Q.   And did you think that -- I mean, would you
12   have been done shoveling by the time he would have come
13   back with the snowblower?
14          MS. HAYES:  Objection.  Foundation.
15      A.   I don't know.  Depending on the snow and
16   depending on how many people were there.  But, yeah, we
17   probably -- I don't know how long it takes to load a
18   snowblower.  But we would have just continued on.
19      Q.   (BY MR. THOMPSON) How long did it typically
20   take the public works crew to shovel snow?
21      A.   That's a good question.  Because we do have a
22   riding tractor with a snowplow on it.  And that can get
23   it done real quick.  So depending on if it was out or
24   not.  But, typically, without the use of the tractor,
25   maybe 40 minutes.
```

82

```
1       Q.   Did you have that tractor in 2012, 2013?
2       A.   Yeah.
3       Q.   Did you use it?
4       A.   I'm sure we did.  I know I used it.  I like
5    that tractor.
6       Q.   Did you recall any specific instance where you
7    used it to shovel snow?
8       A.   During that time frame?
9       Q.   Yes.
10      A.   I can't say for sure.  But I use it.
11      Q.   This is another one of those areas where the
12   difference between two or three times -- this is one of
13   those areas where the difference between two and three
14   times is significant.  And so I want you to testify based
15   upon personal knowledge and a clear recollection.
16      A.   Okay.
17      Q.   When you talked about Dale Brown using the
18   derogatory term "beaner," that happened one time when you
19   and Roy Mestas were both present?
20          MS. HAYES:  Objection.  Misstates his
21   testimony.
22      A.   At this time I don't remember "beaner," but
23   "Mexican," yeah.  "Beaner"?  I don't know when he -- I
24   don't know for sure.  I can't be for certain.  I know I
25   mentioned it in here, but now I don't -- I don't
```

22  (Pages 79 to 82)

Wyoming Reporting Service, Inc.
1.800.444.2826
Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit B

000362

Mestas v. Town of Evansville                                    17-CV-00017-NDF

                                                                              83

1    recollect.
2         Q.   (BY MR. THOMPSON)  When you say you know you
3    mentioned it here, you're referring to your statement.
4    Correct?
5         A.   That's correct.  I know I mentioned it in
6    there, but I can't give the exact time.
7         Q.   And in your statement -- and feel free to look
8    at it on page 18 -- you say that, "I don't remember him
9    saying 'stupid beaners.'"
10        A.   I don't remember that still.
11        Q.   And do you recall him using the word "beaner"
12   in your presence more than once?
13        A.   In my presence more than once?
14        Q.   Yes.
15        A.   No.  I really can't unless I sat and thought
16   about it.
17        Q.   And let me have you turn to page 21 of your
18   statement.  You were asked questions by Ms. Hayes about
19   him telling jokes.  And, in your statement, if you'd read
20   on page 8 -- or, excuse me -- on page 21, line 8.
21        A.   Oh, read it?  "He -- yeah.  I -- I -- right now
22   I haven't -- with not much thought, I would have to say
23   that I don't think I remember him telling jokes."
24        Q.   Is that accurate, that you don't remember him
25   telling jokes?

                                                                              84

1         A.   About nationalities?  I would have to say that
2    I don't.  I don't know.
3         Q.   You stated that you would joke around in the
4    workplace?
5         A.   Yeah.
6         Q.   What sort of language would you use?
7         A.   We would use the word "Mexican" and stuff,
8    yeah.
9         Q.   Was that true with Roy also?
10        A.   No.  With Roy being there?  No.  It was a
11   different relationship.
12        Q.   Was that done in the presence of Dale Brown, or
13   was that done with co-employees?
14        A.   What?
15        Q.   Joking around on your own.
16        A.   That was done mostly with Dale and Brian, and
17   then it started more openly.
18        Q.   So that was you using the term?
19        A.   That is correct.  "Mexican," yes.
20        Q.   And did you find that offensive?
21        A.   No.
22        Q.   Did you find use of that term on your own to
23   create a hostile work environment?
24        A.   Depending on -- depending on how it was
25   delivered.

                                                                              85

1         Q.   So, if it was joking, it was okay?
2         A.   If it was -- if it was meant to be jokingly, it
3    was -- I'm fine with it.  But, if it was meant in a
4    derogatory way, that's when I wasn't okay.  And I
5    wouldn't even say "okay."  I would just say that's when I
6    disagree.
7         Q.   And I'm not judging you looking in retrospect.
8    But your use of the term in the workplace when you knew
9    that that wasn't appropriate, why did you find that that
10   was okay to do?
11             MS. HAYES:  Objection.  Form of the
12   question.
13        A.   It was used on a personal relationship with
14   some of the people that I had.  Was it right?  No,
15   probably not.  Probably shouldn't have.
16        Q.   (BY MR. THOMPSON)  Understand your perception
17   of the mayor and Dale Brown's relationship, but you were
18   aware that there were council members on the city
19   council, correct, or on the town council?
20        A.   Yeah.
21        Q.   And you were aware of your right to go talk to
22   those council members if you had problems in the
23   workplace?
24        A.   No.  But that's actually not a bad thought.  I
25   was always told it was a mayor-ran town, that he did kind

                                                                              86

1    of what -- that he was more managing it.  But, no, I
2    didn't really think about that.
3         Q.   Did you ever look to the employee handbook to
4    see if there was any remedy available for --
5         A.   No, I did not.
6         Q.   Why not?
7         A.   Because I was just going to work through it,
8    find a way to work through it.  And that might have been
9    an option.
10        Q.   Did you have the ability to go talk to the Town
11   attorney if you felt that there was problems in the
12   workplace?
13        A.   I'm sure I could have.
14        Q.   Did you ever make the suggestion to Roy Mestas
15   to go talk to the Town attorney?
16        A.   No.
17        Q.   So, in regards to Dale Brown making the
18   comment, you said that you never heard him make the
19   comment "stupid beaner."  Correct?
20        A.   Yeah.
21        Q.   But he made the comment "beaner."  And he only
22   made that one time in your presence?
23        A.   Possibly.
24        Q.   And that's over the time period from when you
25   were employed to when you terminated your employment?

                                    23  (Pages 83 to 86)

Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit B

                                                                              000363

Mestas v. Town of Evansville                                    17-CV-00017-NDF

87

1    A.   Yeah.
2    Q.   Which is what time period?
3    A.   From when he was let go, it was two thousand --
4    I was hired in 2011, and he was hired -- and he was
5    released -- I don't know when.  In his presence, overall,
6    between the terms -- in my presence, I probably heard him
7    use the phrase in a way that could be perceived as
8    shouldn't have used it in that way probably three or four
9    times.
10   Q.   Over the entire time that you were employed?
11   A.   Uh-huh.
12   Q.   Is that a yes?
13   A.   Yes.
14   Q.   And how many times when Roy Mestas was present?
15   A.   Once or twice when I was in there, yeah.
16         MR. THOMPSON:  I don't have any further
17   questions for you.  Thank you.
18         (Deposition proceedings recessed
19              2:51 p.m. to 2:58 p.m.)
20              EXAMINATION
21   BY MS. HAYES:
22   Q.   You mentioned twice, Mr. Reyna, in responding
23   to questions from Mr. Thompson that the situation with
24   Mr. Mestas' employment was -- and I wrote the quote
25   down -- "completely unfortunate."

88

1    A.   Yeah.
2    Q.   What do you mean by that?
3    A.   The dealings between -- between Roy and Dale
4    which led to here.  Just the circumstances.  Some of the
5    things that have happened is just unfortunate.
6    Q.   Unfortunate in what regard?
7    A.   In that it came to this point, that it comes to
8    this point.  It's unfortunate that it came to this point.
9    Q.   You weren't referring to unfortunate in terms
10   of what was happening in the workplace?
11   A.   That too.  Unfortunate with that situation too.
12   Q.   And you were asked some questions about
13   communicating with Mr. Mestas about the discrimination
14   charges he made.  Did you have communications with him
15   about him filing charges of discrimination?
16   A.   Yeah.  After he filed, he said he filed and
17   talked about it a little bit.  And that was about it.
18   Nothing real detailed or anything.
19   Q.   Have you spoken to Mr. Mestas since he filed
20   his federal discrimination lawsuit?
21   A.   I'm not sure when that was, but I don't think
22   so.  We were communicating, and then we -- we were
23   communicating recently -- or, not even recently.  It's
24   been a while.  I haven't talked to him.
25   Q.   So he filed his discrimination lawsuit in

89

1    federal court in January of this year.  Have you spoken
2    to him about those charges or anything about the
3    underlying facts of those charges?
4    A.   Oh, no.  No.
5    Q.   Have you communicated -- did you communicate
6    with Dale Brown about Mr. Mestas after Dale Brown fired
7    him in April of 2013?
8    A.   Did we talk about Roy?
9    Q.   Yes.
10   A.   I'm sure we did.
11   Q.   What did you talk about?
12   A.   I don't know.  Probably about the situation.
13   Q.   And what do you remember about the
14   conversation?
15   A.   I don't remember much, to be honest with you.
16   I would have to -- I guess I'm assuming.  I would have to
17   assume that we did talk about it on a certain degree
18   because we're going to have personnel changes.
19   Q.   And you knew he had been fired, obviously?
20   A.   Yeah.  So I'm sure we had some dialogue there,
21   but I don't remember specific.
22   Q.   Have you ever communicated with Mr. Brown about
23   the discrimination charges made by Mr. Mestas?
24   A.   We did have some conversations about that,
25   about that Dale was upset about the accusations brought

90

1    against him.
2    Q.   And what did he tell you?
3    A.   That he was upset about them and that -- he was
4    upset and didn't have no bias or prejudice.  "That's
5    good," was my response.  Like I said, and I'll say again,
6    and I'd hope not.
7    Q.   Do you know what the law is in Wyoming
8    regarding recording your conversation with another
9    individual?
10   A.   I don't.
11   Q.   Do you know if it takes a one-person consent or
12   both parties to the conversation consent?
13        MR. THOMPSON:  Objection as to form.
14   Q.   (BY MS. HAYES)  I'm asking if you know.
15   A.   No.
16   Q.   You also mentioned that you would see
17   Mr. Mestas disagreeing with Mr. Brown at times about
18   work-related matters?
19   A.   Yeah.
20   Q.   Did you ever witness Mr. Emond disagreeing with
21   Mr. Brown about work-related matters?
22   A.   Yeah.  I think there was a couple of times.
23   Q.   What did you witness?
24   A.   Just a disagreement.  I witnessed a
25   disagreement.

24   (Pages 87 to 90)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000364

Mestas v. Town of Evansville                                    17-CV-00017-NDF

91

1    Q.   Different type of -- never mind.  That's a
2   terrible question.  When Mr. Emond testified here, he
3   mentioned that he one time threw a chair across the
4   office.
5    A.   Yeah.  He stated that.  I didn't see that.
6    Q.   Were you aware that he had done that?
7    A.   Yeah.  He told me he had done that.
8    Q.   Do you know what that argument was about?
9    A.   I do not.
10    Q.   Do you know if Mr. Mestas was ever violent or
11   threw things in disagreeing with Mr. Brown?
12    A.   No, not to my knowledge.  And just -- I think
13   disagreement -- I think there's times to disagree
14   depending on what the situation was.  And I think one
15   time it was about triangles, having safety triangles in
16   the truck in case of a breakdown.  And it was a
17   disagreement there on whether they should or whether they
18   shouldn't.  And I think that's an appropriate discussion
19   to have because it's a safety issue.  So, when we talk
20   about disagreements and discussions, there's a lot to
21   those questions.
22    Q.   I understand.  Did you ever hear Mr. Mestas
23   raise his voice when he was disagreeing with Mr. Brown?
24    A.   I think I heard a change of tone in his voice,
25   yeah.

92

1    Q.   How about Mr. Brown?  Would he raise his voice?
2    A.   Oh, yeah.  His was a little bit more -- yeah,
3   he would raise his voice.  His tone would change.
4    Q.   Did Dale Brown tell you that he thought
5   Mr. Mestas hadn't really been injured?
6    A.   He wasn't sure.  The conversation was brought
7   up.  But I think that -- I think he came to terms with
8   what if he really did hurt his back?  I know he'd
9   questioned it.  I think -- I think we all questioned it
10   when it first happened.  I'm not going to lie.  It's a
11   valid question.  But, if somebody says they hurt their
12   back, we give them the benefit of the doubt that they're
13   honest and they did.  So that's the position.  So, when
14    Q.   Did you have any information to say one way or
15   the other whether Mr. Mestas had injured his back?
16    A.   Did I have any information?
17    Q.   Yes.
18    A.   Whether or not he really hurt his back or not?
19    Q.   Like a medical.  Did you see any of his medical
20   records?
21    A.   Oh, after he was going through his medical
22   procedures and stuff, it's like, wow, this guy really
23   hurt his back.
24    Q.   And when was that?  Do you remember?
25    A.   I don't remember that.

93

1    Q.   Because you mentioned that you were aware that
2   Mr. Mestas had an operation on his back.
3    A.   Yeah, or was going to.  I know he -- since his
4   incident, he has had an operation.
5    Q.   But during his employment with the Town of
6   Evansville?
7    A.   Oh, I don't know.  I'd have to think about that
8   one.  I don't think so.  I don't know.
9    Q.   Just back to the shoveling-of-snow incident
10   when Mr. Mestas asked to use a snowblower, were you aware
11   that Mr. Mestas had told Mr. Brown the week before that
12   the following week he was going to be having an injection
13   in his back for back pain?
14    A.   I don't remember that.
15    MR. THOMPSON:  Objection as to form.
16    Q.   (BY MS. HAYES)  You weren't aware of that?
17    A.   No.
18    Q.   And when he returned to work in January after
19   he took time off to recover from his injury, was there
20   anything that you noticed that Mr. Mestas was unable to
21   do in terms of his job duties, aside from you mentioned
22   the shoveling snow?
23    A.   No, not that I'm aware of.  Dale could probably
24   answer that better than I could.
25    Q.   Were you issued an employee handbook when you

94

1   worked for the Town?
2    A.   I'm sure I was.
3    Q.   Do you recall anything in that handbook
4   indicating that you could go talk to individual council
5   members about your supervisor?
6    A.   To my knowledge none even, I don't know that.
7    MS. HAYES:  I don't have any further
8   questions at this time.  Oh, wait.  One more question.
9   I'm sorry, Mr. Reyna.
10    MR. THOMPSON:  You thought you were out of
11   here.
12    MS. HAYES:  I know.  You want to get home
13   to your son, or your child.
14    THE DEPONENT:  My wife, more likely.  He's
15   not going to have no recollection of this, but my wife
16   will.
17    Q.   (BY MS. HAYES)  You were asked by both myself
18   and Mr. Thompson about Mr. Brown using the term "beaner"
19   in the workplace.  Have you ever heard Mr. Brown refer to
20   anyone else using the term "beaner"?  Like his wife or
21   neighbors or Town residents?
22    A.   Using that?
23    Q.   Yes.
24    A.   I don't remember.
25    Q.   Does that mean you don't remember it ever

25  (Pages 91 to 94)

Wyoming Reporting Service, Inc.
1.800.444.2826
Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit B

000365

Mestas v. Town of Evansville                                17-CV-00017-NDF

95

1  happening?
2      A.   That means I don't remember it happening.
3      Q.   It could have happened and you don't remember,
4  or you don't remember it ever happening?
5          MR. THOMPSON:  Objection as to form.
6      A.   It could have happened.  I don't remember.
7      Q.   (BY MS. HAYES)  And then -- sorry.  I had one
8  other thing.  Page 20 of your interview with the
9  investigator, can you please -- you were asked by
10  Mr. Thompson that you didn't hear Mr. Brown telling any
11  jokes about Hispanics or other minority groups.  On
12  page 20, line 17 to 19, would you please read those
13  lines?
14     A.   "I want to say -- and I -- depends on -- I have
15  heard him be involved in jokes --"
16         "Okay."
17         "-- that were Spanish or Mexican or something."
18         "Okay."
19     Q.   Do you remember when that was?
20     A.   Maybe when I told them, then he was involved.
21  But, as far as somebody else making them, I don't
22  remember, to be honest with you.  In all honesty, him and
23  I would -- I would joke with him.  So he was in the
24  presence, involved in them, because I put him in that
25  situation.  But, as far as -- which was probably bad on

96

1  my part.  But, as far as being involved in jokes in the
2  office place, right now I can't say specifically of one.
3          MS. HAYES:  I don't have any further
4  questions.
5              EXAMINATION
6  BY MR. THOMPSON:
7      Q.   Just for the record, Eric -- and this is for
8  purposes of establishing what's evident -- but what's
9  your ethnicity?
10     A.   Mexican and Spaniard.
11         MR. THOMPSON:  That's all we've got.  You
12  get to go home.
13         THE DEPONENT:  All right.  Good.  And
14  listen to my wife.
15         MR. THOMPSON:  You want to advise him
16  about his opportunity to read and sign?
17         MS. HAYES:  So you would have an
18  opportunity to read a draft of the transcript from your
19  deposition.  And if you have corrections that you would
20  like to make, if you read through it and see there's
21  something that is incorrect that you feel needs to be
22  corrected, like, "Oh, shoot.  I was on LSD all day today
23  and I told her I wasn't on medication" --
24         THE DEPONENT:  If I misspoke, yeah.
25         MS. HAYES:  -- then you'll have the chance

97

1  to review that and sign it if it looks okay.  If not, you
2  can make some correction.
3          THE DEPONENT:  Can I get a copy of it, or
4  do I have to make those revisions now?
5          MR. THOMPSON:  No.
6      We're off, Randy.
7          (Deposition proceedings concluded
8          3:12 p.m., September 19, 2017.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

98

1          DEPONENT'S CERTIFICATE
2      I, Eric Reyna, do hereby certify that I have
3  read the foregoing transcript of my testimony consisting
4  of 97 pages taken on September 19, 2017, and that the
5  same is a full, true and correct transcript of my
6  testimony.
7
8
9
10  _____
          ERIC REYNA
11
( ) No changes      ( ) Changes attached
12
13     Subscribed and sworn to before me this _____
14  day of _____, 2017.
15
16
          _____
17          Notary Public
18
19
My Commission Expires_____.
20
21
22
23
24
25

26  (Pages 95 to 98)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit B

000366

Mestas v. Town of Evansville                                        17-CV-00017-NDF

                                                    99

```
 1              C E R T I F I C A T E
 2
 3          I, RANDY A. HATLESTAD, a Registered Merit
 4     Reporter and a Notary Public of the State of Wyoming, do
 5     hereby certify that the aforementioned deponent was by me
 6     first duly sworn to testify to the truth, the whole
 7     truth, and nothing but the truth;
 8          That the foregoing transcript is a true record
 9     of the testimony given by the said deponent, together
10     with all other proceedings herein contained.
11          IN WITNESS WHEREOF, I have hereunto set my hand
12     and affixed my notarial seal this 2nd day of October,
13     2017.
14
15
16
17     _____
                RANDY A. HATLESTAD
18              Registered Merit Reporter
19
20
21
22
23     My Commission Expires April 2, 2020.
24
25
```

                                                    27  (Page 99)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit B

                                                                        000367

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              1

 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF WYOMING

 3   ----------------------------------------------------------
     ROY MESTAS,
 4
                  Plaintiff,
 5
          vs.                     Case No. 17-CV-00017-NDF
 6

 7   TOWN OF EVANSVILLE, a duly
     incorporated municipal corporation
 8   under the laws of the State of
     Wyoming, and DALE BROWN, in
 9   his official capacity as public
     works supervisor for the
10   Town of Evansville,

11              Defendants.
     ----------------------------------------------------------
12

13                  DEPOSITION OF RONALD EMOND
                    Taken in behalf of Plaintiff
14
                    11:00 a.m., Tuesday
15                  September 19, 2017

16

17          PURSUANT TO NOTICE, the deposition of RONALD

18   EMOND was taken in accordance with the applicable Wyoming

19   Rules of Civil Procedure at the offices of Schwartz, Bon,

20   Walker & Studer, 141 South Center, Suite 500, Casper,

21   Wyoming, before Randy A. Hatlestad, a Registered Merit

22   Reporter and a Notary Public in and for the State of

23   Wyoming.

24

25

                    Wyoming Reporting Service, Inc.
                           1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              2

1                    A P P E A R A N C E S

2   For the Plaintiff:        MS. MEGAN L. HAYES
                              Attorney at Law
3                             910 Kearney Street
                              Laramie, Wyoming 82070
4

5   For the Defendants:       MR. THOMAS A. THOMPSON
                              Attorney at Law
6                             MacPHERSON, KELLY & THOMPSON
                              616 West Buffalo Street
7                             P.O. Box 999
                              Rawlins, Wyoming 82301-0999
8

9   Also Present:            Mr. Roy Mestas

10
                              I N D E X
11
    DEPOSITION OF RONALD EMOND:
12                                                      PAGE

13  Examination by Ms. Hayes                             3
    Examination by Mr. Thompson                         32
14  Examination by Ms. Hayes                            42
    Examination by Mr. Thompson                         46
15  Examination by Ms. Hayes                            48

16
                             E X H I B I T S
17
    No.                  Description              Identified
18
    1     Transcript of Audio Recording               6
19

20

21

22

23

24

25


                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              3

1                    P R O C E E D I N G S

2                    (Deposition proceedings commenced

3                    11:00 a.m., September 19, 2017.)

4                         RONALD EMOND,

5    called for examination by the Plaintiff, being first duly

6    sworn, on his oath testified as follows:

7                         EXAMINATION

8    BY MS. HAYES:

9         Q.    Mr. Emond --

10        A.    Emond.

11        Q.    Emond.

12        A.    Yeah.  It all depends on who you are.

13        Q.    Emond.

14        A.    If you live where I used to live, it's Emond.

15    French.  French Canadian.

16        Q.    In New Hampshire?

17        A.    Yeah.

18        Q.    My name is Megan Hayes, relatively

19    straightforward pronunciation.  And I represent Roy

20    Mestas in a discrimination lawsuit that he's filed in

21    federal court against the Town of Evansville.  Can you

22    please state your full name for the record and spell it?

23        A.    Ronald, R-O-N-A-L-D, Emond, E-M-O-N-D.

24        Q.    Have you ever had your deposition taken before?

25        A.    No.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                 000370

Mestas v. Town of Evansville                    17-CV-00017-NDF

4

 1      Q.    So, just to give you some guidance, we've got a

 2   court reporter here who's taking down your every word.

 3   And just to make sure we get a clean transcript, if you

 4   can just let me ask my questions and finish and then

 5   respond and if you can respond with an audible yes or no

 6   rather than a nod or shaking your head, then the court

 7   reporter can get your answer down accurately.

 8      A.    Yes.

 9      Q.    And will you just please let me know if you

10   need to take a break?

11      A.    Okay.

12      Q.    And I'm going to assume that if I ask you a

13   question and you answer it, you understood the question

14   I've asked.  Is that a fair assumption?

15      A.    Yes.

16      Q.    If you don't understand my question, just say

17   so, and I'll try to make it a little more intelligible.

18      A.    Okay.

19      Q.    You understand now that you're under oath?

20      A.    Yes.

21      Q.    What does that mean to you?

22      A.    Tell the truth.

23      Q.    And you understand that you can be prosecuted

24   for penalty of perjury if you don't tell the truth today?

25      A.    Yes.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit C
000371

Mestas v. Town of Evansville                    17-CV-00017-NDF

5

1      Q.    Do you have any short-term or other memory

2    problems?

3      A.    No.

4      Q.    On any drugs or medication that would affect

5    your memory?

6      A.    No.

7      Q.    Did you bring the documents that I listed in

8    your notice of deposition?

9            MR. THOMPSON:  These are being produced

10   subject to the protective order, Evansville 0465 through

11   0474.  And, again, same objection.  Federal court didn't

12   require us to produce those, but we voluntarily produced

13   them.

14           MS. HAYES:  Thanks, Tom.

15     Q.    (BY MS. HAYES)  What have you done to prepare

16   for your deposition today?

17     A.    I've just reread the -- I don't know if it was

18   the deposition, but the statement that we gave.  It was a

19   couple years ago, I believe, to -- what was it?  I don't

20   know where we were.  I had to go over and give a

21   statement to somebody.  I don't even remember her name.

22     Q.    Were you interviewed by an investigator with

23   the State of Wyoming on April 8th, 2014, in connection

24   with Mr. Mestas' discrimination charge?

25     A.    Yes.

Mestas v. Town of Evansville                    17-CV-00017-NDF

6

```
 1       Q.    And you said you reviewed a transcript of that

 2   interview.  Is that correct?

 3       A.    Yes.

 4             MS. HAYES:  I'm going to hand you a

 5   transcript of Mr. Emond's interview on April 8th, 2014,

 6   in Wyoming -- WFEP Number 66-2013.

 7                   (Exhibit No. 1 marked for

 8                   identification.)

 9       Q.    (BY MS. HAYES)  Do you recognize that document?

10       A.    Yes, I do.

11       Q.    What is that document?

12       A.    That's the statement that I gave to the lady.

13   She just asked me a bunch of questions, and I answered

14   it.

15       Q.    Did you tell the truth during that interview?

16       A.    Best as I remember, yes.

17       Q.    Do you know Roy Mestas?

18       A.    Yes, I do.

19       Q.    How do you know Mr. Mestas?

20       A.    I worked with him.

21       Q.    Do you remember the dates that you worked with

22   him?

23       A.    Not sure of the dates.  He was hired like a

24   week after me, I believe, a week or two after me.  So it

25   would have been late September, early October of -- let's
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit C
000373

Mestas v. Town of Evansville                    17-CV-00017-NDF

7

1    see.  Been there five years, so 2012.

2         Q.    Do you know when he was terminated from his

3    employment?

4         A.    I'm not exactly sure of the date.

5         Q.    Do you know Dale Brown?

6         A.    Yes.

7         Q.    How do you know Dale Brown?

8         A.    He was my supervisor.

9         Q.    How long were you supervised by Dale Brown?

10        A.    I'm trying to think how long he's been gone.

11   At least three and a half years, I believe.

12        Q.    And do you work for the Town of Evansville now?

13        A.    Yes.

14        Q.    In which department?

15        A.    All of them.  I was hired to do parks, but

16   pretty much everything.

17        Q.    Can you just briefly summarize your employment

18   history with the Town, when you were hired, what your

19   starting pay was?

20        A.    When I was hired, it was September 17th, 2012.

21   And I started at $13 an hour.

22        Q.    What were your job duties?  What was the

23   position you were hired for?

24        A.    Take care of parks, mowing, trimming, weeds.

25   That was what I was mainly hired for.  But, if something

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000374

Mestas v. Town of Evansville                    17-CV-00017-NDF

8

1    else came up, then we all worked together.

2        Q.    What do you mean, you all worked together?

3        A.    We're a small crew.  We're not like Casper,

4    where you got a water division, sewer division, street

5    division.  If we had a water break, then we were all

6    called over to work on that.  If we had a sewer back up,

7    whoever was available is called over and worked on that.

8    So we pretty much do everything.

9        Q.    And how many are in the public works

10   department?  How many employees?

11       A.    Right now there's one, two, three, four,

12   five -- six of us.

13       Q.    And you typically work as a team -- is that

14   fair? -- when there's a project that would require more

15   than --

16       A.    Yes.  If there's a major problem, yes.

17       Q.    When you started working for the Town, did you

18   have your commercial driver's license?

19       A.    No, I did not.

20       Q.    Do you have one now?

21       A.    Yes, I do.

22       Q.    When did you get that?

23       A.    Six months after hire.  So what's that?  April?

24   March?

25       Q.    I think you said your immediate supervisor was

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit C
                                                                                           000375

Mestas v. Town of Evansville                    17-CV-00017-NDF

9

1   Dale Brown after you started working for the public works

2   department?

3       A.    Yes.  He was head supervisor.

4       Q.    Anyone else your supervisor?

5       A.    There was Brian Boettcher.  He was like second

6   in charge.  So, if Dale wasn't around, he would be the

7   next in line.

8       Q.    Did Dale Brown hire you to work for the Town?

9       A.    Yes.

10      Q.    And what were your duties when you first

11  started working at the public works department in 2012

12  and 2013?  You kind of said that already.

13      A.    Yeah.  I said parks.

14      Q.    Parks?

15      A.    Yeah.  I took care of parks.  That's what I was

16  hired for.  That was my main thing I was hired for, was

17  parks, to mow.  Because -- mow weeds, trim, and just take

18  care of the parks.

19      Q.    How about during the winter?  Same?

20      A.    Well, no.  It was different.  You would have to

21  plow, shovel.  During the winter was a little different,

22  a little slower.  We would clean shop, organize the shop

23  when we're weren't plowing or shoveling.  We did what we

24  could during the wintertime outside.

25      Q.    And shoveling snow was part of your job duties?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000376

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                    10

     1      A.    Yes.

     2      Q.    Was that required for all public works

     3   department employees?

     4      A.    Yes.

     5      Q.    Did all public works employees shovel snow?

     6      A.    Yes.

     7      Q.    Any who didn't?

     8      A.    Dale and Brian usually didn't.

     9      Q.    Why didn't they shovel snow?

    10      A.    They're the boss.

    11      Q.    Do you work for Dan Adcock now?

    12      A.    Yes.

    13      Q.    Does he shovel snow?

    14      A.    Yes.

    15      Q.    During your employment with the Town, were you

    16   issued a Town phone or radio to use?

    17      A.    I'm trying to think.  At first we had -- yeah,

    18   we had radios.  We had cheap radios.

    19      Q.    "At first" meaning after you were hired, you

    20   were given a cheap Town radio?

    21             MR. THOMPSON:  Objection as to form.

    22      A.    Yes.

    23      Q.    (BY MS. HAYES)  Do you remember when?

    24      A.    I do not.

    25      Q.    I want to ask you a few questions about

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                            11

1    Mr. Mestas.  How frequently would you see Mr. Mestas

2    during a typical workday?

3         A.    Three times.

4         Q.    And when was that?

5         A.    First thing in the morning, lunchtime, the end

6    of the day.

7         Q.    How about during a typical week?

8         A.    15 to 20 times.

9         Q.    Were there days where you and Mr. Mestas would

10   be -- let me back up and ask it differently.  A previous

11   witness has testified that on Thursdays, it was sort of a

12   maintenance day.  Was that part of your responsibility

13   too?  Sort of maintenance on Thursdays?

14        A.    No.

15        Q.    Were you in the shop or in the public works

16   department area on Thursdays?

17        A.    Not always.  Most of the time, probably not.

18        Q.    Did you ever -- were you able to observe

19   Mr. Mestas interacting with other public works employees?

20        A.    I'll try short and sweet.  He ran the trash

21   route on the garbage truck.  So we did not work together

22   a lot.  I did not see him a lot.  I'm sure he worked -- I

23   worked with him.  He's worked with other people.  But I

24   just don't recall when or what.

25        Q.    So my question was did you ever observe him

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                        000378

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                        12

1    interacting with other employees?

2         A.    Yes.  Yes.

3         Q.    Do you remember any of those?

4         A.    No, I do not.

5         Q.    Did you ever observe him having any issues or

6    arguments with other public works employees?

7         A.    I know him and Dale got into it a couple of

8    times.  Don't ask me what it was about because I don't

9    recall.

10        Q.    What do you mean, they got --

11        A.    An argument, loud.

12        Q.    How often would you hear them getting into an

13   argument?

14        A.    Couple of times.

15        Q.    Do you know what the argument was about?

16        A.    No, I do not.  I don't remember.

17        Q.    Do you know who started the argument?

18        A.    I don't remember.

19        Q.    Did it appear to you that Mr. Mestas was being

20   disrespectful to Mr. Brown?

21              MR. THOMPSON:  Objection as to form.

22        A.    No.

23        Q.    (BY MS. HAYES)  Did you believe that Mr. Brown

24   was being disrespectful to Mr. Mestas?

25              MR. THOMPSON:  Same objection.

Mestas v. Town of Evansville                    17-CV-00017-NDF

13

```
 1      A.    No.

 2      Q.    (BY MS. HAYES)  Besides seeing them in loud

 3  arguments, did you have -- ever witness Mr. Mestas and

 4  Mr. Brown interacting, say, in weekly meetings or around

 5  the shop?

 6      A.    Yes.

 7      Q.    And how often?

 8      A.    In the morning, I mean, we all would sit around

 9  and talk before 8:00, before our jobs started.

10      Q.    Who's "we all"?

11      A.    Whoever was working there at the time.

12      Q.    Did you ever have any conflicts with

13  Mr. Mestas?

14      A.    No.

15      Q.    Did you ever have any arguments with him?

16      A.    Not that I remember.

17      Q.    Does that mean that it didn't happen or it

18  might have happened?  You just don't remember?

19      A.    I don't believe it happened.

20      Q.    Did you have any conflicts with him?

21      A.    No.

22      Q.    Any issues with the way he was performing his

23  job?

24            MR. THOMPSON:  Objection as to form.

25  Foundation.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000380

Mestas v. Town of Evansville                    17-CV-00017-NDF

14

```
 1      A.    No.

 2      Q.    (BY MS. HAYES)  From what you observed, how did

 3  Mr. Mestas get along with other co-employees in the

 4  public works department?

 5      A.    Fine.

 6      Q.    Did you witness any problems between Mr. Mestas

 7  and other co-employees?

 8      A.    No.

 9      Q.    Were you aware that Mr. Mestas was injured at

10  work?

11      A.    Yes.

12      Q.    How do you know?  How do you know he was

13  injured?

14      A.    I was there the morning that he supposedly

15  slipped on the ice.

16      Q.    Do you know how he got injured, what injury he

17  sustained?

18      A.    Back.  I never really talked to him about it,

19  but I was told it was his back injury.

20      Q.    Do you know approximately when that was?

21      A.    You're asking for a date or time of day?

22      Q.    Both if you can remember.

23      A.    Date, I do not.  Time of day was probably

24  somewhere around 7:30 a.m.

25      Q.    So first thing in the morning?
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          15

```
 1       A.    Yes.

 2       Q.    And I'll just represent it was November 26th,

 3  2012, that he was injured.  Do you know if he took time

 4  off from work for that injury?

 5       A.    Yes.

 6       Q.    Do you remember when he returned to work from

 7  his injury?

 8       A.    No.

 9       Q.    I'll, again, just represent that it was in mid

10  January of 2013 that he returned to work.  After he

11  returned to work, after mid January of 2013, do you know

12  if he was able to perform his job duties?

13            MR. THOMPSON:  Objection as to form.

14  Foundation.

15       A.    I was told he was back on full -- full duty.

16       Q.    (BY MS. HAYES)  Did you notice any problems

17  with his ability to perform his job?

18            MR. THOMPSON:  Objection as to form.

19  Speculation.  Foundation.

20       A.    No.

21       Q.    (BY MS. HAYES)  I asked you this earlier, but

22  you said you'd see him morning, lunch and after work, at

23  work.  That includes after he returned from his injury in

24  January of 2013?

25       A.    Yes.
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

16

```
 1      Q.    How about, were there weekly meetings of the

 2   public works department employees?

 3      A.    Yes.

 4      Q.    What were those meetings about?

 5      A.    Typically, safety meetings every Thursday

 6   morning.

 7      Q.    And how long would they last?

 8      A.    Half hour to an hour.

 9      Q.    And who would attend?

10      A.    All employees.

11      Q.    And did Mr. Mestas participate in those

12   meetings?

13      A.    Yes.

14      Q.    Did you ever notice -- did you ever observe

15   Mr. Mestas being disrespectful to Mr. Brown at those

16   meetings?

17      A.    No.

18      Q.    Did you notice Mr. Brown being disrespectful to

19   Mr. Mestas at those meetings?

20      A.    No.

21      Q.    How would you describe your relationship with

22   Mr. Brown when he was your supervisor?

23      A.    I didn't care for him.

24      Q.    Why was that?

25      A.    He was not a very good supervisor, as far as
```

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                    17

1   I'm concerned.

2        Q.    In what respects?

3        A.    He just had a real big ego.  And if it wasn't

4   his way, it was not the right way.

5        Q.    Did anyone ever -- who was Mr. Mestas' -- I'm

6   sorry.  I'll start over.  Who was Dale Brown's

7   supervisor?

8        A.    The mayor.

9        Q.    And who's that?

10       A.    Philip Hinds.

11       Q.    Did anyone ever complain to Mr. Hinds about

12  Mr. Brown's performance as a supervisor?

13             MR. THOMPSON:  Objection as to form.

14  Speculation.

15       A.    I don't know.

16       Q.    (BY MS. HAYES)  Did you ever complain?

17       A.    No, not to the mayor.

18       Q.    Did you complain to other people about

19  Mr. Brown?

20       A.    Coworkers talked, yes.

21       Q.    And what were your complaints?

22       A.    Just didn't like the way he supervised.

23       Q.    So, in your interview, on page 5, would you

24  just read from page 5, line 19, to the end and the top

25  line of page 6, please, out loud?

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            18

```
 1        A.    "Just made it tough for him to do his job, you
 2   know, after the injury, when he came back.  You know,
 3   he -- you know, he -- I get to work early.  I mean,
 4   I'm -- I'm there before anybody, even before Dale.  So,
 5   when Dale would get there, he'd always come in and talk.
 6   And, you know, he just was going to make his life
 7   miserable until he quit, so --"
 8        Q.    Did Dale Brown tell you that?
 9        A.    Yes.
10        Q.    And what were the circumstances?
11        A.    I don't understand the question.
12        Q.    So where were you when he told you that he was
13   just going to make --
14        A.    I was at my desk.
15        Q.    And how did it come up?
16        A.    I don't remember.
17        Q.    How, in your perception, would Mr. Brown -- or,
18   did you see Mr. Brown making Mr. Mestas' life miserable
19   at work?
20              MR. THOMPSON:  Objection as to form.
21        A.    I saw it a couple times where he would make it
22   hard for him.
23        Q.    (BY MS. HAYES)  Can you describe those couple
24   times?
25        A.    Like I said in the paper, there was one time
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit C
                                                                                            000385

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                           19

1   where a big trash bin fell in the truck.  And we

2   usually -- it would take more than one guy to pull this

3   bin out because you would need a backhoe and whatever.

4   And there was one time he told me, "No.  Let him do it

5   himself."  The other time when we were shoveling when he

6   came back from his injury, he asked to go get a

7   snowblower from his house, and Dale told him, "No way."

8        Q.    About the trash bin and the truck, can you

9   describe why it usually takes more than one guy?  What

10  did it take to get a trash bin out of a truck?

11       A.    We're talking a three-yard bin.  It's one of

12  those big steel bins.  It's not like a regular trash can.

13  So you would need a backhoe.  You would need a couple

14  guys up on top of the truck.  Then they would have to

15  jump into the trash to chain it up and direct the backhoe

16  to hook it all up.  And it's a big bin.  You're not going

17  to get it out by hand.

18       Q.    Did that happen other times during your

19  employment, that a trash bin would fall into a truck?

20       A.    With other drivers?

21       Q.    Yeah.

22       A.    Yes.

23       Q.    And how many people would it take to get the

24  trash bin out?

25       A.    Usually three.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit C
                                                                                000386

Mestas v. Town of Evansville                    17-CV-00017-NDF

20

```
 1       Q.    And were you ever directed, aside from the time

 2    with Mr. Mestas, not to help?

 3       A.    No.

 4       Q.    Did Mr. Brown tell you that he thought he

 5    couldn't fire Mr. Mestas because of Mr. Mestas' injury?

 6       A.    Yes.

 7       Q.    When did he tell you that?

 8       A.    In the morning before anybody got there.

 9       Q.    In January?  Was this shortly after he returned

10    from injury leave?

11       A.    Probably.

12       Q.    On page 8 of your interview, was it your

13    perception that Mr. Brown was treating Mr. Mestas more

14    harshly than other public works employees?

15       A.    After his injury, yes.

16       Q.    And how so?  How so more harshly?

17       A.    Just seemed like anything that Roy did Dale

18    always had something to say about it.  He just -- they

19    did not get along after the injury, from what I observed.

20    He just made it very hard for him.

21       Q.    And on page 7 of your interview -- sorry to

22    keep flipping back and forth.

23       A.    That's okay.

24       Q.    On lines 21 and 22, can you just read the first

25    sentence of that?
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

21

1      A.     "I mean, he beat him up pretty good.  I mean,

2   he don't -- Dale's just -- he's got a wicked ego."

3      Q.     What do you mean, "He beat him up pretty good"?

4      A.     Verbally.  Like I was saying, he -- anything

5   that Roy had to say or do, whatever, Dale would find

6   something to make it like he wasn't doing the right

7   thing.

8      Q.     Do you have any specific examples?

9      A.     I don't recall.

10     Q.     To your knowledge, would Mr. Mestas ever just

11  disappear from the workplace during the day?

12            MR. THOMPSON:  Objection as to form.

13  Foundation.

14     A.     No.

15     Q.     (BY MS. HAYES)  Did Dale Brown ever ask you

16  where Mr. Mestas had gone during the workday?

17     A.     I don't remember.  Probably not.

18     Q.     You don't remember meaning it could have

19  happened, but you don't remember, or it didn't happen?

20     A.     Can you repeat the question?

21     Q.     Sorry.  It was a bit muddled.  Okay.  Let's

22  start over with that.  Did Dale Brown ever ask you where

23  Mr. Mestas had gone during the day?

24     A.     I'm going to say no.

25     Q.     To your knowledge, do you know, did Mr. Mestas

Mestas v. Town of Evansville                 17-CV-00017-NDF

22

1    ever procure items for the Town that Mr. Brown had not

2    authorized?

3         A.    To my knowledge, no.

4         Q.    Did Mr. Brown ever complain to you that

5    Mr. Mestas was procuring items for the Town without his

6    permission?

7         A.    No.

8         Q.    So you described some mornings -- mentioned

9    some mornings when you would come into the office and

10   would chat with other employees.  Did that include

11   Mr. Brown?

12        A.    Yes.

13        Q.    And how often would that happen?

14        A.    Every day.

15        Q.    And so would he confide in you or talk to you

16   about other employees?

17        A.    Sometimes.

18        Q.    But he did talk to you about Mr. Mestas in the

19   mornings after Mr. Mestas returned from his injury leave?

20        A.    It wasn't an everyday occurrence.

21        Q.    I understand.  I'm sorry.  On occasion he

22   mentioned --

23        A.    Yes.

24        Q.    Did Mr. Brown ever yell at you for helping

25   Mr. Mestas?  And I'm looking at a statement you made on

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit C
000389

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          23

1    page 18 of your interview.

2        A.    Yes.

3        Q.    What was that about?

4        A.    We have these slips.  They're work orders.  And

5    he was doing his trash route.  And I believe it was me

6    and Dan.  We didn't have a lot to do that day.  And he

7    had a work order to deliver a trash bin.  And me and Dan

8    decided we were going to do it because we weren't really

9    that busy.  So we delivered the trash can.  And when we

10   got back, Dale stopped and yelled at us for doing his

11   job.

12       Q.    Was that unusual that you would be yelled at

13   for doing someone else's work order?

14       A.    Yes.

15       Q.    Why do you think he yelled at you for doing --

16   for filling a work order that was for Roy Mestas?

17             MR. THOMPSON:  Objection as to form.

18   Speculation.

19       A.    I don't know.

20       Q.    (BY MS. HAYES)  Did you complete work orders

21   for other employees?

22       A.    Sometimes.

23       Q.    Did you ever -- were you ever reprimanded or

24   yelled at for doing that?

25       A.    No.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                 000390

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          24

1      Q.    I want to get back to the snow shoveling.  And

2    I'm sorry if I've already asked you that.  Did Dale Brown

3    shovel snow?

4      A.    No.

5      Q.    How about Brian Boettcher?

6      A.    I think I saw him once or twice.

7      Q.    And were they required to shovel snow?

8      A.    I don't know.

9      Q.    Who's Wilbur Yankey?

10     A.    He was an older gentleman that did, like, the

11   water meters.

12     Q.    Did he work in the public works department?

13     A.    Yes.

14     Q.    At the same time that you and Mr. Mestas were

15   working in the public works department?

16     A.    Yes.

17     Q.    Is Mr. Yankey an older gentleman?

18     A.    Yes.

19     Q.    Does he wear hearing aids?

20     A.    Yes.

21     Q.    Do you know if Mr. Yankey shoveled snow?

22     A.    Yes.

23     Q.    Do you know of any Town employee being

24   disciplined for not shoveling snow?

25               MR. THOMPSON:  Objection as to form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                              000391

Mestas v. Town of Evansville                          17-CV-00017-NDF

25

```
1        A.     No.

2        Q.     (BY MS. HAYES)  Do you know of any public works

3    employee being discharged from their employment for not

4    shoveling snow?

5        A.     No.

6        Q.     And on page 16 of your interview, would you

7    please just read lines 1 through 13 of your interview?

8        A.     "He just could -- you know, snowy morning.  He

9    came in and, you know, he asked, you know, if he -- you

10   know, if he didn't have to shovel because his back was

11   sore.  You know, he just -- and I don't -- I -- I know he

12   asked that, but I'm not quite sure what Dale said back to

13   him.  Something about -- I know Roy said something about

14   he wanted to get a snowblower from his house or whatever.

15   And Dale said, you know, no F'ing way or whatever.  You

16   know what I mean?  You know, you can shovel with the rest

17   of the crew or whatever.  And I'm pretty sure Roy ended

18   up shoveling that day, if I remember right."

19       Q.     Does that accurately portray what you told the

20   interviewer on that day?

21       A.     Yes.

22       Q.     Have you ever been excused from shoveling snow?

23       A.     Yes.

24       Q.     For what reason?

25       A.     I had shoulder surgery.
```

Wyoming Reporting Service, Inc.
1.800.444.2826

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit C
000392

Mestas v. Town of Evansville                17-CV-00017-NDF

26

1      Q.    And how long were you excused from shoveling

2   snow?

3      A.    Let's see.  I was out of work for a week, and I

4   came back.  Probably I did office work for about a week,

5   computer work.  So a couple of weeks.  I still went out

6   and shoveled.  I'd use my left arm instead of my right

7   arm.  Did what I could.

8      Q.    I just want to ask you a couple questions about

9   Mr. Brown's references to Hispanics in the public works

10  department.  And I believe on pages 10 and 11, if you

11  need to refresh your memory, did you ever hear Mr. Brown

12  refer to Mr. Mestas as a stupid beaner?

13     A.    Yes, once.

14     Q.    Do you remember the circumstances?

15     A.    Do not.

16     Q.    Do you remember when that was?

17     A.    Do not.

18     Q.    Do you remember if it was after his injury?

19     A.    I believe so.

20     Q.    Have you ever heard him -- have you ever heard

21  Dale Brown refer to anyone else using the term "beaner"?

22     A.    Yes.

23     Q.    When?

24     A.    In a joking manner.  I mean, we all joke around

25  once in a while.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                000393

Mestas v. Town of Evansville                    17-CV-00017-NDF

27

1       Q.    At work?

2       A.    Yeah.

3       Q.    How often?

4             MR. THOMPSON:   How often what, Counsel?

5       Q.    (BY MS. HAYES)  How often would you hear jokes

6   about beaners?

7       A.    It wasn't often, and it wasn't just beaners.

8   It was -- you know, I'm French.  French jokes.  You know,

9   just jokes.  Guys would just joke around.  It's just a

10  group of guys, you know.

11      Q.    Would Dale Brown participate in those jokes?

12      A.    I guess.  I mean, maybe.  I don't really

13  remember who told jokes and who didn't.  But it's a group

14  of guys.  We would just joke around once in a while.

15      Q.    Were those jokes made in Dale Brown's presence?

16      A.    I don't remember.

17      Q.    Do you remember Dale Brown telling jokes about

18  Hispanics or other minority groups?

19      A.    I don't remember.

20      Q.    Did you ever hear Dale Brown tell somebody that

21  those jokes were inappropriate?

22            MR. THOMPSON:   Objection as to form.  He

23  said he didn't know if Brown participated in them.

24      A.    Can you repeat the question?

25

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000394

Mestas v. Town of Evansville                17-CV-00017-NDF

28

```
 1                      (Previous question read by the

 2                       reporter.)

 3      A.    No.

 4      Q.    (BY MS. HAYES)  Did you ever hear Dale Brown

 5  making negative comments about Wilbur Yankey?

 6      A.    Can you explain the question a little bit more?

 7  Negative as far as his work?

 8      Q.    Age.

 9      A.    Oh, age?  No.

10      Q.    Does Dale Brown still work for the Town?

11      A.    No.

12      Q.    Do you know why he left his employment?

13              MR. THOMPSON:  Objection as to form.

14  Relevance.

15      A.    I don't know.

16      Q.    (BY MS. HAYES)  Have you heard anything about

17  why he left his employment?

18              MR. THOMPSON:  Same objection.

19      A.    I don't know.

20      Q.    (BY MS. HAYES)  My question was have you heard

21  anything about why he left his employment?

22              MR. THOMPSON:  Same objection.

23      A.    The only thing I was told, it was kind of a

24  voluntary retirement type of thing.

25      Q.    (BY MS. HAYES)  And who told you that?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000395

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            29

1        A.    Probably Dan.

2        Q.    Have you seen Dale Brown since he left his

3   employment with the Town?

4        A.    In person or just out?  I seen him drive by

5   once.

6        Q.    Have you spoken to him since he left his

7   employment?

8        A.    No.  We're not friends.

9        Q.    Have you ever communicated with him since

10  April of 2013, after he fired Roy Mestas, about

11  Mr. Mestas?

12       A.    No.

13       Q.    You never spoke to him even early morning when

14  you would arrive and he would come into the office early?

15  No further mention of Mr. Mestas?

16       A.    Not really.

17       Q.    Did you know why Mr. Mestas was fired?

18       A.    No.

19       Q.    Did Dale Brown ever mention that he had fired

20  Roy Mestas to you?

21       A.    No.  We knew he got fired.  He left, said he

22  was fired.

23       Q.    Who said he was fired?

24       A.    I believe it was probably Dale.  I mean, it's

25  pretty obvious when somebody gets fired in a small crew.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                               000396

Mestas v. Town of Evansville                    17-CV-00017-NDF

30

1     Q.    And how did you feel about Mr. Mestas being

2    fired?

3     A.    It's really not my problem.  People get fired

4    all the time.

5     Q.    What was your perception of -- did it affect

6    the crew, morale of the crew at all?

7     A.    It affects the crew as far as performance goes

8    because then we're down a man.

9     Q.    Did you ever communicate with Mr. Brown about

10   the discrimination charges made by Mr. Mestas?

11    A.    No.

12    Q.    So, when you were interviewed in April of 2014,

13   did you discuss what you talked about in that interview

14   at all with Mr. Brown?

15    A.    No.

16    Q.    Before you were interviewed, did you talk about

17   it at all with Mr. Brown?

18    A.    No.

19    Q.    Do you know if Mr. Brown kept any personal

20   equipment on Town of Evansville property?

21    A.    He'd keep his four-wheeler in the shop during

22   the wintertime.

23    Q.    And how long did he keep it there?

24    A.    During the wintertime.

25    Q.    And did anyone else keep personal equipment on

Mestas v. Town of Evansville                    17-CV-00017-NDF

31

1    Town of Evansville property?

2        A.    Not that I'm aware of.

3        Q.    Did his four-wheeler have a snowplow on it?

4        A.    I believe so.

5        Q.    Did he use his four-wheeler to shovel snow on

6    Town property?

7        A.    No.

8        Q.    I forget if I asked you who Phil Hinds is.

9        A.    He's the mayor.

10       Q.    Was Mayor Hinds Mr. Brown's supervisor in 2013,

11   2012, 2013?

12       A.    Yes.

13       Q.    Did you ever complain to Mayor Hinds about

14   Mr. Brown?  I think I already asked you that.

15       A.    No.

16       Q.    Why not?

17       A.    Didn't have to.

18       Q.    You testified earlier that you didn't --

19   correct me if I'm wrong -- in describing that you didn't

20   think he was a good manager.  But you never mentioned

21   anything to Mr. Hinds about your feelings about his

22   management?

23       A.    Didn't need to.  Take care of it myself.

24       Q.    Do you know if Dale Brown purchased a diesel

25   fuel tank with Town funds?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit C
000398

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        32

    1      A.    I do not know.

    2      Q.    Do you know if he purchased -- used Town funds

    3   to procure any items for himself personally?

    4      A.    I don't know.

    5      Q.    Never heard of that happening?

    6      A.    No.  If you're talking about the tank that was

    7   in his pickup truck, that was there before I got there.

    8   So I have no idea what Dale bought or what he didn't buy.

    9      Q.    And what's the diesel fuel tank in his pickup

   10   truck?  What was that?

   11      A.    It's just a transfer tank.  You store diesel

   12   fuel in it.

   13      Q.    And do you know what happened to the diesel

   14   tank?

   15      A.    As far as I know, it's down in one of our

   16   lagoon buildings.

   17      Q.    And how did it get -- why was it removed from

   18   his personal truck?

   19      A.    I don't know.

   20             MS. HAYES:  I don't have any further

   21   questions at this time.

   22                     EXAMINATION

   23   BY MR. THOMPSON:

   24      Q.    I've got a few follow-up questions for you.  Do

   25   you need a break?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                               000399

Mestas v. Town of Evansville                17-CV-00017-NDF

33

 1      A.    No.  I'm good.

 2      Q.    Ron, you talked about the public works

 3  department working as a team if there's a major problem.

 4  Is it fair to say that each individual in the public

 5  works department has an assigned task each day?

 6      A.    Yes.

 7      Q.    In other words, you're responsible to take care

 8  of the parks.  Roy Mestas was responsible to be a

 9  sanitation truck driver.  Is that correct?

10      A.    Yes.

11      Q.    So, if you are pulled from your task of taking

12  care of the parks, the parks don't get done for that day.

13  Is that fair?

14      A.    Yes.

15            MS. HAYES:  Objection.  Form.

16      Q.    (BY MR. THOMPSON)  Was it unusual, then, for

17  individuals to be pulled from their tasks to assist each

18  other?

19      A.    No.

20      Q.    How often were you pulled from the parks

21  department to help with the sanitation department?

22      A.    Probably maybe once if the truck broke down,

23  you know, to help repair it.

24      Q.    So would it be fair to characterize being

25  pulled as under unusual circumstances?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000400

Mestas v. Town of Evansville                    17-CV-00017-NDF

34

1                    MS. HAYES:   Objection.   Form of the

2    question.

3         A.    Yes.

4         Q.    (BY MR. THOMPSON)   You talked about witnessing

5    Mestas and Dale Brown arguing out loud or arguing in a

6    loud manner.   Was Mestas yelling back at Dale Brown?

7         A.    I don't remember.

8         Q.    Did you witness Mestas in situations where he

9    was yelling at Dale Brown?

10        A.    My definition of "yelling" and somebody else's

11   is different.   I don't remember.

12        Q.    Raising their voice?

13        A.    Raising their voice, yes.

14        Q.    And did you see that happen on more than one

15   occasion?

16        A.    A couple of times.

17        Q.    As far as Roy Mestas' job performance, counsel

18   asked you a number of questions about what you observed.

19   You only saw him in the morning when you returned from

20   lunch and when you were going home in the evening.

21   Correct?

22        A.    Yes.

23        Q.    So is it fair to say that you never saw him

24   working as a sanitation truck driver because you were

25   only observing him at meetings?

Mestas v. Town of Evansville                    17-CV-00017-NDF

35

1      A.    Yes.

2      Q.    You had limited interaction with Roy Mestas as

3   far as what his job duties were?

4      A.    Yes.

5      Q.    Do you believe any of the treatment that you

6   observed Dale Brown towards Roy Mestas was motivated by

7   Mr. Mestas' ethnicity?

8      A.    No.

9      Q.    Did Dale Brown ever confide in you and tell you

10   that the reason that he didn't like Roy Mestas was

11   because of his ethnicity?

12      A.    No.

13      Q.    Did he ever tell you it was because of what he

14   perceived as poor job performance?

15      A.    I don't remember if it was poor job

16   performance.

17      Q.    Now, the incident with the snowblower, were you

18   ever allowed to bring a snowblower, your personal

19   property, to work to assist you with snow shoveling?

20      A.    I never asked.

21      Q.    Has the public works department, since the time

22   you've been employed, ever had a snowblower to assist

23   with snow shoveling?

24      A.    No.

25      Q.    And at the time the incident occurred with Roy

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000402

Mestas v. Town of Evansville                    17-CV-00017-NDF

36

1    Mestas, it's your understanding that Roy Mestas was

2    released to return to work without restrictions.

3    Correct?

4         A.    Yes.

5         Q.    What's that mean to you?

6         A.    Means full duty.

7         Q.    Does it mean being able to do everything you

8    were asked to do as part of your job?

9         A.    Yes.

10        Q.    When Roy Mestas was returned to work after his

11   injury, was he given any extra duties?

12        A.    No.

13        Q.    He was given the same duties that he was

14   responsible for prior to getting hurt at work.  Correct?

15        A.    Yes.

16        Q.    And when you talked about his slip and fall at

17   work, you said that he allegedly fell.  Did you mean

18   anything by that?

19        A.    I didn't see him.  I was at work, and then

20   Dan -- Dan would get there.  And that's -- I believe it

21   was Dan that saw him laying on the ground.  And Dan

22   didn't even see him slip.  So I'm just using that -- I

23   did not see him slip on the ice.  Not saying he didn't.

24   I'm just saying I did not see him.

25        Q.    Were you aware of Roy Mestas' medical history

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000403

Mestas v. Town of Evansville                17-CV-00017-NDF

37

1    when he was --

2         A.    Prior?

3         Q.    Yes.

4         A.    No.

5         Q.    Prior to being employed at the Town of

6    Evansville.

7         A.    No.

8         Q.    Did you see other employees other than Roy

9    Mestas treated harshly or treated differently by Dale

10   Brown?

11        A.    Yeah.  Me and Dale got in arguments before

12   people got to work.  It's just the way he was.  I threw a

13   chair across the room one morning because he pissed me

14   off so bad.  But it's just the way Dale was.

15        Q.    What was the argument about that you and him

16   got into?

17        A.    God, I don't remember.  I really don't

18   remember.

19        Q.    When you say that's just the way he was, do you

20   mean his management style?

21        A.    Yeah.  He would get under your skin and just

22   really drive you nuts.

23        Q.    So he treated you harshly or differently on

24   occasion?

25        A.    On occasion, yeah.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit C
000404

Mestas v. Town of Evansville                    17-CV-00017-NDF

38

1     Q.    How about an employee that was employed after

2  Roy Mestas left that was eventually terminated from

3  employment?

4     A.    Oh, Paul?

5     Q.    Waddell?

6     A.    I believe that was his last name, yes.

7     Q.    Tell me about that, what you observed in

8  regards to the employment of Paul Waddell.

9     A.    Dale didn't like him.  And you could tell he

10  was going to get rid of him eventually.

11     Q.    Did he tell you that he was going to get rid of

12  him eventually?

13     A.    I knew he didn't like him.  He told me he

14  didn't like him.

15     Q.    What was Mr. Waddell's ethnicity or race?

16     A.    A white guy.

17     Q.    Did Dale end up terminating Mr. Waddell?

18     A.    Yes.

19     Q.    Do you know why he terminated him other than

20  because he didn't like him?

21     A.    No.

22     Q.    This morning there was testimony from Dan

23  Adcock in regards to the fact that Brown did not like it

24  when he gave a directive and an employee violated that

25  directive.  Did you observe that?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000405

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                         39

1       A.    Yeah.

2       Q.    And can you give us an example?

3       A.    Personal example?

4       Q.    Just what you observed.  And if it's a personal

5    example, that's fine too.

6       A.    It was one time I came in a little bit late.  I

7    can't remember if I had a doctor's appointment or

8    something.  But the day before I had told Dale I was

9    going to spray for weeds.  And that's subject to change.

10   And so I come in after my appointment, and Dan was down

11   at the river park trimming trees.  And usually go down

12   there with a couple guys in case someone gets hurt,

13   because we use chain saws and stuff like that.  And he

14   was down by himself.  So I told Dale that I was going to

15   go down and help work with Dan.  And he was pissed off

16   because I was going to go work with Dan and not do what I

17   told him I was going to do the day before.

18      Q.    And when you say "Dan," you're referring to Dan

19   Adcock?

20      A.    Dan Adcock.

21      Q.    And Dale was mad because you were going to go

22   assist Dan?

23      A.    Yeah.  Yeah.

24      Q.    And that's similar to when you went to assist

25   Roy.  Correct?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                  000406

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          40

1      A.     Right.

2      Q.     Do you believe that it was reasonable for Dale

3   Brown to expect Roy Mestas to perform the duties of his

4   job?

5      A.     After he returned?

6      Q.     Yes.  When he returned to work without any

7   restrictions.

8      A.     Yes.

9      Q.     You were injured at one point in time.

10  Correct?

11     A.     Yes.

12     Q.     And when you were excused from shoveling, were

13  you under a doctor's order not to shovel?

14     A.     Yes.

15     Q.     In other words, limited duties?

16     A.     Yes.  Light duty.

17     Q.     But you still went out and shoveled?

18     A.     Yes, because -- yeah.

19     Q.     And you understand that this occurred some time

20  ago, but you recall an incident where Dale Brown used the

21  term "stupid beaner" on one occasion.  Correct?

22     A.     Yes.

23     Q.     And do you know who he directed that to?

24     A.     If I remember right, Eric Reyna and Roy were in

25  the room.  But I would say Roy.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                  000407

Mestas v. Town of Evansville                    17-CV-00017-NDF

41

1        Q.     And there has been testimony by Mr. Mestas that

2    he spoke to Dale Brown after that occurred.  Did you know

3    anything about that?

4        A.     No.

5        Q.     Did you ever hear Dale Brown use that term

6    after that one occasion?

7        A.     No.

8        Q.     You stated that, in regards to Dale Brown's

9    management style, you didn't explain to the mayor, that

10   you were going to take care of it yourself.  How would

11   you do that with Dale Brown?

12       A.     I should have said deal with it myself, not

13   take care of it.  We would go -- we'd get in an argument

14   or whatever, and we'd go two, three, four days without

15   talking, and just like nothing would happen.  I'm not

16   going to go complain to the mayor about it.

17                   MR. THOMPSON:  I don't have any further

18   questions.

19                   MS. HAYES:  Can we just take a quick

20   break?  And I'll probably have just a few more questions

21   for you.

22                   (Deposition proceedings recessed

23                   11:58 a.m. to 12:02 p.m.)

24

25

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          42

1                              EXAMINATION

2    BY MS. HAYES:

3        Q.    You were asked by Mr. Thompson if -- or, I

4    guess you testified that Dale Brown would treat you

5    harshly on occasion.   Is that an accurate --

6        A.    We got in arguments, yes.

7        Q.    Were you treated as harshly as Roy Mestas?

8        A.    No.

9              MR. THOMPSON:  Objection as to form.

10       Q.    (BY MS. HAYES)  When you said that Dale Brown

11   beat up on Roy pretty good, were there other employees

12   that Dale treated in the same manner?

13       A.    No.

14       Q.    What was more harsh about the way Dale Brown

15   treated Mr. Mestas than other employees?

16       A.    It was almost everything he did after he came

17   back from his injury.  He always had something to say

18   about something that Roy did.

19       Q.    And in terms of the public works department

20   employees helping each other out or working as a team --

21   and, again, I'm sorry if I've already asked you this --

22   but was that usual, unusual, that you would help someone

23   else out with their job duties?

24             MR. THOMPSON:  Objection as to form.

25   Asked and answered.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                  000409

Mestas v. Town of Evansville                    17-CV-00017-NDF

43

1       A.    If they needed a hand and we were asked to

2    help, we would help.

3       Q.    (BY MS. HAYES)  So, if another employee asked,

4    "Hey, Ron, you mind helping me out picking up these

5    limbs?" is that --

6       A.    Picking up what?

7       Q.    Branches from trees.  I'm trying to get a sense

8    of --

9       A.    Oh, yeah.  If we weren't sent out to do a

10   specific job that day and someone asked, yeah, we would

11   go help.

12      Q.    And did you observe Mr. Mestas helping out you

13   or other employees with job duties?

14      A.    He ran the trash route.  And I don't recall any

15   certain instances.  But the trash truck driver in

16   Evansville is pretty much the guaranteed thing you're

17   going to do every day, except for Thursdays, where we

18   don't run a route.  So, when you get hired as a trash

19   truck driver, that's what you're going to do pretty much

20   all the time.  It's not like everybody else.  How can I

21   explain it?  That's the one specific job there is in

22   Evansville, is a trash truck driver.  Everybody else has

23   to be ready to do different things, like a sewer backup

24   or a water main break or whatever we're asked to do.  But

25   the trash truck driver is a specific job.  And that's

Mestas v. Town of Evansville                17-CV-00017-NDF

44

1    what he did most of the time.

2        Q.    So there wouldn't be occasion for Roy to help

3    other public works employees?

4        A.    Not saying there wouldn't be an occasion, but

5    it would be rare.  I mean, he would have Thursdays off.

6    Thursdays, there's no trash route.  So he would maintain

7    a truck, wash the truck, grease it, whatever he would do

8    on Thursdays.  Or if he got done with a truck, cleaning

9    and servicing the truck, he would go out and fix trash

10   bins with broken lids or stuff like that.

11       Q.    Was it your perception that Roy was a good team

12   member?

13               MR. THOMPSON:  Objection as to form.

14       A.    Yeah.  I had no problem with Roy.

15       Q.    (BY MS. HAYES)  Was it your observation or

16   perception that other public works employees had problems

17   with Roy?

18               MR. THOMPSON:  Objection as to form.

19       A.    Not that I saw.

20       Q.    (BY MS. HAYES)  Did any other public works

21   employee complain to you about Mr. Mestas?

22       A.    About his job duty or job performance?

23       Q.    Anything.

24       A.    No.

25       Q.    No complaints from other public works

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                  000411

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          45

1    employees?

2         A.    No.

3         Q.    How did you know that Mr. Mestas had injured

4    his back?

5               MR. THOMPSON:  Objection as to form.

6    Asked and answered.

7         A.    Because Dan came in and said he was laying on

8    the ground.  And then he went to the doctor.  He said he

9    was going to be out because he had a back injury.

10        Q.    (BY MS. HAYES)  And how do you know that?

11        A.    That's what we were told.

12        Q.    Who told you that?

13        A.    Probably Dale.

14        Q.    So Dale informed you that Mr. Mestas' doctor

15   had said he had a back injury?

16              MR. THOMPSON:  Objection as to form.

17   Misstates his testimony.

18        A.    I don't even recall if he said it was a back

19   injury.  He said he was injured and he was going to be

20   out.  Most likely, he said back injury, yes.

21        Q.    (BY MS. HAYES)  And were you told, when he came

22   back to work, that he had no work restrictions?

23        A.    Yes.

24        Q.    Who told you that?

25        A.    Dale.

                Wyoming Reporting Service, Inc.
                        1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

46

```
 1      Q.    You mentioned that you didn't go to the mayor.
 2   If you had problems with Dale Brown, you would just deal
 3   with it yourself.  Is that accurate?
 4      A.    Yeah.
 5      Q.    Were you afraid if you went to the mayor, that
 6   you might be retaliated against or lose your job?
 7      A.    No.  I didn't need the job that bad.
 8      Q.    Have you ever been reimbursed for any
 9   work-related clothing or boots?
10      A.    For boots, yes.
11      Q.    What kind of boots?
12      A.    Work boots, steel-toed boots.
13      Q.    So that's a typical reimbursement or something
14   that the Town will reimburse you for?
15      A.    Yes, $100.
16            MS. HAYES:  I have no further questions.
17                      EXAMINATION
18   BY MR. THOMPSON:
19      Q.    I have a follow-up question.  You stated that
20   you didn't get beat up on by Dale Brown like Roy Mestas
21   did.  Would you say you reacted differently when you got
22   into a disagreement with Dale Brown than what you
23   observed Roy Mestas do?
24      A.    Oh, yeah.
25            MS. HAYES:  Objection --
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit C
000413

Mestas v. Town of Evansville                    17-CV-00017-NDF

47

```
1      Q.    (BY MR. THOMPSON)  You treated it differently?

2                  MS. HAYES:  -- as to form.

3      A.    Yes.

4      Q.    (BY MR. THOMPSON)  And you didn't observe all

5  the interactions between Dale Brown and Roy Mestas during

6  the day, did you?

7      A.    No.

8      Q.    Mr. Waddell was treated harshly by Dale Brown,

9  wasn't he?

10     A.    Yeah.

11     Q.    He was beat up on by Dale Brown?

12     A.    Yeah.  Dale didn't like him.  You could tell

13 early on after he was hired that Dale didn't care for him

14 that much.

15     Q.    And did he beat up on him on a daily basis?

16     A.    I don't recall.

17     Q.    But he treated him harshly.  Correct?

18     A.    Yes.

19     Q.    And it would be pure speculation on your part

20 as to comparing Dale Brown's treatment of Roy Mestas

21 versus Mr. Waddell because you didn't see their

22 interaction on a daily basis.  Is that fair?

23     A.    Yes.

24     Q.    And so, to sit here and say that Mr. Mestas was

25 beat up on like nobody else, that would be pure
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
000414

Mestas v. Town of Evansville                17-CV-00017-NDF

48

1    speculation on your part?

2        A.    Yes.

3                 MS. HAYES:  Objection.

4                 MR. THOMPSON:  No further questions.

5                      EXAMINATION

6    BY MS. HAYES:

7        Q.    I just have one follow-up.  Getting back to the

8    beat up on Mr. Mestas pretty good.  You were asked that

9    you perhaps respond differently than Mr. Mestas may have

10   to Dale.  Did you see Dale Brown beating up on Mr. Mestas

11   pretty good?

12                MR. THOMPSON:  Objection as to form.

13       A.    When I say "beat up on," I meant as far as not

14   physically beating up on somebody, but they would argue.

15   And like I said before, whatever Roy did, Dale found

16   something to find wrong with whatever he was doing.  I

17   think I've said that three or four times.

18       Q.    (BY MS. HAYES)  Yes.

19       A.    And that's what I meant.  He was always on his

20   case with whatever he did after he came back from the

21   injury.  Dale was pissed because he got hurt, plain and

22   simple, and that's it in a nutshell.

23       Q.    So what was your observation of how Mr. Mestas

24   would respond to Mr. Brown's constantly finding something

25   wrong with him?

Mestas v. Town of Evansville                    17-CV-00017-NDF

49

```
 1      A.    There was a lot of times he didn't say

 2   anything, but there were a couple of times they got into

 3   voice-raising.  I wasn't there all the time.  I didn't

 4   see everything.  But what I did see, there was a lot of

 5   times that Roy would just go and do whatever he had to

 6   do.  And they got in a couple loud arguments here and

 7   there.  No one ever saw mine and Dale's arguments because

 8   they were always done before anybody even got to work.

 9      Q.    Do you have any other -- anything else you'd

10   like to add?

11              MR. THOMPSON:  Objection as to form.

12      A.    No.

13              MS. HAYES:  I don't have any further

14   questions.

15              MR. THOMPSON:  Read and sign.

16                  (Deposition proceedings concluded

17                  12:12 p.m., September 19, 2017.)

18

19

20

21

22

23

24

25
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit C
                                                                                  000416

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          50

      1                    DEPONENT'S CERTIFICATE

      2            I, Ronald Emond, do hereby certify that I have

      3    read the foregoing transcript of my testimony consisting

      4    of 49 pages taken on September 19, 2017, and that the

      5    same is a full, true and correct transcript of my

      6    testimony.

      7

      8

      9

     10            _____
                           RONALD EMOND
     11
           ( ) No changes          ( ) Changes attached
     12

     13         Subscribed and sworn to before me this _____

     14    day of _____, 2017.

     15

     16

     17            _____
                           Notary Public

     18

     19
           My Commission Expires_____.
     20

     21

     22

     23

     24

     25


                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

51

```
 1                  C E R T I F I C A T E

 2

 3           I, RANDY A. HATLESTAD, a Registered Merit

 4     Reporter and a Notary Public of the State of Wyoming, do

 5     hereby certify that the aforementioned deponent was by me

 6     first duly sworn to testify to the truth, the whole

 7     truth, and nothing but the truth;

 8           That the foregoing transcript is a true record

 9     of the testimony given by the said deponent, together

10     with all other proceedings herein contained.

11           IN WITNESS WHEREOF, I have hereunto set my hand

12     and affixed my notarial seal this 2nd day of October,

13     2017.

14

15

16

17     _____

18               RANDY A. HATLESTAD
                 Registered Merit Reporter

19

20

21

22

23     My Commission Expires April 2, 2020.

24

25
```

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                17-CV-00017-NDF

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF WYOMING

 3    ----------------------------------------------------------
      ROY MESTAS,
 4
                    Plaintiff,
 5
           vs.                    Case No. 17-CV-00017-NDF
 6

 7    TOWN OF EVANSVILLE, a duly
      incorporated municipal corporation
 8    under the laws of the State of
      Wyoming, and DALE BROWN, in
 9    his official capacity as public
      works supervisor for the
10    Town of Evansville,

11                  Defendants.
      ----------------------------------------------------------
12

13              DEPOSITION OF DANIEL C. ADCOCK
                   Taken in behalf of Plaintiff
14
                      8:55 a.m., Tuesday
15                    September 19, 2017

16

17         PURSUANT TO NOTICE, the deposition of DANIEL C.

18    ADCOCK was taken in accordance with the applicable

19    Wyoming Rules of Civil Procedure at the offices of

20    Schwartz, Bon, Walker & Studer, 141 South Center, Suite

21    500, Casper, Wyoming, before Randy A. Hatlestad, a

22    Registered Merit Reporter and a Notary Public in and for

23    the State of Wyoming.

24

25
```

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

2

```
 1                  A P P E A R A N C E S

 2   For the Plaintiff:      MS. MEGAN L. HAYES
                             Attorney at Law
 3                           910 Kearney Street
                             Laramie, Wyoming 82070
 4

 5   For the Defendants:     MR. THOMAS A. THOMPSON
                             Attorney at Law
 6                           MacPHERSON, KELLY & THOMPSON
                             616 West Buffalo Street
 7                           P.O. Box 999
                             Rawlins, Wyoming 82301-0999
 8

 9   Also Present:           Mr. Roy Mestas

10

11                     I N D E X

12   DEPOSITION OF DANIEL C. ADCOCK:
                                                   PAGE
13   Examination by Ms. Hayes                        3
     Examination by Mr. Thompson                    39
14   Examination by Ms. Hayes                       51
     Examination by Mr. Thompson                    57
15   Examination by Ms. Hayes                       59

16

17                   E X H I B I T S

     No.              Description            Identified
18
     1     Transcript of Audio Recording          5
19
     2     Copy of Menards Invoice               34
20
     3     Copy of Purchase Order and Purchase   38
21         Authorization

22

23

24

25
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

3

```
 1                    P R O C E E D I N G S

 2                    (Deposition proceedings commenced

 3                    8:55 a.m., September 19, 2017.)

 4                         DANIEL C. ADCOCK,

 5    called for examination by the Plaintiff, being first duly

 6    sworn, on his oath testified as follows:

 7                         EXAMINATION

 8    BY MS. HAYES:

 9         Q.    My name is Megan Hayes.  I just introduced

10    myself.  I represent Roy Mestas, who's filed a

11    discrimination lawsuit in federal court against the Town

12    of Evansville.  Would you just please state your full

13    name and spell it for the record?

14         A.    Yeah.  Daniel C. Adcock, spelled A-D-C-O-C-K.

15         Q.    Have you ever had your deposition taken?

16         A.    Never.

17         Q.    So, just to give you a little bit of guidance,

18    we're on the record.  We have the court reporter here

19    transcribing these proceedings.  And if you can just make

20    sure you let me finish my question before you answer.

21    We're just trying to get a clean transcript.  And, also,

22    if you could audibly say yes or no to a question rather

23    than shake your head or nod, that would be helpful.  And

24    just let me know if you need to take a break for any

25    reason, if you need to use the restroom or want to
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000421

Mestas v. Town of Evansville                    17-CV-00017-NDF

4

1    stretch.

2        A.    Okay.

3        Q.    I'm going to assume that if I ask you a

4    question and you answer it, that you understood my

5    question.

6        A.    Okay.

7        Q.    And you understand that you're under oath?

8        A.    Uh-huh.

9        Q.    And what does that mean to you?

10       A.    Means you're going to tell the truth, and it's

11   all going to be the truth.  If not, you can get into some

12   trouble if you don't tell the truth.

13       Q.    Right.  You could be subject to penalty of

14   perjury in this proceeding for not telling the truth.

15             And what have you done to prepare for your

16   deposition today?

17       A.    Not a lot.  I did speak to Mr. Thompson a

18   little bit.  And that's really about all the preparation

19   that's been done.

20       Q.    Did you review any documents?

21       A.    I did review one document that was given to me

22   on a testimony -- not really testimony, but an interview

23   that I had several years ago with workforce services, I

24   believe.

25             MS. HAYES:  I am handing the court

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000422

Mestas v. Town of Evansville                    17-CV-00017-NDF

5

```
 1   reporter a transcript of audio recording labeled Track

 2   01, Dan Adcock interview.

 3                        (Exhibit No. 1 marked for

 4                         identification.)

 5        Q.   (BY MS. HAYES)  Is this the document that you

 6   reviewed?

 7        A.   Different format than the one that I reviewed,

 8   but it looks similar, yeah.

 9        Q.   Anyone else you spoke to about your deposition

10   to prepare?

11        A.   No.

12        Q.   Do you have any short-term or other memory

13   problems?  Sorry.  I have to ask that.

14        A.   No.

15        Q.   On any drugs or medication that might affect

16   your memory?

17        A.   No.

18        Q.   Did you bring the documents with you that were

19   listed in your notice of deposition?

20        A.   I'm afraid I did not.

21             MS. HAYES:  Do you have those, Tom?

22             MR. THOMPSON:  I've got them.  These are

23   being produced subject to a protective order.  And I

24   would note that these were not required to be produced by

25   either the magistrate or Judge Freudenthal since they're
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000423

Mestas v. Town of Evansville                     17-CV-00017-NDF

                                                              6

1   part of the personnel file.

2                  MS. HAYES:   Thank you, Tom.

3      Q.   (BY MS. HAYES)   Do you know Roy Mestas?

4      A.   Yes.

5      Q.   How do you know Mr. Mestas?

6      A.   Working at the Town of Evansville.

7      Q.   And when did you work together?

8      A.   Not sure of the exact dates, but we met the

9   first day, his day, on the job.  And the dates, I really

10  don't know.

11     Q.   And I'll just represent to you it's not

12  contested he was hired in September of 2012, and his

13  employment was terminated in April of 2013.  Does that

14  roughly jog your memory?

15     A.   That's roughly, yeah.

16     Q.   Do you know Dale Brown?

17     A.   Yes.

18     Q.   How do you know Dale Brown?

19     A.   I've known Dale Brown for many years.  Met

20  early '80s when I worked for the Town for the first time.

21     Q.   And do you socialize with him outside of work?

22     A.   More definition.  Currently or before?

23     Q.   Anytime.

24     A.   We did for many years, yes, but currently, we

25  do not.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000424

Mestas v. Town of Evansville                    17-CV-00017-NDF

7

1      Q.    How long has it been since you've seen Dale

2   Brown?

3      A.    November of 2014.

4      Q.    And you haven't spoken to him since then?

5      A.    No.

6      Q.    Do you work for the Town of Evansville now?

7      A.    Yes.

8      Q.    In what department?

9      A.    Public works.

10      Q.    And what's your position there?

11      A.    I am the public works supervisor.

12      Q.    And can you explain your employment history

13   with the Town of Evansville?  I know I've got these

14   documents.  But when you started, gaps in employment,

15   starting pay.

16      A.    Definition on -- the second time that I was

17   employed with the Town of Evansville?

18      Q.    Yeah, let's start with that.  Just so I'm

19   clear, there have been two times you were employed there?

20      A.    Correct.

21      Q.    How about the first time?  What were the dates

22   of that?

23      A.    First time was 1979 through 1984.

24      Q.    And then the second time?

25      A.    February 2011 through current.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000425

Mestas v. Town of Evansville                    17-CV-00017-NDF

8

```
 1        Q.    So let's just start with your 2011.  What was

 2   your -- if you can just explain your employment history

 3   since then.

 4        A.    I was hired as a sanitation driver, and I was a

 5   sanitation driver for a while and then moved to just

 6   regular public works, streets, alleys, parks, and then

 7   after that to sewer collections, state-certified.  And

 8   then after that, I was asked to be the public works

 9   supervisor.

10        Q.    And when was that?

11        A.    That was in March of 2015.

12        Q.    Do you remember what your starting pay was?

13        A.    I started at $14 per hour.

14        Q.    And did you have a commercial driver's license

15   when you started?

16        A.    I did not.

17        Q.    When did you obtain that?

18        A.    May of same year, 2011.

19        Q.    Who was your supervisor in 2011 when you

20   started working at the public works department?

21        A.    Dale Brown and Brian Boettcher.

22        Q.    And how long were you supervised by Dale Brown?

23        A.    Until November of 2014.

24        Q.    And what were your job duties in the public

25   works department in 2012 and 2013?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit D
000426

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                9

1       A.      Mainly streets and alleys, parks, water, water

2    distribution, wastewater collection.  And it just varied.

3    We do a little bit of everything every day.

4       Q.      Did your job duties include shoveling snow?

5       A.      Yes.

6       Q.      Can you describe what you had to do to shovel

7    snow?

8       A.      On snow days we came in at 7:00 a.m. to clear

9    the sidewalks for the town hall and the community center

10   for residents coming in at 8:00 in the morning.

11      Q.      And when you were employed -- first employed in

12   2011, were you issued a town phone or radio?

13      A.      Not immediately.  I think I got a Town phone at

14   some point after that.

15      Q.      Do you remember when?

16      A.      Frankly, I don't recall.

17      Q.      Like within a year?

18      A.      Within a year.

19              MR. THOMPSON:  Objection as to form.

20      Q.      (BY MS. HAYES)  Within a year of being hired?

21      A.      Correct.

22      Q.      And what would you use the phone for?

23      A.      Communication with other employees.

24      Q.      About what?

25      A.      Daily job duties.  It varied.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000427

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                            10

 1      Q.    Just want to ask you a few questions about your

 2   relationship with Roy Mestas.  How would you describe

 3   your relationship when you worked together at the Town of

 4   Evansville?

 5      A.    Employee-and-employee relationship.

 6      Q.    Did you have any conflicts with Mr. Mestas?

 7      A.    None that I recall.

 8      Q.    Does that mean that it may have occurred and

 9   you don't remember or that it didn't occur?

10            MR. THOMPSON:  Objection as to form.

11      A.    I don't recall one, no.

12      Q.    (BY MS. HAYES)  You don't recall having an

13   argument with him?

14      A.    Correct.

15      Q.    Did you have a conflict with him?

16      A.    No, I don't believe so.

17      Q.    How frequently would you see Mr. Mestas during

18   a typical workday?

19      A.    Typically, in the morning before shift started,

20   again lunchtime and again end of the day, generally.

21      Q.    And throughout the workweek, can you describe a

22   little bit about just the format of the workweek at that

23   time?  Were you all together in the shop?  Were people

24   out in their trucks?  If you can just give me a little

25   sense of how the job worked in a typical workweek.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                          000428

Mestas v. Town of Evansville                    17-CV-00017-NDF

11

1                MR. THOMPSON:   Objection as to form.   As

2   to what time frame, Counsel?

3        Q.   (BY MS. HAYES)   I'm only asking during

4   Mr. Mestas' employment in 2012 and 2013.

5        A.   And the whole crew as general?

6        Q.   Just the sanitation department.

7        A.   The sanitation department has routes Monday,

8   Tuesday, Wednesday and Friday.   The sanitation employee

9   generally starts the route 8:00 in the morning, processes

10   the route until finished.   Other crew members do other

11   things throughout the town.

12        Q.   And what happens on Thursdays?

13        A.   For the sanitation operator?

14        Q.   Yes.

15        A.   Generally, truck maintenance day.   And when

16   truck maintenance is done, they assist in other areas as

17   needed.

18        Q.   During the times that you saw Mr. Mestas during

19   the workday, were you able to witness him interacting

20   with other public works employees?

21        A.   Yes.

22        Q.   And did you ever -- how did he get along with

23   his coworkers?

24        A.   Coworkers, I would say fine.   I didn't see any

25   issues that I remember.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000429

Mestas v. Town of Evansville                17-CV-00017-NDF

12

1     Q.    So I'm going to ask you to read lines -- on

2   page 4 of your transcript, line 7 to 17.

3     A.    And that was 4?  I'm on page 4.  "I thought he

4   got along just fine."

5              MR. THOMPSON:  Do you want him to read it

6   to himself?

7     Q.    (BY MS. HAYES)  No.  Just read it out loud.

8     A.    "I thought he got along just fine.  And any new

9   associate takes time to get to know everyone and blend

10  in, but as I -- as I stated, he tried to participate in

11  any -- any discussions we were having, in our weekly

12  safety meetings, all those things.  And he -- he did the

13  niceties.  He'd bring in doughnuts once in a while or

14  something like that.  So he really worked hard.  And I

15  didn't see any -- any confusion or personality conflicts

16  with anyone on the team, of the regular folks."

17    Q.    Is that an accurate portrayal of what you told

18  the interviewer during your --

19    A.    Yes.

20    Q.    Did any of Mr. Mestas' coworkers complain to

21  you about him ever?

22    A.    That's a long time ago.  Again, not that I

23  recall right off, no.

24    Q.    Again, does that mean that you don't remember

25  it ever happening or it may have happened and you don't

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit D
000430

Mestas v. Town of Evansville                    17-CV-00017-NDF

13

1   recall?

2       A.    I don't -- I just don't recall if it happened.

3   It's been a long time.  It's been difficult to remember

4   every situation.

5       Q.    How would you describe Mr. Mestas' work ethic?

6             MR. THOMPSON:  Objection as to form.

7       A.    Yeah.  I need definition.  From my view,

8   Mr. Mestas got in his truck on time and did his route.

9   But only very limited exposure to actually watching the

10  process.

11      Q.    (BY MS. HAYES)  Did you ever witness Mr. Mestas

12  and Mr. Brown interacting?

13      A.    Yes.

14      Q.    Did you ever observe Mr. Mestas being

15  disrespectful to Mr. Brown?

16            MR. THOMPSON:  Object as to form.

17      A.    I have to have, I guess, definition on

18  "disrespectful."  It can be judged by different people

19  different ways.  But I did not see that, no.

20      Q.    (BY MS. HAYES)  Were you at work when

21  Mr. Mestas was injured?

22      A.    I was arriving at work.

23      Q.    Do you remember what happened, or can you

24  describe what happened on that day?  Do you remember when

25  it was, first of all?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000431

Mestas v. Town of Evansville                    17-CV-00017-NDF

14

```
1        A.    I do not remember the exact day.  I know that

2    it was icy outside.  I pulled into work, and I saw

3    Mr. Mestas' car or truck door open.  There was a car

4    between where I parked and where he was parked.  He had

5    backed in.  I got out of my car, walked over, saw

6    Mr. Mestas laying on the ground.  I asked him if he

7    needed help.  He said that he had fallen, and he was

8    having a hard time getting up.  I said, "Then I'll call

9    the fire department for assistance."  He said, "No," and

10   got up.  That's my recollection.

11       Q.    Did you help him up after he fell?

12       A.    I don't remember.  I think I probably lended a

13   hand, reached down to lend a hand to him, but I don't

14   remember picking him up or anything like that.

15       Q.    Did you inform Dale Brown that Mr. Mestas had

16   fallen on the ice?

17       A.    Yes, I did.

18       Q.    And how did he respond?

19       A.    His response was he wasn't on the clock at that

20   particular time and -- that he just wasn't on the clock.

21       Q.    What does that mean, to your understanding?

22       A.    To my understanding, just wasn't punched in at

23   the time.

24       Q.    Is that all he said?

25       A.    I believe so, yes.
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

15

1     Q.    Can I ask you to look at page 32 of your

2     interview?  So lines 7 to 13.

3     A.    "And I said, Dale, there's a problem.  Roy just

4     fell in the parking lot, and we got -- we got a problem

5     here.  Dale goes, 'Not my problem.  He wasn't clocked in.

6     I don't have to worry about it.'  'Well, you probably do.

7     You know, that's what we do here.'  'Nope.  He's not

8     clocked in.  Wasn't on my clock.  Doesn't -- doesn't

9     affect me at all.'"

10    Q.    And can you read to line 18?  Finish reading to

11    line 18.

12          MR. THOMPSON:  And, Counsel, to the extent

13    that this is a statement that was given that was not

14    under oath and not in any judicial administrative

15    proceeding, I'd object to the introduction of this

16    testimony.

17    Q.    (BY MS. HAYES)  Mr. Adcock, did you tell the

18    truth during this interview?

19    A.    Yes.

20    Q.    Would you just please finish reading lines 14

21    to 18?

22    A.    "And that was just the type of -- of response

23    he would have for someone that he didn't like or didn't

24    want around anymore.  And that's when it all start --

25    that's when it really started to get bad, after that

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                 000433

Mestas v. Town of Evansville                    17-CV-00017-NDF

16

1   point."

2       Q.    Is that an accurate portrayal of what you told

3   the interviewer during this interview?

4       A.    Yes.

5       Q.    Do you know how long Mr. Mestas was out on

6   injury leave after he slipped on the ice?

7       A.    I don't have the exact times, no.  It wasn't

8   something I was responsible for, so I didn't track that.

9       Q.    I'll just represent that he returned to work in

10  mid January of 2013.  Did you ride with him in his truck

11  after he --

12      A.    Yes.

13      Q.    -- returned to work?

14      A.    Yes.

15      Q.    For how long did you do that?

16      A.    The better part of a week, if I remember

17  correctly.

18      Q.    How did that go?  Was he able to perform his

19  job duties?

20      A.    Yeah.  He operated the truck -- operated the

21  truck in a manner I would expect, yes.

22      Q.    Did you notice any problems with his job

23  performance during that week?

24      A.    No.

25      Q.    Were you able to observe Mr. Mestas at work

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit D
000434

Mestas v. Town of Evansville                17-CV-00017-NDF

17

1   from mid January until he was terminated in mid April?

2      A.    Basically the same manners as before.

3   Sanitation driver generally was separated from the rest

4   of the team most of the time.

5      Q.    On Thursdays were you able to observe him

6   during the workday?

7      A.    Yes, on occasion.

8      Q.    Did you ever notice any problems with his job

9   performance from January until mid April?

10     A.    No.  Similar to what it was before.

11     Q.    Did he help coworkers if they asked for his

12  help?

13     A.    I don't recall a time that he asked for help.

14  I don't recall a time.

15     Q.    Just as a general matter, how many -- let me

16  start over.  How many employees were in the sanitation

17  department during this time period?

18     A.    One.

19     Q.    Who was that?

20     A.    Roy Mestas.

21     Q.    How about in the public works department?

22     A.    I would say, including Dale and Brian, at that

23  time I think nine, I think.

24     Q.    And did co-employees help each other out ever?

25     A.    Absolutely.

Mestas v. Town of Evansville                    17-CV-00017-NDF

18

1        Q.     Can you describe some of that?  How would they

2    help each other?

3        A.     For example, if we had a water leak or

4    something, everyone works together, takes their role in

5    that assignment and completes the job.  And, again, with

6    the Town, we are tasked to do many different things

7    throughout the day.  So sometimes you're independent, and

8    sometimes you're working with the team, depending on

9    what's occurring at the time.

10       Q.     Do you know if Mr. Mestas kept his sanitation

11   truck clean and maintained on Thursday?

12       A.     Yes.

13       Q.     Any problems with him -- with his keeping his

14   truck clean and maintained?

15              MR. THOMPSON:   Objection as to form.

16       Q.     (BY MS. HAYES)   That you know of?

17       A.     No, not in my opinion.

18       Q.     To your knowledge, would Mr. Mestas ever just

19   disappear during the day on Thursdays or any other day?

20       A.     Difficult to answer.  I didn't watch him all

21   the time.

22       Q.     Did Dale Brown ever ask you where Mr. Mestas

23   had gone?

24       A.     No, not that I recall.

25       Q.     Do you know if Mr. Mestas ever procured items

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit D
000436

Mestas v. Town of Evansville                    17-CV-00017-NDF

19

1   for the Town that Mr. Brown had not authorized?

2       A.    Not that I recall.  No, not that I recall.

3       Q.    So, again, does that mean that it could have

4   occurred but you don't remember, or it didn't happen?

5       A.    Yes.  Every employee has the ability to

6   purchase certain things.  But it wasn't in my area to pay

7   attention to those things, so I wouldn't know, really.

8       Q.    Did Dale Brown ever mention to you that

9   Mr. Mestas was procuring things for the Town without his

10  authorization or approval?

11      A.    Not that I recall, no.

12      Q.    And how closely did you work with Dale Brown at

13  that time?

14      A.    Dale stayed in the office most of the time.  I

15  was in the field 99 percent of the time.  So we weren't

16  together much at that time.

17      Q.    But you were friendly with Dale Brown.

18  Correct?

19      A.    Professional relationship, yes.

20      Q.    Would he confide in you about other employees

21  ever?

22      A.    Occasionally, yes.

23      Q.    Did he ever talk to you about Roy Mestas?

24      A.    I would say yes.  But I don't really recall

25  what it was.  Generalities, most likely.  How's he doing

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                 000437

Mestas v. Town of Evansville                   17-CV-00017-NDF

20

1   on the route?  Bent hooks on the bins, things like that.

2   Just day-to-day operational things.

3         Q.    And when you were talking to Mr. Brown in these

4   conversations, did you communicate to him any problems

5   that you were witnessing with Mr. Mestas' job

6   performance?

7         A.    I don't know about the definition there.  I did

8   mention one time that we had what appeared to be a series

9   of bent hooks on the bins and that I wanted to explore

10  what may be happening with those, because it's an

11  expensive process, and it seemed to be an abnormal number

12  of them at that time.

13        Q.    With Mr. Mestas' truck?

14        A.    Well, Mr. Mestas was operating the truck at

15  that time.  And that comes to my mind, yes.  I do

16  remember that conversation.

17        Q.    I just want to ask you a few questions about

18  Dale Brown.  Did you observe Mr. Brown treating

19  Mr. Mestas differently after Mr. Mestas returned from his

20  injury leave in January of 2013?

21        A.    I guess, definition.  Differently than me or

22  differently than all of the employees that he managed?

23        Q.    Well, I'm going to ask you to look at page 32

24  to 33 of your interview.  And by "differently," I mean

25  differently than he treated him before he was injured.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000438

Mestas v. Town of Evansville                    17-CV-00017-NDF

21

1      A.    That's a difficult question.  I don't know.  In

2    this I did state that he did treat him differently.

3    Which section are you looking at here?

4      Q.    Sorry.  I'm on pages 32 and 33.  And I think

5    you've already reviewed page 32.  I'm sorry.  Let's try

6    page 34, lines 9 through 15.  Does that refresh your

7    memory a bit?

8      A.    "It progressively became worse.  I'm not

9    positive the injury was the cause of it, but it certainly

10   helped verify Dale's feelings that Roy wasn't going to

11   work there anymore.  So he just kept pushing even harder,

12   as we talked about, with put him in positions to -- very

13   difficult to be successful, that sort of thing."

14     Q.    Is that an accurate portrayal of what you told

15   the interviewer?

16     A.    Absolutely, yes.

17     Q.    And so that's what I was asking you, if you can

18   describe or elaborate on that sort of thing.  What did he

19   do to make Mr. Mestas -- make it very difficult for

20   Mr. Mestas to be successful?

21     A.    One instance that I recall that's in this

22   testimony was the issue of picking up a trash bin that

23   was no longer needed at -- I believe it was All Creatures

24   animal veterinary clinic.  It was on a Wednesday.

25   Wednesday route is a very heavy route.  It takes most of

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion
Exhibit D
000439

Mestas v. Town of Evansville                    17-CV-00017-NDF

22

1    the day, majority of the day.  And Dale Brown asked Roy

2    to ensure that he had that bin picked up and delivered

3    back to the shop by noon.  I knew that was a bit

4    difficult to accomplish.  And that's what I -- that's one

5    of the issues or one of the things that I saw.

6        Q.    Did you offer to help Mr. Mestas that day?

7        A.    I did.

8        Q.    And how did Mr. Brown respond when you offered

9    to help Mr. Mestas?

10       A.    Mr. Brown was very upset with me because he

11   felt I overstepped my authority by reassigning work.

12       Q.    I'm sorry.  I didn't hear that.

13       A.    By reassigning a task.

14       Q.    Was that unusual for Mr. Brown to mention

15   something to you like that about helping another

16   co-employee?

17       A.    I guess it depends on the context.  If Dale

18   Brown said, "Do it this way," and I did it another way,

19   then that was a problem, yes.

20       Q.    Did Dale Brown ever tell you not to help

21   Mr. Mestas?

22       A.    No, not to the best of my recollection.

23       Q.    Did you hear him tell other employees not to

24   help Mr. Mestas?

25       A.    No, not to the best of my recollection.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000440

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              23

1      Q.    Again, I'm sticking with 2012 and 2013.  During

2  this time period, did Mr. Brown have regular meetings

3  with the public works employees?

4      A.    Yes.

5      Q.    And how often was that?

6      A.    Every Thursday.

7      Q.    And what was the purpose of those meetings?

8      A.    Safety meetings or -- safety meetings, other

9  discussions generally.

10     Q.    And who attended those meetings?

11     A.    The entire department.

12     Q.    So all nine employees?

13     A.    Yes.

14     Q.    Did you ever hear jokes at those meetings about

15  racial minorities or Asians or African Americans?

16     A.    I heard jokes at the meetings, but I really

17  don't remember what type of jokes they were, to be

18  honest.  Nine guys getting together talking, and there's

19  a whole bunch of conversations going on at the time.  And

20  I know there were jokes told, but I don't recall exactly

21  what the jokes were.

22     Q.    So my question is specifically not just jokes

23  about -- specifically jokes about minorities, African

24  Americans, Hispanics, Asians.  Any jokes of that nature?

25     A.    None that I can recall at the meetings.  None

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit D
                                                                    000441

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              24

1    that I can recall.

2         Q.    How about in the workplace in general?

3         A.    None that I can recall.

4         Q.    After mid January when Mr. Mestas returned from

5    his injury leave, were you able to observe Mr. Brown's

6    interacting with Mr. Mestas at these meetings?

7         A.    We're all in the room.  Dale and Roy were

8    absolutely in the room.  So, at that particular time, I

9    was -- if I remember right, at that time frame, I was

10   presenting the majority of the meetings, so I was up in

11   front of the room and holding the discussions.

12        Q.    What was your impression of how Mr. Brown

13   treated Mr. Mestas at those meetings?

14        A.    Again, that's -- I think it varied from meeting

15   to meeting.  Some meetings it was just pretty benign.

16   And other meetings it was a little tense at times between

17   everyone, depending on what we're discussing and what

18   happened.

19        Q.    Did you ever observe Mr. Brown being

20   condescending to Mr. Mestas during these meetings?

21        A.    Again, I think that there's a big line of what

22   "condescending" means to different people.  At times I

23   did see Dale Brown be condescending to people.  And Roy

24   most likely was one of them, yes.

25        Q.    On page 15 and 16 of your interview, you

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                        000442

Mestas v. Town of Evansville                    17-CV-00017-NDF

25

```
 1    mentioned or stated that you've heard Mr. Brown use the

 2    term "beaner" many times.

 3         A.    Page 16 -- or, 15.

 4         Q.    Page 15.  Can you describe some of -- the

 5    context for some of those comments, what he said, when he

 6    said it?

 7         A.    Known Dale for many years.  In many different

 8    situations, I heard him use terms like that on several

 9    occasions.  I heard him call his wife that.  I heard

10    him -- I'm trying to think of another time.  I think he

11    referred to an electrician as "Beaner Electric" once.  So

12    I did hear him use that term over the years, yes.

13         Q.    In the workplace?

14         A.    I don't recall him using it around me in the

15    workplace at that time, no.

16         Q.    Did anyone -- any of your coworkers mention to

17    you that they heard Dale Brown using the term "beaner"?

18         A.    Yes.

19         Q.    Who mentioned it to you?

20         A.    After the fact, Mr. Reyna, Eric Reyna.

21         Q.    When was that?

22         A.    I don't have the date.  That would be very

23    difficult.  That would be a guess.

24         Q.    What's your best guess?

25              MR. THOMPSON:  Objection as to form.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000443

Mestas v. Town of Evansville                    17-CV-00017-NDF

26

1      A.    I don't even want to venture a guess.  It's

2   sometime in 2013.

3      Q.    (BY MS. HAYES)  And on page 15, you mentioned

4   that you heard indirectly some statements and jokes.  Do

5   you remember who you might have heard indirectly that --

6   sorry.  I'm looking at lines 11 through 17, referring to

7   Hispanics or Mexicans in a joking manner that you may

8   have heard indirectly from someone else.

9      A.    I think, as I said before, we're in a room with

10   several guys, and there's a lot of things being said.

11   And that's probably why I mentioned I heard them

12   indirectly.  But I'm not even sure of the context, to be

13   honest.  It's been a while.

14      Q.    Was Dale Brown present when you would hear

15   these jokes in the workplace?

16            MR. THOMPSON:  Objection as to form.  What

17   jokes?

18      A.    Dale spent a lot of time in his office.  He

19   would come out during Thursday meeting times.  And once

20   in a while, he would come out and visit with the folks.

21   So, most of the time, he stayed in the office.  So was

22   there times he was in the office -- possibly -- when the

23   jokes were being spoken of or told?

24      Q.    (BY MS. HAYES)  You also state in your

25   interview -- I'm looking now at pages 16 and 17 -- that

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit D
000444

Mestas v. Town of Evansville                    17-CV-00017-NDF

27

1    someone told you Dale Brown had called Mr. Mestas a

2    beaner.  Do you recall who told you that?

3         A.    Yes.  Again, Mr. Reyna.

4         Q.    Just so I'm clear, Mr. Reyna told you that

5    Mr. Brown had called Mr. Mestas a beaner?

6         A.    Correct.

7         Q.    So this is a separate incident from --

8         A.    I don't know if that's a separate incident or

9    they were in the room together.  I don't know.

10        Q.    I see.  Thank you.  Who is Wilbur Yankey?

11        A.    Wilbur Yankey was an employee of the Town that

12   had been there for some time.

13        Q.    Did he work there at the same time as

14   Mr. Mestas?

15        A.    Yes, I believe.

16        Q.    Was he supervised by Dale Brown?

17        A.    Yes.

18        Q.    Did you ever hear Mr. Brown making negative

19   comments about Mr. Yankey?

20        A.    I heard Dale make comments like, "When are you

21   going to retire?" things like that.

22        Q.    How old, approximately, was Mr. Yankey?

23        A.    I don't know.  Probably late 60s, I would say.

24        Q.    Did he wear hearing aids?

25        A.    Yes.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit D
000445

Mestas v. Town of Evansville                    17-CV-00017-NDF

28

1      Q.    Did you ever hear Mr. Brown make any comments

2   about Mr. Yankey's hearing ability?

3              MR. THOMPSON:  Objection as to form.

4   Relevance.

5      A.    Wilbur and Dale bantered back and forth all the

6   time.  They're both strong personalities, and they liked

7   to poke each other all the time.

8      Q.    (BY MS. HAYES)  Does Dale Brown still work for

9   the Town of Evansville?

10     A.    No.

11     Q.    Do you know why he left his employment?

12             MR. THOMPSON:  Objection as to form.

13  Relevance.

14     A.    I don't know.  I know that he left, but I don't

15  know the exact reasons why.

16     Q.    (BY MS. HAYES)  What do you think are the

17  reasons why he left?

18             MR. THOMPSON:  Objection as to form.

19  Speculation.  Foundation.

20     A.    Yeah.  I really -- I don't know.  Dale was --

21  could be a very difficult manager to understand and to

22  work with at times.  And that's all I really would know

23  about what exactly was going on with that.

24     Q.    (BY MS. HAYES)  Have you seen him since he left

25  his employment with the Town?

Mestas v. Town of Evansville                17-CV-00017-NDF

29

 1      A.   I saw him one time drive past me on the road.

 2  That was all.

 3      Q.   Have you communicated with him in any manner

 4  about Mr. Mestas since April of 2013?

 5      A.   Since April of 2013?  I don't know.  I have not

 6  communicated anything with Dale Brown since November of

 7  2014.

 8      Q.   How about after he fired Mr. Mestas?

 9      A.   I don't know.  I'm pretty sure the discussion

10  around the shop when someone is removed from a position

11  in a small town, it affects everyone.  So I'm sure there

12  was some discussion about, "What are we going to do with

13  the trash routes?  What are we going to do here?  What

14  happened?"  But all generality conversations that you

15  have almost every day.

16      Q.   In terms of what happened, what conversations

17  did you have about what happened with Mr. Brown regarding

18  Mr. Mestas?

19      A.   There was some speculation about shoveling

20  snow, a snowblower.  But that particular day I believe,

21  if I remember correctly, I was on the snowplow that day,

22  and I wasn't at the town hall.  Or, if I was, I was in a

23  different section of the town hall, so I didn't know what

24  happened.  And all of a sudden, boom, it happened.

25      Q.   What were the discussions about shoveling snow

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit D
000447

Mestas v. Town of Evansville                     17-CV-00017-NDF

                                                                30

 1   and a snowblower?

 2      A.    I heard that Roy had asked if he could go home

 3   and get his snowblower, and Dale said no.  But Dale said,

 4   "No, you can't get your snowblower" also because it's

 5   very difficult to use personal equipment for the Town, if

 6   it gets broken or torn up or whatever.  And that was my

 7   thought at the time.  But that's all I know.  I didn't

 8   even realize Roy had been fired.

 9      Q.    Did Dale Brown tell you why he fired

10   Mr. Mestas?

11      A.    No, he did not, not to the best of my

12   recollection.

13      Q.    And since April of 2013, have you communicated

14   with Mr. Brown in any way about the underlying facts

15   claimed by Mr. Mestas regarding his complaints of

16   discrimination by Dale Brown?

17      A.    No.  No, I don't believe we did.

18      Q.    So were you both still working together when

19   you gave this interview?

20      A.    Dale and I?

21      Q.    Yes.

22      A.    And we did this April 2nd in '14?  Yes.

23      Q.    And did you discuss your interviews at all?

24      A.    No.

25      Q.    Do you know if Dale Brown kept any of his

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit D
                                                                                   000448

Mestas v. Town of Evansville                    17-CV-00017-NDF

31

 1   personal equipment on Town property?

 2        A.   Yes.

 3        Q.   What personal equipment?

 4        A.   There was an ATV kept in the shop for some

 5   time.  Yes, the ATV is one that comes to mind.

 6        Q.   Any other personal items?

 7        A.   He would bring his personal truck to work once

 8   in a while.

 9        Q.   But to store on or leave on Town property?

10        A.   Other than cell phones or things like that, the

11   ATV was the biggest thing that I remember.

12        Q.   And where was that?  Where did Dale Brown keep

13   that?

14        A.   In the main shop.

15        Q.   For what reason?  Do you know?

16        A.   I do not know.

17        Q.   Did anyone else keep personal equipment on Town

18   property that worked for public works?

19        A.   Nothing the size of an ATV.  Like I said, cell

20   phone or whatever you have in your desk drawers.

21        Q.   Who is Phil Hinds?

22        A.   Phil Hinds is the mayor of the Town of

23   Evansville.

24        Q.   How do you know Mr. Hinds?

25        A.   He's the mayor of the Town of Evansville.  And

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                     17-CV-00017-NDF

                                                                    32

1    I communicate with him, especially now more than ever,

2    that I'm the public works supervisor.  But he's the

3    mayor, council meetings, those sorts of things.

4        Q.    Is he your supervisor now?

5        A.    Correct.  Yes.

6        Q.    In 2012 and 2013, then, I would assume that

7    Mr. Hinds was Mr. Brown's supervisor?

8        A.    Correct.

9        Q.    Do you know if Dale Brown purchased a diesel

10   fuel tank with Town funds?

11       A.    Yes.

12       Q.    Can you tell me what happened or what you know

13   about that purchase?

14       A.    What I know about that purchase was Dale Brown

15   purchased the diesel tank and put it in the back of his

16   pickup, his personal pickup.

17       Q.    And what happened with the diesel tank?

18       A.    It ended up in the lagoon building and since

19   been put back into service.

20       Q.    How did it end up in the lagoon building?

21       A.    I have no idea.

22       Q.    How do you know Dale Brown bought a diesel fuel

23   tank with Town funds that he put in his personal pickup

24   truck?

25              MR. THOMPSON:  Objection as to form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000450

Mestas v. Town of Evansville                17-CV-00017-NDF

33

1      A.    How do I know?  I guess I don't have any

2   concrete evidence.  But that's what all the indicators

3   led to.  I didn't see a purchase order or anything like

4   that.

5      Q.    (BY MS. HAYES)  When did he purchase this fuel

6   tank?

7              MR. THOMPSON:  Same objection.

8      A.    I don't know.

9      Q.    (BY MS. HAYES)  Can you give me a rough time

10   frame?  After Mr. Mestas left his employment?  During

11   that time?

12      A.    Wow, that's a tough question.  If I had to

13   guess, I would say probably while Roy was there, most

14   likely, but I don't know for a fact.

15      Q.    Do you know if Dale Brown used Town funds to

16   procure other items for himself personally?

17              MR. THOMPSON:  Objection as to form.

18   Relevance.

19      A.    Not that I know of.

20      Q.    (BY MS. HAYES)  Can you describe the procedure

21   for me in 2012 and 2013 for employees to procure items

22   for the Town of Evansville?

23      A.    A couple of different avenues.  Certain

24   companies, for example, Murdoch's or Menards, had an open

25   purchase order where employees could go purchase products

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000451

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                      34

1    and put it on the general account.  Other companies

2    required a purchase order, and you would have to obtain a

3    purchase order number for procuring the products.

4        Q.    What are some of those other companies?

5        A.    Just about everyone else.  NAPA, Russell

6    Industries, Wyoming Waterworks.  All of those require a

7    purchase order number.

8        Q.    Do you recall what stores other than Murdoch's

9    and Menards had a general account with the Town?

10       A.    The only other one that comes to mind is

11   AutoZone.

12       Q.    How about Casper Tire?

13       A.    Casper Tire, to the best of my knowledge, did

14   and still requires a purchase order number.

15       Q.    Has this procedure for procuring items, has

16   that changed --

17       A.    No.

18       Q.    -- since you've been employed?

19             MS. HAYES:  I am handing you, Randy --

20   this is a guest copy.  Looks like an invoice.  It's

21   Evans 0290.  Can you mark that as Exhibit 2, please?

22                    (Exhibit No. 2 marked for

23                     identification.)

24       Q.   (BY MS. HAYES)  Do you recognize this document?

25       A.    Looks like a receipt from Menards.  Yeah.

Mestas v. Town of Evansville                     17-CV-00017-NDF

35

1      Q.    And is that your signature?

2      A.    Yes.

3      Q.    I know those are hard to --

4      A.    They can be very difficult.

5      Q.    -- write a signature on a scratch pad.  So, on

6   the type of sale -- I'm just trying to make sure I

7   understand this document, so bear with me here.  On the

8   type of sale -- I'm sorry.  The purchase order number, do

9   you see the numbers O3262013?

10      A.    Yeah.  This top part of this, I don't normally

11   see.  The top part of this is done at the town hall.  The

12   part we saw was the receipt.

13      Q.    So let's start with the receipt.  So, at the

14   top of that receipt -- it's sideways.  But, when you turn

15   it sideways, at the top of the receipt, the PO number, it

16   looks like O3262013.

17      A.    That's the date.

18      Q.    And this is a receipt from which store?

19      A.    Menards.

20      Q.    And that store, I believe you said, does not

21   require you to first have a purchase order.  Is that

22   correct?

23      A.    Correct.

24      Q.    And just so I understand, so you, Dan Adcock,

25   could leave work -- well, I'm sorry.  I'm going to let

Mestas v. Town of Evansville                    17-CV-00017-NDF

36

1    you describe for me how you came to purchase these items

2    just so I understand.  How would this work?  Did you have

3    to get approval first?

4         A.    On something of this size, no.  I would go to

5    Menards.  I would purchase the product.  I'd get to the

6    lanes.  Their data entry system required a PO number,

7    which we used today's date.  The town hall processes

8    vendors like this in one lump PO at the end of the month,

9    so they're not in need of creating multiple POs in a

10   month for something like this that we go to often.

11         So we go to Menards often.  At the end of the

12   month, we cut one purchase order to pay the bill.  And

13   being that they have an insertion point on their system

14   for PO, we usually use the date so we know what date it

15   was it was purchased.

16        Q.    You mentioned that for this amount, you

17   wouldn't need any preauthorization.  Was there an amount

18   above which you would have to get preapproval to purchase

19   something?

20        A.    The higher the dollar amount, you should

21   have -- you should obtain approval.  But I don't know if

22   there was a drop-dead dollar amount that you have to

23   obtain approval on, $50 or $100, other than when you get

24   to $1,000, then it requires council approval if it's not

25   in the budget.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                 000454

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            37

1       Q.    And if it were a larger purchase, how would you

2   get -- what would you do to get approval?

3       A.    I would go to my boss, Dale or Brian, and say,

4   "I need this.  This is how much it costs."  They would

5   review the budget to determine if the money was there and

6   then provide a line item in which that money should come

7   out of from the budget.  And then a purchase order is

8   procured, and you go purchase the product.  Or, in this

9   case, if it was from Menards, you really didn't need a

10  purchase order, but they would assign it to a budget

11  line.  But it was up to the supervisor to determine if

12  that money was available to be spent at that time.

13      Q.    And just the mechanics or the logistics of

14  getting a purchase order, how did that work?  Would you

15  call the town hall?  Would Dale Brown obtain that for

16  you?  Just walk me through that process.

17      A.    Well, it varied.  You needed to obtain the line

18  item code for the budget from Dale or Brian.  And then at

19  that time, maybe the supervisor would call the town hall

20  or they'd have you call the town hall.  And you'd call

21  them.  "Need a PO."  They'd ask where, what you're

22  buying, how much, and what line item do you need?  And

23  then they would write it down and provide you a purchase

24  order number.

25      Q.    Even for smallish -- I'm assuming sometimes

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                 000455

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            38

1    employees would get purchase orders even from Menards.

2    Is that accurate?  Do you know?

3        A.    Well, I don't know.  In public works, at

4    Menards -- we generally didn't have real big purchases at

5    Menards.  We're talking hundreds of dollars.  So, most of

6    the time, you did not get a particular purchase order for

7    a Menards purchase unless you were going to buy something

8    that was very expensive, like a shelter or something.

9        Q.    And how much would a shelter cost?

10       A.    $1,500 to $2,500.

11       Q.    And just so I'm clear -- I'm sorry.  I want to

12   make sure I'm tracking you on this.  If an employee first

13   got a purchase order, would that indicate that that

14   purchase had been authorized by the Town?

15       A.    Correct.

16                    (Exhibit No. 3 marked for

17                    identification.)

18                    MS. HAYES:  I am handing the court

19   reporter a purchase order for the Town of Evansville.  It

20   is Evans 0221, 0222 and 0224.

21       Q.    (BY MS. HAYES)  Do you recognize any of those

22   documents?

23       A.    I know what these documents are, yes.

24       Q.    Is that your signature on the first page?

25       A.    Uh-huh.

                    Wyoming Reporting Service, Inc.
                         1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

39

1      Q.    And what is this purchase order for?

2      A.    It appears to have been for some sprinkler

3   parts and reimbursement for a pair of steel-toed boots

4   that the Town reimburses $100 for.

5      Q.    And was this purchase -- sorry.  I'll start

6   over.  Was the reimbursement for steel-toed safety boots

7   preauthorized by Dale Brown?

8      A.    Yeah.  It's preauthorized in the policy of the

9   Town of Evansville.  Every twelve months they will allow

10   you to purchase a pair of steel-toed boots and reimburse

11   you up to $100 for those boots, provided that you provide

12   all of the attached documentation.  And they have to be

13   safety-rated boots.

14      Q.    So this was a -- safety boots were something

15   that the Town had already preapproved?

16      A.    Correct.

17            MS. HAYES:  I don't have any further

18   questions at this time.

19            MR. THOMPSON:  Could we take a break?

20            MS. HAYES:  Sure.

21            (Deposition proceedings recessed

22            9:49 a.m. to 9:53 a.m.)

23                 EXAMINATION

24   BY MR. THOMPSON:

25      Q.    Dan, I want to ask you some questions beginning

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000457

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              40

1   with Deposition Exhibit 1, which was your statement.  Do

2   you recall the circumstances under which you gave that

3   statement?

4       A.    Yes.  I know that the first time I heard about

5   the statement, I was actually driving to Rock Springs for

6   a little vacation.  And I got a call from -- I'm not even

7   sure what the young lady's name was -- and asked if I

8   could come speak to her.  And I said yes, I could, and we

9   scheduled the date.  And that occurred -- I don't know --

10  April 2nd, from the date on the form.  And it was after

11  work, 5:00, 5:30 in the evening.

12      Q.    Were you provided the opportunity to speak with

13  counsel prior to providing that statement?

14      A.    No.

15      Q.    Do you recall being administered an oath

16  subject -- that your testimony was subject to the penalty

17  of perjury?

18      A.    No.

19      Q.    What was your attitude towards Dale Brown when

20  you gave that statement?

21      A.    Very agitated and upset.

22      Q.    And why is that?

23      A.    Dale Brown was treating everyone at that time,

24  including myself, very aggressively.  Very upset, very

25  hard to work there, based on just Dale's actions and the

Mestas v. Town of Evansville                    17-CV-00017-NDF

41

1    way he treated the people at the Town.

2        Q.    When you say "everyone," do you mean everyone

3    on the public works crew?

4        A.    Everyone on the public works crew and even some

5    conflict with the neighboring departments.

6        Q.    Describe for me, if you could, Dale Brown's

7    management style.

8        A.    Dale Brown had a huge ego.  If you did

9    everything he wanted you to do, you were fine.  If you

10   did anything that he did not agree with, he was very

11   aggressive and could be very rude and just downright mean

12   to people.

13       Q.    Do you believe that his management style was

14   aggressive only towards individuals that were minorities?

15       A.    No, I do not.  He was aggressive to anyone that

16   he didn't like.

17       Q.    That would include white middle-aged males?

18       A.    That's correct, yes.

19       Q.    White males of any age?

20       A.    Correct.

21       Q.    What is a probationary employee?

22       A.    A probationary employee is a new employee that

23   has been hired.  They're on a probationary period for a

24   period of six months to ensure that that employee will be

25   a good fit and able to perform the functions required in

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                42

1    the position.

2         Q.    And, if the employee doesn't perform the

3    functions in that position, what is the remedy that the

4    Town has available, if you know?

5         A.    Termination, removal from position.

6         Q.    Is that an at-will position?

7         A.    Yes.

8         Q.    And how many probationary employees were there

9    at the public works department at the time Roy Mestas was

10   employed?

11        A.    That, I don't know off the top of my head,

12   whether there was Roy or more than one.  I don't know.

13        Q.    Roy was a probationary employee?

14        A.    Yeah, for six months after he was hired.

15        Q.    And are the responsibilities that a

16   probationary employee -- are they any different than a

17   permanent employee?

18        A.    No.

19        Q.    They have the same responsibilities to perform

20   their job duties?

21        A.    Correct.

22        Q.    How about the authority that they're given?  Is

23   that any different?

24        A.    No, not -- not markedly different.

25        Q.    You talked about the time period when

Mestas v. Town of Evansville                    17-CV-00017-NDF

43

1    Mr. Mestas returned to work after a work injury.  First

2    of all, let me ask you about that injury.  Do you recall

3    whether or not that was reported as a workers'

4    compensation claim?

5        A.    I assume it was.  But I wasn't involved in that

6    process.

7        Q.    So, even though Dale Brown initially said he

8    wasn't on the clock, you believe it was reported as a

9    workers' comp claim?

10       A.    I do, yes.

11       Q.    And that it was treated as a work injury which

12   occurred on the job site.  Correct?

13       A.    Correct.

14       Q.    And when Dale Brown returned to work -- or,

15   excuse me.  When Roy Mestas returned to work, were you

16   aware of any restrictions that he was placed on?

17       A.    No, no restrictions.

18       Q.    What was your understanding as far as his

19   ability to work?

20       A.    My understanding of no restrictions is you can

21   perform all the duties of your job.

22       Q.    And you're expected to perform all duties of

23   your job?

24       A.    Correct.

25       Q.    And that would include snow shoveling.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000461

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                         44

1    Correct?

2        A.    Correct.

3        Q.    Were all employees of the public works

4    department required to shovel snow when you had a snow

5    event?

6        A.    Yes.

7        Q.    And by "shovel snow," that was manually to

8    shovel snow.  Correct?

9        A.    Yes.

10       Q.    When Roy Mestas returned and was released to

11   full duty without restrictions, why were you riding with

12   him in the truck?

13       A.    I rode with him in the truck, as I mentioned

14   before, because I had seen what I thought was a

15   larger-than-normal amount of bent hooks on the bins.  And

16   I was just looking to ensure that Roy was comfortable in

17   hooking the bins in an appropriate manner and not bending

18   the hooks in lifting and lowering the bins.

19       Q.    And, at the time that you were observing bent

20   hooks on the bins, Roy was the only sanitation driver.

21   Correct?

22       A.    Correct.

23       Q.    And so was it your assumption that it was Roy

24   that was causing the hooks to be bent?

25       A.    That was my suspicion, yes.

Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit D
                                                                        000462

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        45

1       Q.      And what does it take to replace a hook that's

2   bent on a bin?

3       A.      Well, it requires three bolts, and it requires

4   a $55 hook.  And the hooks either have to be ordered

5   and/or manufactured.

6       Q.      And what sort of time is required to go ahead

7   and replace that hook?

8       A.      With the hook in hand, it would probably take a

9   half hour, I imagine.

10      Q.      And how many hooks were there that you were

11  observing ended up being bent?

12      A.      I don't know that I have an exact number, but

13  several.

14      Q.      And Dale Brown allowed you to ride with Roy in

15  the truck?

16      A.      Correct.

17      Q.      Did this take away from other duties that you

18  had as an employee of the Town of Evansville?

19      A.      Yes.

20      Q.      And when an employee is assisting another

21  employee, I assume that also takes away from other duties

22  that the employee would typically be performing?

23      A.      Typically, yes.

24      Q.      As far as Roy Mestas' job performance, is it

25  fair to say that you had limited observation of his job

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000463

Mestas v. Town of Evansville                17-CV-00017-NDF

46

1   performance?

2       A.   Yes, limited.

3       Q.   You saw him in the morning, you saw him at

4   noon, and you saw him at the end of the day.  Correct?

5       A.   Yes, mainly.

6       Q.   When you talked about when Roy Mestas returned,

7   I believe, in your statement, you said he was treated

8   differently.  What did you mean, "treated differently"?

9       A.   I felt that Roy was basically put in a couple

10  positions where it would have been very difficult to be

11  successful.  And that was my feeling.

12      Q.   Have you seen other employees that worked for

13  the Town of Evansville that were treated differently by

14  Dale Brown?

15      A.   I guess I need some more definition.

16      Q.   Employees that were put in a position that

17  would make it difficult for them to be successful.

18      A.   Yes, I have.

19      Q.   And who is that?

20      A.   There's actually been more than one.  I can

21  come up with a couple.  Paul Waddell was one of them.

22  Robert Lanier was one of them.  And there were others.

23      Q.   Was Mr. Waddell Hispanic?

24      A.   No.

25      Q.   Was the other gentleman Hispanic?

Mestas v. Town of Evansville                17-CV-00017-NDF

47

```
 1      A.    No.

 2      Q.    Were either of them minorities?

 3      A.    No.

 4      Q.    How were they treated by Dale Brown?

 5      A.    Again, put in positions that were very

 6   difficult to be successful, being condescending in

 7   discussions and basically being rude.

 8      Q.    Is it fair to say that once Dale Brown didn't

 9   like an employee, he treated them differently?

10      A.    Yes.

11      Q.    Do you believe that his treating employees

12   differently had anything to do with their ethnicity or

13   race?

14      A.    No.

15      Q.    You talked about the one instance where Brown

16   was upset with you because you had reassigned a task.

17   Did that occur on other instances other than the matter

18   involving Roy Mestas?

19      A.    Yes.

20      Q.    Could you describe other instances when that

21   occurred?

22      A.    It happened several times.  I don't have a

23   specific example at mind right now.  But, as I stated,

24   anytime that you didn't follow the exact order, then you

25   were put in that position with Dale Brown.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit D
000465

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                               48

1        Q.    You talked about meetings where there was some

2   tension between Dale Brown and Roy Mestas, but I believe

3   you also indicated that there was tension with everyone

4   else and Brown at those meetings.  Is that a fair summary

5   of your testimony?

6        A.    That is a fair summary because of the situation

7   at the time, yes.

8        Q.    And when you said Brown could be condescending,

9   was he condescending to other employees other than the

10  incidents which you referred to, being in a meeting and

11  being condescending to those individuals present at that

12  meeting?

13       A.    Yes.  Dale was condescending all the time.

14       Q.    And who was he condescending to?

15       A.    Everyone that worked for him at one time or

16  another.

17       Q.    Ms. Hayes asked you some questions about the

18  incident involving a snowblower.  Let me ask it this way.

19  What did you believe would have been a reasonable

20  response to that incident?

21            MS. HAYES:  Objection.  Form of the

22  question.

23       A.    I would have said, "No.  I don't want you to

24  bring your snowblower in because of the potential

25  liability with the snowblower."  But, also, I believe

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
                                                                                      000466

Mestas v. Town of Evansville                    17-CV-00017-NDF

49

1    that we should have explored a snowblower to help with

2    the laborious task of shoveling heavy snow.

3         Q.    (BY MR. THOMPSON)   Everybody was required to do

4    that task.   Correct?

5         A.    Correct.

6         Q.    Including you?

7         A.    Including me.

8         Q.    Do you have a snowblower now with the Town of

9    Evansville?

10        A.    Not currently.

11        Q.    Do you all still do it by manual shoveling?

12        A.    Correct.

13        Q.    And is everybody required to do that task?

14        A.    Everyone is required.

15        Q.    Do you expect somebody that had been injured

16   and released to return to work without restrictions to be

17   able to do that task as an employee of the department of

18   public works?

19        A.    Yes.

20        Q.    Did you believe that Dale Brown's response to

21   Roy Mestas was reasonable?

22        A.    On the snowblower?

23        Q.    Yes.

24              MS. HAYES:   Objection.   Form of the

25   question.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000467

Mestas v. Town of Evansville                17-CV-00017-NDF

50

```
1        A.    I did not see his actual response.  I heard the
2   response secondhand.  So I don't know how it was
3   delivered.
4        Q.    (BY MR. THOMPSON)  By the time an employee
5   leaves work, goes home, loads up a snowblower and comes
6   back to work, is it likely, during that time period, that
7   the task of shoveling snow will be completed by other
8   employees?
9        A.    Yes.
10       Q.    When Roy Mestas returned from his work injury
11  and was released without any restrictions, did you
12  consider him disabled?
13       A.    No.
14       Q.    Did you perceive him as having a disability?
15       A.    No.
16       Q.    Were you aware of any injuries Roy Mestas had
17  prior to being employed with the Town of Evansville?
18       A.    No.
19       Q.    When you fill out an application, when you
20  began your employment for the Town of Evansville, did you
21  have to indicate whether or not you were able to perform
22  the functions of the job?
23       A.    No.
24       Q.    Were you asked any questions as to whether or
25  not you could perform those functions?
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

51

1      A.    No.

2                  MR. THOMPSON:  I have no further

3    questions.

4                        EXAMINATION

5    BY MS. HAYES:

6      Q.    Mr. Thompson asked you some questions about

7    employees shoveling snow for the public works department,

8    and I believe you said that all public works employees

9    were required to shovel snow.  Is that correct?

10     A.    Correct.

11     Q.    Did Dale Brown shovel snow?

12     A.    Not generally.

13     Q.    Why not?

14     A.    Supervisor, I assumed.

15     Q.    Was he, in your opinion, capable of shoveling

16   snow?

17     A.    Briefly.

18     Q.    And "briefly" meaning was there a time when he

19   could not do that physically?

20     A.    Well, "briefly," I mean in the sense he could

21   shovel for a few minutes, I'm sure, yes.

22     Q.    You're a supervisor now.  Do you shovel snow?

23     A.    Yes.

24     Q.    Are you excused from shoveling snow because

25   you're a supervisor?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
                                                                                           000469

Mestas v. Town of Evansville                  17-CV-00017-NDF

52

1       A.    I could excuse myself from shoveling snow, but

2    I opt not to.

3       Q.    Who's Brian Boettcher?

4       A.    Brian Boettcher was the second -- the second in

5    charge at the Town of Evansville when I was -- when Dale

6    and Brian were there.

7       Q.    In the public works department?

8       A.    Correct.

9       Q.    Did he shovel snow?

10      A.    On occasion.

11      Q.    Not always?

12      A.    No.

13      Q.    Was he excused from shoveling snow?

14      A.    I don't know if he was excused, but, again, the

15   supervisor position.

16      Q.    You mentioned an employee named Dale -- I'm

17   sorry -- Wilbur Yankey.

18      A.    Uh-huh.

19      Q.    Did he shovel snow?

20      A.    Yes.

21      Q.    Were you aware that in the week prior to

22   Mr. Mestas asking to use a snowblower, that he had

23   requested time off from work to get a steroid injection

24   for back pain?

25            MR. THOMPSON:   Objection as to form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000470

Mestas v. Town of Evansville                    17-CV-00017-NDF

53

1    Misstates the testimony.

2        A.    No, I'm not aware.  He would not have told me

3    that, most likely, on why.

4        Q.    (BY MS. HAYES)  And by your answer, I'm

5    assuming that Dale Brown didn't mention that to you

6    either?

7        A.    No.

8        Q.    Who asked you to spend a week after Mr. Mestas

9    returned from work to ride in his truck with him?

10        A.    I asked Dale if I could.

11        Q.    And for what reason?

12        A.    Again, because I noticed what I considered an

13    abnormal amount of bent hooks.  And I thought it was just

14    the way that the truck was hooking onto the bins.  And it

15    can cause bent hooks.

16        Q.    And you had noticed the bent hooks before

17    Mr. Mestas left for his injury leave six weeks earlier?

18        A.    I believe so.  And, again, the time frame

19    that's there.  So, yes.

20        Q.    And so you mentioned to Dale that there may be

21    an issue with the way that Mr. Mestas was hoisting the

22    trash bins?

23        A.    The way they were being hooked onto the truck.

24    It has a lift bar.  And it's a training issue.  You have

25    to hook into the center of the bar, not at each end.  If

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000471

Mestas v. Town of Evansville                    17-CV-00017-NDF

54

1   you hook it at each end, it can cause it to twist, which

2   bends the hooks.

3        Q.    During the week that you rode with Mr. Mestas,

4   did you observe him -- how did you observe his ability to

5   pick up the trash bins?

6        A.    The abilities were good.  I didn't see any

7   issues.  So what was bending the hooks, I really don't

8   know.  But they were bent.  And I assume that maybe it

9   was just a fact of hooking the bins correctly.

10       Q.    But you didn't see anything improper during

11  that week that you were with --

12       A.    No.

13       Q.    And during that week that you rode with

14  Mr. Mestas, was he able -- I believe you already

15  testified to this.  I'm sorry if I'm repeating myself.

16  But did you observe that he was able to perform his job

17  duties?

18       A.    Yes.

19       Q.    I want to get back to this issue of Mr. Brown

20  putting Mr. Mestas in positions where he couldn't be

21  successful.  And, again, I'm looking at pages 10 and 11

22  of your interview, where you discuss the incident of a

23  trash bin falling into the trash truck.  Do you remember

24  that incident?

25       A.    Yes.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000472

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        55

1      Q.    And then on page 11, would you just please read

2   lines 10 to 23?

3                MR. THOMPSON:  Object as to the reading of

4   select portions of the statement without the entirety of

5   the statement being read in.  Go ahead.

6      A.    "And in my opinion, that was putting him --

7   that put Roy in an unfair position, where if anybody else

8   was driving the truck, there wouldn't have been an issue

9   that the other two boys were on the truck getting the bin

10  out" --

11               "Okay."

12               -- "in my opinion.

13               "From what you observed and witnessed, did Dale

14  take objection to when people were helping Roy with his

15  tasks?"

16               "Yes."

17               "Okay."

18               "Yeah.  And -- and sometimes aggressively."

19               "Okay.  Do you recall any directive from Dale

20  specifically?"

21     Q.    (BY MS. HAYES)  And what do you mean by

22  "sometimes aggressively"?

23     A.    The way he dealt with me when I reassigned that

24  bin, he was very angry at me.

25     Q.    Was that the only incident?  Your "sometimes

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
                                                                                  000473

Mestas v. Town of Evansville                    17-CV-00017-NDF

56

1   aggressively" seems to imply that there were other

2   incidents.

3       A.    The one here that I just read about, when we

4   were removing the bin from the truck and Roy was on the

5   ground, two other gentlemen were hooking the bin, and

6   Dale said, "No.  Roy, you can go ahead and go up there

7   and hook the bin."  And that's not really aggressive, but

8   sometimes he could be very rude.

9       Q.    So sometimes aggressively.  Were there other

10  times when he would aggressively take objection to

11  co-employees helping Mr. Mestas with his tasks?

12      A.    The one that I remember is the bending that we

13  spoke about, when I reassigned the bin picked up.

14      Q.    And this was after -- was this after Mr. Mestas

15  returned from his injury leave?

16      A.    I believe so.

17      Q.    You mentioned that you wouldn't observe

18  Mr. Mestas all day every day when he was working for the

19  Town.  Is that correct?

20      A.    Correct.

21      Q.    How about Dale Brown?  Do you know how much he

22  would observe Mr. Mestas during a workday?

23      A.    No.

24            MR. THOMPSON:  Objection as to form.

25      Q.    (BY MS. HAYES)  Do you know if Mr. Brown ever

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000474

Mestas v. Town of Evansville                    17-CV-00017-NDF

57

 1   rode with Mr. Mestas in the sanitation truck?

 2       A.    No, I don't know that he did.  I don't believe

 3   he did, but I don't know that he did, no.

 4       Q.    You never saw him in the sanitation truck?

 5       A.    Correct.

 6             MS. HAYES:  Can we just take a short

 7   break?  I'll make sure I've gotten everything.

 8             MR. THOMPSON:  Can I see his job

 9   application?  Well, I think I've got a copy of it.

10             Do you mind if I ask a couple questions?

11             MS. HAYES:  No.

12             MR. THOMPSON:  Well, you wanted to take a

13   break.

14             MS. HAYES:  Well, I know.  Now I have to

15   listen, though.

16                      EXAMINATION

17   BY MR. THOMPSON:

18       Q.    Dan, I'm going to hand you what has been marked

19   Evans 0388 through 0391 and ask you if you recognize that

20   document.

21       A.    Yes.  It's my application for employment.

22       Q.    And what I'm going to ask you to do is to turn

23   to -- I believe it's the third page.  You had responded

24   to some questions I had, and I didn't give you the

25   benefit of having the application in front of you.  But

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit D
000475

Mestas v. Town of Evansville                    17-CV-00017-NDF

58

1    is there a question on that page as to whether or not

2    you're physically or otherwise unable to perform the

3    duties of the job for which you are applying?

4        A.    Yes, there is.  There is a line there.

5        Q.    So your prior testimony about whether or not

6    that question was asked of you when you were employed,

7    does this refresh your recollection about whether or not

8    that occurred?

9        A.    Yes.

10       Q.    And you would correct your prior testimony in

11   regards to your prior response?

12       A.    Absolutely.

13       Q.    You were asked as to whether or not you could

14   physically perform the functions of your job.  Correct?

15       A.    On the application.

16       Q.    And then under the applicant statement, is that

17   your signature?

18       A.    Yes.

19       Q.    And would you read the last paragraph out loud?

20       A.    "In the event of employment, I understand that

21   false or misleading information given in my application

22   or interviews may result in discharge.  I understand also

23   that I'm required to abide by all rules and regulations

24   of the employer."

25       Q.    And you understood what that meant when you

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000476

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              59

1   signed it?

2       A.    Correct.

3       Q.    That you were filling out the application

4   truthfully and honestly?

5       A.    Correct.

6       Q.    And that you weren't misrepresenting anything

7   on the application.  Correct?

8       A.    Correct.

9       Q.    Which would include your ability to physically

10  perform the functions of the job?

11      A.    Correct.

12            MR. THOMPSON:  Thank you.

13                    EXAMINATION

14  BY MS. HAYES:

15      Q.    I have one more question about the ATV that you

16  mentioned that Dale Brown kept in the main shop.  Were

17  public works employees permitted to store personal

18  equipment on Town property?

19      A.    I believe -- I believe the Town policy would be

20  to -- they prefer that you did not store your equipment

21  on Town property.  Is it written?  No.  But it is a

22  taxpayer's facility.  So, in my opinion, you should not

23  store your personal property there.

24      Q.    Do you know how long he kept his ATV there?

25      A.    No, not really.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit D
000477

Mestas v. Town of Evansville                    17-CV-00017-NDF

60

1      Q.    Do you know why he removed it?

2      A.    No.

3      Q.    Do you know if he was asked to remove it?

4      A.    No.

5      Q.    Did he use it for any work-related purposes?

6            MR. THOMPSON:  Objection as to form.

7      Q.    (BY MS. HAYES)  That you know of.

8      A.    Not that I know of.  Not that I know of.

9      Q.    Did you ever see him on his ATV during work

10   hours?

11     A.    It's been a long time.  Not to the best of my

12   recollection, no.  I mean, I might have saw him ride it

13   around once.  But not to the best of my recollection.

14     Q.    Do you know if he ever used Town fuels -- any

15   Town fuel in any of his personal equipment or vehicles?

16     A.    No.

17           MR. THOMPSON:  Objection as to form.

18     A.    No.

19     Q.    (BY MS. HAYES)  You don't know if he did?

20     A.    I don't know if he did.

21           MS. HAYES:  I don't have any further

22   questions, Mr. Adcock.  Thank you for your testimony.

23           MR. THOMPSON:  We'll read and sign.

24           (Deposition proceedings concluded

25            10:21 a.m., September 19, 2017.)

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit D
                                                                                   000478

Mestas v. Town of Evansville                    17-CV-00017-NDF

61

```
 1                    DEPONENT'S CERTIFICATE

 2            I, Daniel C. Adcock, do hereby certify that I

 3    have read the foregoing transcript of my testimony

 4    consisting of 60 pages taken on September 19, 2017, and

 5    that the same is a full, true and correct transcript of

 6    my testimony.

 7

 8

 9

10                  _____
                         DANIEL C. ADCOCK
11
      ( ) No changes          ( ) Changes attached
12

13          Subscribed and sworn to before me this _____

14    day of _____, 2017.

15

16
                    _____
17                        Notary Public

18

19
      My Commission Expires_____.
20

21

22

23

24

25
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        62

1                    C E R T I F I C A T E

2

3         I, RANDY A. HATLESTAD, a Registered Merit

4    Reporter and a Notary Public of the State of Wyoming, do

5    hereby certify that the aforementioned deponent was by me

6    first duly sworn to testify to the truth, the whole

7    truth, and nothing but the truth;

8         That the foregoing transcript is a true record

9    of the testimony given by the said deponent, together

10   with all other proceedings herein contained.

11        IN WITNESS WHEREOF, I have hereunto set my hand

12   and affixed my notarial seal this 2nd day of October,

13   2017.

14

15

16

17   _____
                RANDY A. HATLESTAD
18              Registered Merit Reporter

19

20

21

22

23   My Commission Expires April 2, 2020.

24

25