UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| ROY MESTAS, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | |
| v. | ) | Case Nos. 17-8092 |
| | ) | |
| TOWN OF EVANSVILLE, | ) | |
| WYOMING, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

On Appeal from the United States District Court
for the District of Wyoming

The Honorable Nancy D. Freudenthal
District Court Judge

D.C. No. 17-CV-00017-NDF

**APPELLANT'S APPENDIX VOLUME III**

Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Tel: (307) 760-6258
E-mail: mlhayes@wyoming.com
Attorney for Roy Mestas

Mestas v. Town of Evansville                    17-CV-00017-NDF

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF WYOMING

 3     ----------------------------------------------------------
       ROY MESTAS,
 4
                   Plaintiff,
 5
           vs.                    Case No. 17-CV-00017-NDF
 6

 7     TOWN OF EVANSVILLE, a duly
       incorporated municipal corporation
 8     under the laws of the State of
       Wyoming, and DALE BROWN, in
 9     his official capacity as public
       works supervisor for the
10     Town of Evansville,

11                   Defendants.
       ----------------------------------------------------------
12

13                   DEPOSITION OF DALE L. BROWN
                     Taken in behalf of Plaintiff
14
                       11:00 a.m., Wednesday
15                       September 20, 2017

16

17              PURSUANT TO NOTICE, the deposition of DALE L.

18     BROWN was taken in accordance with the applicable Wyoming

19     Rules of Civil Procedure at the offices of Schwartz, Bon,

20     Walker & Studer, 141 South Center, Suite 500, Casper,

21     Wyoming, before Randy A. Hatlestad, a Registered Merit

22     Reporter and a Notary Public in and for the State of

23     Wyoming.

24

25
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000482

Mestas v. Town of Evansville                    17-CV-00017-NDF

2

```
1                    A P P E A R A N C E S

2   For the Plaintiff:       MS. MEGAN L. HAYES
                             Attorney at Law
3                            910 Kearney Street
                             Laramie, Wyoming 82070
4

5   For the Defendants:      MR. THOMAS A. THOMPSON
                             Attorney at Law
6                            MacPHERSON, KELLY & THOMPSON
                             616 West Buffalo Street
7                            P.O. Box 999
                             Rawlins, Wyoming 82301-0999
8

9   Also Present:            Mr. Roy Mestas

10
                             I N D E X
11
    DEPOSITION OF DALE L. BROWN:
12                                                   PAGE

13  Examination by Ms. Hayes                          4
    Examination by Mr. Thompson                     150
14  Examination by Ms. Hayes                         172
    Examination by Mr. Thompson                     177
15

16                    E X H I B I T S

17  No.               Description              Identified

18  1     Personnel File of Dale Brown              10

19
    2     Employee Handbook                         24
20
    3     Transcript of Audio Recording             38
21
    4     Letters from Casper Orthopaedic Associates 43
22
    5     Transcript of Audio Recording             46
23
    6     Letter from Casper Orthopaedic Associates 56
24
    7     Casper Tire Purchase Order                78
25
```

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          3

 1    EXHIBITS CONT'D:

 2    No.                    Description              Identified

 3     8     Hose & Rubber Supply Invoice                 79

 4     9     Casper Tire Purchase Order                   82

 5    10     NAPA Purchase Authorization                  85

 6    11     Hose & Rubber Invoice                        89

 7    12     Grainger Invoice                             91

 8    13     Menards Purchase Order                       93

 9    14     Menards Receipts                             98

10    15     Transcript of Audio Recording              117

11    16     Copies of Notes                            129

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000484

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                    4

1                    P R O C E E D I N G S

2                    (Deposition proceedings commenced

3                    11:00 a.m., September 20, 2017.)

4                         DALE L. BROWN,

5     called for examination by the Plaintiff, being first duly

6     sworn, on his oath testified as follows:

7                         EXAMINATION

8     BY MS. HAYES:

9        Q.    I introduced myself in the hall.  I'm Megan

10    Hayes.  I represent Roy Mestas.  And he has filed a

11    discrimination lawsuit in federal court against the Town

12    of Evansville in which he alleged that you discriminated

13    against him when you were his supervisor.

14       A.    Okay.

15       Q.    Would you please state your full name for the

16    record?

17       A.    Dale Leonard Brown.

18       Q.    Thank you for having an easy name for me to

19    pronounce today.  Have you had your deposition taken

20    before?

21       A.    No.

22       Q.    So we have a court reporter here, obviously,

23    who's taking down your testimony today.  And if you would

24    please help us make sure we can get a clean transcript by

25    waiting until I've answered -- excuse me -- asked my

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                    000485

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                5

1    questions before you begin to answer them, and give

2    audible responses like yes and no rather than shaking or

3    nodding your head?

4         A.    Just like that?

5         Q.    Exactly.  If you need to take a break for any

6    reason, would you tell me you'd like to use the rest room

7    or get up and stretch?  And we'll be happy to take a

8    break.

9         A.    Okay.

10        Q.    I'm going to assume that if you answer a

11   question I asked, that you understand the question.  Is

12   that a fair assumption?

13        A.    Fair assumption.

14        Q.    If you don't understand my question, just

15   please tell me, and I will try to rephrase it so that you

16   can understand it before you answer.

17        A.    Okay.

18        Q.    You understand today you're under oath?

19        A.    I understand that.

20        Q.    What does that mean to you?

21        A.    To tell you the truth.

22        Q.    And you could be subjected to perjury penalties

23   if you don't tell the truth in this proceeding.

24        A.    I understand.

25        Q.    Do you have any short-term or other memory

Mestas v. Town of Evansville                    17-CV-00017-NDF

6

1    problems?

2       A.    Depends on what "short-term" is.

3       Q.    Do you have any memory problems generally?

4       A.    At my age, I have some memory problems.  I

5    don't think it's -- yes.  We'll just go with that.

6       Q.    Is it going to affect your testimony today?

7       A.    No.

8       Q.    Are you on any drugs or other medication that

9    might affect your memory?

10      A.    I don't know.

11      Q.    What kind of drugs or medications are you on?

12      A.    Losartan --

13      Q.    What do you take that for?

14      A.    -- meloxicam.  Losartan is for blood pressure.

15   Meloxicam is for arthritis.  And there's a couple others

16   for congestive heart failure.  I don't recall the exact

17   name of them.

18      Q.    Have you been advised that they might affect

19   your memory, any of the medications?

20      A.    No.  No.

21      Q.    What have you done to prepare for your

22   deposition today?

23      A.    Consulted with the attorney.

24      Q.    And what documents did you review?

25      A.    I have reviewed all the documents that he's

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000487

Mestas v. Town of Evansville                    17-CV-00017-NDF

7

1    given me, transcripts.

2        Q.    Transcripts of your interview?

3        A.    Of interviews and such.

4        Q.    Did you speak to anybody else about your

5    deposition?

6        A.    I spoke to Brian.

7        Q.    And what did you guys discuss?

8              MR. THOMPSON:  And as to the conversations

9    that occurred when you and Brian and I were all present,

10   I direct you not to talk about those.

11       A.    Okay.

12       Q.    (BY MS. HAYES)  Did you have any conversation

13   with Brian, outside the presence of Mr. Thompson, about

14   your deposition?

15       A.    Not about the deposition, no.

16       Q.    What did you discuss with Brian prior to your

17   deposition outside of the presence of Mr. Thompson?

18       A.    We discussed the fact that we didn't -- I

19   didn't understand the reason for this litigation being

20   brought forth.  We discussed why I was originally named.

21   He was not named.  Other than that, nothing.

22       Q.    And what didn't you understand about the

23   reasons for the litigation?

24       A.    That I was being accused of discrimination.

25       Q.    And what didn't you understand about the

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000488

Mestas v. Town of Evansville                    17-CV-00017-NDF

8

1    allegation?  Have you read a copy of the complaint?

2         A.    I've read the complaint.  What I didn't

3    understand is, if you don't do something you're accused

4    of, you don't understand why you got accused of it.

5         Q.    You mentioned that you reviewed a transcript of

6    your interview with -- that you were provided by

7    Mr. Thompson -- of your interview with the investigator

8    for the State of Wyoming.  Is that correct?

9         A.    That's correct.

10        Q.    And did you tell the truth during that

11   interview?

12        A.    To the best of my knowledge.

13        Q.    How do you know Roy Mestas?

14        A.    Roy Mestas was an employee for the public works

15   department for the Town of Evansville.

16        Q.    Did you hire him?

17        A.    Brian Boettcher and I both did as co-

18   supervisors.

19        Q.    Did you previously work for the Town of

20   Evansville?

21        A.    Previous to what?

22        Q.    Now.

23        A.    That's difficult to answer.  Because, prior to

24   that, I was a volunteer fireman and EMT for the Town of

25   Evansville.  Volunteer work.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
000489

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                               9

1      Q.    When was that?

2      A.    I don't remember.  It's been a long time.  But,

3  yes, I was there.  I was also a council person at one

4  time.

5      Q.    When was that?

6      A.    Again, those dates, it's been a very long time.

7      Q.    Before 1990?

8      A.    I believe so.

9      Q.    And was Phil Hinds on the council at that time?

10     A.    He was.

11     Q.    And you served together for how long?

12     A.    Approximately two years.

13     Q.    Was he the mayor at that time?

14     A.    He was a council person.

15     Q.    When did you work for the Town of Evansville?

16  When were you employed as a paid employee by the Town of

17  Evansville?

18     A.    I believe it's 2008, May of 2008.

19     Q.    Until when?

20     A.    November 17th.  I think it's 2014.

21           MS. HAYES:  Randy, I am handing you

22  excerpts from Mr. Brown's personnel file that were

23  produced by the Town.  They are pages Evans 001, pages

24  Evans 0028 and 29, Evans 0035 to 39, which is -- the

25  final document is Mr. Brown's employment application.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000490

Mestas v. Town of Evansville                    17-CV-00017-NDF

10

```
 1                    (Exhibit No. 1 marked for

 2                     identification.)

 3      Q.    (BY MS. HAYES)  Do you recognize any of the

 4   documents in that exhibit, Mr. Brown?

 5      A.    I recognize all of them.

 6      Q.    Who was your immediate supervisor in 2012 and

 7   2013?

 8      A.    The mayor.

 9      Q.    And who is that?

10      A.    Phil Hinds.

11      Q.    And how long have you known Mr. Hinds?

12      A.    Other than several years, I can't give you a

13   specific number.  But several years.

14      Q.    Ten years?  Did you know him -- well, you

15   obviously knew him from being on the council with him.

16      A.    Uh-huh.  I did.  I knew him from that.  I met

17   Mr. Hinds as a copier service manager.  He had a print

18   shop, and I serviced his copier.

19      Q.    You served as his what?  Sorry.

20      A.    I repaired his copier.

21      Q.    And who did you work for when you repaired his

22   copier?

23      A.    Capital Business Systems.

24      Q.    Would you ever socialize with Mr. Hinds outside

25   of work or council context?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000491

Mestas v. Town of Evansville                    17-CV-00017-NDF

11

```
 1      A.    No.

 2      Q.    Talk to him on the phone?

 3      A.    No.

 4      Q.    Go to a bar?

 5      A.    Not that I recall.

 6      Q.    I'd like to have you look in the exhibit I just

 7  handed you, Evans 0036.  You were asked "Are you

 8  physically or otherwise unable to perform the duties of

 9  the job for which you are applying?"  Do you see where

10  I'm reading toward the bottom?

11      A.    I see that.  Uh-huh.

12      Q.    And it looks like you checked "yes" and then

13  "no."  Which box is the right box to check?

14      A.    Well, the "no" is the right box.

15      Q.    Meaning you were physically able to perform the

16  duties --

17      A.    Yes.

18      Q.    -- when you were hired?  And what were the

19  duties?

20      A.    Sanitation truck driver.

21      Q.    And what did you do?

22      A.    I drove the sanitation truck, picked up trash,

23  took it to the dump, delivered and retrieved bins as

24  required, repaired bins and maintained the sanitation

25  truck, basic maintenance.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000492

Mestas v. Town of Evansville                    17-CV-00017-NDF

12

1      Q.      And just back to this question about your

2   physical ability to perform your job.  Did that ever

3   change during your employment, that you were physically

4   unable to perform your job duties?

5      A.      Not as sanitation truck driver, no.

6      Q.      How about any other time when you were employed

7   by the Town?

8      A.      During the time of my employment with the Town,

9   I had a hernia operation and rotator cuff operation.

10      Q.      And how did those affect your ability to do

11   your job?

12      A.      Well, immediately after the surgeries,

13   obviously, I was not able to do my job.

14      Q.      For how long were you not able?

15      A.      Only a couple weeks.  Even the rotator cuff, I

16   went back on light duty.

17      Q.      And then you were able to resume ultimately?

18      A.      Uh-huh.

19      Q.      Who's Dan Adcock?

20      A.      I believe Dan Adcock is the current public

21   works supervisor.

22      Q.      And how do you know him?

23      A.      I met Dan when -- I don't remember if I was on

24   the town council at the time or not.  But Dan was

25   employed by the Town of Evansville in public works.  That

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000493

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            13

1    was many years ago.  And he was also -- at that time

2    public works was required to be daytime fire and

3    ambulance crew.  And being a volunteer fireman, EMT, I

4    believe that's how we met.  And we became friends.

5        Q.    And did you socialize with Mr. Adcock?

6        A.    Yes.

7        Q.    And he's listed as one of your three

8    references, is that correct, in your employment

9    application?

10       A.    Yes.

11       Q.    Was he able to observe your work before you

12   filed your application for employment?

13                MR. THOMPSON:  Objection as to form.

14   Vague.

15       A.    I don't know how to answer that.

16       Q.    (BY MS. HAYES)  Did you work with him prior to

17   applying for this position?

18       A.    Again, I still don't know how to answer that.

19   Because work -- did we do projects together, personal

20   projects on our residence or whatever?  Yes, we did.  We

21   worked together.

22       Q.    What sort of personal projects?

23       A.    We went up and cut wood together and hauled it

24   down off the mountain, those types of normal routine

25   things that people do, I think.  At least, I do.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000494

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        14

1      Q.     And why did you list him on your employment

2    application?

3      A.     Because we knew each other.  It didn't . . .

4      Q.     You also signed on page 0038, the last

5    sentence.  "I understand, also, that I am required to

6    abide by all rules and regulations of the employer."  Do

7    you see where I'm reading, the last sentence in that box

8    on page Evans 0038?

9      A.     Oh, yes.

10      Q.     Did you ever violate any rules or regulations

11    of your employer?

12              MR. THOMPSON:  Objection as to form.

13      A.     Not to my knowledge.

14      Q.     (BY MS. HAYES)  Did you receive any supervisory

15    training from the Town of Evansville prior to becoming --

16    I'm sorry.  Let me back up.  When did you become a

17    supervisor?

18              MR. THOMPSON:  With the Town of

19    Evansville?

20              MS. HAYES:  With the Town of Evansville.

21      A.     It was about fourteen months after my initial

22    employment, which would be July, I believe, of '09.

23    Let's find out.

24      Q.     (BY MS. HAYES)  And, Mr. Brown, just to let you

25    know, I didn't copy the entire personnel file, just some

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000495

Mestas v. Town of Evansville                    17-CV-00017-NDF

15

1    portions of it.

2       A.    Understood.  Okay.  May of '08.  So it would be

3    July '09.

4       Q.    And did you receive any supervisory training

5    from the Town of Evansville?

6       A.    From the Town of Evansville, no.

7       Q.    Your application indicates that you previously

8    worked for Capital Business Systems from 1993 to 2008.

9    Why did you leave your employment there?

10      A.    I worked on office equipment for in excess of

11   30 years.  15 of those years -- well, the last 15 it was

12   Capital.  And I was tired of fixing machines.

13      Q.    Were you asked to leave?

14      A.    No.

15      Q.    What kind of -- what sort of management

16   experience did you have before you started working for

17   the Town of Evansville as a paid --

18      A.    I had 15 years with Capital Business Systems.

19      Q.    Managing other employees?

20      A.    Okay.  Let's correct that.  Yes, managing other

21   employees.  I had ten years with Capital.  I had five

22   years before that.

23      Q.    And tell me about your management experience

24   with Capital Business Systems.  How many employees did

25   you supervise?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
000496

Mestas v. Town of Evansville                17-CV-00017-NDF

16

 1     A.    It varied.  Approximately six.

 2     Q.    And who was your supervisor?

 3     A.    When I left Capital, it was Frank Lindemann.

 4     Q.    Does he still work for Capital Business

 5  Systems?

 6     A.    He does.

 7     Q.    And so he'd be able to confirm that you were in

 8  a supervisory position when you worked?

 9            MR. THOMPSON:  Objection as to form.

10     A.    He can.

11     Q.    (BY MS. HAYES)  Mr. Boettcher testified that

12  Mayor Hinds fired you from your employment with the Town

13  of Evansville.  Is that correct?

14     A.    No.

15     Q.    So you were not fired?

16     A.    No.  I resigned.

17     Q.    Why did you resign?

18     A.    Personal reasons.

19     Q.    What were those?

20     A.    Personal reasons.

21     Q.    What were your personal reasons?

22     A.    At 68, I thought it was time for me to retire.

23     Q.    So your age?

24     A.    Yes.

25     Q.    So you weren't asked to resign?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
000497

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          17

 1              MR. THOMPSON:  Objection as to form.

 2    Relevance.

 3        A.    No.

 4        Q.    (BY MS. HAYES)  How did you communicate -- did

 5    you communicate to the mayor that you would be resigning?

 6        A.    I had a notice from the mayor that he wanted to

 7    see me at his office.  That was the day after my 68th

 8    birthday, which, I had discussed the possibility prior to

 9    that of retiring after I reached 68.  The mayor and I had

10    some discussion as to the viability or whatever of doing

11    that.  And he mentioned that there were some -- what he

12    felt might be some issues.  And I said, "I think, then,

13    it's best that I go ahead and retire.  I think it's time

14    to move on."

15        Q.    What sort of issues?

16        A.    Accusations by employees.

17        Q.    What accusations?

18        A.    I don't recall specifically.

19        Q.    What do you recall generally?

20        A.    Generally, improprieties.

21        Q.    What sort of improprieties?

22        A.    I don't recall specifically.

23        Q.    So you were accused -- just trying to make sure

24    I understand -- according to the mayor by some of the

25    employees that you supervised of improprieties?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
                                                                                        000498

Mestas v. Town of Evansville                    17-CV-00017-NDF

18

1            MR. THOMPSON:  Objection as to form.

2    Relevance.

3        A.    Correct.

4        Q.    (BY MS. HAYES)  But you have no recollection of

5    what those accusations were?

6        A.    Not specific.

7        Q.    Okay.  Generally, what is your recollection of

8    what the accusations were?

9            MR. THOMPSON:  Same objection.

10       A.    That I used Town property for personal use.

11       Q.    (BY MS. HAYES)  Such as what?

12            MR. THOMPSON:  Same objection.

13       A.    Storing my ATVs in the Town shop.

14       Q.    (BY MS. HAYES)  Did you do that?

15       A.    I did that.

16       Q.    What else?

17       A.    Storing my ATV trailer down at the Town locked

18    yard.

19       Q.    What else?

20            MR. THOMPSON:  Same objections to this

21    line of questioning.  No relevance.

22       A.    That I used a fuel tank for personal use.

23       Q.    (BY MS. HAYES)  What sort of fuel tank?

24       A.    A diesel fuel tank.

25       Q.    Did you purchase that with Town funds?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000499

Mestas v. Town of Evansville                    17-CV-00017-NDF

19

```
 1      A.    I did.

 2      Q.    And where did you put it after you purchased

 3   it?

 4      A.    At the -- in the Town storage garage.

 5      Q.    Was it ever in your own vehicle?

 6      A.    Yes, it was.

 7      Q.    For how long?

 8      A.    I don't recall.

 9      Q.    Why did it get returned to the Town's yard?

10      A.    It belonged to the Town.

11      Q.    Why was it in your vehicle?

12      A.    Because I used it.

13      Q.    For what?

14      A.    For personal use.

15      Q.    When was that?

16      A.    I don't recall specifically the dates.

17      Q.    And what did you use it for?

18      A.    Made a road trip to Washington.

19      Q.    Washington state?

20      A.    Uh-huh.

21      Q.    Sorry.  I am not very conversant about fuel

22   tanks.  Was this like an auxiliary tank for your truck?

23   What was the purpose of the diesel fuel?

24      A.    It was an auxiliary tank for the truck.

25      Q.    So you would not have to stop as frequently, I
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
000500

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                    20

1    take it?  Is that the purpose of this?  Or did it serve

2    some other purpose?

3        A.    Well, that would be the primary purpose, would

4    be not having to stop and fuel.

5        Q.    Is there a receipt for that item?

6        A.    The Town has a receipt.  Okay.  I'm assuming

7    the Town has a receipt.

8        Q.    And when, approximately, would you have

9    purchased that?

10       A.    Again, the approximate dates, I don't know.

11   Probably one or two years prior to my resignation.

12       Q.    And that was in 2014.  So, in 2012 or 2013 --

13       A.    Yeah.

14       Q.    -- you purchased a diesel fuel tank with Town

15   funds, and there would be a receipt for that fuel tank

16   with the Town's records?

17             MR. THOMPSON:  Objection as to form.  Go

18   ahead.

19       A.    I purchased a lot of items for the Town.  The

20   reason that tank was purchased -- and I want that on the

21   record -- is the tank that we had, the transfer tank we

22   had on the flatbed truck, was leaking.  And I wouldn't

23   ask anybody to try to repair or weld on a fuel tank, so

24   we needed a replacement.

25       Q.    (BY MS. HAYES)  So, if I asked -- I just want

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                    000501

Mestas v. Town of Evansville                    17-CV-00017-NDF

21

1    to make sure I'm able to get a copy of this receipt.  So

2    what would I need to do to ask to give me a time frame

3    and a document that would show the purchase of this fuel

4    tank?  Did you have an invoice from a store?

5         A.    It would be from Northern -- I believe Northern

6    Tools.  And it would be Janelle Underwood that would have

7    that.

8         Q.    From 2012 into sometime in 2013?

9         A.    Uh-huh.

10        Q.    Do you remember how much it cost?

11        A.    I do not.

12        Q.    Do you remember how long you had it in your

13   personal vehicle?

14        A.    Just a few days.

15        Q.    How long was your trip to Washington?

16        A.    A week.

17        Q.    How long did you have it in your personal

18   vehicle before that trip?

19        A.    I didn't.

20        Q.    How long did you have it in your personal

21   vehicle after the trip?

22        A.    A day or two.

23        Q.    Did you ever use the Town's backhoe for

24   personal use?

25        A.    Yes, I did.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000502

Mestas v. Town of Evansville                    17-CV-00017-NDF

22

1       Q.    For what?

2       A.    Bury my dog.

3       Q.    When did you do that?

4       A.    I don't know.

5       Q.    You don't know when your dog died?

6       A.    Well, I have several.  I have five right now.

7    I do not recall when the dog died.

8       Q.    Where did you bury the dog?

9       A.    In my yard.

10             MR. THOMPSON:  Objection as to form.

11   Relevance.

12      Q.    (BY MS. HAYES)  In your own backyard?

13      A.    I did.

14             MR. THOMPSON:  Same objection.  Continuing

15   objection to these questions.

16      Q.    (BY MS. HAYES)  So you drove the Town's backhoe

17   to your residence?

18      A.    Uh-huh.

19      Q.    And used it to dig a hole to bury your dog?

20      A.    I did.

21      Q.    And that would have been sometime between 2008

22   and 2014?

23      A.    Sometime, yes.

24      Q.    Did you ever use Town funds to procure items

25   for yourself personally?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000503

Mestas v. Town of Evansville                    17-CV-00017-NDF

23

```
 1      A.    No.

 2      Q.    Ever use Town fuel for your own personal use?

 3      A.    No.

 4      Q.    And any of your personal equipment or vehicles?

 5      A.    No.

 6      Q.    Did you ever use your ATV to shovel snow on

 7   Town property?

 8      A.    No.

 9      Q.    Did you ever sell any Town property and retain

10   the funds from that sale for yourself?

11      A.    No.

12      Q.    Never sold a welder?

13      A.    No.

14      Q.    Any other items?

15      A.    No.

16      Q.    I'm just asking, Mr. Brown.

17      A.    I understand.  But, no.

18      Q.    Was it a violation of Town policy to use

19   Town-owned property for your own personal use or

20   convenience?

21      A.    Not if you had permission.

22      Q.    And whose permission did you have to use the

23   backhoe to bury your dog?

24      A.    My immediate supervisor.

25      Q.    So Phil Hinds approved?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000504

Mestas v. Town of Evansville                    17-CV-00017-NDF

24

1      A.    The mayor.

2                      (Exhibit No. 2 marked for

3                      identification.)

4      Q.    (BY MS. HAYES)  I'm going to hand you a copy of

5   the employee handbook from the Town of Evansville.  It is

6   not numbered with Bates numbers.  I apologize.

7                  MR. THOMPSON:  Is this the same exhibit

8   that you had for Brian Boettcher?

9                  MS. HAYES:  Yes.

10     Q.    (BY MS. HAYES)  Do you recognize this document?

11     A.    Absolutely, yes.

12     Q.    Did you receive a copy of it?

13     A.    Yes.

14     Q.    And would you please turn to page 26,

15  Section 6?  What is that?  Do you see where I am?

16     A.    Uh-huh.

17     Q.    What does that section pertain to?

18     A.    Use of Town property.

19     Q.    So, at the bottom of page 26 -- I'm sorry.

20  Where in this policy does it say that it's okay for you

21  to use Town property, equipment or vehicles for private

22  use or convenience with the approval of a supervisor?

23     A.    It does not say that.

24     Q.    Were you ever disciplined or reprimanded in any

25  way for using Town property for your own personal use or

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000505

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        25

 1    convenience?

 2        A.    No.

 3                MR. THOMPSON:  Objection as to form.

 4    Relevance.

 5        Q.    (BY MS. HAYES)  Are you still in contact with

 6    Phil Hinds?

 7        A.    No.

 8        Q.    When was the last time you spoke to him?

 9        A.    You know, I really can't tell you.  I don't

10    know, other than the day that I resigned.  There was one

11    day that I saw him at the post office, but I don't know

12    what day that was or . . .

13        Q.    So, since your resignation from the Town of

14    Evansville, have you had any substantive conversations

15    with Mr. Hinds?

16        A.    No.

17                MR. THOMPSON:  Objection as to form.

18        Q.    (BY MS. HAYES)  Have you had any communications

19    with Mr. Hinds in any manner whatsoever since your

20    resignation?

21        A.    He stopped at my vehicle and asked me how I was

22    doing at the post office.  I said, "I'm doing just fine."

23    And that was pretty much the end of my side of the

24    conversation.

25        Q.    Have you ever communicated with Mr. Hinds in

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
                                                                                000506

Mestas v. Town of Evansville                    17-CV-00017-NDF

26

1    any manner about Mr. Mestas?

2        A.    No.

3        Q.    Never?

4        A.    Well, when we were employed.  When you're

5    talking about an employee, I communicated with him.  Yes,

6    I communicated with Phil about that.

7        Q.    Tell me about those conversations.  When did

8    you talk to him about Mr. Mestas?

9        A.    You know, I don't recall when it was.  But it

10   was -- it was normal to discuss or talk, visit about

11   employees.  It was a common thing that we did, whether

12   good, bad, indifferent.  We'd talk about, How is

13   so-and-so doing?  How is this person doing?  What's going

14   on here?  So would I talk about Mr. Mestas?  I would.

15       Q.    What did you talk to Mr. Hinds about regarding

16   Mr. --

17       A.    Specifically, I don't recall.

18       Q.    Did you talk to Mr. Hinds about Mr. Mestas

19   after you fired Mr. Mestas in April of 2013?

20       A.    I can tell you I don't recall any specific

21   conversation concerning Mr. Mestas specifically after

22   that.

23       Q.    Did you communicate with Mr. Hinds in any

24   manner about firing Mr. Mestas?

25       A.    I don't recall communicating with Mr. Hinds

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000507

Mestas v. Town of Evansville                    17-CV-00017-NDF

27

1    about the termination of Mr. Mestas.

2        Q.    Did you communicate -- since you fired

3    Mr. Mestas in April of 2013, have you communicated in any

4    manner with Mr. Hinds about the underlying facts claimed

5    by Mr. Mestas regarding his complaints of discrimination

6    by you outside of the presence of counsel?

7        A.    No.

8        Q.    Have you talked to him in the presence of legal

9    counsel?

10       A.    No.

11       Q.    Who's Brian Boettcher?

12       A.    Brian was the co-supervisor for the public

13   works department down in Evansville.

14       Q.    And when did you two work together?

15       A.    From July of 2009 until my resignation.

16       Q.    So Mr. Boettcher said he was informed that you

17   were fired.  Do you know why he would --

18       A.    I do not.

19       Q.    He also mentioned that three employees went to

20   the mayor to complain about you.

21       A.    I have no knowledge of that.

22       Q.    You don't know that anyone complained about you

23   to the mayor?

24       A.    Oh, I wouldn't doubt that people complained

25   about me to the mayor.  But do I specifically know that?

Mestas v. Town of Evansville                    17-CV-00017-NDF

28

1    I don't.

2        Q.    But you testified earlier that certain

3    employees made accusations about financial improprieties

4    or use of Town equipment.

5              MR. THOMPSON:  What's the question,

6    Counsel?

7              MS. HAYES:  I'm thinking, Tom.

8        Q.    (BY MS. HAYES)  You testified earlier that you

9    knew through the mayor that employees had made

10   accusations against you about using Town property for

11   personal use.  Did you ever discuss that with

12   Mr. Boettcher?

13       A.    With Mr. Boettcher?

14       Q.    Yes.

15       A.    No.

16       Q.    Since the day you fired Mr. Mestas in April of

17   2013, have you communicated in any manner with

18   Mr. Boettcher about the underlying discrimination

19   complaints made by Mr. Mestas outside of the presence of

20   legal counsel?

21       A.    Yes.

22       Q.    What did you discuss with Mr. Boettcher?

23       A.    Discussed that we didn't understand why this

24   litigation is being brought forth.

25       Q.    Did you discuss with him terminating

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000509

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                    29

1    Mr. Mestas' employment?

2        A.    You mean after the fact or before?

3                    MR. THOMPSON:   Outside the presence of

4    counsel.

5                    THE DEPONENT:   Thank you.

6        A.    Yes.

7        Q.    (BY MS. HAYES)  And what did you discuss?

8        A.    Again, specifics, I really don't recall.

9        Q.    What do you recall generally?

10       A.    Generally.  Generally, again, we didn't

11   understand why the litigation was being brought.  And our

12   understanding was one that Mr. Mestas was an at-will

13   employee.  And we -- Mr. Boettcher was the one that came

14   to me and said, "This guy's not going to work out.  We

15   need to make a change."  Because sanitation was my area

16   of supervision and Mr. Mestas was in sanitation,

17   Mr. Mestas -- I'm the one that actually did the

18   termination.

19       Q.    And why did he -- what did he say about why

20   Mr. Mestas wasn't working out?

21       A.    He said the guy just didn't want to work,

22   didn't want to perform his duties.

23       Q.    Like what?

24       A.    Like the shoveling of snow, repairing bins and

25   moving forward with training in other areas other than

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000510

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              30

1    sanitation.  Sanitation -- well, whatever.

2         Q.    So those were Mr. Boettcher's concerns?

3         A.    Those were the concerns Brian gave -- shared

4    with me.  And I agreed with him.

5         Q.    Did you communicate with any other Town

6    employees about Mr. Mestas' job performance?

7         A.    Yes.

8         Q.    Who did you communicate with?

9         A.    Eric Reyna.

10        Q.    What did you tell Mr. Reyna?

11        A.    I didn't tell Mr. Reyna.  I asked Mr. Reyna.  I

12   asked -- because Mr. Reyna had been previously one of the

13   truck operators and much more recent than I was -- what

14   his input would be as to how Roy could improve on what he

15   was doing.  Because Roy was taking what I felt was an

16   exceptionally long time to do the job on a daily basis.

17   So I said, "Eric, do you see anything that's going on

18   that might help us help Roy improve on his times to be

19   more efficient?"

20        Q.    And what did Mr. Reyna tell you?

21        A.    Well, he said that he just needs to become more

22   proficient with the truck controls and just be a little

23   faster.  Eric was very -- he was kind of ambiguous about

24   it.  But he agreed that it could be faster.  But, on a

25   comparative basis, Mr. Reyna did a much more efficient

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000511

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              31

 1    job.

 2        Q.    Did Mr. Reyna ever complain to you about how

 3    Mr. Mestas was performing his job duties?

 4        A.    No.  It wouldn't be -- no.

 5        Q.    Mr. Reyna testified here yesterday and

 6    testified that he was able to observe Mr. Mestas during a

 7    typical workday and workweek.  And he testified that he

 8    didn't have any problems with how Mr. Mestas was

 9    performing his job.  Do you disagree with that?

10              MR. THOMPSON:  Objection as to form.

11    Misstates his testimony.  Go ahead.

12        A.    Mr. Reyna wouldn't have a reason to have a

13    problem.  I as supervisor had issues with the time it

14    took.  I asked Mr. Reyna how could we improve -- what is

15    he seeing that we could improve on the efficiency of

16    truck operations?

17        Q.    (BY MS. HAYES)  How about conversations with

18    other employees about Mr. Mestas' job performance?

19        A.    I don't recall any except with Brian.

20        Q.    Was it typical to discuss an employee's job

21    performance with coworkers?

22        A.    No.

23        Q.    So, when you spoke to Eric Reyna about

24    Mr. Mestas, what was your motivation for doing that?

25        A.    To help Roy become more efficient at what he

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            32

1    was doing.  It wasn't a job performance so much as -- the

2    job was getting done.  Don't misunderstand.  What I was

3    looking for is a more efficient Roy on the route.  And I

4    was asking input from someone with recent experience with

5    that particular vehicle that could help Roy improve what

6    he was doing.  It wasn't a question of whether I thought

7    he was efficient or thought he was doing all right or

8    whether he was good, bad.  How can we make it better?

9         Q.   Did you have other complaints or concerns about

10   Mr. Mestas' job performance --

11              MR. THOMPSON:  Objection as to form.

12        Q.   (BY MS. HAYES)  -- besides that he wasn't -- he

13   could more efficient on his route?

14        A.   Mr. Mestas seemed to put a lot more energy into

15   finding ways to not get things done than he would in

16   getting things done.

17        Q.   (BY MS. HAYES)  Can you give me some specific

18   examples?

19        A.   Yeah.  Come into the office, lean on the door

20   casing and say, Well, I need this, and I need that, and I

21   need this, and I can't do it without that.  And the irony

22   there, to me, is that all the other operators were

23   getting it done in the past, the previous operators.

24        Q.   Getting what done?

25        A.   The job done.  They were getting -- they were

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000513

Mestas v. Town of Evansville                    17-CV-00017-NDF

33

1    completing the tasks in an efficient amount of time and

2    having opportunity to learn and do other things.  The

3    idea of that job is to move forward, become -- well,

4    whatever.

5              MR. THOMPSON:  No.  You finish.  She asked

6    you a question.  You finish.

7        A.    What we required of our employees was not to

8    just do a job.  If we look at our policy manual, it says

9    "duties as assigned."  Those duties could include

10   operating skid steer, backhoe, plow trucks at night being

11   on call-out, repairing minor water leaks on call-out on a

12   24-hour deal.  We always needed to get people into the

13   position where they could be on call for a week.

14   Everybody rotated, including Brian and I, on an on-call

15   basis so that if there were an emergency, a sewer backup,

16   a water line break, snow removal, that people -- all of

17   us could go out and respond to that.

18             Well, in order to do that, you have to have

19   time to train.  The other employees managed to get

20   through that training and get to that point where we

21   could do that.  Mr. Mestas was not getting there.

22       Q.    (BY MS. HAYES)  Did you ever tell any of

23   Mr. Mestas' coworkers not to assist him with his job

24   duties?

25       A.    Yes.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000514

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              34

1        Q.    Why did you do that?

2        A.    It's a one-man job, with one exception, and

3    that's getting a bin out of a truck.  That requires more

4    than one person, depending on the type of bin.  We had

5    three different types.  We had three-yard metal bins,

6    yard-and-a-half metal bins and the common residential

7    rollout.

8        Q.    And how would a three-yard bin be removed from

9    a truck?

10       A.    We used a backhoe and chain.  That required

11   more than one person.

12       Q.    Did you ever instruct Mr. Mestas' coworkers not

13   to help him remove a three-yard bin from his truck?

14       A.    I did not.

15       Q.    That never happened?

16       A.    I did not instruct them not to do that.

17       Q.    Eric Reyna testified yesterday that you told

18   him not to assist Mr. Mestas to remove a three-yard

19   bin -- specifically, he used that term -- from his trash

20   truck.  You don't recall that happening?

21       A.    No.  The only ones I -- the only bin I said he

22   shouldn't need help with would be the rollouts, the small

23   residential ones.  Those can be retrieved by the

24   operator.

25       Q.    And if Dan Adcock and Ron Emond also remember

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

35

1    you instructing them not to help Mr. Mestas remove a

2    large trash bin from your truck, you would say they're

3    lying, or you just don't remember them doing that?

4               MR. THOMPSON:  Objection as to form.

5    Misstates their testimony.  And it's argumentative.  Go

6    ahead.

7        A.    I would say they misunderstood the directive.

8        Q.    (BY MS. HAYES)  And what was your directive as

9    you understood?

10       A.    Not to help Roy with the rollouts, the small

11   residential bins.  Nobody could have gotten those bins

12   out by themselves, ever, so I would not make that

13   statement.  It would be -- you can't do it.

14       Q.    You just never made a statement like that?

15       A.    My statement was not to help with the rollouts.

16   That was the operator's responsibilities.

17       Q.    Did public works employees typically work

18   together or ever work together to complete job tasks?

19       A.    Always.  Not always, but often.  Most of the

20   time.

21       Q.    What sorts of things?

22       A.    Could be sewer jetting, installing water

23   meters.  Sometimes it took more than one person.  Not

24   usually, but sometimes.  Sometimes we'd use more than one

25   person in the parks department in the summer, mowing,

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000516

Mestas v. Town of Evansville                    17-CV-00017-NDF

36

1    weed-eating, those types of things.  A lot of our jobs

2    require at least two people, sometimes more, depending on

3    the project.  Sometimes it was a one-person job.

4        Q.    Did you ever hear Mr. Mestas refuse to help

5    another crew member?  Did you ever hear another -- start

6    over.  Did you ever hear another crew member ask

7    Mr. Mestas to help them do something?

8        A.    Please state that again.

9        Q.    Did you ever hear another crew member ask

10   Mr. Mestas to assist them with some job-related task?

11       A.    I didn't overhear it, no.

12       Q.    Did you ever -- was it ever brought to your

13   attention that another crew member asked Mr. Mestas to

14   help them with a job-related task?

15       A.    Not that I recall.

16       Q.    Were you ever aware that Mr. Mestas had refused

17   to help another employee with a job-related task?

18             MR. THOMPSON:  Objection as to the form of

19   the question.  Assumes facts not in evidence.

20       A.    Not that I remember.

21       Q.    (BY MS. HAYES)  Did any of Mr. Mestas'

22   coworkers complain to you about Mr. Mestas?

23       A.    No.

24       Q.    Did any of Mr. Mestas' coworkers discuss with

25   you any concerns they had about Mr. Mestas' job

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000517

Mestas v. Town of Evansville                17-CV-00017-NDF

37

1    performance?

2                    MR. THOMPSON:  Other than what he's

3    already testified to?

4        A.    You know --

5                    MR. THOMPSON:  Hold on.

6                    MS. HAYES:  Yes.  Correct.

7        A.    The question arose from time to time -- and I

8    wish I could remember specifically who was discussing it

9    or asking about it -- that why was it taking Mr. Mestas

10   as long as it was to complete the routes?  And my

11   response is, "I really don't know," which prompted the

12   question that I asked Mr. Reyna.  "What can we do to

13   improve?"  Because I was aware that it was taking longer

14   than what I felt it should, but I also was aware that he

15   was still reasonably new.  But I also felt by that time,

16   things should have been progressing.

17       Q.    (BY MS. HAYES)  By what time?

18       A.    Well, my opinion -- this is my opinion -- that

19   within 30 days, a person should be able to operate and be

20   efficient on the truck as far as doing the routes.  And

21   in order to service the truck and move forward with other

22   training, those things had to be done in a certain

23   relevant time zone.  Part of the probationary period was

24   to allow for that additional training so that person

25   could, by the end of probation, be an on-call person.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000518

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            38

1    And we weren't getting there.

2        Q.    When did you notice that Mr. Mestas wasn't

3    getting there?

4        A.    Shortly before termination.  Within days.

5        Q.    I'm going to hand you -- this is a transcript

6    of an audio recording, Brown and Boettcher interview,

7    December 18th, 2013.

8              MS. HAYES:  Would you please mark that a

9    deposition exhibit?

10                   (Exhibit No. 3 marked for

11                    identification.)

12       Q.    (BY MS. HAYES)  Before we get to that, describe

13   a typical workday for you.

14       A.    Typical workday for me?  Normally arrived at

15   the shop about 7:00 a.m., visit with Ron for a little

16   while.  He was always an early person.  I'd go into my

17   office, check for Town e-mails, notifications and such,

18   and basically determine what we felt -- what I felt was

19   going to go on that day.  Often days -- you know, and

20   then Brian would come in.  We'd have a quick discussion,

21   make sure we're on the same page for the day's

22   operations, verify with the crew what they were going to

23   do, and they went about their business.

24       Q.    So, on a typical workday, how often would you

25   see or interact with Mr. Mestas?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000519

Mestas v. Town of Evansville                    17-CV-00017-NDF

39

1        A.      Not a great deal.  He was out on his route.

2   We'd see him on his truck.  I'd wave, whatever.  But, as

3   far as conversation, not often.

4        Q.      During a typical workweek, what would you

5   say -- how often did you see Mr. Mestas?

6        A.      Oh, see him daily.

7        Q.      For how long?

8        A.      Oh, a few minutes in the morning, maybe a few

9   minutes in the evening, with the exception of Thursdays,

10  which was essentially maintenance day, vehicle and bins.

11       Q.      And you would be in the shop or in the

12  maintenance area on Thursdays?

13       A.      Yes.

14       Q.      So you would see him throughout the day?

15       A.      Off and on, sure.

16       Q.      Would you see him interacting with other public

17  works employees?

18       A.      From time to time.

19       Q.      Did you ever notice that he was having problems

20  with any other public works employees?

21               MR. THOMPSON:  Objection as to form.

22       A.      I don't recall.

23       Q.      (BY MS. HAYES)  Did you ever ride with

24  Mr. Mestas in a sanitation truck when he was driving his

25  route?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion         Exhibit E
000520

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              40

  1       A.    I don't remember if I rode with Roy or not.

  2       Q.    Would that have been something you would do as

  3   his supervisor?

  4       A.    Initially, no.

  5       Q.    Would someone else ride with him in his

  6   sanitation truck to get him trained?

  7       A.    It would be the most recent driver, which, in

  8   this case, would have been Eric.

  9       Q.    And after Mr. Reyna rode with Mr. Mestas in his

 10   sanitation truck, did he comment to you at all about how

 11   Mr. Mestas was performing his job?

 12       A.    He said he was slow, but he's getting it.

 13       Q.    So I'm going to ask you, please, Mr. Brown, to

 14   refer to page 10 of your interview with the State of

 15   Wyoming investigator.  And would you just please read

 16   lines 12 through 24 out loud?

 17       A.    Do I have the right one?

 18       Q.    Page 10.

 19       A.    Okay.

 20             "MR. BROWN:  You know, I think initially

 21   when -- when we're looking at someone, a new -- new

 22   employee, we do have a probationary period.  And we try

 23   to give people a -- a -- a very fair opportunity to -- to

 24   reach a level that -- performance.  It's new.  It's

 25   different.  And it takes time to learn."

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000521

Mestas v. Town of Evansville                    17-CV-00017-NDF

41

1             How far am I supposed to go?

2        Q.    To the end of your comments.  One more

3    paragraph, please.

4        A.    "I think up to the point of his injury, as far

5    as his primary job -- and everybody has different jobs.

6    It's a small department.  His primary duty as driving and

7    operating the sanitation truck, it was -- it was

8    progressing fine.  Okay?  Afterwards, when he came back

9    to work, not so much."

10       Q.    Was that an accurate portrayal of what you told

11   the investigator in your interview?

12       A.    That is my belief that it is accurate.

13       Q.    And what do you mean, afterward, when he came

14   back to work, he was not progressing so much?

15       A.    It's as if the man reached a plateau.  He had

16   gotten to a certain level and wasn't getting beyond that

17   point.  Just wasn't the -- the route times weren't

18   getting any shorter.  And Mr. Mestas became more and more

19   argumentative about doing projects, finding reasons "Why

20   not," "Why I can't."  "I can't do this."  "I need that."

21             To the best of my ability, I tried to

22   accommodate whatever he needed.  If he needed drill bits,

23   I said to go buy drill bits.  Get a purchase order.  Get

24   a drill bit, whatever it was you needed.  If you needed

25   gloves, buy gloves.  We never denied, to my knowledge,

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
000522

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            42

1    anyone the chance to get the job done.  But Roy appeared

2    to be in a mind-set of working harder to get out of

3    getting to or completing projects than completing them.

4        Q.    And this was after his injury?

5        A.    After the injury.

6        Q.    How did you learn that Mr. Mestas had been

7    injured?

8        A.    Mr. Mestas told me he was injured.

9        Q.    Did you talk to Dan Adcock about it at all?

10       A.    Entirely possible.  I don't recall specific

11   conversation.  But, in light of the fact that Mr. Mestas

12   fell in front of the Town shop, which is where he says he

13   was injured, that's where everybody comes in the door.

14   Would that be possible that Dan saw him or talked to me?

15   Yes.  I can't state specifically.

16       Q.    Sure.  What do you recall about learning that

17   Mr. Mestas had fallen?

18             MR. THOMPSON:  And, Counsel, because

19   there's other lawyers involved in this case, you're

20   talking about the injury that occurred with the Town of

21   Evansville in November of 2012.  Correct?

22             MS. HAYES:  Yes.  Yes.  That's correct.

23       Q.    (BY MS. HAYES)  Mr. Mestas was injured on

24   November 26th, 2012.  What do you remember about learning

25   about his injury or accident?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion           Exhibit E
000523

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                           43

1      A.    I remember him coming into my office that

2  morning and saying, "I fell on the ice outside and hurt

3  my back."  I can't say exactly what I said because it's

4  too long ago.  But it would be normal for me to say, "Are

5  you okay?  Can you work?  What's going on?  Where are we

6  here?"

7      Q.    Do you recall telling Dan Adcock that

8  Mr. Mestas wasn't on the clock when he slipped on the ice

9  on November 26th, 2012?

10     A.    Yeah.  I don't remember telling Dan that, but I

11 do remember talking with Brian about it, that since we

12 hadn't clocked in yet, my question was, was there a

13 liability on the Town?  I didn't know the answer to that,

14 and I needed to find out.  And the determination was yes

15 because he was there to go to work.  So I had no problem

16 with that.  I just needed to educate myself.

17     Q.    Sure.  As Mr. Mestas' supervisor, did you have

18 access to his personnel file?

19     A.    I had access to the part of his -- well, yes, I

20 had access.

21                   (Exhibit No. 4 marked for

22                    identification.)

23     Q.    (BY MS. HAYES)  I am handing the court reporter

24 two notes.  They are from Casper Orthopaedic Association,

25 P.C., and they are Evan --

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000524

Mestas v. Town of Evansville                    17-CV-00017-NDF

44

1       A.    Are we done with this one?

2       Q.    No.

3             They're Evan 0017 and 0018.  Did you ever see

4   these documents?  Do you recognize these documents?

5       A.    I recall seeing one document.  I'm not sure I

6   saw two documents.  I'm not sure.  I do remember that

7   there was a document stating he was unable to return to

8   work.

9       Q.    And just so I'm clear and the transcript is

10  clear, you would have been able to see these documents --

11      A.    Yes.

12      Q.    -- in Mr. Mestas' personnel file?

13      A.    Yes.

14      Q.    And I will just represent to you that these two

15  documents were produced by the Town, and they were in

16  Mr. Mestas' personnel file.

17      A.    Okay.

18      Q.    Were you aware after his injury that he had

19  been -- he had submitted to the Town notices from his

20  doctor that he was unable to work?

21      A.    Yes.

22      Q.    And what did the note say specifically about

23  his ability to work?

24            MR. THOMPSON:  Which note?

25            MS. HAYES:  Both of them, please.

Mestas v. Town of Evansville                 17-CV-00017-NDF

45

1            MR. THOMPSON:  Do you want him to read

2     them into the record?

3            MS. HAYES:  Sure.

4            MR. THOMPSON:  Object as to the question,

5     but go ahead.

6     A.    Tim Glennon, PAC.  I have been treating Roy

7     Mestas Junior in my office.  The patient is unable to

8     return to work or school.  Not working until further

9     notice.  If you have any further questions, please

10    contact us at (307) 265-7205.

11            And to whom it may concern on the next one.

12    Demian Yakel, M.D.  I have been treating Roy Mestas

13    Junior in my office.  The patient is unable to return to

14    work or school until further notice.

15            Pretty much a duplicate of their previous one.

16    Q.    (BY MS. HAYES)  So they're both saying -- or,

17    it was your understanding that Mr. Mestas was off work

18    until further notice?

19    A.    Until further notice.

20    Q.    When Mr. Mestas was on leave for his back

21    injury, did you have any information about any treatment

22    he was receiving during that time?

23    A.    No.

24    Q.    Did you know if he was in physical therapy?

25            MR. THOMPSON:  Objection as to the form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000526

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                      46

 1    Asked and answered.

 2         A.    I don't know.

 3         Q.    (BY MS. HAYES)  Did you ever hear anything from

 4    any source about what Mr. Mestas was doing while he was

 5    on his medical leave?

 6         A.    No.

 7         Q.    I'm going to hand you -- this is a document

 8    that is Mestas versus Town of Evansville, transcript of

 9    audio recording, labeled "A-A0000053."

10              MS. HAYES:  Would you please mark that as

11    a deposition exhibit?

12                        (Exhibit No. 5 marked for

13                        identification.)

14         Q.    (BY MS. HAYES)  Have you read the transcript of

15    this recording, Mr. Brown?  Were you provided this before

16    your deposition?

17         A.    I'm sure I've read it.  I've been provided a

18    number of documents.

19         Q.    Do you recognize this document?

20         A.    I do recognize this one as having read it.

21         Q.    Sorry?

22         A.    I've read it.

23         Q.    And on page 4 -- and just for the record, this

24    is a recording -- a transcript of a recording that

25    Mr. Mestas took of a conversation he had with you.  Can I

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                000527

Mestas v. Town of Evansville                    17-CV-00017-NDF

47

```
 1    see the front page?

 2         A.    Sure.

 3         Q.    Okay.  Thank you.  So, on page 4, lines 15 to

 4    25, would you read those lines out loud, please?

 5         A.    Yes.

 6               "MR. BROWN:"  That's me.  "Well, I -- I want to

 7    tell you.  I mean, I'm still frustrated over some of

 8    this.  I realize you did not hurt your back on purpose.

 9    But I still say get -- you know, there's things you could

10    have done and been in here on light duty.  One of those

11    things sits right there in that corner table.  The -- no,

12    this table.  Over here."

13               How far do you want me to go?

14         Q.    Just to the end of the page, please.

15         A.    "MR. MESTAS:  Oh."

16               Myself:  "This.  Sit in front of the computer

17    and go through it and do it.  Everybody here has to do

18    it.  Could have come" --

19         Q.    That's fine.  Do you want me to play the

20    recording of that so you can hear your voice?

21         A.    No.

22         Q.    Do you believe this accurately portrays what

23    you said during that conversation?

24               MR. THOMPSON:  Objection as to form.

25         Q.    (BY MS. HAYES)  Would you like me to play the
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000528

Mestas v. Town of Evansville                    17-CV-00017-NDF

48

1    recording so you can hear your voice?

2        A.    Sure.

3                MR. THOMPSON:  For the record, you're

4    starting the tape from the beginning?

5                MS. HAYES:  Did I?

6                MR. THOMPSON:  You are starting the tape

7    from the beginning?

8                MS. HAYES:  I am, yes.

9                (Audio recording playing.)

10       Q.    (BY MS. HAYES)  I'm just going to stop the tape

11   for a moment.  Is that your voice, Mr. Brown, on the

12   recording?

13       A.    I think so.

14               (Audio recording continues.)

15       Q.    (BY MS. HAYES)  Okay.  Is that your voice,

16   Mr. Brown --

17       A.    I think so, yeah.

18       Q.    -- on the tape?

19       A.    Yes.

20       Q.    Do you remember this conversation with

21   Mr. Mestas?

22       A.    Not specifically, no.

23       Q.    You mentioned that you did not have any

24   information about what medical treatment Mr. Mestas was

25   undergoing while he was on injury leave.  Is that

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000529

Mestas v. Town of Evansville                    17-CV-00017-NDF

49

1    correct?

2        A.    That's correct.  I had no documentation or

3    communication directly with me at all.

4        Q.    So on what information did you base your belief

5    that he could have come into work and performed

6    light-duty jobs?

7        A.    Experience.

8        Q.    What sort of experience?

9        A.    Personal and with other people.  My experience

10   has been that people who either are injured or have

11   surgeries or have had to have time off from work for

12   medical on a long-term basis inevitably are able to come

13   in and do light work, light-duty work, of which we would

14   have had plenty.  Myself, I've had a hernia operation.

15       Q.    Well --

16              MR. THOMPSON:  You want to let him finish?

17              MS. HAYES:  Sure.  I don't think he's

18   answering my question.

19       Q.    (BY MS. HAYES)  But go ahead.

20       A.    Well, you asked me what I based it on.  I base

21   it on personal experience, my personal experience.  I had

22   a hernia operation at the Town of Evansville.  Two weeks

23   later I was back doing light duty, doing what I could for

24   my employer.  I had rotator cuff surgery on my shoulder.

25   Within two weeks, even before I started therapy, I was in

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000530

Mestas v. Town of Evansville                    17-CV-00017-NDF

50

1    my office.  I had a light-duty job based on what I did as

2    a supervisor.  I wasn't doing what Roy would do.  But

3    there are light-duty work.

4            Ron Emond had rotator cuff surgery, shoulder

5    surgery.  He was back in two weeks doing what he could.

6    To me, it's been common practice throughout all the years

7    of my experience, people generally come back and go on

8    light duty as prescribed by their physician.

9            Go ahead.  I'm done.

10   Q.    I'm sorry.  Please finish.  I don't mean to

11   interrupt you.  Go ahead.

12            MR. THOMPSON:  Go ahead and finish.

13   A.    My personal logic tells me that it's not

14   logical for a person who's been off with a severe injury

15   for several weeks to, on Friday, be still 100 percent

16   disabled and unable to do anything prior to that light

17   duty, and on the following Monday, be 100 percent able to

18   return to work as per the doctor's note.

19   Q.    (BY MS. HAYES)  What's your previous experience

20   with back injuries?

21   A.    How about Vietnam?  I had a back injury in

22   Vietnam.

23   Q.    And what was that?

24   A.    Well, I don't know how it was injured at the

25   time.  But my treatment for that was sleeping on a

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000531

Mestas v. Town of Evansville                    17-CV-00017-NDF

51

1   plywood board for six weeks.  And, no, I didn't get out

2   of going on duty.

3       Q.    Any other employees in the public works

4   department with back injuries that you had experience

5   with?

6       A.    In public works?  Back injuries?

7       Q.    Yes.

8       A.    No.

9       Q.    How long was Mr. Mestas out for his back

10  injury?

11      A.    I don't know the exact time span, but we do

12  have the dates listed someplace.  We could look at those

13  and find how many weeks it was.

14      Q.    And you just testified that he did have a note

15  from his doctor, unable to return to work until further

16  notice.

17      A.    Until further notice.  Uh-huh.

18      Q.    Did you have any reason to dispute what the

19  doctor had written in their notice to the Town?

20      A.    No.  We got the note to say come back to work.

21      Q.    And why were you frustrated that Mr. Mestas had

22  taken time off for his back injury?

23              MR. THOMPSON:  Objection as to form.

24      A.    Somewhere -- and I don't recall exactly where.

25  In this documentation, there was a statement by

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
                                                                                    000532

Mestas v. Town of Evansville                    17-CV-00017-NDF

52

1    Mr. Mestas where he stated that he offered to go to the

2    town hall and work light duty.  My question would be why

3    the town hall?  We got the same opportunity at the public

4    works department.

5         Q.    (BY MS. HAYES)  And how did you respond to

6    that?

7         A.    I didn't respond to it.

8         Q.    Where is that in this document?

9         A.    I wish I could tell you, ma'am.  I don't

10   remember.  But I do recall seeing it somewhere.

11        Q.    Did you think that Mr. Mestas wasn't really

12   injured?

13        A.    I had no question about his injury.  I'm not a

14   doctor.  I can't question those things.

15        Q.    But you still felt, even though he had this

16   doctor's note, that he could have come in and done

17   light-duty work based on your experience?

18              MR. THOMPSON:  Objection as to form.

19   Misstates his testimony.

20        A.    I have no idea how to even answer that.

21        Q.    (BY MS. HAYES)  On what information did you

22   base your belief that he could have come into work and

23   done light-duty jobs?

24        A.    As I stated earlier --

25              MR. THOMPSON:  Objection as to form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000533

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              53

1    Misstates his testimony.  Go ahead and answer if you can.

2        Q.    (BY MS. HAYES)  I'll restate it.  I'm sorry.

3    Strike my question.  In this transcript, you say "There's

4    things you could have done and been in here on light

5    duty."  On what information did you base the belief that

6    there were things he could have done for light duty?

7                    MR. THOMPSON:  Objection as to form.

8    Asked and answered.

9        A.    Again, based on my personal experiences.

10                   MS. HAYES:  Should we take a break?

11                   (Deposition proceedings recessed

12                    12:21 p.m. to 12:32 p.m.)

13       Q.    (BY MS. HAYES)  I forget to tell everybody.

14   Every time we take a break you're still under oath.

15       A.    Understood.

16       Q.    So it's been several minutes since we were

17   here, so I forgot, but I think what you said is that --

18   well, let me just start again.

19                   (Previous question and answer read by

20                    the reporter.)

21       Q.    (BY MS. HAYES)  On page 6 of this transcript --

22   now, I'm still referring to the transcript of your

23   recorded conversation with Mr. Mestas.  Mr. Mestas is

24   explaining to you -- and I'm looking from lines --

25   starting at line 2, you're telling him "It's not my job

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000534

Mestas v. Town of Evansville                    17-CV-00017-NDF

54

1    to motivate you."  And Mr. Mestas responds "Well, I

2    understand that.  And -- and you got mad when I was

3    going" -- do you see where I am?  I'm sorry.  I'm at the

4    top of page 6.

5        A.    Right.

6        Q.    "You got mad when I was going to suggest maybe

7    there was something I can do over at town hall.  You

8    said, 'No, you're not.'"  And how did you respond?

9        A.    "You don't work for town hall."

10        Q.    And so do you remember when Mr. Mestas

11    commented to you that maybe there would be something to

12    do over at the town hall?

13        A.    You know, I didn't know that I was being

14    recorded, for one.  And do I recall that he said

15    something about the town hall?  Vaguely.  I have a vague

16    recollection.  Specifically -- as to what he said

17    specifically, no.  But, again, I go back to, if he can

18    work at the town hall, which would be light duty in that

19    circumstance, why couldn't he work for us?  Didn't make

20    sense.

21        Q.    When he suggested there was something at the

22    town hall and you said, "No, you're not," did you suggest

23    to him then that he come and do something at the

24    sanitation department?

25              MR. THOMPSON:  Objection as to form.  At

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000535

Mestas v. Town of Evansville                    17-CV-00017-NDF

55

1    what point in time?

2        Q.    (BY MS. HAYES)  During this conversation.  And

3    it doesn't appear to be in this conversation.

4        A.    In this conversation, assuming this is accurate

5    transcription, at that point, no.

6        Q.    And do you remember Mr. Mestas asking you or

7    mentioning to you earlier that perhaps there might be

8    something in an earlier conversation that there might be

9    something he could do over at the town hall?

10               MR. THOMPSON:  Objection as to form.

11       A.    I don't recall.

12       Q.    (BY MS. HAYES)  Do you recall when you might

13   have said to him, "No, you're not going to work at the

14   town hall"?

15       A.    As to when this date was, no.

16       Q.    You don't remember that conversation?

17       A.    I don't remember the specific conversation, but

18   I do remember saying, "You're not" -- "There's no need

19   for you to work" -- "There's no need for you to work at

20   the town hall."

21       Q.    And at that time when you felt there's no need

22   to work, did you suggest to him that he come to the

23   public works department and do light-duty work?

24               MR. THOMPSON:  Objection as to form.

25       A.    I don't remember.  I really don't remember if I

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion         Exhibit E
000536

Mestas v. Town of Evansville                    17-CV-00017-NDF

56

1    actually told him, "If you can do that, you can do this."

2    I'm going to tell you that's my thought.  If you can work

3    town hall, you can certainly work here on light duty.

4    Doesn't make sense any other way.

5        Q.    (BY MS. HAYES)  I understand, Mr. Brown.  But

6    my question is do you recall ever suggesting to him that

7    he come into the public works department and do light-

8    duty work?

9                MR. THOMPSON:  Objection as to form.  At

10   what point in time?

11               MS. HAYES:  After his injury.

12       A.    I didn't see him after his injury until he

13   brought the note in saying he was released.

14       Q.    (BY MS. HAYES)  So I'm sorry.  Let's just move

15   on.  This is getting a little too convoluted.

16              I am going to hand you -- this is another note

17   from Casper Orthopaedics dated January 9th, 2013, and it

18   is Evan, period, 0020.

19                     (Exhibit No. 6 marked for

20                      identification.)

21       Q.    (BY MS. HAYES)  Have you seen this document

22   before, Mr. Brown?

23       A.    Yes, I have.

24       Q.    And what is this document?

25       A.    This is a note releasing Mr. Mestas back to

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000537

Mestas v. Town of Evansville                17-CV-00017-NDF

57

1    full duty on 1/14 of '13.

2         Q.    And did his physician indicate that Mr. Mestas

3    had any work restrictions?

4         A.    It says -- it specifically states with no

5    restrictions.

6         Q.    When he returned to work in January of 2013,

7    did you want to fire him?

8         A.    No.

9         Q.    Did you think you could fire him?

10        A.    Doesn't matter.  I didn't want to.

11        Q.    Well, did you think you could?

12        A.    Why would I?

13              MR. THOMPSON:  Objection to the form.

14   Argumentative.

15        A.    Well, I could fire him, yes.  I had no reason

16   to have a plan or position to fire him.

17        Q.    (BY MS. HAYES)  Could you have fired Mr. Mestas

18   while he was on medical leave for his back injury?

19              MR. THOMPSON:  Objection to form.  Calls

20   for a legal conclusion.

21        A.    I have no idea.  Again, it didn't come up as a

22   matter of interest.

23        Q.    (BY MS. HAYES)  So I am going to ask you again

24   to refer on page 7 of this recorded conversation, 0053.

25   Would you just please read out loud lines 11 to 18,

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        58

```
 1   page 7?
 2        A.    11 through 18?
 3            "Yeah, but right after you get back from" -- I
 4   don't know what that was.  "So, again, I'm being asked by
 5   other people outside of our department, 'Does this guy
 6   have a pattern here?'  Outside of this department.  Okay.
 7   Just saying.  And I -- I was told that if you were unable
 8   to perform your duties, I should have just let you go.  I
 9   didn't.  Okay?  That was back when you were off on
10   disability."
11        Q.    And who told you that if Mr. Mestas was unable
12   to perform his duties, you should let him go?
13            MR. THOMPSON:  To the extent any of these
14   conversations occurred with Phil Willoughby, who is the
15   Town attorney, I'd direct you not to answer.
16        A.    I'm not going to answer.
17        Q.    (BY MS. HAYES)  Did you have conversations with
18   Mr. Willoughby about --
19        A.    I did.
20        Q.    -- whether you could terminate Mr. Mestas?
21            MR. THOMPSON:  You're not going to answer
22   that question.  That's an improper question.  You don't
23   ask him about conversations that he had with counsel.
24   You know that.
25        Q.    (BY MS. HAYES)  Did someone outside of the
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        59

1    department tell you that you should have fired

2    Mr. Mestas?

3              MR. THOMPSON:  To the extent any of that

4    communication came from the Town attorney, I'm going to

5    direct you not to answer.

6              MS. HAYES:  I'd just like the record to

7    reflect that he's not responding.

8         Q.   (BY MS. HAYES)  Did someone tell you that they

9    had seen Mr. Mestas at the mall when he was on medical

10   leave?

11        A.   It would have been hearsay because -- and I

12   don't recall which employee told me, but an employee told

13   me that another employee had seen Mr. Mestas at the mall.

14   So did somebody come to me and say, "I saw Roy"?  No.

15   But another employee said that somebody had seen Roy up

16   at the mall.

17        Q.   Do you remember when they would have told you

18   that?

19        A.   No.  During the time he was off for his back.

20        Q.   Did you hear that they'd seen -- any employees

21   had seen Mr. Mestas at other various places?

22        A.   I'd heard they saw him at the post office.

23   That was at the post office.

24        Q.   Do you know who told you that?

25        A.   I do not recall that.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
                                                                                    000540

Mestas v. Town of Evansville                    17-CV-00017-NDF

60

1      Q.    So back to your interview with the State of

2   Wyoming investigator.  I believe you testified that after

3   Mr. Mestas came back from his injury again -- I'm sorry.

4   I'm looking at pages 7 and 8.  And I think we've reviewed

5   those, Mr. Brown.  On page 7, for example, you told --

6   you responded to a question from the interviewer.  After

7   Mr. Mestas came back from injury leave, it was not the

8   most rewarding relationship because of obvious reasons.

9   Do you see where I'm reading?

10     A.    No, I do not.  I'm sorry.  What line am I at?

11     Q.    I'm on page 7.

12     A.    Page 7.

13     Q.    Lines 20 to 21.

14     A.    Okay.  I'm down here.  Thank you.

15     Q.    What were the obvious reasons that the

16   relationship was not the most rewarding?

17     A.    I think the obvious reasons were, in my mind,

18   Mr. Mestas was trying to find more ways to not get the

19   job done than to pursue and complete the tasks that were

20   assigned.  I needed someone who is self-motivated and is

21   willing to get up and get after it.  I don't want to have

22   to babysit people.  They're adults.

23     Q.    And on page 8, you mention -- would you just

24   please read lines 20 to 22?

25     A.    "MR. BROWN:  Okay.  I -- I can't speak for

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
                                                                                000541

Mestas v. Town of Evansville                    17-CV-00017-NDF

61

```
 1    them.  My opinion is there were some issues getting along

 2    with coworkers."

 3         Q.    Does that accurately portray what you told the

 4    interviewer?

 5         A.    That was my opinion at that time, yes, that he

 6    had issues getting along.

 7         Q.    And what issues and with what employees?

 8         A.    Again, I can't remember the specific

 9    individual.  But it was brought to my attention that Roy

10    was never completing his route early enough, like we

11    discussed earlier, and being available to work with the

12    other employees on their tasks, jobs, such as sewer

13    jetting, water, hydrant flushing or valve turning.  He

14    made himself essentially unavailable by extending his

15    personal duties.

16         Q.    And what employee told you that?

17         A.    I stated earlier I don't recall exactly which

18    one.

19         Q.    And who would have had the opportunity to

20    observe that he was taking too long in his route?

21         A.    Any employee.  Almost everyone -- almost

22    everyone started out as a sanitation truck driver in our

23    organization.  It was kind of an entry point.  So I can

24    think of only one person there that didn't drive the

25    truck, and that would have been Ron Emond.  So
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000542

Mestas v. Town of Evansville                    17-CV-00017-NDF

62

1    everybody -- Dan, Eric and anybody else that worked there

2    drove the sanitation truck.

3        Q.    So the issues that Mr. Mestas had getting along

4    with coworkers, plural, more than one coworker told you

5    that he was taking too long in his route?

6        A.    I can't speak as to the plurality.  I know that

7    it was brought to my attention.  Whether it was by one

8    person or more, I do not recall at this time.  It's been

9    too long.

10       Q.    So, besides one of Mr. Mestas' coworker

11   indicating to you that Mr. Mestas was not completing his

12   route quickly enough, did any other coworkers complain to

13   you about his job performance after he returned from his

14   injury leave in 2013?

15                MR. THOMPSON:  Objection.  Form.  Asked

16   and answered.

17       A.    Would you please restate that or just repeat

18   it?

19                (Previous question read by the

20                reporter.)

21       A.    I just don't recall any specific coworker

22   coming to me after that.

23       Q.    (BY MS. HAYES)  Could it have happened and you

24   just don't remember, or you don't recall it ever

25   happening?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000543

Mestas v. Town of Evansville                     17-CV-00017-NDF

63

    1        A.    It could have happened, but I don't remember

    2   it.

    3        Q.    Do you remember any complaints or concerns by

    4   Mr. Adcock about Mr. Mestas' job performance?

    5        A.    No.

    6        Q.    How about Mr. Emond?  Any complaints or

    7   concerns?

    8        A.    Mr. Emond complains about everything.  It's his

    9   character of nature.

   10        Q.    Did he complain to you about Mr. Mestas?

   11        A.    I believe he had some complaints that were

   12   probably -- I stated earlier Ron would be an early person

   13   in before 7:00.  I'd come in at 7:00.  We visited.  We

   14   talked.  It's what people do.  And it seems I recall

   15   that -- and I say "seems" because it's been so long --

   16   that he would ask questions such as, "Why is it taking so

   17   long?  Why is he never out there to help us with any of

   18   our stuff?"

   19        Q.    So you would see Ron Emond in the mornings

   20   before work.  Is that correct?

   21        A.    Uh-huh.  Almost every day.

   22        Q.    Did you ever communicate with him about

   23   Mr. Mestas between January to April of 2013?

   24        A.    I think in the context of what we're discussing

   25   today, again, I recall the conversation Ron was asking

Mestas v. Town of Evansville                    17-CV-00017-NDF

64

1    me, why he wasn't getting done earlier and why he wasn't

2    there to help.  But a specific date, no, I can't give you

3    that.  I don't remember.  But that was after his return

4    to work.

5        Q.    Mr. Emond testified yesterday that you told

6    him -- "you" meaning telling Mr. Emond -- that you were

7    going to make Mr. Mestas so miserable that he would just

8    quit his job.  Do you recall telling Mr. Emond that?

9        A.    No.

10              MR. THOMPSON:  Objection as to form.

11       Q.    (BY MS. HAYES)  I believe you mentioned that,

12   during his employment, Mr. Mestas was argumentative.  Is

13   that correct?

14       A.    Prior to the back injury, Mr. Mestas was

15   dependable, reliable and seemed to have a very good

16   attitude and ethic.  Once he returned back to work, he

17   was not that same person.  He wanted to argue about

18   things on a constant basis.  I mean, I'm talking almost

19   daily coming in, leaning up against the door casing,

20   wanted to discuss why he couldn't do something or why he

21   didn't have time or why he didn't have the right tool.

22   And whatever Mr. Mestas asked for, I advised him to get.

23   If he needed a different drill bit, go buy a different

24   drill bit.

25       Q.    Were there any witnesses to him leaning against

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
000545

Mestas v. Town of Evansville                          17-CV-00017-NDF

                                                              65

1    the doorjamb?

2        A.    Brian Boettcher.

3        Q.    Anyone besides Mr. Boettcher?

4        A.    I can't answer that, if there are or not.  I

5    don't know.

6        Q.    Mr. Emond testified yesterday that, during one

7    argument with you, he threw a chair across the room.

8        A.    Uh-huh.

9        Q.    Can you describe what happened?

10       A.    Huh-uh.  I don't remember him throwing a chair

11   across the room.

12       Q.    You don't recall that happening?

13       A.    I really don't.  I just don't recall that.

14   Argue?  Ron's an argumentative person.  Typical.

15       Q.    More so than Mr. Mestas?

16       A.    More so?  I don't know if it's more so or just

17   a different type of argument.  I don't know how to

18   describe that.  I don't know.

19       Q.    Did Mr. Mestas ever throw a chair across the

20   room during an argument with you?

21       A.    No.

22       Q.    Did he ever raise your [sic] voice when he was

23   arguing with you?

24       A.    Yes.

25       Q.    Did you believe he was being disrespectful to

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                          000546

Mestas v. Town of Evansville                    17-CV-00017-NDF

66

1    you?

2         A.    Yes.

3         Q.    Did other people, other employees, witness him

4    being disrespectful to you?

5              MR. THOMPSON:  Objection as to the form.

6              MS. HAYES:  That you know of.

7         A.    Not that I know of other than Brian.

8         Q.    (BY MS. HAYES)  Did you ever yell at another

9    employee for completing a work order for Mr. Mestas?

10        A.    I don't like the term "yell," no.  Completing a

11   work order.  I may have had a discussion about it.

12        Q.    What was that discussion?

13        A.    Mr. Mestas had his own job to do.  He needs to

14   take care of his business.  Because, if some -- the

15   reason is we're a small group.  If somebody is doing

16   another person's job, then they're not getting their work

17   done.  And when you have a small group, everybody has an

18   assignment, and everybody has an obligation to complete

19   their assignments.

20        Q.    Do you believe that you did anything to make

21   Mr. Mestas' job more difficult than it needed to be?

22        A.    No.

23        Q.    Do you believe you did anything that would not

24   allow Mr. Mestas to be successful in his job?

25        A.    On the contrary, I tried to find ways to help

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000547

Mestas v. Town of Evansville                17-CV-00017-NDF

67

1   him be more successful.

2        Q.    And how did you do that?

3        A.    By ensuring that if he came and said, I needed

4   this, or, I needed that to do this, such as drilling

5   holes in the replacement hooks for the bins, those types

6   of projects that are part of that job, that he would have

7   the stools he needed, and gloves, cutting oil.  Whatever

8   those things were required to get the job done, it was my

9   responsibility to him to see that he had what he needed

10  to be successful.

11       Q.    Like supplies and equipment?

12       A.    Supplies, equipment, additional training if he

13  needed it.

14       Q.    What sort of training?

15       A.    Operator training on the truck.

16       Q.    When did he have that?

17       A.    I didn't say he had it.  I said it was

18  available.

19       Q.    When would he have done operator truck

20  training?

21       A.    Anytime he asked for it.  Again, he needed to

22  be motivated.  If he wanted to be successful, he had to

23  at least say, "Hey, could someone help me with driving?

24  You say I'm not fast enough.  Then somebody show me how I

25  can be faster."

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000548

Mestas v. Town of Evansville                17-CV-00017-NDF

68

```
 1      Q.     Do you know?  Did any other employees mention

 2   to you that they felt that Mr. Mestas wasn't motivated?

 3      A.     Other than those conversations I might have had

 4   with Ron in the morning and with Brian, I don't recall

 5   any.

 6      Q.     Did Mr. Mestas ever stop speaking to you for

 7   several days after he had an argument or disagreement

 8   with you?

 9      A.     I don't recall that.

10      Q.     It may have happened?  You don't recall?

11      A.     I just don't recall, no.

12      Q.     Is there a procedure for Town employees to use

13   before they can procure items for work at the Town of

14   Evansville?

15      A.     There is.

16      Q.     What is that procedure?

17      A.     The procedure would be that if an employee had

18   a need for an item, any item, whether it's gloves or

19   whether it was a tool, that they would come to Brian or

20   myself, explain what they needed, why they needed it.

21   And then Brian and I would then determine whether or not

22   to purchase that item.  If we determined that they could

23   purchase that item, we would try to get them what we

24   considered a line item out of our budget, depending on

25   the department.  So, out of the sanitation department, if
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000549

Mestas v. Town of Evansville                    17-CV-00017-NDF

69

1    we're talking sanitation, we'll take it out of general

2    tools if it was a tool and go up to the town hall.  You

3    get a purchase order from Janelle or Peggy, the town

4    treasurer or the clerk.  "This is the line item we want

5    to use."  And tell them what you're buying and

6    approximately how much.  They need to put that on there.

7              Then they take the purchase order and go get

8    what they wanted, what they needed.  They bring the PO

9    back, turn that in.  The clerk would then do a voucher.

10   Brian or I, the next time we were at town hall, we have a

11   box, and we sign off on the vouchers approving that.

12   Q.    And can I ask you again -- now, I'm referring

13   back to your interview with the state investigator.  If

14   you could please refer to page 12.  Would you please just

15   read out loud lines 9 to 17?

16   A.    "When we needed new drill bits, rather than

17   going to a local -- when -- when I say local, around this

18   area, vendor, without permission, without asking, without

19   doing anything, he just takes off and leaves and goes all

20   the way across town to Contractor Supply or something,

21   which is a very expensive place.  And then you look

22   around and say, Well, where'd Roy go?  Nobody knows.  He

23   didn't tell anybody.  He'd just disappear."

24   Q.    Is that an accurate depiction of what you told

25   the state investigator?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000550

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                      70

 1      A.    To the best of my recollection, yes.

 2      Q.    So this -- what you just described seems to

 3   conflict with the procedure you just mentioned --

 4      A.    It does.

 5      Q.    -- that Mr. Mestas would take off.  The Town --

 6   what items did Mr. Mestas procure without your

 7   permission?

 8      A.    Well, the drill bits, for one.

 9      Q.    And from where?

10      A.    I seem to -- and, again, specifically, I can't

11   recall.  We did business with Contractor Supply for

12   certain things.  Normally, for us, we would go to -- it

13   was Big R.  Then it was Murdoch's.  We go to Home Depot.

14   We go to -- not Murdock's, but --

15      Q.    Menards?

16      A.    Menards.  Menards and Murdoch's.  We'd go to

17   people in our local area.  It's a lot closer, a lot less

18   time to go there.  We had accounts at those locations,

19   open accounts.  So you go in, take your PO.  They accept

20   the PO, and you get your receipt and leave.  And they

21   also knew that we were tax-exempt.  So that's why we like

22   to use those.  We shared that information with all

23   employees.  But there was somewhere in the back of my

24   mind where -- and if I'm misstating this, I apologize.

25   But Mr. Mestas went to a relative he knew that worked

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000551

Mestas v. Town of Evansville                    17-CV-00017-NDF

71

1    somewhere to buy some very expensive drill bits.

2        Q.    And would there be an invoice?

3        A.    There would be.  And, again, it's been a long

4    time.  If I'm mistaken, then so be it.

5        Q.    Before we get into the purchase order issues,

6    you mentioned that when you look around and say, "Well,

7    where did Roy go?"  "Nobody knows."  Did you ask

8    employees where Mr. Mestas was during the workday?

9        A.    Yeah.  If I was looking for someone and didn't

10   see them or couldn't find them, I would ask, "Have you

11   seen Roy?"

12       Q.    Who did you ask?

13             MR. THOMPSON:  I'm going to object as to

14   the time frame is indefinite.

15       Q.    (BY MS. HAYES)  After his injury, you mentioned

16   that Roy would just -- you'd look around, and he would

17   just disappear.  At those times when he would just

18   disappear, what employees specifically did you ask about

19   his whereabouts?

20       A.    You know, specifically, I don't recall.  It

21   could be anybody that was in the shop working or in the

22   office area.  I could say, "Dan, have you seen Roy?"  I

23   would ask that about any employee, of any employee, if I

24   was looking for someone and didn't find them.  They might

25   be out flushing hydrants out by Hat Six Truck Stop.  I

Wyoming Reporting Service, Inc.
1.800.444.2826

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000552

Mestas v. Town of Evansville                17-CV-00017-NDF

72

 1   didn't see them.  "Do you know where they went right

 2   now?"  That seems right to me.

 3        Q.    Did you ask Dan Adcock ever?

 4        A.    About Roy specifically?

 5        Q.    His whereabouts.

 6        A.    I don't recall a specific person that I did

 7   ask, but I'm sure I asked.

 8        Q.    Let's look at some of these purchase orders.

 9   So the Town has represented that it produced all purchase

10   orders, receipts and invoices for the Town of Evansville

11   sanitation department for the time period September 12th

12   to December of 2013.  Did you review any of those?

13             MR. THOMPSON:  Counsel, there's two

14   receipts they couldn't find.

15             MS. HAYES:  Which receipts are those?

16             MR. THOMPSON:  I can look at an e-mail I

17   sent you.  But my computer is running low, so I can't

18   pull it up right now.  But I represented that there were

19   two receipts that they were not able to locate.

20             MS. HAYES:  Okay.  So there may be two

21   receipts --

22             MR. THOMPSON:  I can see if I've got any

23   battery power left.

24             MS. HAYES:  Better get Apple, Tom.

25             MR. THOMPSON:  I'm pretty happy with what

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
                                                                                        000553

Mestas v. Town of Evansville                    17-CV-00017-NDF

73

1    I have.  Go ahead.  I don't know if I'm going to be able

2    to get this pulled up.

3                    MS. HAYES:  How do they know there are two

4    receipts missing?

5                    MR. THOMPSON:  Because the receipts were

6    itemized.

7                    MS. HAYES:  Oh, so, on the itemization,

8    they couldn't find it.  So I could ask another

9    interrogatory.

10                   MR. THOMPSON:  Well, the discovery

11   deadline has passed.  It's required they be served 30

12   days before the deadline.  So interrogatories were due

13   the end of last month.

14                   MS. HAYES:  So, in this itemized list of

15   sanitation department invoices -- and I didn't make a

16   copy of this.  But you're saying there are two receipts

17   that are not in this stack?

18                   MR. THOMPSON:  I believe that's correct.

19                   MS. HAYES:  So maybe we can take a break,

20   and I'll have Mr. Brown look through these and tell me

21   which ones are missing of the two.

22                   MR. THOMPSON:  Are you going to have him

23   compare the itemization with the receipts that were

24   produced to tell you which ones are missing?

25                   MS. HAYES:  I guess so.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000554

Mestas v. Town of Evansville                    17-CV-00017-NDF

74

1           MR. THOMPSON:  Okay.

2      Q.    (BY MS. HAYES)  So I did not -- I will just

3  represent to you that Mr. Mestas and I went through all

4  the receipts that the Town provided, and we did not find

5  any receipts from Contractor Supply.  So, as you go

6  through the itemized, if you identify one from Contractor

7  Supply which I didn't see, I'd like you to bring that to

8  my attention, please.  So it's possible that the

9  Contractor Supply receipt may be missing?

10     A.    It would be possible.  And it could be possible

11 I misstated.

12     Q.    On pages 12 to 13 of your -- I'm sorry.  12 of

13 your interview, you mentioned Contractor Supply or

14 something, some very expensive place.  What other

15 expensive place were you referring to?

16     A.    I think that is maybe an arbitrary statement,

17 in that he took off, went across town to Contractor

18 Supply.  And maybe instead of "something," it might have

19 been "or somewhere else."

20     Q.    And where else would that have been?

21     A.    I don't know.

22     Q.    But there would be a receipt for that if he

23 went and bought something in an expensive place?

24          MR. THOMPSON:  Objection as to form.

25     A.    Looking at a receipt wouldn't tell me whether

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000555

Mestas v. Town of Evansville                    17-CV-00017-NDF

75

1    it was more expensive there or a different location.  I

2    don't know what the pricing is.  I know that Contractor

3    Supply, we've purchased there, which, some things we had

4    to buy there because no one else had it.  It was

5    expensive.  We always thought, dang, that's expensive.

6    If we could have bought the same item -- for example,

7    let's say cones, traffic cones.  Home Depot now sells

8    traffic cones.  They're about half the cost of traffic

9    cones if you found them at Contractor Supply.  That's

10   what I base that on.  There are some items that you can

11   buy elsewhere that are just not near as expensive.

12       Q.    (BY MS. HAYES)  And it was your opinion that

13   Mr. Mestas was purchasing items at more expensive places?

14       A.    It was my opinion, on this occasion, that he

15   did, is my opinion.

16       Q.    Well, it's not just one occasion, Mr. Brown.

17   At the bottom of that page, if you want to finish reading

18   that entire paragraph --

19       A.    Starting at 18?

20       Q.    Please.

21       A.    "I don't assume the worst.  I assume that these

22   people are mature and are doing a good job, are doing

23   what they're supposed to do, but at some point I have to

24   go up and sign off on this stuff at the town hall when

25   it's purchased.  So that was a problem, but it wasn't --

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000556

Mestas v. Town of Evansville                    17-CV-00017-NDF

76

 1    that's not an isolated problem.  He -- there were various

 2    times he would take off and go buy stuff without allowing

 3    us to have knowledge of it prior to."

 4           Okay.  It doesn't say that he bought expensive

 5    stuff.  It says he left without getting permission, which

 6    is part of the procedure we discussed to go purchase

 7    something.  If you need something, you had to tell us

 8    what it was, and we might even advise you where to go.

 9    But, without getting permission to do it, you had no

10    right to just go do it.

11        Q.    And when did he do it?

12        A.    I'm responsible for the budget.

13        Q.    When did he go without your permission?

14        A.    Well, I don't know.  He went without my

15    permission.

16        Q.    But you indicate in here that you would later

17    have to go to town hall and sign off.

18        A.    Exactly.

19        Q.    So you, at some point, would have knowledge

20    that he --

21        A.    I would, but I don't recall.

22        Q.    Can I finish my question, please?

23        A.    Sorry.

24        Q.    At some point, you would have to go to the town

25    hall after the fact and sign off on something Mr. Mestas

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                            77

1    had procured without your permission.  Is that correct?

2        A.    Yes.

3        Q.    What items?

4        A.    Specifically, at this point, I can't recall.

5    And it might not be just me that signed off.  Brian also

6    had the authority to sign off.  He might have signed off

7    on something.  So the specific answer at this time, I

8    can't recall.

9        Q.    I have the receipts, and I'll let you go

10   through those.  But we pulled out from the receipts that

11   were provided by the Town, except for the two that appear

12   to be missing, that we could see were somehow associated

13   with Mr. Mestas.  They had his signature.  So I'm going

14   to --

15              MR. THOMPSON:  Can he look at all the

16   receipts rather than just the ones you pulled out?

17              MS. HAYES:  Yeah.  I'd like to go through

18   these first, however.

19              MR. THOMPSON:  Were you going to take a

20   break and let him do that?

21              MS. HAYES:  I'm going to go through this

22   first, and then we can take a break if he wants to look

23   through the receipts.

24              MR. THOMPSON:  I can't get it on my

25   computer.  I'll call Janelle, town clerk, and find out

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000558

Mestas v. Town of Evansville                    17-CV-00017-NDF

78

```
 1    which receipts she was referring to.

 2                    MS. HAYES:  That would be great.

 3        Q.   (BY MS. HAYES)  So I am handing you -- this is

 4    Evans 0301 to 0305.

 5                    (Exhibit No. 7 marked for

 6                     identification.)

 7        Q.   (BY MS. HAYES)  Do you recognize any of these

 8    documents?

 9        A.   I'm not sure how to answer that.

10        Q.   Take your time and look through them all,

11    please.

12        A.   At some point in time, I've seen all these

13    documents.  Do I remember when I saw them or where?  That

14    would be at town hall.  Because somebody had to sign this

15    someplace.  And I don't see the voucher signature.  I see

16    the purchase order.  And, in some cases, even Brian and

17    I -- I see my signature here on the voucher.  Okay.

18    Purchase authorization.  We have this one.

19        Q.   Sorry?  Was there a problem with this?

20        A.   No.  This is fine.

21        Q.   Would this have been something that you

22    authorized --

23        A.   Certainly.

24        Q.   -- a purchase for Mr. Mestas to make?

25        A.   Uh-huh.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                    000559

Mestas v. Town of Evansville                    17-CV-00017-NDF

79

1       Q.      Would he have obtained -- this appears to be

2   repair tire on sanitation truck.

3       A.      Uh-huh.

4       Q.      Is this something that he procured with your

5   permission or authorization?

6       A.      Yeah.

7       Q.      So this is not one of the items?

8       A.      This is not a problem.

9                       (Exhibit No. 8 marked for

10                       identification.)

11      Q.      (BY MS. HAYES)  I am handing you Exhibit 8,

12  which is an invoice from Hose & Rubber.  Do you recognize

13  any of these documents?

14      A.      I really don't know how to answer that

15  question.

16      Q.      Okay.  I'll ask you a different question.

17      A.      Thank you.

18      Q.      On the second page of Exhibit 8 -- that's hard

19  to see.  Let me see if I can find it on the first page.

20  Well, it's a bit hard to see, Mr. Brown.  And I apologize

21  for that.  But these are the copies I got.  On the second

22  page, near the top left-hand corner, it says customer PO

23  number.  Do you see where I'm looking?  It's in this sort

24  of box with a lot of black dots.

25      A.      Yes, I see.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
000560

Mestas v. Town of Evansville                    17-CV-00017-NDF

80

1      Q.    Can you read the purchase order there?

2      A.    The PO number?

3      Q.    Please.

4      A.    Is -- it looks like it's 42497.

5      Q.    Is this an invoice that appears to have been

6    signed?  Does it have Roy Mestas' name?

7      A.    It does.

8      Q.    Is this an item that you did not approve or

9    authorize?

10     A.    I have no idea.

11     Q.    How would he get a PO number?

12     A.    Call Janelle or call Peggy and ask for it.

13     Q.    So he could get a PO number without your

14   authorization?

15     A.    There are times they could, yeah.  They weren't

16   supposed to, but they could.

17     Q.    Was this an expensive item that you would not

18   have preapproved?

19           MR. THOMPSON:  Objection as to form.

20     A.    Hose & Rubber is one of the few places with the

21   proper equipment to provide hydraulic parts.  It would

22   not be a -- it could cost ten times this.  We'd still

23   have to have it to run the truck.  So I would approve it

24   regardless.

25     Q.    (BY MS. HAYES)  I'm sorry.  I didn't understand

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000561

Mestas v. Town of Evansville                    17-CV-00017-NDF

81

1    what you said.  I just didn't hear it.

2         A.    Hose & Rubber would be the location with

3    hydraulic parts.  This is a hydraulic part.  Without the

4    hydraulics, the truck doesn't operate.  It wouldn't

5    matter what it cost at that point.  Without it, the truck

6    doesn't operate.  There wouldn't even be -- the question

7    of this price is not relevant to me on this part.  The

8    truck's got to run.  It could be $143.  It doesn't

9    matter.  The truck's got to run.

10        Q.    So is this an item that you did not approve or

11   authorize?

12        A.    I have no idea.  I don't see my signature, so I

13   have no idea.  How can I tell?  How do I remember?

14        Q.    Well, I'm asking you.

15        A.    I don't.

16             MR. THOMPSON:  He answered.

17        Q.    (BY MS. HAYES)  So is this an expensive item?

18             MR. THOMPSON:  Objection.  Asked and

19   answered.

20        A.    I don't know how to compare to -- in a manner

21   that would be relevant to answering you.

22        Q.    (BY MS. HAYES)  Could Mr. Mestas have gotten

23   this item somewhere else for significantly less money, to

24   your knowledge?

25             MR. THOMPSON:  Objection as to form.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000562

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        82

1        A.    You know, I can't answer that question.  I know

2    we did business with Hose & Rubber.  We had an account

3    with Hose & Rubber.

4        Q.    (BY MS. HAYES)  And so, to get a purchase

5    authorization purchase order number, someone at the Town

6    would have had to provide that to Mr. Mestas.  Is that

7    correct?

8        A.    Correct.

9        Q.    I am handing you Evans 0308 to be marked as

10   Exhibit 9.  This is a purchase order to rotate tires on

11   Unit 123.

12                    (Exhibit No. 9 marked for

13                     identification.)

14       Q.    (BY MS. HAYES)  Do you recognize any of these

15   documents?

16       A.    Okay.  In a manner of specifics, do I recognize

17   these documents?  I recognize the documents as being Town

18   documents.  I recognize that I signed off on the purchase

19   authorization for a $20 tire rotation.

20       Q.    So is that your signature on page 2 under

21   "Department Official"?

22       A.    Yes, it is.

23       Q.    And on page 3, there are several columns on the

24   invoice from Casper Tire.  One of them is a column for a

25   PO number.  Does it appear to you that Mr. Mestas

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion             Exhibit E
                                                                                    000563

Mestas v. Town of Evansville                    17-CV-00017-NDF

83

1    obtained a PO number before going to Casper Tire?

2                  MR. THOMPSON:  Objection as to form.

3    Speculation.

4        A.    The policy would be to get the PO number before

5    going.  Whether he did or didn't, I can't tell you.

6        Q.    (BY MS. HAYES)  But there is a PO number on

7    this invoice?

8        A.    There's a purchase order number.

9        Q.    Was this a purchase that you had to go sign off

10   on later at the town hall?

11       A.    Yes.  That was the common practice, that we

12   have obtained the POs, get a number from either Janelle

13   or Peggy so we could go ahead and move forward and get

14   the truck fixed or whatever we were doing, whatever we

15   were doing.  And then at some point in time, either that

16   day or the next, Brian and I -- Brian or I would go to

17   the town hall on a regular basis.  We go in and find what

18   was in our box, as I stated earlier, and signed the

19   vouchers authorizing those purchases.

20       Q.    Was this an item that Mr. Mestas did not get

21   your approval, prior permission or authorization?

22       A.    I have no idea.  I have no idea.  The fact that

23   I signed the voucher doesn't mean he did or didn't get

24   the permission from me.  I still signed the voucher

25   because it's paying out of my budget.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000564

Mestas v. Town of Evansville                    17-CV-00017-NDF

84

1      Q.    I understand.  My question is, is this -- does

2   this help refresh your memory of an item that Mr. Mestas

3   would have procured without your prior authorization or

4   approval?

5                  MR. THOMPSON:  Objection as to form.  It's

6   been asked and answered.

7      A.    I don't know.  I don't remember.

8      Q.    (BY MS. HAYES)  So you have no idea if this was

9   something you didn't approve?

10                 MR. THOMPSON:  Objection as to form.

11  Asked and answered.

12     A.    I have no idea.

13     Q.    (BY MS. HAYES)  Is $20 an unusual amount at

14  Casper Tire to rotate tires, in your experience?

15     A.    $20 is -- first off, I don't recall exactly

16  which unit 123 is.  I just don't remember which unit it

17  is, which one of the trucks.  If it would have been the

18  sanitation truck, I'd say that we were underbilled.  If

19  it was one of the pickups, then I would say it's

20  probably, at that time, a normal fee of $5 per tire or

21  something.  I don't have enough information to give you a

22  good answer.

23     Q.    On page 3, would you please look at this

24  document invoice?  What is the description of the vehicle

25  that is having the tires rotated?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
000565

Mestas v. Town of Evansville                17-CV-00017-NDF

85

    1        A.    It says "Semi wheel switch, rotate front side

    2    to side, 2010 sanitation truck Unit 123."

    3        Q.    So $20 --

    4        A.    $5 a tire.

    5        Q.    And is it your testimony --

    6        A.    Or $10.  I'm sorry.  Go ahead.

    7        Q.    -- that $20 is underbilled to rotate tires on a

    8    sanitation truck?

    9        A.    Well, when it's only two, that would probably

   10    be appropriate, $10 each.  And I say "probably."  I'm not

   11    in the tire business.

   12             MS. HAYES:  I am handing the reporter

   13    0317, 0320, 0319 and 0318.

   14             (Exhibit No. 10 marked for

   15             identification.)

   16        Q.    (BY MS. HAYES)  Do you recognize any of those

   17    documents?

   18        A.    As far as specifically remembering this, no, I

   19    don't recall.  But I have signed off on the vouchers, so

   20    this would be a normal course of business.

   21        Q.    Was this $122.52 purchase with PO Number 42563,

   22    was that one of -- does that help refresh your memory of

   23    an item that Mr. Mestas procured without your permission

   24    or approval?

   25        A.    I can't recall one way or the other.  Again, as

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000566

Mestas v. Town of Evansville                    17-CV-00017-NDF

86

1    I said, in the situation, if -- the opportunity to get a

2    purchase order did exist by just directly contacting the

3    town hall.  As much as our policy was there, not

4    everybody in the Town always followed the policy.  This

5    policy, as I stated to you, was our public works policy,

6    that they come to us.  We're responsible for the budget.

7    Tell us what you need, why you need it.  And we would

8    then decide whether to authorize or maybe suggest

9    something different.  That was our policy in our

10   department.

11          If an employee simply went somewhere, bought

12   something or called the Town and said, "I need to get

13   filters for the sanitation truck.  Can you give me a PO?"

14   they may very easily have assumed they had the permission

15   to do it without Brian or I knowing.  I can't speak for

16   them.

17   Q.    So my question, Mr. Brown, does this refresh

18   your recollection of an item that Mr. Mestas procured

19   without your permission or approval?

20   A.    No.

21          MR. THOMPSON:  Objection.  Asked and

22   answered.

23          MS. HAYES:  Counsel, I am allowed under

24   the federal rules to exhaust his memory.

25          MR. THOMPSON:  And he's already told you

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000567

Mestas v. Town of Evansville                    17-CV-00017-NDF

87

1    at the beginning of this questioning --

2                    MS. HAYES:  Okay.

3                    MR. THOMPSON:  Let me finish, because you

4    had your say -- about this document that he said he

5    cannot recall.  And he's told you that about each of the

6    documents that you've presented to him.  So I have the

7    right to put my objection on the record.

8                    MS. HAYES:  And I have the right to

9    exhaust his memory.

10                   MR. THOMPSON:  And you've done that

11   ad nauseam.

12                   MS. HAYES:  And I'm going to continue to

13   do it until I feel like he's answering my question.

14                   MR. THOMPSON:  That's fine.

15   Q.    (BY MS. HAYES)  So, on page 2 of that document,

16   Mr. Brown, there appears to be a purchase order number

17   under the line for purchase order number, "Attention

18   Roy."  Do you see where I'm looking?

19   A.    Uh-huh.

20   Q.    And then on page 3 of that document, in the

21   same place, there is a purchase order number, "Attention

22   Roy."  Do you see where I'm looking?

23   A.    I do.

24   Q.    And then on page 4 of that document, there's a

25   purchase order.  Under the purchase order number entry,

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000568

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              88

1     it says "shop."  Do you see where I'm looking?

2          A.    Uh-huh.

3          Q.    And "Chris Winslow" under "Attention."

4          A.    Uh-huh.

5          Q.    Do you remember if Chris Winslow got your prior

6     permission or approval to purchase at NAPA Auto Parts

7     fuel line disconnect and something fuel filter?

8          A.    I don't remember.

9          Q.    But he didn't have a purchase order.  Is that

10    correct?

11               MR. THOMPSON:  Objection as to form.

12         Q.    (BY MS. HAYES)  Is there a purchase order

13    associated with this invoice from NAPA Auto Parts,

14    page 4, Evans 0318?

15         A.    I can't answer that question because I don't

16    know.  It's attached to this voucher.  But, as far as the

17    actual procedure at the town hall, I realize that it says

18    "shop."  And it doesn't say Roy.  It says Chris.  But it

19    is attached to this same voucher.  So they could have

20    assigned that purchase order at the town hall to this

21    voucher and this PO.  I have no control over that.

22         Q.    I understand.  Mr. Winslow may have gone to

23    NAPA Auto Parts prior to obtaining a purchase order.  Is

24    that a possibility?

25         A.    Okay.  Possible, yes.  Likely, no.  Probably

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000569

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        89

1    said, "Hey, I need to get these things."  And town hall

2    already had an open purchase order for NAPA and said,

3    "We'll just put it on that purchase order.  We already

4    have an open one that we haven't completed."

5       Q.    Do you recall if you approved or gave

6    Mr. Winslow permission?

7       A.    I don't recall.

8             MR. THOMPSON:  Objection as to form.

9    Asked and answered.

10      Q.    (BY MS. HAYES)  Was NAPA Auto Parts a place

11   that the Town of Evansville had an account with that was

12   paid on a monthly basis?

13      A.    To my knowledge.  I don't know when they paid

14   the bills, but we had an account there.

15            MS. HAYES:  I am handing the court

16   reporter an invoice from Hose & Rubber.  These are

17   Evans 0314 and 0315.

18                 (Exhibit No. 11 marked for

19                  identification.)

20      Q.    (BY MS. HAYES)  Do you recognize any of those

21   documents?

22      A.    As far as I can recall and remember

23   specifically, no.

24      Q.    This appears to be an invoice from Hose &

25   Rubber Supply.  Is that a vendor with -- that the Town of

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

90

1   Evansville had an account with?

2       A.    It is.  Or, it was.  I don't know about now.

3       Q.    What are the items that -- this appears to be,

4   at least according to Mr. Mestas, items that he procured

5   in November of 2012 for the Town.  Was this a purchase

6   that you had not authorized or approved?

7       A.    I have no idea.

8       Q.    Why don't you have any idea?

9       A.    I don't remember.

10      Q.    You don't remember not --

11      A.    I don't remember whether I did or did not

12  approve this.  There's not even a voucher attached to

13  this with mine or Brian's signature on it.

14      Q.    I understand.  These are the documents that I

15  was given by the Town.  Do you think there might be a

16  voucher missing?

17              MR. THOMPSON:  Objection as to form.

18  Speculation.

19      A.    I have no idea.  There's no voucher.  That's

20  all I know.  With no voucher, there's no signature on the

21  voucher.  Well, there might be a signature if they have a

22  voucher, but I don't have it.

23      Q.    (BY MS. HAYES)  So these were for items -- a

24  spring guard and a MegaCrimp assembly.

25      A.    Uh-huh.

Mestas v. Town of Evansville                    17-CV-00017-NDF

91

1    Q.    That was something that would be needed at the

2    Town of Evansville?

3              MR. THOMPSON:  Objection as to form.

4    A.    The MegaClamp assembly, I would personally say

5    it was essential.  The spring guards, I don't recall

6    exactly what those are.  I have an idea, but I'm not

7    wanting to speculate.

8              MS. HAYES:  I'm handing the court reporter

9    an invoice from Grainger.

10                  (Exhibit No. 12 marked for

11                   identification.)

12   Q.    (BY MS. HAYES)  Was Grainger a vendor I think

13   you mentioned that the Town had an account to do business

14   with?

15   A.    I don't recall.

16   Q.    Did you ever get anything at Grainger, any

17   supplies for the Town of Evansville?

18   A.    We used Grainger from time to time.  But,

19   whether we had an open account, again, those are

20   assumptions on my part that we had open accounts.  We

21   didn't carry cash.  There were very few times that we

22   would actually -- we might not even have an account, but

23   we would call a vendor and say, "Will you take our

24   purchase order?"  Sometimes even out of state.  We're a

25   municipality.  And they would say yes.  And we would give

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000572

Mestas v. Town of Evansville                17-CV-00017-NDF

92

1    them that information, and then they would conduct

2    business with us and get paid on a net 30 or whatever it

3    is that we did.  As far as having open accounts

4    everywhere, no.  We did have some.  But we did a lot of

5    business, many vendors, without having open accounts just

6    through the use of a purchase order.

7        Q.    Is there a purchase order number on this

8    invoice?

9        A.    There is.

10       Q.    And who's the caller?

11       A.    Roy Mestas.

12       Q.    Does this refresh your recollection of an item

13   that Mr. Mestas procured without your permission or

14   approval?

15       A.    No.

16       Q.    Why not?

17       A.    I have no idea why not.  I don't remember.

18       Q.    So my question was, was this something he

19   procured?  And you said no.  Is that --

20            MR. THOMPSON:  You asked him whether or

21   not it refreshed his recollection.

22       A.    Did not refresh my recollection.

23       Q.    (BY MS. HAYES)  Didn't refresh your

24   recollection.  So you don't know whether this was an item

25   that Mr. Mestas procured without your prior permission or

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000573

Mestas v. Town of Evansville                    17-CV-00017-NDF

93

1    approval?

2        A.    Correct.  I do not know.

3        Q.    Was this, in your experience, an expensive item

4    for a Town employee to procure?

5        A.    I have no way of knowing how to answer that.

6        Q.    So Mr. Boettcher testified that certain items

7    would trip.  You'd have to make sure you had money in the

8    budget to cover like expensive $1,000 or $2,000 items.

9        A.    Uh-huh.

10       Q.    Was this something that would have caught your

11   attention as something that needed to be preapproved as

12   an expensive item for a Town employee to purchase?

13       A.    The dollar amount was irrelevant.  All items

14   had to be preapproved.

15       Q.    Right.  And this indicates that Mr. Mestas did

16   obtain a purchase order number from someone at the Town.

17   Is that correct?

18       A.    It indicates he obtained a purchase order

19   number, yes.

20                    (Exhibit No. 13 marked for

21                     identification.)

22       Q.    (BY MS. HAYES)  I am handing you a series of

23   pages.  The first one is a purchase order.  These are

24   Evans 0279, 80, 0285, 0290, 0292.  Do you recognize any

25   of those documents?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000574

Mestas v. Town of Evansville                17-CV-00017-NDF

94

1       A.    As far as specific items, I don't recall.

2       Q.    Do you recall if any of these items were items

3    that you did not authorize Mr. Mestas to -- that you did

4    not approve or give permission for Mr. Mestas to procure?

5       A.    I don't recall.  I did sign a voucher for drill

6    bits.

7       Q.    And when would you sign that voucher?  Before

8    or after they made the purchase?

9       A.    After.

10      Q.    And, on page 0285, it indicates an invoice with

11   Purchase Number 43042.  Do you see that, where I'm

12   looking, Mr. Brown?  Page 0285.

13      A.    43 what?

14      Q.    042.

15      A.    042.  That's the one I've got.

16      Q.    And this is a receipt -- or, a guest copy of an

17   invoice from Menards in Casper.  Is that correct?

18      A.    That's what it indicates.

19      Q.    Was Menards a more expensive place to procure

20   supplies?

21      A.    No, not that I recall.

22      Q.    Was Menards someplace that Town employees would

23   go regularly to purchase supplies?

24      A.    Yes.

25      Q.    And is that drill bit, 14.97, expensive for a

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000575

Mestas v. Town of Evansville                    17-CV-00017-NDF

1   drill bit?

2       A.    For a single drill bit for a nine-sixteenths?

3   You know, there are several different qualities of bits

4   that can be purchased from wherever.  So, whether this is

5   a particularly expensive one or not expensive, I can't

6   speak to that.  If I had a specific job that required a

7   specific type of bit, then I would pay whatever the price

8   was.  However, if I am doing just general stuff, then I

9   would buy a general-use bit, which would be less.  How

10  much it was, I don't know.

11      Q.    Was this the drill bit that you mentioned in

12  your interview that you felt was too expensive, that you

13  would -- you did not preapprove or authorize before you

14  purchased it?  Is that the drill bit we're talking about?

15              MR. THOMPSON:  Objection as to form.

16      A.    I have no idea if that's the drill bit or not.

17      Q.    (BY MS. HAYES)  Would there be other receipts

18  for other drill bits more expensive than this that you

19  didn't preapprove or authorize?

20              MR. THOMPSON:  Objection as to form.

21      A.    I'm looking at these receipts because I want to

22  try to answer you properly.

23              MR. THOMPSON:  Those aren't all the

24  receipts.

25      A.    Been too long.  I don't recall specifically.

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                              96

1     This particular one where you're showing -- okay.  This

2     drill bit on PO 43042, I don't know where that comes

3     from.  They've attached several purchase order numbers to

4     this voucher, it appears to me.  It's not a match.  If

5     you look at this, you've got a purchase order number here

6     on this last page of 43058.  There's no voucher signed

7     for that.  We've got a purchase order number --

8          Q.    (BY MS. HAYES)  I'm sorry.  Which page?

9          A.    The last page.

10         Q.    The last page?

11         A.    The very last page.  It's Menards.

12         Q.    092 -- 292?

13               MR. THOMPSON:  Yes.

14         Q.    (BY MS. HAYES)  There's no purchase order for

15    that?

16         A.    No.  If you look here, this purchase order is

17    43058.

18         Q.    Yes.

19         A.    That is a different purchase order than the one

20    we just discussed, which is 43042.

21         Q.    And your point is?

22         A.    There's no voucher for that.

23         Q.    I see.  So would this be an item that you did

24    not approve Mr. Mestas to --

25         A.    I have no idea.  I don't think Mr. Mestas

                    Wyoming Reporting Service, Inc.
                           1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF
                                                                97

1    bought that.  And there's another one here, a Purchase

2    Order 03262013.  That doesn't even match our numbering

3    scheme.

4        Q.    What do those numbers appear to be to you?

5        A.    What do these appear to be to me?

6        Q.    03262013.  What's the transaction date on the

7    invoice?

8        A.    That purchase order number looks to me as the

9    date.  This also appears to me that Dan Adcock signed

10   this one.

11       Q.    So could employees go to Menards without a

12   purchase order and procure supplies?

13       A.    Again, not without -- no.  They weren't

14   supposed to.

15       Q.    So this would be a violation of Town policy to

16   procure an item --

17       A.    It would be a violation of public works policy.

18       Q.    But, in any of the receipts I've shown you so

19   far that Mr. Mestas believes he procured, do any of those

20   not have a purchase order number?  If you want to take a

21   moment and look back through those.  Just tell me which

22   ones do not have a purchase order number.

23                    (Pause in proceedings.)

24       A.    Unless I'm missing it, I don't find a PO on

25   this one.  If I missed it, I apologize.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                    000578

Mestas v. Town of Evansville                  17-CV-00017-NDF

                                                          98


 1      Q.    (BY MS. HAYES)  This one is Evans O314 and

 2   0315.  No purchase order.

 3                MR. THOMPSON:  Which exhibit number is it?

 4      A.    And I may have missed it.

 5      Q.    (BY MS. HAYES)  Okay.  One more, Mr. Brown.

 6                MS. HAYES:  I am handing the court

 7   reporter Evans 0284, 0287, 0288 and 0286.

 8                     (Exhibit No. 14 marked for

 9                      identification.)

10      Q.    (BY MS. HAYES)  Do you recognize any of these

11   documents?

12      A.    As far as specifics, no.

13      Q.    What are these -- I'm sorry.  On page 0287, if

14   you turn the document sideways, is that your signature on

15   the charge-of-sale document?

16      A.    Which one am I looking at?

17      Q.    0287.  If you'd turn it sideways.  There's a

18   signature.

19      A.    There's a second page?

20      Q.    Right here.  Is that your signature?

21      A.    That's not my signature.

22      Q.    Whose signature is that?  Do you recognize it?

23      A.    I don't have any idea.

24      Q.    Do you recognize who signed for this?

25      A.    It appears to be in hieroglyphics.  No.


                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              99

1    Seriously, appears to be Dan Adcock on the first two.  I

2    can't tell about that one.  It might be Ron Emond.  And

3    it looks like Travis Scharosch on it, it appears.  I

4    can't tell who signed the signatures.

5         Q.    Sure.  Do any of these documents have purchase

6    order numbers issued by the Town?

7         A.    There's no orders there -- no purchase orders

8    there match the Town's numbering system at that time.

9         Q.    What are given for purchase order numbers on

10   each of these documents?

11        A.    I see dates on two of them that have -- and a

12   charge -- a shop purchase order and Travis purchase

13   order.

14        Q.    And were these items procured without your

15   prior permission or approval?

16        A.    I don't know.  I don't recall.

17        Q.    Am I correct in saying, then, it was a

18   violation of the public works department policy to

19   procure items without first obtaining a purchase order

20   from the Town?

21        A.    Yeah.  I would say that.

22        Q.    So we can take a short break.  But I will hand

23   to you -- these are all of the receipts and invoices that

24   were represented to me as all purchase orders, receipts

25   and invoices for the Town of Evansville sanitation

Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit E
                                                                                 000580

Mestas v. Town of Evansville                    17-CV-00017-NDF

100

1    department for the time period September 2012 to December

2    2013, minus two receipts that are apparently missing from

3    the stack.  And we can take a short break.  And you can

4    go through these and just pull from there any receipts

5    that reflect purchases by Mr. Mestas that were made

6    without your permission or approval.

7                    (Deposition proceedings recessed

8                     1:50 p.m. to 2:08 p.m.)

9        Q.    (BY MS. HAYES)  You're still under oath.  Did

10   you have an opportunity to go through the receipts that

11   the Town had produced?

12       A.    I did.

13       Q.    Did you find any that were purchases that

14   Mr. Mestas made without your prior authorization or

15   approval?

16       A.    Unable to determine that from this.

17       Q.    And why is that?

18       A.    Not enough information.

19       Q.    What more information would you need?

20       A.    I don't know if I can determine that from even

21   with additional, but there's not enough here at this

22   point.

23       Q.    Who would you ask to try to get more

24   information about purchases that Mr. Mestas made without

25   your authorization or approval?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
                                                                         000581

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                            101

1       A.    Well, the thing about this is it's a hodgepodge

2   of things from just receipts to vouchers to invoices.   It

3   doesn't match, go together or necessarily become cohesive

4   for me to look at in that respect.  I mean, here's a PO

5   for nuts, bolts and so on.  I have no idea who actually

6   bought them, and I have no idea who signed this.

7       Q.    I understand.

8       A.    I cannot determine.

9       Q.    Those are the documents that were produced by

10  the Town?

11      A.    From these documents, I cannot make a

12  determination of any specific thing that I can tell.

13      Q.    And no specific thing can you tell in there

14  that has your signature that you would indicate that you

15  had to go later and sign off on something that Mr. Mestas

16  had bought without your prior approval or authorization?

17      A.    Not in these documents.

18      Q.    So there are no documents that you saw that

19  indicate your signature, that have your signature for a

20  time when you went to town hall after the fact to sign

21  off on something that Mr. Mestas had procured?

22            MR. THOMPSON:  Objection as to form.

23  Misstates his testimony.  Go ahead.

24      A.    Not with my signature.

25      Q.    (BY MS. HAYES)  But you did tell the

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                  17-CV-00017-NDF

102

```
 1   interviewer that there were times when you would have to

 2   go later and sign off on something?  I will direct you

 3   back to that page.  So, on page 12, line 21 and -- line

 4   21 and 22 -- actually, line 21 to the bottom of the page,

 5   you indicated various times when you would have to go up

 6   and sign off on this stuff at the town hall when it's

 7   purchased.

 8               MR. THOMPSON:  What's the question?

 9        A.    And I'm reading this.

10        Q.    (BY MS. HAYES)  So is it your testimony that,

11   in these documents that you would have signed off on, as

12   you explained to the interviewer, none of them were for

13   items that Mr. Mestas purchased without your prior

14   authorization or approval?

15        A.    Not that I could determine with these

16   documents.

17        Q.    What would you need to help you determine if

18   any of these -- any of these documents that contain your

19   signature were for items that Mr. Mestas purchased

20   without your authorization or approval?

21               MR. THOMPSON:  Objection as to form.  Go

22   ahead.

23        A.    At this date, I can't tell you what I would

24   need, because at this point, I don't know.

25               Back to our policy.  If I got a call, I would
```

Mestas v. Town of Evansville                17-CV-00017-NDF

103

1    go up to the town hall or Brian would go to the town

2    hall.  There would be vouchers in our box.  If there are

3    vouchers in there that we were unaware of, we would have

4    to question them.  And there would be from time to time.

5    It might be for utility bills.  We didn't ask for a

6    purchase order for that.  The Town handled that.  But,

7    because it's our department, we still have to sign a

8    voucher because it's out of our budget.

9            But now that the time has passed and I've

10   already signed that document, do I recall specifically

11   the document, or do I recall the incident?  I remember

12   the incident but not the specific purchase or document

13   any longer.

14       Q.    (BY MS. HAYES)  What do you recall about the

15   specific incident?

16       A.    I recall having to sign vouchers for things I

17   was not aware of that had been purchased.

18       Q.    By Mr. Mestas?

19       A.    By Mr. Mestas.

20       Q.    And when was that?

21       A.    After he returned to work from his injury.

22       Q.    Would you have spoken to the town clerk that,

23   "I'm having to sign off on purchases made by Mr. Mestas"?

24   Would you have mentioned that to anybody when you went in

25   to sign off on things?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000584

Mestas v. Town of Evansville                17-CV-00017-NDF

104

1      A.    I may or may not.

2      Q.    So, while we were on a break, Mr. Thompson

3   obtained from the town clerk four items in this matrix

4   that did not have receipts that the Town purchased.

5            MR. THOMPSON:  Invoices, receipts or

6   purchase orders.

7      Q.    (BY MS. HAYES)  That they couldn't find any

8   documentation, although they're in there as sort of an

9   accounting spreadsheet.  One of these is from petty cash,

10  $17 on August 23rd, 2013.  Was Mr. Mestas working for the

11  Town at that time?

12     A.    What's that date?

13     Q.    August 23rd, 2013.  When did you fire

14  Mr. Mestas?

15     A.    About the middle of April, I believe.

16     Q.    So was he working for the Town in August?

17     A.    In August?  No.

18     Q.    Another item looks like February 22nd, 2013,

19  petty cash, 7.99 for garbage bags.  You wouldn't have to

20  sign off on custodial supplies, would you, for petty

21  cash?

22     A.    Possibly.  We use garbage bags down at the

23  shop.  We have it as a line-item budget.

24     Q.    Is 7.99 an expensive item?  Is it an expensive

25  amount to pay for garbage bags, in your experience?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion
Exhibit E
000585

Mestas v. Town of Evansville                    17-CV-00017-NDF

105

1      A.    I wouldn't even bother thinking about it, no.

2      Q.    Do you know if this was an item that Mr. Mestas

3   purchased?

4      A.    Unable to tell.

5      Q.    There is another item, October 24th, 2012,

6   Ameri-Tech Equipment, 61.54, springs for sanitation

7   truck.  Is that an item you remember Mr. -- if Mr. Mestas

8   procured without your prior authorization or approval?

9      A.    As a matter of specifics, I don't remember.

10     Q.    Is 61.54, in your experience, expensive from

11  Ameri-Tech Equipment, Incorporated, for sanitation truck

12  springs?

13     A.    I have no idea.  Inasmuch as I don't know what

14  springs they are, I have no idea.

15     Q.    I understand.  On October -- do you recall if

16  that item was purchased by Mr. Mestas?

17     A.    I don't recall.

18     Q.    Then on October 26th, 2012, there is an entry

19  for Ameri-Tech Equipment Corp., $123 for rubber grabbers

20  for sanitation truck.  Is that an item that Mr. Mestas

21  procured without your prior authorization or approval?

22     A.    Specifically, I don't recall.  But I could tell

23  you that would have been approved.  And that's the only

24  location we could have gotten them, or we'd have had to

25  send out to Texas.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000586

Mestas v. Town of Evansville                 17-CV-00017-NDF

                                                    106

1      Q.    And you don't know even if this is an item that

2   Mr. Mestas procured?  There's no documentation?

3      A.    It's an item -- I want to say likely because

4   he's a truck operator, and it's on the truck.  And he

5   would know if he needed it.

6      Q.    And it's your testimony that you would have

7   approved a purchase like that, rubber grabbers?

8      A.    Yeah, I would have if I'd have been given the

9   opportunity.

10     Q.    Do you think he procured it without giving you

11  the opportunity?

12     A.    I don't know.  I don't know that.

13     Q.    In that same paragraph about Mr. Mestas

14  procuring items without your prior authorization or

15  approval, you mentioned -- and I know we talked about

16  this earlier -- that sometimes Mr. Mestas would just

17  disappear and nobody would know where he went.  Did you

18  ever try to call Mr. Mestas on a Town radio to find out

19  where he was?

20     A.    Mr. Mestas was not issued a Town radio.

21     Q.    How about on his personal cell phone?

22     A.    We probably would have tried to call him on

23  that if we couldn't locate him.

24     Q.    Did you ever try to locate him by calling his

25  phone?

Mestas v. Town of Evansville                    17-CV-00017-NDF

107

```
 1        A.    I don't recall if we did or not.  But the

 2   reason we would have called him, whether it was Brian or

 3   myself, is he's out by himself, generally working by

 4   himself, and if we can't locate him, it might be a reason

 5   to find out if something's gone wrong.

 6        Q.    So is it your testimony that you would call him

 7   on his personal cell phone when you couldn't find him

 8   when he would just disappear?

 9        A.    If I couldn't find him and he just disappeared,

10   I would try to call him.

11        Q.    But you didn't mention that to the interviewer,

12   did you?

13        A.    Well, if it's not in the transcript, I suppose

14   I didn't.

15        Q.    But you did mention that you would ask other

16   employees?

17        A.    I think that would be a good starting point,

18   "Does anybody know where Roy is at?" if you're looking

19   for someone.  "Have you seen him?  What's up?  Does

20   anybody know?" before you start going through steps to

21   locate somebody.

22        Q.    And if you called him on his personal cell

23   phone, would he answer your phone call, typically?

24             MR. THOMPSON:   Objection as to form.

25   Foundation.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000588

Mestas v. Town of Evansville                17-CV-00017-NDF

108

1      Q.    (BY MS. HAYES)  Did you ever call Mr. Mestas on

2    his cell phone?

3      A.    You know, I truly believe that Brian or I did

4    and didn't get answers sometimes.  Sometimes he answered.

5      Q.    How would you communicate with him during the

6    day if you needed to get in touch with him?

7      A.    In his routes.  We could find him.

8      Q.    So you would drive around and look for him?

9      A.    Sure.  Why not?

10     Q.    Would you call him on his cell phone?

11     A.    If it were an emergency.  Let's say, for

12   example --

13     Q.    I'm just asking you --

14               MR. THOMPSON:  Can he answer the question?

15               MS. HAYES:  No.

16               MR. THOMPSON:  Yes, he can.

17               MS. HAYES:  He's not answering my

18   question.  It's a yes-or-no question, Tom.

19               MR. THOMPSON:  No.  That's not the way

20   depositions work, and you know that.  You've got to give

21   the witness --

22               MS. HAYES:  You don't have to lecture me,

23   Tom.

24               MR. THOMPSON:  Okay.  Well, you need to

25   give the witness the opportunity to answer.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion
Exhibit E
000589

Mestas v. Town of Evansville                    17-CV-00017-NDF

109

 1            MS. HAYES:  I've given Mr. Brown a lot of

 2    opportunities to answer.

 3            MR. THOMPSON:  You need to give the

 4    witness the opportunity to answer your questions.

 5        Q.    (BY MS. HAYES)  Go ahead, Mr. Brown.

 6        A.    There would be times where calling him on the

 7    phone would be the most expeditious and appropriate way

 8    to communicate.

 9        Q.    When you would call him when you couldn't

10    ascertain his whereabouts, how would he respond to you?

11    What would he tell you?

12            MR. THOMPSON:  Objection as to form.

13    Foundation.

14        Q.    (BY MS. HAYES)  Would you call him on his cell

15    phone when you couldn't find him during the day?

16        A.    If I couldn't find him by driving around,

17    again, if there was an emergency situation, say a family

18    issue, most important thing is try to call him, let the

19    man know he's got an issue.  "We need to get somebody to

20    cover your route.  You need to go home," whatever.  If

21    it's just a routine thing where we want to know where he

22    was or what's going on, "Haven't heard from you for a

23    while," we might ask the crew, "Have you seen Roy?

24    Anybody know where he's at?"

25        Q.    And who would you ask?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000590

Mestas v. Town of Evansville                    17-CV-00017-NDF

110

1      A.    Anybody.  Anybody I saw.

2      Q.    Can you give me some names?

3      A.    You've got all their depositions.  Dan, Roy --

4   I mean, Ron, Eric and any of the other employees.  "Have

5   you seen Roy?"

6      Q.    So Ron Emond, Eric Reyna and Dan Adcock all

7   testified yesterday that you never asked them where Roy

8   was during the workday.

9            MR. THOMPSON:  Objection as to form.

10  Misstates their testimony.

11     A.    I can't speak to what they testified to.

12     Q.    (BY MS. HAYES)  I understand.  Did you ask

13  other employees?  Give me some names of other employees

14  you would have asked about Mr. Mestas' whereabouts.

15     A.    I might have asked Travish Scharosch.  Oh,

16  gosh, I wish I could remember his name.  I remember his

17  nickname.  I'd have to do some research to give you some

18  other names.

19     Q.    How would you do that research?

20     A.    I'd just ask Janelle about personnel that were

21  on staff at the time, just get some names from her.

22     Q.    If perhaps this goes to trial --

23     A.    We can provide that.

24     Q.    So you mentioned you might call Mr. Mestas on

25  his cell phone for an emergency.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000591

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            111

1      A.    Uh-huh.

2      Q.    In these times when you would just look around

3    and say, "Where did Roy go?" and nobody knows because he

4    didn't tell anybody, and he'd just disappear, would you

5    call Mr. Mestas on his cell phone in these situations?

6    Did you call Mr. Mestas?

7      A.    I don't recall whether I did or not.

8      Q.    Would that have been something you would have

9    thought to do?

10           MR. THOMPSON:   Object to the form.

11     A.    Depending on the situation.

12     Q.    (BY MS. HAYES)  Well, this situation when he

13   would just disappear.

14     A.    Again, depending on the situation.  If he was

15   overdue by an extended period of time at a certain point

16   where we know he should be in or if we would get a call

17   from a customer saying, "Our garbage hasn't been picked

18   up yet," that would be a time to find out, okay, where is

19   Roy?  "What's going on?  Do you need help?  What happened

20   here?"  Then I would try to call him.

21           On the other hand, if it was just, okay, well,

22   he's probably out doing his thing, getting his job done,

23   could be out at the landfill.  Nobody knew he went to the

24   landfill.  I expect people to be independent and

25   motivated enough to just go out and do their job.  That's

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                              112

1    my expectation of an employee.  So, if he's out doing his

2    job and I can't get ahold of him, if I'm comfortable with

3    that person, I'm assuming they're just out doing their

4    job.  I'm not going to worry about it too much.

5         Q.    So, when you called Mr. Mestas on his cell

6    phone, would you call from -- what phone would you use to

7    call him?

8         A.    Either use my Town phone or my personal phone.

9         Q.    And so your cell phone -- presumably,

10   Mr. Mestas' cell phone records would indicate when you

11   had called him either on the Town phone or on your

12   personal cell phone?

13              MR. THOMPSON:  Objection as to form.

14        A.    Yeah.  I don't know what his records show.

15        Q.    (BY MS. HAYES)  What is your personal cell

16   phone number?

17        A.    (307) 267-3035.

18        Q.    How about the Town's phone number that you

19   would have used?

20        A.    I don't remember that number.

21        Q.    Were all public works employees required to

22   report to work early on snow days?

23        A.    They were.

24        Q.    And for what purpose?

25        A.    Snow removal.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
                                                                               000593

Mestas v. Town of Evansville                    17-CV-00017-NDF

113

1    Q.    And by hand?

2    A.    By what?

3    Q.    I'm sorry.  Out with their fingers.

4          Did they remove snow with shovels by hand?

5    A.    They did.

6    Q.    Were any public works employees excused from

7    shoveling?

8    A.    Not to my knowledge.

9    Q.    Did Brian Boettcher shovel snow?

10   A.    He did.

11   Q.    Every snow day?

12   A.    I don't recall.

13   Q.    You mean he may have shoveled every day and you

14   don't remember, or you don't think he shoveled every day?

15         MR. THOMPSON:  Objection as to the form of

16   the question.

17   A.    Brian Boettcher shoveled snow on snow days.

18   Did he do it every time?  I don't remember.

19   Q.    (BY MS. HAYES)  Did you shovel snow?

20   A.    I did.  Not often.

21   Q.    Why didn't you shovel snow?

22   A.    I was responsible for streets and alleys as

23   part of my responsible area.  And if we were shoveling

24   snow at the town hall, we were likely plowing snow on the

25   town streets and on the highway.  That was our

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000594

Mestas v. Town of Evansville                    17-CV-00017-NDF

114

1    responsibility.  I would ensure that -- I would make sure

2    that the school was plowed out so the school buses could

3    get into the school.  Make sure Lathrop Hill -- I don't

4    know if you know that area.  Doesn't matter.  It's a

5    hill, treacherous.  Make sure it was getting plowed.

6    Make sure the highway was being attended to.

7         Q.    The highway?

8         A.    Yeah.  The Old Glenrock Highway.  We had that

9    from Western Street to Hat Six.  That was part of our

10   snow-removal responsibility.  We were under -- not under

11   contract.  State of Wyoming paid the Town of Evansville

12   $50,000 a year to do snow removal within the town limits

13   that the highway was on.

14        Q.    So is it your testimony that you drove a

15   snowplow for the Town on snow days?

16        A.    I did on occasion, yes.

17        Q.    How many times?

18        A.    I don't know.  I was there for six years.

19        Q.    Regularly on snow days?

20        A.    I regularly drove, yeah.

21        Q.    Were there other employees that drove a

22   snowplow for the Town besides you?

23        A.    Oh, yes.  We had two plows.  Everybody got to

24   drive that reached that level of employment.  When I say

25   that, I mean -- and since we're talking a lot about Roy,

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000595

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              115

1    he hadn't completed that part where we had taken him out

2    and gone through the snow-removal procedures with those

3    trucks.  We haven't got there yet.  That's the only

4    reason.  We had not made that transition.

5         Q.   So what other public works employees drove a

6    snowplow?

7         A.   Oh, well, let's see.  All of them.

8         Q.   Dan Adcock?

9         A.   Dan drove.  Ron drove.  Eric drove.  I wish I

10   could remember that guy's name.  Everybody that had CDLs,

11   with the exception of newer people, were available for

12   callout for snow removal.  And after a reasonable period

13   of time out, if we start early, we would call for relief

14   and bring two other guys in if there was a steady,

15   ongoing snowstorm.  Everybody got the opportunity to

16   plow.

17        Q.   Did somebody named Wilbur Yankey work in the

18   public works department for you?

19        A.   He certainly did.

20        Q.   Did Mr. Yankey shovel snow?

21        A.   Mr. Yankey -- yeah, he shoveled snow.  But he

22   really just stopped at the town hall on his way to work

23   because he lived just the other side.  And he would start

24   doing some shoveling.  It was pretty limited due to his

25   age.  More likely, you'd see him out there spreading ice

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
                                                                                     000596

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              116

 1    melt.

 2         Q.    Did he have a note from his doctor that excused

 3    him from shoveling snow?

 4         A.    No.  He shoveled, like I said.

 5         Q.    Every day?

 6         A.    Every time he was -- yeah, unless he was on

 7    vacation.

 8         Q.    What do you mean, his shoveling was limited?

 9         A.    Well, he would be shoveling until the other

10    guys showed up.  When they showed up, then he would go

11    get the ice melt.  There's a multitude of different tasks

12    that we do from shoveling to sometimes we could use a

13    snowblower -- or, not a snowblower -- a leaf blower if

14    it's fine and powdery.  Sometimes we used the John Deere

15    tractor with the snow blade on it.  Not everything is

16    just dyed in the wool.  Circumstance dictates what

17    procedures we would use on a given time, heavy wet snow,

18    light powdery snow, snowblower, shovels, brooms.

19         Q.    Can you refer, please, to page 21 of your

20    interview with the State of Wyoming investigator?  This

21    is apparently a conversation about the Town snow removal.

22    And you're asked, referring to line 16, by a female

23    speaker, not me, "Dale, April 17th, 2013, do you recall

24    Roy calling in requesting not to shovel snow that day?"

25    And would you please read your response from lines 19 to

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion
Exhibit E
000597

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                        117

1    24?

2        A.    Okay.  At the time of this I said "I -- I don't

3    recall it.  Brian seems to recall it.  But had he called

4    in, I would have told him probably he needs to be here

5    unless he's got an excuse from a doctor.  If the rest of

6    the crew needs to be here, everybody needs to be here."

7        Q.    And did Wilbur Yankey have an excuse from his

8    doctor to do limited shoveling?

9        A.    No.

10                MS. HAYES:  Would you please mark this as

11   Exhibit 15?

12                    (Exhibit No. 15 marked for

13                     identification.)

14       Q.    (BY MS. HAYES)  This is a transcript of audio

15   recording labeled A_A0000058.  And this is -- this,

16   Mr. Brown, is a recording that Mr. Mestas made of a

17   conversation he had with you on Thursday, April 11th.  Do

18   you remember having a conversation with him on April

19   11th?

20       A.    Again, not specifically, no.

21       Q.    I'm going to just play the beginning of this,

22   and you tell me if you recognize your voice.

23                    (Audio recording playing.)

24       Q.    (BY MS. HAYES)  Do you recognize your voice?

25       A.    Not yet.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000598

Mestas v. Town of Evansville                    17-CV-00017-NDF

118

1     Q.     Keep going?  Do you know who that is?  Do you

2   recognize, not Mr. Mestas laughing, but the other voice?

3   That's not you?

4     A.     I don't know.

5     Q.     You don't know who it is?

6     A.     Not yet.

7                    (Audio recording playing.)

8     Q.     (BY MS. HAYES)  Is that your voice, Mr. Brown?

9     A.     I think it is.

10     Q.     Keep going?

11                    (Audio recording playing.)

12     Q.     (BY MS. HAYES)  Is that your voice?

13     A.     Uh-huh.

14     Q.     This is now on page 3.  This interview was

15   transcribed by a court reporter.  You said -- I'm looking

16   at lines 10 and 11.  "I don't want reasons why not."  And

17   Mr. Mestas says "Okay."  And you respond "All I want is

18   reason how I'm going to get her done."  Mr. Mestas says

19   "Okay."  Was Mr. Mestas being argumentative with you in

20   this conversation?

21     A.     I don't take that as an argument.

22     Q.     Did he appear to be giving you excuses for not

23   doing something you asked him to do?

24     A.     Yes.

25     Q.     And what were those?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000599

Mestas v. Town of Evansville                    17-CV-00017-NDF

119

1        A.    He couldn't do it because it was too cold.

2        Q.    But you told him -- he indicates in this

3    conversation "I'm going to have to warm that thing up."

4    "I don't know if it's going to be warm enough.  I'm going

5    to have to warm that thing up."  And you tell him you

6    don't want reasons why not, and he says okay.  Is there

7    somewhere in this transcript where he says he's not going

8    to do that?

9        A.    No.

10       Q.    And at the bottom of the page, he says "I can

11   do that."  Do you see where I'm looking on line 24?

12       A.    Uh-huh.

13       Q.    Was this being argumentative with you?

14       A.    I don't see an argument there.

15       Q.    So this is not an example of when he would come

16   in and lean against the door and argue with you?

17       A.    No.  If we look at -- going back to the top

18   here -- I forget what line -- but I wanted him to get the

19   truck cleaned out.  And he said, "It's too cold.  I'm

20   going to have to warm it up."  And I said, "I don't want

21   to hear why you can't get her done.  I just want to get

22   her done."  He said, "Okay.  I'll have to bring it in."

23   I said, "Okay.  Bring it in, warm it up."

24       Q.    And he agreed to do that?

25       A.    He agreed.  I don't see an argument there.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000600

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          120

1       Q.    So, on page 5, I'm just going to play this part

2    of the . . .

3                      (Audio playing.)

4       Q.    (BY MS. HAYES)  So Mr. Mestas tells you in this

5    conversation, "Do you remember what I was talking to you

6    about a while back?"  What's he referring to there?

7       A.    I have no idea.  Too long ago.

8       Q.    You have no recollection of him talking to you

9    about anything to do with his back after he returned from

10   his injury leave in mid January?

11      A.    No, I do not recall that.

12      Q.    Could it have happened and you just don't

13   recall?

14                    MR. THOMPSON:  Objection as to form.

15      A.    I said I don't recall that.

16      Q.    (BY MS. HAYES)  My question is could it have

17   happened and you just don't recall?

18                    MR. THOMPSON:  Objection as to form.

19   Calls for speculation.

20      A.    I don't recall having that conversation.

21      Q.    (BY MS. HAYES)  When did Mr. Mestas call into

22   work after this conversation and -- did Mr. Mestas call

23   into work after this conversation and ask to be excused

24   from shoveling snow?

25      A.    Again, I don't recall that.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000601

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                        121

1     Q.    You didn't take a call from him?

2     A.    I don't remember taking a call from him.

3     Q.    Would Mr. Mestas typically call you or

4  Mr. Boettcher about coming into work if he was going to

5  be excused or issues relating to work?

6           MR. THOMPSON:  Objection.  Foundation.

7     A.    Typically, he would call me.  That would be --

8  typically, he would call me.

9     Q.    (BY MS. HAYES)  But you don't recall -- do you

10 recall a conversation when he asked you your permission

11 to use his snowblower to shovel snow?

12    A.    Yes, I do.

13    Q.    And how did you respond?

14    A.    I told him no.

15    Q.    Why did you say no?

16    A.    I thought it was inappropriate to use personal

17 tools for Town business.  And at that point when he

18 was -- on that day he was complaining about his back

19 hurting.  And looking at it from my perspective, to leave

20 the town hall, go back to the shop, get your truck and

21 load a snowblower into the back of a pickup and then

22 bring it down to the town hall, upload a snowblower with

23 this bad back didn't make sense.  And by the time that

24 would have happened, it's not that much work at the town

25 hall.  We would have been done at the town hall anyway.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
                                                                                   000602

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        122

1    In fact, we were done in very short order after that.

2    From there, we moved to the community center and do that

3    same way.  But I wasn't going to have a guy using

4    personal tools.  Did they ever do that sometimes?  On

5    occasion, but not with permission.

6         Q.    Who's "they"?  And do what at times?

7         A.    Use a personal tool.  We built a building.  One

8    of the guys brought in an air nailer that he had.

9         Q.    When was that?

10        A.    Oh, I don't know when it was.  It was long

11   before Roy was there.

12        Q.    So how do you know how -- do you know where

13   Mr. Mestas lived in relation to the town hall?

14        A.    Yes.

15        Q.    How far did he live?

16        A.    Oh, I would say it was probably approximately

17   half a mile.

18        Q.    And do you know how he would have gotten his

19   snowblower into his truck?

20        A.    No.

21        Q.    And do you recall when he asked to use the

22   snowblower?

23        A.    About the time we were completing the snow

24   removal.

25        Q.    The date?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
                                                                                000603

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          123

 1      A.    No.  I don't recall the specific date, no.

 2      Q.    How close was it in time to when you terminated

 3  his employment?

 4      A.    To the best of my knowledge, it was within

 5  days.

 6      Q.    Was it after this conversation you had with him

 7  on the 11th about his getting an injection in his back?

 8      A.    Well, I wouldn't have had a conversation about

 9  that if he was still there, would I?  So it would have to

10  be before.  I would have to have terminated after that

11  point.

12      Q.    No.  I'm sorry.  I didn't ask that question

13  very clearly.  So when did you terminate Mr. Mestas'

14  employment?

15      A.    I'd have to look at the documents to have the

16  specific date.

17      Q.    I'll represent it was on April 18th.

18      A.    Okay.

19      Q.    Sorry.  April 17th, 2013.

20      A.    Okay.

21      Q.    So is it your testimony that he asked to use

22  his snowblower a day or so before he was terminated?

23      A.    It was before he was terminated, yes.

24      Q.    Was it before you had this conversation with

25  him on April 11th about going to the doctor to get an

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
                                                                                          000604

Mestas v. Town of Evansville                17-CV-00017-NDF

124

1    injection, steroid injection in his back?

2         A.    It would have been after, I believe.

3         Q.    This conversation about him asking to use a

4    snowblower?

5         A.    Specifically, I don't recall.  I don't recall

6    specifically.

7         Q.    While you were working at the Town of

8    Evansville during 2012 and 2013, did you ever use the

9    word "beaners" when referring to anyone?

10        A.    Used the term plural -- I did not use the term

11   in a plural sense.  I used the term in a singular sense

12   in a conversation with Mr. Eric Reyna.

13        Q.    And when was that?

14        A.    I don't recall the specific date.

15        Q.    Just one time?

16        A.    One time.

17        Q.    Did you ever, during 2012 and 2013, use the

18   words "stupid beaners" at work?

19        A.    No.

20        Q.    How about "stupid beaner," not plural?

21        A.    I used the term "stupid beaner" in reference --

22   if I may answer -- to a joke that was shared with some of

23   the Town crew -- I don't remember who all was there -- by

24   Eric Reyna.  And I said, "Eric, that's kind of a stupid

25   beaner joke."  That was my conversation between him and

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000605

Mestas v. Town of Evansville                    17-CV-00017-NDF

125

1    I.    Yes, there were other people around.

2         Q.    Who was around?

3         A.    I don't recall specifically.

4         Q.    Is there anything you can do to refresh your

5    recollection of who the witnesses were?

6         A.    No.  Because I was actually concentrating on my

7    conversation with Eric at the time.  So whoever else was

8    in there was in there.

9         Q.    So Mr. Reyna might know, perhaps?

10        A.    He might.

11        Q.    So you might be able to ask him who else was

12   present?

13        A.    I might.

14        Q.    Did you ever apologize to Mr. Reyna for using

15   the term with him?

16        A.    I did.

17        Q.    When was that?

18        A.    Shortly after, the very same day, within

19   minutes.

20        Q.    And was Mr. Mestas present when you referred to

21   Mr. Reyna as a beaner?

22        A.    I did not refer to Mr. Reyna as a beaner.

23        Q.    I'm sorry.  I thought that's what you said.

24        A.    No.

25        Q.    One time.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000606

Mestas v. Town of Evansville                17-CV-00017-NDF

126

1       A.    I did not say that.  I said it was a "stupid

2   beaner" joke.  That's my statement.

3       Q.    I believe what you said is you used the term

4   "beaner," not plural, one time to Mr. Reyna.  Is that not

5   correct?

6       A.    In a conversation with Mr. Reyna.  I did not

7   call him a stupid beaner.  I said, "Eric, that's kind of

8   a stupid beaner joke."

9       Q.    I didn't ask you if you called him that.  I

10  asked if you used this word "beaner" in the workplace in

11  2012 and 2013.

12      A.    I stated I did.

13      Q.    And how many times?

14      A.    Once.

15      Q.    To whom?

16      A.    Eric.

17      Q.    Was anyone else present?

18      A.    There were, but I don't recall who was present.

19      Q.    And you don't recall if Mr. Mestas was present?

20      A.    I do not.

21      Q.    Did you ever refer to Town of Evansville

22  citizens or residents as "beaner" or "beaners"?

23      A.    No.

24      Q.    "Stupid beaners"?

25      A.    No.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000607

Mestas v. Town of Evansville                17-CV-00017-NDF

127

1        Q.    While at work for the Town of Evansville in

2    2012 and 2013, did you ever refer to your wife as a

3    beaner?

4        A.    No.

5        Q.    Did you ever say anything to Dan Adcock

6    referring to your wife as a beaner?

7        A.    To Dan?  No.

8        Q.    Never?

9        A.    Never.

10       Q.    While at work for the Town of Evansville during

11   2012 and 2013, did you ever use the term "Mexican" when

12   referring to a Town employee?

13       A.    Please restate that question.  State it the

14   same.  Just repeat it.

15       Q.    While at work for the Town of Evansville during

16   2012 and 2013, did you ever use the term "Mexican" when

17   referring to a Town employee?

18       A.    I don't recall that, other than as previously

19   stated, when I said -- no.  I don't know.  I don't

20   believe I ever did.

21       Q.    While at work in 2012 and 2013, did you ever

22   hear jokes about any minority groups, like Hispanics or

23   African Americans or Asians?

24       A.    Only the ones that Eric told.

25       Q.    Did you ever tell Mr. Reyna that you thought

Wyoming Reporting Service, Inc.
1.800.444.2826

Exhibit E
000608

Mestas v. Town of Evansville                    17-CV-00017-NDF

128

1    that jokes about minority groups were inappropriate in

2    the workplace?

3        A.    I did not.  In retrospect, I probably should

4    have.

5        Q.    Did you ever tell him that it was inappropriate

6    to be joking about people's ethnicity?

7        A.    I did not, and I probably should have.

8        Q.    Why do you think you should have?

9        A.    In the current world's politically correctness

10   attitude, it's determined that those things are

11   inappropriate and should be refrained from in the

12   workplace.  And I should have told Eric that we really

13   shouldn't be doing this.  And the only -- and I will say

14   this.  The only excuse I have for not is because I was

15   aware of Eric's ethnicity, and he was the one telling the

16   joke.  So I should have still recognized the

17   inappropriateness and said don't do this anymore.

18       Q.    What do you mean by "politically correct"?

19       A.    What do I mean by "politically correct"?  I

20   think it's an arbitrary term that tries to define how we

21   should act in both the workplace and in life in general.

22       Q.    What do you mean, "tries to define"?

23       A.    I don't know if I can give -- if I can give a

24   definition to what is PC.  But there are things that have

25   been determined that we don't use certain -- it's

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
                                                                                        000609

Mestas v. Town of Evansville                    17-CV-00017-NDF

129

1    inappropriate to use certain language that refers to

2    ethnicity, religions, sex, gender, sexuality, things that

3    are now deemed inappropriate.

4        Q.    And, again, it's your testimony that comments

5    about an employee's ethnicity is inappropriate in the

6    workplace?

7        A.    It is my testimony it is inappropriate.

8                    (Exhibit No. 16 marked for

9                     identification.)

10       Q.   (BY MS. HAYES)  I'm going to hand you -- this

11   is identified as Mestas Employment 000037 and 38.  These

12   are pages from a memo pad that Mr. Mestas kept in his

13   shirt pocket at work.

14               MR. THOMPSON:  Are you testifying or

15   representing?

16               MS. HAYES:  I'm representing what this is

17   that we've disclosed to the Town as part of our automatic

18   disclosures that we're required to provide under Rule 26

19   of the Federal Rules of Civil Procedure.

20               MR. THOMPSON:  Just didn't know if I

21   needed to call you as a witness.

22       Q.   (BY MS. HAYES)  Did you make a "stupid beaner"

23   remark on February 22nd, 2013?

24               MR. THOMPSON:  Objection as to form.

25   Asked and answered.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000610

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                           130

    1        A.    I don't know if that's the day Eric told his

    2    joke or not.  So I can't tell you.  I don't know.

    3        Q.    (BY MS. HAYES)  There's another date, March

    4    27th, 2013, what appear to indicate that these remarks

    5    were made on two separate dates.  Do you see where I'm

    6    referring?

    7        A.    I do.

    8        Q.    Did you make a "stupid beaner" remark on March

    9    27th, 2013?

   10             MR. THOMPSON:  Same objection.  Go ahead.

   11        A.    Unless that's the day he told the joke, no.

   12        Q.    (BY MS. HAYES)  You didn't make a "stupid

   13    beaner" remark to Mr. Mestas?

   14        A.    I had never made a "stupid beaner" remark to

   15    Mr. Mestas.

   16        Q.    Never directly to him?

   17        A.    Never.

   18        Q.    In anyone else's presence?

   19        A.    No.

   20        Q.    Sorry.  That didn't come out right.  Did you

   21    make a "stupid beaner" remark to somebody else in

   22    Mr. Mestas' presence?

   23        A.    Not that I recall.

   24        Q.    Could it have happened?

   25             MR. THOMPSON:  Objection as to form.

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            131

1      A.    I don't know if it could have or not.

2      Q.    (BY MS. HAYES)  What would help you refresh

3  your memory?

4      A.    Nothing.

5      Q.    On the second page of that document, there's a

6  writing.  "Asked Dale to stop using beaner remarks, April

7  1st 2013."  Did Mr. Mestas ask you to stop using "beaner"

8  remarks on that day?

9      A.    I have no idea.  I don't recall.  I don't know

10  why he would if I didn't do it.  But, no, I don't recall

11  him doing that.

12      Q.    Do you recall making a "stupid beaner" remark

13  to Mr. Mestas on or around April 1st, 2013?

14            MR. THOMPSON:  Objection as to form.  It's

15  been asked and answered.

16      A.    I have never made that remark to Mr. Mestas on

17  any date.

18      Q.    (BY MS. HAYES)  On any date?

19      A.    On any date.

20      Q.    So it's your testimony that he never asked you

21  to stop using "beaner" remarks?

22            MR. THOMPSON:  Objection as to form.

23      A.    Yes, that's my testimony.

24      Q.    (BY MS. HAYES)  Did you put any documentation

25  in Mr. Mestas' personnel file regarding the deficiencies

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                          000612

Mestas v. Town of Evansville                    17-CV-00017-NDF

132

```
 1   that you testified to in his work performance?

 2       A.    No.

 3       Q.    Why isn't there any documentation?

 4       A.    Probationary employee.  An at-will employee.

 5   Not required.

 6       Q.    Did you warn Mr. Mestas of any problems with

 7   performance deficiencies prior to terminating his

 8   employment in April of 2013?

 9       A.    We had discussions about his argumentativeness,

10   about the time frame with his ability to complete his

11   routes and to service his truck.  So we had

12   conversations.

13       Q.    And, on the argumentative issue, the recorded

14   interview that I provided to you, I believe Mr. Mestas

15   apologized profusely.  We played that out loud.  Let me

16   find it.  That is Document AOO53.  And on page 4, you

17   asked him to quit arguing with you.  Do you see where I'm

18   referring?

19       A.    I'm still trying to find it.

20       Q.    We're on page 4 and AOOOO53.  And on lines 5

21   and 6 you ask him to "quit arguing with me."  Do you see

22   where I'm referring, Mr. Brown?

23       A.    Uh-huh.

24       Q.    Does he apologize to you if he's arguing with

25   you?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000613

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                                133

1        A.    At that point on this, he does.

2        Q.    And did you tell him afterward to stop arguing?

3    Any other occasions after this conversation that you had

4    to tell him to stop arguing with you?

5        A.    I don't recall whether I did or not.

6        Q.    You also mentioned that he didn't interface

7    with coworkers.  What did you mean by that?

8        A.    I thought we had been there before.  But it's

9    not a situation where things were adversarial in that

10   sense.  It was more just lack of what I consider

11   reasonable amenities, where you just visit, talk, get

12   along, discuss things, talk about the weekend, talk about

13   the football game, talk about this, things that people

14   do.  Didn't appear to me that Roy was interfacing with

15   that kind of conversations with the rest of the crew.

16   There's not a requirement to.  Just, that was an

17   observation.

18       Q.    And how did that affect his ability to get

19   along with his coworkers, in your opinion?

20       A.    I think when people are displaying what I

21   consider an antisocial tendency, that people tend to have

22   a lack of faith, lack of trust, lack of something with

23   that individual, because they don't interface with them.

24   They don't get to know them as a person as well as a

25   fellow employee, so they don't know what the expectation

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000614

Mestas v. Town of Evansville                    17-CV-00017-NDF

134

1    of working with that person is.  So they're unsure of how

2    to perform or be around that person.  They just don't

3    know them.

4        Q.    Did you consider Mr. Mestas to have antisocial

5    tendencies?

6        A.    I consider Mr. Mestas to not interface well or

7    assimilate well into the group.  Whatever those

8    tendencies are, I don't know.  But he just didn't seem to

9    get into the group.

10       Q.    What do you mean?  What is an antisocial

11   tendency?

12       A.    Antisocial tendency would be a tendency not to

13   socialize with people.

14       Q.    After Mr. Mestas returned from his injury leave

15   in January of 2013, did you feel that you treated him any

16   differently than you did before he left for injury leave?

17       A.    No.

18       Q.    Eric Reyna testified yesterday that your

19   treatment of Mr. Mestas after he returned from injury

20   leave was odious.

21       A.    You want to define that?

22       Q.    Sure.  Revolting, repulsive, repellant,

23   repugnant, disgusting, offensive, objectionable, vile,

24   foul, abhorrent, loathsome, nauseating, sickening,

25   hateful, detestable, execrable, abominable, monstrous,

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
000615

Mestas v. Town of Evansville                    17-CV-00017-NDF

135

1    appalling, reprehensible, deplorable, insufferable,

2    intolerable, despicable, contemptible --

3        A.    I think we got the picture.  If we were looking

4    at --

5              MR. THOMPSON:  Wait for the question.

6        Q.    (BY MS. HAYES)  Do you think that your

7    treatment of Mr. Mestas after he returned from his injury

8    leave was odious in any fashion?

9        A.    No.

10       Q.    What would you have done that Mr. Reyna would

11   have observed to cause him to consider your treatment

12   odious?

13             MR. THOMPSON:  Objection.  Speculation.

14       A.    That's his opinion.  I can't speak to that.

15       Q.    (BY MS. HAYES)  I understand it's his opinion.

16       A.    So I have no idea.

17       Q.    I think we talked about an incident with a

18   trash bin falling into --

19       A.    Uh-huh.

20       Q.    Did you instruct Mr. Reyna or any other

21   employees not to help Mr. Mestas remove that trash bin?

22             MR. THOMPSON:  Objection.  Asked and

23   answered.

24       A.    I've answered that question.  I did not

25   instruct any employee not to help Mr. Mestas in the

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000616

Mestas v. Town of Evansville                    17-CV-00017-NDF

136

1    removal of a three-yard or yard-and-a half bin.  Only the

2    rollouts.

3        Q.    (BY MS. HAYES)  Mr. Reyna testified yesterday,

4    after the incident of the trash bin -- three-yard trash

5    bin falling into Mr. Mestas' truck, that you talked to

6    him about how that incident was handled.  Do you remember

7    a conversation with him about that?

8        A.    Specifically, no.

9        Q.    Do you remember anything generally in talking

10   to Mr. Reyna?

11       A.    I do not.

12                   (Pause in proceedings.)

13       Q.    (BY MS. HAYES)  Yesterday in his deposition,

14   Ron Emond testified that after Mr. Mestas returned from

15   his injury leave, you beat up on him, meaning Mr. Mestas,

16   pretty good.  What conduct or what do you think you would

17   have done that would have caused Mr. Emond to describe

18   your treatment of Mr. Mestas as beating up on him pretty

19   good?

20       A.    I don't know.

21            MR. THOMPSON:  Objection as to form.

22   Speculation.

23       A.    I have no idea.

24       Q.    (BY MS. HAYES)  Nothing you did to Mr. Mestas

25   you felt was overly harsh?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000617

Mestas v. Town of Evansville                    17-CV-00017-NDF

137

 1      A.    No.  I think there's some evidence right here

 2  in these transcripts of recordings that I was unaware of

 3  that indicate I was very amicable to Mr. Mestas.  And I

 4  wasn't even aware of that.

 5      Q.    Do you know what the law is in Wyoming on how

 6  many people have to consent before a conversation can be

 7  recorded?

 8            MR. THOMPSON:  Relevance.  Calls for a

 9  legal conclusion.  Go ahead and answer.

10      A.    I don't know, but it doesn't matter to me.  I'm

11  just saying that I think there's evidence there that

12  shows that I was very responsive to what he had to say.

13      Q.    (BY MS. HAYES)  So my question was do you know

14  what the law is?

15            MR. THOMPSON:  Same objection.

16      A.    No.

17      Q.    (BY MS. HAYES)  I think I previously gave you a

18  Town of Evansville employee handbook.  Do you recognize

19  that document?

20      A.    Yes, I do.

21      Q.    On page 15, what is that policy on page 15?

22      A.    Do you want me to read it?

23      Q.    No.  What is it?  What is on that page?

24      A.    Employment practices.

25      Q.    And what specifically in Section 1?

Mestas v. Town of Evansville                    17-CV-00017-NDF

138

 1        A.    It refers to "Discrimination on the basis of

 2    race, color, national origin, religion, handicap,

 3    disability, sex, age, veteran status or political

 4    affiliation with respect to the terms and conditions of

 5    employment, including, but not limited to, recruitment,

 6    employment, appointment, reinstatement, termination,

 7    training or any other personal action is prohibited

 8    except where a bona fide occupational qualification or

 9    job requirement exists."

10              Do you wish me to go on?

11        Q.    No.  I didn't ask you to read it.  What's your

12    understanding of this statement on page 15?

13              MR. THOMPSON:  Objection as to form.

14    Calls for a legal conclusion.

15        Q.    (BY MS. HAYES)  What's your personal

16    understanding of this equal opportunity statement?

17              MR. THOMPSON:  Same objection.  You're

18    asking him for a legal conclusion.

19        A.    You're not allowed to discriminate for any of

20    these reasons.

21        Q.    (BY MS. HAYES)  And what does "discrimination"

22    mean in your understanding of that word?

23              MR. THOMPSON:  Objection.  Legal

24    conclusion.

25        A.    What does "discrimination" mean?  It means I

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        139

1    cannot hire or fire or promote or not promote and things

2    of that nature based on a person's -- based on these

3    descriptions of discriminatory items, such as national

4    origin, religion, handicap, disability, et cetera.

5         Q.    (BY MS. HAYES)  And as a supervisor in the

6    public works department, was it your responsibility to

7    ensure that this policy was fulfilled in the workplace?

8         A.    I didn't have a job description as far as

9    responsibility.

10        Q.    That's not my question.  My question was, as a

11   supervisor for the public works department, was it your

12   responsibility to ensure that employees in your

13   department were not discriminated against in the terms

14   and conditions of their employment?

15        A.    Yes.

16        Q.    And what does that mean to you?

17              MR. THOMPSON:  Objection as to form.

18   Calls for a legal conclusion.  Foundation.

19        A.    Means that if I were to observe any of these

20   actions or situations taking place, that that needed to

21   be curtailed or stopped or eliminated and just not done.

22        Q.    (BY MS. HAYES)  Did you receive any training

23   when you worked for the Town of Evansville on equal

24   employment policy concerning discrimination or

25   harassment?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                 000620

Mestas v. Town of Evansville                    17-CV-00017-NDF

140

```
 1      A.    No.

 2      Q.    Is there a procedure in the employee handbook

 3  for making a complaint of discrimination or harassment?

 4      A.    There is.  I don't remember exactly which area

 5  it's in, but there is.

 6      Q.    There's a table of contents.  If you can tell

 7  me where that policy is.

 8      A.    Section 11 -- or Item 11, Section -- there's a

 9  general grievance process in here and the complaint

10  process.

11      Q.    Does that specifically refer to harassment or

12  discrimination?

13      A.    In this grievance process, I do not see where

14  it specifically relates to whatever your question was.

15      Q.    Discrimination or harassment.

16      A.    Discrimination or harassment.

17      Q.    In your understanding, this is sort of a

18  general grievance policy but not specific to either

19  harassment or discrimination?

20      A.    It's specific to a condition that exists when

21  the employee feels unsatisfactory.  So, if he felt

22  unsatisfied at what we were doing, he had a process to go

23  to.

24      Q.    My question is, is it your testimony that

25  there's nothing in that grievance procedure specific to
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000621

Mestas v. Town of Evansville                17-CV-00017-NDF

141

1    harassment or discrimination complaints?

2        A.    No.  No.

3        Q.    On page 13 of the employee handbook, Section 3

4    refers to "Performance Evaluation" and provides that "All

5    permanent and probationary classified Town employees

6    shall receive a written performance evaluation prepared

7    by their department head."  Did you provide --

8                 MR. THOMPSON:  Do you want to read the

9    rest of the sentence?

10                MS. HAYES:  Sure.  "Evaluations shall" --

11                MR. THOMPSON:  No.  It says "as specified

12   herein."

13                MS. HAYES:  "As specified herein."

14       Q.    (BY MS. HAYES)  Did you ever write any

15   performance evaluations about Mr. Mestas' job

16   performance?

17       A.    It is not required during his probationary

18   period.

19       Q.    And where does it say that?

20       A.    Doesn't.  If it doesn't say I have to, I don't

21   have to during the probationary period.

22       Q.    What's a probationary classified Town employee?

23       A.    It's a new hire.  All new hires in public works

24   are on probation for a period of six months.

25       Q.    So it says they shall receive a written

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000622

Mestas v. Town of Evansville                17-CV-00017-NDF

142

1    performance evaluation prepared by their department head

2    as specified herein.  You weren't required to do any

3    performance evaluation of Mr. Mestas?

4         A.    Not during the probationary period.

5         Q.    Why would this mention probationary classified

6    Town employees?

7         A.    At the end of his probationary period.

8         Q.    Where does it say that?

9         A.    It doesn't say that.  It also doesn't tell me

10   within what time frame it has to be done.

11        Q.    So, at page 12, Section 2 discusses

12   probationary employees.  Do you see where I'm reading?

13        A.    Uh-huh.

14        Q.    And if you continue on to page 13, can you

15   please read the first sentence of the first full

16   paragraph on page 13?

17        A.    "A performance appraisal shall be conducted

18   with each probationary employee upon conclusion of 30

19   days, 90 days and 6 months."  So I stand corrected, and I

20   was mistaken.

21        Q.    Did you provide a written performance appraisal

22   of Mr. Mestas at the conclusion of 30 days?

23        A.    No.

24        Q.    90 days?

25        A.    No.

Mestas v. Town of Evansville                    17-CV-00017-NDF

143

1    Q.    Why not?

2    A.    I have no excuse.  I didn't.

3    Q.    Would you agree that you didn't follow the

4    Town's policy with respect to performance appraisals for

5    Mr. Mestas as a probationary employee?

6              MR. THOMPSON:  Objection as to form.

7    Calls for a legal conclusion.

8    A.    Yes.

9    Q.    (BY MS. HAYES)  Would you agree that both

10   Mr. Emond and Mr. Mestas were argumentative?

11   A.    Yes.

12   Q.    Did either of them have any -- I'm sorry.  Let

13   me ask that again.  Did Mr. Emond have any reprimands or

14   disciplinary history when you were his supervisor?

15   A.    I don't recall.

16   Q.    Did you ever reprimand him in any way for

17   arguing with you?

18              MR. THOMPSON:  Objection as to form.

19   A.    Informally, yes.

20   Q.    (BY MS. HAYES)  And when was that?

21   A.    I don't recall.

22   Q.    And how would you informally reprimand?

23   A.    I'd say to Ron, "I think this argument really

24   is not very productive, and it's not doing us any good,

25   and we need to get past this and move on so we can both

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion         Exhibit E
000624

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                          144

 1   get our work done."

 2       Q.    And did he apologize to you?

 3       A.    Did he apologize?  I don't recall.

 4       Q.    Did you receive any training before you became

 5   a supervisor at the Town of Evansville on the contents of

 6   the employee handbook?

 7       A.    No.

 8       Q.    Who were the persons involved in terminating

 9   Mr. Mestas' employment?

10               MR. THOMPSON:  Object as to form.  This

11   area has been asked and answered.

12       A.    I would really like to talk to my counsel

13   before I answer.  Can I do that?

14               MS. HAYES:  Sure.  Do you want to take a

15   break?

16               MR. THOMPSON:  Yeah.

17               (Deposition proceedings recessed

18               3:24 p.m. to 3:30 p.m.)

19       Q.    (BY MS. HAYES)  Did you ever attend any job-

20   related training on workplace harassment?

21       A.    No.

22       Q.    Oh, sorry.  I forgot where I was.  I was asking

23   you about who were the persons involved in firing

24   Mr. Mestas when we took a break.  Who was that?

25       A.    Brian Boettcher, myself and the Town's legal

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000625

Mestas v. Town of Evansville                17-CV-00017-NDF

145

1    counsel.

2        Q.    And did you have any conversation with any

3    other witnesses outside of the presence of the Town's

4    counsel after you terminated Mr. Mestas' employment?

5             MR. THOMPSON:  Object as to form of the

6    question.

7        A.    I don't recall.

8        Q.    (BY MS. HAYES)  Did you have any conversations

9    with anyone in the public -- any employees in the public

10   works department about firing Mr. Mestas?

11       A.    Again, I don't recall.

12       Q.    Do you recall being asked by any of the crew

13   members whether Mr. Mestas had been fired?

14       A.    Specifically, I don't recall anyone asking.

15       Q.    Did the subject of his being fired ever come up

16   with any members of the public works crew?

17       A.    Again, I don't recall anything specific.  What

18   I'm saying is I don't remember somebody, this person or

19   that person, coming in and saying, "Where's Roy?"  I

20   don't recall anybody doing that.

21       Q.    Do you have any sense of how, if at all, firing

22   Mr. Mestas affected other public works employees?

23             MR. THOMPSON:  Objection as to form.

24   Speculation.

25       Q.    (BY MS. HAYES)  Well, you were the supervisor.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000626

Mestas v. Town of Evansville                    17-CV-00017-NDF

146

```
 1   Correct?

 2       A.   I don't know how it affects them.  How would I

 3   know?

 4       Q.   Well, did they have more work to do in the day

 5   after you fired Mr. Mestas?

 6       A.   Yes.  Somebody would have to run the sanitation

 7   truck.

 8       Q.   And did anyone talk to you about why they were

 9   having to do that?

10       A.   No.

11       Q.   Who did you assign to do Mr. Mestas' sanitation

12   route?

13       A.   I don't recall.

14       Q.   So you had to pull that employee from some

15   other job to do the route?

16       A.   That would be correct.  Same as you would do if

17   they went on vacation or off sick.  There's no

18   difference.  You have to get the job done.

19       Q.   And how long did it take you to hire somebody

20   to replace Mr. Mestas?

21       A.   I don't remember.  It would be a position we'd

22   try to fill quickly.  But, whether it was a week or two

23   weeks or longer or less, I don't know.  I don't remember.

24       Q.   Did any Town employee complain to any Town

25   official about you?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion            Exhibit E
000627

Mestas v. Town of Evansville                    17-CV-00017-NDF

147

1      A.    I don't know.

2      Q.    You have no knowledge that there were any

3   complaints made about you?

4             MR. THOMPSON:   Objection as to form.

5      A.    I don't know.

6      Q.    (BY MS. HAYES)   Since the day that you fired

7   Mr. Mestas in April of 2013, have you communicated in any

8   manner with Eric Reyna about the underlying facts claimed

9   by Mr. Mestas regarding his complaints of discrimination

10  by you?

11     A.    Please just repeat that.   Sorry.

12     Q.    No.   I understand completely.   Since the day

13  you fired Mr. Mestas in April of 2013 -- that's why I

14  write these things down, Mr. Brown -- have you

15  communicated in any manner with Eric Reyna about the

16  underlying facts claimed by Mr. Mestas regarding his

17  complaints of discrimination by you?

18     A.    I do not remember having any discussion with

19  Eric.

20     Q.    Not just a discussion.

21     A.    I don't remember.

22     Q.    Would you e-mail, send e-mails or text

23  messages, when you worked for the Town of Evansville?

24     A.    We did e-mails but not to employees.

25     Q.    Would you have e-mailed --

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

148

1      A.    I mean, I would send an e-mail to the mayor or

2   the town council, those types of things, or Town

3   engineers.

4      Q.    Would there be any communications, e-mail

5   communications, from you about Mr. Mestas to Town

6   officials?

7      A.    Town officials.  I would say -- I'd just have

8   to say I don't remember doing that.

9      Q.    That you put anything in an e-mail to a Town

10  official about Mr. Mestas?

11     A.    I don't remember doing that.

12     Q.    But you may have?  You don't recall?

13           MR. THOMPSON:  Objection as to form.

14     A.    I don't recall.

15     Q.    (BY MS. HAYES)  I'll read my same question to

16  you again.  Since the day you fired Mr. Mestas in April

17  of 2013, have you communicated in any manner with Dan

18  Adcock about the underlying facts claimed by Mr. Mestas

19  regarding his complaint of discrimination?

20     A.    Not that I recall.

21     Q.    Ron Emond?

22     A.    I would say I don't recall that.

23     Q.    Chris Winslow?

24     A.    I don't think Chris Winslow was there, so I'd

25  say no.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000629

Mestas v. Town of Evansville                    17-CV-00017-NDF

149

1      Q.    Mayor Hinds?

2      A.    I don't recall.

3      Q.    Janelle Underwood?

4      A.    Restate the question one more time.

5      Q.    Since the day you fired Mr. Mestas in April of

6    2013, have you communicated in any manner with Janelle

7    Underwood about the underlying facts claimed by

8    Mr. Mestas regarding his complaints of discrimination by

9    you?

10     A.    No.

11     Q.    Have you spoken to any other employees that you

12   supervised about Mr. Mestas' allegations of

13   discrimination?

14     A.    In reference to the previous question, I'd like

15   to change that.  I don't recall that.

16     Q.    Don't recall with Janelle?

17     A.    Janelle, yeah.  And, to the current question, I

18   don't recall.

19     Q.    Did your firing of Mr. Mestas come up during

20   your conversations with the mayor when you separated your

21   employment with the Town?

22     A.    I don't recall that.

23           MS. HAYES:  I don't have any further

24   questions at this time.

25           MR. THOMPSON:  Yay.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
                                                                                            000630

Mestas v. Town of Evansville                    17-CV-00017-NDF

150

1               MS. HAYES:  I said at this time, Tom.

2                       EXAMINATION

3    BY MR. THOMPSON:

4       Q.    Dale, let me first go through a couple matters

5    concerning these exhibits.  Exhibit 11 is an example of

6    an invoice with a receipt.  Is that correct?

7       A.    Correct.

8       Q.    And the other exhibits that are similar to

9    Exhibit 11 had invoices -- some had invoices, some had

10   receipts, and some had purchase orders accompanying those

11   exhibits.  Correct?

12      A.    Correct.

13      Q.    And your testimony that you provided today,

14   referring back to the audio recording that was made by

15   the official that investigated this charge of

16   discrimination, was that there were times when Roy Mestas

17   would go and procure items without talking to you or

18   Brian Boettcher first.  Correct?

19      A.    Yes.

20      Q.    And you cannot tell from any of the exhibits

21   that were provided to you whether or not that occurred in

22   that given instance?

23      A.    I cannot tell.

24      Q.    And there are times that you would have gone

25   and signed the purchase orders after the fact where Roy

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion              Exhibit E
000631

Mestas v. Town of Evansville                    17-CV-00017-NDF

151

1    may not have followed that policy.  Correct?

2         A.    Correct.  I'd have signed a voucher.

3         Q.    And you did so because the voucher was

4    attributable to your budget, to your department?

5         A.    Correct.

6         Q.    And even with your signature on those various

7    purchase orders, it does not mean the policy was complied

8    with in that given instance?

9               MS. HAYES:  Objection.  Leading.  These

10   are all leading questions.

11              MR. THOMPSON:  I think I can do that on

12   cross.

13              MS. HAYES:  It's your own witness.

14        A.    Please restate it.  I'm sorry.

15              MR. THOMPSON:  You want to read it back?

16              (Previous question read by the

17              reporter.)

18        A.    That's correct.

19        Q.    (BY MR. THOMPSON)  In regards to the EEOC

20   policy that was referred to in the personnel manual, were

21   there posters that were placed in the workplace within

22   the public works department concerning policies on EEOC?

23        A.    Yes, there were.  They were next to the time

24   clock.

25        Q.    And how do you know that?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion
Exhibit E
000632

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                    152

 1      A.    I posted them.

 2      Q.    And can anybody verify that besides yourself?

 3      A.    It should be verifiable by all employees.

 4      Q.    How about the investigator with the State of

 5  Wyoming?

 6      A.    She should be able to verify that.

 7      Q.    Did they look for those posters when they

 8  conducted this investigation?

 9      A.    Specifically.

10      Q.    And did they find them to be in place?

11      A.    They did.

12      Q.    And was that poster present during the time

13  that Roy Mestas was employed with the Town of Evansville?

14      A.    Yes, it was.

15      Q.    Let me have you pull out Exhibit Number 1.  I

16  think that's this personnel policy.  And turn to the

17  second-to-the-last page.

18      A.    Is this an ordinance one?

19      Q.    Yeah.  I'm looking at Ordinance Number 10-2009.

20  The date of this, as far as when it was adopted and

21  approved, was what day?

22      A.    Passed and approved.  The final adoption was

23  28 September 2009.

24      Q.    So before Roy Mestas began employment with the

25  Town of Evansville?

Mestas v. Town of Evansville                17-CV-00017-NDF

153

1      A.    Correct.

2      Q.    And do you see that section where it says "Be

3   it further ordained that to page "i" of the handbook, the

4   following language shall be added"?

5      A.    I do.

6      Q.    And you can just read that to yourself.

7            Were employees with the Town of Evansville

8   at-will employees?

9      A.    They were.

10     Q.    And what does that mean to you according to the

11  language in Ordinance Number 10-2009?

12     A.    Means employee can be terminated or quit for

13  any or no reason.

14     Q.    With or without cause?

15     A.    With or without cause.

16     Q.    Or notice?

17     A.    Yes.

18     Q.    In regards to questions that were asked of you

19  by Ms. Hayes, you were asked whether or not you ever told

20  other employees not to assist Roy Mestas.  What was Roy

21  Mestas' job, primary responsibility, during the time

22  period that he was employed with the Town of Evansville?

23     A.    Primary responsibility was to operate the

24  sanitation truck, to pick up and remove trash and deliver

25  it to the landfill and maintain -- routine maintenance on

Mestas v. Town of Evansville                    17-CV-00017-NDF

154

1    the truck and on the trash bins that needed repairs or

2    replaced.

3        Q.    How many employees did it take to operate the

4    sanitation truck?

5        A.    One.

6        Q.    And what happens if you take an employee off

7    another job within the public works to assist the

8    sanitation truck driver?

9        A.    The job would be delayed or not done.

10       Q.    Whose job?

11       A.    The employee who was pulled off to assist the

12   sanitation driver.

13       Q.    As far as the time that other employees spent

14   with Roy Mestas during a typical workweek, would you say

15   that that was limited to morning meetings, lunch break

16   and the end of the day?

17               MS. HAYES:  Objection.  Foundation.

18       A.    I would say yes.

19       Q.    (BY MR. THOMPSON)  And there was time on

20   Thursday where they may have been around him more

21   frequently during the day?

22       A.    Logically so, yes.

23       Q.    As to those tasks that public works employees

24   were required to accomplish, who assigned those tasks?

25       A.    Either Brian, myself or essentially together by

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000635

Mestas v. Town of Evansville                17-CV-00017-NDF

155

1    consensus of Brian and myself.

2        Q.    Let me have you turn to Audio Recording 0058.

3    When testimony was taken of Roy Mestas, he indicated that

4    he made these recordings without your knowledge.  Is that

5    correct?

6        A.    It is.

7        Q.    He did not tell you that he was tape-recording

8    these?

9        A.    He did not.

10       Q.    Was there any purpose, as a sanitation truck

11   driver, that it would require him to record conversations

12   of his supervisors?

13             MS. HAYES:  Objection.  Speculation.

14       A.    Not that I can think of.

15       Q.    (BY MR. THOMPSON)  You know the job duties and

16   responsibilities of a sanitation truck driver, don't you?

17       A.    I do.  I did it for over a year.

18       Q.    Did you ever have to record conversations of

19   you and your supervisors?

20       A.    No.

21       Q.    Did it serve any purpose for the job as

22   sanitation truck driver?

23       A.    None.

24       Q.    If you'd look on the -- I believe it is the

25   third page, line 5, where it says "MR. BROWN:  What I'd

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000636

Mestas v. Town of Evansville                    17-CV-00017-NDF

156

1    like you to start on is (inaudible) in your truck."  And

2    then Mr. Mestas replies "I don't know if it's going to be

3    warm enough."

4        A.    Okay.  I've got it here.  All right.

5        Q.    Were you assigning him a task?  Where it says

6    "What I'd like you to start on is (inaudible) in your

7    truck" is the way the transcript reads?

8        A.    Not knowing exactly the day of the week that

9    this was done on, this recording, if it was a Thursday,

10   it wouldn't have been necessarily an assignment because

11   that was normal truck maintenance day.  If it was a

12   situation early in the morning where it had frozen

13   overnight, I don't know.  So I can't say it was an

14   assignment, per se, other than a general duty.

15       Q.    You're telling him what you would like him to

16   start on.  Correct?

17       A.    Start him on doing that.

18       Q.    And read his response out loud.

19       A.    "I don't know if it's going to be warm enough.

20   I'm going to have to warm that thing up to --" and

21   then --

22       Q.    And then your response.

23       A.    "No.  I don't want reasons why not."

24       Q.    And you go on to say "All I want is reason how

25   I'm going to get her done."  Do you see that?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit E
000637

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                          157

```
1        A.    I do.

2        Q.    Is that an example of where you testified today

3    that you were telling Roy to do certain things and he was

4    making excuses as to why he couldn't do them?

5        A.    That would be an example, yeah.  It's like it's

6    got to be done.  You can't give me a reason why not.  You

7    got to find a way to do it.

8        Q.    And then let me have you turn to -- I believe

9    it's page 5.  And read from line 5 through 13 out loud.

10        A.    "Already?  What the hell?  No.  The -- they're

11    going to do an injection in my back where that -- that --

12    remember I was talking to you about it a while back?

13    They wanted to do one today, but I told them I couldn't

14    because I need a driver and stuff because of medicine

15    they give you, I can't drive.  So I told them next

16    Thursday would be the day that I could do it.  So I'll be

17    out of commission on Thursday.  I'll be back Friday."

18        Q.    At any point during the point when he returned

19    to work with a release to return to full duty up to the

20    point of this conversation, did Mr. Mestas ever present

21    you with a doctor's note indicating that he should not be

22    doing certain portions of the job?

23        A.    No.

24        Q.    Certain responsibilities or duties within the

25    job?
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
                                                                                              000638

Mestas v. Town of Evansville              17-CV-00017-NDF

                                                    158


    1       A.    No.

    2       Q.    Did he ever tell you during this conversation

    3   that he was in pain?

    4       A.    No.

    5       Q.    Did he ever tell you during this conversation

    6   that his back hurt?

    7       A.    No.

    8       Q.    Did he ever tell you that he was complaining of

    9   back problems and needed to go see a doctor for it?

   10       A.    No.

   11       Q.    You had no idea what the injection was.  Is

   12   that fair?

   13       A.    That's correct.

   14       Q.    You didn't know what kind of injection it was?

   15       A.    No.

   16       Q.    And you were cooperative and told him to go

   17   ahead and put it on the board.  Correct?

   18       A.    Yes.

   19       Q.    Was that standard procedure?

   20       A.    Yes.

   21       Q.    Did you treat him any differently than any

   22   other employee who might be sick or need a doctor's

   23   appointment?

   24       A.    No.

   25       Q.    As you read these transcripts that Mr. Mestas


                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

159

1    made during his conversations with you -- and you've read

2    all three.  Correct?

3         A.    I have.

4         Q.    Do you believe that they were self-serving?

5         A.    Yes.

6         Q.    And why is that?

7                    MS. HAYES:  Objection.  Speculation.

8         A.    I believe they're self-serving because I was

9    totally unaware of the recordings.  So it served no

10   purpose for me.  The only person it could possibly serve

11   was him.

12        Q.    (BY MR. THOMPSON)  Do you know why he was

13   making recordings of you and Brian Boettcher?

14                   MS. HAYES:  Objection.  Speculation.

15        A.    I personally believe he was trying to set us up

16   for exactly where we're at right here.

17        Q.    (BY MR. THOMPSON)  For a lawsuit.  Is that

18   correct?

19        A.    That's correct.

20                   MS. HAYES:  Objection.  Foundation.

21        Q.    (BY MR. THOMPSON)  That's your belief?

22        A.    Yes, sir.

23        Q.    I think there was a long discussion about light

24   duty and release to return to work.  When Mr. Mestas came

25   back to work on January 14th, 2013, he was not required

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                17-CV-00017-NDF

160

1    to be on light duty.  Correct?

2        A.    Correct.

3        Q.    And so there was no reason to put him on light

4    duty.  Correct?

5        A.    No.

6        Q.    And if he volunteered for light duty, that

7    would not have been because of any restrictions that the

8    doctor placed him on.  Correct?

9        A.    Correct.

10       Q.    Would you expect that Mr. Mestas would be

11   argumentative with you when he was making these

12   recordings that he made without your knowledge?

13             MS. HAYES:  Objection.  Speculation.

14       A.    I don't know how to answer that, because I

15   didn't have the knowledge, so I don't know what to expect

16   him to do.  From his perspective, I don't know.

17       Q.    (BY MR. THOMPSON)  Well, if he was using the

18   tapes as you think he was to set you up for a lawsuit, do

19   you think he would be argumentative on those tapes?

20             MS. HAYES:  Same objection.

21       A.    He wouldn't be argumentative, no.

22       Q.    (BY MR. THOMPSON)  Why not?

23       A.    It wouldn't serve his purpose.

24       Q.    During the times that Eric Reyna told jokes

25   that were ethnic in nature, was Roy Mestas ever present?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000641

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                        161

1       A.    I don't know.

2       Q.    And once you went and apologized to Eric Reyna,

3   did you ever use derogatory language in front -- or, in

4   the workplace after that date?

5       A.    No.

6       Q.    Do you recall whether or not, on those

7   employment policies that were posted in the workplace,

8   whether or not there was contact information or a

9   procedure to report what an employee perceived as

10  discrimination?

11      A.    Yes.

12      Q.    Were you aware of Roy Mestas going to anyone at

13  town hall to complain about you?

14      A.    No.

15      Q.    Were you aware of Roy Mestas going to any

16  public official, whether the mayor or council person, to

17  complain about you?

18      A.    No.

19      Q.    Were you aware of Roy Mestas ever going to the

20  city attorney to complain about you?

21      A.    No.

22      Q.    Was it typical at the end of an employee's

23  probation period to provide a report to recommend them to

24  permanent status?

25      A.    Yes.

Mestas v. Town of Evansville                    17-CV-00017-NDF

162

1       Q.    I think it's been established that the date

2   that Roy Mestas was injured at work for the Town of

3   Evansville was November 26th, 2012, or approximately that

4   date.  Do you have any reason to dispute that?

5       A.    No.

6       Q.    And we have Deposition Exhibit 6 dated January

7   9th, 2013, from Dr. Yakel.  What date does that indicate

8   that Roy Mestas could return to work with the Town of

9   Evansville?

10      A.    January 14, 2013.

11      Q.    And on Deposition Exhibit 6, are there any

12  restrictions concerning his return to work?

13      A.    It states "with no restrictions.  May return to

14  regular duty."

15      Q.    And did he return to regular duties with the

16  Town?

17      A.    He did.

18      Q.    And the release that you have in front of you,

19  that was provided to the Town in writing?

20      A.    It was.

21      Q.    And I believe that Ms. Hayes, in asking you

22  questions, established that his termination date from the

23  Town of Evansville was April 17th, 2013.  Do you have any

24  reason to dispute that date?

25      A.    I do not.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000643

Mestas v. Town of Evansville                17-CV-00017-NDF

163

1    Q.    Between the time that you were presented with

2   Deposition Exhibit 6 for his return to work in January of

3   2013, up until April 17th of 2013, did Mr. Mestas present

4   you with any doctor statements or orders which would

5   indicate that he had any restrictions regarding his

6   performing his regular job duties with the Town?

7    A.    No.

8    Q.    At any time while Mr. Mestas was employed with

9   the Town, other than November of 2012 when he was injured

10  while at work, did you have any knowledge of any kind

11  regarding any other medical condition that Mr. Mestas

12  might have had?

13   A.    I seem to recall he had a sick day for the flu.

14  I'm not sure.

15   Q.    Other than a sick day for a flu, were you aware

16  of any other medical condition that Mr. Mestas might have

17  had?

18   A.    No.

19   Q.    Were you aware of any injury that Mr. Mestas

20  might have incurred or suffered before he came to work

21  with the Town of Evansville?

22   A.    No.

23   Q.    Did he ever tell you that he had filed other

24  workers' compensation claims with other employers for

25  injuries that he suffered?

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000644

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        164

     1      A.    No.

     2      Q.    Did he ever disclose that on his application

     3   form?

     4      A.    No.

     5      Q.    On his application form, did he indicate that

     6   he was able to perform the functions or the job

     7   responsibilities required of him?

     8      A.    Yes.

     9      Q.    Were you aware of any history that he had of

    10   being disabled?

    11      A.    No.

    12      Q.    So is it fair to say that all you knew from the

    13   time that Mestas was a Town employee was that he had an

    14   injury at work in November of 2012, was off of work for a

    15   period of time and came back to work with a doctor's

    16   statement that there were no restrictions to perform his

    17   regular duties?

    18      A.    That's correct.

    19      Q.    Did you perceive Mr. Mestas as being disabled

    20   when he returned to work?

    21      A.    No.

    22      Q.    Did you perceive him as being disabled at any

    23   time while he was employed with the Town?

    24              MS. HAYES:  Objection.  Calls for a legal

    25   conclusion.

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                             165

 1      Q.    (BY MR. THOMPSON)  Go ahead.

 2      A.    Only when he was off due to his back injury,

 3   that time period.

 4      Q.    When he was off during his back injury, you

 5   don't know whether or not he was disabled in the sense

 6   that he couldn't walk, for example.  Correct?

 7      A.    Correct.

 8      Q.    All you knew is that he had been injured and he

 9   was off of work?

10      A.    Correct.

11      Q.    And it was a result of a work injury?

12      A.    Correct.

13      Q.    As a matter of fact, you heard reports,

14   hearsay, that he was at the mall.  Correct?

15      A.    Yes, I did.

16      Q.    He was mobile.  He was ambulating?

17      A.    Yes.

18      Q.    He was walking.  Correct?

19              MS. HAYES:  Objection.  Misstates the

20   testimony.

21      Q.    (BY MR. THOMPSON)  Is that correct?

22      A.    That's correct.

23      Q.    Is that what you heard?

24      A.    That's what I heard.

25      Q.    Were there any changes in Mr. Mestas' regular

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000646

Mestas v. Town of Evansville                17-CV-00017-NDF

166

```
 1   job duties during the time period of January 2013, when

 2   he returned to work, to the date of his termination in

 3   April of 2013?

 4        A.    No.

 5        Q.    Were there any reductions in the amount of work

 6   tasks that Mr. Mestas was assigned after January 2013,

 7   when he returned to work, in comparison to that which he

 8   was assigned to perform on November 26th, 2012, the day

 9   he was injured at work?

10        A.    No.

11        Q.    Were there any reductions in the nature of the

12   work that Mr. Mestas was assigned after January 2013,

13   when he returned to work, in comparison to the nature of

14   the work tasks he was assigned to perform on November

15   26th, 2012, the date that he was injured at work?

16        A.    No.

17        Q.    Was there any reduction in the benefits from

18   the Town of Evansville that were provided to Mr. Mestas

19   after January 2013, when he returned to work, in

20   comparison to the employee benefits that were provided to

21   him before his injury on November 26th, 2012?

22        A.    Not to my knowledge.

23        Q.    Was there any reduction in the amount of pay or

24   compensation he received from the Town of Evansville

25   after January 2013, when he returned to work, in
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion

Exhibit E
000647

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                        167

1    comparison to the pay or compensation that was provided

2    to him before he was injured on November 26th, 2012?

3         A.    No.

4         Q.    Did Mr. Mestas, when he returned to work in

5    January 2013, return to the same position and resume the

6    same duties which he held on November 26th, 2012, the

7    date that he was injured?

8         A.    Please restate that.  I'm sorry.

9         Q.    When Mr. Mestas returned to work in January of

10   2013, did he return to the same position and resume the

11   same duties which he had held on November 26th, 2012, the

12   date that he was injured at work?

13        A.    He did.

14        Q.    Between the date of his return to work in

15   January of 2013 and the date of his termination in April

16   of 2013, did he continue to hold that same position?

17        A.    He did.

18        Q.    And were the job duties the same during that

19   period from January to April of 2013?

20        A.    They were.

21        Q.    Did you expect Mr. Mestas to perform all the

22   duties required of his position when he returned to work

23   in January of 2013?

24        A.    Yes, I had that expectation.

25        Q.    Did you expect Mr. Mestas to perform all the

Mestas v. Town of Evansville                17-CV-00017-NDF

168

1    duties required of his position between the date of his

2    return to work in January of 2013 to the date of his

3    termination in April of 2013?

4        A.    Yes.

5        Q.    You testified that Mr. Mestas, when he returned

6    to work in January 2013, had never presented any type of

7    doctor statement or order which indicated that he had

8    restrictions of any type or that he was physically

9    incapable of performing his regular duties.  So, during

10   the time period of January 2013, when he returned to

11   work, and the date he was terminated, did you perceive

12   him as being disabled?

13       A.    No.

14       Q.    Did you regard him as having any history of

15   being disabled?

16             MS. HAYES:  Objection.  Calls for a legal

17   conclusion.

18       Q.    (BY MR. THOMPSON)  You can go ahead and answer.

19       A.    No.

20       Q.    How did you regard him during the time period

21   of January 2013, when he returned to work, up until the

22   time he was terminated in April of 2013?

23       A.    100 percent able to go and do his job.  I had

24   no other indications to the contrary.

25       Q.    And the reason that you felt that way was based

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                Exhibit E
000649

Mestas v. Town of Evansville                    17-CV-00017-NDF

169

```
 1   upon --

 2        A.    A doctor's release.

 3        Q.    And the fact he never complained to you.

 4   Correct?

 5        A.    Correct.

 6        Q.    That he was not capable of performing?

 7        A.    Yes.  That's correct.

 8        Q.    And so we're clear for the record, the use of

 9   the word "beaner" or derogatory term referring to someone

10   of Hispanic ethnicity, you believe that you've only used

11   that one time in the workplace?

12        A.    Yes.

13        Q.    And that was the time that you used it with

14   Eric Reyna?

15        A.    Yes.

16        Q.    And you went and you apologized to Eric after

17   you used it?

18        A.    I did.

19        Q.    That same day?

20        A.    I did.

21        Q.    And you didn't use it again?

22        A.    I did not.

23        Q.    And you didn't use any jokes which were told

24   regarding minorities?

25        A.    No.
```

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000650

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                            170

1      Q.    Or different ethnic groups?

2      A.    No.

3      Q.    And you didn't use the words "stupid beaner" or

4   "dumb Mexican" or "Mexican" or "beaner" directed to

5   Mr. Mestas.  Is that correct?

6      A.    That is absolutely correct.  I didn't know

7   Mr. Mestas was Hispanic.  Didn't know.

8      Q.    Was Mr. Mestas terminated based upon his

9   ethnicity?

10     A.    No.

11     Q.    Was Mr. Mestas terminated based upon his work

12  injury?

13     A.    No.

14     Q.    Was Mr. Mestas terminated because he was not

15  motivated to go perform what you thought were the

16  essential functions of his job?

17     A.    Yes.

18     Q.    Do you believe that, up until the point of his

19  termination, April 17th, 2013, that Mr. Mestas, at least

20  from what you knew and from the medical records provided,

21  was capable of performing his regular job duties as a

22  sanitation truck driver?

23     A.    The records I had, I believe he was capable

24  physically to do the job.

25     Q.    Were you aware that Mr. Mestas filed an

Mestas v. Town of Evansville                17-CV-00017-NDF

171

1    application with the Social Security Administration,

2    after he was terminated from the Town of Evansville, that

3    he was disabled from performing work during that time

4    period?

5         A.    No.

6              MS. HAYES:  Objection.  During which time

7    period, Counsel?

8              MR. THOMPSON:  During the time period up

9    to April 17th, 2013.

10        Q.    (BY MR. THOMPSON)  Go ahead.

11        A.    No.

12        Q.    Were you aware that he filed an application

13   with the Social Security Administration indicating that

14   he was disabled after he left his employment with the

15   Town of Evansville?

16        A.    No.

17        Q.    Would that be consistent or inconsistent with

18   what you observed?

19        A.    Inconsistent.

20        Q.    And why is that?

21        A.    What I observed is a person who was 100 percent

22   able to do his job.

23              MR. THOMPSON:  Thank you.  I have no

24   further questions.

25

Wyoming Reporting Service, Inc.
1.800.444.2826

Mestas v. Town of Evansville                 17-CV-00017-NDF

172

```
1                        EXAMINATION

2    BY MS. HAYES:

3        Q.    Mr. Brown, Mr. Reyna testified yesterday and

4    also during his interview with the investigator that

5    there were two times when you used the -- when you used

6    terms like "beaner" and "Mexican" in Roy Mestas'

7    presence.  Are you denying that you did that?

8        A.    I do not recall doing that.

9        Q.    Are you denying --

10       A.    I don't recall doing it.

11       Q.    Could you have used terms like "beaner" or

12   "Mexican" in Mr. Mestas' presence?

13             MR. THOMPSON:  Objection as to form.

14   Asked and answered.  Argumentative.  Badgering the

15   witness.

16       A.    Not likely.

17       Q.    (BY MS. HAYES)  So is it your testimony today

18   that Mr. Reyna and Mr. Mestas are mistaken in recalling

19   you using the term "beaner" or "Mexican" to Mr. Mestas?

20             MR. THOMPSON:  Objection as to form.

21   Asked and answered.  Argumentative.  Badgering the

22   balance.

23       A.    The one time I used it, as I stated earlier,

24   was in a conversation with Eric.  Whoever else was in the

25   room, I do not recall.  And I believe that's what I
```

Mestas v. Town of Evansville                    17-CV-00017-NDF

173

1    stated earlier.

2        Q.    (BY MS. HAYES)  Are you qualified to determine

3    whether an employee of yours is disabled?

4        A.    No.

5        Q.    Did you ever have a supervisor whose treatment

6    of you, you would have described as odious?

7        A.    No.

8        Q.    Did you ever have a supervisor who would beat

9    up on you?

10       A.    No.

11       Q.    Would that have been a possible reason, in your

12   opinion, for someone to record conversations with a

13   supervisor who they felt was -- treatment was odious?

14             MR. THOMPSON:  Objection as to form.

15   Speculation.  Foundation.

16       A.    I have no idea what the motivation was or would

17   be.

18       Q.    (BY MS. HAYES)  And you testified that

19   Mr. Mestas took leave for work for his back injury.  Is

20   that correct?

21       A.    Yeah.

22       Q.    Do you know if he received any workers' comp

23   benefits during that time?

24       A.    I believe he did.  I know paperwork was done

25   for that.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit E
000654

Mestas v. Town of Evansville                17-CV-00017-NDF

174

1      Q.      What type of benefits would he have received

2   while he was on injury leave?

3      A.      I have no idea.

4      Q.      Disability?

5      A.      That would be a question for the town clerk.

6      Q.      But it's your understanding that he did receive

7   some sort of workers' comp benefits?

8      A.      My understanding, he received something.

9      Q.      Did you sign any paperwork for him to apply for

10  workers' comp benefits?

11     A.      I do believe I did sign some paperwork, yes.

12     Q.      And what is your understanding of what it means

13  to have a record of a disability?

14     A.      Just say the same question again.

15     Q.      What's your understanding of an employee who

16  has a record of a disability?

17     A.      Someone that has a previous history of

18  disability.

19     Q.      Like what?

20     A.      Well, that would be speculation.  I wouldn't

21  know what that would be.  But whatever might be

22  considered a disability happened previously and there's a

23  record of it.

24     Q.      So somebody who receives workers' comp benefits

25  while they're on medical leave for an injury, would that

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000655

Mestas v. Town of Evansville                17-CV-00017-NDF

175

 1   be, to your understanding, someone having a record of a

 2   disability?

 3               MR. THOMPSON:  Objection as to form.  It

 4   calls for a legal conclusion.  Foundation.

 5        A.    I don't know.

 6        Q.    (BY MS. HAYES)  Where do you currently work?

 7        A.    Natrona County School District.

 8        Q.    Are you full-time?

 9        A.    Permanent part-time.

10        Q.    So, when you said that it was time for you to

11   retire when you left, why did you look for work with the

12   Natrona County School District?

13        A.    Well, it's the middle of winter.  It's

14   November.  Your wife is retired.  You're retired.  And

15   after a month of sitting there and looking at one another

16   for about so long, we both looked at each other and said,

17   "One of us have got to do something."  I said, "All

18   right.  I got a CDL."  My daughter was working at the

19   district.  My wife had previously worked there.  And I

20   said, "See if I can go up there.  I'll drive a bus."

21        Q.    Is that what you're doing now?

22        A.    I drive a school bus.

23        Q.    And how many hours a week do you work?

24        A.    My contract hours -- I'm contracted 175 days

25   and 6.5 hours per day.  And it varies.  It can vary from

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
000656

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                          176

1    a 14-hour day to a two-hour day.

2        Q.    Do you supervise any employees?

3        A.    No.

4        Q.    Was Mr. Mestas physically able to perform his

5    job duties when he returned to work after his injury

6    leave?

7        A.    To the best of my knowledge, he had a full

8    release, and he was able to.

9        Q.    Is it your testimony that -- did Mr. Mestas

10   ever tell you that he was experiencing back pain after he

11   returned to work in mid January of 2013?

12              MR. THOMPSON:  Objection as to form.

13   Asked and answered.

14       A.    No.

15       Q.    (BY MS. HAYES)  But, in the transcript of the

16   audio recording, page -- Document 58 --

17       A.    Page what?

18       Q.    5.  On lines 6 and 7, did he inform you that he

19   was going to have an injection in his back?

20       A.    During this conversation, yes.

21       Q.    So you were aware that he was going in for

22   additional medical treatment for his back?

23              MR. THOMPSON:  Objection as to form.

24       A.    At this time.

25       Q.    (BY MS. HAYES)  Yes or no?

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                          177

 1     A.    At this time, I was aware.

 2               MS. HAYES:  I don't have any further

 3     questions.

 4                         EXAMINATION

 5     BY MR. THOMPSON:

 6     Q.    I've got a question about that exhibit.  Where

 7     does it say in there that he has pain in his back?

 8               MS. HAYES:  Objection.

 9               MR. THOMPSON:  It's a fair question,

10     Counsel.  What's the objection?

11               MS. HAYES:  I never asked about pain in

12     his back.

13               MR. THOMPSON:  Doesn't matter.  I get to

14     ask the question about the exhibit.

15     Q.    (BY MR. THOMPSON)  Where does it say it in

16     there that he has pain in his back?

17     A.    I don't see anything.

18     Q.    How did you know the injection was a medical

19     procedure?

20     A.    I'm not a doctor.  I don't know.

21     Q.    All you knew is that he was going in for an

22     injection.  Correct?

23     A.    Correct.

24     Q.    You didn't know what type of injection it was?

25     A.    Nor for what.

Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit E
                                                                                  000658

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                            178

1       Q.    Nor for what.  And you didn't know whether it

2    was a medical procedure.  Correct?

3       A.    Correct.

4       Q.    And he had not complained of any back pain up

5    to this point in time.  Correct?

6       A.    Correct.

7       Q.    He had not given you any doctors' excuses or

8    notes saying that he should be restricted from work?

9       A.    Correct.

10      Q.    Or that he should be limited in his job duties

11    or responsibilities?

12      A.    Correct.

13      Q.    And up until this point in time, he was

14    performing all his job duties and responsibilities?

15      A.    Yes.

16      Q.    Without any complaints of his back?

17      A.    Yes.

18            MR. THOMPSON:  Thank you.

19                  (Deposition proceedings concluded

20                  4:16 p.m., September 20, 2017.)

21

22

23

24

25

                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                    17-CV-00017-NDF

                                                              179

1                    DEPONENT'S CERTIFICATE

2            I, Dale L. Brown, do hereby certify that I have

3    read the foregoing transcript of my testimony consisting

4    of 178 pages taken on September 20, 2017, and that the

5    same is a full, true and correct transcript of my

6    testimony.

7

8

9

10           _____
                       DALE L. BROWN
11
     ( ) No changes          ( ) Changes attached
12

13           Subscribed and sworn to before me this _____

14   day of _____, 2017.

15

16

17           _____
                       Notary Public

18

19
     My Commission Expires_____.
20

21

22

23

24

25

                    Wyoming Reporting Service, Inc.
                          1.800.444.2826

Mestas v. Town of Evansville                17-CV-00017-NDF

                                                          180

1              C E R T I F I C A T E

2

3         I, RANDY A. HATLESTAD, a Registered Merit

4    Reporter and a Notary Public of the State of Wyoming, do

5    hereby certify that the aforementioned deponent was by me

6    first duly sworn to testify to the truth, the whole

7    truth, and nothing but the truth;

8         That the foregoing transcript is a true record

9    of the testimony given by the said deponent, together

10   with all other proceedings herein contained.

11        IN WITNESS WHEREOF, I have hereunto set my hand

12   and affixed my notarial seal this 2nd day of October,

13   2017.

14

15

16

17   _____

18        RANDY A. HATLESTAD
          Registered Merit Reporter

19

20

21

22

23   My Commission Expires April 2, 2020.

24

25

Mestas v. Town of Evansville
17-CV-00017-NDF     Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion     Exhibit F

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF WYOMING
 2

 3       ROY MESTAS,                   )
                                       ) Civil Action No.:
 4                                     ) 17-CV00017-NDF
                     Plaintiff,        )
 5                                     )
         vs.                           )
 6                                     )
         TOWN OF EVANSVILLE, a duly)
 7       incorporated Municipal    )
         Corporation under the laws)
 8       of the State of Wyoming,  )
         and DALE BROWN, in his    )
 9       official capacity as      )
         Public Works Supervisor   )
10       for the Town of           )
         Evansville,               )
11                                 )
                     Defendants.   )
12       _____)

13

14

15               DEPOSITION OF ROY MESTAS

16          TAKEN ON BEHALF OF THE DEFENDANTS

17               AT CASPER, WYOMING

18          MAY 16, 2017 AT 10:01 A.M.

19

20

21       REPORTED BY:

22       MARY DEAN MARSHALL, C.S.R.
         Notary Public
23

24

25
                   TWO SISTERS REPORTING SERVICE
                  307-335-5362 and 307-438-1629
```

000662

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 183

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 2 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   MEGAN L. HAYES, Attorney at Law, 910 Kearney
 4   Street, Laramie, Wyoming 82070, appearing for and
 5   on behalf of the Plaintiff.
 6
 7   THOMAS A. THOMPSON, Attorney at Law, of the law
 8   firm of MacPherson, Kelly & Thompson, LLC, 616 West
 9   Buffalo, P.O. Box 999, Rawlins, Wyoming 82301,
10   appearing for and on behalf of the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              THE DEPOSITION OF ROY MESTAS was taken on
 2   behalf of the Defendants on this, the 16th day of
 3   May, 2017, at the offices of Schwartz, Bon, Walker
 4   & Studer, LLC, Casper, Wyoming, before Two Sisters
 5   Reporting Service, by Mary Dean Marshall, Court
 6   Reporter and Notary Public within and for the State
 7   of Wyoming, to be used in an action pending in the
 8   United States District Court for the District of
 9   Wyoming, said cause being Cause No. 17-CV00017-NDF
10   in said Court.
11              AND THEREUPON, the following testimony
12   was adduced, to wit:
13              ROY MESTAS,
14   having been first duly sworn to tell the truth, the
15   whole truth and nothing but the truth relating to
16   said cause, deposes and says:
17              EXAMINATION
18   QUESTIONS BY MR. THOMPSON:
19       Q.   Sir, would you please state your full
20   name for the record.
21       A.   Roy Mestas.
22       Q.   Can you spell your last name?
23       A.   M-e-s-t-a-s.
24       Q.   Thank you.  Mr. Mestas, how would you
25   like me to address you during the deposition?
```

**Page 3**

```
 1              I N D E X
 2
 3   TESTIMONY OF ROY MESTAS:               PAGE
 4   Examination by Mr. Thompson      4
 5   Examination by Ms. Hayes        151
 6   Further Examination by Mr. Thompson    153
 7
 8   DEPOSITION EXHIBITS:             MARKED
 9   1 - Resume of Roy Mestas          24
10   2 - SS Adult Disability Report    66
11   3 - Employment file for Roy Mestas  78
12   4 - Employee Handbook, Town of Evansville  89
13   5 - Charge of Discrimination for Roy Mestas  96
14   6 - EEOC Intake Questionnaire     133
15   7 - 3/10/17 letter to Roy Mestas from  138
16       Carla Schanck, Department of
         Workforce Services
17   8 - SSA, Retirement, Survivors and  139
18       Disability Insurance
19   9 - CD of conversations between  146
20       Roy Mestas and Dale Brown
21   10 - Photocopy of notebook       150
22
23
24
25
26
```

**Page 5**

```
 1   Would you like me to call you Roy or Mr. Mestas?
 2       A.   Roy is fine.
 3       Q.   Roy, I introduced myself to you before we
 4   went on the record.  My name is Tom Thompson and I
 5   represent the defendants in a lawsuit that you have
 6   filed in Federal Court.  We are here today for the
 7   purpose of your deposition.  Have you ever had your
 8   deposition taken before?
 9       A.   Yes.
10       Q.   When did you have your deposition taken?
11       A.   I believe I had one taken back in 2015.
12       Q.   In what context did you have your
13   deposition taken?  Was it a civil lawsuit?  Was it
14   a Workers' Compensation matter?  Do you recall?
15       A.   Work Comp.
16       Q.   Who took your deposition?
17       A.   Meaning?
18       Q.   Do you know the attorney's name?  Was
19   that a Laura Kemster, who is an attorney for the
20   Division?
21       A.   I do not remember.
22       Q.   Do you remember if it was a female or a
23   male?
24       A.   It was a female.
25       Q.   Was it in a Wyoming Work Comp matter?
```

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**6**

| | |
|---|---|
| 1 | **A.  Yes.** |
| 2 | Q.  Other than the Work Comp matter that you |
| 3 | had your deposition taken in, what other matters |
| 4 | have you had your deposition taken in? |
| 5 | **A.  For another Work Comp.** |
| 6 | Q.  Was that in Colorado or Wyoming or some |
| 7 | other state? |
| 8 | **A.  Wyoming.** |
| 9 | Q.  Do you recall what year? |
| 10 | **A.  I believe December of 2016 or January of** |
| 11 | **'17.** |
| 12 | (Whereupon, a discussion was held off the |
| 13 | record.) |
| 14 | BY MR. THOMPSON: |
| 15 | Q.  The 2016 or 2017 Work Comp matter in |
| 16 | Wyoming where you had your other deposition taken, |
| 17 | was that deposition taken by the same individual |
| 18 | who took your deposition in 2015? |
| 19 | **A.  I'm not sure I understand.** |
| 20 | Q.  Was it the same attorney that took your |
| 21 | deposition in 2015, then again in 2016 or 2017? |
| 22 | **A.  I still don't understand.** |
| 23 | Q.  You stated that a female attorney took |
| 24 | your deposition in 2015. |
| 25 | **A.  It was a male.** |

**7**

| | |
|---|---|
| 1 | Q.  It was a male in 2015 or a male in 2016? |
| 2 | **A.  '16 or '17, yes.** |
| 3 | Q.  Was the issue that you had your |
| 4 | deposition taken for in 2016 or '17, was that |
| 5 | related to the work injury that you claimed to have |
| 6 | suffered from the Town of Evansville? |
| 7 | **A.  No.** |
| 8 | Q.  What was the issue before Work Comp in |
| 9 | 2016 or 2017? |
| 10 | **A.  I'm not sure I understand that question.** |
| 11 | Q.  What were you fighting Work Comp about in |
| 12 | 2016 or 2017? |
| 13 | **A.  A Work Comp related injury.** |
| 14 | Q.  Were you fighting them about certain |
| 15 | benefits such as temporary total disability, |
| 16 | permanent impairment? |
| 17 | **A.  TTD, yes.** |
| 18 | Q.  Other than those two depositions in |
| 19 | Wyoming Work Comp matters, have you had your |
| 20 | deposition taken in any other case, whether it was |
| 21 | an administrative proceeding or a civil lawsuit? |
| 22 | **A.  No. No.** |
| 23 | Q.  You reached a settlement agreement with |
| 24 | one of your prior employers, United Airlines, |
| 25 | correct? |

**8**

| | |
|---|---|
| 1 | **A.  Yes.** |
| 2 | Q.  Did you have your deposition taken by any |
| 3 | attorney from United Airlines? |
| 4 | **A.  No.** |
| 5 | Q.  Have you ever testified in any court |
| 6 | proceeding? |
| 7 | **A.  No.** |
| 8 | Q.  There are a couple of things that I want |
| 9 | to talk to you about before we get too far into the |
| 10 | deposition.  I will call them guidelines or rules |
| 11 | for us, your attorney and myself, at the end of |
| 12 | this process, to have a clean transcript. |
| 13 | What is going to happen is everything |
| 14 | said in this room today while we are on the record, |
| 15 | whether it's you answering a question, me asking a |
| 16 | question, your attorney and I talking about an |
| 17 | objection, is going to be taken down by the court |
| 18 | reporter.  At the end of the deposition, she's |
| 19 | going to put it in transcript form. |
| 20 | You may have seen that in the Work Comp |
| 21 | matter where you have question/answer, |
| 22 | question/answer.  What we both want, both your |
| 23 | attorney and myself, is to have a clean transcript |
| 24 | at the end of the deposition, and these are some of |
| 25 | the ways we keep that transcript clean. |

**9**

| | |
|---|---|
| 1 | First, we don't talk over each other.  I |
| 2 | think it's just human nature when you start to get |
| 3 | into a conversational mode with an individual that |
| 4 | you are anticipating a question with an answer or |
| 5 | vice versa, I'm anticipating a follow-up question |
| 6 | to what I think your answer is. |
| 7 | So I'm going to do my best to not talk |
| 8 | over you, and I would ask you for the same |
| 9 | courtesy, which is, let me completely ask the |
| 10 | question before you begin answering, okay? |
| 11 | **A.  Okay.** |
| 12 | Q.  You have to give audible responses |
| 13 | instead of head nods.  You can't shake your head no |
| 14 | or shake your head yes because the court reporter |
| 15 | can't take that down.  She is only going to take |
| 16 | down what we are saying in regards to the |
| 17 | deposition. |
| 18 | This isn't a marathon session.  We are |
| 19 | going to go and be here for quite a few hours, I |
| 20 | would anticipate, and so if you need a break, as |
| 21 | long as there is not a question pending or I'm not |
| 22 | in the middle of some area that it is critical for |
| 23 | me to finish up, I will go ahead and let you take a |
| 24 | break, use the restroom, get a drink of water, |
| 25 | stretch if you need to stretch.  Just ask me for a |

**10**

1  break, okay?

2  **A.   Okay.**

3  **Q.**   I'm going to assume that if you answer a

4  question, you have understood the question that I

5  have asked; is that a fair assumption?

6  **A.   Yes.**

7  **Q.**   You understand that you are under oath,

8  correct?

9  **A.   Yes.**

10  **Q.**   What does that mean to you?

11  **A.   To tell you the truth.**

12  **Q.**   You are subject to the penalty of perjury

13  in this sort of proceeding, no different than if

14  you were in courtroom giving testimony in open

15  court; do you understand that?

16  **A.   Yes, I do.**

17  **Q.**   What have you done in preparation for

18  your deposition today?

19        MS. HAYES:  Objection, attorney/client

20  privilege, but you can answer to the extent that it

21  doesn't --

22        MR. THOMPSON:  Let's set one rule before

23  you go any further, to the extent that the proper

24  form of objections are objection as to form.  And I

25  understand that attorney/client communication is

**11**

1  privileged.  You can tell your client not to answer

2  the question in regards to those questions, but

3  speaking objection are not permissible.  You and I

4  know that.  The proper objection to a question is

5  as to form.

6  BY MR. THOMPSON:

7  **Q.**   So your attorney is telling you not to

8  answer this question in regards to communications

9  that you and her have had.  I'm not asking you

10  about that.  I don't want, throughout the day, to

11  know about communications that you and your

12  attorney have had.

13        What I am entitled to know about is what

14  documents you have reviewed in anticipation of this

15  deposition, whether you have talked to anybody

16  other than your attorney outside of her presence,

17  and so that is the question.

18  **A.   Okay.  Will you repeat it, please?**

19  **Q.**   The court reporter can.

20        (Whereupon, the Court Reporter read back

21  the last question.)

22  **A.   In preparation for today, I have read**

23  **over my EEOC complaint, my complaint and the**

24  **findings.**

25

**12**

1  BY MR. THOMPSON:

2  **Q.**   Are those the only documents that you

3  have reviewed?

4  **A.   Yes.**

5  **Q.**   When you say EEOC complaint, do you mean

6  the charge of discrimination that was filed with

7  the State of Wyoming, Wyoming Fair Employment

8  Program?

9  **A.   Yes.**

10  **Q.**   When you say your complaint, are you

11  referring to a separate document?

12  **A.   No.**

13  **Q.**   And the findings that you read are the

14  findings that were reached by the State of Wyoming,

15  correct?

16  **A.   Yes.**

17  **Q.**   Are those the only documents that you

18  reviewed in anticipation of your deposition?

19  **A.   Do they include the DOJ?  That would be**

20  **it.**

21  **Q.**   What are you referring to when you say

22  DOJ?

23  **A.   All the findings from the EEOC and the**

24  **DOJ.**

25  **Q.**   Other than conversations with your

**13**

1  attorney, have you talked to anybody in

2  anticipation of your deposition?

3  **A.   No.**

4  **Q.**   Have you talked to your wife about your

5  deposition today?

6  **A.   Yes.**

7  **Q.**   So she would be a person that you talked

8  to, correct?

9  **A.   She knows about it.  I didn't go into**

10  **detail.**

11  **Q.**   What did you tell her about your

12  deposition today?

13  **A.   That I had it at 10:00.**

14  **Q.**   That's the only thing you told her?

15  **A.   She told me good luck.**

16  **Q.**   Is that the only thing you told her?

17  **A.   Yes.**

18  **Q.**   Anybody else that you talked to about

19  your deposition today?

20  **A.   No.**

21  **Q.**   And you have looked at no other

22  documents, correct, other than the ones that you

23  have mentioned?

24  **A.   I don't remember.**

25  **Q.**   Do you have short-term memory issues?

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**14**

1 A. No.
2 Q. Are those the only three that you looked
3 at?
4 A. **There are a lot of documents there.**
5 Q. I understand, and that's what I'm trying
6 to find out is what you might have looked at in
7 addition to these three documents.
8 A. **What I mean by a lot of documents, I'm**
9 **talking in pages.**
10 Q. So in order to understand your answer,
11 again, I will ask you:  Have you looked at any
12 other documents other than those three?
13 A. **No.**
14 Q. Are you on any medications?
15 A. **Can you be a little more specific?**
16 Q. Any prescription medications?
17 A. **Yes.**
18 Q. What prescription medications are you
19 taking?
20 A. **I'm diabetic, I take Tresiba, I take**
21 **Jentdueto, a vitamin, a low-dose aspirin, just**
22 **basically the diabetic regimen.**
23 Q. Are you still being prescribed
24 Hydrocodone or some other form of narcotic pain
25 medication?

**15**

1 A. **Not at this moment.**
2 Q. When was the last time you were
3 prescribed a pain medication by any of your
4 treating physicians?
5 A. **It's been quite some time.**
6 Q. More than a year?
7 A. **Are you asking in relation to my injury?**
8 Q. For any reason.
9 A. **For any reason?**
10 Q. Yes, sir.
11 A. **No, within the last year.**
12 Q. Are any of the medications that you are
13 taking, do any of them affect your ability to
14 recall certain events?
15 A. **Not that I know of.**
16 Q. You told me that you don't have any
17 problem with short-term memory, correct?
18 A. **Correct.**
19 Q. Do you have any problem with long-term
20 memory?
21 A. **There are things I don't remember, yes.**
22 Q. Have you ever been diagnosed by a doctor
23 as having any long-term memory issues?
24 A. **No.**
25 Q. Or dementia?

**16**

1 A. No.
2 Q. Roy, there have been certain items
3 exchanged by the attorneys in what's called initial
4 discovery or initial disclosures, and one of the
5 items that has been disclosed by your attorney are
6 audio recordings that you made of conversations
7 with Dale Brown.  I have listened to three of those
8 audio recordings.  Are there anymore audio
9 recordings that you have other than those three?
10 A. **No.**
11 Q. Did you make any audio recordings other
12 than those three?
13 A. **No.**
14 Q. Is Dale Brown the only person you
15 recorded?
16 A. **Yes.**
17 Q. Did you make those recordings with Dale
18 Brown's knowledge that you were recording him?
19 A. **No.**
20 Q. Why not?  Why didn't you tell him?
21 A. **Did I need to?**
22 Q. Actually I'm not under oath, so I don't
23 get to answer questions.
24 A. **I'm sorry.  I didn't think I needed to.**
25 Q. Why didn't you think you needed to?

**17**

1 A. **So I had recordings of him making**
2 **statements and doing things that were wrong.**
3 Q. When you were making those recordings,
4 did you anticipate filing a lawsuit?
5 A. **No.**
6 Q. Why did you need recordings of him saying
7 things or doing things that you perceived as wrong?
8 A. **I got tired of being treated poorly.**
9 Q. So what was the purpose of having those
10 recordings?
11 A. **To back up anything I said.**
12 Q. Why did you select those three different
13 points in time that you recorded him?
14 A. **They were random.**
15 Q. Did you erase any recordings of any other
16 employees where you recorded conversations?
17 A. **No.**
18 Q. Have you made recordings prior to your
19 employment with the Town of Evansville -- have you
20 made recordings of any other supervisor or
21 co-employee?
22 A. **No.**
23 Q. On any other job in which you worked?
24 A. **No.**
25 Q. What was the recording device that you

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**18**

```
1   used to make those three recordings?
2       A.   I don't remember.
3       Q.   You can't recall how you recorded them?
4       A.   Just a little handheld.
5       Q.   Whose was it?
6       A.   Mine.
7       Q.   Do you still have that device?
8       A.   I might.  I would have to look for it.
9       Q.   You can produce that device?
10      A.   If I have it, yes.
11      Q.   You haven't done anything to -- I mean,
12  to the best of your recollection, you haven't done
13  anything to try to erase anything on that device,
14  have you?
15      A.   No.  I know one time my kids used it.
16      Q.   If you would go ahead and preserve it, if
17  you could look for it and see if you can find it,
18  I'm going to make a request that it be produced.
19  Your attorney and I can discuss it outside the
20  context of the deposition, but don't do anything to
21  erase anything on there, okay?
22      A.   Okay.
23      Q.   Let me have you tell me a little bit
24  about yourself.  Where did you grow up, Roy?
25      A.   Casper, Wyoming.
```

**19**

```
1       Q.   Were you born here?
2       A.   Yes, I was.
3       Q.   What did your parents do?  How were they
4   employed?
5       A.   My father worked in a tire business for
6   33 and a half years; my mother was in retail and a
7   bartender for a number of years.
8       Q.   Did you go to high school here?
9       A.   Yes.
10      Q.   Did you graduate high school?
11      A.   No.
12      Q.   What was the highest grade you completed
13  in high school?
14      A.   Eleventh.
15      Q.   Did you get your GED?
16      A.   Yes.
17      Q.   What year did you obtain your GED?
18      A.   I think it was '80 -- excuse me.  It was
19  in the '80s.
20      Q.   Did you go on any sort of college or
21  trade school?
22      A.   No.
23      Q.   Tell me a little bit about your family.
24  Are you married?
25      A.   Yes.
```

**20**

```
1       Q.   First marriage?
2       A.   No.
3       Q.   How many times previously have you been
4   married?
5       A.   Once.
6       Q.   Who was that to?
7       A.   My ex-wife?
8       Q.   Yes.
9       A.   Lori.
10      Q.   Do you know what her current last name
11  is?
12      A.   Chornaick, C-h-o-r-n-a-i-c-k.
13      Q.   What year did you get divorced from Lori?
14      A.   It was either '95 or '96.
15      Q.   Was that here in Casper?
16      A.   Yes.
17      Q.   Was she married to you during the time
18  that you were employed at United?
19      A.   No.
20      Q.   What was your dates of employment with
21  United?
22      A.   I hired on November '98 through July of
23  2007.
24      Q.   What's your wife's name now?
25      A.   Kathy.
```

**21**

```
1       Q.   With a K or with a C?
2       A.   With a K.
3       Q.   Have you talked to Kathy about this
4   lawsuit?
5       A.   Not in depth, no.
6       Q.   What have you talked to Kathy about?
7            MS. HAYES:  Objection to the form.  You
8   can answer.
9       A.   Just what she knows from day one.
10  BY MR. THOMPSON:
11      Q.   What's that?
12      A.   How I would come home upset from being
13  called stupid beaner, from being treated
14  condescendingly, for not getting help when I would
15  request help.  They were told not to help me
16  because if they did, they would be reprimanded.  So
17  she knew about that.
18      Q.   So she knows about some of the
19  allegations that you have set forth in this
20  lawsuit, correct?
21      A.   She does.
22      Q.   You have talked to her about that during
23  the time you were employed with Evansville as well
24  as since the lawsuit has been filed?
25      A.   Not since the lawsuit has been filed, no.
```

000667

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**22**

```
1    Q.   Do you have children, Roy?
2    A.   Yes, I do.
3    Q.   What are the names of your children?
4    A.   Biological?
5    Q.   Let's go through biological first.
6    A.   Anthony and Andrew.
7    Q.   What are their last names?
8    A.   Mestas.
9    Q.   What is Anthony's age?
10   A.   33.
11   Q.   Does he live here in Casper?
12   A.   Yes, he did does.
13   Q.   Have you talked to him about this
14   lawsuit?
15   A.   No.
16   Q.   How old is Andrew?
17   A.   He is 27.
18   Q.   Does he live here in Casper also?
19   A.   Yes, he does.
20   Q.   Have you talked to him about this
21   lawsuit?
22   A.   No, I haven't.
23   Q.   Why haven't you talked to your children
24   about this lawsuit?
25   A.   Prior to filing it, they knew about it,
```

**24**

```
1    A.   She is.
2    Q.   How is she employed?
3    A.   Yes.
4    Q.   How is she employed?
5    A.   I'm sorry.  She works for Park Place
6    Assisted Living.
7    Q.   Is she a CNA or an RN?
8    A.   Dietary manager.
9    Q.   Roy, I know it's in the records, but what
10   is your current age?
11   A.   55.
12   Q.   What's your date of birth?
13   A.   9/18/61.
14        (Whereupon, Mestas Deposition Exhibit
15   Number 1 was marked for identification.)
16   BY MR. THOMPSON:
17   Q.   Roy, I will hand you what has been marked
18   as Deposition Exhibit 1 and I will go ahead and ask
19   you to take a look at that.  Tell me when you
20   have had a chance to review it.
21   A.   Okay.
22   Q.   Do you recognize this document?
23   A.   Yes.
24   Q.   How do you recognize it?
25   A.   It's my resume.
```

**23**

```
1    but after filing, no.
2    Q.   So you talked to both your children about
3    the allegations that are in your complaint
4    concerning the conditions from the Town of
5    Evansville, correct, working conditions?
6    A.   Conditions of demeaning -- about how I
7    was treated and called the names I was called, yes.
8    Q.   You stated that there are other children
9    other than biological?
10   A.   Yes.
11   Q.   What are their names?
12   A.   Sydney Holder, Ashleigh Holder and Chase
13   Holder.
14   Q.   Are those Kathy's kids?
15   A.   Yes.
16   Q.   How old is Sydney?
17   A.   Sidney is 16.
18   Q.   Ashleigh?
19   A.   13.
20   Q.   Chase?
21   A.   12.
22   Q.   Do all three of those children live with
23   you?
24   A.   Yes.
25   Q.   What does Kathy do?  Is she employed?
```

**25**

```
1    Q.   You prepared this?
2    A.   Yes.
3    Q.   When did you prepare this document?
4    A.   Most recent is when I updated for Park
5    Place.
6    Q.   So I don't know if I understand your
7    answer. Would that have been as of 9/2016?
8    A.   Yes.
9    Q.   Why did you prepare a resume?
10   A.   I have always had one prepared.
11   Q.   Was there a specific reason for preparing
12   this one?  In other words, were you requested by an
13   employer to have a resume?
14   A.   No.
15   Q.   Were you requested by Park Place to have
16   a resume?
17   A.   When I hired on, yes.
18   Q.   Do I understand, from looking at this
19   resume correctly, that after you left or terminated
20   from the Town of Evansville in April of 2013, that
21   you went to work for Dooley Oil in December 2014?
22   A.   That's correct.
23   Q.   And you worked there for approximately
24   six or seven months?
25   A.   Yes.
```

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**26**

1    Q.    When you worked for Dooley Oil, you were
2    a driver?
3        A.    Yes.
4        Q.    It also says transport and warehouse.
5    Did you work in the warehouse for Dooley Oil
6    Company?
7        A.    Yes.
8        Q.    What did you do in the warehouse for
9    Dooley Oil?
10       A.    Put away freight, inventory.
11       Q.    How did you do that?
12       A.    Forklift.
13       Q.    Other than --
14       A.    And by hand.
15       Q.    So you moved items with a forklift and
16   then you ended up moving items by hand also?
17       A.    Yes.
18       Q.    You left Dooley Oil in June of 2015.
19   Under what conditions did you leave Dooley Oil?
20       A.    Great conditions.
21       Q.    Why did you leave?
22       A.    I was offered the job with Park Place
23   Assisted Living.
24       Q.    Did you voluntarily resign from Dooley
25   Oil?

**27**

1        A.    I gave them my two week notice, yes.
2        Q.    Did you receive any discipline while
3    working for Dooley Oil?
4        A.    I do not recall that I ever did.
5        Q.    When I say discipline, I'm talking about
6    oral reprimands, written reprimands.
7        A.    I think I had one written.
8        Q.    What was the written reprimand that you
9    received?
10       A.    It was for -- I was putting fuel --
11   transferring fuel back into storage tanks, and I
12   accidently put like five gallons -- maybe not even
13   five gallons of gas in the diesel.
14       Q.    You put gasoline in a diesel tank?
15       A.    In a storage tank, underground storage
16   tank.
17       Q.    Who was your supervisor at Dooley Oil?
18       A.    Kelly.
19       Q.    Last name?
20       A.    What's Kelly's last name?  I don't recall
21   his last name.
22       Q.    Kelly is a male?
23       A.    Yes.
24       Q.    What was Kelly's position at Dooley Oil?
25       A.    He was the manager.

**28**

1        Q.    Then you worked for Park Place Assisted
2    Living?
3        A.    Yes.
4        Q.    That's the same employer that your wife
5    is currently working for?
6        A.    Yes.
7        Q.    And you worked for them for approximately
8    two months -- I'm sorry -- a year and two months,
9    14 months?
10       A.    Yes.
11       Q.    What did you do for Park Place Assisted
12   Living?
13       A.    I was their transport driver.
14       Q.    What did that require you to do on a
15   day-to-day basis?
16       A.    Transport residents to and from doctors'
17   appointments, shopping, anything that was for the
18   residents.
19       Q.    Was there any lifting required?
20       A.    Sometimes.
21       Q.    What did that consist of?
22       A.    Wheelchairs or walkers, sometimes a
23   resident.
24       Q.    When you were lifting a resident, you
25   weren't lifting a resident unassisted, were you?

**29**

1        A.    No.
2        Q.    You would lift with another employee of
3    Park Place?
4        A.    Yes.
5        Q.    You were able to do those lifting
6    requirements of that job?
7        A.    Yes.
8        Q.    Why did you leave Park Place?
9        A.    I sustained an injury.
10       Q.    What was the injury that you sustained at
11   Park Place?
12       A.    I had a resident fall on me.
13       Q.    Was that a Wyoming Work Comp claim?
14       A.    Yes.
15       Q.    What part of your body was injured when a
16   resident fell on you at Park Place Assisted Living?
17       A.    Midback.
18       Q.    What benefits did you receive from the
19   State of Wyoming Workers' Compensation Division for
20   that injury?
21       A.    None apparently.
22       Q.    Is the compensability of the injury at
23   issue?
24       A.    Yes.
25       Q.    Is the claim that you have with the State

000669

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion        Exhibit F

**30**

1   of Wyoming Workers' Compensation Division, is that
2   being litigated in front of the Office of
3   Administrative Hearings or in front of the Medical
4   Commission?
5       A.    Currently it's just in litigation.  I
6   believe it is going to be in front of the medical
7   review.
8       Q.    I don't want to know what discussions you
9   have had with your attorney, but do you have an
10  attorney for that?
11      A.    Yes, I do.
12      Q.    Who is that?
13      A.    Peter Timbers.
14      Q.    Is Park Place Assisted Living the one
15  that is contesting the compensability of that
16  injury?
17      A.    No.
18      Q.    It's the State of Wyoming Workers'
19  Compensation Division?
20      A.    Yes.
21      Q.    Are you being treated for that injury?
22      A.    Yes.
23      Q.    Who is treating you?
24      A.    Dr. Turner.
25      Q.    Where is Dr. Turner out of?

**31**

1       A.    Casper.
2       Q.    So when you say you injured your midback,
3   is that thoracic spine?
4       A.    I believe so.  They call it the T9-T10,
5   so I'm assuming it's thoracic.
6       Q.    Are you receiving any -- I understand
7   that the compensability is at issue with the State
8   of Wyoming Workers' Compensation.  Are you
9   receiving temporary total disability benefits?
10      A.    No.
11      Q.    Have you been employed with anybody
12  either on a temporary or part-time or full-time
13  basis since September of 2016?
14      A.    No.
15      Q.    Let's go down to the entry on your
16  resume, Deposition Exhibit Number 1, stating Town
17  of Evansville, 9 of 2012 through 4/17/2013.  You
18  have sanitation route driver listed?
19      A.    Yes.
20      Q.    Describe what you did on a day-to-day
21  basis for the Town of Evansville.
22      A.    Monday morning come, I would report to
23  work at 8:00, go check my truck over.  It's part of
24  the DOT regulations to check your truck, make sure
25  everything works, lights, brakes, air horn,

**32**

1   everything works on that truck.  My license is at
2   issue.  If I'm driving that truck and something
3   doesn't work, I get in trouble.
4       So once my inspection is done, my pretrip
5   inspection, I start the truck, I go on my daily
6   route until completed, make trips to the dump, dump
7   the truck, come back, clean out the truck, clean
8   the truck up, park it, go in the office, clock out
9   and go home.
10      Q.    There were certain times of the year
11  that, as part of your duties with the Town of
12  Evansville, you were required to shovel snow,
13  correct?
14      A.    Yes.
15      Q.    Was that everybody within the public
16  works department?
17      A.    It's supposed to be, yes.
18      Q.    When you had a day where there was an
19  accumulation of snow, describe for me how that day
20  differed versus what you just described.
21      A.    On a snow day, if there was any
22  accumulation, we would go in early, an hour early.
23  So we had to report by seven.  We'd go in, get any
24  necessary equipment we needed to complete the
25  task or the job, which was clearing snow from town

**33**

1   hall, the senior center, and that included the
2   sidewalks, and then we would clean up around the
3   garage, the maintenance garage.
4       Q.    Did that snow shoveling that was
5   required, did that require the use of a handheld
6   shovel?
7       A.    Most of the time.
8       Q.    What other equipment did you use besides
9   a handheld shovel?
10      A.    We had a little John Deere tractor with a
11  snow blade on it, and we also had gas-powered
12  blowers.
13      Q.    How many tractors did you have?
14      A.    One.
15      Q.    How many snowblowers did you have?
16      A.    None.
17      Q.    Did I misunderstand what you stated?  You
18  had equipment --
19      A.    There were gas-powered blowers, like leaf
20  blowers.  I'm sorry.
21      Q.    How many of those did you have?
22      A.    I believe there were at least two.
23      Q.    Those would not work to blow away a heavy
24  accumulation of snow, would they?
25      A.    No, they would not.

000670

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                Exhibit F

**34**

1    Q.   Were those for a light dusting of snow?
2    A.   Yes.
3    Q.   Did your job consist of anything else
4    when you were employed with the Town of Evansville
5    other than driving the sanitation truck and
6    removing snow?
7    A.   Yes.
8    Q.   What else did you do as an employee of
9    the Town of Evansville?
10   A.   We never got to that point.
11   Q.   Why is that?
12   A.   Never got trained.
13   Q.   Let's talk about first what you actually
14   did, and then you can tell me what you didn't get
15   trained on.  As an employee, were you required to
16   do anything else, tasks that you actually
17   accomplished, other than driving the sanitation
18   truck and removing snow?
19   A.   Yes.  I would go and repair bins, which
20   was part of my duty, change out broken bins, repair
21   broken bins, pick up, drop off.
22   Q.   Did that require putting the bin in the
23   truck, driving it to the location, unloading the
24   bin and setting it in position?
25   A.   I'm not quite sure I understand that

**35**

1    question properly.
2    Q.   Well, why don't you tell me what you did
3    when you replaced the bin.
4    A.   Depending on what type of bin we were
5    replacing, if it was just a regular, rollout bin, I
6    could take it and put it in the back of a pickup
7    truck, pick up the bad one, put it in the back of
8    the truck, put the new one out.
9         Now, if it was a metal bin, a two-yard, a
10   three-yard bin, generally it took two to three
11   people.  I had to do it by myself most of the time.
12   We had a truck with a hoist or a crane.  I was told
13   to use that and go do it, so that's how I would do
14   it.
15   Q.   So you would do it -- when you stated
16   that you did it on your own, you had a truck with a
17   hoist or crane, you would use the hoist or crane to
18   put the bin in the truck, and then when you
19   unloaded the bin, you would use the hoist or crane
20   to do that?
21   A.   Yes.
22   Q.   So you weren't lifting the bin into the
23   truck on your own?
24   A.   No.
25   Q.   And you weren't unloading the bin off the

**36**

1    truck on your own?
2    A.   No.
3    Q.   You were using a mechanical hoist?
4    A.   Yes.
5    Q.   Could you do that without any problems?
6    A.   No.
7    Q.   Why couldn't you do that?
8    A.   Because you have a -- it's electrical.
9    You have got to try to control the bin and try and
10   operate that and try and place the bin all at the
11   same time.  You are physically unable to do that.
12   You just can't do it.
13        It takes one person to run the
14   controller, it takes one person to maneuver the bin
15   around and try and swing it away from the truck.
16   When you're doing it by yourself, it's virtually
17   impossible.  So you have got to try and move it
18   out, lay it down.
19        Once it's down, then you have got to
20   either try and move it by yourself or go back and
21   get the big truck and try to position it to the
22   point where you can pick it up with the big truck
23   and set it in the spot.
24   Q.   How much did the bins weigh?
25   A.   150, 200 pounds probably, empty.

**37**

1    Q.   How many times were you required to move
2    one of those bins on your own?
3    A.   At least two or three times.
4    Q.   Was there any journal or log that you
5    kept that would show what you did on a day-to-day
6    basis?
7    A.   I had a note pad that I did recordings
8    on.
9    Q.   How about anything that was required by
10   the employer to be kept?  Did you fill out a time
11   sheet on a day-to-day basis saying, drove around,
12   picked up trash for two hours, moved bin for hour
13   and a half, anything that would have a description
14   of the work that you did and the time it took on a
15   certain date?
16   A.   The employer having something?
17   Q.   The employer requiring you to keep
18   something.
19   A.   No.
20   Q.   So as far as you can recall, the Town of
21   Evansville didn't require you to fill out where you
22   were on a day-to-day basis?
23   A.   No.
24   Q.   You came in at 7 or 8:00 and you punched
25   out at 4 or 5:00 each day?

000671

**38**

1   A.   Yes.

2   Q.   When you applied -- go ahead.

3   A.   I'm sorry.  You asked me at the beginning

4   of the question -- the Town of Evansville did not

5   require and I want to make sure that -- they didn't

6   have anything that was required of me, yes, that

7   was true.  Yes.  I just wanted to make sure I said

8   yes there.

9   Q.   I appreciate that.

10   A.   Yes.

11   Q.   When you applied for the job with the

12   Town of Evansville, did they tell you what the

13   requirements of the job were?

14   A.   Yes.

15   Q.   What did they tell you?

16   A.   That I would be the primary driver for

17   the sanitation truck, and that took almost four

18   days of the week.  If there was anything outside of

19   doing the sanitation, that I would help public

20   works, whether it be mowing in the summertime or

21   fixing a water main in the wintertime.

22   Q.   So your job duties, as I understood them

23   when you applied for the job, were sanitation truck

24   driver, but anything else that public works might

25   require you to do?

**39**

1   A.   Yes.

2   Q.   As far as public works, can you describe

3   what your -- if there was such a thing as a chain

4   of command, do you understand that terminology?

5   A.   Yes.

6   Q.   What's chain of command mean to you?

7   A.   Well, it would start out like with the

8   mayor being the boss.

9   Q.   Okay.

10   A.   And it goes down from there.

11   Q.   What was your chain of command going up?

12   A.   As far as I know, Dale was my immediate

13   supervisor.  He was in charge of public works and

14   sanitation.  Brian Boger was in charge of water and

15   parks, I believe.

16   Q.   Who was above Dale?

17   A.   His immediate supervisor was the mayor.

18   Q.   What was the mayor's name when you were

19   employed there?

20   A.   Phil Hinds.

21   Q.   Did you ever talk to Phil Hinds?

22   A.   Never.

23   Q.   Was that by choice?

24   A.   Never saw him.

25   Q.   Did he have an office at town hall?

**40**

1   A.   I don't know.

2   Q.   Did you ever go to town hall and make any

3   sort of inquiry as to, is Mr. Hinds in?

4   A.   No.

5   Q.   Were you ever in town hall?

6   A.   Yes.

7   Q.   When were you in town hall?

8   A.   I would go there to get petty cash or to

9   get a purchase order number.

10   Q.   Who did you deal with when you went to

11   town hall?

12   A.   It was Janelle or -- she is retired

13   now -- Judy.

14   Q.   Is Janelle's last name Underwood?

15   A.   Yes, it is.

16   Q.   What is Judy's last name?

17   A.   I don't recall.  She is retired.

18   Q.   Were those the only times where you would

19   actually go to town hall?

20   A.   Unless they requested it, that was the

21   only time.

22   Q.   Did you ever have any training sessions

23   at town hall?

24   A.   No.

25   Q.   You were only employed with Evansville

**41**

1   for less than seven months; is that right?

2   A.   I would say yes.

3   Q.   Did you ever operate a lawnmower?

4   A.   No, sir.

5   Q.   I assume you were there too late in the

6   fall and were terminated too early in the spring

7   for public works to be mowing a lawn; is that fair?

8   A.   Yes.

9   Q.   Other than sanitation truck driver, you

10   stated that you were required to do what public

11   works might need to be done.  Any duties or

12   responsibilities that you did outside of being a

13   sanitation truck driver?  In other words, did you

14   ever repair a water break?  Did you ever go with

15   other public work crews and do something other than

16   drive a sanitation truck?

17   A.   Yes.

18   Q.   Tell me about those.

19   A.   He is a firefighter now for the Town of

20   Evansville.  His name is Dan.  I do not remember

21   his last name, but him and I were flushing fire

22   hydrants.

23   Q.   Did that require you to open the fire

24   hydrant?

25   A.   Yes.

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

42

1  Q.  Were you yourself actually required to do
2  that --
3      A.  Yes.
4      Q.  -- or was Dan doing that?
5      A.  We both did.
6      Q.  That consisted of you putting a wrench on
7  the fire hydrant and pulling on it?
8      A.  Yes.
9      Q.  Anything else you recall doing other than
10 flushing fire hydrants?
11     A.  Yes.  We changed furnace filters, air
12 filters, in city hall and the senior center.
13     Q.  Anything else?
14     A.  Other than shoveling, no.
15     Q.  When you were driving the sanitation
16 truck and picking up trash, you are going to
17 various public facilities within the Town of
18 Evansville?
19     A.  And residential.
20     Q.  So it's a municipal trash service?
21     A.  Yes.
22     Q.  How big is the truck?
23     A.  Pretty big.  The GBW on it, I think, was
24 right around 60,000.
25     Q.  When you pick up trash, is that done by a

43

1  hydraulic lift that grabs onto the trash can and
2  puts it in the truck?
3      A.  Yes.
4      Q.  So you are not getting out of the truck
5  at each stop and grabbing the trash can, it's being
6  done by mechanical means?
7      A.  No.
8      Q.  Tell me where I'm wrong.
9      A.  Sometimes there is trash around the bins,
10 sometimes there are couches, sometimes people put
11 stuff in the trash bins that shouldn't be in those
12 bins.  So I would have to physically move the stuff
13 out or try and get help, try and get help to move
14 it, so I can empty the bins to complete my job.
15     Q.  How many sanitation truck drivers were
16 there with the Town of Evansville when you were
17 employed?
18     A.  Everybody is supposed to be qualified to
19 drive that truck.  There were only three of us that
20 ever did it.
21     Q.  On a day-to-day basis when you were
22 working there, how many trucks would be operating
23 each day?
24     A.  One.
25     Q.  How many trucks did the Town of

44

1  Evansville have?
2      A.  One and a half.
3      Q.  What's that half mean?
4      A.  The other one barely ran.
5      Q.  So the Town of Evansville was only using
6  the one truck each day?
7      A.  Yes.
8      Q.  And you were the driver for that
9  sanitation truck?
10     A.  Yes.
11     Q.  Sir, you look like you are uncomfortable.
12 Do you need to take a break?
13     A.  My back is killing me.  Thank you.
14         (Whereupon, a break was taken.)
15         (Whereupon, the Court Reporter read back
16 the last question.)
17 BY MR. THOMPSON:
18     Q.  You understand you are still under oath,
19 correct?
20     A.  Yes.
21     Q.  When you worked for Dooley Oil Company as
22 a driver in the warehouse, what was your hourly
23 rate of pay?
24     A.  Sixteen, I think.
25     Q.  So you were making more driving for

45

1  Dooley Oil Company than you were at the Town of
2  Evansville?
3      A.  Yes.
4      Q.  Were you receiving benefits through
5  Dooley?
6      A.  Yes.  They weren't very good.
7      Q.  What were the benefits that you were
8  receiving?
9      A.  They were standard benefits, but they
10 were the deductibles, and the premiums were just
11 outrageous.
12     Q.  So you had health insurance?
13     A.  I don't believe I opted under their's.  I
14 was under my wife's.
15     Q.  Did you have a retirement program or
16 plan?
17     A.  No.
18     Q.  What were the other benefits you received
19 at Dooley?
20     A.  It would have been vacation pay, holiday.
21     Q.  Sick leave?
22     A.  Yes.
23     Q.  How about as a driver for Park Place
24 Assisted Living, how much were you making?
25     A.  I was making 13 an hour.

000673

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion                    Exhibit F

**46**

1    Q.   Was that 40 hours a week?
2    A.   Minimum of 32, up to 40.
3    Q.   Why did you take a job with Park Place
4    and leave Dooley when you were making $3 more an
5    hour at Dooley?
6    A.   For one, the benefits were better, the
7    hours were better, I wasn't driving over the road,
8    I was home.
9    Q.   When you say driving over the road, did
10   Dooley Oil Company make you leave town?
11   A.   Yes.
12   Q.   How far out of town were you driving for
13   Dooley?
14   A.   I never had to leave the state.
15   Q.   When you say better hours, can you
16   explain that for me?
17   A.   With Park Place, I worked Monday through
18   Friday 7 to 3, 3:30.  At Dooley I was working 7 to
19   5, 6, 10, 12.  It just wasn't set hours, even
20   though when they hired you, it was 8 to 5.
21   Q.   Were you getting overtime when you were
22   working for Dooley?
23   A.   Yes.
24   Q.   You worked for McMurry Ready Mix from
25   June of 2012 to September of 2012?

**47**

1    A.   Yes.
2    Q.   You were a driver for McMurry?
3    A.   Yes.
4    Q.   Who was your boss, do you recall, or your
5    supervisor?
6    A.   I think his name was Tim.
7    Q.   Do you know a last name?
8    A.   No.
9    Q.   Why did you leave McMurry?
10   A.   Bettered myself with the job at the Town
11   of Evansville, I thought.
12   Q.   You voluntarily resigned that employment?
13   A.   Yes.
14   Q.   Did you receive any disciplinary measures
15   while working for McMurry?
16   A.   No.
17   Q.   How much were you making an hour at
18   McMurry Ready Mix?
19   A.   I think it was either 16 or 17 an hour.
20   Q.   So why did you think it was bettering
21   yourself when you were taking a job that paid 2 to
22   $3 less an hour with the Town of Evansville?
23   A.   Once again, I was going to work for a
24   municipality, better benefits, better hours.
25   Q.   Before that, you were working for Mobile

**48**

1    Ready Mix?
2    A.   Yes.
3    Q.   As a ready mix driver?
4    A.   Yes.
5    Q.   Who was your boss at Mobile Ready Mix?
6    A.   I do not remember his name.
7    Q.   Was it Craig Earl?
8    A.   Sounds familiar.
9    Q.   Did you leave Mobile Ready Mix
10   voluntarily or were you terminated?
11   A.   I quit.
12   Q.   Why did you quit?
13   A.   Faulty equipment.
14   Q.   What was wrong with the equipment?
15   A.   Air brakes.
16   Q.   What was wrong with the air brakes?
17   A.   I lost my air brakes on a trip loaded.
18   Q.   And you quit immediately after that trip?
19   A.   Yes.
20   Q.   Did you complain to your supervisor?
21   A.   Yes.
22   Q.   What did you do after losing your air
23   brakes as far as reporting that to your supervisor?
24   A.   State that again, please.
25   Q.   What did you do?  How did you act in a

**49**

1    manner to report that to your supervisor or your
2    employer?
3    A.   Well, I was hurting pretty bad because I
4    couldn't stop the truck.  Once I got it stopped, he
5    was yelling at me over the radio and I told him I
6    lost my air brakes.  He used a few foul language
7    words towards me, and I said, don't talk to me that
8    way, I just lost my air brakes and about totaled
9    the truck.  I finally got the brakes cooled down,
10   took the truck down, unloaded it and said, I'm
11   quitting, taking the truck back into town and
12   quitting.
13   Q.   How long did you work for Mobile Ready
14   Mix?
15   A.   It wasn't very long, probably a couple of
16   months.
17   Q.   Were you injured on the job?
18   A.   Yes.
19   Q.   Did you file a Work Comp claim?
20   A.   Yes.
21   Q.   What was your injury?
22   A.   It was just strained muscles, I think,
23   from grabbing onto the steering wheel and
24   pushing — trying to stop.  I don't know how they
25   described it, but I just couldn't stop.  I was

50

1   hyper whatever they called me. I can't remember.
2   I don't remember what type of injury they called
3   it.
4        Q.    Did you receive benefits from Work Comp
5   for that injury?
6        A.    Yes. They paid for it.
7        Q.    What benefits did you receive?
8        A.    They paid for doctor visits.
9        Q.    Were you put on temporary total
10  disability?
11       A.    No.
12       Q.    Were you injured on the job with McMurry
13  Ready Mix?
14       A.    No.
15       Q.    Were you injured on the job with Dooley
16  Oil Company?
17       A.    Yes.
18       Q.    What injury did you have with Dooley?
19       A.    It was a slip and fall in a containment
20  pit.
21       Q.    What part of the body did you injure when
22  you slipped and fell in the containment pit?
23       A.    The neck.
24       Q.    What did you do to your neck?
25       A.    Just strained it, I think, is what it

51

1   was.
2        Q.    Did you receive benefits from Workers'
3   Compensation as a result of the injury that you had
4   at Dooley Oil Company?
5        A.    They paid for doctors' visits, yes.
6        Q.    Did you receive any temporary total
7   disability?
8        A.    No, didn't need it, never missed any
9   work.
10       Q.    What's the longest period of time you
11  have been employed by any one employer?
12       A.    That would be United Airlines.
13       Q.    How long were you employed with United?
14       A.    From '98 to '07.
15       Q.    You left United voluntarily or were you
16  terminated?
17       A.    It was mutual.
18       Q.    It was mutual, what's that mean?
19       A.    Because of my cervical, I wasn't going to
20  be able to do my job anymore, and they said, you
21  know, we can't have you, so would you mind just
22  quitting or whatever, and I said, all right, so I
23  voluntarily quit.
24       Q.    Where did you work for United Airlines?
25       A.    DIA.

52

1        Q.    Do you recall who your supervisor was
2   during the time period that you worked at United?
3        A.    There were several.
4        Q.    Who were the several supervisors that you
5   had?
6        A.    They had like 20 supervisors.
7        Q.    You can't remember the names of any of
8   them?
9        A.    I can see their faces, but I don't
10  remember their names.
11       Q.    Did you enter into a written settlement
12  agreement with United?
13       A.    There is something.
14       Q.    Do you have a copy of that settlement
15  agreement?
16       A.    On me, no. I know there is one
17  somewhere.
18       Q.    I assume you don't have one on you, but
19  do you have a copy of it at your house?
20       A.    I think I do.
21       Q.    Was there any claim against United that
22  was made by you for a hostile work environment or
23  anything of that nature?
24       A.    No.
25       Q.    It was strictly limited to your medical

53

1   condition?
2        A.    Yes.
3        Q.    Did there come a point in time while
4   working for United that your employer that
5   you couldn't do your job anymore?
6        A.    No.
7        Q.    What was the injury that you were
8   suffering from while working for United that ended
9   up in the settlement agreement?
10       A.    Cervical fusion, C6-7.
11       Q.    Was that from an acute injury, in other
12  words, an accident or injury that occurred?
13       A.    Work-related injury, yes.
14       Q.    Where did the work-related injury occur?
15       A.    United Airlines.
16       Q.    What happened while working for United
17  where you were injured?
18       A.    I was a refueler. I was pulling a hose
19  to refuel, was pulling the fuel hose and something
20  popped in my neck, and there was a sensation down
21  my arm.
22       Q.    Did that result in you not being able to
23  perform your job?
24       A.    Temporarily, yes.
25       Q.    For how long?

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

54

1    A.   I don't recall.  I don't remember.
2    Q.   More than a year?
3    A.   Initially, no, I don't believe so.
4    Q.   Initially, no, but eventually yes?
5    A.   Yes.
6    Q.   Not being able to perform your job for
7    more than a year, is that what led to the
8    settlement agreement?
9    A.   Yes.
10   Q.   Why weren't you able to perform your job
11   for United Airlines?
12   A.   I believe it was part of a functionality
13   test.  I wasn't able to pass a functionality test.
14   Q.   That was a Colorado Work Comp claim,
15   correct?
16   A.   Yes.
17   Q.   What did you agree to do as part of that
18   settlement agreement with United?  They gave you
19   money and you agreed to what?
20   A.   I don't remember.  I don't remember.
21   Q.   Did you agree not to file anymore claims
22   against United for those injuries that you
23   sustained on the job?
24        MS. HAYES:  Objection, asked and
25   answered.

55

1    BY MR. THOMPSON:
2    Q.   Go ahead.
3    A.   I'm sorry?
4    Q.   Go ahead and answer the question.
5    A.   I don't remember.
6    Q.   Since you don't recall, the best place
7    that we would be able to find that answer is in the
8    settlement agreement, correct?
9    A.   I believe so.
10   Q.   And you will produce that to your
11   attorney if you have it?
12   A.   Yes.
13        MS. HAYES:  It's already been produced.
14   BY MR. THOMPSON:
15   Q.   You worked for MWD Engineering from
16   5/2011 through 10/2012?
17   A.   Yes.
18   Q.   Do you know what MWD stands for?
19   A.   Actually MWD is for Measurements While
20   Drilling.
21   Q.   Where were they located?
22   A.   That is for Weatherford -- excuse me --
23   that is for Halliburton, Sperry Drilling Services.
24   Q.   So they were located in Evansville?
25   A.   Yes.

56

1    Q.   Under what terms did you leave that
2    employment?
3    A.   I resigned.
4    Q.   Can you explain to me, MWE Engineering
5    shows employment from 5/2011 to 10/2012, and then
6    on the next page, it says Sperry Drilling Services,
7    10/2010 to 5/2011.  Are those two separate
8    employers?
9    A.   They are the same employer, but when I
10   worked for Halliburton, I went from the Halliburton
11   Energy Services as the warehouseman to an MWD
12   engineer.
13   Q.   So you resigned the position with MWD
14   Engineer?
15   A.   As an MWD engineer, yes.
16   Q.   Why did you resign your position with
17   them?
18   A.   I had a death in my family.
19   Q.   Why did the death in the family cause you
20   to resign your employment?
21   A.   Hit me pretty hard.
22   Q.   Who died?
23   A.   My brother.
24   Q.   That happened in October of 2012?
25   A.   Yes.

57

1    Q.   What was your brother's name?
2    A.   Andy.
3    Q.   Mestas?
4    A.   Montoya.
5    Q.   Did he die here in Casper?
6    A.   No.
7    Q.   Where did he pass away?
8    A.   Colorado.
9    Q.   Roy, I understand that some of this stuff
10   is difficult, and if you need a break, we can take
11   a break, but it's my one opportunity to speak to
12   you.
13   A.   I understand.
14   Q.   So I have to ask these questions, as
15   difficult as they are for you to answer.
16   A.   I understand.
17   Q.   This is my only time that I get to talk
18   to you between now and trial.
19   A.   I understand.
20   Q.   Sorry about your losing your brother, I
21   truly am.
22   A.   It's okay.
23        MS. HAYES:  Let's take a break, Roy.
24   Let's just take a minute.
25        THE DEPONENT:  It hit me pretty hard.

000676

Mestas v. Town of Evansville
17-CV-00017-NDF                 Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                 Exhibit F

**58**

1    MS. HAYES:  Is that okay, Tom?
2    MR. THOMPSON:  That's fine.
3    MS. HAYES:  Let's take a walk down the
4  hall and we'll be right back.
5        (Whereupon, a break was taken.)
6  BY MR. THOMPSON:
7    Q.    Sir, before we took a break, we were
8  talking about MWD Engineer, your employment.  It
9  indicates on your resume that you left that
10  employment in October of 2012.  You had employment
11  with Ready Mix from June 2012 to September of 2012
12  and employment starting with the Town of Evansville
13  in September of 2012.  Is that a typo on your
14  resume?
15    A.    It has to be.
16    Q.    Were you only employed with MWD as an MWD
17  engineer for five months?  Should that be October
18  of 2011?
19    A.    Yes.
20    Q.    Was there a reason you were unemployed
21  from March of 2010 to October of 2010?
22    A.    I was laid off with Weatherford.
23    Q.    So Weatherford, did they terminate you or
24  did they lay you off?
25    A.    Laid off.  It was the downturn.

**59**

1    Q.    Do you recall who your supervisor was
2  with Weatherford?
3    A.    I certainly did.  Great man.  Clint
4  Shirley.
5    Q.    Industrial Distributors, were you laid
6  off, terminated by the employer, or voluntarily
7  quit?
8    A.    Voluntarily quit.
9    Q.    Did you file any Work Comp claims as a
10  result of your employment with Industrial
11  Distributors?
12    A.    No.
13    Q.    Why did you quit Industrial Distributors?
14    A.    I was offered a better job with
15  Weatherford, substantial.
16    Q.    How were you employed between when you
17  left high school up to the time that you started
18  working for United?  I don't need to know every
19  employer, just generally how were you employed?
20    A.    I worked with my father at General Tire
21  for a number of years from junior high through high
22  school and beyond, for a number of years.
23    Q.    Who was your employer immediately prior
24  to United Airlines?
25    A.    I think it was Auto Electric, I think it

**60**

1  was.
2    Q.    Here in Casper?
3    A.    They were here in Casper.  They are no
4  longer around.
5    Q.    Were there any employers that you worked
6  for between when you left high school and the
7  eleventh grade and when you went to work for United
8  Airlines where you filed a Work Comp claim?
9    A.    Only one I can think of.
10    A.    Who is that?
11    A.    That would have been All-Out Fire.
12    Q.    Was All-Out Fire a company here in
13  Casper?
14    A.    Yes.  Well, they are in Mills.
15    Q.    What did you do for All-Out Fire?  How
16  were you employed?
17    A.    I was a certified fire extinguisher tech.
18    Q.    How did you injure yourself on the job
19  with All-Out Fire?
20    A.    Lifting -- oh, God -- acetylene bottles
21  into the back of a truck.
22    Q.    What part of your body did you hurt?
23    A.    It was the shoulder.
24    Q.    Have you filed more than one claim for
25  Workers' Compensation in Colorado other than the

**61**

1  one we talked about?
2    A.    No.
3    Q.    Have you filed claims for Workers'
4  Compensation in any states other than Colorado or
5  Wyoming?
6    A.    No.
7    Q.    Have you been involved in any claims
8  against any other employer other than United
9  Airlines?
10    A.    Only the ones stated.
11    A.    Only what, sir?
12    A.    The ones we talked about.
13    Q.    Separate from the Workers' Compensation
14  claims that you filed, have you filed a claim
15  against any employer other than United Airlines?
16    A.    Yes.
17    Q.    Which employers have you filed claims
18  against?
19    A.    Okay.
20    Q.    Do you not understand the question?
21        MS. HAYES:  If you could clarify.  I
22  think he is not understanding.
23  BY MR. THOMPSON:
24    Q.    I understand that you filed Work Comp
25  claims, okay?

Mestas v. Town of Evansville
17-CV-00017-NDF       Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion       Exhibit F

**62**

1    A.   Okay.
2    Q.   I understand that you were involved in a
3  settlement agreement with United, all right?
4    A.   Okay.
5    Q.   There are other employers that you worked
6  for other than the employers that you filed Work
7  Comp claims against, correct?
8    A.   Yes.
9    Q.   There are other employers that you worked
10 for other than United Airlines, correct?
11   A.   Yes.
12   Q.   Have any of those employers -- other than
13 the Work Comp claims that you filed and other than
14 United Airlines, the settlement agreement, have you
15 filed claims against any of those employers?
16   A.   I think I have mentioned them all.
17   Q.   Have you been involved in any civil
18 litigation other than this lawsuit?
19   A.   I'm not sure I understand civil.
20   Q.   Okay.  Well, tell me what lawsuits you
21 have been involved in other than this lawsuit.
22   A.   Lawsuit, no lawsuits.
23   Q.   How about claims where you have demanded
24 monetary compensation from an employer?
25   A.   No.

**63**

1    Q.   When I asked you that question, you had
2  an inquisitive look on your face.  What were you
3  thinking of?
4    A.   I'm trying to process what your question
5  is.  I don't know that I'm actually understanding
6  your question.
7    Q.   So what I want to know is pretty simple.
8  Have you sued anybody before or have you made a
9  claim for monetary damage?
10   A.   No.
11        MS. HAYES:  That's not Workers' Comp
12 related.
13        THE DEPONENT:  No.
14 BY MR. THOMPSON:
15   Q.   This is the only claim that you have ever
16 had against an employer other than your Work Comp
17 claims?
18   A.   As far as I remember, yes.
19   Q.   Sir, were you ever in the military?
20   A.   No.
21   Q.   Have you ever been charged with a crime?
22   A.   Never.
23   Q.   Let me talk to you about your medical
24 history.  What was the date of injury that you
25 suffered with while working for the Town of

**64**

1  Evansville?
2    A.   The date of the injury?
3    Q.   Yes.
4    A.   November 26, 2012.
5    Q.   How were you injured?
6    A.   Getting out of my truck, I slipped and
7  fell on the ice.
8    Q.   You filed an injury report as a result of
9  that injury, correct?
10   A.   Yes.
11   Q.   Did you indicate all of the parts of your
12 body that suffered injury while getting out of the
13 truck and slipping on the ice?
14   A.   Yes.
15   Q.   You went to the doctor in November of
16 2012 after you suffered this injury, correct?
17   A.   Yes.
18   Q.   You were treated by Dr. Yakel here in
19 Casper?
20   A.   Yes.
21   Q.   As part of that treatment, you went to
22 physical therapy?
23   A.   Yes.
24   Q.   Did that physical therapy last
25 approximately eight to nine months?

**65**

1    A.   I don't remember.
2    Q.   Do you recall when you were released to
3  return to work?
4    A.   January of 2013.
5    Q.   Is Dr. Yakel the one who released you to
6  return to work?
7    A.   Yes.
8    Q.   Did he release you to return to work
9  without any restrictions?
10   A.   Yes.
11   Q.   What did that mean to you?  What was your
12 understanding of that release to return to work?
13   A.   That I could go back to doing my duties.
14   Q.   That was your duties with the Town of
15 Evansville public works department, correct?
16   A.   Yes.
17   Q.   When you went back to work, were you able
18 to do your duties?
19   A.   Yes.
20   Q.   Was there any part of your duties that
21 you could not do?
22   A.   No.
23   Q.   Was that true up through the date of
24 termination?
25   A.   Yes.

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion        Exhibit F

**66**

1  Q.  You went on to be employed with those
2  other employers after termination from the Town of
3  Evansville that we have talked about that are
4  indicated on Deposition Exhibit 1, correct?
5  **A.  Yes.**
6  Q.  You were able to do the duties that were
7  required by those various employers up until the
8  time that you suffered the injury with Park Place?
9  **A.  Yes.**
10  Q.  You had no limitation or restriction with
11  those employers that you were employed by
12  subsequent to the Town of Evansville, correct?
13  **A.  No.**
14  Q.  No restrictions or limitations, correct?
15  **A.  No.**
16      (Whereupon, Mestas Deposition Exhibit
17  Number 2 was marked for identification.)
18  BY MR. THOMPSON:
19  Q.  Sir, I hand you what's been marked as
20  Deposition Exhibit Number 2 and ask you to take a
21  look at that.  Just let me know when you have
22  reviewed it.
23  **A.  Okay.**
24  Q.  Do you recognize that document?
25  **A.  Yes, I do.**

**67**

1  Q.  How do you recognize it?
2  **A.  This is something that I received.**
3  Q.  When did you receive Deposition Exhibit
4  2?
5  **A.  I believe it was like October 2013, I**
6  **think it was.**
7  Q.  Did you have somebody assist you with
8  filling out an application for Social Security
9  disability benefits?
10  **A.  Yes.**
11  Q.  Who is the individual that assisted you?
12  **A.  It was Premier Disability.**
13  Q.  When you were employed with the Town of
14  Evansville, did you share any of the medical
15  documentation that you received from Dr. Yakel with
16  your supervisor?
17  **A.  What medical?**
18  Q.  Any restrictions or limitations the
19  doctor placed on you, the return to work that the
20  doctor provided to you without restrictions, did
21  you share any of that with Dale Brown?
22  **A.  They received all paperwork from my**
23  **doctors.**
24  Q.  How do you know that?
25  **A.  I handed it to them.**

**68**

1  Q.  So your testimony is that you gave all
2  paperwork that you received from Dr. Yakel to Dale
3  Brown?
4  **A.  Yes.**
5  Q.  And all paperwork being what?
6  **A.  Anything to do with my -- related to my**
7  **injury.**
8  Q.  So that would be office visits?
9  **A.  Yes.**
10  Q.  Any procedures that Dr. Yakel performed
11  on you?
12  **A.  Yes.**
13  Q.  The return to work without restrictions
14  that Dr. Yakel provided to you --
15  **A.  Yes.**
16  Q.  -- did you provide that to Dale Brown
17  when you were released to return to work in January
18  of 2013?
19  **A.  Yes.**
20  Q.  Were there any subsequent -- or any
21  documents between that release to return to work
22  without restrictions from Dr. Yakel that you gave
23  to Dale Brown -- were there any subsequent
24  documents?
25      In other words, in January of 2013, you

**69**

1  hand Dale Brown the release to return to work, it
2  says release to return to work without
3  restrictions.  Were there any other documents that
4  you gave Dale Brown between January of 2013 up to
5  the date of termination?
6  **A.  No.**
7  Q.  I just want to make sure I understand
8  your testimony.  You would agree with me that as of
9  the date of termination from the Town of
10  Evansville, that you had been released to return to
11  work and that you had no restrictions, including
12  lifting restrictions, bending restrictions,
13  twisting restrictions, restrictions of any nature
14  placed upon you?
15  **A.  No.**
16      MS. HAYES:  Object to the form of the
17  question, but you can answer.
18  BY MR. THOMPSON:
19  Q.  You said no; is that correct?
20  **A.  Yes.**
21  Q.  If you look in the lower right-hand
22  corner of Deposition Exhibit Number 2, there is a
23  number that starts with SSA, and then it has a
24  bunch of zeros.  Turn to page 6, if you would,
25  000006.

**70**

1    When you applied for Social Security
2    disability, did you tell the Social Security
3    Disability Administration that you stopped working
4    on April 16, 2013?
5        A.    Repeat that, please.
6        Q.    When you applied for Social Security
7    disability benefits, did you represent to the
8    Social Security Administration that you had stopped
9    working on April 16, 2013?
10       A.    I thought it was April 17, 2013.
11       Q.    Is that what you represented to the
12   Social Security Administration?
13       A.    That was my last day of work, yes.
14       Q.    But you were employed after April 17,
15   2013, correct?
16       A.    No.
17       Q.    I thought you worked for Dooley Oil
18   Company?
19       A.    Oh, okay.  I misunderstood the question.
20   I thought you meant employed with the Town of
21   Evansville.  Yes, I was employed.
22       Q.    Why did you represent that you had
23   stopped working as of April 16th or April 17th
24   because of your condition?
25       A.    My work-related injury.

**71**

1        Q.    But that's not why you stopped working,
2    was it?
3        A.    Well --
4        Q.    I mean, you were terminated from
5    employment and then you went back to work for
6    another employer, correct?
7            MS. HAYES:  Objection.
8    BY MR. THOMPSON:
9        Q.    Go ahead.
10           MR. THOMPSON:  Is it as to form?
11           MS. HAYES:  I guess so.  I mean, the date
12   of this -- yes, objection as to form, right.
13   BY MR. THOMPSON:
14       Q.    Do you understand my question?
15       A.    No, I don't.  I'm sorry.
16       Q.    I understand that you applied for Social
17   Security disability, correct?
18       A.    Yes.
19       Q.    You had been receiving benefits from the
20   Social Security Administration that backdate those
21   benefits to April of 2013, correct?
22       A.    Yes.
23       Q.    So they had been paying you from being
24   disabled from April of 2013 to the present,
25   correct?

**72**

1        A.    Yes and no.
2        Q.    What's the no part?
3        A.    There was an overpayment, so they quit
4    paying me.
5        Q.    Was there an overpayment for that period
6    of time that you were working for Dooley Oil and
7    Park Place?
8        A.    Yes.
9        Q.    Did you represent to the Social Security
10   Administration that you were disabled from April
11   17, 2013?
12           MS. HAYES:  Object to form.
13       A.    Say the date.
14   BY MR. THOMPSON:
15       Q.    Did you represent to the Social Security
16   Administration that you were disabled as of April
17   17, 2013?
18       A.    Did I represent -- yes.
19       Q.    Why did you represent to the Social
20   Security Administration that you were disabled when
21   you were gainfully employed?
22           MS. HAYES:  Objection to the form of the
23   question.
24       A.    I wasn't employed.
25

**73**

1    BY MR. THOMPSON:
2        Q.    Well, you were receiving Social Security
3    disability benefits in 2013, correct?
4        A.    Yes.
5        Q.    You received those benefits from April
6    through December of 2013, correct?
7        A.    Yes.
8        Q.    You received Social Security disability
9    benefits in 2014?
10       A.    Yes.
11       Q.    But you were employed?
12       A.    Yes.
13       Q.    So why were you receiving disability
14   benefits when you were employed and otherwise
15   gainfully employed?
16       A.    Part of the Social Security -- if you
17   understand how the Social Security works, they give
18   you benefits until you can -- for -- I don't
19   remember the exact time frame, but they will give
20   you benefits for an extended period of time.
21           And if you happen to make more money than
22   what they are paying you monthly, then your
23   benefits cease, and that is what happened on an
24   overpayment.  I was making more than what I was
25   making off of Social Security, so I had an

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**74**

1  overpayment and it ceased.
2      Q.   So are you done with your answer?
3      A.   Yes.
4      Q.   Is it your testimony, sir, under oath
5  that you did not represent to the Social Security
6  Administration that you were disabled?
7      A.   No.
8      Q.   Let's turn to page eight of Deposition
9  Exhibit 2. Read the remarks section on that page.
10     A.   Okay.
11     Q.   Is that what you represented to the
12  Social Security Administration when you made
13  application for disability benefits?
14     A.   Yes.
15     Q.   What happened between when you made
16  application for Social Security disability benefits
17  and when you went to work for Dooley Oil? Were you
18  cured of some of these illnesses and ailments?
19     A.   No.
20     Q.   You still had them when you went to work
21  for Dooley Oil?
22     A.   Yes.
23     Q.   When you made application for Social
24  Security disability benefits, in looking back at
25  the application now, is it true or not true that

**75**

1  you were totally disabled?
2      A.   It would be true.
3      Q.   So what happened between when you were
4  totally disabled and when you went to work for
5  Dooley Oil? Because during that time period, I
6  would assume that you are still totally disabled,
7  but then you go to work for Dooley Oil.
8      A.   Trying to get back to the workforce.
9      Q.   So when you go to work for Dooley Oil,
10  are you no longer totally disabled?
11     A.   No, I'm still disabled, but I'm trying to
12  make gainful employment, trying to get off Social
13  Security.
14     Q.   But when you made application, as set
15  forth on page eight of Deposition Exhibit 2, it
16  says that you are totally disabled from performing
17  any substantial gainful activity due to the
18  symptoms and restrictions; is that true? That's
19  what that says, correct, on 5/16/2013?
20     A.   Yes.
21     Q.   I'm just trying to understand. Did your
22  medical condition change at all?
23     A.   No.
24     Q.   You still suffered -- when you went to
25  work for Dooley Oil, you still suffered from all

**76**

1  these problems, correct?
2      A.   Yes.
3      Q.   Were you also receiving -- during this
4  time period between when you left employment with
5  Evansville and when you went to work for Dooley
6  Oil, were you receiving temporary total disability
7  benefits from the State of Wyoming Work Comp?
8      A.   No.
9      Q.   Did you continue to search for employment
10  between when you left employment with the Town of
11  Evansville up to the time you were hired by Dooley
12  Oil?
13     A.   No.
14     Q.   So you didn't do any job searches during
15  that time period?
16     A.   No.
17     Q.   Was Dooley Oil Company the first employer
18  that you made application to after you left
19  employment with the Town of Evansville?
20     A.   Yes.
21     Q.   Here is where the confusion is for me,
22  Roy. You have told me two things, and you can
23  correct me when I'm done asking the question if I
24  have misstated this.
25          Part of your testimony today has been

**77**

1  that you were fully capable of performing the job
2  duties that were required by the Town of Evansville
3  up to the date that you were terminated with them.
4          And then we have just reviewed Deposition
5  Exhibit Number 2, which is either the date that you
6  were terminated or the day after you were
7  terminated where you represented that you were
8  totally disabled and not capable of performing any
9  gainful employment.
10          So are both of those true or is one true
11  and the other not true? Do I misunderstand your
12  testimony?
13     A.   No, you did not. When I applied for
14  those questions from Premier, they asked for those
15  dates, when was my last day of work. I gave it to
16  them. They are the ones that filled out the
17  paperwork, not myself. I gave them answers to
18  their questions, just like I'm doing with you
19  today, to the best of my ability, but I did attest
20  to that, so that's all true.
21     Q.   So both of those statements are true, you
22  were fully capable of performing the jobs, the job
23  duties required by Evansville, up to the date of
24  termination, and you were totally disabled the day
25  after termination?

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

78

1   A.   Yes.
2   Q.   Was Thomas A. Clint the individual from
3   Premier that assisted you?
4   A.   Yes.
5   Q.   I take it you still have type II
6   diabetes?
7   A.   Yes.
8   Q.   You are insulin dependent?
9   A.   Yes.
10       (Whereupon, Mestas Deposition Exhibit
11   Number 3 was marked for identification.)
12   BY MR. THOMPSON:
13   Q.   Sir, I hand you what has been marked as
14   Deposition Exhibit Number 3 and ask you to take a
15   minute and look at that.  Just let me know when you
16   are done.
17   A.   Excuse me.  I haven't seen any of these.
18   Okay.
19   Q.   Did you obtain a copy of your personnel
20   file after you left the employment of the Town of
21   Evansville?
22   A.   No.
23   Q.   Have you ever seen your personnel file
24   before?
25   A.   No -- well, excuse me.  Yes, I have.

79

1   Q.   When did you see it?
2   A.   I might have missed these couple.  I
3   think it was in disclosure.
4   Q.   Sir, let me have you turn to page 121 as
5   marked in the bottom right-hand margin.  Is this
6   the application that you filled out for employment
7   with the Town of Evansville?
8   A.   Yes.
9   Q.   If you turn to 0122, you indicated to
10   Evansville that you were physically or otherwise --
11   that you were not physically or otherwise unable to
12   perform the duties of the job for which you were
13   applying, correct?
14   A.   Correct.
15   Q.   You testified that they described what
16   those duties were to you before you took the job,
17   correct?
18   A.   Yes.
19   Q.   In the next part of the application, it's
20   indicated that you had a CDL license?
21   A.   Yes.
22   Q.   Do you have to have a physical for your
23   CDL license?
24   A.   Yes.
25   Q.   What does that physical consist of?

80

1   A.   You have to squat, bend, lift, color --
2   colorblindness.  It's been three years now.  My
3   CDL, I'm going to lose it.  It's pretty extensive.
4   Q.   Prior to making employment with the Town
5   of Evansville, when had been the last time that you
6   had undergone a physical for your CDL?
7   A.   It was two years prior to this December.
8   Q.   Two years prior to when you made
9   application to the Town of Evansville?
10   A.   Prior to December 16th.
11   Q.   Well, that would put you in 2014.  You
12   weren't working for Evansville then.  So what I'm
13   trying to figure out is you made application to the
14   Town of Evansville in 2012, correct?
15   A.   Yes.
16   Q.   When was your last physical prior to
17   making application to the Town of Evansville?
18   A.   I don't remember.
19   Q.   Do you recall who the doctor was that
20   performed that physical for you?
21   A.   It was at InstaCare.
22   Q.   Here in Casper?
23   A.   Yeah.  I think that's where it was at.
24   Q.   Do you go to the same place each renewal?
25   A.   I have, yes.

81

1   Q.   Let me have you turn to 80123.  Is the
2   employer under paragraph two an employer that's
3   included on Deposition Exhibit 1?
4   A.   I must have omitted it.
5   Q.   This is the time period that you said you
6   weren't working because of the loss of your
7   brother?
8   A.   No.
9   Q.   I thought you said you lost your brother
10   in October of 2011.
11   A.   I did lose my brother in 2011, yes.
12   Q.   Are you correcting your testimony?
13   A.   No, I lost my brother in October of 2011.
14   Q.   You stated earlier that you were not
15   working after you lost your brother because I asked
16   you specifically about the date on your resume.
17   But now this shows that you were working between
18   October of 2011 and April of 2012.
19   A.   Well, I can't dispute what's in black and
20   white.  I omitted it somehow, so yes.
21   Q.   Who is NOV?
22   A.   National Oilwell Varco.
23   Q.   What did you do for National Oilwell
24   Varco?
25   A.   I did warehouse and inside sales.

Mestas v. Town of Evansville
17-CV-00017-NDF                 Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                 Exhibit F

82

1    Q.    Did you voluntarily leave that position?
2    A.    Yes.
3    Q.    Were you injured on the job?
4    A.    Yes.
5    Q.    This says reason for leaving, had
6    surgery.  What was the surgery that you had?
7    A.    Elbow.
8    Q.    Do you know how many Work Comp injuries
9    you filed in your lifetime?
10   A.    No.
11   Q.    More than ten?
12   A.    No.
13   Q.    Under item number four under employment
14   experience, it's left blank.  Is there a reason
15   that you didn't put down United?
16   A.    I just didn't.
17   Q.    Why?
18   A.    I didn't.
19   Q.    I understand you didn't.  Do you know why
20   you didn't?
21   A.    No.
22   Q.    Let me have you turn to page 124.  Is
23   that your signature?
24   A.    Yes, it is.
25   Q.    And the date is September 10, 2012?

83

1    A.    Yes.
2    Q.    You understood that as defined by Wyoming
3    law, your employment relationship was at will?
4    A.    Yes.
5    Q.    Let me have you turn to page 130.  Is
6    that your signature on page 130?
7    A.    Yes.
8    Q.    What's the date?
9    A.    9/24/12.
10   Q.    Why did you sign page 130?  What was the
11   purpose?
12   A.    I believe it's a handbook is what it
13   says.
14   Q.    Were you acknowledging receipt of the
15   employee handbook for the Town of Evansville?
16   A.    Yes.
17   Q.    The personnel rules and regulations,
18   correct?
19   A.    Yes.
20   Q.    Did you, in fact, receive a copy?
21   A.    Yes.
22   Q.    Let me have you turn to page 132.  Is
23   that your signature?
24   A.    Yes.
25   Q.    It's dated September 26, 2012?

84

1    A.    Yes.
2    Q.    And you are acknowledging receipt of
3    resolution number 2,000 -- excuse me -- 20-2003
4    stating that you acknowledge receipt of and have
5    reviewed that resolution, correct?
6    A.    Yes.
7    Q.    Let me have you turn to the next page,
8    133.  Is that your signature?
9    A.    Yes.
10   Q.    It's dated September 26, 2012?
11   A.    Yes.
12   Q.    You acknowledge receipt of ordinance
13   number 10-2009, correct?
14   A.    Yes.
15   Q.    Let me have you turn to page 140.  What
16   do you recall about page 140 of that document?
17   A.    That I was being threatened if I didn't
18   sign it, that I was going to be terminated.
19   Q.    What is the document?
20   A.    It's an extension of my probation.
21   Q.    Were you a probationary employee with the
22   Town of Evansville?
23   A.    I was.
24   Q.    What is your understanding of being a
25   probationary employee?

85

1    A.    That you are on probation, just the same
2    as if you are at will.
3    Q.    This was given to you by who?
4    A.    I think it was in the manual.
5    Q.    Who presented you this document?
6    A.    Janelle.
7    Q.    Page 140 of this deposition exhibit.
8    A.    Yeah, I believe -- like I said, I think
9    it was -- excuse me.  I retract that.  This was
10   given to me by Dale Brown.
11   Q.    It says on the document from Dale Brown
12   and Brian Boger?
13   A.    Yes.
14   Q.    Did Brian Boger also participate in
15   giving you this document?
16   A.    No.
17   Q.    It's an extension of your probationary
18   period?
19   A.    Yes.
20   Q.    Who threatened you that if you did not
21   sign, you would be fired from your job?
22   A.    Dale.
23   Q.    That's your testimony under oath,
24   correct?
25   A.    That is.

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**86**

1    Q.    Was this on January 14, 2013 that he made
2    that threat?
3    A.    Yes.
4    Q.    What did you do about receiving that
5    threat of if you don't sign, you are going to be
6    terminated?  Did you go talk to anyone?
7    A.    No.
8    Q.    Why not?
9    A.    Dale Brown, Phil Hinds, they are friends,
10   best of friends.
11   Q.    So you thought --
12   A.    People are afraid to talk to the mayor.
13   Q.    Who has told you that they are afraid to
14   talk to the mayor?
15   A.    Employees.
16   Q.    Well, I need names.
17   A.    Eric, Ron.
18   Q.    Eric Reyna?
19   A.    Eric Reyna.
20   Q.    What's Ron's last name?
21   A.    I think it's Edmond.  I don't know how
22   you say his last name.
23   Q.    Okay.
24   A.    Chris, whatever Chris' last name was.
25   Those guys, two of the firemen that are no

**87**

1    longer -- that were part of public works, they are
2    fire fighters.  First name is Dan and the other
3    one -- I can't remember.  I can't remember his
4    name.
5    Q.    All five of those employees or former
6    employees told you that they were afraid to go talk
7    to the mayor?
8    A.    Yes.  I heard conversation that the mayor
9    would not do anything to Dale.
10   Q.    Who did you overhear it in conversation?
11   A.    All those guys.  They said they were
12   friends.
13   Q.    The statement that they were afraid to go
14   talk to the mayor, is that a -- and we will depose
15   these individuals -- is that a statement that they
16   made to you or did you overhear in conversation?
17   A.    Both.
18   Q.    Let me have you turn to page 146.  You
19   filed a claim for unemployment after your
20   termination from the Town of Evansville?
21   A.    After my termination, no.
22   Q.    When did you file a claim for
23   unemployment?
24   A.    When I was released from Workers' Comp.
25   Q.    Would that have been after your

**88**

1    termination from the Town of Evansville?
2    A.    Yes.
3    Q.    That would have been in June of 2014?
4    A.    Yes.
5    Q.    When you say when you were released from
6    Workers' Comp, do you mean from when you stopped
7    receiving benefits from Workers' Compensation?
8    A.    Yes.
9    Q.    You weren't under any restriction from
10   Work Comp from January of 2013 up to the date of
11   your termination, were you?
12   A.    January of 2000 -- repeat that, please.
13   Q.    Work Comp didn't place you on any work
14   restrictions, the only person that placed you on a
15   work restriction was Dr. Yakel and he released you
16   to return to work, correct?
17   A.    Yes.
18   Q.    Is this a copy of the application that
19   you filled out?
20   A.    It's the claim that I put in.
21   Q.    You gave unemployment a statement as to
22   why you were fired?
23   A.    I more than likely did.
24   Q.    This says claimant's statement.  Do you
25   see that?

**89**

1    A.    About my back, yeah.
2    Q.    Is that what you told unemployment?
3    A.    Uh-huh.
4    Q.    Is that a yes?
5    A.    That I had surgery, yes.
6    Q.    You didn't say anything in the claimant's
7    statement about being harassed or terminated
8    because of your ethnicity, did you?
9    A.    No.
10   Q.    Let me have you turn to page -- let me
11   mark this.
12          (Whereupon, Mestas Deposition Exhibit
13   Number 4 was marked for identification.)
14   BY MR. THOMPSON:
15   Q.    I give you Deposition Exhibit Number 4.
16   It's marked Evansville 0040 to Evansville 0018.
17   This is a copy of an employee handbook from the
18   Town of Evansville, and you acknowledged, as you
19   have already testified, that you received a copy of
20   the employee handbook while you were employed,
21   correct?
22   A.    I received one of them, yes.
23   Q.    Let me have you turn to 0060.  Can you
24   read under employment practices, section one, Equal
25   Employment Opportunity statement, that first

Mestas v. Town of Evansville
17-CV-00017-NDF    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion    Exhibit F

90

1    paragraph out loud.
2        A.    The Town of Evansville is an Equal
3    Opportunity employer.  Discrimination on the basis
4    of race, color, national origin, religion,
5    handicap, disability, sex, age, veteran status or
6    political affiliation with respect to terms and
7    conditions of employment, including, but not
8    limited to, recruitment, employment, appointment,
9    reinstatement, termination, training or any other
10    personal action is prohibited except where a bona
11    fide occupational qualification or job requirement
12    exists.
13        Q.    That's not the first time that you read
14    that, correct?
15        A.    I don't know if it's the same book.
16        Q.    Well, that was in the book that you
17    received, wasn't it?
18        A.    I don't know.  They have several volumes
19    of this, so I don't know if it's the same one.
20        Q.    Okay.
21        A.    I received a book, but I don't know if
22    it's the same one.
23        Q.    I will represent to you for purposes of
24    this question that this is a copy of the manual
25    that you received, as Evansville has indicated to

91

1    me.  You testified earlier that you read the
2    handbook when you received it, correct?
3        A.    I read a handbook that I received, yes.
4        Q.    And you are not disputing that this was
5    in there?
6        A.    I don't remember reading that.  If it's
7    in my handbook, then yes.
8        Q.    Did you ever speak to anyone about what
9    you perceived as harassment or discrimination based
10    upon your ethnicity by Dale Brown?
11        A.    Talked to Dale.
12        Q.    Did you talk to anyone other than Dale?
13        A.    The other guys in town that heard it,
14    that knew, the other employees.
15        Q.    Those are Eric, Ron and Chris?
16        A.    And Dan.
17        Q.    Did you ever go to the mayor?
18        A.    No.
19        Q.    Did you ever go to the town attorney?
20        A.    No.
21        Q.    Why not?
22        A.    Because they wouldn't listen.
23        Q.    What's the name of the town attorney?
24        A.    Phil Willoughby.
25        Q.    Why do you think Mr. Willoughby wouldn't

92

1    listen?
2        A.    Because he doesn't listen to anybody.
3        Q.    Why do you say that?
4        A.    I have seen it.
5        Q.    Have you observed complaints made by
6    other employees to Mr. Willoughby where he has been
7    non-responsive?
8        A.    No complaints.
9        Q.    What have you observed where you were
10    able to make the statement that you just made about
11    Mr. Willoughby?  What is the basis for that
12    statement?
13        A.    Attitude.
14        Q.    I need to find out what the basis for
15    that statement is.  When you say attitude, are you
16    referring to a specific incident?
17        A.    No -- well, he's there to defend the Town
18    of Evansville, such as you.  I went in there and
19    had a speeding ticket at one time, so to deal with
20    him before I became a town employee was not the
21    best treatment that a guy could get as being
22    somebody who had a moving violation.  So because of
23    my past experience, I didn't want to go talk to
24    him.
25        Q.    Because Mr. Willoughby did not dismiss

93

1    the ticket?
2        A.    No.  We made an agreement.  He didn't
3    dismiss it, we made an agreement.
4        Q.    Did he reduce the miles per hour that was
5    on the citation?
6        A.    He reduced the fine.
7        Q.    Because of that dealing with
8    Mr. Willoughby, you believed he would not listen to
9    a claim that an employee of the Town of Evansville
10    was discriminating against you based upon
11    ethnicity?
12        A.    No.
13        Q.    I don't understand your answer.
14        A.    I didn't understand your question, I
15    guess.
16        Q.    Is it based upon the incident or the
17    interaction that you had with Mr. Willoughby when
18    you had a speeding citation that you then believed
19    that he would not listen to your complaints of
20    discrimination?
21        A.    No.
22        Q.    What was the basis that you had --
23        A.    Because --
24        Q.    Let me finish.
25        A.    Okay.  I'm sorry.

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion        Exhibit F

94

1    Q.    What was the basis that you thought he
2    wasn't going to listen to you in regards to
3    allegations of discrimination?
4        A.    I guess it could just be hearsay from
5    other employees.
6        Q.    So other employees had dealings with
7    Mr. Willoughby and told you that he would not be
8    responsive to your complaints?
9        A.    Repeat that question, please.
10            (Whereupon, the Court Reporter read back
11   the last question.)
12           THE DEPONENT:  I don't know if they had
13   dealings with him, as I said, but a lot of it was
14   hearsay conversation.
15   BY MR. THOMPSON:
16       Q.    What was the hearsay?
17       A.    That Willoughby doesn't listen to people.
18       Q.    Who told you that?
19       A.    I just heard conversation.  Nobody told
20   me, I just heard conversation.
21       Q.    Who was speaking when you overheard
22   conversation?
23       A.    The town employees.
24       Q.    Each and every one of the individuals you
25   have given me?

95

1        A.    I don't think Ron was part of it.  I
2    think it would probably be Eric.  Wilbur might have
3    been in there.  Wilbur was a former employee.
4        Q.    Chris?
5        A.    No, I think -- Chris might have been, because
6    I know Chris had some dealings with him, him and
7    the mayor.
8        Q.    So based upon you overhearing
9    conversations, hearsay, in regards to Willoughby
10   not being responsive to complaints, you chose not
11   to go to him and say, I'm being discriminated
12   against or I'm being harassed?
13           MS. HAYES:  Objection to the form of the
14   question.
15   BY MR. THOMPSON:
16       Q.    Is that correct?
17       A.    Do I need to answer that question?
18       Q.    Yes, sir.
19       A.    Yes.
20       Q.    Did you ever see the Equal Opportunity
21   Employment posters at any facility owned by the
22   Town of Evansville?
23       A.    I don't remember.
24       Q.    So they may have been there, you just
25   can't recall?

96

1        A.    May have.
2            (Whereupon, Mestas Deposition Exhibit
3    Number 5 was marked for identification.)
4    BY MR. THOMPSON:
5        Q.    If you want to stand, you are free to do
6    that.
7        A.    I appreciate it.  We'll keep pushing on
8    here.
9        Q.    You tell me when you need a break.
10       A.    Okay.  Thank you.
11       Q.    Is this the charge of discrimination that
12   you filed?
13       A.    Let me look through it here.  Yes.
14       Q.    Let me have you turn to the first page
15   which is marked FUP 000242.  You allege that the
16   discrimination that was occurring was occurring
17   based upon disability and national origin, correct?
18       A.    Yes.
19       Q.    What was the disability that you suffered
20   from when you were employed by the Town of
21   Evansville?
22       A.    My work-related injury.
23       Q.    How were you disabled?
24       A.    I had a back injury.
25       Q.    Well, you were released to return to

97

1    work, correct?
2        A.    I was still disabled, I was still
3    injured.
4        Q.    Did that disability prevent you from
5    doing any activity or duty or responsibility from
6    your employer?
7        A.    No.
8        Q.    You were able to care for yourself,
9    correct?
10       A.    To a point, yes.
11       Q.    You could perform the manual tasks that
12   the employer told you to do?
13       A.    Yes.
14       Q.    You could lift?
15       A.    Yes.
16       Q.    You could bend?
17       A.    Yes.
18       Q.    You could eat?
19       A.    Yes.
20       Q.    You could walk?
21       A.    Yes.
22       Q.    Tell me how that disability -- you are
23   saying it was from your back?
24       A.    My back injury, yes.
25       Q.    What or how did that effect your

000686

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**98**

1  employment with the Town of Evansville?

2      MS. HAYES:  Objection to the form of the

3  question. You can answer.

4      A.    Can you rephrase that, please?

5  BY MR. THOMPSON:

6      Q.    Sure.  What impact or affect did that

7  disability have on your employment with the Town of

8  Evansville?

9      A.    There were times when I would call for

10  help, which I had to use my personal phone, didn't

11  have a radio because I was told I didn't need one.

12  So if I needed help moving some trash around a

13  trash bin -- because my back bothered me still.

14         I went in to get an injection on the 17th

15  or 18th of April, 2013. So my back was bothering

16  me again, and I requested help.  And if I had any

17  assistance where they accommodated me -- and they

18  didn't. So my back was bothering me again from

19  moving snow.

20      Q.    I truly want to be able to understand

21  your testimony, but earlier you testified that when

22  you were released to return to work by Dr. Yakel

23  with no restrictions that you could perform all of

24  your duties and responsibilities.

25      A.    And I did.

**99**

1      Q.    Are you telling me now that there were

2  times that you could not perform your job duties

3  and responsibilities?

4      A.    When I reinjured my back shoveling snow.

5      Q.    So during the time period you were

6  employed, your prior testimony is inaccurate?

7      MS. HAYES:  Objection to the form of the

8  question.

9      A.    I don't understand.

10  BY MR. THOMPSON:

11      Q.    Well, you have testified under oath --

12  and we are going in circles because I'm getting

13  different testimony when I ask you different

14  questions.

15         You testified earlier that you were fully

16  capable of meeting the duties, responsibilities and

17  obligations of the employer up to the date that you

18  were terminated?

19      A.    And I did.

20      Q.    Now you are telling me that you

21  couldn't --

22      A.    I didn't say I couldn't. I said I

23  requested assistance and I completed all my task

24  without any assistance, and that's what aggravated

25  my back injury even more, and that's why I needed

**100**

1  to go and get injections again.

2      Q.    Did you ever go to Dale Brown and say, my

3  back is hurting me, I need assistance?

4      A.    Yes.

5      Q.    You asked him for an accommodation?

6      A.    I called him.  I called him.

7      Q.    So if we listen to the tape where on the

8  date of the termination you state that you never

9  asked for an accommodation, is the audio recording

10  accurate or is your testimony now accurate?

11      MS. HAYES:  Objection, misstates the

12  testimony.

13  BY MR. THOMPSON:

14      Q.    The audio recording hasn't been altered,

15  has it?

16      A.    No.

17      Q.    We'll listen to it in a little bit, okay,

18  and then you can answer some follow-up questions.

19         Did Dale Brown tell you on the date that

20  you were discharged that he was discharging you

21  because you could no longer do your job?

22      A.    No.

23      Q.    So that's an inaccurate statement in this

24  Deposition Exhibit 5?

25      A.    Well, if you listen to the recording, he

**101**

1  said things are no longer working out.

2      Q.    He never told you that he was discharging

3  you because you could no longer do your job?

4      A.    Well, he did say that, too, yes.

5      Q.    In that audio recording?

6      A.    No, that was before. I believe that was

7  before.

8      Q.    Well, you state on this signed Deposition

9  Exhibit 5, that on or about April 17, 2013, the

10  director of public works told me that I was being

11  discharged because I could no longer do my job.

12      A.    Well, if I put it in there, it's got to

13  be on the recording.

14      Q.    And if it's not on the recording?

15      MS. HAYES:  Objection, argumentative.

16  BY MR. THOMPSON:

17      Q.    If it's not on the recording, he didn't

18  tell you that?

19      A.    No. It was told to me.

20      Q.    Did you record your entire conversation

21  with Dale Brown on April 17, 2013?

22      A.    From beginning to end, yes. I'm going to

23  stand, please.

24      Q.    Yes, sir. You admitted in that

25  conversation with Dale Brown on April 17, 2013,

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

102

1  that you did not do what he required you to do in
2  regards to snow shoveling, correct?
3      A.   I asked to be excused.
4      Q.   Did you do what he asked you to do as far
5  as snow shoveling on that date?
6      A.   Yes.
7      Q.   You didn't shovel the snow?
8      A.   On which date?
9      Q.   April 17th.
10     A.   No.  I was fired that day.
11     Q.   How about on April 16th?
12     A.   Yes.
13     Q.   Is that the day that you asked to go home
14 to get the snowblower?
15     A.   No.  I believe it was the week before.
16     Q.   On the day that you were asked to shovel
17 snow where you wanted to go home to get the
18 snowblower and to bring it back, did you shovel
19 snow?
20     A.   Yes.
21     Q.   Was there a time when he asked you to
22 shovel snow that you didn't shovel snow?
23     A.   No.
24     Q.   Well, let's listen to the tapes.
25     A.   Okay.  We can take a break to get this

103

1  set up.
2          (Whereupon, a break was taken.)
3  BY MR. THOMPSON:
4      Q.   We are back on the record.  Off the
5  record, counsel for the plaintiff and I had a
6  discussion in regards to documentation from the
7  Social Security Administration.  Mr. Mestas has
8  indicated that he has received a demand for
9  overpayment or for repayment of Social Security
10 disability benefits that he has received.
11         I have not received that as part of the
12 initial disclosures in this matter and I am making
13 a request on the record, which I will follow up in
14 writing, that plaintiff's counsel obtained the same
15 from her client rather than waiting an extended
16 period of time to get an updated file from the
17 Social Security Administration.  Is that an
18 accurate representation of our conversation,
19 Counsel?
20         MS. HAYES:  It is, and I'm checking my
21 files, too, to see if those documents have been
22 produced.  I will do my best to obtain what I can.
23 BY MR. THOMPSON:
24     Q.   Roy, we are going to go ahead and play
25 the recordings that you made of conversations that

104

1  you had with Dale Brown, and I'm going to play them
2  one at a time and then ask you some questions as a
3  follow-up, okay?
4      A.   Okay.
5      Q.   We do not need the audio recording
6  transcribed.  What we'll do is we'll introduce the
7  audiotape as a deposition exhibit and then we'll
8  have it transcribed at a later date.  These were
9  made on three different dates; is that correct?
10     A.   Yes, I believe so.
11     Q.   I will play these sequentially as they
12 were produced.  This is file 53, whatever
13 identifier that is.
14         (Audio is played.)
15 BY MR. THOMPSON:
16     Q.   The length is 19 minutes, 28 seconds.
17 Who were you with before you began to speak to Dale
18 Brown.
19     A.   That was Eric outside the office.
20     Q.   We will get a transcript of this, but I
21 heard him say, don't go in there and try and make
22 him mad.  Is that what you recall Eric saying?
23     A.   That's what he said.
24     Q.   Why was he saying that, do you know?
25         MS. HAYES:  Objection, speculation.

105

1          MR. THOMPSON:  I said do you know.
2      A.   No.
3  BY MR. THOMPSON:
4      Q.   When you were with Eric, were there times
5  where he observed you going in and talking to Dale
6  and making him mad?
7      A.   No.
8      Q.   Do you know what the date of this
9  recording was?
10     A.   That one had to be -- no, I don't
11 remember.
12     Q.   Do you know what month?
13     A.   February maybe.
14     Q.   Was this a typical interaction between
15 you and Dale?
16     A.   Towards the end, yes.
17     Q.   So is this an example of what is
18 characterized in the complaint as harsh and
19 condescending treatment by Dale Brown?
20     A.   Yes.
21     Q.   You believe he was harsh and
22 condescending?
23     A.   Very.
24     Q.   And specifically in this recording?
25     A.   Parts of it, yes.

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

**106**

1    Q.   He was willing to talk to you, correct?
2    A.   **Yes.**
3    Q.   He dismissed Brian, who I assume is Brian
4    Boger?
5    A.   **Yes.**
6    Q.   Is there any discussion during this audio
7    recording that you believe reflected his harassment
8    or discrimination toward you based upon your
9    ethnicity?
10   A.   **Not in that one, no.**
11   Q.   Do you believe he was argumentative in
12   this audio recording?
13   A.   **Yes.**
14   Q.   He was complaining about you arguing with
15   him, correct?
16   A.   **Yes.**
17   Q.   And you apologized for that behavior in
18   the audio recording?
19   A.   **Yes.**
20   Q.   You stated that you saw his point?
21   A.   **Yes.**
22   Q.   Had you been argumentative with him?
23   A.   **No.**
24   Q.   Why did you apologize?
25   A.   **You can't do anything right for Dale.**

**107**

1    Q.   So you were not being honest with Dale in
2    this recording?
3    A.   **I was just trying to keep everything**
4    **smooth.**
5    Q.   Were you being honest with Dale in this
6    recording?
7    A.   **I was trying to be honest, yes.**
8    Q.   When you were relating that you were sick
9    for six weeks and your wife told you to stay home
10   and that she was going to call an ambulance, you
11   were aware during this entire time period that you
12   were recording your statements on the audio,
13   correct?
14        MS. HAYES:  Objection, misstates the
15   recording.
16   BY MR. THOMPSON:
17   Q.   Correct?
18   A.   **It speaks for itself, yes.**
19   Q.   Well, the tape speaks for itself?
20   A.   **Yes.**
21   Q.   Your understanding of what was going on
22   with the audio recording doesn't speak for itself,
23   so I'm trying to find out whether or not you were
24   aware of the fact that the statements that you were
25   making were being put on that audio.

**108**

1    A.   **Yes.**
2    Q.   And Dale told you he understood that you
3    didn't hurt your back on purpose, correct?
4    A.   **Yes.**
5    Q.   Did he ever make a statement outside of
6    this recording that he believed that you hurt your
7    back on purpose?
8    A.   **Not that I remember.**
9    Q.   Did he ever make a statement that he
10   believed you were faking or malingering?
11   A.   **Not that I remember.**
12   Q.   On this recording, Dale talked about team
13   and building an interpersonal relationship with the
14   team.  Did he talk about that frequently?
15   A.   **No.**
16   Q.   Was it only on this recording that you
17   ever heard that?
18   A.   **Yes.**
19   Q.   Is it only on this recording that you
20   heard him talk about interfacing with the team?
21   A.   **Yes.**
22   Q.   He was talking to you on this recording
23   about getting cross-trained in other areas of the
24   public works department, correct?
25   A.   **Yes.**

**109**

1    Q.   Did he talk to you on other occasions
2    about cross-training?
3    A.   **No.**
4    Q.   How many conversations did you have with
5    Dale?
6    A.   **Not very many.**
7    Q.   I will try to specify the time period,
8    from the time you were released to go back to work
9    without restriction until the date of termination.
10   A.   **There was an occasional good morning,**
11   **hello.  We never had extended conversations.**
12   Q.   So would you say less than five?
13   A.   **A week, or you mean in a day?**
14   Q.   Total.
15   A.   **From the time I came back to the time I**
16   **was dismissed?**
17   Q.   Yes.
18   A.   **No, we had more than five.**
19   Q.   How many do you believe on a weekly
20   basis?
21   A.   **Three, four.**
22   Q.   How many of those was one on one?
23   A.   **Never.**
24   Q.   This one was.
25   A.   **That one was, excuse me, yes.**

000689

Mestas v. Town of Evansville
17-CV-00017-NDF    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion    Exhibit F

**110**

1    Q.    Are there only three conversations that
2  you had with Dale that were one-on-one
3  conversations?
4        A.    Yes, at my request.
5        Q.    And these three that are on the audio
6  recordings that you provided in the disclosures?
7        A.    Yes.
8        Q.    Did you believe that Dale, on this audio
9  recording, was trying to coach or counsel you on
10  how to do your job?
11        A.    No.
12        Q.    When he was telling you about how to do
13  your job, what did you think he was doing other
14  than coaching or counseling?
15        A.    Being condescending.
16        Q.    Were you sincere when you were laughing
17  on this audio recording or was that something that
18  you were doing just to please Dale?
19        A.    To please Dale.
20        Q.    So that was not a sincere laugh?
21        A.    I was pleasing Dale.
22        Q.    Was it a sincere laugh?
23        A.    No.
24        Q.    You heard him say that he is an entirely
25  different type personality than Brian, and that's

**111**

1  Brian Boger, correct?
2        A.    Yes.
3        Q.    What was Dale's management style like, if
4  you could describe that for me?
5        A.    Very, very harsh to everybody -- I
6  shouldn't say everybody.  There were people who
7  were his pets, but if he didn't like you, you were
8  on his list.
9        Q.    Was he harsh to people in the department
10  that were not Hispanic?
11        A.    If he was mad at them, which most of the
12  time he was, yes.
13        Q.    So would you characterize his management
14  style as being rough and condescending to people
15  that he was mad at?
16        A.    Yes.
17        Q.    That was across the board, correct?
18        A.    No.
19        Q.    Other than those people that were his
20  pets?
21        A.    Yes.
22        Q.    Who were his pets?
23        A.    Eric would have been one, Travis, Dan.
24  That's it.
25        Q.    Was Eric, Travis or Dan Hispanic?

**112**

1        A.    Eric is.
2        Q.    So Eric was his pet, but Eric was of
3  Hispanic origin, correct?
4        A.    Yes, he was.
5        Q.    And he didn't discriminate against Eric
6  based upon his ethnicity?
7        A.    Yes, he did.
8        Q.    I thought Eric was his pet.
9        A.    He still called him a stupid beaner.
10  Eric took it as, you know, it's okay, it's okay,
11  and I said, it's not okay, it's not okay.  Eric was
12  afraid of losing his job.  You have to understand
13  Dale's position.
14        Q.    We will get into the comments that you
15  allege in your charge of discrimination.
16            You stated earlier that you couldn't
17  replace the bins on your own because you would have
18  to put the bin down and then you would have to go
19  get a different truck, but Dale was telling you in
20  this audio to use the skid steer with the
21  forklift, to go ahead and put the bins in position
22  on your own, and he said, I have done it by myself,
23  other people in the department have done it by
24  themselves, correct?
25        A.    Correct.

**113**

1        Q.    Did you ever use the skid steer to take
2  the bins to the location to where they needed to be
3  put out or changed out?
4        A.    No.  I was never trained to run it.
5        Q.    You weren't qualified with a CDL to run
6  it?
7        A.    You don't need a CDL to run a forklift.
8  It's a skid steer.
9        Q.    You weren't qualified to run it?
10        A.    No.  I wasn't trained.
11        Q.    Have you ever run a piece of heavy
12  equipment such as a skid steer in any of your past
13  employment?
14        A.    Yes, I have.
15        Q.    Why weren't you trained then?
16        A.    Ask Dale.
17        Q.    Is that what he told you, you couldn't
18  run it?
19        A.    I needed to be trained in all areas.
20  That's part of the training.
21        Q.    So is it your testimony that even though
22  on this audio recording, he is telling you to use
23  the skid steer, that he also told you that you
24  couldn't use the skid steer?
25        A.    He said I could, so that's kind of a --

**114**

1    repeat your question, please.

2         (Whereupon, the Court Reporter read back

3    the last question.)

4         **A.   No, he did not tell me I couldn't.**

5    BY MR. THOMPSON:

6         Q.   So why didn't you use the skid steer to

7    go ahead and replace bins?

8         **A.   Because, as I stated, I was not trained**

9    **as per Town of Evansville's manual.**

10        Q.   Who told you you weren't trained?

11        **A.   Dale says it himself.  I need to be**

12   **trained in all areas.**

13        Q.   Did Dale specifically tell you that you

14   weren't trained to use the skid steer?

15        **A.   No.  I have never run that skid steer.**

16        Q.   So who told you that you weren't trained

17   to use the skid steer?

18        **A.   Town of Evansville.**

19        Q.   Who from the Town of Evansville told you

20   you weren't trained to use the skid steer?

21        **A.   Nobody.**

22        Q.   Thank you.

23        **A.   You're welcome.**

24        Q.   I will have you listen to an audio

25   recording that is labeled A-0000058.

**115**

1         (Audio is played.)

2    BY MR. THOMPSON:

3         Q.   You heard an audio recording that lasted

4    five minutes and 49 seconds.  You recorded that,

5    correct?

6         **A.   Yes.**

7         Q.   The other individuals that were recorded

8    were not aware that you were recording, correct?

9         **A.   Yes.**

10        Q.   Was that Dale Brown as one of the

11   individuals on that recording?

12        **A.   Yes.**

13        Q.   Who was the other individual that you

14   said, what are you raising your eyebrows for?

15        **A.   It might have been Brian.**

16        Q.   You recorded it.  At the beginning, you

17   stated it was April 11th, correct?

18        **A.   Yes.**

19        Q.   You were stating at the beginning, let's

20   see what Dale has to say about my doctor's

21   appointment?

22        **A.   Yes.**

23        Q.   Was Dale complaining about your doctor's

24   appointment in this recording?

25        **A.   He complained about -- no.**

**116**

1         Q.   He told you to put it on the calendar,

2    correct?

3         **A.   I asked him.**

4         Q.   And he said, go ahead and put it on the

5    calendar absolutely?

6         **A.   Yes.**

7         Q.   When you told him that you had that

8    doctor's appointment and you were going to have the

9    injection, he said okay?

10        **A.   Yes.**

11        Q.   Is this an example of his harsh and

12   condescending treatment of you?

13        **A.   Not particularly on there, no.**

14        Q.   Did you see anything wrong with his

15   management style in this audio recording?

16        **A.   Not in that particular one.**

17        Q.   Do you believe he did anything wrong on

18   this audio recording as far as his supervisory

19   capacity over you?

20        **A.   No.**

21        Q.   Did you consider his demeanor to be

22   professional?

23        **A.   No.**

24        Q.   On this audio recording?

25        **A.   No.**

**117**

1         Q.   You thought it was unprofessional?

2         **A.   It was always unprofessional.**

3         Q.   And this audio recording is an example of

4    him being unprofessional?

5         **A.   He was always unprofessional, yes.**

6         Q.   This laughter, was that fake laughter?

7         **A.   Yes.**

8         Q.   That was done to impress Dale?

9         **A.   Keep things smooth.**

10        Q.   So you were not being sincere when you

11   were laughing?

12        **A.   I tried.**

13        Q.   Were you being sincere or were you doing

14   it just to please Dale?

15        **A.   Please Dale.**

16        Q.   This third audio recording is marked

17   A-0000059.

18        (Audio is played.)

19   BY MR. THOMPSON:

20        Q.   We just heard what was marked as

21   A-0000059.  The audio recording lasted four minutes

22   and 26 seconds.  Is that the entire recording of

23   your conversation with Dale Brown?

24        **A.   Yes.**

25        Q.   Why did it cut out at the end?

Mestas v. Town of Evansville
17-CV-00017-NDF         Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion         Exhibit F

**118**

1    A.    I have no idea.

2    Q.    You and Dale Brown were still talking at

3  that point, weren't you?

4    A.    I don't remember.

5    Q.    You can't tell from the audio recording?

6    A.    I don't remember.

7    Q.    That's not the question.  You can't tell

8  from the audio recording?

9    A.    Play it over again and I will listen.

10   Q.    We'll go towards the end, okay?

11   A.    Okay.

12        (Audio is played.)

13        THE DEPONENT:  It just ended, yes.

14  BY MR. THOMPSON:

15   Q.    Were you still in the middle of the

16  conversation with him?

17   A.    Sounds like it.

18   Q.    You don't know what happened to the rest

19  of the recording?

20   A.    No, sir.

21   Q.    This was Wednesday, April 17th?

22   A.    Yes.

23   Q.    Now, in your charge of discrimination,

24  the deposition exhibit that you have in front of

25  you, you state that you were told that you were

**119**

1  discharged because you no longer could do your job.

2  Do you see that in paragraph two, respondent's

3  defense?

4    A.    Yes.

5    Q.    Were you told that on the audio

6  recording?

7    A.    No.

8    Q.    Why did you put it in the charge of

9  discrimination?

10   A.    I don't remember.

11   Q.    You state or you signed this on May 3rd,

12  2013, and this states, I swear or affirm that I

13  have read the above charge and that it is true, to

14  the best of my knowledge, information and belief,

15  correct?

16   A.    Yes.

17   Q.    Did you believe that during this

18  conversation, Mr. Brown, Dale Brown, was harsh and

19  condescending toward you?

20   A.    Yes.

21   Q.    This is another example of his harsh and

22  condescending treatment towards you?

23   A.    Yes.

24   Q.    What was the mistake that you were

25  referring to?

**120**

1    A.    When I slipped and fell on the ice.

2    Q.    At the beginning where you said, this is

3  all one day, one mistake?

4    A.    When I slipped and fell on the ice.

5    Q.    Then you go on to talk about how bad your

6  back was.  Had you ever related any of that to the

7  employer?

8    A.    Yes.  Dale knew.

9    Q.    I thought you told me earlier that you

10  had given nothing to Dale Brown between the slip

11  that you received from Dr. Yakel saying you could

12  return to work with no restrictions up to the date

13  of termination.

14   A.    No paperwork, that's correct.

15   Q.    You only had three individual

16  conversations with Dale, correct?

17   A.    Recorded.

18   Q.    Well, that's not what you said earlier.

19        MS. HAYES:  Objection, misstates the

20  testimony.

21  BY MR. THOMPSON:

22   Q.    The testimony is as in the transcript.

23  When did you tell Dale that your back was hurting

24  you?

25   A.    I believe it was after the initial first

**121**

1  heavy snowstorm we had there in April.

2    Q.    Is that the only time you told him your

3  back was hurting you?

4    A.    I told him my back was hurting and that's

5  why I was going in to get an injection, because I

6  wanted to get it done that day and I couldn't get

7  it done that day.

8    Q.    You were on doctor's release, correct?

9    A.    I was released to full duty, yes.

10   Q.    So as far as the doctor was concerned, he

11  didn't put you on any restrictions to include, but

12  not limited to the shoveling of snow, correct?

13   A.    Correct.

14   Q.    When you were talking about him denying

15  use of the snowblower, that wasn't a snowblower

16  from the Town of Evansville, you had requested to

17  go home, to load up your personal snowblower in

18  your pickup truck and to come back to the Town of

19  Evansville to use your personal snowblower?

20   A.    Yes.

21   Q.    And he denied that request?

22   A.    Yes.

23   Q.    Do you believe he was denying that

24  request to you based on national origin?

25   A.    I have no idea.

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

**122**

1  Q.  Why do you think he was denying the
2  request to go get your personal snowblower?
3       MS. HAYES:  Objection, speculation.
4  BY MR. THOMPSON:
5  Q.  If you know.
6  A.  I don't know.
7  Q.  Did you believe that was inappropriate to
8  deny your request?
9  A.  Yes.
10  Q.  Why?
11  A.  Because he stored all his equipment over
12  there in town.  He used the backhoe, he had his
13  four-wheelers with a snowplow on it, he had his
14  flatbed trailers at the town hall -- I mean, at the
15  maintenance garage.  So if he could use town stuff,
16  why couldn't we use our personal stuff?  He was
17  using it for his personal gain, so why couldn't he
18  use our personal stuff to make our job easier?
19  Q.  How far away from the Town of Evansville
20  shop did you live at the time in April of 2013?
21  A.  Oh, probably ten blocks maybe.
22  Q.  And you were going to load a snowblower
23  into the pickup truck by yourself?
24  A.  No.
25  Q.  How were you going to do it?

**123**

1  A.  My son was at the house.
2  Q.  So you and your son?
3  A.  Or my son could have done it.  It's not
4  that big of a snowblower.
5  Q.  You told Dale that you were doing your
6  job up until yesterday.  What happened the day
7  before this conversation that you weren't doing
8  your job that day?
9  A.  My back was killing me.  I would take --
10  shoveled snow again.  We had two weeks back to back
11  of heavy, heavy snowstorms, and it took all the
12  equipment.  It was just shoveling snow.
13  Q.  Were you not able to shovel snow the day
14  before?
15  A.  I shoveled.
16  Q.  Why did you say that I was doing my job
17  up until yesterday?
18  A.  Because I was hurting.
19  Q.  Was it true that you had never had a back
20  problem when you told Dale Brown in this --
21  A.  No --
22  Q.  Let me finish the question -- when you
23  told Dale Brown, in this conversation on April 17,
24  2013, that you never had a back problem?
25  A.  No, it's not true.

**124**

1  Q.  Why did you tell him that?
2  A.  Because I had never had four or five
3  bulging disks, I had strained muscles, so I never
4  had a back injury to that degree.
5  Q.  You filed Work Comp claims on your back?
6  A.  Yes.
7  Q.  Prior to going to work for the Town of
8  Evansville?
9  A.  Yes.
10  Q.  On this tape you stated that Dale Brown
11  offered you an accommodation, but you refused it?
12  A.  What accommodation?
13  Q.  I don't know.  That's what you stated on
14  the tape.
15  A.  He did?
16  Q.  That's what you stated on the tape, sir.
17  A.  I don't remember.
18  Q.  You stated on the tape that you are a man
19  of high integrity?
20  A.  Yes, I am.
21  Q.  How do you define integrity?
22  A.  Somebody that has respect for authority,
23  that doesn't talk back to people unless you stand
24  up for your rights and when you think you are being
25  talked down to and if you have a legitimate

**125**

1  complaint, you know, things like that.
2  Q.  Do you believe a man of high integrity is
3  honest?
4  A.  Should be.
5  Q.  Do you believe that they are honest with
6  other people that they deal with?
7  A.  They should be, yes.
8  Q.  Do you believe it's of the highest
9  integrity to record someone when they don't know
10  they are being recorded?
11  A.  Yes.
12  Q.  In the charge of discrimination that you
13  filed and signed, you state that there were two
14  occasions in which Dale Brown made racist comments
15  to you, correct?
16  A.  Yes.
17  Q.  Are those the only two occasions?
18  A.  There were other occasions.
19  Q.  Why didn't you include them in the charge
20  of discrimination?
21  A.  Because I never wrote them down.  I
22  started writing them down and those are the two
23  dates that I wrote them down.
24  Q.  Are those the only two dates that you
25  know for certain?

**126**

1    A.   Yes.

2    Q.   What were the racist comments that he

3    made to you on these two dates?

4    A.   He made them out loud in front of other

5    employees, stupid beaner, dumb Mexican.

6    Q.   I want to know exactly what he said.  Are

7    those the two statements that he made?

8    A.   He would also make racial comments or

9    jokes.  I don't care what anybody -- it's just not

10   right for anybody to sit there.

11   Q.   I'm not asking for your commentary, I'm

12   asking you for what he said and when he said it.

13   A.   I stated the dates that he did on the

14   notepad.

15   Q.   What are the dates?

16   A.   I believe it was February 23rd and March

17   something.  I don't remember the date.  It was

18   February 22nd and March 27th.

19   Q.   You were just handed the charge of

20   discrimination by your attorney, correct?

21   A.   Yes.

22   Q.   If you need to refer to a document, would

23   you ask me and I will have you do that.

24   A.   Okay.

25   Q.   The comments that he made were stupid

**127**

1    beaner or beaner?

2    A.   Yes.

3    Q.   Which one, do you recall specifically?

4    A.   Both.

5    Q.   Did he make that comment to you?

6    A.   Yes.

7    Q.   In what context did he use those words?

8    A.   In a demeaning way.

9    Q.   In what context?  What was the sentence?

10   What were you doing?  Where was he at?

11   A.   One was Eric and I were going to go out

12   and do a job, and Eric is another Hispanic, and he

13   said, I don't need you beaners going together.

14   Eric was really upset about it.  Dale went and

15   found Eric, put him in the truck and apologized to

16   Eric for it.  He never came and found me and

17   apologized to me.

18        Eric told me at the end of the day, yeah,

19   Dale come and told me, I'm sorry, Eric, I should

20   have never said that.  And he asked me, did he come

21   to you, and I said, no, he don't come to me.

22   Q.   Other than speaking to Eric about it, did

23   you speak with any other official of the Town of

24   Evansville about that incident?

25   A.   I didn't need to.  They all heard it.

**128**

1    Everybody heard it there.

2    Q.   There were officials from the Town of

3    Evansville --

4    A.   Not officials, employees.

5    Q.   Do you understand my question?

6    A.   Yes.  No, I did not talk to any

7    officials.

8    Q.   What was the other statement that he made

9    to you on the other date?

10   A.   That's why I have you beaners, and he

11   also said, that's why I have you Mexicans.

12   Q.   And were those two statements made on the

13   same day?

14   A.   No.

15   Q.   One of them you included in your report?

16   A.   Yes, the beaner one was.

17   Q.   Well, let's look at the Deposition

18   Exhibit Number 5, which is the charge of

19   discrimination.  You have two dates in here.  One

20   is February 22nd, 2013.  Is that the incident that

21   you just told me about?

22   A.   Yes, February 22nd.

23   Q.   And the other incident was on March 27,

24   2013?

25   A.   That's correct.

**129**

1    Q.   And he used the same phrase on both days?

2    A.   At least, yes.

3    Q.   Did he use the same phrase on both days?

4    A.   Yes.

5    Q.   You believe there is another date that

6    you can't recall that he used --

7    A.   Yes.

8    Q.   -- other derogatory words towards you?

9    A.   Yes.

10   Q.   When would that have been?  After March

11   27, before March 27th?

12   A.   Between February and the time of my

13   dismissal.

14   Q.   On neither of those occasions did you go

15   to any public official for the Town of Evansville

16   and complain?

17   A.   I did to Dale.

18   Q.   Did you go to the mayor or any council

19   member?

20   A.   No.

21   Q.   Did you go to any employee at town hall?

22   A.   No.

23   Q.   Did you talk to the town attorney?

24   A.   Excuse me.  Yes, I went to Dale.

25   Q.   Is Dale located at town hall?

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

**130**

1    **A.   No, he is at the maintenance garage.**
2    Q.   Did you go talk to or complain to any
3    person at town hall?
4    **A.   No.**
5    Q.   You went and talked to Dale, and that's
6    the only person that you directed your complaint
7    towards?
8    **A.   I addressed him because I thought it was**
9    **wrong.**
10   Q.   What was Dale's response after the
11   February 22nd, 2013 incident where you went and
12   complained to him?
13   **A.   Repeat that, please.**
14         (Whereupon, the Court Reporter read back
15   the last question.)
16         THE DEPONENT:  It was in April, I
17   believe, when I went and talked to him about it,
18   and I asked him not to use those comments.  And his
19   reply was, as it was every time, oh, I'm married to
20   one, I'm married to a beaner and that's what I call
21   her all the time, and I replied, I don't care what
22   you call your wife, do not call me those names.
23   Q.   What did he say?
24   A.   Nothing.
25   Q.   So it happened in February, on the 22nd,

**131**

1    and you didn't go and talk to Dale until April?
2    A.   April, I think it was April 1st.
3    Q.   The other incident happened on March
4    27th, and you didn't go and talk to Dale until
5    April?
6         MS. HAYES:  Objection.  That's
7    mischaracterizing the testimony.
8         MR. THOMPSON:  Counsel, you know, if you
9    keep doing speaking objections, we are going to
10   call the magistrate.  It's improper.  If I need a
11   clarification as to the form, I ask you, but you
12   are coaching the witness.
13        MS. HAYES:  I am not coaching the
14   witness.
15        MR. THOMPSON:  Sure, you are.
16        MS. HAYES:  Mr. Thompson, you are
17   mischaracterizing what he has testified to.
18        MR. THOMPSON:  Well, your objection is to
19   form.  That's the federal rules.  You know that.
20        MS. HAYES:  Mischaracterizing the
21   testimony is an objection.  It's a proper form.
22        MR. THOMPSON:  Well, if you continue to
23   do it, we need to get the magistrate on the line.
24        MS. HAYES:  Okay.  Fine.
25        MR. THOMPSON:  If you continue to give

**132**

1    speaking objections --
2         MS. HAYES:  I'm fine with calling the
3    magistrate.
4    BY MR. THOMPSON:
5    Q.   Do you under the question?
6    A.   No.
7    Q.   You didn't go and talk to -- tell me if
8    this mischaracterizes the evidence.  You didn't go
9    and talk to Dale Brown until April of 2013?
10   A.   Correct.
11   Q.   That in regards to conversations,
12   derogatory comments that he had made about you?
13   **A.   About my race, yes.**
14   Q.   Can you tell me how that mischaracterizes
15   what your prior testimony was?
16   **A.   As far as?**
17   Q.   When you went to talk to him.
18   **A.   I just asked him not to call me those**
19   **names.**
20   Q.   What I'm trying to understand, sir, is
21   you told me about three incidents that happened.
22   Two of those are in your charge of discrimination.
23   You said the other one happened between February
24   22nd, 2013, and your date of discharge.
25        And I just want to make sure that from

**133**

1    the time of that first comment that was made on
2    February 22nd, 2013, you didn't go and talk to Dale
3    about that until sometime in April.
4    **A.   Correct.  I was trying to blow it off,**
5    **trying to let it go.**
6         (Whereupon, Mestas Deposition Exhibit
7    Number 6 was marked for identification.)
8    BY MR. THOMPSON:
9    Q.   Sir, I'm going to hand you what has been
10   marked as Deposition Exhibit 6.  Did you fill this
11   Equal Employment Opportunity intake questionnaire
12   out?
13   A.   Yes.
14   Q.   Is that your handwriting on this
15   document?
16   A.   Yes.
17   Q.   Would you look on the second page under
18   paragraph number six?
19   A.   Yes.
20   Q.   Tell me if I read this correctly.  These
21   stupid beaner comments were directed toward Eric
22   and myself, then he would say, I'm just kidding, I
23   married one, and it's against company policy, it's
24   in our manual.  Did I read that correctly?
25   **A.   I believe so.**

Mestas v. Town of Evansville
17-CV-00017-NDF     Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion     Exhibit F

**134**

1  Q.   What I'm trying to figure out is that
2  last sentence where it says, it's against something
3  policy, is that company policy that you have there?
4  It looks like the word C-O.
5      A.   I can't make out what that word is, but
6  it says policy in our manual.
7      Q.   That's what Dale Brown told you?
8      A.   Pardon me?
9      Q.   That's what Dale Brown told you, that
10 it's against company policy, it's in our manual?
11     A.   I don't remember.
12     Q.   That's what you wrote in question six.
13     A.   It could be what I put down there, it
14 could be what he said.  I don't remember.
15     Q.   Did you ever go and look at the personnel
16 policy to see whether or not there was any
17 anti-discrimination statement in that personnel
18 policy?
19     A.   Yes.
20     Q.   Did you find a --
21     A.   No.
22     Q.   You did not find an anti-discrimination
23 policy in there?
24     A.   No.
25     Q.   Do you still have the policy that you

**135**

1  were given by the Town of Evansville?
2      A.   The manual?
3      Q.   Yes.
4      A.   No.
5      Q.   What did you do with it?
6      A.   I might have given it to my attorney.
7      Q.   You didn't destroy it or throw it out?
8      A.   No.
9      Q.   Under paragraph number eight, it asks,
10 describe who was in the same or similar situation
11 as you and how were they treated.  For example, who
12 else applied for the same job you did, who else had
13 the same attendance record, or who else had the
14 performance.  Provide the race, sex, age, national
15 origin, religion or disability of these
16 individuals, if known, and if it relates to your
17 claim of discrimination.
18     For example, if your complaint alleges
19 race discrimination, provide the race of each
20 person, if it alleges sex discrimination, provide
21 the sex of each person and so on, use additional
22 sheets if needed.  And you put not known?
23     A.   Yes.
24     Q.   Under paragraph number 12 on FEP page
25 three, you answered to the question, did you ask

**136**

1  your employer for any changes or assistance to do
2  the job because of your disability, and you checked
3  yes.  What assistance did you ask for from your
4  employer?
5      A.   If I needed help to service the vehicles
6  or go out and move bins, help repair bins.
7      Q.   Why would you need help to do those
8  tasks?
9      A.   Because my back was hurting me.
10     A.   You weren't able to do those tasks?
11     A.   I did do them.
12     Q.   Were you able to do those tasks?
13     A.   Yes.
14     Q.   So why did you need help?
15     A.   My back injury.
16     Q.   So your testimony -- I'm not trying to
17 argue with you -- is just, to me, circular.  You
18 stated that you were released to return to work,
19 you were released by the doctor that treated your
20 back, but you needed help to do these certain tasks
21 because of your back?
22     A.   Yes.
23     Q.   You indicate on page 05 that from 1/13,
24 which I assume is January 13th, through the
25 dismissal date of April 17, 2013, that you were

**137**

1  told you had a big mouth and you could not shut up,
2  correct?
3      A.   Yes, sir.
4      Q.   Dale Brown told you that, correct?
5      A.   Yes.
6      Q.   In your opinion, did that have anything
7  to do with your ethnicity or your back?
8          MS. HAYES:  Objection, speculation.
9      A.   I would say yes.
10 BY MR. THOMPSON:
11     Q.   Why do you think that?
12     A.   Brown didn't like me.
13     Q.   Because you were Hispanic?
14     A.   Because -- yes.
15     Q.   But Eric Reyna was his pet?
16     A.   Yes.
17     Q.   On the last page, 07, you state that all
18 of the above employees except Brian, if asked, will
19 say or should say that they have all called Dale an
20 idiot because of all the things he does?
21     A.   Yes.
22     Q.   Did you hear all the above employees call
23 Dale an idiot?
24     A.   I have heard it on the recordings.
25     Q.   Employees didn't like Dale?

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion        Exhibit F

**138**

1    A.    No.
2    Q.    Do you know why they didn't like Dale?
3    A.    Because he is condescending and talks
4    down to people and if he doesn't like you, you are
5    on his list.
6    Q.    Thank you.
7    A.    You're welcome.
8         (Whereupon, Mestas Deposition Exhibit
9    Number 7 was marked for identification.)
10   BY MR. THOMPSON:
11   Q.    Handing you what has been marked as
12   Deposition Exhibit Number 7, that's a letter from
13   the State of Wyoming Department of Workforce
14   Services to a Roy Mestas.  Is that your P.O. Box?
15   A.    Yes.
16   Q.    If you would look at pages two and
17   three --
18   A.    Okay.
19   Q.    -- does this reflect unemployment
20   insurance benefits that you received after you were
21   discharged from your employment with the Town of
22   Evansville?
23   A.    Yes.
24   Q.    Were you required to pay back any of your
25   unemployment benefits to the State of Wyoming?

**139**

1    A.    No.
2    Q.    Just your Social Security disability
3    benefits?
4    A.    Yes.
5    Q.    How much do you owe or did you owe the
6    Social Security Administration for overpayment?
7    A.    It was in the neighborhood of $10,000.
8    Q.    Are you receiving Social Security
9    benefits now?
10   A.    Currently, yes.
11        (Whereupon, Mestas Deposition Exhibit
12   Number 8 was marked for identification.)
13   BY MR. THOMPSON:
14   Q.    I hand you what has been marked as
15   Deposition Exhibit Number 8.  It's a letter from
16   Social Security Administration, retirement,
17   survivors on disability insurance, notice of award.
18   Did you receive a copy of this from the Social
19   Security Administration?
20   A.    Yes.
21   Q.    It states you became disabled under their
22   rules on April 16, 2013.  Do you see that?
23   A.    Yes.
24   Q.    What is the amount of the disability
25   benefit you are receiving now per month?

**140**

1    A.    1344.
2    Q.    Do you know why it's less than the
3    disability benefit that you began receiving back in
4    October of 2013?
5    A.    Repayment.
6    Q.    So part of that payment includes a
7    deduction for the overpayment to you?
8    A.    Yes.
9    Q.    What's the total amount of the benefit
10   that you are receiving right now?
11   A.    If I wasn't doing a repayment, it would
12   be 1495 a month.  May I stand?
13   Q.    Yes, sir.  When were your Social Security
14   disability benefits reinstated?
15   A.    February of this year.  February or
16   March, I think.  I don't remember, but it was this
17   year, February, March.
18   Q.    Between September of 2016 and when your
19   Social Security disability benefits were
20   reinstated, did you seek employment?
21   A.    September of 2016?
22   Q.    Yes.
23   A.    No.  I was injured on September 12, 2016.
24   Q.    Were you receiving unemployment insurance
25   in 2013?

**141**

1    A.    No.
2    Q.    What year did you receive unemployment
3    insurance?
4    A.    I believe it was right after I was
5    released from doctor's care and no longer on TTD,
6    so it had to be like June of 2014.
7    Q.    You were still receiving Social Security
8    disability benefits at that time?
9    A.    Yes, I think so.
10   Q.    In order to receive your unemployment
11   insurance benefits, did you have to be capable of
12   being able to work?
13   A.    Yes, and I was actively seeking
14   employment.
15   Q.    But you at the same time were receiving
16   Social Security disability benefits?
17   A.    Yes.
18   Q.    Indicating that you were totally
19   disabled?
20   A.    Yes.
21   Q.    Sir, you have got a claim for extreme and
22   severe mental anguish and emotional distress.
23   Since you were terminated from the Town of
24   Evansville, have you been seeing a counselor or
25   mental health professional?

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

**142**

1    A.    Yes.

2    Q.    Who is that individual that you have been

3    seeing?

4    A.    I go to Central Wyoming Counseling

5    Center.

6         MR. THOMPSON:  Have those records been

7    disclosed, Counselor?

8         MS. HAYES:  No, they haven't, sir.

9         MR. THOMPSON:  I reserve the right to

10   leave this deposition open as to that line of

11   questioning until I receive those records.

12   BY MR. THOMPSON:

13   Q.    What are the dates you have been to

14   Central Wyoming Counseling?

15   A.    I have been going since, I believe,

16   October of '16.

17   Q.    Have you talked to your counselor about

18   the comments that you allege were made by Dale

19   Brown?

20   A.    I have made a lot of comments to my

21   counselor.

22   Q.    I understand.  Did you specifically talk

23   to your counselor about your allegations of

24   derogatory comments?

25   A.    No.

**143**

1    Q.    Why not?

2    A.    It's privileged information and I don't

3    want to disclose that because of the lawsuit.

4    Q.    You didn't want to disclose your

5    counseling records because of the lawsuit?

6    A.    That's correct.

7    Q.    Well, you have a claim for mental anguish

8    and emotional distress.

9    A.    Yes.  I did not discuss my lawsuit.

10   Q.    Do you have other complaints of mental

11   anguish and emotional distress?

12   A.    No.

13   Q.    Are they all related to your termination

14   from employment with the Town of Evansville?

15   A.    No.

16   Q.    Sir, I know we have been through this,

17   but you sued, in your lawsuit, the Town of

18   Evansville and Dale Brown in his official capacity.

19   So you have sued two different -- an entity and an

20   individual, if you want to call the official

21   capacity claim an individual claim.  You have made

22   allegations in the lawsuit.

23        I understand your attorney drafted it,

24   but you made allegations in the lawsuit, in the

25   complaint, that Evansville knew about everything

**144**

1    that was going on in regards to Dale Brown's

2    treatment of you.

3         I know we have talked about this ad

4    nauseam in regards to did you go talk to anybody.

5    Did anybody in the chain of command above Dale

6    Brown know about the comments that he made to you?

7    A.    I can say yes, I'm sure they did know.

8    So yes.

9    Q.    Is that an assumption on your part?

10   A.    Yes.

11   Q.    You don't have any direct knowledge of

12   them knowing?

13   A.    Yes, I do.

14   Q.    What is the specific knowledge, personal

15   knowledge that you have that individuals in the

16   chain of command above Dale Brown knew about the

17   comments that he made to you?

18   A.    From the employees that worked with me in

19   the maintenance garage, the talk amongst them, I'm

20   sure it went from there to town hall, to the mayor

21   and to Willoughby.

22   Q.    That's an assumption on your part?

23   A.    Well, yes.

24   Q.    Your testimony now, sir, is since your

25   workplace injury or what you claim is a workplace

**145**

1    injury with Park Place, that you have not worked,

2    correct?

3    A.    Correct.

4    Q.    Do you believe that you are going to be

5    able to return to the workforce?

6    A.    I pray I do.

7    Q.    What have your doctors told you?

8    A.    My last visit was on Thursday of last

9    week, and he said it looked like there was a

10   fracture at T9-T10 and now it looks like it's

11   healed, but there is all the arthritis that has

12   formed around it, so he wants to do an injection, a

13   spinal -- I can't remember the medical term -- to

14   see if that helps.  If not, then he is going to

15   consider going in and burning the nerve endings,

16   and if that didn't work, then they will do surgery.

17   Q.    You are still on full restriction from

18   working?

19   A.    Yes.  Yes.

20   Q.    Do you know if your doctor, your treating

21   doctor for the most recent workplace injury, has

22   filled out a temporary total disability application

23   for you?

24   A.    No.

25   Q.    Is that because the claim is contested?

Mestas v. Town of Evansville
17-CV-00017-NDF                    Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                    Exhibit F

**146**

1      A.    Yes.
2      Q.    Did you fill out a report of injury for
3   your most recent workplace injury?
4      A.    Yes.
5            MR. THOMPSON:  Is that part of that Work
6   Comp file that you have provided, Counsel?
7            MS. HAYES:  It is not.  I thought I had
8   all the Work Comp files, but I have had to recently
9   request more.
10           MR. THOMPSON:  Let me take about five
11  minutes and see where I'm at.  We may be done.
12           THE DEPONENT:  Okay.  Sounds good.
13           MR. THOMPSON:  Before we go off the
14  record, before I forget, I'm going to include the
15  three audio files that we played and listened to
16  that were referenced during the deposition as
17  whatever the next deposition exhibit number is,
18  which is Deposition Exhibit Number 9.
19           (Whereupon, Mestas Deposition Exhibit
20  Number 9 was marked for identification.)
21           (Whereupon, a break was taken.)
22  BY MR. THOMPSON:
23     Q.    Roy, just a couple of follow-up
24  questions.  You stated earlier in your testimony, I
25  believe, that on April 16th, the day before you

**147**

1   were terminated, that you were asked to shovel and
2   your back hurt, correct, and you asked Dale or you
3   told Dale that your back hurt and he made you
4   shovel anyway.
5      A.    On April 16th?
6      Q.    Yes.
7      A.    I don't remember the date, but yes, I
8   still shoveled.
9      Q.    Was that shoveling -- I think you
10  testified early in the deposition that shoveling
11  was one of the things that you were required to
12  do --
13     A.    Yes.
14     Q.    -- as part of your job?
15     A.    I'm sorry.  Yes.
16     Q.    So that was not an unusual or an
17  out-of-the-ordinary request by Dale Brown?
18     A.    Correct.
19     Q.    I'm going to hand you what has been
20  provided to me by your attorney as Mestas
21  employment and it has got the number 3 through 42
22  and just ask you if you recognize that and if you
23  can tell me what that is.
24     A.    Yes, I can.  Do you want me to go page by
25  page?

**148**

1      Q.    No.  Just generally what is that?
2      A.    This is my notepad that I carried in my
3   shirt pocket at work.  For example, the first one
4   here, when we were changing out filters at the
5   senior center, we were almost out, so I wrote down
6   the sizes, and I got a purchase order and that's
7   what the cost was for that.
8      Q.    Why were you keeping those notes?
9      A.    Well, I kept notes for like if I'm on my
10  route and there was a business or a residence that
11  had a bad trash bin or needed a replacement or if
12  there was a violation, then I could note it in my
13  book so I wouldn't forget.
14     Q.    Why the entry, for example, on the first
15  page where you are changing out filters?
16     A.    Why this one?
17     Q.    Yes.
18     A.    Dan and I -- which he is a firefighter
19  now.  This, I believe, was like on my first or
20  second day there.  We were at the senior center
21  changing out filters, and he yelled off some
22  numbers and he said, we're low on these filters,
23  write them down, we need one box of those, two
24  boxes of those, three boxes of those.
25     Q.    Did you keep this notepad with you every

**149**

1   day?
2      A.    Yes.
3      Q.    Did you carry it with you the entire time
4   that you were employed by the Town of Evansville?
5      A.    Yes.
6      Q.    Did you write in that notepad the
7   incidents that occurred where Dale Brown used
8   derogatory comments towards you?
9      A.    I wrote two of them, yes.
10     Q.    Why didn't you write the other ones that
11  you allege happened?
12     A.    I was trying to blow them off.
13     Q.    So it was proper and appropriate and
14  important --
15     A.    No.
16     Q.    Let me finish the question.
17     A.    Sorry.
18     Q.    -- to keep notes of two of the incidents,
19  but you didn't think that it was proper and
20  appropriate and important to keep the other notes
21  of the other incidents?
22           MS. HAYES:  Objection to the form.
23     A.    Yes.
24  BY MR. THOMPSON:
25     Q.    So why didn't you write those down, the

000699

**150**

1  other incidents?

2  **A.    Somebody said, you need to start writing**

3  **this stuff down.**

4  Q.    What's the first entry that you have

5  there?

6  **A.    This one?**

7  Q.    Yes.

8  **A.    That is furnace filters.**

9  Q.    What date?

10  **A.    There is no date.**

11  Q.    Is that one of the first days on the job,

12  is that what you stated?

13  **A.    Yes.**

14  MR. THOMPSON:  Do you have a copy of

15  that?

16  MS. HAYES:  I do.  I have the actual

17  notebook.

18  MR. THOMPSON:  I will go ahead and mark

19  this as an exhibit, Deposition Exhibit 10.

20  (Whereupon, Mestas Deposition Exhibit

21  Number 10 was marked for identification.)

22  MR. THOMPSON:  I don't have any further

23  questions.

24  (Whereupon, discussion was held off the

25  record.)

**151**

1  MS. HAYES:  I have a couple of questions.

2  EXAMINATION

3  QUESTIONS BY MS. HAYES:

4  Q.    I'm going to hands you Exhibit 9.  Do you

5  recognize that document?

6  **A.    Yes.**

7  Q.    What is that document?

8  **A.    Employee handbook.**

9  Q.    Would you please turn to page 60 in that

10  document.

11  **A.    Evansville 0060.**

12  Q.    Do you recall earlier in your testimony

13  that you were asked to read that first paragraph on

14  page 60?

15  **A.    Yes.**

16  Q.    I'm also going to hand you Deposition

17  Exhibit 6.  Do you recognize that document?

18  **A.    Yes.**

19  Q.    What is that?

20  **A.    That is the intake questionnaire to the**

21  **EEOC.**

22  Q.    You were asked some questions about the

23  third line, your entry under paragraph six about --

24  against perhaps company or CO policies in our

25  manual.  Do you see that?

**152**

1  **A.    Yes.**

2  Q.    Is it possible that that paragraph and

3  page reporting the Equal Employment Opportunity

4  statement is the policy to which you were referring

5  in this paragraph six?

6  MR. THOMPSON:  Objection as to form.

7  **A.    Yes.**

8  BY MS. HAYES:

9  Q.    Is there anywhere in that policy, in your

10  employment manual, that gave you any information on

11  how you would make a complaint against the

12  supervisor for race or disability discrimination?

13  **A.    No.**

14  Q.    I'm going to ask you also to look at

15  Deposition Exhibit 8.  That is your letter from

16  Social Security dated April 14th.  Do you recognize

17  that document?

18  **A.    Yes.**

19  Q.    You were asked that you became disabled

20  under our rules, April 16, 2013.  Do you see that?

21  **A.    Yes.**

22  Q.    Do you know if the definition of

23  disability under the Social Security

24  Administration's rules are the same as under the

25  Americans with Disabilities Act?

**153**

1  **A.    I believe they are different.**

2  MS. HAYES:  I don't have any further

3  questions.

4  FURTHER EXAMINATION

5  QUESTIONS BY MR. THOMPSON:

6  Q.    Roy, you can keep that in your hand.  The

7  date on here is April 14, 2014, correct?

8  **A.    Yes.**

9  Q.    When you were answering questions in

10  regards to Exhibit 9, page 60, on the EEOC

11  policy --

12  **A.    Yes.**

13  Q.    -- I thought you told me earlier that you

14  looked at the personnel policy and you didn't find

15  an EEOC statement in the policy that you looked at

16  or in the personnel handbook that you looked at.

17  **A.    I'm confused.**

18  Q.    Me, too.  I believe you testified earlier

19  that when you filed the charge of discrimination

20  where you indicate that it was against CO policy,

21  or whatever that is, against policy, I asked you

22  questions as to whether or not you reviewed the

23  employment handbook, the town handbook.

24  I think there was another line of

25  questioning in regards to Dale's statement that it

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

154

1  was against policy.  I think it's all part of the
2  same paragraph in the charge of discrimination.
3         I asked you, did you go back -- when he
4  told you that it was against policy, did you go
5  back and look at the employee handbook and see
6  whether or not there was an EEO statement in the
7  handbook.
8         You testified that you went back and you
9  looked at the handbook, but you didn't recall
10  seeing that Equal Opportunity statement that's on
11  page 15, whis is Bates Evans 0060, which is all
12  part of Deposition Exhibit 4.
13     A.   I stated that I didn't, that's correct.
14     Q.   You didn't see this?
15     A.   I'm answering your question.
16     Q.   When you referred to Dale's statement in
17  the charge of discrimination -- do you understand
18  what I'm referring to?
19     A.   Yeah.
20     Q.   Let's work with these.  Here is
21  Deposition Exhibit 4, here is Deposition Exhibit 5.
22  On Deposition Exhibit 5 -- hold on a second here.
23  I will also hand you Deposition Exhibit 6.
24         On Deposition Exhibit 6, on the second
25  page under the paragraph which is numbered number

156

1     A.   I can't recall.
2     Q.   You don't know if it was in the handbook
3  or not?
4     A.   Correct.
5     Q.   And you don't know whether or not you
6  went back and looked at it?
7     A.   Correct.
8         MR. THOMPSON:  No further questions.
9         MS. HAYES:  Thank you.
10         (Whereupon, the deposition was concluded
11  at 2:23 p.m.)

155

1  six, your handwriting indicates that the stupid
2  beaner comments were directed toward Eric and
3  myself, then he would say, I'm just kidding, I
4  married one, and it's against whatever that word
5  is, policy, it's in our manual.
6         I had asked you some questions about what
7  you wrote in response to question number six, and I
8  believe what you told me was that you went back and
9  you looked at the manual of the Town of Evansville,
10  is that a correct recollection of your testimony?
11     A.   Kind of.
12     Q.   Did you do that?
13     A.   Yeah.  I went back and looked at one, but
14  I don't know if it's the same one.
15     Q.   Well, your attorney asked you about that
16  manual, Deposition Exhibit Number 4, and you went
17  back to that Equal Opportunity statement that's in
18  it, and you answered questions concerning her cross
19  examination about that policy, correct?
20     A.   Yes.
21     Q.   Help me understand.  Did you go back and
22  look at that specific policy when you filed the
23  charge of discrimination?
24     A.   I can't answer that.
25     Q.   You can't recall?

157

1         CERTIFICATE OF WITNESS
2         I, ROY MESTAS, being first duly sworn,
3  depose and say:
4         That I am the witness named in the
5  foregoing deposition consisting of pages 1 through
6  156; that I have read said deposition and know the
7  contents thereof; that the questions contained
8  therein were propounded to me; and that the answers
9  therein contained are true and correct except for
10  any changes that I may have listed on the Change
11  Sheet attached hereto.
12         Dated this_____day of_____2017.
13
14
15
16
                        _____
17                      ROY MESTAS
18
19         SUBSCRIBED AND SWORN to before me this
20  _____day of_____2017.
21
22                      _____
                        NAME OF NOTARY PUBLIC
23                      NOTARY PUBLIC FOR _____
24                      RESIDING AT _____
25                      MY COMMISSION EXPIRES _____

Mestas v. Town of Evansville                                                        158
17-CV-00017-NDF   Plaintiffs' Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F

| 2 | PAGE | LINE | READS | SHOULD READ | REASON |
|---|------|------|-------|-------------|--------|
|   |      |      |       | FOR CHANGE  |        |
| 3 |      |      |       |             |        |
| 4 |      |      |       |             |        |
| 5 |      |      |       |             |        |
| 6 |      |      |       |             |        |
| 7 |      |      |       |             |        |
| 8 |      |      |       |             |        |
| 9 |      |      |       |             |        |
| 10 |     |      |       |             |        |
| 11 |     |      |       |             |        |
| 12 |     |      |       |             |        |
| 13 |     |      |       |             |        |
| 14 |     |      |       |             |        |
| 15 |     |      |       |             |        |
| 16 |     |      |       |             |        |
| 17 |     |      |       |             |        |
| 18 |     |      |       |             |        |
| 19 |     |      |       |             |        |
| 20 |     |      |       |             |        |
| 21 |     |      |       |             |        |
| 22 |     |      |       |             |        |
| 23 |     |      |       |             |        |
| 24 |     |      |       |             |        |
| 25 |     |      | ROY MESTAS |        |        |

159

1              REPORTER'S CERTIFICATE

2

3    STATE OF WYOMING      )
                           ) SS.
     COUNTY OF FREMONT     )

4

5        I, Mary Dean Marshall, a Notary Public in
     and for the State of Wyoming, residing at Lander,
     County of Fremont, State of Wyoming, and a Court

6    Reporter, do hereby certify:
             That on the 16th day of May, 2017, at

7    10:01 a.m., there appeared before me ROY MESTAS,
     pursuant to notice and stipulation of counsel, as a

8    witness in the foregoing cause;
             That pursuant to stipulation of counsel,

9    said witness was first duly sworn by me to tell the
     truth, the whole truth, and nothing but the truth

10   as he testified in said cause, and said witness was
     thereupon examined orally by counsel and made

11   answer thereto, under oath, as hereinabove
     contained;

12           That the foregoing testimony was taken by
     me in stenograph and thereafter reduced to

13   typewriting by me or under my supervision, and the
     foregoing 156 pages contain a full, true and

14   correct record of all the testimony given by the
     witness, to the best of my ability;

15       That the reading and signing of the
     deposition were expressly requested;

16       That I am not a relative or employee or
     attorney or counsel of any of the parties in said

17   cause, nor am I a relative or employee of such
     attorney or counsel, nor am I financially

18   interested in the action, nor am I a relative of
     any person interested in said action.

19       IN WITNESS WHEREOF, I have hereunto set my
     hand and seal this 22nd day of May, 2017.

20

21       _____
         MARY DEAN MARSHALL, C.S.R.

22       Notary Public
         786 South Third Street

23       Lander, Wyoming 82520

24

25   My Commission expires August 9, 2018.

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 223

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 42 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          1

**$**

**$10,000** [1] - 139:7

**'**

**'07** [1] - 51:14
**'16** [2] - 7:2, 142:16
**'17** [3] - 6:11, 7:2, 7:4
**'80** [1] - 19:18
**'80s** [1] - 19:19
**'95** [1] - 20:14
**'96** [1] - 20:14
**'98** [2] - 20:22, 51:14

**0**

**000006** [1] - 69:25
**000242** [1] - 96:15
**0018** [1] - 89:16
**0040** [1] - 89:16
**0060** [3] - 89:23, 151:11, 154:11
**0122** [1] - 79:9
**05** [1] - 136:23
**07** [1] - 137:17

**1**

**1** [7] - 3:9, 24:15, 24:18, 31:16, 66:4, 81:3, 157:5
**1/13** [1] - 136:23
**10** [5] - 3:20, 46:19, 82:25, 150:19, 150:21
**10-2009** [1] - 84:13
**10/2010** [1] - 56:7
**10/2012** [2] - 55:16, 56:5
**10:00** [1] - 13:13
**10:01** [2] - 1:18, 159:7
**11th** [1] - 115:17
**12** [4] - 23:21, 46:19, 135:24, 140:23
**121** [1] - 79:4
**124** [1] - 82:22
**13** [2] - 23:19, 45:25
**130** [3] - 83:5, 83:6, 83:10
**132** [1] - 83:22
**133** [2] - 3:14, 84:8
**1344** [1] - 140:1
**138** [1] - 3:15
**139** [1] - 3:17
**13th** [1] - 136:24
**14** [3] - 28:9, 86:1, 153:7
**140** [3] - 84:15, 84:16, 85:7

**146** [2] - 3:19, 87:18
**1495** [1] - 140:12
**14th** [1] - 152:16
**15** [1] - 154:11
**150** [2] - 3:20, 36:25
**151** [1] - 3:4
**153** [1] - 3:5
**156** [2] - 157:6, 159:13
**16** [7] - 1:18, 23:17, 47:19, 70:4, 70:9, 139:22, 152:20
**16th** [7] - 4:2, 70:23, 80:10, 102:11, 146:25, 147:5, 159:6
**17** [10] - 47:19, 70:10, 70:14, 72:11, 72:17, 101:9, 101:21, 101:25, 123:23, 136:25
**17-CV00017-NDF** [2] - 1:4, 4:9
**17th** [4] - 70:23, 98:14, 102:9, 118:21
**18th** [1] - 98:15
**19** [1] - 104:16
**1st** [1] - 131:2

**2**

**2** [9] - 3:10, 47:21, 66:17, 66:20, 67:4, 69:22, 74:9, 75:15, 77:5
**2,000** [1] - 84:3
**20** [1] - 52:6
**20-2003** [1] - 84:3
**200** [1] - 36:25
**2000** [1] - 88:12
**2007** [1] - 20:23
**2010** [2] - 58:21
**2011** [5] - 58:18, 81:10, 81:11, 81:13, 81:18
**2012** [15] - 31:17, 46:25, 56:24, 58:10, 58:11, 58:13, 64:4, 64:16, 80:14, 81:18, 82:25, 83:25, 84:10
**2013** [36] - 25:20, 65:4, 67:5, 68:18, 68:25, 69:4, 70:4, 70:9, 70:10, 70:15, 71:21, 71:24, 72:11, 72:17, 73:3, 73:6, 86:1, 88:10, 98:15, 101:9, 101:21, 101:25, 119:12, 122:20, 123:24, 128:20, 128:24, 130:11, 132:9, 132:24,

**133**:2, 136:25, 139:22, 140:4, 140:25, 152:20
**2014** [6] - 25:21, 73:9, 80:11, 88:3, 141:6, 153:7
**2015** [6] - 5:11, 6:18, 6:21, 6:24, 7:1, 26:18
**2016** [6] - 6:10, 6:15, 6:21, 7:1, 7:4, 7:9, 7:12, 31:13, 140:18, 140:21, 140:23
**2017** [8] - 1:18, 4:3, 6:15, 6:21, 7:9, 7:12, 159:6, 159:19
**2018** [1] - 159:24
**22nd** [2] - 126:18, 128:20, 128:22, 130:11, 130:25, 132:24, 133:2, 159:19
**23rd** [1] - 126:16
**24** [1] - 3:9
**26** [4] - 64:4, 83:25, 84:10, 117:22
**27** [3] - 22:17, 128:23, 129:11
**27th** [2] - 126:18, 129:11, 131:4
**28** [1] - 104:16
**2:23** [1] - 156:11

**3**

**3** [7] - 3:11, 46:4, 46:18, 47:22, 78:11, 78:14, 147:21
**3/10/17** [1] - 3:15
**32** [1] - 46:2
**33** [2] - 19:6, 22:10
**3:30** [1] - 46:18
**3rd** [1] - 119:11

**4**

**4** [8] - 3:3, 3:12, 37:25, 89:13, 89:15, 154:12, 154:21, 155:16
**4/17/2013** [1] - 31:17
**40** [2] - 46:1, 46:2
**42** [1] - 147:21
**49** [1] - 115:4

**5**

**5** [9] - 3:13, 46:19, 46:20, 96:3, 100:24, 101:9, 128:18,

**154**:21, 154:22
**5/16/2013** [1] - 75:19
**5/2011** [3] - 55:16, 56:5, 56:7
**53** [1] - 104:12
**55** [1] - 24:11
**5:00** [1] - 37:25

**6**

**6** [8] - 3:14, 46:19, 69:24, 133:7, 133:10, 151:17, 154:23, 154:24
**60** [3] - 151:9, 151:14, 153:10
**60,000** [1] - 42:24
**616** [1] - 2:8
**66** [1] - 3:10

**7**

**7** [6] - 3:15, 37:24, 46:18, 138:9, 138:12
**78** [1] - 3:11
**786** [1] - 159:22

**8**

**8** [5] - 3:17, 46:20, 139:12, 139:15, 152:15
**80123** [1] - 81:1
**82070** [1] - 2:4
**82301** [1] - 2:9
**82520** [1] - 159:23
**89** [1] - 3:12
**8:00** [2] - 31:23, 37:24

**9**

**9** [7] - 3:19, 31:17, 146:18, 146:20, 151:4, 153:10, 159:24
**9/18/61** [1] - 24:13
**9/2016** [1] - 25:7
**9/24/12** [1] - 83:9
**910** [1] - 2:3
**96** [1] - 3:13
**999** [1] - 2:9

**A**

**A-0000058** [1] - 114:25
**A-0000059** [2] - 117:17, 117:21
**a.m** [1] - 159:7
**A.M** [1] - 1:18

**ability** [3] - 15:13, 77:19, 159:14
**able** [17] - 29:5, 51:20, 53:22, 54:6, 54:10, 54:13, 55:7, 65:17, 66:6, 92:10, 97:8, 98:20, 123:13, 136:10, 136:12, 141:12, 145:5
**absolutely** [1] - 116:5
**accident** [1] - 53:12
**accidently** [1] - 27:12
**accommodated** [1] - 98:17
**accommodation** [4] - 100:5, 100:9, 124:11, 124:12
**accomplished** [1] - 34:17
**accumulation** [3] - 32:19, 32:22, 33:24
**accurate** [3] - 100:10, 103:18
**acetylene** [1] - 60:20
**acknowledge** [2] - 84:4, 84:12
**acknowledged** [1] - 89:18
**acknowledging** [2] - 83:14, 84:2
**act** [1] - 48:25
**Act** [1] - 152:25
**action** [4] - 4:7, 90:10, 159:18, 159:18
**Action** [1] - 1:3
**actively** [1] - 141:13
**activity** [2] - 75:17, 97:5
**actual** [1] - 150:16
**acute** [1] - 53:11
**ad** [1] - 144:3
**addition** [1] - 14:7
**additional** [1] - 135:21
**address** [1] - 4:25
**addressed** [1] - 130:8
**adduced** [1] - 4:12
**Administration** [14] - 70:3, 70:8, 70:12, 71:20, 72:10, 72:16, 72:20, 74:6, 74:12, 103:7, 103:17, 139:6, 139:16, 139:19
**Administration's** [1] - 152:24
**administrative** [1] - 7:21
**Administrative** [1] - 30:3
**admitted** [1] - 101:24

Appellate Case: 17-8092     Document: 01019955824     Date Filed: 03/08/2018     Page: 224

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 43 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          2

**Adult** [1] - 3:10
**affect** [2] - 15:13, 98:6
**affiliation** [1] - 90:6
**affirm** [1] - 119:12
**afraid** [5] - 86:12, 86:13, 87:6, 87:13, 112:12
**age** [4] - 22:9, 24:10, 90:5, 135:14
**aggravated** [1] - 99:24
**agree** [3] - 54:17, 54:21, 69:8
**agreed** [1] - 54:19
**agreement** [11] - 7:23, 52:12, 52:15, 53:9, 54:8, 54:18, 55:8, 62:3, 62:14, 93:2, 93:3
**ahead** [12] - 9:23, 18:16, 24:18, 38:2, 55:2, 55:4, 71:9, 103:24, 112:21, 114:7, 116:4, 150:18
**ailments** [1] - 74:18
**air** [8] - 31:25, 42:11, 48:15, 48:16, 48:17, 48:22, 49:6, 49:8
**Airlines** [1] - 7:24, 8:3, 51:12, 51:24, 53:15, 54:11, 59:24, 60:8, 61:9, 61:15, 62:10, 62:14
**All-Out** [4] - 60:11, 60:12, 60:15, 60:19
**allegations** [6] - 21:19, 23:3, 94:3, 142:23, 143:22, 143:24
**allege** [4] - 96:15, 112:15, 142:18, 149:11
**alleges** [2] - 135:18, 135:20
**almost** [2] - 38:17, 148:5
**altered** [1] - 100:14
**ambulance** [1] - 107:10
**Americans** [1] - 152:25
**amount** [2] - 139:24, 140:9
**AND** [2] - 4:11, 157:19
**Andrew** [2] - 22:6, 22:16
**Andy** [1] - 57:2
**anguish** [3] - 141:22, 143:7, 143:11
**answer** [21] - 9:4, 9:6, 10:3, 10:20, 11:1,

11:8, 14:10, 16:23, 21:8, 25:7, 55:4, 55:7, 57:15, 69:17, 74:2, 93:13, 95:17, 98:3, 100:18, 155:24, 159:11
**answered** [3] - 54:25, 135:25, 155:18
**answering** [4] - 8:15, 9:10, 153:9, 154:15
**answers** [2] - 77:17, 157:8
**Anthony** [1] - 22:6
**Anthony's** [1] - 22:9
**anti** [2] - 134:17, 134:22
**anti-discrimination** [2] - 134:17, 134:22
**anticipate** [2] - 9:20, 17:4
**anticipating** [2] - 9:4, 9:5
**anticipation** [3] - 11:14, 12:18, 13:2
**anyway** [1] - 147:4
**apologize** [1] - 106:24
**apologized** [3] - 106:17, 127:15, 127:17
**appeared** [1] - 159:7
**appearing** [2] - 2:4, 2:10
**application** [14] - 67:8, 74:13, 74:16, 74:23, 74:25, 75:14, 76:18, 79:6, 79:19, 80:9, 80:13, 80:17, 88:18, 145:22
**applied** [8] - 38:2, 38:11, 38:23, 70:1, 70:6, 71:16, 77:13, 135:12
**applying** [1] - 79:13
**appointment** [4] - 90:8, 115:21, 115:24, 116:8
**appointments** [1] - 28:17
**appreciate** [2] - 38:9, 96:7
**appropriate** [2] - 149:13, 149:20
**April** [38] - 25:20, 70:4, 70:9, 70:10, 70:14, 70:23, 71:21, 71:24, 72:10, 72:16, 73:5, 81:18, 98:15, 101:9, 101:21, 101:25, 102:9, 102:11, 115:17,

118:21, 121:1, 122:20, 123:23, 130:16, 131:1, 131:2, 131:5, 132:9, 133:3, 136:25, 139:22, 146:25, 147:5, 152:16, 152:20, 153:7
**area** [1] - 9:22
**areas** [3] - 108:23, 113:19, 114:12
**argue** [1] - 136:17
**arguing** [1] - 106:14
**argumentative** [3] - 101:15, 106:11, 106:22
**arm** [1] - 53:21
**arthritis** [1] - 145:11
**Ashleigh** [2] - 23:12, 23:18
**aspirin** [1] - 14:21
**assist** [1] - 67:7
**assistance** [6] - 98:17, 99:23, 99:24, 100:3, 136:1, 136:3
**Assisted** [7] - 24:6, 26:23, 28:1, 28:11, 29:16, 30:14, 45:24
**assisted** [2] - 67:11, 78:3
**assume** [6] - 10:3, 41:5, 52:18, 75:6, 106:3, 136:24
**assuming** [1] - 31:5
**assumption** [3] - 10:5, 144:9, 144:22
**AT** [3] - 1:17, 1:18, 157:24
**attached** [1] - 157:11
**attendance** [1] - 135:13
**attest** [1] - 77:19
**attitude** [2] - 92:13, 92:15
**Attorney** [2] - 2:3, 2:7
**attorney** [26] - 5:19, 6:20, 6:23, 8:3, 8:11, 8:16, 8:23, 11:7, 11:12, 11:16, 13:1, 16:5, 18:19, 30:9, 30:10, 55:11, 91:19, 91:23, 126:20, 129:23, 135:6, 143:23, 147:20, 155:15, 159:16, 159:17
**attorney's** [1] - 5:18
**attorney/client** [2] - 10:19, 10:25
**attorneys** [1] - 16:3

**audible** [1] - 9:12
**Audio** [4] - 104:14, 115:1, 117:18, 118:12
**audio** [31] - 16:6, 16:8, 16:11, 100:9, 100:14, 101:5, 104:5, 106:6, 106:12, 106:18, 107:12, 107:22, 107:25, 110:5, 110:8, 110:17, 112:20, 113:22, 114:24, 115:3, 116:15, 116:18, 116:24, 117:3, 117:16, 117:21, 118:5, 118:8, 119:5, 146:15
**audiotape** [1] - 104:7
**August** [1] - 159:24
**authority** [1] - 124:22
**Auto** [1] - 59:25
**award** [1] - 139:17
**aware** [3] - 107:11, 107:24, 115:8

**B**

**backdate** [1] - 71:20
**backhoe** [1] - 122:12
**bad** [4] - 35:7, 49:3, 120:5, 148:11
**barely** [1] - 44:4
**bartender** [1] - 19:7
**based** [8] - 91:9, 93:10, 93:16, 95:8, 96:17, 106:8, 112:6, 121:24
**basis** [13] - 28:15, 31:13, 31:21, 37:6, 37:11, 37:22, 43:21, 90:3, 92:11, 92:14, 93:22, 94:1, 109:20
**Bates** [1] - 154:11
**beaner** [9] - 21:13, 112:9, 126:5, 127:1, 128:16, 130:20, 133:21, 155:2
**beaners** [2] - 127:13, 128:10
**became** [3] - 92:20, 139:21, 152:19
**began** [2] - 104:17, 140:3
**begin** [1] - 9:10
**beginning** [3] - 38:3, 101:22, 115:16, 115:19, 120:2
**behalf** [3] - 2:5, 2:10,

4:2
**BEHALF** [1] - 1:16
**behavior** [1] - 106:17
**belief** [1] - 119:14
**bend** [2] - 80:1, 97:16
**bending** [1] - 69:12
**benefit** [3] - 139:25, 140:3, 140:9
**benefits** [38] - 7:15, 29:18, 31:9, 45:4, 45:7, 45:9, 45:18, 46:6, 47:24, 50:4, 50:7, 51:2, 67:9, 70:7, 71:19, 71:21, 73:3, 73:5, 73:9, 73:14, 73:18, 73:20, 73:23, 74:13, 74:16, 74:24, 76:7, 88:7, 103:10, 138:20, 138:25, 139:3, 139:9, 140:14, 140:19, 141:8, 141:11, 141:16
**best** [9] - 9:7, 18:12, 55:6, 77:19, 86:10, 92:21, 103:22, 119:14, 159:14
**better** [6] - 46:6, 46:7, 46:15, 47:24, 59:14
**bettered** [1] - 47:10
**bettering** [1] - 47:20
**between** [16] - 3:19, 57:18, 59:16, 60:6, 68:21, 69:4, 74:15, 75:3, 76:4, 76:10, 81:17, 105:14, 120:10, 129:12, 132:23, 140:18
**beyond** [1] - 59:22
**big** [6] - 36:21, 36:22, 42:22, 42:23, 123:4, 137:1
**bin** [18] - 34:22, 34:24, 35:3, 35:4, 35:5, 35:9, 35:10, 35:18, 35:19, 35:22, 35:25, 36:9, 36:10, 36:14, 37:12, 98:13, 112:18, 148:11
**bins** [15] - 34:19, 34:20, 34:21, 36:24, 37:2, 43:9, 43:11, 43:12, 43:14, 112:17, 112:21, 113:2, 114:7, 136:6
**biological** [3] - 22:4, 22:5, 23:9
**birth** [1] - 24:12
**bit** [3] - 18:23, 19:23, 100:17

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 225

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 44 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF              Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion              Exhibit F              3

black [1] - 81:19
blade [1] - 33:11
blank [1] - 82:14
blocks [1] - 122:21
blow [3] - 33:23, 133:4, 149:12
blowers [3] - 33:12, 33:19, 33:20
board [1] - 111:17
body [4] - 29:15, 50:21, 60:22, 64:12
Boger [3] - 39:14, 85:12, 85:14, 106:4, 111:1
Bon [1] - 4:3
bona [1] - 90:10
book [4] - 90:15, 90:16, 90:21, 148:13
born [1] - 19:1
boss [3] - 39:8, 47:4, 48:5
bothered [1] - 98:13
bothering [2] - 98:15, 98:18
bottles [1] - 60:20
bottom [1] - 79:5
box [1] - 148:23
Box [2] - 2:9, 138:14
boxes [2] - 148:24
brakes [8] - 31:25, 48:15, 48:16, 48:17, 48:23, 49:6, 49:8, 49:9
break [15] - 9:20, 9:24, 10:1, 41:14, 44:12, 44:14, 57:10, 57:11, 57:23, 58:5, 58:7, 96:9, 102:25, 103:2, 146:21
Brian [8] - 39:14, 85:12, 85:14, 106:3, 110:25, 111:1, 115:15, 137:18
bring [1] - 102:18
broken [2] - 34:20, 34:21
brother [7] - 56:23, 57:20, 81:7, 81:9, 81:11, 81:13, 81:15
brother's [1] - 57:1
brown [2] - 119:18, 137:12
Brown [39] - 3:19, 16:7, 16:14, 67:21, 68:3, 68:16, 68:23, 69:1, 69:4, 85:10, 85:11, 86:9, 91:10, 100:2, 100:19, 101:21, 101:25, 104:1, 104:18,

105:19, 115:10, 117:23, 118:2, 119:18, 120:10, 123:20, 123:23, 124:10, 125:14, 132:9, 134:7, 134:9, 137:4, 142:19, 143:18, 144:6, 144:16, 147:17, 149:7
BROWN [1] - 1:8
Brown's [2] - 16:18, 144:1
Buffalo [1] - 2:9
building [1] - 108:13
bulging [1] - 124:3
bunch [1] - 69:24
burning [1] - 145:15
business [2] - 19:5, 148:10
BY [50] - 1:21, 4:18, 6:14, 11:6, 12:1, 21:10, 24:16, 44:17, 55:1, 55:14, 58:6, 61:23, 63:14, 66:18, 69:18, 71:8, 71:13, 72:14, 73:1, 78:12, 89:14, 94:15, 95:15, 96:4, 98:5, 99:10, 100:13, 101:16, 103:3, 103:23, 104:15, 105:3, 107:16, 114:5, 115:2, 117:19, 118:14, 120:21, 122:4, 132:4, 133:8, 137:10, 138:10, 139:13, 142:12, 146:22, 149:24, 151:3, 152:8, 153:5

## C

C-h-o-r-n-a-i-c-k [1] - 20:12
C-O [1] - 134:4
C.S.R [2] - 1:22, 159:21
C6-7 [1] - 53:10
calendar [2] - 116:1, 116:5
capable [5] - 77:1, 77:8, 77:22, 99:16, 141:11
capacity [4] - 1:9, 116:19, 143:18, 143:21
care [4] - 97:8, 126:9, 130:21, 141:5
Carla [1] - 3:16

carried [1] - 148:2
carry [1] - 149:3
case [1] - 7:20
cash [1] - 40:8
Casper [12] - 4:4, 18:25, 20:15, 22:11, 22:18, 31:1, 57:5, 60:2, 60:3, 60:13, 64:19, 80:22
CASPER [1] - 1:17
CD [1] - 3:19
CDL [6] - 79:20, 79:23, 80:3, 80:6, 113:5, 113:7
cease [1] - 73:23
ceased [1] - 74:1
Center [1] - 142:5
center [4] - 33:1, 42:12, 148:5, 148:20
Central [2] - 142:4, 142:14
certain [7] - 7:14, 15:14, 16:2, 32:10, 37:15, 125:25, 136:20
certainly [1] - 59:3
CERTIFICATE [2] - 157:1, 159:1
certified [1] - 60:17
certify [1] - 159:6
cervical [2] - 51:19, 53:10
chain [5] - 39:3, 39:6, 39:11, 144:5, 144:16
chance [1] - 24:20
change [2] - 34:20, 75:22
Change [1] - 157:10
CHANGE [2] - 158:1, 158:2
changed [2] - 42:11, 113:3
changes [1] - 136:1, 157:10
changing [3] - 148:4, 148:15, 148:21
characterize [1] - 111:13
characterized [1] - 105:18
charge [17] - 12:6, 39:13, 39:14, 96:11, 112:15, 118:23, 119:8, 119:13, 125:12, 125:19, 126:19, 128:18, 132:22, 153:19, 154:2, 154:17, 155:23
Charge [1] - 3:13

charged [1] - 63:21
Chase [2] - 23:12, 23:20
check [2] - 31:23, 31:24
checked [1] - 136:2
checking [1] - 103:20
children [6] - 22:1, 22:3, 22:23, 23:2, 23:8, 23:22
choice [1] - 39:23
Chornaick [1] - 20:12
chose [1] - 95:10
Chris [5] - 86:24, 91:15, 95:4, 95:5, 95:6
Chris' [1] - 86:24
circles [1] - 99:12
circular [1] - 136:17
citation [2] - 93:5, 93:18
city [1] - 42:12
civil [4] - 5:13, 7:21, 62:17, 62:19
Civil [1] - 1:3
claim [21] - 29:13, 29:25, 49:19, 52:21, 54:14, 60:8, 60:24, 61:14, 63:9, 63:15, 87:19, 87:22, 88:20, 93:9, 135:17, 141:21, 143:7, 143:21, 144:25, 145:25
claimant's [1] - 88:24, 89:6
claimed [1] - 7:5
claims [13] - 54:21, 59:9, 61:3, 61:7, 61:14, 61:17, 61:25, 62:7, 62:13, 62:15, 62:23, 63:17, 124:5
clarification [1] - 131:11
clarify [1] - 61:21
clean [6] - 8:12, 8:23, 8:25, 32:7, 33:2
clearing [1] - 32:25
client [2] - 11:1, 103:15
Clint [2] - 59:3, 78:2
clock [1] - 32:8
CNA [1] - 24:7
co [1] - 17:21
CO [2] - 151:24, 153:20
co-employee [1] - 17:21
coach [1] - 110:9
coaching [3] - 110:14,

131:12, 131:13
college [1] - 19:20
color [2] - 80:1, 90:4
Colorado [5] - 6:6, 54:14, 57:8, 60:25, 61:4
colorblindness [1] - 80:2
command [5] - 39:4, 39:6, 39:11, 144:5, 144:16
comment [2] - 127:5, 133:1
commentary [1] - 126:11
comments [15] - 112:14, 125:14, 126:2, 126:8, 126:25, 130:18, 132:12, 133:21, 142:18, 142:20, 142:24, 144:6, 144:17, 149:8, 155:2
Commission [2] - 30:4, 159:24
COMMISSION [1] - 157:25
communication [1] - 10:25
communications [2] - 11:8, 11:11
Comp [30] - 5:15, 5:25, 6:2, 6:5, 6:15, 7:8, 7:11, 7:13, 7:19, 8:20, 29:13, 49:19, 50:4, 54:14, 59:9, 60:8, 61:24, 62:7, 62:13, 63:11, 63:16, 76:7, 82:8, 87:24, 88:6, 88:10, 88:13, 124:5, 146:6, 146:8
Company [8] - 26:6, 44:21, 45:1, 46:10, 50:16, 51:4, 70:18, 76:17
company [6] - 60:12, 133:23, 134:3, 134:10, 151:24
compensability [3] - 29:22, 30:15, 31:7
Compensation [10] - 5:14, 29:19, 30:1, 30:19, 31:8, 53:3, 60:25, 61:4, 61:13, 88:7
compensation [1] - 62:24
complain [3] - 48:20, 129:16, 130:2
complained [2] -

000705

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit F        4

115:25, 130:12
complaining [2] -
106:14, 115:23
complaint [11] - 11:23,
12:5, 12:10, 23:3,
105:18, 125:1,
130:6, 135:18,
143:25, 152:11
complaints [6] - 92:5,
92:8, 93:19, 94:8,
95:10, 143:10
complete [2] - 32:24,
43:14
completed [3] - 19:12,
32:6, 99:23
completely [1] - 9:9
concerned [1] -
121:10
concerning [2] - 23:4,
155:18
concluded [1] -
156:10
condescending [8] -
105:19, 105:22,
110:15, 111:14,
116:12, 119:19,
119:22, 138:3
condescendingly [1] -
21:14
condition [3] - 53:1,
70:24, 75:22
conditions [6] - 23:4,
23:5, 23:6, 26:19,
26:20, 90:7
confused [1] - 153:17
confusion [1] - 76:21
consider [2] - 116:21,
145:15
consist [3] - 28:21,
34:3, 79:25
consisted [1] - 42:6
consisting [1] - 157:5
contain [1] - 159:13
contained [3] - 157:7,
157:9, 159:11
containment [2] -
50:19, 50:22
contents [1] - 157:7
contested [1] - 145:25
contesting [1] - 30:15
context [4] - 5:12,
18:20, 127:7, 127:9
continue [3] - 76:9,
131:22, 131:25
control [1] - 36:9
controller [1] - 36:14
conversation [15] -
87:8, 87:10, 87:16,
94:14, 94:19, 94:20,
94:22, 101:20,

101:25, 103:18,
117:23, 118:16,
119:18, 123:7,
123:23
conversational [1] -
9:3
conversations [12] -
3:19, 12:25, 16:6,
17:16, 95:9, 103:25,
109:4, 109:11,
110:1, 110:3,
120:16, 132:11
cooled [1] - 49:9
copy [10] - 52:14,
52:19, 78:19, 83:20,
88:18, 89:17, 89:19,
90:24, 139:18,
150:14
corner [1] - 69:22
Corporation [1] - 1:7
correct [92] - 7:25,
10:8, 12:15, 13:8,
13:22, 15:17, 15:18,
21:20, 23:5, 25:22,
32:13, 44:19, 54:15,
55:8, 62:7, 62:10,
64:9, 64:16, 65:15,
66:4, 66:12, 66:14,
69:19, 70:15, 71:6,
71:17, 71:21, 71:25,
73:3, 73:6, 75:9,
76:1, 76:23, 79:13,
79:14, 79:17, 80:14,
83:18, 84:5, 84:13,
85:24, 88:16, 89:21,
90:14, 91:2, 95:16,
96:17, 97:1, 97:9,
102:2, 104:9, 106:1,
106:15, 107:13,
107:17, 108:3,
108:24, 111:1,
111:17, 112:3,
112:24, 112:25,
115:5, 115:8,
115:17, 116:2,
119:15, 120:14,
120:16, 121:8,
121:12, 121:13,
125:15, 126:20,
128:25, 132:10,
133:4, 137:2, 137:4,
143:6, 145:2, 145:3,
147:2, 147:18,
153:7, 154:13,
155:10, 155:19,
156:4, 156:7, 157:9,
159:14
correcting [1] - 81:12
correctly [3] - 25:19,
133:20, 133:24

cost [1] - 148:7
couches [1] - 43:10
council [1] - 129:18
counsel [8] - 103:5,
103:14, 110:9,
159:7, 159:8,
159:10, 159:16,
159:17
Counsel [3] - 103:19,
131:8, 146:6
Counseling [2] -
142:4, 142:14
counseling [2] -
110:14, 143:5
counselor [4] -
141:24, 142:17,
142:21, 142:23
Counselor [1] - 142:7
County [1] - 159:5
COUNTY [1] - 159:3
couple [5] - 8:8,
49:15, 79:2, 146:23,
151:1
Court [10] - 4:5, 4:8,
4:10, 5:6, 11:20,
44:15, 94:10, 114:2,
130:14, 159:5
court [5] - 8:5, 8:17,
9:14, 10:15, 11:19
COURT [1] - 1:1
courtesy [1] - 9:9
courtroom [1] - 10:14
Craig [1] - 48:7
crane [4] - 35:12,
35:17, 35:19
crews [1] - 41:15
crime [1] - 63:21
critical [1] - 9:22
cross [3] - 108:23,
109:2, 155:18
cross-trained [1] -
108:23
cross-training [1] -
109:2
cured [1] - 74:18
current [2] - 20:10,
24:10
cut [1] - 117:25

# D

daily [1] - 32:5
Dale [88] - 3:19, 16:7,
16:14, 16:17, 39:12,
39:16, 67:21, 68:2,
68:16, 68:23, 69:1,
69:4, 85:10, 85:11,
85:22, 86:9, 87:9,
91:10, 91:11, 91:12,
100:2, 100:19,

101:21, 101:25,
104:1, 104:17,
105:5, 105:15,
105:19, 106:25,
107:1, 107:5, 108:2,
108:12, 109:5,
110:2, 110:8,
110:18, 110:19,
110:21, 112:19,
113:16, 114:11,
114:13, 115:10,
115:20, 115:23,
117:8, 117:14,
117:15, 117:23,
118:2, 119:18,
120:8, 120:10,
120:16, 120:23,
123:5, 123:20,
123:23, 124:10,
125:14, 127:14,
127:19, 129:17,
129:24, 129:25,
130:5, 131:1, 131:4,
132:9, 133:2, 134:7,
134:9, 137:4,
137:19, 137:23,
137:25, 138:2,
142:18, 143:18,
144:1, 144:5,
144:16, 147:2,
147:3, 147:17, 149:7
DALE [1] - 1:8
Dale's [5] - 111:3,
112:13, 130:10,
153:25, 154:16
damage [1] - 63:9
Dan [7] - 41:20, 42:4,
87:2, 91:16, 111:23,
111:25, 148:18
date [34] - 24:12,
37:15, 63:24, 64:2,
65:23, 69:5, 69:9,
71:11, 72:13, 77:3,
77:5, 77:23, 81:16,
82:25, 83:8, 88:10,
99:17, 100:8,
100:19, 102:5,
102:8, 104:8, 105:8,
109:9, 120:12,
126:17, 128:9,
129:5, 132:24,
136:25, 147:7,
150:9, 150:10, 153:7
dated [3] - 83:25,
84:10, 152:16
Dated [1] - 157:12
dates [10] - 20:20,
77:15, 104:9,
125:23, 125:24,
126:3, 126:13,

126:15, 128:19,
142:13
day-to-day [6] - 28:15,
31:20, 37:5, 37:11,
37:22, 43:21
days [4] - 38:18,
129:1, 129:3, 150:11
deal [3] - 40:10, 92:19,
125:6
dealing [1] - 93:7
dealings [3] - 94:6,
94:13, 95:6
DEAN [2] - 1:22,
159:21
Dean [2] - 4:5, 159:4
death [2] - 56:18,
56:19
December [6] - 6:10,
25:21, 73:6, 80:7,
80:10
deductibles [1] -
45:10
deduction [1] - 140:7
Deere [1] - 33:10
defend [1] - 92:17
defendants [1] - 5:5
Defendants [3] - 1:11,
2:10, 4:2
DEFENDANTS [1] -
1:16
defense [1] - 119:3
define [1] - 124:21
defined [1] - 83:2
definition [1] - 152:22
degree [1] - 124:4
demand [1] - 103:8
demanded [1] - 62:23
demeaning [2] - 23:6,
127:8
demeanor [1] - 116:21
dementia [1] - 15:25
denied [1] - 121:21
deny [1] - 122:8
denying [3] - 121:14,
121:23, 122:1
department [5] -
32:16, 65:15,
108:24, 111:9,
112:23
Department [2] - 3:16,
138:13
dependent [1] - 78:8
DEPONENT [6] -
57:25, 63:13, 94:12,
118:13, 130:16,
146:12
depose [2] - 87:14,
157:3
deposes [1] - 4:16
Deposition [39] -

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 227

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 46 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF         Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion         Exhibit F         5

24:14, 24:18, 31:16, 66:4, 66:16, 66:20, 67:3, 69:22, 74:8, 75:15, 77:4, 78:10, 78:14, 81:3, 89:12, 89:15, 96:2, 100:24, 101:8, 128:17, 133:6, 133:10, 138:8, 138:12, 139:11, 139:15, 146:18, 146:19, 150:19, 150:20, 151:16, 152:15, 154:12, 154:21, 154:22, 154:23, 154:24, 155:16
**DEPOSITION** [3] - 1:15, 3:8, 4:1
**deposition** [39] - 4:25, 5:7, 5:8, 5:10, 5:13, 5:16, 6:3, 6:4, 6:16, 6:17, 6:18, 6:21, 6:24, 7:4, 7:20, 8:2, 8:10, 8:18, 8:24, 9:17, 10:18, 11:15, 12:18, 13:2, 13:5, 13:12, 13:19, 18:20, 85:7, 104:7, 118:24, 142:10, 146:16, 146:17, 147:10, 156:10, 157:5, 157:6, 159:15
**depositions** [1] - 7:18
**depth** [1] - 21:5
**derogatory** [4] - 129:8, 132:12, 142:24, 149:8
**describe** [5] - 31:20, 32:19, 39:2, 111:4, 135:10
**described** [3] - 32:20, 49:25, 79:15
**description** [1] - 37:13
**destroy** [1] - 135:7
**detail** [1] - 13:10
**device** [4] - 17:25, 18:7, 18:9, 18:13
**DIA** [1] - 51:25
**diabetes** [1] - 78:6
**diabetic** [2] - 14:20, 14:22
**diagnosed** [1] - 15:22
**die** [1] - 57:5
**died** [1] - 56:22
**diesel** [2] - 27:13, 27:14
**dietary** [1] - 24:8
**differed** [1] - 32:20
**different** [9] - 10:13, 17:12, 99:13, 104:9,

110:25, 112:19, 143:19, 153:1
**difficult** [2] - 57:10, 57:15
**direct** [1] - 144:11
**directed** [3] - 130:6, 133:21, 155:2
**director** [1] - 101:10
**Disabilities** [1] - 152:25
**disability** [35] - 7:15, 31:9, 50:10, 51:7, 67:9, 70:2, 70:7, 71:17, 73:3, 73:8, 73:13, 74:13, 74:16, 74:24, 76:6, 90:5, 96:17, 96:19, 97:4, 97:22, 98:7, 103:10, 135:15, 136:2, 139:2, 139:17, 139:24, 140:3, 140:14, 140:19, 141:8, 141:16, 145:22, 152:12, 152:23
**Disability** [4] - 3:10, 3:18, 67:12, 70:3
**disabled** [18] - 71:24, 72:10, 72:16, 72:20, 74:6, 75:1, 75:4, 75:6, 75:10, 75:11, 75:16, 77:8, 77:24, 96:23, 97:2, 139:21, 141:19, 152:19
**discharge** [1] - 132:24
**discharged** [4] - 100:20, 101:11, 119:1, 138:21
**discharging** [2] - 100:20, 101:2
**disciplinary** [1] - 47:14
**discipline** [2] - 27:2, 27:5
**disclose** [2] - 143:3, 143:4
**disclosed** [2] - 16:5, 142:7
**disclosure** [1] - 79:3
**disclosures** [3] - 16:4, 103:12, 110:6
**discovery** [1] - 16:4
**discriminate** [1] - 112:5
**discriminated** [1] - 95:11
**discriminating** [1] - 93:10
**discrimination** [26] - 12:6, 90:3, 91:9,

93:20, 94:3, 96:11, 96:16, 106:8, 112:15, 118:23, 119:9, 125:12, 125:20, 126:20, 128:19, 132:22, 134:17, 134:22, 135:17, 135:19, 135:20, 152:12, 153:19, 154:2, 154:17, 155:23
**Discrimination** [1] - 3:13
**discuss** [2] - 18:19, 143:9
**discussion** [4] - 6:12, 103:6, 106:6, 150:24
**discussions** [1] - 30:8
**disks** [1] - 124:3
**dismiss** [2] - 92:25, 93:3
**dismissal** [2] - 129:13, 136:25
**dismissed** [2] - 106:3, 109:16
**dispute** [1] - 81:19
**disputing** [1] - 91:4
**distress** [3] - 141:22, 143:8, 143:11
**Distributors** [3] - 59:5, 59:11, 59:13
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 4:8
**Division** [5] - 5:20, 29:19, 30:1, 30:19, 31:8
**divorced** [1] - 20:13
**doctor** [10] - 15:22, 50:8, 64:15, 67:19, 67:20, 80:19, 121:10, 136:19, 145:20, 145:21
**doctor's** [5] - 115:20, 115:23, 116:8, 121:8, 141:5
**doctors** [2] - 67:23, 145:7
**doctors'** [2] - 28:16, 51:5
**document** [16] - 12:11, 24:22, 25:3, 66:24, 84:16, 84:19, 85:5, 85:11, 85:15, 126:22, 133:15, 151:5, 151:7, 151:10, 151:17, 152:17
**documentation** [2] - 67:15, 103:6
**documents** [12] -

11:14, 12:2, 12:17, 13:22, 14:4, 14:7, 14:8, 14:12, 68:21, 68:24, 69:3, 103:21
**DOJ** [3] - 12:19, 12:22, 12:24
**done** [17] - 10:17, 18:11, 18:12, 32:4, 41:11, 42:25, 43:6, 74:2, 76:23, 78:16, 112:22, 112:23, 117:8, 121:6, 121:7, 123:3, 146:11
**Dooley** [34] - 25:21, 26:1, 26:5, 26:9, 26:18, 26:19, 26:24, 27:3, 27:17, 27:24, 44:21, 45:1, 45:5, 45:19, 46:4, 46:5, 46:10, 46:13, 46:18, 46:22, 50:15, 50:18, 51:4, 70:17, 72:6, 74:17, 74:21, 75:5, 75:7, 75:9, 75:25, 76:5, 76:11, 76:17
**dose** [1] - 14:21
**DOT** [1] - 31:24
**down** [23] - 8:17, 9:15, 9:16, 31:15, 36:18, 36:19, 39:10, 49:9, 49:10, 53:20, 58:3, 82:15, 112:18, 124:25, 125:21, 125:22, 125:23, 134:13, 138:4, 148:5, 148:23, 149:25, 150:3
**downturn** [1] - 58:25
**Dr** [12] - 30:24, 30:25, 64:18, 65:5, 67:15, 68:2, 68:10, 68:14, 68:22, 88:15, 98:22, 120:11
**drafted** [1] - 143:23
**Drilling** [3] - 55:20, 55:23, 56:6
**drink** [1] - 9:24
**drive** [2] - 41:16, 43:19
**driver** [12] - 26:2, 28:13, 31:18, 38:16, 38:24, 41:9, 41:13, 44:8, 44:22, 45:23, 47:2, 48:3
**drivers** [1] - 43:15
**driving** [9] - 32:2, 34:5, 34:17, 34:23, 42:15, 44:25, 46:7, 46:9, 46:12
**drop** [1] - 34:21
**drove** [1] - 37:11

**due** [1] - 75:17
**duly** [4] - 1:6, 4:14, 157:2, 159:9
**dumb** [1] - 126:5
**dump** [2] - 32:6
**during** [12] - 4:25, 20:17, 21:22, 52:2, 75:5, 76:3, 76:14, 99:5, 106:6, 107:11, 119:17, 146:16
**dusting** [1] - 34:1
**duties** [15] - 32:11, 38:22, 41:11, 65:13, 65:14, 65:18, 65:20, 66:6, 77:2, 77:23, 79:12, 79:16, 98:24, 99:2, 99:16
**duty** [3] - 34:20, 97:5, 121:9

**E**

**Earl** [1] - 48:7
**early** [4] - 32:22, 41:6, 147:10
**easier** [1] - 122:18
**eat** [1] - 97:18
**Edmond** [1] - 86:21
**EEO** [1] - 154:6
**EEOC** [7] - 3:14, 11:23, 12:5, 12:23, 151:21, 153:10, 153:15
**effect** [1] - 97:25
**eight** [4] - 64:25, 74:8, 75:15, 135:9
**either** [5] - 20:14, 31:12, 36:20, 47:19, 77:5
**elbow** [1] - 82:7
**Electric** [1] - 59:25
**electrical** [1] - 36:8
**eleventh** [2] - 19:14, 60:7
**emotional** [3] - 141:22, 143:8, 143:11
**employed** [32] - 19:4, 20:18, 21:23, 23:25, 24:2, 24:4, 31:11, 34:4, 39:19, 40:25, 43:17, 51:11, 51:13, 58:16, 59:16, 59:19, 60:16, 66:1, 66:11, 67:13, 70:14, 70:20, 70:21, 72:21, 72:24, 73:11, 73:14, 73:15, 89:20, 96:20, 99:6, 149:4
**employee** [17] - 17:21,

000707

29:2, 34:8, 34:15, 83:15, 84:21, 84:25, 89:17, 89:20, 92:20, 93:9, 95:3, 129:21, 151:8, 154:5, 159:16, 159:17
**Employee** [1] - 3:12
**employees** [15] - 17:16, 86:15, 87:5, 87:6, 91:14, 92:6, 94:5, 94:6, 94:23, 126:5, 128:4, 137:18, 137:22, 137:25, 144:18
**employer** [27] - 25:13, 28:4, 37:10, 37:16, 37:17, 49:2, 51:11, 53:4, 56:9, 59:6, 59:19, 59:23, 61:8, 61:15, 62:24, 63:16, 71:6, 76:17, 81:2, 90:3, 97:6, 97:12, 99:17, 120:7, 136:1, 136:4
**employers** [12] - 7:24, 56:8, 60:5, 61:17, 62:5, 62:6, 62:9, 62:12, 62:15, 66:2, 66:7, 66:11
**employment** [36] - 17:19, 20:20, 47:12, 56:2, 56:5, 56:20, 58:8, 58:10, 58:12, 59:10, 71:5, 75:12, 76:4, 76:9, 76:10, 76:19, 77:9, 78:20, 79:6, 80:4, 82:13, 83:3, 89:24, 90:7, 90:8, 98:1, 98:7, 113:13, 138:21, 140:20, 141:14, 143:14, 147:21, 152:10, 153:23
**Employment** [6] - 3:11, 12:7, 89:25, 95:21, 133:11, 152:3
**empty** [2] - 36:25, 43:14
**end** [8] - 8:11, 8:18, 8:24, 101:22, 105:16, 117:25, 118:10, 127:18
**ended** [3] - 26:16, 53:8, 118:13
**endings** [1] - 145:15
**Energy** [1] - 56:11
**engineer** [3] - 56:12, 56:15, 58:17
**Engineer** [2] - 56:14, 58:8

**Engineering** [2] - 55:15, 56:4
**enter** [1] - 52:11
**entire** [4] - 101:20, 107:11, 117:22, 149:3
**entirely** [1] - 110:24
**entitled** [1] - 11:13
**entity** [1] - 143:19
**entry** [4] - 31:15, 148:14, 150:4, 151:23
**environment** [1] - 52:22
**Equal** [7] - 89:24, 90:2, 95:20, 133:11, 152:3, 154:10, 155:17
**equipment** [8] - 32:24, 33:8, 33:18, 48:13, 48:14, 113:12, 122:11, 123:12
**erase** [3] - 17:15, 18:13, 18:21
**Eric** [28] - 86:17, 86:18, 86:19, 91:15, 95:2, 104:19, 104:22, 105:4, 111:23, 111:25, 112:1, 112:2, 112:5, 112:8, 112:10, 112:11, 127:11, 127:12, 127:14, 127:15, 127:16, 127:18, 127:19, 127:22, 133:21, 137:15, 155:2
**ethnicity** [6] - 89:8, 91:10, 93:11, 106:9, 112:6, 137:7
**Evans** [1] - 154:11
**EVANSVILLE** [1] - 1:6
**Evansville** [79] - 1:10, 3:12, 7:6, 17:19, 21:23, 23:5, 25:20, 31:17, 31:21, 32:12, 34:4, 34:9, 37:21, 38:4, 38:12, 40:25, 41:20, 42:18, 43:16, 44:1, 44:5, 45:2, 47:11, 47:22, 55:24, 58:12, 64:1, 65:15, 66:3, 66:12, 67:14, 69:10, 70:21, 76:5, 76:11, 76:19, 77:2, 77:23, 78:21, 79:7, 79:10, 80:5, 80:9, 80:12, 80:14, 80:17, 83:15, 84:22, 87:20, 88:1, 89:16, 89:18,

90:2, 90:25, 92:18, 93:9, 95:22, 96:21, 98:1, 98:8, 114:18, 114:19, 121:16, 121:19, 122:19, 124:8, 127:24, 128:3, 129:15, 135:1, 138:22, 141:24, 143:14, 143:18, 143:25, 149:4, 151:11, 155:9
**Evansville's** [1] - 114:9
**events** [1] - 15:14
**eventually** [1] - 54:4
**evidence** [1] - 132:8
**ex** [1] - 20:7
**ex-wife** [1] - 20:7
**exact** [1] - 73:19
**exactly** [1] - 126:6
**EXAMINATION** [3] - 4:17, 151:2, 153:4
**examination** [1] - 155:19
**Examination** [3] - 3:3, 3:4, 3:5
**examined** [1] - 159:10
**example** [8] - 105:17, 116:11, 117:3, 119:21, 135:11, 135:18, 148:3, 148:14
**except** [3] - 90:10, 137:18, 157:9
**exchanged** [1] - 16:3
**excuse** [8] - 19:18, 55:22, 78:17, 78:25, 84:3, 85:9, 109:25, 129:24
**excused** [1] - 102:3
**Exhibit** [41] - 24:14, 24:18, 31:16, 66:4, 66:16, 66:20, 67:3, 69:22, 74:9, 75:15, 77:5, 78:10, 78:14, 81:3, 89:12, 89:15, 96:2, 100:24, 101:9, 128:18, 133:6, 133:10, 138:8, 138:12, 139:11, 139:15, 146:18, 146:19, 150:19, 150:20, 151:4, 151:17, 152:15, 153:10, 154:12, 154:21, 154:22, 154:23, 154:24, 155:16
**exhibit** [5] - 85:7, 104:7, 118:24,

146:17, 150:19
**EXHIBITS** [1] - 3:8
**exists** [1] - 90:12
**experience** [2] - 82:14, 92:23
**expires** [1] - 159:24
**EXPIRES** [1] - 157:25
**explain** [2] - 46:16, 56:4
**expressly** [1] - 159:15
**extended** [3] - 73:20, 103:15, 109:11
**extension** [2] - 84:20, 85:17
**extensive** [1] - 80:3
**extent** [2] - 10:20, 10:23
**extinguisher** [1] - 60:17
**extreme** [1] - 141:21
**eyebrows** [1] - 115:14

**F**

**face** [1] - 63:2
**faces** [1] - 52:9
**facilities** [1] - 42:17
**facility** [1] - 95:21
**fact** [2] - 83:20, 107:24
**Fair** [1] - 12:7
**fair** [2] - 10:5, 41:7
**fake** [1] - 117:6
**faking** [1] - 108:10
**fall** [3] - 29:12, 41:6, 50:19
**familiar** [1] - 48:8
**family** [3] - 19:23, 56:18, 56:19
**far** [12] - 8:9, 37:20, 39:2, 39:12, 46:12, 48:23, 63:18, 102:4, 116:18, 121:10, 122:19, 132:16
**father** [2] - 19:5, 59:20
**faulty** [1] - 48:13
**February** [13] - 105:13, 126:16, 126:18, 128:20, 128:22, 129:12, 130:11, 130:25, 132:23, 133:2, 140:15, 140:17
**Federal** [1] - 5:6
**federal** [1] - 131:19
**fell** [5] - 29:16, 50:22, 64:7, 120:1, 120:4
**female** [3] - 5:22, 5:24, 6:23
**FEP** [1] - 135:24
**few** [2] - 9:19, 49:6

**fide** [1] - 90:11
**fighters** [1] - 87:2
**fighting** [2] - 7:11, 7:14
**figure** [2] - 80:13, 134:1
**file** [10] - 3:11, 49:19, 54:21, 59:9, 78:20, 78:23, 87:22, 103:16, 104:12, 146:6
**filed** [22] - 5:6, 12:6, 21:24, 21:25, 60:8, 60:24, 61:3, 61:14, 61:17, 61:24, 62:6, 62:13, 62:15, 64:8, 82:9, 87:19, 96:12, 124:5, 125:13, 153:19, 155:22
**files** [3] - 103:21, 146:8, 146:15
**filing** [3] - 17:4, 22:25, 23:1
**fill** [4] - 37:10, 37:21, 133:10, 146:2
**filled** [4] - 77:16, 79:6, 88:19, 145:22
**filling** [1] - 67:8
**filters** [7] - 42:11, 42:12, 148:4, 148:15, 148:21, 148:22, 150:8
**finally** [1] - 49:9
**financially** [1] - 159:17
**findings** [4] - 11:24, 12:13, 12:14, 12:23
**Fine** [1] - 131:24
**fine** [4] - 5:2, 58:2, 93:6, 132:2
**finish** [4] - 9:23, 93:24, 123:22, 149:16
**Fire** [4] - 60:11, 60:12, 60:15, 60:19
**fire** [6] - 41:21, 41:23, 42:7, 42:10, 60:17, 87:2
**fired** [3] - 85:21, 88:22, 102:10
**firefighter** [2] - 41:19, 148:18
**firemen** [1] - 86:25
**firm** [1] - 2:8
**first** [20] - 4:14, 9:1, 20:1, 22:5, 34:13, 76:17, 87:2, 89:25, 90:13, 96:14, 120:25, 133:1, 148:3, 148:14, 148:19, 150:4,

Mestas v. Town of Evansville
17-CV-00017-NDF                Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion                Exhibit F            7

150:11, 151:13,
157:2, 159:9
**five** [9] - 27:12, 27:13,
58:17, 87:5, 109:12,
109:18, 115:4,
124:2, 146:10
**fixing** [1] - 38:21
**flatbed** [1] - 122:14
**flushing** [2] - 41:21,
42:10
**follow** [5] - 9:5,
100:18, 103:13,
104:3, 146:23
**follow-up** [4] - 9:5,
100:18, 104:3,
146:23
**following** [1] - 4:11
**FOR** [4] - 1:1, 157:23,
158:1, 158:2
**foregoing** [4] - 157:5,
159:8, 159:12,
159:13
**forget** [2] - 146:14,
148:13
**forklift** [6] - 26:12,
26:15, 112:21, 113:7
**form** [19] - 8:19, 10:24,
11:5, 14:24, 21:7,
69:16, 71:10, 71:12,
72:12, 72:22, 95:13,
98:2, 99:7, 131:11,
131:19, 131:21,
149:22, 152:6
**formed** [1] - 145:12
**former** [2] - 87:5, 95:3
**forth** [2] - 21:19, 75:15
**foul** [1] - 49:6
**four** [6] - 38:17, 82:13,
109:21, 117:21,
122:13, 124:2
**four-wheelers** [1] -
122:13
**fracture** [1] - 145:10
**frame** [1] - 73:19
**free** [1] - 96:5
**freight** [1] - 26:10
**FREMONT** [1] - 159:3
**Fremont** [1] - 159:5
**frequently** [1] - 108:14
**Friday** [1] - 46:18
**friends** [3] - 86:9,
86:10, 87:12
**front** [5] - 30:2, 30:3,
30:6, 118:24, 126:4
**fuel** [3] - 27:10, 27:11,
53:19
**full** [5] - 4:19, 31:12,
121:9, 145:17,
159:13
**full-time** [1] - 31:12

**fully** [3] - 77:1, 77:22,
99:15
**functionality** [2] -
54:12, 54:13
**FUP** [1] - 96:15
**furnace** [2] - 42:11,
150:8
**FURTHER** [1] - 153:4
**fusion** [1] - 53:10

**G**

**gain** [1] - 122:17
**gainful** [3] - 75:12,
75:17, 77:9
**gainfully** [2] - 72:21,
73:15
**gallons** [2] - 27:12,
27:13
**garage** [5] - 33:3,
122:15, 130:1,
146:18
**gas** [3] - 27:13, 33:11,
33:19
**gas-powered** [2] -
33:11, 33:19
**gasoline** [1] - 27:14
**GBW** [1] - 42:23
**GED** [2] - 19:15, 19:17
**General** [1] - 59:20
**generally** [3] - 35:10,
59:19, 148:1
**given** [7] - 85:3, 85:10,
94:25, 120:10,
135:1, 135:6, 159:14
**God** [1] - 60:20
**grabbing** [2] - 43:5,
49:23
**grabs** [1] - 43:1
**grade** [3] - 19:12, 60:7
**graduate** [1] - 19:10
**great** [2] - 26:20, 59:3
**grow** [1] - 18:24
**guess** [3] - 71:11,
93:15, 94:4
**guidelines** [1] - 8:10
**guy** [1] - 92:21
**guys** [3] - 86:25,
87:11, 91:13

**H**

**half** [4] - 19:6, 37:13,
44:2, 44:3
**hall** [16] - 33:1, 39:25,
40:2, 40:5, 40:7,
40:11, 40:19, 40:23,
42:12, 58:4, 122:14,
129:21, 129:25,
130:3, 144:20

**Halliburton** [3] -
55:23, 56:10
**hand** [15] - 24:17,
26:14, 26:16, 66:19,
69:1, 69:21, 78:13,
79:5, 133:9, 139:14,
147:19, 151:16,
153:6, 154:23,
159:19
**Handbook** [1] - 3:12
**handbook** [15] -
83:12, 83:15, 89:17,
89:20, 91:2, 91:3,
91:7, 151:8, 153:16,
153:23, 154:5,
154:7, 154:9, 156:2
**handed** [2] - 67:25,
126:19
**handheld** [3] - 18:4,
33:5, 33:9
**handicap** [1] - 90:5
**handing** [1] - 138:11
**hands** [1] - 151:4
**handwriting** [2] -
133:14, 155:1
**harassed** [2] - 89:7,
95:12
**harassment** [2] - 91:9,
106:7
**hard** [2] - 56:21, 57:25
**harsh** [7] - 105:18,
105:21, 111:5,
111:9, 116:11,
119:18, 119:21
**Hayes** [1] - 3:4
**HAYES** [41] - 2:3,
10:19, 21:7, 54:24,
55:13, 57:23, 58:1,
58:3, 61:21, 63:11,
69:16, 71:7, 71:11,
72:12, 72:22, 95:13,
98:2, 99:7, 100:11,
101:15, 103:20,
104:25, 107:14,
120:19, 122:3,
131:6, 131:13,
131:16, 131:20,
131:24, 132:2,
137:8, 142:8, 146:7,
149:22, 150:16,
151:1, 151:3, 152:8,
153:2, 156:9
**head** [3] - 9:13, 9:14
**healed** [1] - 145:11
**health** [2] - 45:12,
141:25
**hear** [1] - 137:22
**heard** [13] - 87:8,
91:13, 94:19, 94:20,
104:21, 108:17,

108:20, 110:24,
115:3, 117:20,
127:25, 128:1,
137:24
**Hearings** [1] - 30:3
**hearsay** [4] - 94:4,
94:14, 94:16, 95:9
**heavy** [5] - 33:23,
113:1, 121:1,
123:11
**held** [2] - 6:12, 150:24
**hello** [1] - 109:11
**help** [15] - 21:14,
21:15, 38:19, 43:13,
98:10, 98:12, 98:16,
136:5, 136:6, 136:7,
136:14, 136:20,
155:21
**helps** [1] - 145:14
**hereby** [1] - 159:6
**hereinabove** [1] -
159:11
**hereto** [1] - 157:11
**hereunto** [1] - 159:19
**high** [9] - 19:8, 19:10,
19:13, 59:17, 59:21,
60:6, 124:19, 125:2
**highest** [2] - 19:12,
125:8
**himself** [1] - 114:11
**Hinds** [4] - 39:20,
39:21, 40:3, 86:9
**hired** [4] - 20:22,
25:17, 46:20, 76:11
**Hispanic** [5] - 111:10,
111:25, 112:3,
127:12, 137:13
**history** [1] - 63:24
**hit** [2] - 56:21, 57:25
**hoist** [5] - 35:12,
35:17, 35:19, 36:3
**hold** [1] - 154:22
**Holder** [3] - 23:12,
23:13
**holiday** [1] - 45:20
**home** [7] - 21:12,
32:9, 46:8, 102:13,
102:17, 107:9,
121:17
**honest** [5] - 107:1,
107:5, 107:7, 125:3,
125:5
**horn** [1] - 31:25
**hose** [2] - 53:18, 53:19
**hostile** [1] - 52:22
**hour** [8] - 32:22,
37:12, 45:25, 46:5,
47:17, 47:19, 47:22,
93:4
**hourly** [1] - 44:22

**hours** [7] - 9:19,
37:12, 46:1, 46:7,
46:15, 46:19, 47:24
**house** [2] - 52:19,
123:1
**human** [1] - 9:2
**hurt** [5] - 60:22, 108:3,
108:6, 147:2, 147:3
**hurting** [7] - 49:3,
100:3, 120:23,
121:3, 121:4,
123:18, 136:9
**hydrant** [2] - 41:24,
42:7
**hydrants** [2] - 41:22,
42:10
**hydraulic** [1] - 43:1
**Hydrocodone** [1] -
14:24
**hyper** [1] - 50:1

**I**

**ice** [4] - 64:7, 64:13,
120:1, 120:4
**idea** [2] - 118:1,
121:25
**identification** [10] -
24:15, 66:17, 78:11,
89:13, 96:3, 133:7,
138:9, 139:12,
146:20, 150:21
**identifier** [1] - 104:13
**idiot** [2] - 137:20,
137:23
**II** [1] - 78:5
**illnesses** [1] - 74:18
**immediate** [2] - 39:12,
39:17
**immediately** [2] -
48:18, 59:23
**impact** [1] - 98:6
**impairment** [1] - 7:16
**important** [2] -
149:14, 149:20
**impossible** [1] - 36:17
**impress** [1] - 117:8
**improper** [1] - 131:10
**IN** [2] - 1:1, 159:19
**inaccurate** [2] - 99:6,
100:23
**inappropriate** [1] -
122:7
**incident** [7] - 92:16,
93:16, 127:24,
128:20, 128:23,
130:11, 131:3
**incidents** [5] - 132:21,
149:7, 149:18,
149:21, 150:1

000709

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit F          8

include [4] - 12:19,
121:11, 125:19,
146:14
included [3] - 33:1,
81:3, 128:15
includes [1] - 140:6
including [2] - 69:11,
90:7
incorporated [1] - 1:7
indicate [3] - 64:11,
136:23, 153:20
indicated [5] - 66:4,
79:9, 79:20, 90:25,
103:8
indicates [2] - 58:9,
155:1
indicating [1] - 141:18
individual [9] - 6:17,
9:3, 67:11, 78:2,
115:13, 120:15,
142:2, 143:20,
143:21
individuals [6] -
87:15, 94:24, 115:7,
115:11, 135:16,
144:15
industrial [1] - 59:5
Industrial [2] - 59:10,
59:13
information [3] -
119:14, 143:2,
152:10
initial [4] - 16:3, 16:4,
103:12, 120:25
injection [4] - 98:14,
116:9, 121:5, 145:12
injections [1] - 100:1
injure [2] - 50:21,
60:18
injured [10] - 29:15,
31:2, 49:17, 50:12,
50:15, 53:17, 64:5,
82:3, 97:3, 140:23
injuries [2] - 54:22,
82:8
injury [39] - 7:5, 7:13,
15:7, 29:9, 29:10,
29:20, 29:22, 30:16,
30:21, 49:21, 50:2,
50:5, 50:18, 51:3,
53:7, 53:11, 53:12,
53:13, 53:14, 63:24,
64:2, 64:8, 64:9,
64:12, 64:16, 66:8,
68:7, 70:25, 96:22,
96:24, 97:24, 99:25,
124:4, 136:15,
144:25, 145:1,
145:21, 146:2, 146:3
inquiry [1] - 40:3

inquisitive [1] - 63:2
inside [1] - 81:25
inspection [2] - 32:4,
32:5
InstaCare [1] - 80:21
instead [1] - 9:13
insulin [1] - 78:8
Insurance [1] - 3:18
insurance [6] - 45:12,
138:20, 139:17,
140:24, 141:3,
141:11
intake [2] - 133:11,
151:20
Intake [1] - 3:14
integrity [4] - 124:19,
124:21, 125:2, 125:9
interaction [2] - 93:17,
105:14
interested [2] -
159:18, 159:18
interfacing [1] -
108:20
interpersonal [1] -
108:13
introduce [1] - 104:6
introduced [1] - 5:3
inventory [1] - 26:10
involved [4] - 61:7,
62:2, 62:17, 62:21
issue [5] - 7:3, 7:8,
29:23, 31:7, 32:2
issues [2] - 13:25,
15:23
item [1] - 82:13
items [4] - 16:2, 16:5,
26:15, 26:16
itself [3] - 107:18,
107:19, 107:22

**J**

Janelle [2] - 40:12,
85:6
Janelle's [1] - 40:14
January [9] - 6:10,
65:4, 68:17, 68:25,
69:4, 86:1, 88:10,
88:12, 136:24
Jentdueto [1] - 14:21
job [49] - 17:23, 26:22,
29:6, 32:25, 34:3,
38:11, 38:13, 38:22,
38:23, 43:14, 46:3,
47:10, 47:21, 49:17,
50:12, 50:15, 51:20,
53:5, 53:23, 54:6,
54:10, 54:23, 59:14,
60:18, 76:14, 77:1,
77:22, 79:12, 79:16,

82:3, 85:21, 90:11,
99:2, 100:21, 101:3,
101:11, 110:10,
110:13, 112:12,
119:1, 122:18,
123:6, 123:8,
123:16, 127:12,
135:12, 136:2,
147:14, 150:11
jobs [1] - 77:22
John [1] - 33:10
jokes [1] - 126:9
journal [1] - 37:4
Judy [1] - 40:13
Judy's [1] - 40:16
July [1] - 20:22
June [5] - 26:18,
46:25, 58:11, 88:3,
141:6
junior [1] - 59:21

**K**

Kathy [4] - 20:25,
21:3, 21:6, 23:25
Kathy's [1] - 23:14
Kearney [1] - 2:3
keep [10] - 8:25,
37:17, 96:7, 107:3,
117:9, 131:9,
148:25, 149:18,
149:20, 153:6
keeping [1] - 148:8
Kelly [3] - 2:8, 27:18,
27:22
Kelly's [2] - 27:20,
27:24
Kemster [1] - 5:19
kept [3] - 37:5, 37:10,
148:9
kidding [2] - 133:22,
155:3
kids [2] - 18:15, 23:14
killing [2] - 44:13,
123:9
kind [2] - 113:25,
155:11
knowing [1] - 144:12
knowledge [5] -
16:18, 119:14,
144:11, 144:14,
144:15
known [2] - 135:16,
135:22
knows [3] - 13:9, 21:9,
21:18

**L**

labeled [1] - 114:25

laid [3] - 58:22, 58:25,
59:5
Lander [2] - 159:5,
159:23
language [1] - 49:6
Laramie [1] - 2:4
last [29] - 4:22, 11:21,
15:2, 15:11, 20:10,
22:7, 27:19, 27:20,
27:21, 40:14, 40:16,
41:21, 44:16, 47:7,
64:24, 70:13, 77:15,
80:5, 80:16, 86:20,
86:22, 86:24, 94:11,
114:3, 130:15,
134:2, 137:17, 145:8
lasted [2] - 115:3,
117:21
late [1] - 41:5
laugh [2] - 110:20,
110:22
laughing [2] - 110:16,
117:11
laughter [2] - 117:6
Laura [1] - 5:19
Law [2] - 2:3, 2:7
law [2] - 2:7, 83:3
lawn [1] - 41:7
lawnmower [1] - 41:3
laws [1] - 1:7
lawsuit [20] - 5:5,
5:13, 7:21, 17:4,
21:4, 21:20, 21:24,
21:25, 22:14, 22:21,
22:24, 62:18, 62:21,
62:22, 143:3, 143:5,
143:9, 143:17,
143:22, 143:24
lawsuits [2] - 62:20,
62:22
lay [2] - 36:18, 58:24
leaf [1] - 33:19
least [3] - 33:22, 37:3,
129:2
leave [12] - 26:19,
26:21, 29:8, 45:21,
46:4, 46:10, 46:14,
47:9, 48:9, 56:1,
82:1, 142:10
leaving [1] - 82:5
led [1] - 54:7
left [11] - 25:19, 26:18,
51:15, 58:9, 59:17,
60:6, 76:4, 76:10,
76:18, 78:20, 82:14
legitimate [1] - 124:25
length [1] - 104:16
less [4] - 41:1, 47:22,
109:12, 140:2
letter [4] - 3:15,

138:12, 139:15,
152:15
license [3] - 32:1,
79:20, 79:23
lifetime [1] - 82:9
lift [4] - 29:2, 43:1,
80:1, 97:14
lifting [7] - 28:19,
28:24, 28:25, 29:5,
35:22, 60:20, 69:12
light [1] - 34:11
lights [1] - 31:25
likely [1] - 88:23
limitation [1] - 66:10
limitations [2] - 66:14,
67:18
limited [3] - 52:25,
90:8, 121:12
line [4] - 131:23,
142:10, 151:23,
153:24
LINE [1] - 158:2
list [2] - 111:8, 138:5
listed [2] - 31:18,
157:10
listen [13] - 91:22,
92:1, 92:2, 93:8,
93:19, 94:2, 94:17,
100:7, 100:17,
100:25, 102:24,
114:24, 118:9
listened [2] - 16:7,
146:15
litigated [1] - 30:2
litigation [2] - 30:5,
62:18
live [4] - 22:11, 22:18,
23:22, 122:20
Living [7] - 24:6,
26:23, 28:2, 28:12,
29:16, 30:14, 45:24
LLC [2] - 2:8, 4:4
load [2] - 121:17,
122:22
loaded [1] - 48:17
located [3] - 55:21,
55:24, 129:25
location [2] - 34:23,
113:2
log [1] - 37:4
long-term [2] - 15:19,
15:23
longest [1] - 51:10
look [16] - 18:8, 18:17,
24:19, 44:11, 63:2,
66:21, 69:21, 78:15,
96:13, 128:17,
133:17, 134:15,
138:16, 152:14,
154:5, 155:22

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 231

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 50 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          9

looked [12] - 13:21, 14:2, 14:6, 14:11, 145:9, 153:14, 153:15, 153:16, 154:9, 155:9, 155:13, 156:6
looking [2] - 25:18, 74:24
looks [2] - 134:4, 145:10
Lori [2] - 20:9, 20:13
lose [2] - 80:3, 81:11
losing [3] - 48:22, 57:20, 112:12
loss [1] - 81:6
lost [6] - 48:17, 49:6, 49:8, 81:9, 81:13, 81:15
loud [2] - 90:1, 126:4
low [2] - 14:21, 148:22
low-dose [1] - 14:21
lower [1] - 69:21
luck [1] - 13:15

## M

M-e-s-t-a-s [1] - 4:23
MacPherson [1] - 2:8
mad [4] - 104:22, 105:6, 111:11, 111:15
magistrate [3] - 131:10, 131:23, 132:3
main [1] - 38:21
maintenance [4] - 33:3, 122:15, 130:1, 144:19
male [5] - 5:23, 6:25, 7:1, 27:22
malingering [1] - 108:10
man [3] - 59:3, 124:18, 125:2
management [3] - 111:3, 111:13, 116:15
manager [2] - 24:8, 27:25
maneuver [1] - 36:14
manner [1] - 49:1
manual [13] - 85:4, 90:24, 97:11, 114:9, 133:24, 134:6, 134:10, 135:2, 151:25, 152:10, 155:5, 155:9, 155:16
marathon [1] - 9:18
March [9] - 58:21, 126:16, 126:18,

128:23, 129:10, 129:11, 131:3, 140:16, 140:17
margin [1] - 79:5
mark [2] - 89:11, 150:18
marked [21] - 24:15, 24:17, 66:17, 66:19, 78:11, 78:13, 79:5, 89:13, 89:16, 96:3, 96:15, 117:16, 117:20, 133:7, 133:10, 138:9, 138:11, 139:12, 139:14, 146:20, 150:21
MARKED [1] - 3:8
marriage [1] - 20:1
married [7] - 19:24, 20:4, 20:17, 130:19, 130:20, 133:23, 155:4
Marshall [2] - 4:5, 159:4
MARSHALL [2] - 1:22, 159:21
Mary [2] - 4:5, 159:4
MARY [2] - 1:22, 159:21
matter [6] - 5:14, 5:25, 6:2, 6:15, 8:21, 103:12
matters [2] - 6:3, 7:19
MAY [1] - 1:18
mayor [11] - 39:8, 39:17, 86:12, 86:14, 87:7, 87:8, 87:14, 91:17, 95:7, 129:18, 144:20
mayor's [1] - 39:18
McMurry [6] - 46:24, 47:2, 47:9, 47:15, 47:18, 50:12
mean [13] - 10:10, 12:5, 14:8, 18:11, 39:6, 44:3, 51:18, 65:11, 71:4, 71:11, 88:6, 109:13, 122:14
meaning [1] - 5:17
means [1] - 43:6
meant [1] - 70:20
Measurements [1] - 55:19
measures [1] - 47:14
mechanical [2] - 36:3, 43:6
Medical [1] - 30:3
medical [7] - 30:6, 52:25, 63:23, 67:14, 67:17, 75:22, 145:13

medication [2] - 14:25, 15:3
medications [4] - 14:14, 14:16, 14:18, 15:12
meeting [1] - 99:16
MEGAN [1] - 2:3
member [1] - 129:19
memory [4] - 13:25, 15:17, 15:20, 15:23
mental [4] - 141:22, 141:25, 143:7, 143:10
mentioned [2] - 13:23, 62:16
Mestas [23] - 3:9, 3:11, 3:13, 3:15, 3:19, 4:21, 4:24, 5:1, 22:8, 24:14, 57:3, 66:16, 78:10, 89:12, 96:2, 103:7, 133:6, 138:8, 138:14, 139:11, 146:19, 147:20, 150:20
MESTAS [10] - 1:3, 1:15, 3:2, 4:1, 4:13, 157:2, 157:16, 158:1, 158:25, 159:7
metal [1] - 35:9
Mexican [1] - 126:5
Mexicans [1] - 128:11
midback [2] - 29:17, 31:2
middle [2] - 9:22, 118:15
might [9] - 14:6, 18:8, 38:24, 41:11, 79:2, 95:2, 95:5, 115:15, 135:6
miles [1] - 93:4
military [1] - 63:19
Mills [1] - 60:14
mind [1] - 51:21
mine [1] - 18:6
minimum [1] - 46:2
minute [1] - 57:24, 78:15
minutes [4] - 104:16, 115:4, 117:21, 146:11
mischaracterizes [2] - 132:8, 132:14
mischaracterizing [3] - 131:7, 131:17, 131:20
missed [2] - 51:8, 79:2
misstated [1] - 76:24
misstates [3] - 100:11, 107:14, 120:19
mistake [2] - 119:24,

120:3
misunderstand [2] - 33:17, 77:11
misunderstood [1] - 70:19
Mix [8] - 46:24, 47:18, 48:1, 48:5, 48:9, 49:14, 50:13, 58:11
mix [1] - 48:3
Mobile [4] - 47:25, 48:5, 48:9, 49:13
mode [1] - 9:3
moment [1] - 15:1
Monday [2] - 31:22, 46:17
monetary [2] - 62:24, 63:9
money [2] - 54:19, 73:21
month [3] - 105:12, 139:25, 140:12
monthly [1] - 73:22
months [8] - 25:24, 28:8, 28:9, 41:1, 49:16, 58:17, 64:25
Montoya [1] - 57:4
morning [2] - 31:22, 109:10
most [6] - 25:4, 33:7, 35:11, 111:11, 145:21, 146:3
mother [1] - 19:6
mouth [1] - 137:1
move [6] - 36:17, 36:20, 37:1, 43:12, 43:13, 136:6
moved [2] - 26:15, 37:12
moving [4] - 26:16, 92:22, 98:12, 98:19
mowing [2] - 38:20, 41:7
MR [66] - 4:18, 6:14, 10:22, 11:6, 12:1, 21:10, 24:16, 44:17, 55:1, 55:14, 58:2, 58:6, 61:23, 63:14, 66:18, 69:18, 71:8, 71:10, 71:13, 72:14, 73:1, 78:12, 89:14, 94:15, 95:15, 96:4, 98:5, 99:10, 100:13, 101:16, 103:3, 103:23, 104:15, 105:1, 105:3, 107:16, 114:5, 115:2, 117:19, 118:14, 120:21, 122:4, 131:8, 131:15, 131:18,

131:22, 131:25, 132:4, 133:8, 137:10, 138:10, 139:13, 142:6, 142:9, 142:12, 146:5, 146:10, 146:13, 146:22, 149:24, 150:14, 150:18, 150:22, 152:6, 153:5, 156:8
MS [40] - 10:19, 21:7, 54:24, 55:13, 57:23, 58:1, 58:3, 61:21, 63:11, 69:16, 71:7, 71:11, 72:12, 72:22, 95:13, 98:2, 99:7, 100:11, 101:15, 103:20, 104:25, 107:14, 120:19, 122:3, 131:6, 131:13, 131:16, 131:20, 131:24, 132:2, 137:8, 142:8, 146:7, 149:22, 150:16, 151:1, 151:3, 152:8, 153:2, 156:9
municipal [1] - 42:20
Municipal [1] - 1:7
municipality [1] - 47:24
muscles [2] - 49:22, 124:3
must [1] - 81:4
mutual [2] - 51:17, 51:18
MWD [9] - 55:15, 55:18, 55:19, 56:11, 56:13, 56:15, 58:8, 58:16
MWE [1] - 56:4
MY [1] - 157:25

## N

name [24] - 4:20, 4:22, 5:4, 5:18, 20:10, 20:24, 27:19, 27:20, 27:21, 39:18, 40:14, 40:16, 41:20, 41:21, 47:6, 47:7, 48:6, 57:1, 86:20, 86:22, 86:24, 87:2, 87:4, 91:23
NAME [1] - 157:22
named [1] - 157:4
names [9] - 22:3, 22:7, 23:7, 23:11, 52:7, 52:10, 86:16, 130:22, 132:19

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 232

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 51 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          10

**narcotic** [1] - 14:24
**national** [5] - 81:22, 90:4, 96:17, 121:24, 135:14
**National** [1] - 81:23
**nature** [3] - 9:2, 52:23, 69:13
**nauseam** [1] - 144:4
**necessary** [1] - 32:24
**neck** [3] - 50:23, 50:24, 53:20
**need** [27] - 9:20, 9:25, 16:21, 17:6, 41:11, 44:12, 51:8, 57:10, 59:18, 86:16, 92:14, 95:17, 96:9, 98:11, 100:3, 104:5, 113:7, 114:11, 126:22, 127:13, 127:25, 131:10, 131:23, 136:7, 136:14, 148:23, 150:2
**needed** [11] - 16:24, 16:25, 32:24, 98:12, 99:25, 113:2, 113:19, 135:22, 136:5, 136:20, 148:11
**neighborhood** [1] - 139:7
**nerve** [1] - 145:15
**never** [20] - 34:10, 34:12, 39:22, 39:24, 46:14, 51:8, 63:22, 100:8, 101:2, 109:11, 109:23, 113:4, 114:15, 123:19, 123:24, 124:2, 124:3, 125:21, 127:16, 127:20
**new** [1] - 35:8
**next** [4] - 56:6, 79:19, 84:7, 146:17
**nine** [1] - 64:25
**nobody** [2] - 94:19, 114:21
**non** [1] - 92:7
**non-responsive** [1] - 92:7
**none** [2] - 29:21, 33:16
**Notary** [4] - 1:22, 4:6, 159:4, 159:22
**NOTARY** [2] - 157:22, 157:23
**note** [2] - 37:7, 148:12
**notebook** [2] - 3:20, 150:17
**notepad** [4] - 126:14,

148:2, 148:25, 149:6
**notes** [4] - 148:8, 148:9, 149:18, 149:20
**nothing** [4] - 4:15, 120:10, 130:24, 159:9
**notice** [3] - 27:1, 139:17, 159:7
**NOV** [1] - 81:21
**November** [3] - 20:22, 64:4, 64:15
**Number** [2] - 24:15, 31:16, 66:17, 66:20, 69:22, 77:5, 78:11, 78:14, 89:13, 89:15, 96:3, 128:18, 133:7, 138:9, 138:12, 139:12, 139:15, 146:18, 146:20, 150:21, 155:16
**number** [15] - 19:7, 40:9, 59:21, 59:22, 69:23, 82:13, 84:3, 84:13, 133:18, 135:9, 135:24, 146:17, 147:21, 154:25, 155:7
**numbered** [1] - 154:25
**numbers** [1] - 148:22

**O**

**oath** [7] - 10:7, 16:22, 44:18, 74:4, 85:23, 99:11, 159:11
**object** [2] - 69:16, 72:12
**objection** [25] - 8:17, 10:19, 10:24, 11:3, 11:4, 21:7, 54:24, 71:7, 71:12, 72:22, 95:13, 98:2, 99:7, 100:11, 101:15, 104:25, 107:14, 120:19, 122:3, 131:6, 131:18, 131:21, 137:8, 149:22, 152:6
**objections** [3] - 10:24, 131:9, 132:1
**obligations** [1] - 99:17
**observed** [3] - 92:5, 92:9, 105:5
**obtain** [3] - 19:17, 78:19, 103:22
**obtained** [1] - 103:14
**occasional** [1] - 109:10
**occasions** [5] - 109:1,

125:14, 125:17, 125:18, 129:14
**occupational** [1] - 90:11
**occur** [1] - 53:14
**occurred** [2] - 53:12, 149:7
**occurring** [2] - 96:16
**October** [10] - 56:24, 58:10, 58:17, 58:21, 67:5, 81:10, 81:13, 81:18, 140:4, 142:16
**OF** [10] - 1:1, 1:6, 1:15, 1:16, 3:2, 4:1, 157:1, 157:22, 159:2, 159:3
**of**_____2017 [1] - 157:12
**of**_____2017 [1] - 157:20
**offered** [3] - 26:22, 59:14, 124:11
**Office** [1] - 30:2
**office** [4] - 32:8, 39:25, 68:8, 104:19
**offices** [1] - 4:3
**official** [5] - 1:9, 127:23, 129:15, 143:18, 143:20
**officials** [3] - 128:2, 128:4, 128:7
**Oil** [26] - 25:21, 26:1, 26:5, 26:9, 26:18, 26:19, 26:25, 27:3, 27:17, 27:24, 44:21, 45:1, 46:10, 50:16, 51:4, 70:17, 72:6, 74:17, 74:21, 75:5, 75:7, 75:9, 75:25, 76:6, 76:12, 76:17
**Oilwell** [2] - 81:22, 81:23
**old** [2] - 22:16, 23:16
**omitted** [2] - 81:4, 81:20
**ON** [1] - 1:16
**Once** [1] - 36:19
**once** [4] - 20:5, 32:4, 47:23, 49:4
**one** [69] - 5:11, 7:24, 10:22, 16:4, 18:15, 21:9, 25:10, 25:12, 27:7, 30:14, 33:14, 35:7, 35:8, 36:13, 36:14, 37:2, 43:24, 44:2, 44:4, 44:6, 46:6, 51:11, 52:16, 52:18, 57:11, 60:9, 60:24, 61:1, 65:5,

77:10, 87:3, 89:22, 89:24, 90:19, 90:22, 92:19, 94:24, 98:11, 104:2, 105:10, 106:10, 109:22, 109:24, 109:25, 110:2, 111:23, 115:10, 116:16, 120:3, 127:3, 127:11, 128:15, 128:17, 129:18, 130:20, 132:23, 133:23, 147:11, 148:3, 148:16, 148:23, 150:6, 150:11, 155:4, 155:13, 155:14
**one-on-one** [1] - 110:2
**ones** [5] - 13:22, 61:10, 61:12, 77:16, 149:10
**open** [3] - 10:14, 41:23, 142:10
**operate** [2] - 36:10, 41:3
**operating** [1] - 43:22
**opinion** [1] - 137:6
**Opportunity** [7] - 89:25, 90:3, 95:20, 133:11, 152:3, 154:10, 155:17
**opportunity** [1] - 57:11
**opted** [1] - 45:13
**oral** [1] - 27:6
**orally** [1] - 159:10
**order** [4] - 14:10, 40:9, 141:10, 148:6
**ordinance** [1] - 84:12
**ordinary** [1] - 147:17
**origin** [5] - 90:4, 96:17, 112:3, 121:24, 135:15
**otherwise** [3] - 73:14, 79:10, 79:11
**out-of-the-ordinary** [1] - 147:17
**outrageous** [1] - 45:11
**outside** [6] - 11:16, 18:19, 38:18, 41:12, 104:19, 108:5
**overhear** [2] - 87:10, 87:16
**overheard** [1] - 94:21
**overhearing** [1] - 95:8
**overpayment** [7] - 72:3, 72:5, 73:24, 74:1, 103:9, 139:6,

140:7
**overtime** [1] - 46:21
**owe** [2] - 139:5
**own** [6] - 35:16, 35:23, 36:1, 37:2, 112:17, 112:22
**owned** [1] - 95:21

**P**

**p.m** [1] - 156:11
**P.O** [2] - 2:9, 138:14
**pad** [1] - 37:7
**PAGE** [2] - 3:2, 158:2
**page** [31] - 56:6, 69:24, 74:8, 74:9, 75:15, 79:4, 82:22, 83:5, 83:6, 83:10, 83:22, 84:7, 84:15, 84:16, 85:7, 87:18, 89:10, 96:14, 133:17, 135:24, 136:23, 137:17, 147:24, 147:25, 148:15, 151:9, 151:14, 152:3, 153:10, 154:11, 154:25
**pages** [4] - 14:9, 138:16, 157:5, 159:13
**paid** [4] - 47:21, 50:6, 50:8, 51:5
**pain** [1] - 14:24, 15:3
**paperwork** [5] - 67:22, 68:2, 68:5, 77:17, 120:14
**paragraph** [12] - 81:2, 90:1, 119:2, 133:18, 135:9, 135:24, 151:13, 151:23, 152:2, 152:5, 154:2, 154:25
**pardon** [1] - 134:8
**parents** [1] - 19:3
**park** [1] - 32:8
**Park** [17] - 24:5, 25:4, 25:15, 26:22, 28:1, 28:11, 29:3, 29:8, 29:11, 29:16, 30:14, 45:23, 46:3, 46:17, 66:8, 72:7, 145:1
**parks** [1] - 19:3
**part** [26] - 29:15, 31:12, 31:23, 32:11, 34:20, 50:21, 54:12, 54:17, 60:22, 64:21, 65:20, 72:2, 73:16, 76:25, 79:19, 87:1, 95:1, 103:11,

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          1 1

113:20, 140:6, 144:9, 144:22, 146:5, 147:14, 154:1, 154:12
**part-time** [1] - 31:12
**participate** [1] - 85:14
**particular** [1] - 116:16
**particularly** [1] - 116:13
**parties** [1] - 159:16
**parts** [2] - 64:11, 105:25
**pass** [2] - 54:13, 57:7
**past** [2] - 92:23, 113:12
**pay** [3] - 44:23, 45:20, 138:24
**paying** [3] - 71:23, 72:4, 73:22
**payment** [1] - 140:6
**penalty** [1] - 10:12
**pending** [2] - 4:7, 9:21
**people** [12] - 35:11, 43:10, 86:12, 94:17, 111:6, 111:9, 111:14, 111:19, 112:23, 124:23, 125:6, 138:4
**per** [3] - 93:4, 114:9, 139:25
**perceived** [2] - 17:7, 91:9
**perform** [7] - 53:23, 54:6, 54:10, 79:12, 97:11, 98:23, 99:2
**performance** [1] - 135:14
**performed** [2] - 68:10, 80:20
**performing** [4] - 75:16, 77:1, 77:8, 77:22
**perhaps** [1] - 151:24
**period** [13] - 51:10, 52:2, 72:5, 73:20, 75:5, 76:4, 76:15, 81:5, 85:18, 99:5, 103:16, 107:11, 109:7
**perjury** [1] - 10:12
**permanent** [1] - 7:16
**permissible** [1] - 11:3
**person** [10] - 13:7, 16:14, 36:13, 36:14, 88:14, 130:3, 130:6, 135:20, 135:21, 159:18
**personal** [9] - 90:10, 98:10, 121:17, 121:19, 122:2,

122:16, 122:17, 122:18, 144:14
**personality** [1] - 110:25
**personnel** [7] - 78:19, 78:23, 83:17, 134:15, 134:17, 153:14, 153:16
**pet** [3] - 112:2, 112:8, 137:15
**Peter** [1] - 30:13
**pets** [3] - 111:7, 111:20, 111:22
**petty** [1] - 40:8
**Phil** [4] - 39:20, 39:21, 86:9, 91:24
**phone** [1] - 98:10
**Photocopy** [1] - 3:20
**phrase** [2] - 129:1, 129:3
**physical** [7] - 64:22, 64:24, 79:22, 79:25, 80:6, 80:16, 80:20
**physically** [4] - 36:11, 43:12, 79:10, 79:11
**physicians** [1] - 15:4
**pick** [4] - 34:21, 35:7, 36:22, 42:25
**picked** [1] - 37:12
**picking** [1] - 42:16
**pickup** [3] - 35:6, 121:18, 122:23
**piece** [1] - 113:11
**pit** [2] - 50:20, 50:22
**place** [4] - 36:10, 55:6, 80:24, 88:13
**Place** [17] - 24:5, 25:5, 25:15, 26:22, 28:1, 28:11, 29:3, 29:8, 29:11, 29:16, 30:14, 45:23, 46:3, 46:17, 66:8, 72:7, 145:1
**placed** [3] - 67:19, 69:14, 88:14
**plaintiff** [1] - 103:5
**Plaintiff** [2] - 1:4, 2:5
**plaintiff's** [1] - 103:14
**plan** [1] - 45:16
**play** [4] - 103:24, 104:1, 104:11, 118:9
**played** [5] - 104:14, 115:1, 117:18, 118:12, 146:15
**pleasing** [1] - 110:21
**pocket** [1] - 148:3
**point** [6] - 34:10, 36:22, 53:3, 97:10, 106:20, 118:3
**points** [1] - 17:13
**policies** [1] - 151:24

**policy** [21] - 133:23, 134:3, 134:6, 134:10, 134:16, 134:18, 134:23, 134:25, 152:4, 152:9, 153:11, 153:14, 153:15, 153:20, 153:21, 154:1, 154:4, 155:5, 155:19, 155:22
**political** [1] - 90:6
**poorly** [1] - 17:8
**popped** [1] - 35:12
**position** [8] - 27:24, 34:24, 36:21, 56:13, 56:16, 82:1, 112:13, 112:21
**possible** [1] - 152:2
**posters** [1] - 95:21
**pounds** [1] - 36:25
**powered** [2] - 33:11, 33:19
**practices** [1] - 89:24
**pray** [1] - 145:6
**Premier** [3] - 67:12, 77:14, 78:3
**premiums** [1] - 45:10
**preparation** [2] - 10:17, 11:22
**prepare** [2] - 25:3, 25:9
**prepared** [2] - 25:1, 25:10
**preparing** [1] - 25:11
**prescribed** [2] - 14:23, 15:3
**prescription** [2] - 14:16, 14:18
**presence** [1] - 11:16
**present** [1] - 71:24
**presented** [1] - 85:5
**preserve** [1] - 18:16
**pretrip** [1] - 32:4
**pretty** [6] - 42:23, 49:3, 56:21, 57:25, 63:7, 80:3
**prevent** [1] - 37:9
**previously** [1] - 20:3
**primary** [1] - 38:16
**privilege** [1] - 10:20
**privileged** [2] - 11:1, 143:2
**probation** [2] - 84:20, 85:1
**probationary** [3] - 84:21, 84:25, 85:17
**problem** [4] - 15:17, 15:19, 123:20, 123:24
**problems** [2] - 36:5,

76:1
**procedures** [1] - 68:10
**proceeding** [3] - 7:21, 8:6, 10:13
**process** [2] - 8:12, 63:4
**produce** [2] - 18:9, 55:10
**produced** [4] - 18:18, 55:13, 103:22, 104:12
**professional** [2] - 116:22, 141:25
**program** [4] - 45:15
**Program** [1] - 12:8
**prohibited** [1] - 90:10
**proper** [5] - 10:23, 11:4, 131:21, 149:13, 149:19
**properly** [1] - 35:1
**propounded** [1] - 157:8
**provide** [4] - 68:16, 135:14, 135:19, 135:20
**provided** [5] - 67:20, 68:14, 110:6, 146:6, 147:20
**Public** [5] - 1:9, 1:22, 4:6, 159:4, 159:22
**public** [14] - 32:15, 38:19, 38:24, 39:2, 39:13, 41:7, 41:10, 41:15, 42:17, 65:15, 87:1, 101:10, 108:24, 129:15
**PUBLIC** [2] - 157:22, 157:23
**pulling** [3] - 42:7, 53:18, 53:19
**punched** [1] - 37:24
**purchase** [2] - 40:9, 148:6
**purpose** [5] - 5:7, 17:9, 83:11, 108:3, 108:7
**purposes** [1] - 90:23
**pursuant** [2] - 159:7, 159:8
**pushing** [2] - 49:24, 96:7
**put** [25] - 8:19, 26:10, 27:12, 27:14, 35:6, 35:7, 35:8, 35:18, 43:10, 50:9, 80:11, 82:15, 88:20, 101:12, 107:25, 112:18, 112:21, 113:3, 116:1, 116:4, 119:8, 121:11,

127:15, 134:13, 135:22
**puts** [1] - 43:2
**putting** [3] - 27:10, 34:22, 42:6

### Q

**qualification** [1] - 90:11
**qualified** [3] - 43:18, 113:5, 113:9
**question/answer** [2] - 8:21, 8:22
**questioning** [2] - 142:11, 153:25
**Questionnaire** [1] - 3:14
**questionnaire** [2] - 133:11, 151:20
**QUESTIONS** [3] - 4:18, 151:3, 153:5
**questions** [19] - 11:2, 16:23, 57:14, 77:14, 77:18, 99:14, 100:18, 104:2, 146:24, 150:23, 151:1, 151:22, 153:3, 153:9, 153:22, 155:6, 155:18, 156:8, 157:7
**quit** [8] - 48:11, 48:12, 48:18, 51:23, 59:7, 59:8, 59:13, 72:3
**quite** [3] - 9:19, 15:5, 34:25
**quitting** [3] - 49:11, 49:12, 51:22

### R

**race** [6] - 90:4, 132:13, 135:14, 135:19, 152:12
**racial** [1] - 126:8
**racist** [2] - 125:14, 126:2
**radio** [2] - 49:5, 98:11
**raising** [1] - 115:14
**ran** [1] - 44:4
**random** [1] - 17:14
**rate** [1] - 44:23
**rather** [1] - 103:15
**Rawlins** [1] - 2:9
**reached** [2] - 7:23, 12:14
**READ** [1] - 158:2
**read** [17] - 11:20, 11:22, 12:13, 44:15, 74:9, 89:24, 90:13,

000713

Mestas v. Town of Evansville
17-CV-00017-NDF        Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion        Exhibit F        12

91:1, 91:3, 94:10, 114:2, 119:13, 130:14, 133:20, 133:24, 151:13, 157:6
reading [2] - 91:6, 159:15
READS [1] - 158:2
Ready [8] - 46:24, 47:18, 48:1, 48:5, 48:9, 49:13, 50:13, 58:11
ready [1] - 48:3
really [1] - 127:14
reason [6] - 15:8, 15:9, 25:11, 58:20, 82:5, 82:14
REASON [1] - 158:2
receipt [4] - 83:14, 84:2, 84:4, 84:12
receive [13] - 27:2, 29:18, 47:14, 50:4, 50:7, 51:2, 51:6, 67:3, 83:20, 139:18, 141:2, 141:10, 142:11
received [20] - 27:9, 45:18, 67:2, 67:15, 67:22, 68:2, 73:5, 73:8, 89:19, 89:22, 90:17, 90:21, 90:25, 91:2, 91:3, 103:8, 103:10, 103:11, 120:11, 138:20
receiving [18] - 31:6, 31:9, 45:4, 45:8, 71:19, 73:2, 73:13, 76:3, 76:6, 86:4, 88:7, 139:8, 139:25, 140:3, 140:10, 140:24, 141:7, 141:15
recent [3] - 25:4, 145:21, 146:3
recently [1] - 146:8
recognize [8] - 24:22, 24:24, 66:24, 67:1, 147:22, 151:5, 151:17, 152:16
recollection [2] - 18:12, 155:10
record [13] - 4:20, 5:4, 6:13, 8:14, 101:20, 103:4, 103:5, 103:13, 125:9, 135:13, 146:14, 150:25, 159:14
recorded [9] - 16:15, 17:13, 17:16, 18:3, 115:4, 115:7,

115:16, 120:17, 125:10
recording [44] - 16:18, 17:25, 100:9, 100:14, 100:25, 101:5, 101:13, 101:14, 101:17, 104:5, 105:9, 105:24, 106:7, 106:12, 106:18, 107:2, 107:6, 107:12, 107:15, 107:22, 108:6, 108:12, 108:16, 108:19, 108:22, 110:9, 110:17, 113:22, 114:25, 115:3, 115:8, 115:11, 115:24, 116:15, 116:18, 116:24, 117:3, 117:16, 117:21, 117:22, 118:5, 118:8, 118:19, 119:6
recordings [17] - 16:6, 16:8, 16:9, 16:11, 16:17, 17:1, 17:3, 17:6, 17:10, 17:15, 17:18, 17:20, 18:1, 37:7, 103:25, 110:6, 137:24
records [4] - 24:9, 142:6, 142:11, 143:5
recruitment [1] - 90:8
reduce [1] - 93:4
reduced [2] - 93:6, 159:12
refer [1] - 126:22
referenced [1] - 146:16
referred [1] - 154:16
referring [6] - 12:11, 12:21, 92:16, 119:25, 152:4, 154:18
reflect [1] - 138:19
reflected [1] - 106:7
refuel [1] - 53:19
refueler [1] - 53:18
refused [1] - 124:11
regards [1] - 9:16, 11:2, 11:8, 94:2, 95:9, 102:2, 103:6, 132:11, 144:1, 144:4, 153:10, 153:25
regimen [1] - 14:22
regular [1] - 35:5
regulations [2] - 31:24, 83:17

reinjured [1] - 99:4
reinstated [2] - 140:14, 140:20
reinstatement [1] - 90:9
related [10] - 7:5, 7:13, 53:13, 53:14, 63:12, 68:6, 70:25, 96:22, 120:6, 143:13
relates [1] - 135:16
relating [2] - 4:15, 107:8
relation [1] - 15:7
relationship [2] - 83:3, 108:13
relative [3] - 159:16, 159:17, 159:18
release [6] - 65:8, 65:12, 68:21, 69:1, 69:2, 121:8
released [14] - 65:2, 65:5, 68:17, 69:10, 87:24, 88:5, 88:15, 96:25, 98:22, 109:8, 121:9, 136:18, 136:19, 141:5
religion [2] - 90:4, 135:15
remarks [1] - 74:9
remember [36] - 5:21, 5:22, 13:24, 15:21, 18:2, 41:20, 48:6, 50:1, 50:2, 52:7, 52:10, 54:1, 54:20, 55:5, 63:18, 65:1, 73:19, 80:18, 87:3, 91:6, 95:23, 105:11, 108:8, 108:11, 118:4, 118:6, 119:10, 124:17, 126:17, 134:11, 134:14, 140:16, 145:13, 147:7
removing [2] - 34:6, 34:18
renewal [1] - 80:24
repair [4] - 34:19, 34:20, 41:14, 136:6
repayment [3] - 103:9, 140:5, 140:11
repeat [6] - 11:18, 70:5, 88:12, 94:9, 114:1, 130:13
rephrase [1] - 98:4
replace [2] - 112:17, 114:7
replaced [1] - 35:3
replacement [1] - 148:11
replacing [1] - 35:5

replied [1] - 130:21
reply [1] - 130:19
Report [1] - 3:10
report [6] - 31:22, 32:23, 49:1, 64:8, 128:15, 146:2
REPORTED [1] - 1:21
reporter [3] - 8:18, 9:14, 11:19
Reporter [7] - 4:6, 11:20, 44:15, 94:10, 114:2, 130:14, 159:6
REPORTER'S [1] - 159:1
reporting [2] - 48:23, 152:3
Reporting [1] - 4:5
represent [5] - 5:5, 70:7, 70:22, 72:9, 72:15, 72:18, 72:19, 74:5, 90:23
representation [1] - 103:18
represented [3] - 70:11, 74:11, 77:7
reprimand [1] - 27:8
reprimanded [1] - 21:16
reprimands [2] - 27:6
request [10] - 18:18, 21:15, 103:13, 110:4, 121:21, 121:24, 122:2, 122:8, 146:9, 147:17
requested [7] - 25:12, 25:15, 40:20, 98:16, 99:23, 121:16, 159:15
require [7] - 28:14, 33:5, 34:22, 37:21, 38:5, 38:25, 41:23
required [15] - 28:19, 32:12, 33:5, 34:15, 37:1, 37:9, 38:6, 41:10, 42:1, 66:7, 77:2, 77:23, 102:1, 138:24, 147:11
requirement [1] - 90:11
requirements [2] - 29:6, 38:13
requiring [1] - 37:17
reserve [1] - 142:9
residence [1] - 148:10
resident [5] - 28:23, 28:24, 28:25, 29:12, 29:16
residential [1] - 42:19
residents [2] - 28:16, 28:18

residing [1] - 159:5
RESIDING [1] - 157:24
resign [3] - 26:24, 56:16, 56:20
resigned [3] - 47:12, 56:3, 56:13
resolution [2] - 84:3, 84:5
respect [2] - 90:6, 124:22
respondent's [1] - 119:2
response [2] - 130:10, 155:7
responses [1] - 9:12
responsibilities [4] - 41:12, 98:24, 99:3, 99:16
responsibility [1] - 97:5
responsive [3] - 92:7, 94:8, 95:10
rest [1] - 118:18
restriction [5] - 66:10, 88:9, 88:15, 109:9, 145:17
restrictions [17] - 65:9, 66:14, 67:18, 67:20, 68:13, 68:22, 69:3, 69:11, 69:12, 69:13, 75:18, 88:14, 98:23, 120:12, 121:11
restroom [1] - 9:24
result [4] - 51:3, 53:22, 59:10, 64:8
Resume [1] - 3:9
resume [9] - 24:25, 25:9, 25:13, 25:16, 25:19, 31:16, 58:9, 58:14, 81:16
retail [1] - 19:6
retired [2] - 40:12, 40:17
retirement [2] - 45:15, 139:16
Retirement [1] - 3:17
retract [1] - 85:9
return [17] - 65:3, 65:6, 65:8, 65:12, 67:19, 68:13, 68:17, 68:21, 69:1, 69:2, 69:10, 88:16, 96:25, 98:22, 120:12, 136:18, 145:5
review [2] - 24:20, 30:7
reviewed [7] - 11:14, 12:3, 12:18, 66:22, 77:4, 84:5, 153:22

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 235

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 54 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          13

**Reyna** [3] - 86:18, 86:19, 137:15
**right-hand** [2] - 69:21, 79:5
**rights** [1] - 124:24
**RN** [1] - 24:7
**road** [2] - 46:7, 46:9
**rollout** [1] - 35:5
**Ron** [3] - 86:17, 91:15, 95:1
**Ron's** [1] - 86:20
**room** [1] - 8:14
**rough** [1] - 111:14
**route** [3] - 31:18, 32:6, 148:10
**ROY** [10] - 1:3, 1:15, 3:2, 4:1, 4:13, 157:2, 157:16, 158:1, 158:25, 159:7
**Roy** [19] - 3:9, 3:11, 3:13, 3:15, 3:19, 4:21, 5:1, 5:2, 5:3, 16:2, 18:24, 22:1, 24:9, 57:9, 57:23, 76:22, 103:24, 138:14, 146:23
**roy** [2] - 24:17, 153:6
**rule** [1] - 10:22
**rules** [6] - 8:10, 83:17, 131:19, 139:22, 152:20, 152:24
**run** [6] - 36:13, 113:4, 113:5, 113:7, 113:9, 113:11, 113:18, 114:15

## S

**sales** [1] - 81:25
**sanitation** [13] - 31:18, 34:5, 34:17, 38:17, 38:19, 38:23, 39:14, 41:9, 41:13, 41:16, 42:15, 43:15, 44:9
**saw** [2] - 39:24, 106:20
**Schanck** [1] - 3:16
**school** [7] - 19:8, 19:10, 19:13, 19:21, 59:17, 59:22, 60:6
**Schwartz** [1] - 4:3
**seal** [1] - 159:19
**search** [1] - 76:9
**searches** [1] - 76:14
**second** [4] - 133:17, 148:20, 154:22, 154:24
**seconds** [3] - 104:16, 115:4, 117:22
**section** [2] - 74:9,

89:24
**Security** [35] - 67:8, 70:1, 70:2, 70:6, 70:8, 70:12, 71:17, 71:20, 72:9, 72:15, 72:20, 73:2, 73:8, 73:16, 73:17, 73:25, 74:5, 74:12, 74:16, 74:24, 75:13, 103:7, 103:9, 103:17, 139:2, 139:6, 139:8, 139:16, 139:19, 140:13, 140:19, 141:7, 141:16, 152:16, 152:23
**see** [17] - 18:17, 52:9, 79:1, 88:25, 95:20, 103:21, 115:20, 116:14, 119:2, 134:16, 139:22, 145:14, 146:11, 151:25, 152:20, 154:5, 154:14
**seeing** [3] - 141:24, 142:3, 154:10
**seek** [1] - 140:20
**seeking** [1] - 141:13
**select** [1] - 17:12
**senior** [4] - 33:1, 42:12, 148:5, 148:20
**sensation** [1] - 53:20
**sentence** [2] - 127:9, 134:2
**separate** [3] - 12:11, 56:7, 61:13
**September** [10] - 31:13, 46:25, 58:11, 58:13, 82:25, 83:25, 84:10, 140:18, 140:21, 140:23
**sequentially** [1] - 104:11
**service** [2] - 42:20, 136:5
**Service** [1] - 4:5
**Services** [5] - 3:16, 55:23, 56:6, 56:11, 138:14
**session** [1] - 9:18
**sessions** [1] - 40:22
**set** [7] - 10:22, 21:19, 36:23, 46:19, 75:14, 103:1, 159:19
**setting** [1] - 34:24
**settlement** [9] - 7:23, 52:11, 52:14, 53:9, 54:8, 54:18, 55:8, 62:3, 62:14
**seven** [3] - 25:24, 32:23, 41:1

**several** [3] - 52:3, 52:4, 90:18
**severe** [1] - 141:22
**sex** [4] - 90:5, 135:14, 135:20, 135:21
**shake** [2] - 9:13, 9:14
**share** [2] - 67:14, 67:21
**Sheet** [1] - 157:11
**sheet** [1] - 37:11
**SHEET** [1] - 158:1
**sheets** [1] - 135:22
**Shirley** [1] - 59:4
**shirt** [1] - 148:3
**shop** [1] - 122:20
**shopping** [1] - 28:17
**short** [2] - 13:25, 15:17
**short-term** [2] - 13:25, 15:17
**SHOULD** [1] - 158:2
**shoulder** [1] - 60:23
**shovel** [11] - 32:12, 33:6, 33:9, 102:7, 102:16, 102:18, 102:22, 123:13, 147:1, 147:4
**shoveled** [3] - 123:10, 123:15, 147:8
**shoveling** [9] - 33:4, 42:14, 99:4, 102:2, 102:5, 121:12, 123:12, 147:9, 147:10
**show** [1] - 37:5
**shows** [2] - 56:5, 81:17
**shut** [1] - 137:1
**sick** [2] - 45:21, 107:8
**sidewalks** [1] - 33:2
**Sidney** [1] - 23:17
**sign** [4] - 83:10, 84:18, 85:21, 86:5
**signature** [4] - 82:23, 83:6, 83:23, 84:8
**signed** [3] - 101:8, 119:11, 125:13
**signing** [1] - 159:15
**similar** [1] - 135:10
**simple** [1] - 63:7
**sincere** [5] - 110:16, 110:20, 110:22, 117:10, 117:13
**Sisters** [1] - 4:4
**sit** [1] - 126:10
**situation** [1] - 135:10
**six** [8] - 25:24, 107:9, 133:18, 134:12, 151:23, 152:5, 155:1, 155:7

**sixteen** [1] - 44:24
**sizes** [1] - 148:6
**skid** [11] - 112:20, 113:1, 113:8, 113:12, 113:23, 113:24, 114:6, 114:14, 114:15, 114:17, 114:20
**slip** [2] - 50:19, 120:10
**slipped** [4] - 50:22, 64:6, 120:1, 120:4
**slipping** [1] - 64:13
**smooth** [2] - 107:4, 117:9
**snow** [23] - 32:12, 32:19, 32:21, 32:25, 33:4, 33:11, 33:24, 34:1, 34:6, 34:18, 98:19, 99:4, 102:2, 102:5, 102:7, 102:17, 102:19, 102:22, 121:12, 123:10, 123:12, 123:13
**snowblower** [9] - 102:14, 102:18, 121:15, 121:17, 121:19, 122:2, 122:22, 123:4
**snowblowers** [1] - 33:15
**snowplow** [1] - 122:13
**snowstorm** [1] - 121:1
**snowstorms** [1] - 123:11
**Social** [35] - 67:8, 70:1, 70:2, 70:6, 70:8, 70:12, 71:16, 71:20, 72:9, 72:15, 72:19, 73:2, 73:8, 73:16, 73:17, 73:25, 74:5, 74:12, 74:16, 74:23, 75:12, 103:7, 103:9, 103:17, 139:2, 139:6, 139:8, 139:16, 139:18, 140:13, 140:19, 141:7, 141:16, 152:16, 152:23
**someone** [1] - 125:9
**sometime** [1] - 133:3
**sometimes** [5] - 28:20, 28:22, 43:9, 43:10
**somewhere** [1] - 52:17
**son** [3] - 123:1, 123:2, 123:3
**sorry** [12] - 16:24, 24:5, 28:8, 33:20,

38:3, 55:3, 57:20, 71:15, 93:25, 127:19, 147:15, 149:17
**sort** [3] - 10:13, 19:20, 40:3
**sounds** [3] - 48:8, 118:17, 146:12
**South** [1] - 159:22
**speaking** [5] - 11:3, 94:21, 127:22, 131:9, 132:1
**speaks** [2] - 107:18, 107:19
**specific** [5] - 14:15, 25:11, 92:16, 144:14, 155:22
**specifically** [5] - 81:16, 105:24, 114:13, 127:3, 142:22
**specify** [1] - 109:7
**speculation** [3] - 104:25, 122:3, 137:8
**speeding** [2] - 92:19, 93:18
**spell** [1] - 4:22
**Sperry** [2] - 55:23, 56:6
**spinal** [1] - 145:13
**spine** [1] - 31:3
**spot** [1] - 36:23
**spring** [1] - 41:6
**squat** [1] - 80:1
**SS** [2] - 3:10, 159:3
**SSA** [2] - 3:17, 69:23
**stand** [4] - 96:5, 101:23, 124:23, 140:12
**standard** [1] - 45:9
**stands** [1] - 55:18
**start** [4] - 9:2, 32:5, 39:7, 150:2
**started** [2] - 59:17, 125:22
**starting** [1] - 58:12
**starts** [1] - 69:23
**state** [10] - 4:19, 6:7, 46:14, 48:24, 100:8, 101:8, 118:25, 119:11, 125:13, 137:17
**State** [13] - 1:8, 4:6, 12:7, 12:14, 29:19, 29:25, 30:18, 31:7, 76:7, 138:13, 138:25, 159:5, 159:5
**STATE** [1] - 159:2
**statement** [1] - 87:13, 87:15, 88:21, 88:24,

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion          Exhibit F          1 4

89:7, 89:25, 92:10, 92:12, 92:15, 100:23, 108:5, 108:9, 128:8, 134:17, 152:4, 153:15, 153:25, 154:6, 154:10, 154:16, 155:17
**statements** [6] - 17:2, 77:21, 107:12, 107:24, 126:7, 128:12
**states** [3] - 61:4, 119:12, 139:21
**States** [1] - 4:8
**STATES** [1] - 1:1
**stating** [3] - 31:16, 84:4, 115:19
**status** [1] - 90:5
**stay** [1] - 107:9
**steer** [11] - 112:20, 113:1, 113:8, 113:12, 113:23, 113:24, 114:6, 114:14, 114:15, 114:17, 114:20
**steering** [1] - 49:23
**stenograph** [1] - 159:12
**still** [20] - 6:22, 14:23, 18:7, 44:18, 74:20, 75:6, 75:11, 75:24, 75:25, 78:5, 97:2, 98:13, 112:9, 118:2, 118:15, 134:25, 141:7, 145:17, 147:8
**stipulation** [2] - 159:7, 159:8
**stop** [4] - 43:5, 49:4, 49:24, 49:25
**stopped** [6] - 49:4, 70:3, 70:8, 70:23, 71:1, 88:6
**storage** [3] - 27:11, 27:15
**stored** [1] - 122:11
**strained** [3] - 49:22, 50:25, 124:3
**Street** [2] - 2:4, 159:22
**stretch** [2] - 9:25
**strictly** [1] - 52:25
**Studer** [1] - 4:4
**stuff** [7] - 43:11, 43:12, 57:9, 122:15, 122:16, 122:18, 150:3
**stupid** [6] - 21:13, 112:9, 126:5, 126:25, 133:21, 155:1

**style** [3] - 111:3, 111:14, 116:15
**subject** [1] - 10:12
**SUBSCRIBED** [1] - 157:19
**subsequent** [3] - 66:12, 68:20, 68:23
**substantial** [2] - 59:15, 75:17
**sued** [3] - 63:8, 143:17, 143:19
**suffered** [8] - 7:6, 63:25, 64:12, 64:16, 66:8, 75:24, 75:25, 96:19
**suffering** [1] - 53:8
**summertime** [1] - 38:20
**supervision** [1] - 159:13
**Supervisor** [1] - 1:9
**supervisor** [12] - 17:20, 27:17, 39:13, 39:17, 47:5, 48:20, 48:23, 49:1, 52:1, 59:1, 67:16, 152:12
**supervisors** [2] - 52:4, 52:6
**supervisory** [1] - 116:18
**supposed** [2] - 32:17, 43:18
**surgery** [4] - 82:6, 89:5, 145:16
**survivors** [1] - 139:17
**Survivors** [1] - 3:17
**sustained** [3] - 29:9, 29:10, 54:23
**swear** [1] - 119:12
**swing** [1] - 36:15
**SWORN** [1] - 157:19
**sworn** [3] - 4:14, 157:2, 159:9
**Sydney** [2] - 23:12, 23:16
**symptoms** [1] - 75:18

---

**T**

**T9-T10** [2] - 31:4, 145:10
**TAKEN** [1] - 1:16
**talks** [1] - 138:3
**tank** [3] - 27:14, 27:15, 27:16
**tanks** [1] - 27:11
**tape** [6] - 100:7, 107:19, 124:10, 124:14, 124:16, 124:18

**tapes** [1] - 102:24
**task** [2] - 32:25, 99:23
**tasks** [6] - 34:16, 97:11, 136:8, 136:10, 136:12, 136:20
**team** [3] - 108:12, 108:14, 108:20
**tech** [1] - 60:17
**temporarily** [1] - 53:24
**temporary** [7] - 7:15, 31:9, 31:12, 50:9, 51:6, 76:6, 145:22
**ten** [2] - 82:11, 122:21
**term** [5] - 13:25, 15:17, 15:19, 15:23, 145:13
**terminate** [1] - 58:23
**terminated** [15] - 65:24, 66:2, 69:5, 69:9, 77:24, 77:25, 87:20, 87:21, 88:1, 88:11, 90:9, 100:8, 109:9, 120:13, 143:13
**terminology** [1] - 39:4
**terms** [2] - 56:1, 90:6
**test** [2] - 54:13
**testified** [12] - 8:5, 79:15, 89:19, 91:1, 98:21, 99:11, 99:15, 131:17, 147:10, 153:18, 154:8, 159:10
**TESTIMONY** [1] - 3:2
**testimony** [27] - 4:11, 10:14, 68:1, 69:8, 74:4, 76:25, 77:12, 81:12, 85:23, 98:21, 99:6, 99:13, 100:10, 100:12, 113:21, 120:20, 120:22, 131:7, 131:21, 132:15, 136:16, 144:24, 146:24, 151:12, 155:10, 159:12, 159:14
**THE** [10] - 1:1, 1:1, 1:16, 4:1, 57:25, 63:13, 94:12, 118:13, 130:16, 146:12
**their's** [1] - 45:13
**themselves** [1] -

112:24
**therapy** [2] - 64:22, 64:24
**thereafter** [1] - 159:12
**therein** [2] - 157:8, 157:9
**thereof** [1] - 157:7
**thereto** [1] - 159:11
**THEREUPON** [1] - 4:11
**thereupon** [1] - 159:10
**thinking** [1] - 63:3
**third** [2] - 117:16, 151:23
**Third** [1] - 159:22
**this____day** [1] - 157:12
**THOMAS** [1] - 2:7
**Thomas** [1] - 78:2
**THOMPSON** [67] - 2:7, 4:18, 6:14, 10:22, 11:6, 12:1, 21:10, 24:16, 44:17, 55:1, 55:14, 58:2, 58:6, 61:23, 63:14, 66:18, 69:18, 71:8, 71:10, 71:13, 72:14, 73:1, 78:12, 89:14, 94:15, 95:15, 96:4, 98:5, 99:10, 100:13, 101:16, 103:3, 103:23, 104:15, 105:1, 105:3, 107:16, 114:5, 115:2, 117:19, 118:14, 120:21, 122:4, 131:8, 131:15, 131:18, 131:22, 131:25, 132:4, 133:8, 137:10, 138:10, 139:13, 142:6, 142:9, 142:12, 146:5, 146:10, 146:13, 146:22, 149:24, 150:14, 150:18, 150:22, 152:6, 153:5, 156:8
**Thompson** [5] - 2:8, 3:3, 3:5, 5:4, 131:16
**thoracic** [2] - 31:3, 31:5
**threat** [2] - 86:2, 86:5
**threatened** [2] - 84:17, 85:20
**three** [24] - 14:2, 14:7, 14:12, 16:7, 16:9, 16:12, 17:12, 18:1, 23:22, 35:10, 37:3,

43:19, 80:2, 104:9, 109:21, 110:1, 110:5, 120:15, 132:21, 135:25, 138:17, 146:15, 148:24
**three-yard** [1] - 35:10
**throughout** [1] - 11:10
**throw** [1] - 135:7
**Thursday** [1] - 145:8
**ticket** [2] - 92:19, 93:1
**Tim** [1] - 47:6
**Timbers** [1] - 30:13
**tire** [1] - 19:5
**Tire** [1] - 59:20
**tired** [1] - 17:8
**today** [9] - 5:6, 8:14, 10:18, 11:22, 13:5, 13:12, 13:19, 76:25, 77:19
**together** [1] - 127:13
**Tom** [2] - 5:4, 58:1
**took** [12] - 5:16, 6:18, 6:20, 6:23, 35:10, 37:14, 38:17, 49:10, 58:7, 79:16, 112:10, 123:11
**total** [8] - 7:15, 31:9, 50:9, 51:6, 76:6, 109:14, 140:9, 145:22
**totaled** [1] - 49:8
**totally** [8] - 75:1, 75:4, 75:6, 75:10, 75:16, 77:8, 77:24, 141:18
**toward** [4] - 106:8, 119:19, 133:21, 155:2
**towards** [7] - 49:7, 105:16, 118:10, 119:22, 129:8, 130:7, 149:8
**TOWN** [1] - 1:6
**town** [25] - 32:25, 39:25, 40:2, 40:5, 40:7, 40:11, 40:19, 40:23, 46:10, 46:12, 49:11, 91:13, 91:19, 91:23, 92:20, 94:23, 122:12, 122:14, 122:15, 129:21, 129:23, 129:25, 130:3, 144:20, 153:23
**Town** [68] - 1:10, 3:12, 7:6, 17:19, 23:4, 25:20, 31:16, 31:21, 32:11, 34:4, 34:9, 37:20, 38:4, 38:12, 41:19, 42:17, 43:16,

000716

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 237

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 56 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit F     15

43:25, 44:5, 45:1, 47:10, 47:22, 58:12, 63:25, 65:14, 66:2, 66:12, 67:13, 69:9, 70:20, 76:10, 76:19, 77:2, 78:20, 79:7, 80:4, 80:9, 80:14, 80:17, 83:15, 84:22, 87:20, 88:1, 89:18, 90:2, 92:17, 93:9, 95:22, 96:20, 98:1, 98:7, 114:9, 114:18, 114:19, 121:16, 121:18, 122:19, 124:7, 127:23, 128:2, 129:15, 135:1, 138:21, 141:23, 143:14, 143:17, 149:4, 155:9
**tractor** [1] - 33:10
**tractors** [1] - 33:13
**trade** [1] - 19:21
**trailers** [1] - 122:14
**trained** [13] - 34:12, 34:15, 108:23, 113:4, 113:10, 113:15, 113:19, 114:8, 114:10, 114:12, 114:14, 114:16, 114:20
**training** [4] - 40:22, 90:9, 109:2, 113:20
**transcribed** [2] - 104:6, 104:8
**transcript** [6] - 8:12, 8:19, 8:23, 8:25, 104:20, 120:22
**transferring** [1] - 27:11
**transport** [3] - 26:4, 28:13, 28:16
**trash** [11] - 37:12, 42:16, 42:20, 42:25, 43:1, 43:5, 43:9, 43:11, 98:12, 98:13, 148:11
**Travis** [2] - 111:23, 111:25
**treated** [7] - 17:8, 21:13, 23:7, 30:21, 64:18, 135:11, 136:19
**treating** [3] - 15:4, 30:23, 145:20
**treatment** [6] - 64:21, 92:21, 105:19, 116:12, 119:22, 144:2
**Tresiba** [1] - 14:20
**trial** [1] - 57:18

**tried** [1] - 117:12
**trip** [2] - 48:17, 48:18
**trips** [1] - 32:6
**trouble** [1] - 32:3
**truck** [45] - 31:23, 31:24, 32:1, 32:2, 32:5, 32:7, 32:8, 34:5, 34:18, 34:23, 35:7, 35:8, 35:12, 35:16, 35:18, 35:23, 36:1, 36:15, 36:21, 36:22, 38:17, 38:23, 41:9, 41:13, 41:16, 42:16, 42:22, 43:2, 43:4, 43:15, 43:19, 44:6, 44:9, 49:4, 49:9, 49:10, 49:11, 60:21, 64:6, 64:13, 112:19, 121:18, 122:23, 127:15
**trucks** [2] - 43:22, 43:25
**true** [6] - 38:7, 65:23, 74:25, 75:2, 75:18, 77:10, 77:11, 77:20, 77:21, 119:13, 123:19, 123:25, 157:9, 159:13
**truly** [2] - 57:21, 98:20
**truth** [7] - 4:14, 4:15, 10:11, 159:9
**try** [12] - 18:13, 36:9, 36:10, 36:15, 36:17, 36:20, 36:21, 43:13, 104:21, 109:7
**trying** [18] - 14:5, 49:24, 63:4, 75:8, 75:11, 75:12, 75:21, 80:13, 107:3, 107:7, 107:23, 110:9, 132:20, 133:4, 133:5, 134:1, 136:16, 149:12
**TTD** [2] - 7:17, 141:5
**turn** [15] - 69:24, 74:8, 79:4, 79:9, 81:1, 82:22, 83:5, 83:22, 84:7, 84:15, 87:18, 89:10, 89:23, 96:14, 151:9
**Turner** [2] - 30:24, 30:25
**twisting** [1] - 69:13
**Two** [1] - 4:4
**two** [31] - 7:18, 27:1, 28:8, 33:22, 35:9, 35:10, 37:3, 37:12, 56:7, 76:22, 80:7, 80:8, 81:2, 86:25, 119:2, 123:10,

125:13, 125:17, 125:22, 125:24, 126:3, 126:7, 128:12, 128:19, 132:22, 138:16, 143:19, 148:23, 149:9, 149:18
**two-yard** [1] - 35:9
**type** [4] - 35:4, 50:2, 78:5, 110:25
**typewriting** [1] - 159:13
**typical** [1] - 105:14
**typo** [1] - 58:13

# U

**unable** [2] - 36:11, 79:11
**unassisted** [1] - 28:25
**uncomfortable** [1] - 44:11
**under** [28] - 1:7, 10:7, 16:22, 26:19, 44:18, 45:13, 45:14, 56:1, 74:4, 81:2, 82:13, 85:23, 88:9, 89:24, 99:11, 132:5, 133:17, 135:9, 135:24, 139:21, 151:23, 152:20, 152:23, 152:24, 154:25, 159:11, 159:13
**undergone** [1] - 88:10
**underground** [1] - 27:15
**understood** [4] - 10:4, 38:22, 83:2, 108:2
**Underwood** [1] - 40:14
**unemployed** [1] - 58:20
**unemployment** [9] - 87:19, 87:23, 88:21, 89:2, 138:19, 138:25, 140:24, 141:2, 141:10
**UNITED** [1] - 1:1
**United** [28] - 4:8, 7:24, 8:3, 20:18, 20:21, 51:12, 51:13, 51:15, 51:24, 52:2, 52:12, 52:21, 53:4, 53:8, 53:15, 53:16, 54:11, 54:18, 54:22, 59:18, 59:24, 60:7, 61:8, 61:15, 62:3, 62:10, 62:14, 82:15
**unless** [2] - 40:20,

124:23
**unloaded** [2] - 35:19, 49:10
**unloading** [2] - 34:23, 35:25
**unprofessional** [4] - 117:1, 117:2, 117:4, 117:5
**unusual** [1] - 147:16
**up** [36] - 9:5, 9:23, 17:11, 18:24, 26:16, 32:8, 33:2, 34:21, 35:7, 36:22, 37:12, 39:11, 42:16, 42:25, 46:2, 53:9, 59:17, 65:23, 66:7, 69:4, 76:11, 77:3, 77:23, 88:10, 99:17, 100:18, 103:1, 103:13, 104:3, 120:12, 121:17, 123:6, 123:17, 124:24, 137:1, 146:23
**updated** [2] - 25:4, 103:16
**upset** [2] - 21:12, 127:14

# V

**vacation** [1] - 45:20
**Varco** [2] - 81:22, 81:24
**various** [2] - 42:17, 66:7
**vehicles** [1] - 136:5
**versa** [1] - 9:5
**versus** [1] - 32:20
**veteran** [1] - 90:5
**vice** [1] - 9:5
**violation** [2] - 92:22, 148:12
**virtually** [1] - 36:16
**visit** [1] - 145:8
**visits** [3] - 50:8, 51:5, 68:8
**vitamin** [1] - 14:21
**volumes** [1] - 90:18
**voluntarily** [8] - 26:24, 47:12, 48:10, 51:15, 51:23, 59:6, 59:8, 82:1
**vs** [1] - 1:5

# W

**waiting** [1] - 103:15
**walk** [2] - 58:3, 97:20
**Walker** [1] - 4:3

**walkers** [1] - 28:22
**wants** [1] - 145:12
**warehouse** [5] - 26:4, 26:5, 26:8, 44:22, 81:25
**warehouseman** [1] - 56:11
**water** [4] - 9:24, 38:21, 39:14, 41:14
**ways** [1] - 8:25
**Weatherford** [5] - 55:22, 58:22, 58:23, 59:2, 59:15
**Wednesday** [1] - 118:21
**week** [6] - 27:1, 38:18, 46:1, 102:15, 109:13, 145:9
**weekly** [1] - 109:19
**weeks** [2] - 107:9, 123:10
**weigh** [1] - 36:24
**welcome** [2] - 114:23, 138:7
**West** [1] - 2:8
**wheel** [1] - 49:23
**wheelchairs** [1] - 28:22
**wheelers** [1] - 122:13
**WHEREOF** [1] - 159:19
**white** [1] - 81:20
**whole** [2] - 4:15, 159:9
**wife** [5] - 13:4, 20:7, 28:4, 107:9, 130:22
**wife's** [2] - 20:24, 45:14
**Wilbur** [2] - 95:2, 95:3
**willing** [1] - 106:1
**Willoughby** [11] - 91:24, 91:25, 92:6, 92:11, 92:25, 93:8, 93:17, 94:7, 94:17, 95:9, 144:21
**wintertime** [1] - 38:21
**wit** [1] - 4:12
**witness** [7] - 131:12, 131:14, 157:4, 159:8, 159:9, 159:10, 159:14
**WITNESS** [2] - 157:1, 159:19
**word** [3] - 134:4, 134:5, 155:4
**words** [7] - 25:12, 41:13, 49:7, 53:12, 68:25, 127:7, 129:8
**work-related** [4] - 53:13, 53:14, 70:25, 96:22

Appellate Case: 17-8092    Document: 01019955824    Date Filed: 03/08/2018    Page: 238

Case 1:17-cv-00017-NDF   Document 60-1   Filed 11/03/17   Page 57 of 57

Mestas v. Town of Evansville
17-CV-00017-NDF          Plaintiff's Brief in Opposition to Defendant's  Summary Judgment Motion          Exhibit F          16

**Workers'** [13] - 5:14, 29:19, 30:1, 30:18, 31:8, 51:2, 60:25, 61:3, 61:13, 63:11, 87:24, 88:6, 88:7
**workforce** [2] - 75:8, 145:5
**Workforce** [2] - 3:16, 138:13
**workplace** [4] - 144:25, 145:21, 146:3
**Works** [1] - 1:9
**works** [15] - 24:5, 31:25, 32:1, 32:16, 38:20, 38:24, 39:2, 39:13, 41:7, 41:11, 65:15, 73:17, 87:1, 101:10, 108:24
**wrench** [1] - 42:6
**write** [4] - 148:23, 149:6, 149:10, 149:25
**writing** [3] - 103:14, 125:22, 150:2
**written** [4] - 27:6, 27:7, 27:8, 52:11
**wrote** [6] - 125:21, 125:23, 134:12, 148:5, 149:9, 155:7
**WYOMING** [3] - 1:1, 1:17, 159:2
**Wyoming** [30] - 1:8, 2:4, 2:9, 4:4, 4:7, 4:9, 5:25, 6:6, 6:8, 6:16, 7:19, 12:7, 12:14, 18:25, 29:13, 29:19, 30:1, 30:18, 31:8, 61:5, 76:7, 83:2, 138:13, 138:25, 142:4, 142:14, 159:5, 159:5, 159:23

## Y

**Yakel** [10] - 64:18, 65:5, 67:15, 68:2, 68:10, 68:14, 68:22, 88:15, 98:22, 120:11
**yard** [2] - 35:9, 35:10
**year** [12] - 6:9, 15:6, 15:11, 19:17, 20:13, 28:8, 32:10, 54:2, 54:7, 140:15, 140:17, 141:2
**years** [7] - 19:6, 19:7, 59:21, 59:22, 80:2, 80:7, 80:8
**yelled** [1] - 148:21

**yelling** [1] - 49:5
**yesterday** [2] - 123:6, 123:17
**yourself** [8] - 18:24, 36:16, 36:20, 42:1, 47:21, 60:18, 97:8, 122:23

## Z

**zeros** [1] - 69:24



**FILED**

8:07 am, 11/21/17

**Stephan Harris**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

ROY MESTAS,

                Plaintiff,

vs.                                                         Case No:  17-CV-17-NDF

TOWN OF EVANSVILLE,

                Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment.  The Court has reviewed the motions, responses and heard oral argument.   The Court FINDS and ORDERS as follows:

### Background

Plaintiff Roy Mestas (Mestas) was employed by the public works department for Defendant Town of Evansville (Evansville) on September 12, 2012.  Mestas's primary responsibility was as the sanitation truck driver, but he also had other public works responsibilities.  On November 26, 2012, Mestas injured his back when he fell on the ice at work.  Mestas was on medical leave from November 26, 2012 until January 14, 2013, when he returned to work with no restrictions.

Mestas claims that when he returned to work, his supervisor, Dale Brown (Brown), engaged in a pattern of harassment, including extending his probationary

period, not allowing other public works employees to assist him, belittling him and harassing him.  On one occasion Mestas requested to use his personal snowblower for snow removal and Brown denied the request.

Brown terminated Mestas's employment on April 17, 2013.  Mestas then applied for, and received, Social Security Disability Insurance Benefits (SSDI) as of April 16, 2013.

## STANDARD OF REVIEW

Summary judgment is appropriate where the movant has demonstrated that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1207-08 (10th Cir. 2010). As a general matter, the summary judgment movant has the burden to produce evidence supporting its claims. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the movant does so, the burden of production shifts to the party opposing summary judgment to demonstrate a genuine issue of material fact exists. *Id*. At all times the Court must view the evidence in the light most favorable to the party opposing summary judgment. *Id.* at 1168. There is a genuine issue of material fact if a reasonable jury could find in favor of the non-moving party. *Id*. at 1169. In addition, the Court may only consider evidence that is admissible at trial, inadmissible evidence should be disregarded. *Johnson*, 594 F.3d at 1209.  "It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." *Gross v. Burggraf Const. Co.*, 52 F.3d 1531, 1541 (10th Cir. 1995)(citations omitted).

000720

## DISCUSSION

Mestas has three claims in his Amended Complaint against Evansville. (Doc. 32). Specifically, those claims are 1) discrimination based on national origin in violation of Title VII, 2) hostile work environment based on the Americans with Disabilities Act (ADA), and 3) retaliation in employment for taking medical leave for a disability in violation of the ADA.

Mestas filed a motion for partial summary judgment and Evansville filed a motion for summary judgment.  In his motion, Mestas asks the Court to find as a matter of law that (1) Mestas had an actual disability that was reasonably accommodated with medical leave, that Mestas's leave constituted protected conduct for purposes of his ADA retaliation claim; and (2) for purposes of his ADA hostile work environment claims, when he returned to work from his medical leave Mestas was disabled because he had a "record of" a disability based on his prior medical leave and his inability to work. (Doc. 52 [Pl's Motion for Partial Summary Judgment] at 2).  Evansville seeks summary judgment on all claims.  Evansville asserts that Mestas failed to establish any dispute of material fact to support his claims.  The Court will consider both these motion within the same discussion.

### 1.  National Origin Discrimination under Title VII

Mestas claims he was subjected to national origin harassment based on his Hispanic ethnicity.  He claims these actions affected a term, condition or privilege of employment that was so egregious it altered the working conditions of his employment

3

000721

and created a hostile work environment and that he was terminated after he complained to his supervisor, Brown.

In his charge before the EEOC Mestas claimed two instances when Brown used "dumb Mexican" or "stupid beaner" on February 22, 2013 and March 27, 2013. (Doc. 53-1 at 12-13 [Mestas depo. at 125-16]). He also testified that Brown used derogatory comments about other minorities groups on multiple occasions, and Mestas heard Brown make derogatory comments about Mexicans on at least six occasions. Mestas also recounted one time when Brown told Mestas and another Hispanic employee, Eric Reyna that he didn't need "you beaners going together". (*Id*. at 13 [Mestas depo. at 127]). Brown later apologized to Reyna, but not to Mestas. *Id*. Mestas did not talk to any Evansville officials about Brown's comments. (*Id*. [Mestas depo. at 128]). Mestas also believes there was one other time between February and April that Brown made a "beaner" or "Mexican" comment. (*Id*. [Mestas depo. at 129]). He also stated that he heard Brown make derogatory comments about Hispanics on at least six occasions, if not more. (Doc. 53-3 at 5).

Under Title VII, it is "'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "This includes an employee's claims of a hostile work environment based on race or national origin discrimination." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).

000722

The Tenth Circuit has explained that "Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir.2012) (internal quotes and citations omitted). "To survive summary judgment on a claim alleging a racially hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim "was targeted for harassment because of his race or national origin." *Hernandez v. Valley View Hosp. Ass'n,* 684 F.3d 950, 957 (10th Cir. 2012) (*citing Morris,* 666 F.3d at 664). "'The applicable test for a hostile work environment has both objective and subjective components. A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended' and both must be proved." *Hernandez*, 684 F.3d at 957 (citing *Morris*, 666 F.3d at 664).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*.

Mestas also claims he was terminated after making a complaint about these statements to Brown.  To establish a prima facie case of retaliation, Mestas must show he

5

engaged in protected opposition to discrimination, Brown took an adverse employment action against him, and a causal connection between the protected activity and adverse action exists. See *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (citing *Stover v. Martinez*, 382 F.3d 1064, 1070–71 (10th Cir. 2004)); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

### A.  Hostile Work Environment

There was another Hispanic employee who worked at the public works department during the time in question, named Eric Reyna.  Reyna testified that during 2012 to 2013 he heard comments about Mexicans maybe two or three times that he recalled.  (Doc. 59-7 at 11 [Reyna depo. at 36-37]).  He also testified that Brown apologized to him at one point for making a comment about Mexicans.  (*Id*.).  Reyna testified that he was involved in telling jokes about Mexicans in the workplace.  (*Id*. at 12 [Reyna Depo. at 41]).  Reyna also testified that he did not remember Brown telling any inappropriate jokes about minorities.  (*Id*. [Reyna Depo. at 41-42]).  Reyna did not remember Brown using the term "stupid beaner", only that he used the term "beaner" improperly three or four times during the four years he worked with Brown and once or twice in front of Mestas.  (*Id*. at 22-24 [Reyna depo. at 81-83, 86-87]).

Public works employee Ronald Emond testified that guys would joke around and he did not know if these jokes were made in Brown's presence.  He also testified that he did not remember if Brown participated in these jokes.  (Doc. 59-27 at 28 [Emond depo.]).

000724

Even accepting all of Mestas's claims as true, they represent offhand comments and isolated incidents. Mestas never informed anyone in city hall or any other city official of his complaints. Additionally, when Reyna indicated he was upset about Brown's comments, Brown apologized to Reyna and it does not appear that Reyna experienced any adverse employment action because of his complaints. Additionally, while Mestas was recording some of his conversations with Brown, he has failed to include any recorded conversation where Brown makes a racial remark.

While Brown may have been a bad boss, who was belittling and harsh to Mestas, Mestas has failed to establish that Brown created a hostile work environment based on prohibited racial grounds. For these reasons, Mestas's Title VII hostile work environment claim is DISMISSED.

## B. Title VII Retaliation

Mestas also claims retaliation in the form of termination based on his complaint to Brown about using the term "beaner". However, Mestas did not include this claim in his Amended Complaint. (Doc. 32). Mestas's Count 1 asserts a cause of action for discrimination based on national origin. The Amended Complaint does not indicate that Mestas engaged in protected activity or that he suffered an adverse employment action as a result of the protected activity. (Doc. 32 at 7-8).

However, both parties discussed this claim, so the Court will consider it briefly. Mestas appears to claim he was terminated in retaliation for complaining about the comments. To establish a prima facie case of retaliation, Mestas must show he engaged in protected opposition to discrimination, Brown took an adverse employment action

7

against him, and a causal connection between the protected activity and adverse action exists. *See Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (citing *Stover v. Martinez*, 382 F.3d 1064, 1070–71 (10th Cir. 2004)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

A causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)). "[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted).

Even if Brown terminated Mestas in retaliation for his protected activity of complaining about Brown's improper racial statements, Mestas has failed to show how he was damaged by the retaliation. "Causation in fact—i.e., proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim, see Restatement of Torts § 9 (1934) (definition of "legal cause"); § 431, Comment a (same); § 279, and Comment c (intentional infliction of physical harm); § 280 (other intentional torts); § 281(c) (negligence)." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.

8

Ct. 2517, 2524–25 (2013). "This includes federal statutory claims of workplace discrimination." *Id*. (citations omitted). "In the usual course, this standard requires the plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Id*. (citations omitted).

In this case, Mestas has alleged that starting April 16, 2013, he was no longer able to perform the essential functions of his job, specifically, that he was not able to engage in snow removal. Additionally, Mestas applied for and received total disability SSID benefits effective April 16, 2013. Based on these undisputed facts, Mestas cannot show any damages from his termination, because his total disability prevented him from working.

The Court finds that Mestas failed to establish facts that would support his claim for retaliation based on his complaints regarding Mestas's national origin. To the extent this claim existed in Mestas's Amended Complaint, it is DISMISSED.

### 2. Mestas's ADA Claims

In addition to his claims regarding Title VII, Mestas also claims Brown created a hostile work environment in violation of the ADA and that Brown retaliated against Mestas for taking medical leave for a disability in violation of the ADA.

As part of this claim Mestas asks the Court to find as a matter of law that (1) Mestas had an actual disability that was reasonably accommodated with medical leave, which constituted protected conduct for purposes of his ADA retaliation claim; and (2) for purposes of his ADA hostile work environment claim, when he returned to work from his medical leave Mestas was disabled because he had a "record of" a disability based on

9

his prior medical leave and his inability to work. (Doc. 52 [Pl's Motion for Partial Summary Judgment] at 2).

This case presents unique and unusual facts.  It appears that Mestas was working without any limitation or restriction, when he fell at work on November 24, 2012.  At that time, he immediately took medical leave.  Then on January 14, 2013, Mestas returned to work with no restrictions.  From January 14, 2013 to April 16, 2013, Mestas never provided any note from his doctor providing additional restrictions, nor does it appear he asked for accommodation.  It appears that on April 11, 2013, Mestas told Brown he was getting an injection in his back.  During this recorded conversation, Mestas did not indicate the need for reasonable accommodations.  Additionally, during this time period Mestas did not provide any information from his doctor that he had any restriction.  After his termination, Mestas applied for SSID benefits for total disability, effective April 16, 2013.  That request was granted and Social Security found Mestas was totally disabled and not able to work effective April 16, 2013.

The ADA was created "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). A person with a disability is defined as an individual who has "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Thus, the ADA is violated when a covered entity discriminates "against a qualified individual on the basis of disability in regard to job application procedures, the

000728

hiring, advancement, or discharge of employees, employee compensation, job training,

and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

> The ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Initially, we need to distinguish between the elements of an ADA retaliation claim and an ADA discrimination claim. To prosecute an ADA discrimination claim, a plaintiff must show that he is a "qualified individual with a disability." See *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003) (quoting 42 U.S.C. § 12112(a)). But to prosecute an ADA retaliation claim, "a plaintiff need not show that [ ]he suffers from an actual disability." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001). Rather, on this point, the plaintiff need only show that he had a reasonable, good-faith belief that he was disabled. *Id.*; see *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA . . . ." (quoting 42 U.S.C. § 12203(a))).

*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016).

**A. ADA Hostile Work Environment Claim**

Mestas claims Brown created a hostile work environment by belittling Mestas,

failing to provide him with assistance, and extending his probation period because of the

extended absence from work.  The standard for determining a hostile work environment

under the ADA is the same as a hostile work environment under Title VII.

"[A]s a threshold matter, any plaintiff asserting a claim under the ADA must

establish he or she is a 'qualified individual with a disability.'" *Lanman v. Johnson Cty.,

Kansas*, 393 F.3d 1151, 1156 (10th Cir. 2004) (citing 42 U.S.C. § 12112(a)).

"Disability" is defined by the ADA as "(A) a physical or mental impairment that

11

substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Mestas argues that when he returned to work in January 2013, he was a "qualified individual with a disability" because he had "a record of" disability based on his prior medical leave and his inability to work. Additionally, as part of his motion for partial summary judgment, Mestas asks the Court to find as a matter of law that Mestas had a "record of" disability based on his prior medical leave for purposes of his hostile work environment claim.

"In determining whether an impairment is substantially limiting such that it may support a record of disability under the ADA, the following factors are considered: '(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact" of the impairment.'" *McKenzie v. Dovala*, 242 F.3d 967, 972–73 (10th Cir. 2001)(quoting 29 C.F.R. § 1630.2(j)(2)). In considering these factors, the Court finds Mestas failed to establish he had "a record of" disability under the ADA.

Again, the Court would note that Mestas provided his medical records, but has not designated any expert testimony to explain his physical condition during the November 2012 to January 2013 timeframe. However, a review of the records demonstrates that Mestas did not undergo surgery or hospitalization related to his injury. Rather, he was treated with steroid injections, therapy, and pain management. (Doc. 52-7). Mestas was out for a relatively short period of time, approximately six weeks from November 24,

12

000730

2012 to January 14, 2013.[1]   Additionally, when Mestas returned to work on January 14, 2013, he returned to work with no restrictions, indicating no permanent or long term impacts from the prior injury.   In fact, Mestas's progress notes from January 9, 2013, represent that he was released back to work without restrictions, that he was feeling well, and that his progress was rated as excellent.   Doc. 52-7 at 3.

During the time from January 14, 2013 and April 17, 2013, Mestas did not provide Brown with any doctor's statement or order placing restrictions on the performance of his job duties.   There is no evidence that Mestas suffered from a disability during the time period of January 14, 2013 to April 17, 2013.   During this time, Mestas did not provide information to Brown that he was no longer able to perform the essential duties of his job, without reasonable accommodation.   Mestas testified that he informed Brown that he was getting a cortisone shot in his back, but this was not a request for a reasonable accommodation based on disability.   Again, Mestas did not provide a note from his doctor or any other information to Brown that his back was injured to the degree that Mestas was a qualified individual with a disability or that he required a reasonable accommodation to perform his essential job functions.

Mestas failed to establish that he was a "qualified individual with a disability" because he had a "record of a disability" as required to receive protection under the ADA. For all of these reasons, Mestas has failed to prove his hostile work environment claim under the ADA.

---

[1] In completing his continuing disability claim form on December 11, 2012, Mestas indicated that he did not think he would be released to work until March 1, 2013. (Doc. 52-7 at 61).  This appears to match initial estimate provided by his physician on the initial accident and health claim form submitted to Worker's Compensation.  (Doc. 52-7 at 70-71).

000731

### B.  ADA Retaliation

Mestas also claims Brown engaged in ADA retaliation for Mestas taking ADA protected medical leave.  Mestas claims after he took protected medical leave, Brown belittled Mestas, failed to provide him with assistance, and extended his probationary period because of the extended absence from work and ultimately terminated his employment.

 "To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Id.* at1186–87 (citations, quotation marks and brackets omitted).

In this case, Mestas claims he engaged in protected activity under the ADA by taking medical leave after he fell and injured his back from November 24, 2012 to January 16, 2013.  The Tenth Circuit has recognized that requests for limited leave for medical treatment may qualify as a reasonable accommodation under the ADA.  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002).  However, there is nothing in this case to suggest that Mestas's medical leave in this case was a protected activity under the ADA.

There is no evidence Mestas requested an accommodation of time off under the ADA to recover from his fall.  There is no evidence that Mestas took any steps to classify his medical leave from November to January as a reasonable accommodation.  At oral argument, Mestas's counsel argued that Mestas did not have to specifically invoke the

14

provisions of the ADA to be entitled to the protections of the ADA. However, Mestas has claimed retaliation under the ADA. Mestas has the burden of establishing that he engaged in a protected activity under the ADA. In explaining the distinction between leave under the Family Medical Leave Act (FMLA) and leave under the ADA, the regulations explain:

> ADA's "disability" and FMLA's "serious health condition" are different concepts, and must be analyzed separately. FMLA entitles eligible employees to 12 weeks of leave in any 12–month period due to their own serious health condition, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation. FMLA requires employers to maintain employees' group health plan coverage during FMLA leave on the same conditions as coverage would have been provided if the employee had been continuously employed during the leave period, whereas ADA does not require maintenance of health insurance unless other employees receive health insurance during leave under the same circumstances.

29 C.F.R. § 825.702. Mestas could not just "take" ADA leave as a reasonable accommodation without any notice or discussion with his employer. ADA leave as a reasonable accommodation is not mandatory or automatic, rather it is part of the accommodation discussion, which includes a determination of whether the leave poses a hardship to the employer. In this case, Mestas failed to present any evidence that his earlier leave was taken as part of an "accommodation" provided by Evansville for his back injury. There is no evidence in the record to support Mestas's claim that his medical leave from November to January was a protected activity under the ADA. For these reasons, Mestas cannot establish that he engaged in a protected activity under the ADA. As a result Mestas cannot establish a prima facie claim for retaliation under the ADA.

15

Finally, on the date of his termination, Mestas was not a qualified individual, because he was not able to perform the essential functions of his position. Mestas sought and received SSDI benefits, based on his claim that he was disabled, effective April 16, 2013. Therefore, any ADA claim related to his termination fails, because on the date of his termination, Mestas was no longer able to perform the essential functions of his position.

For all of these reasons, Mestas has failed to establish that he engaged in protected conduct under the ADA to support his claim for retaliation in violation of the ADA.

## CONCLUSION

For all the above stated reasons, the Court finds that Mestas has failed to establish a claim for hostile work environment and retaliation under Title VII. Additionally, Mestas has failed to establish he was a qualified individual with a disability under the ADA. For all of these reasons, the Court finds Mestas's Motion for Partial Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

IT IS ORDERED that Defendant's Motion for Summary Judgment (Doc. 53) is GRANTED.

IT IS FURTHER ORDERED that Mestas's Motion for Partial Summary Judgment (Doc. 51) is DENIED.

16

IF IS FINALLY ORDERED that Mestas's claims are DISMISSED WITH

PREJUDICE and that Judgment shall be entered in Defendant's favor.


Dated this __21st__ day of November, 2017.



_____

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE

17

**FILED**

**Stephan Harris**
**Clerk of Court**

1:33 pm, 11/21/17

# United States District Court
## For The District of Wyoming

ROY MESTAS,

                Plaintiff,

vs.                                                         Civil No. 17-CV-17-F

TOWN OF EVANSVILLE,

              Defendant.

## JUDGMENT IN A CIVIL ACTION

The Court having denied Plaintiff, Roy Mestas' Motion for Partial Judgment and having granted Defendant, Town of Evansville's Motion for Summary Judgment on Plaintiff's claims on November 21, 2017 and the Court having ordered that Plaintiff's Complaint be dismissed with prejudice.

Plaintiff, Roy Mestas, shall take nothing and Defendant, Town of Evansville is entitled to judgment in their favor on all claims asserted against it by Plaintiff.

Dated this 21st day of November, 2017.

_____
*Clerk of Court or Deputy Clerk*

000736

MEGAN L. HAYES, Wyo. Bar # 6-2891
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Telephone: 307-760-6258

Attorney for Roy Mestas

---

### IN THE UNITED STATES DISTRICT COURT, DISTRICT OF WYOMING

---

| | | |
|---|---|---|
| ROY MESTAS | ) | CASE NO. 17-CV-00017-NDF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF EVANSVILLE, a duly incorporated | ) | |
| Municipal Corporation under the laws of the | ) | |
| State of Wyoming, | ) | |
| | ) | |
| Defendant. | ) | |

---

### NOTICE OF APPEAL ON BEHALF OF
### PLAINTIFF ROY MESTAS

---

Plaintiff Roy Mestas, by and through undersigned counsel, hereby gives notice of

his appeal to the United States Court of Appeals for the Tenth Circuit from the Order

Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for

Partial Summary Judgment entered in this matter on November 21, 2017.

Submitted this 6th day of December, 2017.

BY:

/s/ Megan L. Hayes
Megan L. Hayes
Attorney for Plaintiff Roy Mestas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 6, 2017, I electronically filed the foregoing **NOTICE OF APPEAL ON BEHALF OF PLAINTIFF ROY MESTAS**, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

/s/ Megan L. Hayes

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3   _____

4   ROY MESTAS,                        DOCKET NO. 17-CV-017-F

5          Plaintiff,

6          vs.

7   EVANSVILLE, WYOMING,               Cheyenne, Wyoming
    a duly incorporated Municipal     November 20, 2017
8   Corporation under the laws of     8:30 a.m.
    the State of Wyoming,

9
           Defendant.

10

11  _____

                TRANSCRIPT OF HEARING PROCEEDINGS
12                    DISPOSITIVE MOTIONS

13      BEFORE THE HONORABLE NANCY D. FREUDENTHAL
                CHIEF UNITED STATES DISTRICT JUDGE

14  _____

15
    APPEARANCES:
16  For the Plaintiff:       MEGAN HAYES
                             Attorney at Law
17                           910 Kearney Street
                             Laramie, WY 82070

18
    For the Defendant:       THOMAS A. THOMPSON
19                           MacPHERSON KELLY & THOMPSON
                             616 West Buffalo Street
20                           P.O. Box 999
                             Rawlins, WY 82301

21

22  Court Reporter:          Janet Davis, RDR, FCRR, CRR
                             Federal Official Court Reporter
23                           2120 Capitol Avenue, Room 2226
                             Cheyenne, WY  82001
24                           (307)222-3147/jbd.davis@gmail.com

25  *Proceedings recorded by digital stenography; transcript
    produced with computer-aided transcription.*

2

1                              I N D E X

2
    ORAL ARGUMENT                                        PAGE
3

4       Mr. Thompson                                        3
        Ms. Hayes                                          16
5       Mr. Thompson                                       32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    3

1        (Proceedings commenced 8:30 a.m., November 17, 2017.)

2        COURTROOM DEPUTY:  In civil matter Case No.

3    17-CV-17-F, Mestas versus Evansville, Wyoming, et al., set

4    today for a dispositive motion hearing.

5      Counsel, please state your appearances.

6        MS. HAYES:  Megan Hayes for plaintiff Ray Mestas.

7        MR. THOMPSON:  Tom Thompson on behalf of the defendant

8    Town of Evansville.

9        THE COURT:  Good morning.  We're here on cross motions

10   for summary judgment.  We have a motion for partial by the

11   plaintiff, a motion for summary judgment as to all claims by

12   defendant.  Given the breadth of the defendant's motion, I

13   think I'll invite the defense to make its argument first.

14   Although both sides can reserve time, if time is reserved,

15   affording the plaintiff the last opportunity to argue.

16        Mr. Thompson.

17        MR. THOMPSON:  May it please the Court.

18        THE COURT:  Counsel.

19        MR. THOMPSON:  Counsel.  Your Honor, as I stated, I

20   represent the defendant Town of Evansville.  Evansville is a

21   Wyoming municipal corporation located in Natrona County,

22   Wyoming.  The plaintiff, Roy Mestas, was an employee of the

23   defendant Town of Evansville from September 24th, 2012, until

24   April 17th, 2013, when he was terminated from his employment.

25        On November 26th, 2012, Roy Mestas suffered an injury

DOCKET 17-CV-17-F                ARGUMENT - THOMPSON                        4

1    outside of the public workshop of the Town of Evansville and

2    he, thereafter, was off work for a period of time,

3    approximately six to seven weeks from that date of November

4    26th, 2012, until when he returned to work on January 14th,

5    2013.

6            Between that time period of the September work injury,

7    he did not have any contact with the Town.  The record is

8    devoid of any information being exchanged between Mr. Mestas

9    and the Town.  There's simply a note from a Dr. Yakel who

10   allegedly treated Mr. Mestas that he could not return to work

11   until further notice.

12           When he returns to work in January the following year,

13   he returns to work with a note from Dr. Yakel saying that he

14   can come back to work with no restrictions, so there is

15   absolutely nothing from the doctor when he returns to work

16   indicating that he should be on any sort of lifting

17   restrictions, bending restrictions, anything of that nature;

18   just says come back to work, full duty.

19           From the time that he returns to work in January of

20   2013 up until the time that he is terminated from his employer,

21   he does not present the Town of Evansville or any of its

22   supervisors with any sort of note from his doctor, work

23   restriction or order of any nature, which would indicate that

24   he had been reconsidered or that he needed to have some sort of

25   restrictions or modifications to his job duty.

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    5

1          Now, for the first time in the declaration that was

2   filed with the plaintiff's brief in opposition to the

3   defendant's summary judgment motion there's an allegation that

4   he reinjured his back sometime in April of 2013, but he did not

5   report that to his employer.  And the record in this case is

6   devoid of any notation, comment, document of any nature which

7   would indicate that he did go to Dale Brown, his supervisor, or

8   to Bryan Boettcher, his cosupervisor, or to anybody on the

9   public works crew and tell them that he had reinjured his back.

10         Mr. Mestas was a sanitation worker, and what that

11   comprised of, Your Honor, he basically drove a garbage truck.

12   He would get into the garbage truck and drive to various

13   locations within the Town of Evansville and pick up trash.  And

14   other individuals who were deposed as former -- excuse me -- as

15   employees of the Town of Evansville who had this position in

16   the past indicated that it was basically a one-man job.

17         Now, when Mestas returns to employment in January of

18   2013, of significance is that there's no changes whatsoever in

19   his job.  He has the same pay.  He has the same job duties.  He

20   has the same benefits.  He has, in fact, the same job.  There

21   is no reduction in his work tasks or responsibilities.  He

22   basically leaves in September as a sanitation truck driver;

23   comes back in January as a sanitation truck driver.

24         On May 3rd of 2013, Mestas files a claim with the EEOC

25   claiming discrimination based on national origin and

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    6

1   disability.  He states within that claim that he was, quote,

2   qualified for his job with the Town and was performing it

3   satisfactorily.

4           Now, the claim that he filed with the EEOC is filed

5   subject to the penalty of perjury, and Mr. Mestas signs that

6   claim and submits it to the EEOC.

7           On May 16th, 2013, approximately two weeks after he

8   files that claim, he turns around and files a claim for Social

9   Security Disability benefits asserting that he was disabled

10  from work, and he is actually awarded Social Security

11  Disability benefits as of April 16th, 2013, which is a day

12  prior to his termination.  And those award of benefits occurred

13  on April 14th, 2014.

14          The defendant's motion for summary judgment seeks

15  relief from the Court as to all three counts set forth in the

16  plaintiff's amended complaint; that is, relief from the claim

17  of discrimination based upon national origin, hostile work

18  environment based upon disability, and retaliation in

19  employment for taking protected medical leave for disability.

20          And I'll address the national origin claim first, Your

21  Honor.  The plaintiff has not only been deposed, the plaintiff

22  answered requests for admissions in this case and the

23  interrogatories.  And again, I would take you back to the EEOC

24  filing.  There are two incidents set forth in plaintiff's EEOC

25  filing that he alleges were the basis for his claim of

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    7

1    discrimination based upon national origin.  He indicates that

2    Dale Brown spoke the words "stupid beaner," or, "beaner," "dumb

3    beaner" on two occasions in that EEOC filing, on February 22nd,

4    2013 -- well, and March 27th, 2013.

5          In his deposition he is asked repeatedly by myself,

6    "Tell me about these incidents.  Tell me about what he said.

7    Tell me when he said what he said, and tell me exactly what it

8    was that he called you."  And Mr. Mestas adds one additional

9    incident involving Mr. Brown, so now we're up to three.  Again,

10   deposition testimony given under oath.

11         When he filled out his interrogatories, he then

12   indicates six different occasions, at least six different

13   occasions I believe is how it is phrased in his answers to

14   interrogatories, even though in his admissions he admits that

15   the use of these words "beaner" or "stupid beaner" only

16   occurred on two occasions.

17         So we do have a difference, at least from Mr. Mestas,

18   from initially when he fills out his EEOC complaint up

19   through -- bless you, Your Honor.

20         THE COURT:  Excuse me.

21         MR. THOMPSON:  -- up through his request -- excuse

22   me -- his answers to interrogatories and if you look at the

23   Cleveland versus Policy Management Systems Corp case, Your

24   Honor, which is cited at the end of our brief, defendant's

25   brief, it certainly stands for the proposition that a plaintiff

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    8

1    cannot create issues of material fact by contradicting prior

2    sworn testimony.  Regardless of whether it is two or three or

3    six, the Town of Evansville's position remains the same in that

4    it did not sufficiently meet the requirements as set forth by

5    case law in the Tenth Circuit which would suggest that this is

6    grounds for a Title VII claim.

7          Mr. Mestas never filed a grievance.  He never filed a

8    written complaint.  He never went to anybody at Town Hall.  He

9    never spoke to a council person.  He never spoke to the mayor.

10   He never spoke to the attorney.

11         What did he do?  On one occasion allegedly on April

12   1st of 2017, went to his supervisor Dale Brown and said, "I

13   don't appreciate those comments."

14         Again, Your Honor, as a basis for the Title VII claim,

15   there was no change whatsoever in Mr. Mestas' job duties or

16   responsibilities during this time frame when he alleges that

17   this discrimination occurred.  The case law is clear that the

18   plaintiff must establish that the workplace is permeated with

19   discriminatory intimidation, ridicule and insult in order for

20   it to reach the level that it meets the legal requirement that

21   the conduct complained of is sufficiently severe or pervasive

22   to alter the conditions of plaintiff's employment.

23         And the Court is directed in situations like this to

24   look at the totality of the circumstances.  Certainly it was

25   not pervasive, whether it is two comments or six.  It was not

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                        9

1   so egregious that it altered work conditions.  Again, Mr.

2   Mestas was a sanitation truck driver when he started and a

3   sanitation truck driver when he was terminated from employment

4   on April 17th, 2013.

5           And when you look, what we did, Your Honor, in filing

6   this brief is we took Mr. Mestas' sworn testimony, not only the

7   EEOC but the deposition testimony, the requests for admissions

8   and the interrogatories.  And when you look at the supporting

9   references in regards to plaintiff's opposition to summary

10  judgment and when you sort through those, specifically what

11  actually was said within the various depositions, I would

12  assert to the Court that it certainly does not go beyond those

13  six comments and probably is significantly less than that.

14          There -- when I was prepping for this argument, I was

15  again going through plaintiff's response.  And there's a

16  reference to Dan Adcock who was one of the coemployees.  And in

17  plaintiff's brief it states that Mr. Mestas used the

18  word "beaner" all the time, and that's quoted within

19  plaintiff's brief.

20          But when go you go to the deposition testimony of

21  Mr. Adcock --

22          THE COURT:  Mr. Mestas or Mr. Brown?

23          MR. THOMPSON:  Mr. Brown.  I'm sorry, Your Honor.  I

24  misspoke.

25          THE COURT:  No, that's fine.  Please proceed.

JANET DAVIS, RDR, FCRR, CRR                          jbd.davis@gmail.com

000747

DOCKET 17-CV-17-F            ARGUMENT - THOMPSON                    10

1          MR. THOMPSON:  When you go to the deposition testimony

2     of Mr. Adcock, what he talks about is him using it outside the

3     workplace, inappropriate but certainly not grounds for a Title

4     VII claim.  He was friends with Mr. Mestas.  He associated with

5     Mr. Mestas.  He said he heard him use it outside the workplace.

6     And then the follow-up question was, "How about in the

7     workplace?"  And he says, "No, I think I heard him say that

8     about one of the electricians that came and was doing some work

9     for the town."

10         So when you actually look at the number of times that

11    this happened, the employees do not support the suggestion of

12    the plaintiff that this was so egregious and it permeated the

13    workforce that it rose to the level of the grounds for a Title

14    VII claim.

15         Your Honor, the citation within our brief from

16    Faragher versus City of Boca Raton I think hits this right on

17    the head; the run-of-the-mill boorish, juvenile or boring

18    behavior that is not uncommon in the America workplace is not

19    the -- a Title VII hostile work environment claim.

20         That's exactly what we have here.  Mr. Mestas, his

21    comments, again, inappropriate, boorish, juvenile, do not rise

22    to the level that it created this pervasive environment where

23    this was so commonplace that it occurred all the time.

24         Taking the plaintiff's responses to requests for

25    admissions, responses to interrogatories, plaintiff's

DOCKET 17-CV-17-F                ARGUMENT - THOMPSON                        11

 1   deposition testimony, plaintiff's EEOC complaint as well as the

 2   other deposition testimony that has been provided to the Court

 3   certainly suggests that there are no issues of material fact

 4   other than those that Mr. Mestas attempts to create on his own

 5   that would preclude this Court from granting the defendant

 6   summary judgment in regards to the Title VII claim.

 7          Your Honor, the two other areas that are set forth in

 8   the plaintiff's complaint are -- at least one of them is

 9   hostile work environment based upon a disability, and as the

10   Court is well aware, under that particular cause of action the

11   plaintiff must show that he was a qualified individual with a

12   disability.  And I believe that in this instance what the

13   plaintiff attempts to move forward with is a record of

14   impairment to show disability.

15          Again, Mr. Mestas was off work between six and seven

16   weeks.  The injury which he sustained to his back certainly,

17   the time period for which he was off work suggests that it was

18   minor and transitory.  He returns to work with the Town of

19   Evansville on January 14th of 2013, with absolutely no work

20   restrictions, full return to duty to the position of sanitation

21   driver.

22          When he comes back, he presents the Town with a

23   medical release which indicates that he can return to work with

24   no restrictions.  That medical release does not contain any

25   information concerning whether plaintiff had a physical

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    12

1    impairment which substantially limited a major life activity.

2            And of significance in this case, Your Honor, is that

3    the plaintiff has failed to designate any medical experts,

4    neither the treating physician, Dr. Yakel, or any other doctors

5    who may be able to opine in regards to whether or not Mr.

6    Mestas had an impairment and what the results of that

7    impairment were.

8            And I would turn to 29 CFR for authority that even if

9    an impairment is there, not every impairment will constitute a

10   disability.  And there's reference to the 29 CFR in the

11   MacDonald versus City of New York case which is set forth in

12   defendant's brief.

13           The plaintiff also filed a claim for Social Security

14   Disability benefits, asserting he was totally incapable of

15   working commencing on April 16th, 2013.  So prior to April

16   16th, 2013, the date that the Social Security Administration

17   found him disabled, he did not have a physical impairment, at

18   least the record would suggest, which substantially limited him

19   from his ability to work, and therefore, he was not a qualified

20   individual with a disability of the physical impairment type

21   that's required by 42 USC 12102.

22           Your Honor, again, under record of impairment, the

23   plaintiff must establish by competent medical evidence that he

24   previously possessed a physical impairment that substantially

25   limited a major life activity.  Again, his injury was

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    13

1    transitory, six to seven weeks.  It was minor and he was

2    released without any restrictions.  The medical release did not

3    contain any information regarding his physical impairment or

4    how that physical impairment may have substantially limited a

5    major life activity as compared to the general population.

6            Your Honor, I'm going to move along with the hostile

7    work environment based upon a disability, and that's his third

8    claim in this case.  The Court is well aware of the

9    requirements for the plaintiff to meet the burden of proof to

10   show that a hostile work environment based upon a disability

11   occurred.  The Court can consider the frequency of the

12   discriminatory conduct, the severity, whether the conduct was

13   physically threatening, humiliating or a mere offensive

14   utterance, whether the conduct unreasonably interfered with the

15   plaintiff's work and what physiological harm, if any, resulted.

16           And again, defendant would assert that looking at the

17   totality of the circumstances plaintiff's claim fails as a

18   matter of law.

19           In regards to the retaliation portion of the claim, he

20   asserts that he was retaliated against for taking protected

21   medical leave for a disability in violation of 42 USC

22   12100(3)(b), yet he returns to work, and again, not to beat the

23   dead horse, but it is the same job, the same pay, the same

24   benefits, the same duties, the same scope of work.  And it is

25   plaintiff's burden in this instance to prove that the

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    14

1   termination of April 17th, 2013, was in retaliation for having

2   taken that medical leave five and a half months earlier.

3            Furthermore, Your Honor, the retaliation claim fails

4   because on April 17th, 2013, the date of Mr. Mestas'

5   termination, he was not qualified with a disability, able to

6   perform the essential functions of the job.  And this is

7   something that plaintiff has not been able to explain in the

8   response brief and simply asserts that, well, there's different

9   statutes under different statutory schemes and the Cleveland

10  versus Policy Management Systems Corp case I think addresses

11  that very argument and states that plaintiff cannot simply come

12  forward and say, well, it is different statutory schemes.

13  There has to be some rational explanation.  And why he is not a

14  qualified individual with a disability is if he files a Social

15  Security Disability claim and sets forth his allegation that

16  I'm totally disabled, and if there's a finding by the Social

17  Security Disability Administration that as of April 16th, 2013,

18  he's totally disabled and that his disability was present at

19  that time, then the disability was present at the time that he

20  was terminated.

21           And again, Your Honor, the Cleveland case stands for

22  the proposition that there's inconsistency here.  You have his

23  application for Social Security Disability and then you have

24  him working for the Town of Evansville at the time that this

25  finding of disability occurs from the Social Security

DOCKET 17-CV-17-F                ARGUMENT - THOMPSON                          15

 1   Administration.  So those inconsistencies logically defeat any

 2   implication that he is qualified to perform the essential

 3   functions of that job.

 4          Your Honor, the plaintiff also filed a motion for

 5   summary judgment, and I want to save a little bit of time for

 6   rebuttal, but I briefly want to touch on our response in

 7   opposition to that motion for partial summary judgment.

 8          What was submitted to the Court is an affidavit of a

 9   record keeper at a medical office in Casper, Wyoming, and

10   attached to that affidavit is 87 pages of medical records.

11   Again though experts have been designated for the plaintiff in

12   this case.  This is not evidence that would be available to the

13   jury.  Certainly record keeper could set foundation,

14   authenticity, but there's been no medical expert designated to

15   be able to testify as to the content of that record, and I

16   believe that the purpose of the records being submitted is that

17   there's argument within the brief about his medical treatment

18   and what it was for and the fact that he went to physical

19   therapy.

20          That is argument that's being proffered to the Court

21   by Ms. Hayes, and there's no medical expert if there's no

22   designation that will be able to come and testify with regard

23   to what his treatment was, what he received, what his condition

24   was, what his impairment was and whether or not he was

25   substantially limited to perform any major life activity.

DOCKET 17-CV-17-F              ARGUMENT - HAYES                        16

1      There's case law that certainly suggests that the

2 affidavit itself which contains or incorporates expert

3 testimony cannot be used unless the affiant themselves is

4 designated as an expert, and that did not, in fact, occur in

5 this case, Your Honor.  Therefore, for those reasons and those

6 reasons set forth in the response in opposition, I would

7 respectfully assert to the Court that the Court should deny

8 that motion.

9      Of course, if the Court grants our motion, that motion

10 is moot, and we would respectfully request that the Court grant

11 defendant's motion in regards to all three claims.

12      Answer any questions you might have, Your Honor.

13 Thank you.

14      THE COURT:  Thank you.

15      MS. HAYES:  Good morning, Judge Freudenthal.  May it

16 please the Court, Counsel.

17      THE COURT:  Counsel.

18      MS. HAYES:  Okay.  I just want to respond to some of

19 the arguments that Mr. Thompson made.  I believe that Mr.

20 Mestas has both put forward in his motion for partial summary

21 judgment a properly supported motion with his declaration, with

22 medical records that corroborate his receipt of medical

23 treatment that he sought and received medical treatment.  Also

24 in response to the Town's motion for summary judgment I believe

25 that Mr. Mestas has put forward enough information and evidence

DOCKET 17-CV-17-F                ARGUMENT - HAYES                           17

1   to withstand that motion for summary judgment.

2          So let me just first -- I know our motion for partial

3   summary judgment is going to be mooted if the Town's motion is

4   granted, but just on sort of the minor issue of the medical

5   records, those come in under rule 803.  Those are exceptions to

6   the hearsay rule.  Certainly there's statements in those

7   documents for purposes of obtaining medical treatment.  The

8   jury or the Court can read those records themselves.  You don't

9   need a medical expert to interpret what those records say for

10  you.  Mr. Thompson has repeatedly said in his briefs and here

11  at oral argument that we failed to designate a medical expert.

12  However, he never provides a citation for that requirement,

13  that Mr. Mestas here is required to have a medical expert

14  designated.

15         In fact, the regulations on the record of a disability

16  part of -- piece of showing that someone is disabled which is

17  are they actually disabled, do they have a record of an

18  impairment or are they regarded as, and this is supported

19  heavily in the brief that it doesn't require extensive medical

20  or scientific analysis.  It doesn't require competing experts

21  here to testify about Mr. Mestas' disability.

22         He was injured at work.  He sought medical treatment.

23  Mr. Thompson has repeatedly said that's a minor and transitory

24  problem.  That's not a defense that applies to either the

25  actual -- or the record of disability that is in the

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        18

1    regulations.  And we are now under the regime of the ADA, the

2    amendments to the ADA that were passed in 2008.

3           So Congress has tried to put the focus back on, you

4    know, not a major fight into whether this person has a

5    disability -- it certainly is a foundational requirement --

6    but, rather, the conduct of the employer in reacting or in

7    discriminating against this individual because of that

8    disability.

9           And I would say that this case is a perfect case for

10   why the ADA should apply.  Mr. Mestas was injured at work.  He

11   took time off for that injury.  He received medical treatment.

12   He came back.  He has a back injury.  The medical records will

13   show he has a back injury.  He has bulging disks.  He's

14   injured.  Anyone with a back injury can tell you, you know, it

15   is a problem.  It is not like it is a broken leg you get a cast

16   on, it is going to heal and you can go back to work.

17          It is something -- someone who has had a back injury

18   is always going to have to be careful with their back.  The

19   regulations make clear as well, a disability assessment of this

20   kind is a very individualized assessment.  You have to look at

21   that person in particular.

22          THE COURT:  Where Mr. Mestas came back, though, with

23   no restrictions, this isn't an individual who comes back with

24   his medical records to show workplace supervisors.  He doesn't

25   have lifting or bending or stooping restrictions.  How -- how

DOCKET 17-CV-17-F              ARGUMENT - HAYES                    19

1    can the ADA either characterize under this individualized

2    situation Mr. Mestas is either disabled or regarded as just

3    simply because he went in and came out in a relatively short

4    period following a workplace injury?  I'm having difficulty

5    tracking that where there's no doctor -- not so much that

6    there's no medical expert designated, but there's no doctor

7    telling the workplace that this individual needs anything.  He

8    comes back with no restrictions whatsoever, no limitations.

9           MS. HAYES:  Right.  So I guess the -- the facts here

10   in Mr. Mestas' situation -- and we have put those in his

11   declaration.  It is also in a recorded conversation in early

12   April with his supervisor that he's starting to experience this

13   back injury.  He has reinjured his back, so it is in his

14   declaration --

15          THE COURT:  The April reinjury?  Are you talking about

16   that?

17          MS. HAYES:  Yes, yes.

18          THE COURT:  It is my understanding that he advised

19   Mr. Brown that he needed to go in for steroid injections.

20          MS. HAYES:  Right, yes.

21          THE COURT:  But I don't know that -- is there any

22   indication that he told him that he had reinjured his back or

23   anything like that?

24          MS. HAYES:  Yes, I believe that's in that recording,

25   that he had -- he had mentioned that he has -- is having to go

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        20

1    back in for a steroid injection, that he's having -- and I

2    think I've quoted it in my brief.  I'm not sure what page it

3    is, but that it is to do with his back, it is -- you know, so,

4    yes, he came back to work -- I mean, in a way it can be, you

5    know -- cancer goes into remission.  Someone has a record of

6    disability.  They've been treated.  They come back to work.

7    They're in remission.  Everything is fine.  They can work fine.

8    Then it comes back.

9            I mean, it is very analogous to that situation.  He

10   has a record of a disability.  It is in remission, if you will.

11   He comes back.  He has a clean bill of health.  He reinjures

12   himself at work and needs further treatment.  He tells his

13   supervisor.  His supervisor says, "Yeah, yeah, yeah, take the

14   day off."  I don't think it is much different than -- it is not

15   like having an appendicitis:  You get your appendicitis out;

16   you're good to go.

17           THE COURT:  Where does the hostile work environment

18   play in?  He's granted the day off for the steroid injections.

19   Is it the fact that he was then terminated later that month?

20           MS. HAYES:  So the hostile work environment started

21   when he returned to work after his injury leave.  So he's

22   injured in November.  He comes back in January.  He's

23   immediately given a memo to sign to agree to extend his

24   probationary at-will status which also prevents him --

25   precludes him from activating the grievance procedure in the

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        21

1    Town of Evansville.  He has no way to file a grievance as a

2    temporary -- as a probationary employee.

3              It is at that point, Judge Freudenthal, when he comes

4    back that he is subjected to a hostile work environment.  So

5    from January 14th until he's terminated, the deposition

6    testimony of his co-workers is very clear that he was targeted

7    by Dale Brown after his injury after he came back to work.  He

8    was subjected to a very hostile work environment.  He was

9    isolated.  He was treated in a condescending manner.  He was

10   told to work alone.  He was not given help.  He was criticized

11   by Dale Brown for buying expensive parts that were never

12   authorized that Dale Brown could then never find receipts for

13   to corroborate those criticisms.

14             So I think that from the moment he returned to work

15   after his injury, he was subjected to a hostile work

16   environment.

17             Was that Title VII?  Was it because of his race?  Was

18   it because of his injury, that he had taken injury leave that

19   in the partial summary judgment motion has attempted to

20   establish that that was conduct protected by the ADA in that

21   period of time from -- for purposes of his ADA hostile work

22   environment from January 14th until he is terminated was a

23   hostile work environment.

24             THE COURT:  But let's talk a bit about this

25   circumstance where he receives this Social Security Disability.

1  Where are we with damages and how can -- how can his

2  termination relate to either national origin discrimination or

3  ADA discrimination when he is not a qualified individual

4  because of his disability as of the day before he was

5  terminated?  What -- how -- first of all, where are we with

6  damages?  It seems like there's no damages in this case where

7  Mr. Mestas has now been classified as disabled and receives

8  Social Security.

9          MS. HAYES:  So we did file an amended complaint and we

10  have taken economic damages -- we're not asserting a claim for

11  economic damages.  So this is a compensatory damages case only

12  for the discrimination that he was subjected to while he was

13  working for the Town of Evansville.

14          THE COURT:  So what are we talking about?  I mean,

15  what would a jury be asked to consider in terms of compensatory

16  damages?

17          MS. HAYES:  So the cap for compensatory damages for an

18  employer from zero to a hundred is $50,000.

19          THE COURT:  Well, apart from the cap, we need some

20  testimonial basis.  It can't be just pure speculation and just

21  a request from you to the jury that this is a number.  What --

22  what is he going to say, that but for these -- this national

23  origin discrimination and hostile work environment and

24  retaliation he wouldn't have these damages?  What are they?

25          I understood he hasn't -- whether he has sought

DOCKET 17-CV-17-F              ARGUMENT - HAYES                    23

1   counseling or not, he hasn't turned over any records to

2   substantiate that.  What -- what might he testify to that would

3   be reasonably compensated by a jury, apart from just appealing

4   to sympathy or prejudice?

5          MS. HAYES:  Well, I think that's what compensatory

6   damages are, to compensate you for the discrimination that you

7   experienced in the workplace.

8          THE COURT:  So what's he going to say?  I mean, what

9   is he actually going to testify to that this -- that -- how

10  this damaged him?

11         MS. HAYES:  I think it was humiliating.  I think it

12  drove him to a disabling back injury because he was afraid to

13  speak up and explain that he had reinjured his back and maybe

14  needed some help.  I think he's going to testify, and it

15  certainly is in his deposition, that he would go home, you

16  know, almost every night to his wife and complain how

17  humiliating it was.  I think that's the purpose of compensatory

18  damages, to -- to express to a jury how you were harmed sort

19  of, I guess, emotionally by the treatment you received.

20         And I -- the deposition testimony of his co-workers

21  also corroborates just how humiliating and how belittled he was

22  in the workplace.  Is that compensable?  Yes, it is

23  compensable.  Yes, it is.  If I'm a woman, if I'm discriminated

24  against in the workplace, I'm a lawyer; I can go get another

25  job.  I quit at whatever law firm; I go get another job.  Maybe

1    it is higher pay.  Do I have compensatory damages?  No.  Am I

2    entitled to damages for what I had to endure in the workplace

3    as a woman?  Absolutely I am.  That's why they have

4    compensatory damages.

5            What is he going to say?  He's going to testify to the

6    environment he was subjected to because he was injured, because

7    he was Hispanic, and it is absolutely for the jury to decide

8    what -- what level of damages he's entitled to based on that

9    three-month period of discriminatory treatment by Dale Brown.

10           I'm going to get a drink of water.

11           I think it is important to -- it is important to not

12   conflate the three different claims.  So he has a Title VII

13   hostile work environment claim.  He complained to Dale Brown on

14   April 1st, "Stop with the beaner remarks."  He's documented

15   that.  That would be -- you know, right there I feel like we're

16   being accused of trying to mislead the Court.  He certainly has

17   in his notepad two instances when Dale Brown made some "stupid

18   beaner" remark.  That is in February and again in March.

19           And then on April 1st he asked Dale Brown to stop with

20   the beaner remarks.  That would be a third.  He's not just

21   going to sort of out of the blue come to Dale Brown and say,

22   "Hey, stop with the beaner remarks," unless he makes another

23   one.

24           Eric Reyna testified that there were many comments,

25   "Nice job for a Mexican."  He was fired then on April 17th, so

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        25

1   that's for a jury to decide was that in retaliation for him

2   complaining?  Was that in retaliation for him asking to use a

3   snowblower because his back was bothering him?  So he has --

4   was the note that he was given the day after he came back to

5   work -- was that because, you know, he's Hispanic, because he's

6   Hispanic and has sustained this workplace injury?  The cases

7   we've cited in our brief are clear that -- at least the Herrera

8   versus Lufkin Industries case -- that's for a jury to sort out,

9   you know, where -- what's driving, what's the motivation behind

10  that adverse job -- adverse job action.

11          His hostile work environment claim requires him to

12  show that he is qualified for the job, which he was qualified

13  for that job up until April 16th when he could no longer -- and

14  we've -- we've said this -- he could no longer shovel snow.

15  His back injury was bad.  He couldn't shovel snow.  So he's

16  not -- as of April 16th he is not qualified to do that job.

17  We're not contending that he is.  There's not a conflict with

18  his Social Security application.

19          As of that date, he's not qualified.  But that doesn't

20  mean that he wasn't discriminated against by a hostile work

21  environment before that date or that he hasn't had an adverse

22  job action, which was that note, that memo from Dale Brown

23  telling him, "You need to sign this or you will be fired,"

24  extending his -- so he has an adverse job -- employment action

25  for purposes of his hostile work environment claim.

1          His last claim is an ADA --

2          THE COURT:  Does the case support that?  Does that --

3   the case deal with extending a probationary period because an

4   employee had essentially been off work for a portion of the

5   earlier period when it was running?

6          MS. HAYES:  I'm not sure I understand your question.

7          THE COURT:  Does the case that you cite, does it

8   concern extending a probationary period and characterize that

9   as an adverse employment action?

10         MS. HAYES:  No, I'm characterizing that as a --

11         THE COURT:  Well, do you have case law that supports

12  that?

13         MS. HAYES:  Well, I haven't found a case where that's

14  happened, so no.

15         THE COURT:  Well, you mentioned a case that I

16  misunderstood.  I guess I just wanted to clarify because you

17  mentioned a case and I thought, well, okay, maybe that's the

18  case that I was curious about.

19         MS. HAYES:  No, the case I was referring to is this

20  Herrera versus Lufkin and it is cited in our brief, 474 F.3d

21  675, where the Tenth Circuit reversed a summary judgment,

22  granted in the employer's favor to say no, no, there's enough

23  here -- there's enough evidence, you know, taking the facts in

24  the light most -- inferences in the -- I'm not saying it right,

25  but I don't need to tell you what the summary judgment standard

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        27

1    is.  There's enough there to go to the jury, that they properly

2    withstood a summary judgment motion.  It should not have been

3    granted.  I think I've analyzed that case in our brief.

4          But the facts here, I think, are even more egregious

5    than in the Herrera decision, that the discrimination was more

6    pervasive.  It was directed specifically at Mr. Mestas.

7          Is there a case that says extending one's probationary

8    period is an adverse employment action?  No, I didn't find a

9    case with those specific facts.  But it is.  How -- how can it

10   not be?  So you are extending someone's vulnerability, their

11   status as an at-will employee and depriving them of becoming a

12   permanent employee under the Town's handbooks that then gives

13   you access to benefits and grievance procedures and other job

14   protections.

15         So he's extending the period of time when he can

16   fire -- when Mr. Brown can fire Mr. Mestas for no reason.  And

17   that's an adverse job action.  The ADA retaliation claim,

18   harassment itself is an adverse job action, and you don't --

19   under his ADA retaliation claim you don't need to show you're

20   disabled.  That's why we moved for a partial summary judgment

21   on that his taking medical leave was an accommodation that's

22   protected by the ADA.  So having taken that protected leave, he

23   has then -- he's engaged in conduct protected by the ADA and

24   he, even though he may not be disabled at that time, is

25   protected from retaliation.

DOCKET 17-CV-17-F                ARGUMENT - HAYES                        28

1          And I think the record is very clear that he was

2    retaliated against.  He was singled out.  He was targeted when

3    he came back from his medical leave.

4          So the ADA retaliation claim is, you know, quite

5    separate and distinct from the hostile work environment claim.

6    It has different elements.  They don't conflict.  I don't think

7    I've tried to mislead the Court in any way about Mr. Mestas'

8    condition.  I provided the Court with his medical records which

9    the Court under Rule 803 is welcome to read.  I don't need a

10   medical expert and there's been no citation that says I have to

11   have a medical record -- medical expert for the Court to read

12   those records or the jury.

13         So I think the ADA retaliation claim is quite its own

14   stand-alone claim for purposes of Mr. Mestas' assertion of

15   retaliation for taking -- for engaging in conduct protected by

16   the ADA.

17         THE COURT:  Does he have to do anything more than just

18   take medical leave?  Wouldn't he have to identify that this

19   medical leave is reasonable accommodation for the circumstances

20   that he was facing or is medical leave -- taking medical leave

21   by itself without any characterization of that leave as

22   anything at all connected to ADA?  Is that your position, that

23   he doesn't have to -- he doesn't have to request that leave

24   under the ADA?

25         MS. HAYES:  I don't think that's a requirement, that

1    you have to request it under the ADA.  And I -- the cases that

2    I've cited certainly say that -- have held, many Tenth Circuit

3    cases, that taking leave to recover from a workplace injury is

4    a reasonable accommodation for an actual injury, for a

5    disability.  That is protected by the ADA.  It gives you -- it

6    gives the injured employee the opportunity to recover so that

7    they can return to work.  I think there are a number of cases

8    that I have cited that, you know, if an employee can't even

9    show up to work, that's substantially limiting a major life

10   activity.  They're entitled to a reasonable accommodation.

11        THE COURT:  Well, those are reasonable accommodation

12   matters.  This is a retaliation claim.  Is there a case where

13   someone just simply took medical leave and then was successful

14   in later connecting that as a basis for retaliation.

15        MS. HAYES:  I'd have to -- I'd have to go through the

16   cases.  I just -- I don't know that when people -- when someone

17   is injured that they go to their employer and they say, "Hi, I

18   would like leave under the ADA."  I mean, I'm certain that my

19   client did not know a thing about the ADA.  He drives a trash

20   truck, so he's not going to -- he's not going to go into his

21   employer and say, "Hi, I have rights protected under the

22   Americans with Disabilities Act, amendments especially as of

23   2008."  It is just not plausible.

24        Were these other -- I don't know, would that be fair

25   to require an injured employee to say to their employer, "I'm

DOCKET 17-CV-17-F              ARGUMENT - HAYES                    30

1  requesting reasonable accommodation for my injury under the

2  ADA"?  No, I don't think that's realistic.  Perhaps those cases

3  are those, but I would be surprised.

4         THE COURT:  Well, he wasn't denied medical leave, so,

5  granted, he doesn't have to designate it and then, you know,

6  have it denied or any of this.  But where you've got a

7  retaliation claim, retaliation for the exercise of rights, it

8  seems like that's slightly different in terms of the employee's

9  conduct post that exercise to know that that is, in fact, the

10 exercise of a right protected under federal law.

11        So this -- again, it is not the denial of the

12 accommodation, it is the retaliation for engaging in protected

13 activity.  And so if the -- if no one flags this as protected

14 activity, like it is obviously flagged if you -- you know, if

15 you pursue a claim or something like that, but -- so I was just

16 curious about your connecting the accommodation and the law on

17 accommodation to the retaliation.

18        MS. HAYES:  So I'm connecting it because I know the

19 law and Dale Brown should have connected it because he should

20 have been trained on what the law was.  Did he know what the

21 law was?  No, I don't think he knows what the law was.  He was

22 hired himself as a trash truck driver and came up through the

23 ranks, I guess, and became a supervisor.  Did he know that he

24 shouldn't have retaliated against somebody after they sustained

25 a workplace injury?  It certainly is illegal under the Wyoming

DOCKET 17-CV-17-F                ARGUMENT - HAYES                          31

1    Workers' Compensation Act to do that.

2              THE COURT:  Right, but we're not in Workers' Comp.

3              MS. HAYES:  I understand.  We're way beyond.  Mr.

4    Mestas was unrepresented when he would have -- could have

5    asserted a claim against the government entity.

6              But did Dale Brown know he couldn't retaliate against

7    someone for taking leave under the Workers -- I doubt it.  If

8    he's ignorant of the law does that excuse what he did?  No, I

9    don't think that's fair.  I don't think that's what the ADA

10   would allow, that simply because a supervisor doesn't

11   understand the legal requirements, then they're somehow excused

12   from knowing that their conduct was discriminatory.  I don't

13   think that's right.

14             I think that the ADA amendments of 2008 are very

15   clear, that, you know, whether someone knows the law or not is

16   not the issue.  This isn't a fault statute.  This isn't --

17   we're not looking at, you know, why -- what are the underlying

18   motivations:  When I made those jokes, when I made comments

19   with racial -- that had racist subjects to them, I was just

20   joking.  It doesn't matter that they're joking.  It is a

21   no-fault statute.  Their motivation is not controlling.  It is

22   that -- was that conduct subjectively and objectively

23   offensive.

24             And here, yes, it was.  I think both Mr. Mestas has

25   testified as well as his co-workers testified they were shocked

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    32

1    by how badly he was treated when he came back from his injury

2    leave.  And to your question -- am I going back up?

3           COURTROOM DEPUTY:  You are.  You are almost two

4    minutes over.

5           MS. HAYES:  Sorry.  I'm sorry, Judge Freudenthal.

6           I don't think whether Dale Brown knew what he was

7    doing violated the law is relevant, certainly not here at

8    summary judgment.  I think that the inquiry is is what he did

9    substantively and objectively offensive, and I think it was.

10          THE COURT:  All right.  Thank you.

11          MR. THOMPSON:  Your Honor, just a couple of points of

12   clarification.  You asked the question about a recorded

13   conversation that occurred between Dale Brown and Roy Mestas,

14   and what the record indicates in this case is that Roy Mestas

15   began secretly recording Dale Brown without Dale Brown's

16   consent, without Dale Brown's knowledge.  He would walk in and

17   start asking Dale Brown questions.  And there's a particular

18   recording where he comes in and he says, "I need to get an

19   injection in my back."  And Dale Brown says, and I'm

20   paraphrasing, something to the effect of, well, put it on the

21   calendar.

22          So the implication that at that point in time Roy

23   Mestas had told Dale Brown that, "I reinjured my back," is

24   certainly not my recollection of that recording.  Nor do I

25   recall any place in the record, deposition testimony or

DOCKET 17-CV-17-F              ARGUMENT - THOMPSON                    33

1  otherwise, where there's an indication that Roy Mestas goes to

2  his employer and says, "I reinjured my back."

3         I think this dovetails into the Court's questioning in

4  regards to adverse employment action, because certainly when

5  Roy Mestas was injured, he was off work and he was allowed to

6  be off work for that period of time.  When Roy Mestas came to

7  Dale Brown at least on this one occasion and asked Dale Brown

8  could he go to the doctor, there was no fight from Dale Brown

9  to say, "You're not going for your back.  Don't take any time

10 off."  He did what a reasonable employer would do, which is

11 mark it on the calendar and that was the end of discussion.

12        The first time that I can recall -- and I may have the

13 wrong -- the first and only time I can recall a reference to a

14 reinjury of his back after his return to employment without

15 restrictions is in the declaration that's attached to the

16 opposition -- the memo in opposition to summary judgment.  And

17 I would assert to the Court, to the best of my recollection and

18 my recall of the record, the employer absolutely had no idea

19 that Dale Brown had -- excuse me -- that Roy Mestas had

20 reinjured his back.

21        Your Honor, there is also the questions that you had

22 in regards to damages, and I've always struggled with this

23 issue -- and it may be more appropriate for a motion in limine,

24 but certainly there's no -- nobody that's been designated.

25 Economic damages are gone.  It is down to compensatory damages.

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    34

1   There was discussion in the deposition of the plaintiff whether

2   or not he had been to counseling, and I believe his testimony

3   was, "Although I've been to counseling, it was not for anything

4   that occurred at this -- at the Town of Evansville with this

5   employer."

6           Ms. Hayes stood up and told the Court that immediately

7   upon coming back to work he was subjected to this environment

8   that was so hostile that it is grounds for a claim under both

9   the ADA as well as Title VII.  And it is somewhat significant

10  that there's a recording -- again one of these secret

11  recordings that Roy Mestas made when he's going in and speaking

12  to Dale Brown, and I believe it is approximately four to five

13  weeks after he returns where he says, "I absolutely love this

14  job.  You know, I enjoy my job.  I love this job."

15          So certainly in the conversation or in the recording

16  that he was making there's not an indication he's been

17  subjected to this hostile work environment, at least in the

18  first five weeks that he returned from his leave.

19          So those are points of clarification, Your Honor.

20  Defendant would still rely upon the briefs submitted in this

21  matter and the memo in opposition to plaintiff's partial motion

22  for summary judgment.

23          THE COURT:  Could you address the -- this issue of

24  asking Mr. Mestas to sign the extension on the probationary

25  period?

DOCKET 17-CV-17-F          ARGUMENT - THOMPSON                    35

1         MR. THOMPSON:  Yes, Your Honor.  I don't believe it is

2    an adverse employment action.  And the reason why -- I don't

3    have any case law to tell you that it is not, but every single

4    employee that was deposed in this instance talked about

5    being -- and I think most of them began as sanitation drivers.

6    They come in.  They get on the truck.  They work on the truck

7    for a while, and then they go to different departments within

8    the Town of Evansville.

9         So every employee that's hired, including Dale Brown,

10   testified, "I was a probationary employee."  So they all come

11   on and they have this six-month period.

12        Why is it not inappropriate?  Because Roy Mestas comes

13   to work and shortly after he begins working he is injured on

14   the job and takes medical leave, so there is no ability for the

15   employee -- employer to evaluate his job performance.  So when

16   he comes back:  "Okay, you were only here for this many weeks

17   to begin with.  We're not going to automatically make you a

18   permanent employee.  We're going to evaluate your job

19   performance over this period of time, and you're going to be

20   subject to the six-month probationary period that everybody

21   else is."

22        Adverse employment action would be we're going to take

23   that six-month employment -- that six-month period and we're

24   going to extend it to nine months or we're going to do it for a

25   year.  But he was under the same sort of probationary status as

```
DOCKET 17-CV-17-F            ARGUMENT - THOMPSON                    36
```

 1  each and every other employee that came to work for the Town of

 2  Evansville.

 3          THE COURT:  All right.  Thank you.

 4          MR. THOMPSON:  Thank you, Your Honor.

 5          THE COURT:  I appreciate the arguments today as well

 6  as the briefing.  At this time I'll take the case under

 7  advisement and we'll be addressing it further in chambers with

 8  an order to follow.

 9          Is there anything else that might benefit the case by

10  way of a discussion today in terms of either of the schedule or

11  any update on settlement prospects?  From the defense?

12          MR. THOMPSON:  Nothing from the defense, Your Honor.

13          THE COURT:  All right.  For the plaintiff?

14          MS. HAYES:  Only to say that, yes, we have a proposed

15  settlement, but we're waiting for your ruling on summary

16  judgment to know if they'll even discuss it with us.

17          THE COURT:  So you've -- there's an offer out to the

18  defense?

19          MS. HAYES:  There is.

20          THE COURT:  Is that right?

21          MS. HAYES:  Well, there's not any longer.  I mean, the

22  offer --

23          THE COURT:  You've discussed just the process?  Have

24  you -- have you made a demand?

25          MS. HAYES:  Yes.

```
DOCKET 17-CV-17-F         ARGUMENT - THOMPSON                      37
```

1            THE COURT:  Okay.  That was my -- that was basically a

2   poorly phrased question.

3            MS. HAYES:  Yes.

4            THE COURT:  All right.  And for the defense, has there

5   been any response to the plaintiff's demand?

6            MR. THOMPSON:  Your Honor, the direction I received

7   was wait until the summary judgment arguments were ruled upon

8   before we approached the counteroffer.

9            THE COURT:   All right.  Thank you.

10            Anything else, Ms. Hayes, that would benefit the case

11   by way of a discussion today?

12            MS. HAYES:  Not that I can think of, but if there's

13   something I think of, I'm all ears.  But nothing at this point.

14            THE COURT:  Again.  Thank you for your arguments

15   today.  Have a good day.  Safe travels.  We'll stand in recess

16   until call.

17       (Proceedings concluded 10:11 a.m., November 17, 2017.)

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5           I, JANET DAVIS, Federal Official Court Reporter for

 6   the United States District Court for the District of Wyoming, a

 7   Registered Diplomate Reporter, Federal Certified Realtime

 8   Reporter, and Certified Realtime Reporter, do hereby certify

 9   that I reported by machine shorthand the foregoing proceedings

10   contained herein on the aforementioned subject on the date

11   herein set forth, and that the foregoing pages constitute a

12   full, true and correct transcript.

13

14           Dated this 7th day of February, 2018.

15

16

17

18

19                         /s/ Janet Davis

20           _____

21                   JANET DAVIS, RDR, FCRR, CRR
                     Federal Official Court Reporter
22

23

24

25
```

000776